IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
                                     :

In re:                                   :         Chapter 11

REMY WORLDWIDE HOLDINGS, INC., *et al.*,   :         Case No. 07 – 11481 (___)

             Debtors.                  :         (Jointly Administered)

------------------------------------------------------------x

## DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Douglas P. Bartner, Esq.
Fredric Sosnick, Esq.
Michael H. Torkin, Esq.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

- and -

Pauline K. Morgan, Esq. (No. 3650)
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
The Brandywine Building
P.O. Box 391
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# TABLE OF CONTENTS

Page

ARTICLE I

DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

Section 1.1. Defined Terms. ........................................................................................................ 1
Section 1.2. Rules of Interpretation and Computation of Time. ............................................. 17

ARTICLE II

UNCLASSIFIED CLAIMS

Section 2.1. Administrative Claims. ........................................................................................ 18
Section 2.2. Priority Tax Claims. ............................................................................................. 18
Section 2.3. Professional Fees. ................................................................................................ 18
Section 2.4. Prepetition Indenture Trustee Fees and Expenses. .............................................. 19
Section 2.5. Claims Under DIP Credit Agreement. ................................................................ 19

ARTICLE III

CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Section 3.1. Classification. ...................................................................................................... 19
Section 3.2. Treatment and Voting Rights of Claims and Equity Interests. ........................... 20
Section 3.3. Cram Down. ......................................................................................................... 24

ARTICLE IV

MEANS FOR IMPLEMENTATION OF THE PLAN

Section 4.1. Compromise of Controversies. ........................................................................... 24
Section 4.2. Guarantees. ........................................................................................................... 24
Section 4.3. Vesting of Assets. ................................................................................................. 24
Section 4.4. Continued Corporate Existence. ......................................................................... 24
Section 4.5. Cancellation of Notes, Instruments, Debentures and Equity Interests. .............. 25
Section 4.6. Cancellation of Liens. .......................................................................................... 25
Section 4.7. New Constituent Documents. ............................................................................. 25
Section 4.8. New Officers, New Employment Agreements. .................................................. 25
Section 4.9. Directors of the Reorganized Debtors. ............................................................... 25
Section 4.10. Corporate Action. .............................................................................................. 26
Section 4.11. Rights Offering. ................................................................................................. 27
Section 4.12. CVC Settlement Agreement. ............................................................................ 28
Section 4.13. Sources of Cash for Plan Distribution. ............................................................. 28
Section 4.14. Dissolution of RWHI. ........................................................................................ 28
Section 4.15. Restructuring Transactions. .............................................................................. 28
Section 4.16. Registration Rights. ........................................................................................... 29

ARTICLE V

TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 5.1. Assumption of Executory Contracts and Unexpired Leases. ............................ 29
Section 5.2. Claims Based on Rejection of Executory Contracts or Unexpired Leases. ........ 29
Section 5.3. Indemnification of Directors, Officers and Employees. .................................... 30
Section 5.4. Compensation and Benefit Programs. ............................................................... 30
Section 5.5. Termination of Advisory Agreement and Prepetition Equity Agreements. ........ 30

ARTICLE VI

PROVISIONS GOVERNING DISTRIBUTIONS

Section 6.1. Date of Distributions. ......................................................................................... 31
Section 6.2. Disbursing Agent. ............................................................................................... 31
Section 6.3. Mandatory Exchange Date. ................................................................................ 32
Section 6.4. Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........ 33
Section 6.5. Setoff and Recoupment. ..................................................................................... 33
Section 6.6. Surrender of Cancelled Instruments or Securities. ............................................. 33
Section 6.7. Lost, Stolen, Mutilated or Destroyed Debt or Equity Securities. ....................... 34
Section 6.8. Fractional Distributions. ..................................................................................... 34
Section 6.9. Manner of Payment Under Plan of Reorganization. .......................................... 34
Section 6.10. No Proofs of Claim Required. ......................................................................... 34

ARTICLE VII

PROCEDURES FOR RESOLVING DISPUTED CLAIMS

Section 7.1. Prosecution of Objections to Claims. ................................................................. 35
Section 7.2. Estimation of Claims. ......................................................................................... 35
Section 7.3. Payments and Distributions on Disputed Claims. .............................................. 35

ARTICLE VIII

CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE

Section 8.1. Conditions Precedent to Confirmation. .............................................................. 35
Section 8.2. Conditions Precedent to the Effective Date. ...................................................... 36
Section 8.3. Waiver of Conditions. ........................................................................................ 37
Section 8.4. Modification of Plan. ......................................................................................... 37
Section 8.5. Effect of Withdrawal or Revocation. ................................................................. 37
Section 8.6. Reservation of Rights. ........................................................................................ 37
Section 8.7. Substantial Consummation of Plan. ................................................................... 37

ARTICLE IX

EFFECT OF PLAN CONFIRMATION

Section 9.1. Binding Effect. .................................................................................................... 38

Section 9.2. Discharge of Claims. ................................................................................................ 38
Section 9.3. Releases. .................................................................................................................. 38
Section 9.4. Exculpation and Limitation of Liability. ................................................................. 40
Section 9.5. Injunction. ................................................................................................................ 40
Section 9.6. Term of Bankruptcy Injunction or Stays. ................................................................ 41
Section 9.7. Termination of Subordination Rights and Settlement of Related Claims. .......... 41
Section 9.8. Preservation of Rights of Action. ............................................................................ 41

ARTICLE X

RETENTION OF JURISDICTION

ARTICLE XI

MISCELLANEOUS PROVISIONS

Section 11.1. Payment of Statutory Fees. .................................................................................... 43
Section 11.2. Section 1145 Exemption. ...................................................................................... 43
Section 11.3. Governing Law. ..................................................................................................... 44
Section 11.4. Severability. ........................................................................................................... 44
Section 11.5. Inconsistency. ......................................................................................................... 44
Section 11.6. Filing of Additional Documents. .......................................................................... 44
Section 11.7. Service of Documents. .......................................................................................... 45
Section 11.8. Section 1125(e) of the Bankruptcy Code. ............................................................ 45
Section 11.9. Exemption from Certain Transfer Taxes. ............................................................. 45
Section 11.10. Tax Reporting and Compliance. ......................................................................... 46
Section 11.11. Schedules and Exhibits. ....................................................................................... 46
Section 11.12. No Prejudice. ....................................................................................................... 46
Section 11.13. Allocation of Payments. ...................................................................................... 46

# DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Remy Worldwide Holdings, Inc., Ballantrae Corporation, Western Reman Industrial, Inc., HSG I, Inc., HSG II, Inc., International Fuel Systems, Inc., iPower Technologies, Inc., M. & M. Knopf Auto Parts, L.L.C., Marine Corporation of America, NABCO, Inc., Power Investments Marine, Inc., Power Investments, Inc., Powrbilt Products, Inc., Publitech, Inc., Reman Holdings, L.L.C., Remy Alternators, Inc., Remy India Holdings, Inc., Remy International, Inc., Remy International Holdings, Inc., Remy Korea Holdings, L.L.C., Remy Logistics, L.L.C., Remy Powertrain, L.P., Remy Reman, L.L.C., Remy Sales, Inc., Remy Inc., Unit Parts Company, Western Reman Industrial, LLC, World Wide Automotive, L.L.C. and World Wide Automotive Distributors, Inc., debtors and debtors in possession in the above-captioned cases, hereby respectfully propose the following joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code. The only Entities entitled to vote on the Plan are the Holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims. Prior to voting to accept or reject the Plan, such Holders are encouraged to read the Plan, the accompanying Solicitation and Disclosure Statement, and their respective exhibits and schedules, in their entirety. No materials other than the Plan, the Solicitation and Disclosure Statement, and their respective exhibits and schedules have been authorized by the Debtors for use in soliciting acceptances or rejections of the Plan.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

Section 1.1. *Defined Terms.*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form in the Plan:

"9⅜% Subordinated Note Claims" means all Claims against any Debtor related to, arising out of, or in connection with, the 9⅜% Subordinated Notes and the 9⅜% Subordinated Note Indenture.

"9⅜% Subordinated Note Indenture" means the indenture, dated as of April 23, 2004, by and among RII, as issuer, certain direct and indirect subsidiaries of RII, as guarantors, and the 9⅜% Subordinated Note Indenture Trustee, together with all other agreements entered into and documents delivered in connection therewith.

"9⅜% Subordinated Note Indenture Trustee" means U.S. Bank National Association, as indenture trustee under the 9⅜% Subordinated Note Indenture, or any successor indenture trustee thereunder.

"9⅜% Subordinated Notes" means the 9⅜% senior subordinated notes due 2012 issued by RII under the 9⅜% Subordinated Note Indenture.

"11% Subordinated Note Claims" means all Claims against any Debtor related to, arising out of, or in connection with, the 11% Subordinated Notes and the 11% Subordinated Note Indenture.

"11% Subordinated Note Indenture" means the indenture, dated as of April 26, 2001, by and among RII, as issuer, certain direct and indirect subsidiaries of RII, as guarantors, and the 11% Subordinated Note Indenture Trustee, together with all other agreements entered into and documents delivered in connection therewith.

"11% Subordinated Note Indenture Trustee" means U.S. Bank National Association, as indenture trustee under the 11% Subordinated Note Indenture, or any successor indenture trustee thereunder.

"11% Subordinated Notes" means the 11% senior subordinated notes due 2009 issued by RII under the 11% Subordinated Note Indenture.

"Administrative Claims" means all Claims against any Debtor for costs and expenses of administration under section 503(b)(1) or 507(b) of the Bankruptcy Code, including for (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, (b) compensation for services and reimbursement of expenses under section 330(a) or 331 of the Bankruptcy Code, including Professional fees and expenses, (c) any indebtedness or obligations, other than under the DIP Credit Agreement, incurred or assumed by the Debtors during the Chapter 11 Cases, (d) fees and expenses described in Sections 2.3(b) and 2.4, (e) all fees and charges assessed against the Estates under 28 U.S.C. §§ 1911-1930 and (f) to the extent due and payable on the Effective Date, the CVC Settlement Amount.

"Advisory Agreement" means the advisory agreement, dated as of December 10, 2002, by and between the Debtors and CVCM LLC, as amended, modified or supplemented from time to time.

"Allowed" means, with respect to any Claim, such Claim or portion thereof: (a) as to which no objection or request for estimation has been Filed, no litigation has commenced, and the Debtors otherwise have assented to the validity thereof (and as to which a proof of claim has been properly and timely Filed to the extent required by the Plan or any order of the Bankruptcy Court); (b) as to which any objection or request for estimation that has been Filed has been settled, waived, withdrawn or denied by a Final Order; or (c) that is allowed (i) pursuant to the terms of a Final Order, (ii) pursuant to the terms of an agreement by and among the Holder of such Claim, the Steering Committee and the Debtors (or the Reorganized Debtors, as the case may be) or (iii) under the terms of the Plan.

"Assets" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

"Available Reorganized RII Common Stock" means 10,000,000 shares of Reorganized RII Common Stock.

2

"Backstop Commitment Agreement" means the agreement by and among the Debtors and the Committed Purchasers, annexed as Exhibit C to the Solicitation and Disclosure Statement, and in the form consented to pursuant to the IC Acknowledgment, as may be amended, supplemented or modified from time to time in accordance with the terms thereof, pursuant to which the Committed Purchasers have agreed to provide the Backstop Commitments.

"Backstop Commitments" means the Senior Note Backstop Commitment and the Subordinated Note Backstop Commitment.

"Ballot" means the ballot for voting to accept or reject the Plan prepared and distributed by the Debtors.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Petition Date, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases or any proceeding within, or appeal of an order entered in, the Chapter 11 Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms or the local rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases.

"Barclays" means Barclays Bank PLC.

"Business Day" means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

"Cash" means legal tender of the United States of America.

"Causes of Action" means all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment and claims, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances and trespasses of, or belonging to, the Estates, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or indirectly or derivatively, in law, equity or otherwise.

"Chapter 11 Cases" means the jointly-administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

"Chapter 11 Parties" means, collectively, (a) all Persons engaged or retained by the Debtors in connection with the Chapter 11 Cases (including in connection with the preparation of, and analyses relating to, the Solicitation and Disclosure Statement, the Plan, the DIP Credit Agreement and the Exit Facility Documents), (b) the Plan Support Parties, (c) the Committed Purchasers, (d) the Informal Committee, (e) the Steering Committee, (f) the Prepetition Agent,

(g) the Prepetition Indenture Trustees, (h) all Persons engaged or retained by the parties listed in (b) through (g) of this definition in connection with the Chapter 11 Cases (including in connection with the preparation of, and analyses relating to, the Solicitation and Disclosure Statement, the Plan, the DIP Credit Agreement and the Exit Facility Documents), and (i) any and all affiliates, members, managers, shareholders, partners, representatives, employees, attorneys, advisors and agents of any of the foregoing.

"Claim" means a claim as defined in section 101(5) of the Bankruptcy Code against any Debtor, whether or not asserted.

"Class" means a class of Claims or Equity Interests as set forth in Article III hereof.

"Committed Purchasers" means, collectively, the Senior Note Committed Purchasers and the Subordinated Note Committed Purchasers.

"Committee Professionals" means, collectively, Akin Gump Strauss Hauer & Feld LLP and Pepper Hamilton LLP, as legal advisors to the Informal Committee and the Steering Committee, and Houlihan Lokey Howard & Zukin Capital, as financial advisors to the Informal Committee and the Steering Committee.

"Confirmation Certificate" has the meaning set forth in the CVC Settlement Agreement.

"Confirmation Date" means the date upon which the Confirmation Order is entered in the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rule 5003.

"Confirmation Hearing" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1129 of the Bankruptcy Code.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Consent Fee" means an aggregate of $10 million to be paid on the Effective Date to the holders of Senior Notes, on a pro-rata basis.

"Court Square" means, collectively, CVCP LLC, CSA LLC, CSCL, CVCEP LP, CVCM LLC, CVCSSBEMF LP and CVCEXF.

"Covered Persons" means all directors, officers and other employees of the Debtors, as of the Petition Date, other than such directors, officers and other employees who are expelled or terminated for cause between the Petition Date and the Effective Date.

"CSA LLC" means Court Square Advisor, LLC.

"CSCL" means Court Square Capital Limited.

"CVCEP LP" means Citicorp Venture Capital Equity Partners, L.P.

"CVCEXF" means CVC Executive Fund LLC.

"CVCM LLC" means CVC Management LLC.

"CVC Noteholder Parties" means, collectively, the noteholders listed on the signature pages to the CVC Settlement Agreement.

"CVCP LLC" means CVC Partners LLC.

"CVC Released Debtor Parties" means, collectively, the Debtors, the Reorganized Debtors and all of their respective current and former shareholders, partners, directors, officers, employees, agents, advisors, attorneys, or representatives, and all of their respective heirs, representatives, predecessors, successors, and assigns.

"CVC Released Non-Debtor Parties" means, collectively, the CVC Releasors and all of their respective current and former shareholders, directors, officers, employees, agents, advisors, attorneys, and representatives, including all advisors to the Informal Committee and all of their respective heirs, representatives, predecessors, successors, and assigns.

"CVC Released Parties" means, collectively, the CVC Released Debtor Parties and the CVC Released Non-Debtor Parties.

"CVC Releasees" means Court Square and its respective current and former shareholders, partners, directors, officers, employees, agents, advisors, attorneys, or representatives, and all of their respective heirs, representatives, predecessors, successors, and assigns.

"CVC Releasors" means, collectively: (a) all Holders of Impaired Claims that (i) have voted to accept the Plan and (ii) have not affirmatively elected in the Ballot to decline to grant the releases set forth in Section 9.3(c); and (b) all CVC Noteholder Parties.

"CVC Settlement Agreement" means the settlement, support, forbearance, and release agreement, dated as of June 15, 2007, by and among: (a) Court Square; (b) the Debtors; and (c) the CVC Noteholder Parties, as amended, modified or supplemented from time to time in accordance with the terms thereof.

"CVC Settlement Amount" means the amount payable (if any) by the Debtors to Court Square pursuant to and in accordance with Section 5(a) of the CVC Settlement Agreement.

"CVCSSBEMF LP" means CVC/SSB Employee Fund, L.P.

"Debtors" means, collectively, RWHI, Ballantrae Corporation, Western Reman Industrial, Inc., HSG I, Inc., HSG II, Inc., International Fuel Systems, Inc., iPower Technologies, Inc., M. & M. Knopf Auto Parts, L.L.C., Marine Corporation of America, NABCO, Inc., Power Investments Marine, Inc., Power Investments, Inc., Powrbilt Products, Inc., Publitech, Inc., Reman Holdings, L.L.C., Remy Alternators, Inc., Remy India Holdings, Inc., RII, Remy International Holdings, Inc., Remy Korea Holdings, L.L.C., Remy Logistics, L.L.C., Remy Powertrain, L.P., Remy Reman, L.L.C., Remy Sales, Inc., Remy Inc., Unit Parts Company, Western Reman Industrial, LLC, World Wide Automotive, L.L.C. and World Wide Automotive Distributors, Inc., as debtors and debtors in possession in the Chapter 11 Cases.

"DIP Agent" means Barclays, as administrative and syndication agent under the DIP Credit Agreement, or any successor administrative agent thereunder.

"DIP Credit Agreement" means the $225 million debtor-in-possession credit agreement entered into as of the Petition Date by and among RII, and certain direct and indirect subsidiaries of RII, as borrowers, the DIP Agent, and the lenders party thereto, incorporating the terms and conditions set forth in the DIP/Exit Commitment Letter, as such credit agreement may be amended, supplemented or modified from time to time in accordance with the terms thereof and in a manner reasonably acceptable to the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee.

"DIP/Exit Commitment Letter" means the commitment letter attached as Exhibit I to the Solicitation and Disclosure Statement, and in the form consented to pursuant to the IC Acknowledgment, as such commitment letter may be amended, supplemented or modified from time to time in accordance with the terms thereof and in a manner reasonably acceptable to the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee, pursuant to which (a) the DIP Agent has agreed to enter into the DIP Credit Agreement and (b) the Exit Facility Agent has agreed to provide the Exit Facility.

"Disallowed" means, with respect to any Claim, such Claim or portion thereof that has been disallowed or expunged by a Final Order.

"Disbursing Agent" means the Debtors or the Reorganized Debtors, or any Person designated by the Debtors or the Reorganized Debtors (with the reasonable consent of the Steering Committee), in the capacity as disbursing agent under the Plan.

"Disputed" means, with respect to any Claim, such Claim or portion thereof as to which the Debtors or the Steering Committee have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or that otherwise is disputed by the Debtors in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order.

"DTC" means The Depository Trust Company.

"Effective Date" means the Business Day on which all conditions specified in Article VIII have been satisfied or, if capable of being waived, have been waived in accordance with Section 8.3.

"Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"Equity Interests" means all outstanding ownership interests in any of the Debtors, including any interest evidenced by common or preferred stock, membership interest, option or other right to purchase or otherwise receive any ownership interest in any of the Debtors, or any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

"Estates" means the estates of the Debtors created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and the rules and regulations promulgated thereunder.

"Existing Director" means any individual serving, as of the Petition Date (or at any subsequent date through the Effective Date), as a director of any of the Debtors.

"Existing Employee" means any individual employed by any of the Debtors as of the Petition Date (or at any subsequent date through the Effective Date) who is not an Existing Officer or Existing Director.

"Existing Officer" means any individual serving, as of the Petition Date (or at any subsequent date through the Effective Date), as an officer of any of the Debtors.

"Existing Personnel" means, collectively, the Existing Directors, the Existing Officers and the Existing Employees.

"Exit Facility" means the $330 million credit facility to be provided to Reorganized RII, pursuant to the terms and conditions of the DIP/Exit Commitment Letter.

"Exit Facility Agent" means Barclays, as administrative and syndication agent under the Exit Facility, or any successor administrative agent thereunder.

"Exit Facility Documents" means the agreements, notes, certificates, documents and instruments, and all exhibits, schedules and annexes thereto entered into in connection with the Exit Facility, substantially in the forms set forth in the Plan Supplement, each of which shall be reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee.

"File", "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court (or agent thereof) in connection with the Chapter 11 Cases.

"Final Order" means an order or judgment entered by the Bankruptcy Court: (a) which has not been reversed, stayed, modified, amended or revoked, and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived or (ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending; or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been Filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought and (ii) the time to appeal further or seek certiorari, further review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, further review, reargument, stay or rehearing is pending; *provided, however,* that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code, Rule 59 or 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be Filed with respect to such order or judgment.

"Floating Rate Secured Note Claims" means all Claims against any Debtor related to, arising out of, or in connection with, the Floating Rate Secured Notes and the Floating Rate Secured Note Indenture.

"Floating Rate Secured Note Indenture" means the indenture, dated as of April 23, 2004, by and among RII, as issuer, certain direct and indirect subsidiaries of RII, as guarantors, and the Floating Rate Secured Note Indenture Trustee, together with all other agreements entered into and documents delivered in connection therewith.

"Floating Rate Secured Note Indenture Trustee" means Deutsche Bank National Trust Company, as indenture trustee under the Floating Rate Secured Note Indenture, or any successor indenture trustee thereunder.

"Floating Rate Secured Notes" means the second-priority senior secured floating rate notes due 2009 issued by RII under the Floating Rate Secured Note Indenture.

"General Unsecured Claims" means all Claims that are not Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, Secured Credit Agreement Claims, Floating Rate Secured Note Claims, Senior Note Claims, Subordinated Note Claims or Subordinated Securities Claims.

"GM Agreements" means, collectively, (a) the accommodation agreement, dated as of July 30, 2007, entered into by and among General Motors Corporation, on behalf of itself and certain of its affiliates, and Remy Inc., on behalf of itself and certain of its affiliates, and (b) the access agreement, dated as of July 30, 2007, entered into by and among General Motors Corporation, on behalf of itself and certain of its affiliates, and Remy Inc., on behalf of itself and certain of its affiliates, in each case, as such agreement may be amended, supplemented or modified from time to time in accordance with the terms thereof and, at any time prior to the Effective Date, in a manner reasonably acceptable to the Requisite Committed Purchasers and the Steering Committee.

"Holder" means the beneficial holder of any Claim or Equity Interest.

"IC Acknowledgment" has the meaning set forth in the Plan Support Agreement.

"Impaired" means, with respect to a Claim or Equity Interest, such Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Informal Committee" means that certain committee composed of certain unaffiliated holders of Senior Notes and Subordinated Notes, as such committee may be reconstituted from time to time upon written notice to the Debtors.

"Intercompany Claims" means all Claims held by any Debtor against any other Debtor.

"Intercreditor and Subordination Agreement" means the intercreditor and subordination agreement by and among the Exit Facility Agent, on behalf of itself and the lenders under the Exit Facility, and the New Third-Lien Note Indenture Trustee, on behalf of itself and the holders of the New Third-Lien Notes, in substantially the form consented to pursuant to the IC

8

Acknowledgment and attached as Exhibit H to the Solicitation and Disclosure Statement, to be entered into on the Effective Date.

"Lien" means a lien as defined in section 101(37) of the Bankruptcy Code on or against any of the Debtors' property or the Estates.

"Mandatory Exchange Date" means, with respect to any Prepetition Indenture (or any Claims related thereto or arising thereunder), any Business Day selected by the applicable Prepetition Indenture Trustee as the date on which the surrender by the holders of any and all notes issued under such Prepetition Indenture (or giving rise to such Claims) shall occur, which Business Day shall be the Effective Date, or as soon as practicable following the Effective Date, but in no event later than the third Business Day following the Effective Date.

"New Constituent Documents" means (a) with respect to Reorganized RII, the Reorganized RII Constituent Documents and (b) with respect to any other Reorganized Debtor, the certificate of incorporation, formation or registration (including, if applicable, certificate of name change), articles of incorporation or association, memorandum of association, memorandum of continuance, charter, by-laws, or one or more similar agreements, instruments or documents constituting the organization or formation of such Reorganized Debtor, as amended and restated as of the Effective Date, in each case (i) amended and restated to, among other things, (x) prohibit the issuance of non-voting equity securities by such Reorganized Debtor to the extent required under section 1123(a)(6) of the Bankruptcy Code and (y) otherwise give effect to the provisions of the Plan, and (ii) in form and substance reasonably satisfactory to the Requisite Committed Purchasers, the Requisite Plan Support Parties, the Requisite Subordinated Note Committed Purchasers and the Steering Committee.

"New Employment Agreement" means an employment agreement by and between a New Employment Agreement Officer and Reorganized RII, to be entered into on, or as soon as practicable after, the Effective Date, in a form consistent with the term sheet attached as Exhibit F to the Solicitation and Disclosure Statement, a copy of which shall be included in the Plan Supplement and shall be reasonably satisfactory, in form and substance, to the Requisite Subordinated Note Committed Purchasers, the Requisite Committed Purchasers and the Steering Committee.

"New Employment Agreement Officers" means, collectively, John H. Weber, Jerry Mills, Kerry A. Shiba, David Muir, Jay Pittas and RII's chief financial officer, or such other individuals as the Debtors may select from time to time in consultation with the Requisite Subordinated Note Committed Purchasers, the Requisite Committed Purchasers and the Steering Committee.

"New Management Incentive Plan" means (a) the annual bonus plan, in substantially the form attached as Exhibit F to the Solicitation and Disclosure Statement, (b) the 2010 long-term incentive cash bonus plan, in substantially the form attached as Exhibit F to the Solicitation and Disclosure Statement, and (c) the restricted Reorganized RII Common Stock agreements, each in a form consistent with the term sheet attached as Exhibit F to the Solicitation and Disclosure Statement, copies of which shall be included in the Plan Supplement, and shall be reasonably

satisfactory, in form and substance, to the Requisite Subordinated Note Committed Purchasers, the Requisite Committed Purchasers and the Steering Committee.

"New Officers" means the officers of the Reorganized Debtors immediately following the Effective Date.

"New Third-Lien Note Indenture" means the indenture by and among Reorganized RII, as issuer, certain direct and indirect subsidiaries of Reorganized RII, as guarantors, and the New Third-Lien Note Indenture Trustee relating to the New Third-Lien Notes, the form of which shall be included in the Plan Supplement and shall contain terms substantially similar to those described in Exhibit G to the Solicitation and Disclosure Statement, which indenture shall be reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Senior Note Committed Purchasers and the Steering Committee.

"New Third-Lien Note Indenture Trustee" means The Bank of New York, as indenture trustee under the New Third-Lien Note Indenture, or any successor indenture trustee thereunder.

"New Third-Lien Notes" means the third-lien notes due 2014, to be issued pursuant to and in accordance with the New Third-Lien Note Indenture, in the original principal amount of $100 million.

"Other Priority Claims" means all Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims or Priority Tax Claims.

"Other Secured Claims" means all Secured Claims against any Debtor that are not Secured Credit Agreement Claims or Floating Rate Secured Note Claims.

"Outside Date" has the meaning set forth in Section 5(a)(iv) of the Plan Support Agreement.

"Person" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"Petition Date" means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

"Plan" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, as may be amended, supplemented or modified from time to time in accordance with the terms hereof, and in accordance with the terms of the Bankruptcy Code and the Bankruptcy Rules.

"Plan Documents" means the agreements, documents and instruments to be entered into as of the Effective Date as contemplated by, and in furtherance of, the Plan, which agreements, documents and instruments shall be reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee.

"Plan Supplement" means the compilation of documents and exhibits Filed not later than 10 days prior to the first date on which the Confirmation Hearing is scheduled to be held, as such

documents and exhibits may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules and the terms hereof, and which documents and exhibits shall be reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee.

"Plan Support Agreement" means the agreement, dated as of June 15, 2007, entered into by and among the Debtors and the Plan Support Parties, as may be amended, supplemented or modified from time to time in accordance with the terms thereof.

"Plan Support Party" means any Holder of an Impaired Claim that is party to the Plan Support Agreement, including by execution of an assumption agreement in substantially the form attached to the Plan Support Agreement.

"Prepetition Agent" means Wachovia Capital Finance Corporation (Central), as administrative agent under the Secured Credit Agreement, or any successor administrative agent thereunder.

"Prepetition Equity Agreements" means, collectively, the Prepetition Registration Rights Agreement, the STRH Agreement and the Prepetition Preferred Stockholders' Agreement.

"Prepetition Indentures" means, collectively, the Floating Rate Secured Note Indenture, the Senior Note Indenture, the $9\frac{3}{8}$% Subordinated Note Indenture and the 11% Subordinated Note Indenture.

"Prepetition Indenture Trustees" means, collectively, the Floating Rate Secured Note Indenture Trustee, the Senior Note Indenture Trustee, the $9\frac{3}{8}$% Subordinated Note Indenture Trustee and the 11% Subordinated Note Indenture Trustee.

"Prepetition Notes" means, collectively, the Floating Rate Secured Notes, the Senior Notes, the $9\frac{3}{8}$% Subordinated Notes and the 11% Subordinated Notes.

"Prepetition Preferred Stockholders' Agreement" means the preferred stockholders agreement, dated as of March 14, 2001, by and among RII, CSCL and the other parties thereto, as amended from time to time.

"Prepetition Registration Rights Agreement" means the registration rights agreement for common stock, dated as of March 14, 2001, by and among RII, CSCL and the other parties thereto, as amended from time to time.

"Priority Tax Claims" means all Claims against any Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Professionals" means (a) all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) all professionals or other entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

"Pro-Rata Share" means, with respect to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Claims, other than Disallowed Claims, in such Class.

"Registration Rights Agreement" means the registration rights agreement, in a form consistent with the term sheet attached as Exhibit E to the Solicitation and Disclosure Statement, a copy of which shall be included in the Plan Supplement and shall be reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Subordinated Note Committed Purchasers and the Steering Committee.

"Releasees" means, collectively, (a) the Existing Personnel and (b) the Chapter 11 Parties.

"Releasors" means, collectively: (a) all Holders of Impaired Claims that (i) have voted to accept the Plan and (ii) have not affirmatively elected in the Ballot to decline to grant the releases set forth in Section 9.3(b); and (b) all Plan Support Parties.

"Reorganized Debtor" means any Debtor (other than RWHI or any other Debtor that is dissolved prior to the Effective Date pursuant to Section 4.15) and any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

"Reorganized RII" means RII and any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

"Reorganized RII Board of Directors" means the board of directors of Reorganized RII.

"Reorganized RII By-Laws" means the amended and restated by-laws of Reorganized RII, in substantially the form set forth in the Plan Supplement, which shall (a) be reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Subordinated Note Committed Purchasers and the Steering Committee and (b) become effective on the Effective Date.

"Reorganized RII Certificate of Incorporation" means the amended and restated certificate of incorporation of Reorganized RII, in a form consistent with the term sheet attached as Exhibit D to the Solicitation and Disclosure Statement and in substantially the form set forth in the Plan Supplement, which shall be (a) filed with the Secretary of State of the State of Delaware on or about the Effective Date and (b) reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Subordinated Note Committed Purchasers and the Steering Committee.

"Reorganized RII Certificates of Designation" means, collectively, the Reorganized RII Series A Certificate of Designation and Reorganized RII Series B Certificate of Designation.

"Reorganized RII Common Stock" means the common stock of Reorganized RII, par value $0.0001 per share, 20,000,000 shares of which shall be authorized pursuant to the Reorganized RII Certificate of Incorporation, which common stock shall be the sole class of voting stock of Reorganized RII.

"Reorganized RII Constituent Documents" means, collectively, the Reorganized RII By-Laws, the Reorganized RII Certificate of Incorporation, and the Reorganized RII Certificates of Designation.

"Reorganized RII Preferred Stock" means, collectively, Reorganized RII Series A Preferred Stock and Reorganized RII Series B Preferred Stock.

"Reorganized RII Series A Certificate of Designation" means the certificate of designation in respect of the Reorganized RII Series A Preferred Stock, in substantially the form set forth in the Plan Supplement, which shall be reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Senior Note Committed Purchasers and the Steering Committee.

"Reorganized RII Series A Preferred Stock" means up to 27,000 shares of Reorganized RII Series A Preferred Stock, par value $0.0001 per share, with an initial liquidation preference of $1,000.00 per share, authorized pursuant to the Reorganized RII Certificate of Incorporation and the Reorganized RII Series A Certificate of Designation.

"Reorganized RII Series B Certificate of Designation" means the certificate of designation in respect of the Reorganized RII Series B Preferred Stock, in substantially the form set forth in the Plan Supplement, which shall be reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Subordinated Note Committed Purchasers and the Steering Committee.

"Reorganized RII Series B Preferred Stock" means 60,000 shares of Reorganized RII Series B Preferred Stock, par value $0.0001 per share, with an initial liquidation preference of $1,000.00 per share, authorized pursuant to the Reorganized RII Certificate of Incorporation and the Reorganized RII Series B Certificate of Designation.

"Reorganized Subsidiary Debtors' Boards of Directors" means, collectively, the boards of directors of each of the Reorganized Debtors, other than the Reorganized RII Board of Directors.

"Requisite Committed Purchasers" means the Committed Purchasers who collectively have committed to provide up to more than $42.5 million in connection with the Rights Offering, subject to the terms and conditions of the Backstop Commitment Agreement.

"Requisite Plan Support Parties" means each of the Requisite Senior Note Plan Support Parties and the Requisite Subordinated Note Plan Support Parties.

"Requisite Senior Note Committed Purchasers" means the Senior Note Committed Purchasers who collectively have committed to provide up to more than $12.5 million in connection with the Rights Offering, subject to the terms and conditions of the Backstop Commitment Agreement.

"Requisite Senior Note Plan Support Parties" means the Plan Support Parties holding in excess of 50% of the face amount of the Senior Notes.

"Requisite Subordinated Note Committed Purchasers" means the Subordinated Note Committed Purchasers who collectively have committed to provide more than $25 million in connection with the Rights Offering pursuant to Section 1(a)(i) and Exhibit A of the Backstop Commitment Agreement, subject to the terms and conditions of the Backstop Commitment Agreement.

"Requisite Subordinated Note Plan Support Parties" means the Plan Support Parties holding in excess of 50% of the face amount of the Subordinated Notes.

"Restructuring Transactions" has the meaning set forth in Section 4.15.

"Rights Offering" means the offering of Subscription Rights to the Holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims in accordance with the procedures set forth in the Subscription Approval Order.

"RII" means Remy International, Inc., a Delaware corporation (formerly known as Delco Remy International, Inc.), a debtor and debtor in possession in the Chapter 11 Cases.

"RII Equity Interests" means all Equity Interests in RII.

"RWHI" means Remy Worldwide Holdings, Inc., a Delaware corporation, a debtor and debtor in possession in the Chapter 11 Cases.

"RWHI Equity Interests" means all Equity Interests in RWHI.

"Secured Claims" means all Claims against any Debtor that are secured by a Lien on, or security interest in, property of such Debtor, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, but only to the extent of the value of the Holder's interest in such Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

"Secured Credit Agreement" means the Third Amended and Restated Loan and Security Agreement, dated as of December 27, 2005, by and among RII and certain of its subsidiaries, as borrowers, the Prepetition Agent and the other parties thereto, as amended, modified or supplemented from time to time, together with all other agreements entered into and documents delivered in connection therewith.

"Secured Credit Agreement Claims" means all Claims against any Debtor related to, arising out of, or in connection with, the Secured Credit Agreement.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Senior Note Backstop Commitment" means the commitment by the Senior Note Committed Purchasers to subscribe to any Senior Note Rights that remain unsubscribed to following the Rights Offering, subject to the terms and conditions of the Backstop Commitment Agreement.

"Senior Note Backstop Fee" means the amount payable to the Senior Note Committed Purchasers pursuant to and in accordance with Section 3 of the Backstop Commitment Agreement.

"Senior Note Cash" means Cash in an amount equal to (a) the aggregate amount of all Allowed Senior Note Claims *minus* (b) the original principal amount of the New Third-Lien Notes (*i.e.*, $100 million) *minus* (c) the Senior Note Postpetition Interest Amount.

"Senior Note Claims" means all Claims against any Debtor related to, arising out of, or in connection with, the Senior Notes and the Senior Note Indenture, including the right to receive the Consent Fee.

"Senior Note Committed Purchasers" means, collectively, Ore Hill Hub Fund, Ltd., Third Point, LLC, Group G Capital Partners, LLC, and/or one or more of their respective affiliates and permitted assigns under the Backstop Commitment Agreement.

"Senior Note Indenture" means the indenture, dated as of December 22, 1997, by and among RII, as issuer, certain direct and indirect subsidiaries of RII, as guarantors, and the Senior Note Indenture Trustee.

"Senior Note Indenture Trustee" means The Bank of New York, as indenture trustee under the Senior Note Indenture, or any successor indenture trustee thereunder.

"Senior Note Postpetition Interest Amount" means the dollar amount of interest, calculated at the non-default rate prescribed in the Senior Notes and the Senior Note Indenture, accrued on the Senior Note Principal Amount beginning on the day immediately following the Petition Date up to, but not including, the Effective Date.

"Senior Note Preferred Shares" means the number of shares of Reorganized RII Series A Preferred Stock, subject to an absolute cap of 2,000 shares, equal to the resulting quotient (rounded to the nearest whole number) of (a) the Senior Note Postpetition Interest Amount divided by (b) 1,000.

"Senior Note Principal Amount" means $145 million in principal amount owed in connection with the Senior Notes and the Senior Note Indenture.

"Senior Note Rights" means the non-transferable, non-certificated rights to subscribe for up to 25,000 shares of Reorganized RII Series A Preferred Stock, at the price of $1,000 per share, on the terms and subject to the conditions set forth in the Subscription Approval Order.

"Senior Notes" means the 8⅝% senior notes due 2007 issued by RII under the Senior Note Indenture.

"Solicitation and Disclosure Statement" means the solicitation and disclosure statement relating to the Plan (including any exhibits and schedules thereto) in the form consented to pursuant to the IC Acknowledgment, as such solicitation and disclosure statement may be amended, supplemented, or modified from time to time in a manner reasonably acceptable to the Requisite Plan Support Parties and the Steering Committee.