# SOLICITATION AND DISCLOSURE STATEMENT



### Solicitation of Votes with Respect to the
### Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of:

# REMY WORLDWIDE HOLDINGS, INC.
# AND
# EACH OF THE ENTITIES LISTED ON ANNEX I HERETO

### From Holders of Remy International, Inc.:

**8⅝% Senior Notes Due December 15, 2007**
**11% Senior Subordinated Notes Due May 1, 2009**
**9⅜% Senior Subordinated Notes Due April 15, 2012**

## THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING EASTERN TIME, ON OCTOBER 1, 2007, UNLESS EXTENDED

The Prospective Debtors hereby solicit from Holders of Remy International, Inc.'s 8⅝% Senior Notes due December 15, 2007, 11% Senior Subordinated Notes due May 1, 2009 and 9⅜% Senior Subordinated Notes due April 15, 2012, votes to accept or reject the Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code. All capitalized terms used herein shall have the meanings ascribed to them in Annex II hereto.[1] A copy of the Plan is attached hereto as Exhibit A.

---

[1] The Prospective Debtors, as defined in Annex II, shall be referred to herein collectively either as the "Debtors" or the "Prospective Debtors," and together with their non-Debtor affiliates as the "Company." The terms "we," "our" and "us" refer to the Company, the Debtors or the Prospective Debtors, as the context requires.

ONLY HOLDERS OF SENIOR NOTE CLAIMS, SUBORDINATED NOTE CLAIMS, SUBORDINATED SECURITIES CLAIMS AND EQUITY INTERESTS IN RWHI AND RII ARE IMPAIRED UNDER THE PLAN.

**HOLDERS OF GENERAL UNSECURED CLAIMS, INCLUDING HOLDERS OF PREPETITION TRADE CLAIMS, CUSTOMERS AND EMPLOYEES WILL NOT BE IMPAIRED BY THE PLAN, AND AS A RESULT (OTHER THAN FOR HOLDERS OF CLAIMS IN CONNECTION WITH CERTAIN REAL PROPERTY LEASES THAT THE PROSPECTIVE DEBTORS SEEK TO REJECT IN THE CHAPTER 11 CASES), THE RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PLAN. DURING THE CHAPTER 11 CASES, WE INTEND TO OPERATE OUR BUSINESS IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL OF OUR GENERAL UNSECURED CREDITORS, INCLUDING ALL TRADE CREDITORS, CUSTOMERS AND EMPLOYEES (BUT EXCLUDING CERTAIN LESSORS OF REAL PROPERTY THAT THE PROSPECTIVE DEBTORS EXPECT TO REJECT IN THE CHAPTER 11 CASES), OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.**

**VOTES ON THE PLAN ARE BEING SOLICITED ONLY FROM HOLDERS OF SENIOR NOTE CLAIMS AND SUBORDINATED NOTE CLAIMS – ONLY HOLDERS OF SUCH CLAIMS AS OF THE AUGUST 29, 2007 VOTING RECORD DATE ARE ENTITLED TO VOTE ON THE PLAN. VOTES ARE NOT BEING SOLICITED FROM HOLDERS OF EQUITY INTERESTS IN RWHI OR RII OR FROM ANY OF THE PROSPECTIVE DEBTORS' OTHER CREDITORS.**

**AS EXPLAINED BELOW IN GREATER DETAIL, THE PLAN SUPPORT PARTIES, WHICH ARE HOLDERS OF APPROXIMATELY 83% OF THE OUTSTANDING PRINCIPAL AMOUNT OF SENIOR NOTES AND APPROXIMATELY 80% OF THE OUTSTANDING PRINCIPAL AMOUNT OF SUBORDINATED NOTES, ALREADY HAVE AGREED TO VOTE TO ACCEPT THE PLAN, IN ACCORDANCE WITH THE TERMS OF THE PLAN SUPPORT AGREEMENT. THE BOARD OF DIRECTORS (OR THE EQUIVALENT AUTHORIZED BODY) OF EACH OF THE PROSPECTIVE DEBTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. THE BOARD OF DIRECTORS (OR THE EQUIVALENT AUTHORIZED BODIES) OF THE PROSPECTIVE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SUBMIT BALLOTS TO ACCEPT THE PLAN.**

The date of this Solicitation and Disclosure Statement is August 31, 2007.

**TABLE OF CONTENTS**

**Page**

GENERAL BACKGROUND .................................................................................................. 1
SUMMARY OF THE SOLICITATION AND PLAN .................................................................. 9
I.     VOTING PROCEDURES AND REQUIREMENTS ................................................................ 21
    A.    *Ballots* ............................................................................................................ 21
    B.    *Procedures for Casting and Deadlines for Voting on the Plan* ....................... 22
    C.    *Parties Entitled to Vote on the Plan* ............................................................... 23
    D.    *Counting of Ballots and Master Ballots for Determining Acceptance of the Plan* .......... 23
II.    RISK FACTORS ........................................................................................................ 26
    A.    *Risks Relating to the Chapter 11 Cases* ......................................................... 26
        1.    *General* ............................................................................................. 26
        2.    *Failure to Satisfy Vote Requirement* ................................................ 26
        3.    *Method of Solicitation* ...................................................................... 26
        4.    *Risks Associated with Resolicitation* ............................................... 27
        5.    *Classification and Treatment of Claims and Equity Interests* ........... 27
        6.    *Nonacceptance of the Plan—Confirmation by Nonconsensual "Cram Down"* .......... 28
        7.    *Certain Risks of Nonconfirmation or Delay of Confirmation* ........... 28
        8.    *Alternatives to Confirmation and Consummation of the Plan* ........... 29
        9.    *Risk of Nonoccurrence of the Effective Date* .................................. 29
        10.    *Termination Rights Under Material Restructuring Agreements* ......... 30
        11.    *Failure to Close the Exit Facility or to Successfully Complete the Rights Offering* .......... 31
        12.    *Availability of the DIP Facility and the Exit Facility* ......................... 32
        13.    *Inability to Assume Certain Contracts* .............................................. 32
    B.    *Factors Affecting the Value of the Securities to Be Issued Under the Plan of Reorganization* .......... 33
        1.    *Capital Requirements* ....................................................................... 33
        2.    *Variances From Projections* ............................................................. 33
        3.    *Recovery Percentages May Differ From Estimates* ........................... 33
        4.    *Lack of Trading Market for New Securities and Restrictions on Transfer of New Securities* .......... 34
        5.    *Dividends on New Securities* ............................................................ 34
        6.    *Ownership of Voting Stock* ............................................................... 34
        7.    *Ranking of Reorganized RII Stock* ................................................... 35
        8.    *Tax Treatment of Reorganized RII Preferred Stock* ......................... 35
    C.    *Risks Relating to the Company* ....................................................................... 36
        1.    *Leverage and Debt Service* ............................................................... 36
        2.    *Floating Rate Indebtedness* .............................................................. 37
        3.    *Prepetition Credit Agreement, Receivables Financing and Liquidity* ......... 37
        4.    *Enforcement of Defaults by Entities Not Party to the Plan Support Agreement* .......... 37
        5.    *Treatment of Trade Vendors and Other Unsecured Claims in the Chapter 11 Cases and Risk of Failure to Obtain Authority to Pay Their Claims in the Ordinary Course of Business* .......... 38
        6.    *Competition* ...................................................................................... 39

| | | 7. | Disruption of Operations and Retention of Key Customers and Employees | 39 |
| | | 8. | Rise in Costs of Raw Materials and Component Parts | 40 |
| | | 9. | Reductions in Profit Margins | 40 |
| | | 10. | Product Development and Technology | 40 |
| | | 11. | Cyclical Business Model | 41 |
| | | 12. | Longer Product Life | 41 |
| | | 13. | Industry Volatility | 41 |
| | | 14. | GM Agreements | 42 |
| | | 15. | Predetermined Product Pricing | 42 |
| | | 16. | Customer Issues | 42 |
| | | 17. | Core Liabilities | 44 |
| | | 18. | Global Supply Chain | 44 |
| | | 19. | Lean Manufacturing and Other Cost Saving Plans | 44 |
| | | 20. | Litigation | 44 |
| | | 21. | Product Liability, Warranty and Recall Claims | 45 |
| | | 22. | Intellectual Property | 45 |
| | | 23. | Goodwill and Other Identifiable Intangible Assets | 45 |
| | | 24. | Acquisitions, Sales and Other Major Transactions | 45 |
| | | 25. | International Operations | 46 |
| | | 26. | Domestic and Foreign Currency Fluctuation | 47 |
| | | 27. | Environmental and Health and Safety Liabilities and Requirements | 47 |
| III. | | | BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION | 49 |
| | A. | | Background | 49 |
| | B. | | Events Leading to Financial Distress | 49 |
| | C. | | Events Leading to the Proposed Financial Restructuring | 50 |
| | D. | | Equity Ownership and Debt Structure | 53 |
| | | 1. | Equity Ownership Structure | 53 |
| | | 2. | Debt Structure | 53 |
| IV. | | | THE BUSINESS | 56 |
| | A. | | General | 56 |
| | B. | | Corporate History | 56 |
| | C. | | Products | 56 |
| | D. | | Industry Overview | 57 |
| | E. | | Recent and Future Strategy | 59 |
| | F. | | Government Regulation | 61 |
| | G. | | Environmental, Health and Safety Matters | 61 |
| | H. | | Executive Officers | 62 |
| | I. | | Employees | 63 |
| | J. | | Properties | 64 |
| | K. | | Legal Proceedings | 64 |
| | L. | | Currency Hedging | 65 |
| V. | | | THE PLAN – CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION | 66 |
| | A. | | Overview of Chapter 11 | 66 |
| | B. | | Administrative Claims, Priority Tax Claims and Other Unclassified Claims | 66 |
| | | 1. | Administrative Claims | 66 |
| | | 2. | Priority Tax Claims | 66 |
| | | 3. | Professional Fees | 67 |
| | | 4. | Prepetition Indenture Trustee Fees and Expenses | 67 |
| | | 5. | Claims Under DIP Credit Agreement | 67 |
| | C. | | Classification of Claims and Interests | 68 |
| | D. | | Treatment of Claims and Interests | 70 |

|  |  | 1. | Treatment of Claims and Equity Interests | 70 |
|  |  | 2. | Confirmation Pursuant to 1129(b) of the Bankruptcy Code | 74 |
|  | E. |  | Means of Implementation of Plan | 74 |
|  |  | 1. | Compromise of Controversies | 74 |
|  |  | 2. | Guarantees | 74 |
|  |  | 3. | Vesting of Assets | 74 |
|  |  | 4. | Continued Corporate Existence and New Constituent Documents | 75 |
|  |  | 5. | Cancellation of Notes, Instruments, Debentures, Equity Interests and Liens | 75 |
|  |  | 6. | Directors and Officers of the Reorganized Debtors | 76 |
|  |  | 7. | Corporate Action | 77 |
|  |  | 8. | Sources of Cash for Plan Distribution | 78 |
|  |  | 9. | Restructuring Transactions | 78 |
|  |  | 10. | Registration Rights | 78 |
|  |  | 11. | Rights Offering | 79 |
|  |  | 12. | CVC Settlement Agreement | 79 |
|  |  | 13. | Dissolution of RWHI | 79 |
| VI. | RIGHTS OFFERING | | | 80 |
|  | A. |  | Section 1145 Exemption | 80 |
|  | B. |  | Motion to Approve Rights Offering | 80 |
|  | C. |  | Issuance of Subscription Rights | 80 |
|  | D. |  | Exercise of Subscription Rights | 81 |
|  | E. |  | Transfer and Revocation of Subscription Rights | 83 |
|  | F. |  | Backstop Commitment Agreement | 83 |
|  | G. |  | Use of Proceeds of the Rights Offering | 84 |
| VII. | DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN | | | 85 |
|  | A. |  | Description of GM Agreements | 85 |
|  | B. |  | Description of Exit Financing | 86 |
|  | C. |  | Description of the New Third-Lien Notes | 94 |
|  | D. |  | Description of Intercreditor Agreement | 96 |
|  | E. |  | Description of Reorganized RII Stock and Certificate of Incorporation | 96 |
|  |  | 1. | Description of Reorganized RII Preferred Stock | 96 |
|  |  | 2. | Description of Reorganized RII Common Stock | 98 |
|  |  | 3. | Description of Reorganized RII Certificate of Incorporation | 98 |
|  | F. |  | Description of Registration Rights Agreement | 101 |
|  | G. |  | Description of New Management Incentive Plan and the New Employment Agreements | 102 |
|  | H. |  | Description of CVC Settlement Agreement | 103 |
|  | I. |  | Description of Certain Retention Agreements with Financial Advisors | 105 |
| VIII. | POST-REORGANIZATION CAPITAL STRUCTURE | | | 107 |
| IX. | FINANCIAL PROJECTIONS AND VALUATION ANALYSIS | | | 108 |
|  | A. |  | Financial Projections | 108 |
|  | B. |  | Valuation | 119 |
|  |  | 1. | Valuation Overview | 119 |
|  |  | 2. | Methodology | 120 |
|  |  | 3. | Valuation of Reorganized Company | 121 |
| X. | LIQUIDATION ANALYSIS | | | 123 |
|  | A. |  | General | 124 |
|  | B. |  | Cash | 124 |
|  | C. |  | Trade Accounts Receivable | 124 |
|  | D. |  | Inventories | 125 |

|  | E. | Other Assets ................................................................................................................. 125 |
|  | F. | Goodwill ...................................................................................................................... 125 |
|  | G. | Investment in Subsidiaries ......................................................................................... 125 |
|  | H. | Property, Plant and Equipment .................................................................................. 125 |
|  | I. | Other Noncurrent Assets ............................................................................................ 125 |
|  | J. | Winddown Costs .......................................................................................................... 125 |
|  | K. | Other Professional Fees ............................................................................................. 126 |
|  | L. | Chapter 7 Trustee Fees .............................................................................................. 126 |
|  | M. | Secured Creditors ....................................................................................................... 126 |
|  | N. | Unsecured Creditors ................................................................................................... 126 |
| XI. | | CERTAIN OTHER LEGAL CONSIDERATIONS ................................................... 141 |
|  | A. | Solicitation of Votes Prior to Commencement of Chapter 11 Cases and Section 3(a)(9) of the Securities Act ................................................................. 141 |
|  | B. | Section 1145 of the Bankruptcy Code ........................................................................ 141 |
|  | | 1. Initial Offer and Sale of Securities .................................................................... 141 |
|  | | 2. Subsequent Transfers of Securities .................................................................... 141 |
|  | | 3. Subsequent Transfers Under State Law .............................................................. 142 |
| XII. | | THE PLAN – OTHER PROVISIONS ...................................................................... 144 |
|  | A. | Treatment of Executory Contracts and Unexpired Leases ........................................... 144 |
|  | | 1. Assumption and Cure of Executory Contracts and Unexpired Leases .............. 144 |
|  | | 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ 144 |
|  | | 3. Indemnification of Directors, Officers and Employees ...................................... 145 |
|  | | 4. Compensation and Benefit Programs ................................................................. 145 |
|  | | 5. Termination of Advisory Agreement and Prepetition Equity Agreements ......... 145 |
|  | B. | Provisions Governing Distributions ........................................................................... 145 |
|  | | 1. Date of Distributions ......................................................................................... 145 |
|  | | 2. Disbursing Agent ............................................................................................... 146 |
|  | | 3. Mandatory Exchange Date ................................................................................. 146 |
|  | | 4. Delivery of Distributions and Undeliverable or Unclaimed Distributions ........ 147 |
|  | | 5. Setoff and Recoupment ...................................................................................... 147 |
|  | | 6. Surrender of Cancelled Instruments or Securities ............................................. 147 |
|  | | 7. Lost, Stolen, Mutilated or Destroyed Debt or Equity Securities ....................... 148 |
|  | | 8. No Proofs of Claim Required ............................................................................. 148 |
|  | C. | Procedures for Resolving Disputed Claims ................................................................ 148 |
|  | | 1. Prosecution of Objections to Claims and Payments and Distributions on Disputed Claims ............................................................................................ 149 |
|  | | 2. Estimation of Claims ......................................................................................... 149 |
|  | D. | Conditions Precedent to Confirmation and Effective Date of the Plan ......................... 149 |
|  | | 1. Conditions Precedent to Confirmation .............................................................. 149 |
|  | | 2. Conditions Precedent to the Effective Date and Waiver of Conditions ............. 150 |
|  | | 3. Modification of Plan .......................................................................................... 151 |
|  | | 4. Effect of Withdrawal or Revocation and Reservation of Rights ........................ 151 |
|  | | 5. Substantial Consummation of Plan .................................................................... 152 |
|  | E. | Effect of Plan Confirmation ....................................................................................... 152 |
|  | | 1. Binding Effect .................................................................................................... 152 |
|  | | 2. Discharge of Claims .......................................................................................... 152 |
|  | | 3. Releases ............................................................................................................. 152 |
|  | | 4. Exculpation and Limitation of Liability ............................................................. 155 |
|  | | 5. Injunction .......................................................................................................... 155 |
|  | | 6. Term of Bankruptcy Injunction or Stays ........................................................... 156 |
|  | | 7. Termination of Subordination Rights and Settlement of Related Claims .......... 156 |

|       |      | 8.   | *Preservation of Rights of Action* ........................................ | 156 |
|       | F.   |      | *Retention of Jurisdiction* .................................................... | 156 |
|       | G.   |      | *Miscellaneous Provisions* ................................................... | 159 |
|       |      | 1.   | *Payment of Statutory Fees* ................................................. | 159 |
|       |      | 2.   | *Section 1145 Exemption* ..................................................... | 159 |
|       |      | 3.   | *Governing Law* ................................................................. | 159 |
|       |      | 4.   | *Severability* ...................................................................... | 159 |
|       |      | 5.   | *Inconsistency* .................................................................... | 160 |
|       |      | 6.   | *Section 1125(e) of the Bankruptcy Code* ............................ | 160 |
|       |      | 7.   | *Exemption from Certain Transfer Taxes* .............................. | 160 |
|       |      | 8.   | *Tax Reporting and Compliance* .......................................... | 160 |
|       |      | 9.   | *Schedules and Exhibits* ...................................................... | 161 |
|       |      | 10.  | *No Prejudice* ..................................................................... | 161 |
|       |      | 11.  | *Allocation of Payments* ...................................................... | 161 |
| XIII. |      |      | CERTAIN FEDERAL INCOME TAX CONSIDERATIONS ...................... | 162 |
|       | A.   |      | *Tax Consequences to the Company* ...................................... | 163 |
|       |      | 1.   | *Cancellation of Debt Income* ............................................. | 163 |
|       |      | 2.   | *Applicable High Yield Discount Obligations – Limitation on Interest Deductions* .......................................... | 164 |
|       |      | 3.   | *Section 382 Limitation* ...................................................... | 164 |
|       |      | 4.   | *Worthless Stock Deduction* ................................................ | 166 |
|       |      | 5.   | *Alternative Minimum Tax* ................................................... | 166 |
|       | B.   |      | *Tax Consequences to the Exchanging Senior Noteholders and Subordinated Noteholders* .................................................. | 167 |
|       |      | 1.   | *Exchange of the Senior Notes for New Third-Lien Notes, Cash and Subscription Rights and Subordinated Notes for Reorganized RII Common Stock and Subscription Rights* ..... | 167 |
|       |      | 2.   | *Reorganized RII Series A Preferred Stock* .......................... | 169 |
|       |      | 3.   | *Applicable High Yield Discount Obligations* ....................... | 171 |
|       |      | 4.   | *Original Issue Discount (OID)* ........................................... | 171 |
|       |      | 5.   | *Subsequent Sale of Reorganized RII Common Stock or New Third-Lien Notes* .............................................................. | 173 |
|       | C.   |      | *Backup Withholding* ........................................................... | 174 |
| XIV.  |      |      | THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS .............. | 175 |
|       | A.   |      | *Proposed Debtor in Possession Financing* ............................ | 175 |
|       | B.   |      | *First Day Orders* ............................................................... | 180 |
|       |      | 1.   | *Rights Offering Approval Motion* ....................................... | 180 |
|       |      | 2.   | *Provisions for Employees* ................................................... | 181 |
|       |      | 3.   | *Trade Vendors and Other Unsecured Creditors* ................... | 181 |
|       |      | 4.   | *Cash Management* .............................................................. | 181 |
|       |      | 5.   | *DIP Financing Motion* ....................................................... | 181 |
|       |      | 6.   | *Customer Programs* ........................................................... | 181 |
|       |      | 7.   | *Taxes* ................................................................................ | 181 |
|       |      | 8.   | *Utility Service* ................................................................... | 181 |
|       |      | 9.   | *Scheduling Order* .............................................................. | 182 |
|       | C.   |      | Second Day Orders .............................................................. | 182 |
|       |      | 1.   | *Assumption of the CVC Settlement Agreement* .................... | 182 |
|       |      | 2.   | *Rejection of Real Property Leases* ...................................... | 182 |
|       |      | 3.   | *Retention of Professionals* ................................................. | 182 |
| XV.   |      |      | CONFIRMATION ................................................................... | 183 |
|       | A.   |      | *Confirmation Hearing* ........................................................ | 183 |

      B.      *Requirements for Confirmation* ..................................................................... 183
      C.      *Class Acceptance of the Plan* ...................................................................... 183
      D.      *Cram Down* .................................................................................................. 184
      E.      *Plan Meets Requirements for Confirmation* ................................................ 184
            1.     *Best Interests of Creditors—Liquidation Analysis* ........................... 184
            2.     *Feasibility of the Plan* ....................................................................... 185
      F.      *Alternatives to Confirmation and Consummation of the Plan* ...................... 186
            1.     *Alternative Plans of Reorganization* ................................................. 186
            2.     *Dismissal of the Debtors' Chapter 11 Cases* .................................... 186
            3.     *Liquidation Under Chapter 7 or Chapter 11* ..................................... 187
RECOMMENDATION AND CONCLUSION ....................................................................... 188

ANNEXES

   I.  List of Prospective Debtors
  II.  Definitions

EXHIBITS

  A.  Plan of Reorganization
  B.  Plan Support Agreement (Redacted)
  C.  Backstop Commitment Agreement
  D.  Reorganized RII Certificate of Incorporation – Term Sheet
  E.  Registration Rights Agreement – Term Sheet
  F.  New Employment Agreements and New Management Incentive Plan – Forms and Term Sheets
  G.  Description of New Third-Lien Notes
  H.  Form of Intercreditor Agreement
  I.  DIP/Exit Commitment Letter
  J.  Financial Data for Quarter Ended March 31, 2007, Quarter Ended June 30, 2007 and Year Ended December 31, 2006
  K.  CVC Settlement Agreement
  L.  Reorganized RII Certificates of Designation

## GENERAL BACKGROUND

We negotiated the terms of the Plan with the Informal Committee and the Plan Support Parties.  As a result of such negotiations, the Plan Support Parties entered into the Plan Support Agreement, under which, among other things, the Plan Support Parties agreed, subject to the terms of the Plan Support Agreement, to vote to accept the Plan.  A redacted copy of the Plan Support Agreement (that removes the holdings of each individual Plan Support Party) is attached hereto as Exhibit B.  The Plan Support Parties have informed us that, as of the date of the Plan Support Agreement, collectively they held or controlled approximately 83% of the outstanding principal amount of the Senior Notes, approximately 75% of the outstanding principal amount of the 11% Subordinated Notes and approximately 84% of the outstanding principal amount of the 9⅜% Subordinated Notes.  As a result, approximately 83% of the dollar value of Class 6 Claims and 80% of the dollar value of Class 7 Claims have agreed to vote in favor of the Plan in accordance with the terms of the Plan Support Agreement.  The Term Sheet (contained in Exhibit B) sets forth the material terms of the financial restructuring agreed to between us and the Plan Support Parties, including the proposed distributions to be received by creditors pursuant to the Plan, the funding of the restructuring pursuant to the Plan, our proposed post-reorganization capital structure, selected corporate governance provisions, the Rights Offering and other key terms of the Plan.  The Plan Support Parties, RWHI and RII executed the IC Acknowledgement as of August 31, 2007, confirming that the transactions contemplated herein (even to the extent they may differ from the Term Sheet) are reasonably satisfactory.

**THE PLAN SUPPORT PARTIES SUPPORT THE PROPOSED FINANCIAL RESTRUCTURING DESCRIBED HEREIN AND HAVE AGREED TO VOTE TO ACCEPT THE PLAN, SUBJECT TO THE TERMS OF THE PLAN SUPPORT AGREEMENT.**

If the Plan is confirmed and becomes effective, (i) the Senior Notes would be exchanged, in full satisfaction of all obligations thereunder, for a pro-rata distribution of:  (a) New Third-Lien Notes, (b) the Senior Note Cash, (c) Senior Note Rights and (d) the Senior Note Preferred Shares; and (ii) the Subordinated Notes would be exchanged, in full satisfaction of all obligations thereunder, for a pro-rata distribution of:  (a) Available Reorganized RII Common Stock and (b) Subordinated Note Rights.  On the Effective Date, all Equity Interests in RWHI and RII and any Subordinated Securities Claims will be cancelled or extinguished.  All other classified Claims and Equity Interests that are Allowed will be Unimpaired.

We do not believe that Reorganized RII will be immediately subject to reporting requirements under the Exchange Act following the Effective Date.

As of the date hereof, none of the Prospective Debtors are under the jurisdiction of the Bankruptcy Court.  If we receive the requisite acceptances of the Plan from Impaired Noteholders in number and dollar amount to satisfy the requirements for acceptance of the Plan in accordance with the Bankruptcy Code, we intend to commence the Chapter 11 Cases and to seek confirmation of the Plan by the Bankruptcy Court promptly thereafter.  The confirmation of the Plan is subject to, among other things, judicial approval of this Solicitation and Disclosure Statement and the Plan.  If the Plan is confirmed by the Bankruptcy Court and the Effective Date

occurs, all Prepetition Noteholders (including, in each case, those who do not submit Ballots, those who submit Ballots to reject the Plan and those whose Ballots are rejected because they are illegible, incomplete or unsigned) will be bound by the Plan and the transactions contemplated thereby.

**DURING THE CHAPTER 11 CASES, WE INTEND TO OPERATE OUR BUSINESS IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL OF OUR GENERAL UNSECURED CREDITORS, INCLUDING ALL TRADE CREDITORS, CUSTOMERS AND EMPLOYEES (BUT EXCLUDING CERTAIN LESSORS OF REAL PROPERTY WHOSE LEASES THE PROSPECTIVE DEBTORS EXPECT TO REJECT IN THE CHAPTER 11 CASES), OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.**

We believe that confirmation of the Plan is in the best interests of creditors and other parties in interest, and, therefore, that the Plan should be confirmed. **The Prospective Debtors recommend that all eligible parties vote to accept the Plan.**

This Solicitation and Disclosure Statement and the Plan (and all exhibits, schedules and appendices hereto and thereto), the accompanying forms of Ballot and Master Ballot, and the related materials delivered together herewith are being furnished to Impaired Noteholders pursuant to section 3(a)(9) of the Securities Act and section 1126(b) of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the Plan (and the transactions contemplated thereby, as described herein). Directors, officers and employees of the Company may solicit exchanges from the Holders of Impaired Notes, but will not receive any additional compensation for such solicitations.

**The Voting Agent for the Plan is:**

**Financial Balloting Group LLC**
**757 Third Avenue, 3rd Floor**
**New York, NY 10017**
**Attn: Remy Ballot Processing**
**Tel: (646) 282-1800**

The Company's legal advisors are Shearman & Sterling LLP. They can be contacted at:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

Douglas P. Bartner, Esq.
Fredric Sosnick, Esq.
Michael H. Torkin, Esq.
Randy Martin, Esq.

The solicitation of votes on the Plan is being made in reliance on the exemption from the registration requirements of the Securities Act provided by section 3(a)(9) thereof. The Rights Offering only will be commenced after, and will be conducted pursuant to, an order of the Bankruptcy Court. Each of the new securities issued in accordance with the Plan (*e.g.* the Subscription Rights, the shares of Reorganized RII Preferred Stock, the shares of Reorganized RII Common Stock and the New Third-Lien Notes), will be issued pursuant to the exemption from the registration requirements of the Securities Act provided by section 1145 of the Bankruptcy Code.

**THIS SOLICITATION AND DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE NEW SECURITIES TO BE ISSUED ON THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SEC OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.**

**AS A RESULT OF THESE FACTORS AND THE TRANSFER RESTRICTIONS DESCRIBED HEREIN THERE LIKELY WILL NOT BE ANY LIQUID MARKET FOR THE NEW SECURITIES AND THERE CAN BE NO ASSURANCE THAT ANY MARKET WILL EVER DEVELOP. THE REORGANIZED DEBTORS WILL NOT BE OBLIGATED TO COMPLETE ANY PUBLIC OFFERING FOLLOWING THE EFFECTIVE DATE OF THE PLAN (OTHER THAN AS REQUIRED UNDER THE REGISTRATION RIGHTS AGREEMENT).**

**THIS SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION WITH RESPECT TO THE SUBSCRIPTION RIGHTS AND THE RIGHTS OFFERING DESCRIBED HEREIN. THE RIGHTS OFFERING WILL NOT BE CONDUCTED UNTIL SUCH TIME AS WE HAVE OBTAINED AN ORDER FROM THE BANKRUPTCY COURT AUTHORIZING THE COMMENCEMENT OF THE RIGHTS OFFERING AND THE PROCEDURES RELATED THERETO.**

**THIS SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PARTY DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.**

**EACH IMPAIRED NOTEHOLDER SHOULD REVIEW THIS SOLICITATION AND DISCLOSURE STATEMENT AND THE PLAN AND ALL EXHIBITS HERETO AND THERETO BEFORE CASTING A BALLOT. THIS SOLICITATION AND**

DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION.  WE BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED; HOWEVER, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THOSE DOCUMENTS AND AS OTHERWISE PROVIDED HEREIN.

THIS SOLICITATION AND DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING US AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS.  SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING THOSE SUMMARIZED HEREIN.

ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN, OR CONTEMPLATED BY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.  SUCH PROJECTIONS AND STATEMENTS ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE COMPANY AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY US, OUR ADVISORS OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED.  THERE CAN BE NO ASSURANCE THAT OUR ACTUAL ABILITY TO COVER OUR FUTURE PRINCIPAL AND CASH INTEREST PAYMENT OBLIGATIONS WILL NOT DIFFER FROM THE INFORMATION CONTAINED IN THIS SOLICITATION AND DISCLOSURE STATEMENT.

NEITHER OUR INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION OR THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY, NOR DO THEY ASSUME ANY RESPONSIBILITY FOR OR CLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION OR LIQUIDATION ANALYSIS.

FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS SOLICITATION AND DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PSLRA AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

**SEE THE SECTION ENTITLED "RISK FACTORS" OF THIS SOLICITATION AND DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN RISK FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.**

––––––––––––––––––––

All exhibits to this Solicitation and Disclosure Statement are incorporated into and are a part of this Solicitation and Disclosure Statement as if fully set forth herein.

No person has been authorized to give any information or make any representation on our behalf not contained, or incorporated by reference, in this Solicitation and Disclosure Statement or the Plan and, if given or made, such information or representation must not be relied upon as having been authorized.

The delivery of this Solicitation and Disclosure Statement shall not, under any circumstances, create any implication that the information it contains (or incorporates by reference from other documents or reports), is correct as of any time subsequent to the date hereof (or the date of a document or report incorporated by reference), or that there has been no change in the information set forth herein (or in a document or report incorporated by reference) or in our affairs since the date hereof (or thereof).  All statements contained in this Solicitation and Disclosure Statement are made as of the date hereof unless otherwise specified.

## COMPANY INFORMATION

Our corporate headquarters are located at 2902 Enterprise Drive, Anderson, Indiana  46013.  Our website is www.remyinc.com.  Information on our website is not a part of this Solicitation and Disclosure Statement, except to the extent that any such information expressly is incorporated herein.

On April 2, 2007, RII filed a Form 15 with the SEC terminating its reporting obligations under the Exchange Act.  As a result, certain information contained in our earlier public reports may no longer be accurate and should not be relied upon.  We are not obligated to update such information.

# SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Solicitation and Disclosure Statement contains statements relating to future results of the Company that are "forward-looking statements" as defined in the PSLRA or by the SEC in its rules, regulations and releases. Any statements set forth in this Solicitation and Disclosure Statement with regard to our expectations as to financial results and other aspects of our business may constitute forward-looking statements. These statements relate to our future plans, objectives, expectations and intentions, and may be identified by words like "believe," "expect," "may," "will," "should," "seek," or "anticipate," and similar expressions. We caution readers that any such forward-looking statements are based on assumptions that we believe are reasonable, but are subject to a wide range of risks including, but not limited to, risks associated with, (i) current or future defaults under our existing indebtedness as it pertains to our ability to complete the Solicitation, (ii) our failure to make required interest payments under our existing indebtedness and the continued effectiveness of forbearance agreements with respect to such payments during the solicitation period, (iii) future financial results and liquidity, including our continued ability to finance our operations in the normal course, (iv) various factors that may affect the value of the New Securities to be issued under the Plan, (v) our relationship with and payment terms provided by our trade creditors, (vi) additional financing requirements post-restructuring, (vii) the results of renegotiating certain key commercial agreements, (viii) future dispositions and acquisitions, (ix) our ability to continue to develop new products and services, (x) the effect of competitive products or pricing by our competitors, (xi) the rising costs of commodities, raw materials, and component parts, (xii) our ability to account for the impact of supply chain cost management initiatives, (xiii) our proposed restructuring and the costs associated therewith, (xiv) enterprise resource planning implementation risks, (xv) the amount of customs duty claims, litigation uncertainties and warranty claims, (xvi) the effects of conditions in the automotive industry on us and our operations, (xvii) foreign currency fluctuations, (xviii) costs related to resourcing and outsourcing products, (xix) the Rights Offering and the mechanics and commitments associated therewith, (xx) the continued effectiveness of material restructuring agreements, including the Plan Support Agreement, the Backstop Commitment Agreement and the DIP/Exit Commitment Letter, (xxi) our ability to obtain relief from the Bankruptcy Court in order to facilitate our ability to operate smoothly under chapter 11, (xxii) the confirmation and consummation of the Plan and (xxiii) each of the other risks identified in Article II "RISK FACTORS." Due to these uncertainties, we cannot assure readers that any forward-looking statements will prove to be correct. We are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events or otherwise; provided, however, we may be required to update or otherwise modify the information contained herein in order to comply with certain provisions of the Bankruptcy Code governing the solicitation of votes for acceptance of the Plan.

There may be events in the future that we are not able to predict accurately or over which we have no control. The risk factors listed in this Solicitation and Disclosure Statement under "Risk Factors," as well as any cautionary language contained in this Solicitation and Disclosure Statement, provide examples of risks, uncertainties and events that may cause actual results to differ materially from the expectations we describe in our forward-looking statements. Impaired Noteholders should be aware that the occurrence of the events described in these risk factors and

elsewhere in this Solicitation and Disclosure Statement could have a material adverse effect on our business, operating results and financial condition.

## SUMMARY OF THE SOLICITATION AND PLAN

*This summary does not contain all of the information that is important to you and is qualified in its entirety by the more detailed information included elsewhere in this Solicitation and Disclosure Statement and in the accompanying Plan.*

**Background Information:**    The Plan Support Agreement comprises an initial agreement that was entered into on June 15, 2007, and a series of amendments thereafter, including a final amendment dated August 1, 2007. We intend to effectuate the proposed financial restructuring through a prepackaged plan of reorganization (referred to herein as the Plan) in the Chapter 11 Cases.

Six Impaired Noteholders, who, as of June 15, 2007, together held approximately 83% of the outstanding principal amount of the Senior Notes and six Impaired Noteholders, who, as of June 15, 2007, together held approximately 80% of the outstanding principal amount of the Subordinated Notes, entered into the Plan Support Agreement and agreed, subject to the terms of the Plan Support Agreement, to vote to accept the Plan. We expect to commence the Chapter 11 Cases as soon as practicable after the Voting Deadline if we obtain the requisite number of votes for the Plan from Impaired Noteholders who submit votes. The Bankruptcy Code requires acceptance by creditors in each of Class 6 and Class 7 that hold at least two-thirds in dollar amount and a majority in number of allowed claims in their Class, in both cases counting only those claims actually voting to accept or reject the Plan. If such required votes are not obtained from the Impaired Noteholders, we may commence the Chapter 11 Cases and seek to "cram down" unconsenting creditors pursuant to section 1129(b) of the Bankruptcy Code. See Article XV. "CONFIRMATION."

**The Solicitation:**    We are soliciting votes to accept or reject the Plan from beneficial owners (or their legal representatives or nominees) of Senior Notes and Subordinated Notes. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS — Procedures for Casting and Deadlines for Voting on the Plan."

**Voting Record Date:**    Only Impaired Noteholders that are beneficial owners (or their legal representatives or nominees) as of the Voting Record Date, which has been set as the close of business on August 29, 2007, will be entitled to vote on the Plan. We reserve the right to establish a later Voting Record Date in the event that we decide to extend the Voting Deadline. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS — Procedures for Casting and Deadlines for Voting on the Plan."

| | |
|---|---|
| **Voting Deadline; Extension; Termination; Amendments:** | The Voting Deadline is 5:00 p.m., Eastern Time, on October 1, 2007. If the Voting Deadline is extended, the term Voting Deadline will mean the latest time and date as to which the Solicitation is extended. Any extension of the Voting Deadline, which the Debtors reserve the right to do subject to any consents required by the Plan Support Agreement, will be followed as promptly as practicable by notice of the extension by press release or other public announcement. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS—Procedures for Casting and Deadlines for Voting on the Plan." |
| **Voting Procedures:** | If you are a beneficial owner (or the legal representative of a beneficial owner) of Senior Notes or Subordinated Notes as of the Voting Record Date, you should deliver a properly completed Ballot to the Voting Agent or your Nominee, as applicable. In the event that you deliver a Ballot to a Nominee, your Nominee will be required to complete and submit a Master Ballot to the Voting Agent, on or before the Voting Deadline. Ballots submitted directly to the Voting Agent by registered Holders must also be received on or before the Voting Deadline. See Article I. "VOTING PROCEDURES AND REQUIREMENTS." |
| **Revocation or Withdrawal of Ballots:** | Except with respect to a Plan Support Party, upon the expiration or termination of this Solicitation, Impaired Noteholders and Nominees may not revoke or withdraw their Ballots and Master Ballots; <u>provided</u>, <u>however</u>, that prior to the expiration or termination of this Solicitation, Impaired Noteholders may withdraw any votes cast even if such votes have been delivered to the Voting Agent. The rights and limitations of the Plan Support Parties with respect to revocation or withdrawal of a Ballot are governed by the Plan Support Agreement. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS—Procedures for Casting and Deadlines for Voting on the Plan." |
| **Voting Agent:** | We have retained FBG as Voting Agent in connection with this Solicitation. Deliveries of Master Ballots and Ballots should be directed to FBG at the address set forth on the back cover page of this Solicitation and Disclosure Statement or to your Nominee, pursuant to the instructions contained in the Master Ballots and Ballots. See Article I. "VOTING PROCEDURES AND REQUIREMENTS." |

| | |
|---|---|
| **The Plan:** | As a general matter, in order for the Plan to become effective and for any distributions to be made thereunder, the Plan must, among other things, be confirmed by the Bankruptcy Court. For the Plan to be confirmed, votes to approve the Plan must be received prior to the Voting Deadline from Holders of Impaired Claims that constitute (i) at least two-thirds in amount of the Claims of the Holders in each Impaired Class of Claims who actually cast votes in respect of the Plan and (ii) more than one-half in number of the Holders of each Impaired Class of Claims who actually cast votes with respect to the Plan must be received prior to the Voting Deadline, and the Plan must be confirmed by the Bankruptcy Court. See Article XV.C. "CONFIRMATION—Class Acceptance of the Plan." The Plan may be confirmed by the Bankruptcy Court, however, so long as one Impaired Class of Claims votes to accept the Plan and the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code (as further described under Article XV.D. "CONFIRMATION—Cram Down"). The only Classes of Claims Impaired under the Plan are Class 6 – Senior Note Claims, Class 7 – Subordinated Note Claims, Class 8 – Subordinated Securities Claims and Class 9 – Equity Interests. Holders of Claims in Classes 1 through 5 are Unimpaired, and therefore are deemed to have accepted the Plan and therefore, are not entitled to vote on the Plan. Holders of Class 8 – Subordinated Securities Claims and Class 9 – RWHI Equity Interests are not entitled to receive any distributions under the Plan, and, as a result, are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. See Article I.C. "VOTING PROCEDURES AND REQUIREMENTS—Parties Entitled to Vote on the Plan." If the Plan is confirmed by the Bankruptcy Court: |

     (a)  With respect to Class 6 Holders of Allowed Senior Note Claims, such Holders will receive their Pro-Rata Share of (w) the New Third-Lien Notes, (x) the Senior Note Cash, (y) the Senior Note Preferred Shares and (z) the Senior Note Rights. Senior Note Rights shall be distributed on, or as soon as practicable after, the Subscription Commencement Date. New Third-Lien Notes and the Senior Note Cash shall be distributed on, or as soon as practicable after, the Effective Date. See Article V.D.1. "THE PLAN — CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION — Treatment of Claims and Interests — Treatment of Claims and Equity Interests."

<table>
<tr><td></td><td>(b) With respect to Class 7 Holders of Allowed Subordinated Note Claims, such Holders will receive their Pro-Rata Share of (x) Available Reorganized RII Common Stock and (y) the Subordinated Note Rights.  Subordinated Note Rights shall be distributed on, or as soon as practicable after, the Subscription Commencement Date.  Available Reorganized RII Common Stock shall be distributed on, or as soon as practicable after, the Effective Date.  See Article V.D.1. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Treatment of Claims and Interests—Treatment of Claims and Equity Interests."</td></tr>
<tr><td>**Effectiveness of the Plan:**</td><td>The Effective Date will not occur and distributions will not be made under the Plan unless the requisite votes to accept the Plan under the Bankruptcy Code have been received, the Plan has been confirmed by the Bankruptcy Court as satisfying the requirements set forth in section 1129 of the Bankruptcy Code and the other conditions to effectiveness set forth in Article VIII of the Plan have been satisfied.  We cannot assure you that the requisite votes to accept the Plan under the Bankruptcy Code will be received, that the Plan will be confirmed by the Bankruptcy Court, or that the other conditions to effectiveness of the Plan will be satisfied.  See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases."

If the Plan is confirmed by the Bankruptcy Court and becomes effective, every Holder of a Claim against or Equity Interest in the Debtors will be bound by the terms of the Plan, whether or not such Holder voted to accept the Plan.  See Article XII.E. "THE PLAN—OTHER PROVISIONS—Effect of Plan Confirmation."</td></tr>
<tr><td>**Treatment of Claims and Equity Interests:**</td><td>The table below summarizes each Class of Claims and Equity Interests in the Plan, the projected aggregate amount of Claims or Equity Interests comprising each Class, the treatment of each Class and the projected recoveries of each Class. The projected recoveries (if the Plan is approved) are based upon certain assumptions contained in the valuation analysis as set forth in Article IX.B. hereof and, in the case of recoveries on account of Allowed Subordinated Note Claims, are subject to dilution as a result of the implementation of the New Management Incentive Plan.  See Article V.D. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Treatment of Claims and Interests."</td></tr>
</table>

| Class/Type of Claims or Equity Interests | Projected Claims/Equity Interests | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Unclassified – Administrative Claims | The Prospective Debtors currently are unable to estimate the amount of Claims in this Class. | Paid in full in Cash. | N/A | 100% |
| Unclassified – Priority Tax Claims | The Prospective Debtors currently are unable to estimate the amount of Claims in this Class. | Paid in full in Cash, or treated in accordance with Bankruptcy Code section 1129(a)(9)(C). | N/A | 100% |
| Unclassified – DIP Credit Agreement Claims | Approximately $225 million (plus accrued and unpaid interest).[2] | Paid in full in Cash. | N/A | 100% |
| Class 1 – Secured Credit Agreement Claims | Present estimate is $0.[3] | In the event that such Claims are not paid in full out of the proceeds of the DIP Facility,[4] the Plan provides such Claims will be Paid in full in Cash.[5] | Unimpaired/ Deemed to Accept. | 100% |

---

[2]    We intend to seek authorization from the Bankruptcy Court to pay all outstanding amounts owed in connection with the Prepetition Credit Agreement out of proceeds of borrowings under the DIP Credit Agreement.  The estimated amount of DIP Credit Agreement Claims is based on the assumption that such authorization will be provided by the Bankruptcy Court.

[3]    We intend to seek authorization from the Bankruptcy Court to pay all outstanding amounts owed in connection with the Prepetition Credit Agreement upon the consummation of the DIP Credit Agreement and if such authority is granted there should be no Secured Credit Agreement Claims payable under the Plan.  If we do not obtain the required authorization, we estimate that Secured Credit Agreement Claims, as of the Petition Date, will total approximately $157.4 million (plus accrued and unpaid interest).

[4]    We intend to seek authorization from the Bankruptcy Court to pay all outstanding amounts owed in connection with the Prepetition Credit Agreement upon the consummation of the DIP Credit Agreement. The treatment summarized above will be provided only in the event that such authority to repay amounts outstanding under the DIP Credit Agreement is denied, or we do not otherwise repay such amounts, and the Class 1 Secured Credit Agreement Claims are not eliminated pursuant to section 3.1 of the Plan.  See Article III.D.2.(a) and section 3.1 of the Plan for a more detailed discussion of the treatment of Class 1 Secured Credit Agreement Claims.

[5]    Including all unpaid principal and accrued and unpaid interest thereon at the default rate (to the extent applicable) and any prepayment penalties, make-whole payments or other similar amounts that may be due and owing thereunder.

| Class/Type of Claims or Equity Interests | Projected Claims/Equity Interests | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Class 2 – Floating Rate Secured Note Claims | Approximately $125 million (plus accrued and unpaid interest). | The Plan provides such Claims will be Paid in full in Cash.[6] | Unimpaired/ Deemed to Accept. | 100% |
| Class 3 – Other Secured Claims | The Prospective Debtors currently are unable to estimate the amount of Claims in this Class. | Reinstated pursuant to section 1124(2) of the Bankruptcy Code. | Unimpaired/ Deemed to Accept. | 100% |
| Class 4 – Other Priority Claims | The Prospective Debtors currently are unable to estimate the amount of Claims in this Class. | Paid in full (in the ordinary course of business). | Unimpaired/ Deemed to Accept. | 100% |
| Class 5 – General Unsecured Claims | The Prospective Debtors currently are unable to estimate the amount of Claims in this Class. | Reinstated pursuant to section 1124(2) of the Bankruptcy Code. | Unimpaired/ Deemed to Accept. | 100% |
| Class 6 – Senior Note Claims | The Senior Note Claims shall be deemed Allowed in the aggregate, in the sum of (A) the Senior Note Principal Amount (*i.e.*, $145 million) (and the accrued and unpaid non-default rate interest thereon through the Effective Date) *plus* (B) the amount of the Consent Fee (*i.e.*, $10 million). | Will receive, on the Subscription Commencement Date, a Pro-Rata Share of the Senior Note Rights (to acquire up to 25,000 shares of Reorganized RII Series A Preferred Stock), and on or as soon as practicable after the Effective Date, a Pro-Rata Share of (i) the New Third-Lien Notes (*i.e.*, $100 million in principal amount), (ii) the Senior Note Cash (*i.e.*, approximately $65 million in cash, assuming an October 1, 2007 Petition Date) and (iii) the Senior Note Preferred Shares (*i.e.*, up to 2,000 shares of Reorganized RII Series A Preferred Stock). | Impaired/ Entitled to Vote. | 100%[7] |

---

[6]     Including all unpaid principal and accrued and unpaid interest thereon (to the extent applicable) and any prepayment penalties, make-whole payments or other similar amounts that may be due and owing thereunder.

| Class/Type of Claims or Equity Interests | Projected Claims/Equity Interests | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Class 7 – Subordinated Note Claims | Approximately $315 million (plus accrued and unpaid interest at the nondefault rates set forth in the 9⅜% Subordinated Note Indenture and the 11% Subordinated Note Indenture, *i.e.*, approximately $30 million assuming a Petition Date of October 1, 2007). | Will receive, on the Subscription Commencement Date, a Pro-Rata Share of the Subordinated Note Rights (*i.e.*, to acquire up to 60,000 shares of Reorganized RII Series B Preferred Stock) and on or as soon as practicable after the Effective Date, a Pro-Rata Share of Available Reorganized RII Common Stock (*i.e.*, 100% of the Reorganized RII Common Stock, subject to dilution with respect to the approximately 5% of such stock to be issued under the New Management Incentive Plan). | Impaired/ Entitled to Vote. | 36%[8] |
| Class 8 – Subordinated Securities Claims | The Prospective Debtors currently are unable to estimate the amount of Claims in this Class. | No recovery. | Impaired/ Deemed to Reject/Not Entitled to Vote. | 0% |
| Class 9 – RWHI Equity Interests | Approximately 2.5 million shares of common stock and 2.3 million shares of preferred stock. | No recovery. | Impaired Deemed to Reject/Not Entitled to Vote. | 0% |

[7]     In calculating the recovery to be received by Holders of Class 6 Senior Note Claims, a *de minimis* value has been attributed to the Subscription Rights that will be allocated to the Holders of such Claims.

[8]     In calculating the recovery to be received by Holders of Class 7 Subordinated Note Claims, a *de minimis* value has been attributed to the Subscription Rights that will be allocated to the Holders of such Claims. The calculation of the recovery by Holders of Class 7 Subordinated Note Claims assumes a petition date of October 1, 2007.

| | |
|---|---|
| **Distribution Date:** | Other than the Subscription Rights, distributions to be made under the Plan generally will be made as of the Effective Date, or as soon as practicable thereafter. See Article XII.B.1. "THE PLAN—OTHER PROVISIONS—Provisions Governing Distributions—Date of Distributions." |
| **Plan Supplement:** | We will file the Plan Supplement not later than ten days prior to the first date on which the Confirmation Hearing is scheduled to be held. It is anticipated that the Plan Supplement will include, among other things, forms of the Exit Facility Documents, the Reorganized RII Restricted Stock Agreements, the New Employment Agreements, the Registration Rights Agreement and the New Constituent Documents (other than the Reorganized RII Certificates of Designation). Pursuant to the Plan, each of these documents and agreements are required to be in form and substance reasonably satisfactory to certain parties specified in the Plan, including the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee. The Plan Supplement also will disclose the identity of the directors of the Reorganized Debtors, which will be selected in accordance with section 4.9 of the Plan. See Article V.E.6. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Means of Implementation of Plan—Directors and Officers of the Reorganized Debtors." |
| **Rights Offering and Rights Offering Backstop Commitment:** | We will conduct the Rights Offering pursuant to which Holders of Senior Note Claims and Subordinated Note Claims, as of the Subscription Record Date, will be entitled to subscribe for shares of Reorganized RII Preferred Stock. We entered into the Backstop Commitment Agreement with the Senior Note Committed Purchasers and the Subordinated Note Committed Purchasers, pursuant to which agreement the Senior Note Committed Purchasers have agreed, subject to the terms thereof, to subscribe to any Senior Note Rights not subscribed to by Holders of Senior Note Claims and the Subordinated Note Committed Purchasers have agreed, subject to the terms thereof, to subscribe to any Subordinated Note Rights not subscribed to by Holders of Subordinated Note Claims during the Rights Offering. The Rights Offering and the Backstop Commitment Agreement are more fully described herein and the Backstop Commitment Agreement is attached hereto as Exhibit C. See Article VI. "RIGHTS OFFERING." |
| **Subscription Record Date:** | Distributions of Subscription Rights will be made to Holders of Claims in Classes 6 and 7 as of the Subscription Record Date. See Article VI.C. "RIGHTS OFFERING—Issuance of Subscription Rights." |

| | |
|---|---|
| **Reorganized RII Certificate of Incorporation:** | The Reorganized RII Certificate of Incorporation will include provisions governing, *inter alia*: (i) information that must be provided to shareholders; (ii) the composition of the Reorganized RII Board of Directors; (iii) certain matters that will require supermajority approval of shareholders; (iv) certain matters that will require approval by specified major shareholders; (v) restrictions on the transfer of Reorganized RII Common Stock; (vi) "tag along" and "drag along" rights and (vii) shareholder preemptive rights. The Reorganized RII Certificate of Incorporation will be in substantially the form attached hereto as Exhibit D. See Article VII.E.3 "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Reorganized RII Stock and Certificate of Incorporation—Description of Reorganized RII Certificate of Incorporation." |
| **Board of Directors:** | Section 4.9 of the Plan provides that the initial Reorganized RII Board of Directors will be composed of seven directors, two selected by the members of the Steering Committee who are Holders of Subordinated Note Claims (based upon the holdings of such noteholders), one selected by the Senior Note Committed Purchasers, three selected by the Requisite Subordinated Note Committed Purchasers, and the initial chief executive officer of Reorganized RII. See Article V.E.6. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Means of Implementation of Plan—Directors and Officers of the Reorganized Debtors." |
| **Non-Reporting Status:** | The Plan contemplates that Reorganized RII will NOT be a reporting issuer under the Exchange Act nor will shares of Reorganized RII Common Stock be registered under the Securities Act or Exchange Act immediately following the Effective Date. |
| **Registration Rights Agreement:** | On, or as soon as practicable after, the Effective Date, Reorganized RII will enter into the Registration Rights Agreement with each Plan Support Party and any recipient of shares of Available Reorganized RII Common Stock that, prior to the Effective Date, notifies us and counsel to the Informal Committee, in writing, that such Person desires to be a party to the Registration Rights Agreement. The Registration Rights Agreement, attached hereto as Exhibit E, will incorporate the terms identified. See Article VII.F. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Registration Rights Agreement." |

| | |
|---|---|
| **New Management Incentive Plan:** | The Plan provides for the establishment of the New Management Incentive Plan consisting of: (i) an annual bonus plan; (ii) the 2010 long-term incentive cash bonus plan; and (iii) the Reorganized RII Restricted Stock Agreements. The New Management Incentive Plan will become effective as of the Effective Date. Issuances of Reorganized RII Common Stock pursuant to the Reorganized RII Restricted Stock Agreements, will dilute the Reorganized RII Common Stock ownership percentages received by Holders of Subordinated Note Claims under the Plan. Forms and term sheets outlining the details of the New Management Incentive Plan are contained in Exhibit F. See Article VII.G. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of New Management Incentive Plan and the New Employment Agreements." |
| **New Third-Lien Notes:** | The New Third-Lien Notes will be issued in an aggregate principal amount of $100 million. The New Third-Lien Notes will have a seven-year term (commencing on the Effective Date). Interest will accrue at a rate of LIBOR + 9.5% *per annum* in the event that interest payments are paid in cash, and at a rate of LIBOR + 12% *per annum* in the event that interest payments are paid in kind, as more fully described herein. A description of the key terms of the New Third-Lien Notes is attached hereto as Exhibit G. See Article VII.C. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of New Third-Lien Notes." |
| **Intercreditor Agreement:** | The respective rights and priority, with respect to both payment and security interests, of the holders of New Third-Lien Notes vis-a-vis the holders of debt under the First-Lien Term Loan Facility and the Second-Lien Term Loan Facility will be governed by an intercreditor agreement that will be substantially in the form of the Intercreditor Agreement attached hereto as Exhibit H. A description of the Intercreditor Agreement is contained in the description of the New-Third Lien Notes attached hereto as Exhibit G. |

| | |
|---|---|
| **Debtor-in-Possession and Exit Financing:** | On July 30, 2007, we entered into the original DIP/Exit Commitment Letter and on August 29, 2007 we entered into an amendment to the DIP/Exit Commitment Letter. A copy of the DIP/Exit Commitment Letter is attached hereto as Exhibit I. The proceeds from the DIP Credit Agreement may be used to repay amounts owed under the Prepetition Credit Agreement (if authorized by the Bankruptcy Court) and for working capital and other general corporate purposes of the Debtors during the Chapter 11 Cases. The terms of the DIP Facility are described in Article XIV.A. hereof. The proceeds from the Exit Facility will be used to repay the amounts borrowed under the DIP Credit Agreement, fund certain of the cash distributions under the Plan and for general corporate purposes. The terms of the Exit Facility are described in Article VII hereof. See Article XIV.A. The DIP/Exit Fee Letter includes customary "market flex" provisions which permit Barclays Capital, subject to certain limitations, to adjust the terms and conditions, pricing and/or structure of the DIP Facility and the Exit Facility if Barclays Capital reasonably determines that such changes are necessary to facilitate the successful syndication of the DIP Facility or the Exit Facility. If Barclays Capital exercises its rights pursuant to this provision, the final terms and conditions, pricing and structure of the DIP Facility or the Exit Facility (including the terms and conditions of the Intercreditor Agreement) may differ from those indicated herein. "THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS—Proposed Debtor in Possession Financing" and Article VII.B. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Exit Financing." |
| **Releases:** | In consideration for the contributions of certain parties to the Chapter 11 Cases, the Plan provides for certain waivers, exculpations, releases and injunctions. See Article XII.E.3. "THE PLAN—OTHER PROVISIONS—Effect of Plan Confirmation—Releases." |
| **Certain U.S. Federal Income Tax Consequences:** | For a summary of certain U.S. federal income tax consequences of this Solicitation to Impaired Noteholders, see Article XIII. "CERTAIN FEDERAL INCOME TAX CONSIDERATIONS." |
| **Risk Factors:** | Prior to deciding whether and how to vote on the Plan, each Holder of Senior Note Claims and Subordinated Note Claims should consider carefully all of the information in this Solicitation and Disclosure Statement, especially the "Risk Factors" described in Article II hereof. See Article II. "RISK FACTORS." |

**The foregoing is only a brief summary of certain provisions of the Plan. You should read the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Solicitation and Disclosure Statement.**

# SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA

The following selected consolidated historical financial data sets forth, for the periods and dates indicated, certain summary consolidated financial information of the Company.  We derived the summary consolidated statements of operations information and consolidated balance sheet data as of December 31, 2002, 2003, 2004, 2005 and 2006 from our consolidated financial statements.  Our financial statements for the years ended December 31, 2004, 2005 and 2006 were audited by Ernst & Young LLP, independent accountants – all other data was derived from unaudited financial statements.  Financial statements for the quarters ended March 31, 2007 and June 30, 2007 and for the year ended December 31, 2006 are attached hereto as Exhibit J.  Any statement contained in the financial statements attached hereto will be modified or superseded for all purposes to the extent that a statement contained in this Solicitation and Disclosure Statement (or in any other document that is subsequently made publicly available) modifies or is contrary to that previous statement.  Any statement so modified or superseded will not be deemed a part of this Solicitation and Disclosure Statement except as so modified or superseded.

| | For the year ended December 31, | | | | | For the six months ended June 30, | |
| | | | | | | (unaudited) | |
| | | | | (dollars in thousands) | | | |
| **Statement of Operations Data:** | **2006** | **2005** | **2004** | **2003** | **2002** | **2007** | **2006** |
| Net sales | $1,255,546 | $1,115,305 | $972,424 | $909,073 | $873,844 | $606,774 | $639,303 |
| Cost of goods sold | 1,137,654 | 979,662 | 783,057 | 736,155 | 722,853 | 529,852 | 553,084 |
| Cost of goods sold -special charges | – | – | – | 102,977 | – | – | – |
| Gross Profit | 117,892 | 135,643 | 189,367 | 69,941 | 150,991 | 76,922 | 86,219 |
| | | | | | | | |
| Selling, general and administrative expenses | 135,330 | 140,690 | 115,378 | 96,491 | 94,546 | 65,486 | 67,222 |
| Debt restructuring expenses | – | – | – | – | – | 16,441 | – |
| Impairment charges | 28,606 | 13,917 | – | – | – | – | – |
| Restructuring charges | 7,966 | 4,472 | 1,006 | 48,781 | (4,375) | 1,335 | 3,894 |
| Operating (loss) income | (54,010) | (23,436) | 72,983 | (75,331) | 60,820 | (6,340) | 15,103 |
| Interest expense | (73,022) | (61,605) | (51,214) | (49,836) | (41,136) | (41,119) | (35,718) |
| Loss on early extinguishment of debt | – | – | (7,939) | – | – | – | – |
| Loss from continuing operations before income taxes, minority interest and income from unconsolidated subsidiaries | (127,032) | (85,041) | 13,830 | (125,167) | 19,684 | (47,459) | (20,615) |
| Income tax expense | (127) | (13,154) | (5,289) | (36,648) | (8,158) | (4,188) | (3,273) |
| Minority interest and income from unconsolidated subsidiaries | (3,809) | (219) | (1,313) | (8,172) | (7,269) | (359) | (195) |
| Net (loss) income from continuing operations | (130,968) | (98,414) | 7,228 | (169,987) | 4,257 | (52,006) | (24,083) |
| Net income (loss) from discontinued operations, net of tax | 8,451 | 1,430 | 49,196 | (16,636) | (62,618) | 96,288 | 5,688 |
| **Net loss** | $(122,517) | $(96,984) | $56,424 | $(186,623) | $(58,361) | $44,282 | $(18,395) |
| **Other Financial Data:** | | | | | | | |
| Adjusted EBITDAR (1) | $16,150 | $22,302 | $95,904 | $97,847 | $80,175 | $27,289 | $34,145 |
| Depreciation and amortization | 33,588 | 27,349 | 21,915 | 21,420 | 23,729 | 15,853 | 15,148 |
| Capital expenditures | $18,066 | $37,805 | $23,816 | $14,488 | $16,657 | $6,376 | $8,090 |
| | | | | | | (unaudited) | |
| **Balance Sheet Data:** | | | | | | | |
| Current assets | $517,824 | $512,181 | $488,110 | $480,958 | $585,195 | $492,408 | $561,858 |
| Total assets | 842,828 | 871,175 | 756,018 | 723,979 | 852,820 | 806,417 | 921,636 |
| Current debt (2) | 758,003 | 27,501 | 22,890 | 31,397 | 30,189 | 749,258 | 27,683 |
| Current liabilities | 1,161,784 | 366,266 | 301,085 | 343,300 | 280,278 | 1,090,112 | 409,227 |
| Long-term debt | 17,649 | 714,181 | 610,330 | 593,003 | 596,282 | 15,689 | 735,047 |
| Other non-current liabilities | 40,690 | 50,030 | 4,971 | 6,931 | 7,982 | 35,126 | 44,992 |
| Stock holders deficit | $(414,946) | $(304,311) | $(202,601) | $(575,998) | $(356,739) | $(369,266) | $(315,884) |

(1)  EBITDAR is defined as net income from continuing operations before interest expense, income taxes, minority interest, loss from unconsolidated subsidiaries, cumulative effect of change in accounting principle, depreciation, amortization, restructuring and special charges in 2003.  Significant adjustments had an unfavorable impact on EBITDAR of $27.7 million and $22.6 million for the years ended December 31, 2006 and 2005, respectively, and a favorable impact of $2.5 million and $0.7 million for the six months ended June 30, 2007 and 2006, respectively.  Adjusted EBITDAR is presented  herein because we believe it is a useful supplement for both us and our investors to net income (loss) and cash provided by (used in) operating activities in evaluating the operating performance of the Company as a whole and in understanding cash flow generated by operations that are available for debt service and capital expenditures.  However, EBITDAR does not represent net income (loss) provided by (used in) operating activities as defined by GAAP.  Accordingly, adjusted EBITDAR should not be construed as an alternative to net income (loss), cash provided by (used in) operating activities or other measures as determined in accordance with GAAP as an indication of our operating performance or as a measure of our liquidity.  Moreover, adjusted EBITDAR does not necessarily indicate whether cash flows will be sufficient to fund cash needs, including debt service, and such measures as presented herein may differ from and may not be comparable to similarly titled measures used by other companies.
(2)  Certain debt was reclassified to current in December 2006.

# I. VOTING PROCEDURES AND REQUIREMENTS

The following instructions for voting to accept or reject the Plan, together with the instructions contained in the Ballot and Master Ballot, constitute the Voting Instructions. To vote on the Plan, you must be a beneficial Holder of a Class 6 Senior Note Claim or a Class 7 Subordinated Note Claim as of the Voting Record Date. To vote, you must fill out and sign a Ballot (if you are not a Nominee) or Master Ballot (if you are a Nominee) enclosed herewith.

A. *Ballots*

1. General Provisions

After carefully reviewing this Solicitation and Disclosure Statement and its exhibits, including the Plan, please indicate your acceptance or rejection of the Plan by completing the enclosed Ballot. Ballots should be returned to your Nominee or the Voting Agent as directed below.

If you do not receive a Ballot for a Claim that you believe you hold and that is in a Class that is entitled to vote on the Plan, or if a Ballot is damaged or lost or if you have any questions regarding the procedures for voting on the Plan, you should contact:

> Financial Balloting Group LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017
> Attn: Remy Ballot Processing
> Tel: (646) 282-1800

2. Special Instructions for Nominees

A Nominee should transmit a Ballot with a copy of this Solicitation and Disclosure Statement and the Plan to each beneficial owner of Impaired Notes held in the name of such Nominee as of the Voting Record Date. Each such beneficial owner should return its Ballot to its Nominee, and the Nominee should complete and submit the Master Ballot in accordance with the instructions in this Article I.A. and the Master Ballot. All Ballots must be retained by the Nominee for inspection for at least one year after the Voting Deadline. If a Nominee requires additional copies of this Solicitation and Disclosure Statement or Ballots, it should contact:

> Financial Balloting Group LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017
> Attn: Remy Ballot Processing
> Tel: (646) 282-1800

B. *Procedures for Casting and Deadlines for Voting on the Plan*

If you are the Holder of a Senior Note Claim or a Subordinated Note Claim and your Senior Notes or Subordinated Notes are held by a Nominee or registered in "street name," please complete the information requested on the Ballot, and return the Ballot to your Nominee in sufficient time for your Nominee to then forward your vote to the Voting Agent so that it is actually received by the Voting Agent before the Voting Deadline. To ensure your Nominee has sufficient time to cast your vote on your behalf, it is important that your Ballot be mailed or delivered to your Nominee well in advance of the Voting Deadline. Any Master Ballot received after the Voting Deadline will not be included in any calculation to determine whether the parties entitled to vote on the Plan have voted to accept or reject the Plan. When a Ballot or Master Ballot is returned indicating acceptance or rejection of the Plan, but is unsigned, illegible or incomplete, the unsigned, illegible or incomplete Ballot or Master Ballot will not be included in any calculation to determine whether the requisite parties entitled to vote on the Plan have voted to accept the Plan.

If the Senior Notes or Subordinated Notes are registered in your own name, please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot, and return the Ballot in the enclosed return envelope, by first class mail, courier or hand delivery, to the Voting Agent at the following address:

> Financial Balloting Group LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017
> Attn: Remy Ballot Processing

**BALLOTS AND MASTER BALLOTS WILL NOT BE COUNTED IF THEY ARE RECEIVED BY THE VOTING AGENT AFTER THE VOTING DEADLINE OR ARE ILLEGIBLE, INCOMPLETE OR UNSIGNED.**

**If you do not wish to grant the releases contemplated by sections 9.3(b) and 9.3(c) of the Plan, you must indicate such an election by checking the appropriate box or boxes on the Ballot. If you vote in favor of the Plan and do not make such an election, you will be deemed to be a "Releasor" and/or a "CVC Releasor" for purposes of the Plan. Please refer to sections 9.3(b) and 9.3(c) of the Plan and to Article XII.E.3. hereof for details regarding the relevant release provisions.**

Subject to the terms of the Plan Support Agreement, we reserve the right to terminate the Solicitation at any time prior to the Voting Deadline. Additionally, upon notice to the Holders of Senior Note Claims and Subordinated Note Claims, we reserve the right to amend this Solicitation at any time prior to the Voting Deadline; provided, however, that any such amendment is made after acquiring any and all consents required under the terms of the Plan and the Plan Support Agreement.

We also reserve the right to extend the Voting Deadline, subject to the terms of the Plan Support Agreement. Any such extension will be followed as promptly as practicable by notice

thereof by press release or other public announcement. In the event of an extension of the Voting Deadline, we reserve the right to establish a later Voting Record Date.

Except with respect to a Plan Support Party, upon the expiration or termination of the Solicitation, Ballots and Master Ballots may not be revoked or withdrawn; provided, however, that prior to the expiration or termination of the Solicitation, Ballots and Master Ballots may be revoked or withdrawn even if such votes have been delivered to the Voting Agent. A Plan Support Party's rights with respect to revocation or withdrawal of a Ballot are governed by the Plan Support Agreement.

At this time, we are not requesting the delivery of, and neither we, nor the Voting Agent, will accept certificates representing any Prepetition Notes or Equity Interests.

C.     *Parties Entitled to Vote on the Plan*

Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims that is not deemed to accept or reject the Plan is entitled to vote to accept or reject the Plan. A class is "impaired" unless the legal, equitable and contractual rights of the holders of claims or interests in that class are left unaltered by a plan of reorganization or if the plan reinstates the claims or interests held by members of such class by (i) curing any defaults which exist, (ii) reinstating the maturity of such claims or interests, (iii) compensating the holders of such claims or interests for damages which result from the reasonable reliance on any contractual provision or law that allows acceleration of such claims or interests, (iv) compensating the holders (other than the debtor or an insider) of any claims arising from failure to perform a nonmonetary obligation for any actual pecuniary loss incurred by such holder as a result of such failure and (v) otherwise leaving unaltered any legal, equitable or contractual rights to which the claims or interests entitle the holders of such claims or interests.

Classes that are not impaired under a plan are conclusively presumed to accept such plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, votes are not solicited from the holders of claims or interests in classes that are not impaired.

Section 1126(g) of the Bankruptcy Code provides that a class of claims or equity interests is presumed to have rejected a plan of reorganization if such plan does not entitle the holders of claims or equity interests in such class to receive or retain any property on account of such claims or interests. Accordingly, votes are not being solicited from the holders of claims or interests in such classes.

Votes to accept the Plan are being solicited only from Impaired Classes that are not deemed to accept or reject the Plan. Holders of Claims in Class 6 and Class 7 are Impaired under the Plan, and Holders of Claims therein are the only Holders of Claims that are entitled to vote to accept or reject the Plan. No other Class of Claims or Equity Interests is entitled to vote on the Plan.

D.     *Counting of Ballots and Master Ballots for Determining Acceptance of the Plan*

Only those Ballots and Master Ballots (other than any Ballot or Master Ballot that is illegible, incomplete or unsigned) that are received prior to the Voting Deadline will be counted

for purposes of determining whether each Impaired Class that is entitled to vote has voted to accept or reject the Plan.

Under the Bankruptcy Code, a voting class of claims is deemed to have accepted a plan if it is accepted by holders holding at least two-thirds in amount and more than one-half in number of the allowed claims in such class that vote on the plan.

**THE PLAN SUPPORT PARTIES HAVE AGREED TO VOTE IN FAVOR OF THE PLAN SUBJECT TO THE TERMS AND CONDITIONS CONTAINED IN THE PLAN SUPPORT AGREEMENT. THE PLAN SUPPORT PARTIES HOLD APPROXIMATELY 83% OF THE DOLLAR VALUE OF CLASS 6 AND APPROXIMATELY 80% OF THE DOLLAR VALUE OF CLASS 7 CLAIMS**

Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is presumed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) if there is no such law, rule or regulation, such acceptance or rejection was solicited after disclosure to such holder of "adequate information," as defined in section 1125(a) of the Bankruptcy Code. Section 1125 of the Bankruptcy Code defines "adequate information" as information of a kind and in sufficient detail as is reasonably practicable in light of the nature and history of a company and the condition of such company's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the plan of reorganization. In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest that has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be presumed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

We believe that this Solicitation is proper under applicable non-bankruptcy law, rules and regulations. The Prospective Debtors cannot be certain, however, that this Solicitation will be approved by the Bankruptcy Court. If such approval is not obtained, then we may have to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. There also is a risk that confirmation of the Plan would be denied by the Bankruptcy Court and if confirmation (and subsequent consummation) does not occur by December 14, 2007 (or such later date as may be agreed to by the Plan Support Parties), the Plan Support Agreement will terminate unless the Requisite Plan Support Parties elect to waive such termination pursuant to the terms thereof. Moreover, if the DIP Facility is not closed by October 17, 2007, or if the Exit Facility is not closed by December 14, 2007, the DIP/Exit Commitment Letter will terminate, unless extended by the Exit Facility Agent.

We believe that, with respect to the Plan, all the requirements of Bankruptcy Rule 3018(b) will be satisfied. This Solicitation and Disclosure Statement and the Plan, together with the accompanying materials, are being transmitted to the Holders of Senior Note Claims and

Subordinated Note Claims to solicit their votes to accept or reject the Plan. We believe that this Solicitation and Disclosure Statement contains sufficient information for all of the Holders of Senior Note Claims and Subordinated Note Claims to cast informed votes to accept or reject the Plan.

## II.     RISK FACTORS

### A.     *Risks Relating to the Chapter 11 Cases*

#### 1.     *General*

The filing of bankruptcy petitions by the Prospective Debtors and the publicity attendant thereto may affect our businesses adversely.  Any such adverse effects may worsen during the pendency of a protracted bankruptcy case if the Plan is not timely confirmed and consummated as expected.

#### 2.     *Failure to Satisfy Vote Requirement*

If we obtain the requisite votes from the Holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims to accept the Plan in accordance with the requirements of the Bankruptcy Code, we intend to file voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code and to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received from the Holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims, we nevertheless may file petitions for relief under chapter 11 of the Bankruptcy Code.  In such event, we may seek to accomplish an alternative restructuring of our capital structure and obligations.  We may decide to seek consent to any such restructuring plan by means of another out-of-court solicitation for acceptance of a plan of reorganization.  There can be no assurance that the terms of any such alternative restructuring would be similar to or as favorable to Holders of Claims as those proposed in the Plan.

#### 3.     *Method of Solicitation*

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be deemed to have accepted or rejected the plan if the court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

In order to satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), we are attempting to deliver this Solicitation and Disclosure Statement to all Holders of Senior Note Claims and Subordinated Note Claims as of the Voting Record Date.  In that regard, we believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations.  We cannot be certain, however, that

our solicitation of acceptances or rejections will be approved by the Bankruptcy Court and if such approval is not obtained the confirmation of the Plan could be denied.  If the Bankruptcy Court were to conclude that we did not satisfy the solicitation requirements then we may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited.  We cannot provide any assurances that such a resolicitation would be successful.

4.      *Risks Associated with Resolicitation*

In the event that we resolicit acceptances of the Plan from parties entitled to vote thereon, confirmation of the Plan could be delayed and possibly jeopardized.  Nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time we could experience significant deterioration in our relationships with our trade vendors and major customers.  Furthermore, if the Effective Date is significantly delayed, there is a risk that certain material restructuring agreements may expire or be terminated in accordance with their terms.  Article II.A.10. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Termination Rights Under Material Restructuring Agreements."

5.      *Classification and Treatment of Claims and Equity Interests*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Equity Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class.  We believe that all Claims and Equity Interests have been appropriately classified in the Plan.  We have elected to separately classify General Unsecured Claims because such Claims are largely those of trade creditors, many of whom are key suppliers of products and services essential to our operations.  Accordingly, any impairment of these Claims could be detrimental to our ability to obtain essential trade credit and could substantially impair the ability of the Prospective Debtors to do business with trade creditors whose goods and services are essential.  To the extent that the Bankruptcy Court determines that such classification is incorrect, the Bankruptcy Court could deny confirmation of the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the Holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest.  We believe that we have complied with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

6. *Nonacceptance of the Plan—Confirmation by Nonconsensual "Cram Down"*

It is possible that a Class entitled to vote on the Plan may vote against confirmation of the Plan. In the event that a Class of Claims does not vote to accept the Plan, the Bankruptcy Court nevertheless may confirm the Plan at our request pursuant to the "cram down" provisions of the Bankruptcy Code if at least one impaired Class of Claims has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired class.

Although we believe that the Plan will meet such tests, we cannot assure you that the Bankruptcy Court would reach the same conclusion. Under section 1129(b)(2)(C) of the Bankruptcy Code, the condition that a plan be "fair and equitable" with respect to a class of claims includes the requirement that the holder of any claims that are junior to the claims of such class will not receive or retain under the plan on account of such junior claims any property. If, however, the Bankruptcy Court does not confirm the Plan, we may pursue one of the following alternatives: (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (ii) dismissal of the Chapter 11 Cases or (iii) liquidation of the Prospective Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. See Article XV.F. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan."

7. *Certain Risks of Nonconfirmation or Delay of Confirmation*

It is possible that the Chapter 11 Cases could evolve into lengthy and contested cases, the results of which cannot be predicted.

Regardless of whether all Classes of Claims accept or are presumed to have accepted the Plan, the Plan still may not be confirmed by the Bankruptcy Court, which sits as a court of equity and may exercise substantial discretion. A nonaccepting creditor might challenge the adequacy of the disclosure, the solicitation procedures and results, or the terms of the Plan as not being in compliance with the Bankruptcy Code. In such event, we may seek to resolicit acceptances. Nonetheless, confirmation of the Plan could be delayed and possibly jeopardized. Additionally, we cannot assure you that the Plan will not require significant modifications for confirmation, or that such modifications would not require a resolicitation of acceptances.

Even if the Bankruptcy Court were to determine that the disclosure and the balloting procedures were appropriate and the results were accurate and appropriate, the Bankruptcy Court could nevertheless decline to confirm the Plan if it were to find that any statutory conditions to confirmation had not been met, including that the terms of the Plan are fair and equitable to nonaccepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any nonaccepting Classes, that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to nonaccepting Holders of Impaired Claims and Impaired Equity Interests will not be less than the value of distributions

such Holders would receive if the Company were liquidated under chapter 7 of the Bankruptcy Code. See Article XV.E.1. "CONFIRMATION—Plan Meets Requirements for Confirmation— Best Interests of Creditors—Liquidation Analysis." Although we believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion. See Article XV.E. "CONFIRMATION—Plan Meets Requirements for Confirmation."

The confirmation and consummation of the Plan also are subject to certain other conditions. See Article XII.D. "THE PLAN—OTHER PROVISIONS—Conditions Precedent to Confirmation and Effective Date of the Plan." No assurance can be given that these conditions will be satisfied or, if not satisfied, that we could or would waive such conditions, or that any required consent to such waiver including potentially from the Steering Committee would be obtained.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Equity Interests would ultimately receive in respect of their Claims and Equity Interests. If an alternative plan of reorganization could not be agreed to, it is possible that we would have to liquidate our assets, in which case it is likely that Holders of Claims and Equity Interests would receive less than they would have received pursuant to the Plan. See Article XV.F.1. "CONFIRMATION— Alternatives to Confirmation and Consummation of the Plan—Liquidation Under Chapter 7 or Chapter 11." Moreover, nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time we could experience significant deterioration in our relationships with our trade vendors and major customers. Furthermore, if the Effective Date is significantly delayed, there is a risk that certain material restructuring agreements may expire or be terminated in accordance with their terms. Article II.A.10. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Termination Rights Under Material Restructuring Agreements."

8.    *Alternatives to Confirmation and Consummation of the Plan*

There can be no assurance that the Plan will be confirmed or consummated. If we commence the Chapter 11 Cases and the Plan is not subsequently confirmed by the Bankruptcy Court and consummated, the alternatives include (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (ii) dismissal of the Chapter 11 Cases and (iii) liquidation of the Prospective Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. We believe the Plan is significantly more attractive than these alternatives because we believe, among other things, that it will minimize disputes concerning our reorganization, significantly shorten the time required to accomplish the reorganization, reduce the expenses of a case under chapter 11 of the Bankruptcy Code, minimize the disruption to our business that would result from a protracted and contested bankruptcy case and ultimately result in a larger distribution to creditors than would other types of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 of the Bankruptcy Code.

9.    *Risk of Nonoccurrence of the Effective Date*

Although we believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. The effectiveness of the Plan is subject to a number

of conditions precedent, as outlined in section 8.2 of the Plan, and there can be no assurance that all such conditions will occur (or be waived in accordance with the terms of the Plan). If, for this or any other reason, the Effective Date is significantly delayed, there is a risk that certain material restructuring agreements may expire or be terminated in accordance with their terms. Article II.A.10. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Termination Rights Under Material Restructuring Agreements."

10.    *Termination Rights Under Material Restructuring Agreements*

Our ability to consummate the transactions contemplated by the Plan is conditioned upon, among other things, satisfaction of the terms contained in each of the Plan Support Agreement, the DIP/Exit Commitment Letter, the GM Agreements, the Backstop Commitment Agreement and the CVC Settlement Agreement. Each of these agreements contains certain closing conditions and termination rights. As discussed in Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases," there are several risks that, if realized, could have the effect of extending the chapter 11 proceeding beyond the anticipated timeline. If this happens, the termination rights may be triggered.

- Plan Support Agreement

The Plan Support Parties are entitled to terminate the Plan Support Agreement if, among other things, (a)(i) the solicitation of votes to accept or reject the Plan is not concluded by October 12, 2007, (ii) we fail to commence the Chapter 11 Cases prior to October 17, 2007, or (iii) the Effective Date does not occur prior to December 14, 2007, as such dates may be extended by the Requisite Plan Support Parties, (b) a material adverse effect with respect to the Prospective Debtors or their businesses occurs, (c) we materially breach the terms of the Plan Support Agreement or (d) the GM Agreements and the CVC Settlement Agreement fail to become effective by the Effective Date.

- DIP/Exit Commitment Letter

The commitments under the DIP/Exit Commitment Letter will terminate, unless extended by the Exit Facility Agent, if the closing of the DIP Facility has not occurred on or before October 17, 2007. Assuming such closing does occur prior to such date, the remaining commitments with respect to the Exit Facility will terminate on December 14, 2007, unless the closing of the Exit Facility has occurred prior to such date.

- GM Agreements

Assuming all conditions precedent have been satisfied, the GM Agreements will become effective upon the Effective Date. In the event that the Effective Date has not occurred on or before December 31, 2007, the GM Agreements will terminate, unless the parties to the GM Agreements extend such date in writing. Upon such termination, however, any existing purchase orders will remain in effect.

- CVC Settlement Agreement

Court Square has the ability to terminate the CVC Settlement Agreement if, among other things, (i) the Plan is inconsistent with the terms of the CVC Settlement Agreement, (ii) the Bankruptcy Court does not approve the assumption of the CVC Settlement Agreement within a specified period of time or (iii) if certain provisions of the CVC Settlement Agreement are severed, disallowed, modified, amended, withdrawn, or deemed invalid or unenforceable. In the event of such a termination, CVCEP LP (or the other Court Square parties) could sell their RWHI equity securities or, if we do not emerge from bankruptcy during the 2007 calendar year, claim a worthless stock deduction and thereby cause an ownership change with respect to us under section 382 of the Tax Code prior to the Effective Date. Such an ownership change effectively would eliminate our ability to use our existing NOLs to offset future income of Reorganized RII.

- Backstop Commitment Agreement

The Committed Purchasers' obligations under the Backstop Commitment Agreement are subject to the satisfaction of certain conditions precedent, including those relating to the nonoccurrence of a "material adverse effect" (with respect to the Prospective Debtors' business, as defined in the Backstop Commitment Agreement). See Article VI.F. "RIGHTS OFFERING—Backstop Commitment Agreement." Some of these conditions are not within our control. If we are not able to satisfy the conditions, the Committed Purchasers may be unwilling to waive the conditions and would no longer be obligated to purchase shares of Reorganized RII Preferred Stock. If this happens, we may not be able to raise the proceeds necessary to fund our cash obligations under the Plan, and the Plan will not become effective. See Article II.A.9. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Risk of Nonoccurrence of the Effective Date."

11. *Failure to Close the Exit Facility or to Successfully Complete the Rights Offering*

One of the conditions to the effectiveness of the Plan is the execution and delivery of all material documents and agreements necessary to implement the terms of the Plan, including with respect to the availability to the Debtors of the Exit Facility in an amount not less than $330 million and the successful completion of the Rights Offering.

The proceeds of the Exit Facility may not be made available to us if the Exit Facility Agent asserts that a material adverse change has occurred. Furthermore, the DIP/Exit Fee Letter includes customary "market flex" provisions which permit Barclays Capital, subject to certain limitations, to adjust the terms and conditions, pricing and/or structure of the Facilities if Barclays Capital reasonably determines that such changes are necessary to facilitate the successful syndication of the Facilities. If Barclays Capital exercises its rights pursuant to this provision, the final terms and conditions, pricing and structure of the Facilities (including the terms and conditions of the Intercreditor Agreement) may differ from those indicated in this Solicitation and Disclosure Statement. The Plan, however, provides that the Exit Facility Documents must be reasonably satisfactory, in form and substance, to the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee. Therefore if the

market flex provisions of the DIP/Exit Fee Letter are asserted but one or more of these parties does not consent to the final terms of the Exit Facility, we may be unable to close the Exit Facility. Furthermore, the Plan provides that it is a condition to the effectiveness of the Plan that, if and to the extent that the terms of the Intercreditor Agreement differ in any material respect from the form of such agreement attached hereto as Exhibit H, the reasonable consent of the Requisite Senior Note Plan Support Parties with respect to such differing terms must be obtained. In the event such consent is required but not obtained, we may be unable to close the Exit Facility.

In addition, the Backstop Commitment Agreement also contains a provision that would permit the Committed Purchasers to terminate their commitment thereunder upon the occurrence of a Material Adverse Effect (as defined therein) with respect to the Prospective Debtors' business.

If, for these or any other reasons, we are unable to obtain our credit facility, or to complete the Rights Offering, we would be unable to consummate the Plan. See Article XV.F. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan."

### 12.  *Availability of the DIP Facility and the Exit Facility*

The DIP/Exit Commitment Letter provides for a number of conditions precedent to the DIP Facility including financial covenants relating to (i) RII's consolidated senior secured debt to EBITDA ratio, (ii) EBITDA for the last twelve-month period tested as at the closing date of the DIP Facility and (iii) minimum liquidity requirements. To the extent that there is deterioration in our financial condition prior to the funding of the DIP Facility, we may not satisfy these or other conditions and the DIP Facility may not be made available to us. See Article XIV.A. "THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS—Proposed Debtor in Possession Financing." The DIP/Exit Commitment Letter also provides for a number of conditions precedent to the Exit Facility including financial covenants relating to (i) RII's consolidated senior secured debt to EBITDA ratio, (ii) EBITDA for the last twelve-month period tested as at the closing date of the Exit Facility and (iii) minimum liquidity. To the extent that there is deterioration in our financial condition prior to the funding of the Exit Facility, we may not satisfy these or other conditions and there can be no assurance that the Exit Facility will be made available to us. See Article VII.B. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Exit Financing."

### 13.  *Inability to Assume Certain Contracts*

The Plan provides for the assumption of all our executory contracts, and substantially all of our unexpired leases (with certain exceptions as set forth therein). We intend to seek authority to reject certain nonexpired real property leases and other agreements. Our intention is to preserve as much of the benefit of our existing contracts as possible. Certain limited classes of executory contracts, however, may not be assumed without the consent of the counterparty. In these cases, we would need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent would be forthcoming or that material conditions would not be attached to any such consent that would make assuming such contracts

unreasonable. We would then be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them. We may attempt to pass through to the Reorganized Debtors any and all licenses in respect of patents, trademarks, copyright or other intellectual property which cannot otherwise be assumed pursuant to section 365(c) of the Bankruptcy Code. The counterparty to any contract that we seek to pass through may object to our attempt to pass through the contract and seek to require us to reject the contract or seek approval of the Bankruptcy Court to terminate the contract. If the counterparty prevailed with respect to such action, we could lose the benefit of the contract, which could harm our business.

B.    *Factors Affecting the Value of the Securities to Be Issued Under the Plan of Reorganization*

1.    *Capital Requirements*

The Reorganized Debtors' business is expected to have substantial capital expenditure needs. Although the Plan reduces our debt obligations, we will remain highly leveraged, and our ability to gain access to additional capital, if needed, cannot be assured, particularly in view of competitive factors and industry conditions.

2.    *Variances From Projections*

A fundamental premise of the Plan is that it restructures our indebtedness to reasonable levels consistent with our business plan, as reflected in the Projections. The Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors and their subsidiaries, some of which may not occur. Such assumptions include, among others, assumptions concerning the general economy, our ability to make necessary capital expenditures, our ability to manage costs and achieve cost reductions, our ability to establish market strength, the performance of OEMs and other major customers, consumer purchasing trends and preferences, the ability to stabilize and grow our sales base and control future operating expenses and other risk factors described below. We believe that the assumptions underlying the Projections are reasonable. Unanticipated events and circumstances occurring subsequent to the preparation of the Projections, however, may affect our actual financial results. Additionally, upon the Effective Date, Reorganized RII will have new directors who may elect not to pursue the same business plan that underlies the Projections. The actual results achieved throughout the Projection Period, therefore, necessarily will vary from the projected results, and such variations may be material and adverse. Accordingly, Holders of Claims and Equity Interests and other interested parties are cautioned not to place undue reliance on the Projections.

3.    *Recovery Percentages May Differ From Estimates*

Moreover, the estimated percentage recovery by Holders of Senior Note Claims and Subordinated Note Claims is based upon estimated values of the New Third-Lien Notes, the Reorganized RII Preferred Stock and the Reorganized RII Common Stock. Given that the market and economic conditions upon which such values are based are beyond our control, the actual results achieved necessarily will vary from the estimate. Such variations may be material and adverse. See "SUMMARY OF THE SOLICITATION AND PLAN."

4. *Lack of Trading Market for New Securities and Restrictions on Transfer of New Securities*

The New Securities will be new issues with no established trading market or prior trading history. There can be no assurance regarding the future development of a market for the New Securities, the ability of holders thereof to sell their New Securities or the price for which such holders may be able to sell such New Securities. If a market were to develop, the New Securities could trade at prices lower than their initial values under the Plan. The trading prices of the New Securities will depend on many factors, including factors beyond our control. Furthermore, the liquidity of, and trading market for, the New Securities may be adversely affected by price declines and volatility in the market for similar securities, as well as by any changes in our financial condition or results of operations.

The Reorganized RII Common Stock also will be subject to substantial restrictions on transfer contained in the Reorganized RII Constituent Documents (see the description of the proposed transfer restrictions contained in Exhibit D hereto). Consequently, any Holder of the Reorganized RII Common Stock may have to bear the economic risk associated with such stock for an indefinite period of time.

We do not intend to register the New Securities under the Securities Act until required under the Registration Rights Agreement, or to list the Reorganized RII Preferred Stock and the Reorganized RII Common Stock on any securities exchange. Holders of New Securities should not expect to receive reports or financial statements from us except to the extent required by the Reorganized RII Constituent Documents or the New Third-Lien Note Indenture, or to the extent voluntarily provided.

Furthermore, recipients of Subscription Rights may not sell, assign or otherwise transfer their Subscription Rights. Because the Subscription Rights are non-transferable, there will not be a market for the Subscription Rights.

5. *Dividends on New Securities*

We do not anticipate that we will generate sufficient net profits to pay cash dividends on account of the Reorganized RII Common Stock for the foreseeable future. In addition, provisions in the Exit Facility Documents and the New Third-Lien Note Indenture may limit our ability to pay dividends. The terms of the Reorganized RII Preferred Stock provide that dividends will be paid-in-kind rather than in cash and subsequently paid in cash under certain conditions. The terms of the Reorganized RII Preferred Stock also provide that cash dividends in connection with a partial redemption of the shares of the Reorganized RII Preferred Stock would go to decrease the accrued liquidation preference of such preferred stock.

6. *Ownership of Voting Stock*

After the Effective Date, we anticipate that the voting shares of Reorganized RII may become concentrated in a small number of holders. As a result, and pursuant to the terms of the Reorganized RII Certificate of Incorporation, these stockholders will have significant voting

power, and such holders may exercise any resulting voting power in their own interests and not necessarily in the interests of other stakeholders of Reorganized RII.

The extent of ownership by these stockholders also may discourage a potential acquiror from making an offer to acquire the Company. An offer to acquire the Company also could be made less likely if capitalized interest on the New Third-Lien Notes and the accrued liquidation preference with respect to the Reorganized RII Preferred Stock are sufficiently large that they limit the value remaining for holders of Reorganized RII Common Stock. Reduced likelihood of an acquisition could reduce the value of certain of the New Securities.

7. *Ranking of Reorganized RII Stock*

Reorganized RII Preferred Stock will rank junior to all of our liabilities. In the event of a subsequent bankruptcy, liquidation or winding-up, our assets will be available to make payments with respect to our obligations on Reorganized RII Preferred Stock, including any payments that we may be required to make on account of the Reorganized RII Preferred Stock liquidation preference, only after all of our indebtedness and other liabilities have been paid. Consequently, if we are forced to liquidate our assets to pay our creditors, we may not have sufficient assets remaining to pay amounts due on the Reorganized RII Preferred Stock then issued and outstanding. In addition, we may in the future incur substantial amounts of additional debt and other obligations that will rank senior to Reorganized RII Preferred Stock, including debt that accrues as a result of the payment-in-kind of interest on account of the New Third-Lien Notes.

Reorganized RII Common Stock also will rank junior to all of our existing and future liabilities and to the Reorganized RII Preferred Stock, and will be subject to the risks described above. In addition, in the event of a subsequent bankruptcy, liquidation or winding-up, our assets will be available to make payments with respect to our obligations on Reorganized RII Common Stock only after all of our indebtedness and other liabilities have been paid and after the Reorganized RII Preferred Stock liquidation preference (which will include any dividends that have accrued thereon but remain unpaid) has been paid.

8. *Tax Treatment of Reorganized RII Preferred Stock*

We intend to take the position that the accrual of an undeclared dividend on the Reorganized RII Preferred Stock does not result in a constructive distribution under section 305(c) of the Tax Code and that, as a result, dividends on the Reorganized RII Preferred Stock would not be includible in the gross income of a holder until declared and paid. The IRS might disagree with this treatment and assert that the accrual of an undeclared dividend on the Reorganized RII Preferred Stock results in a constructive distribution (or series of constructive distributions) under section 305(c) of the Tax Code. If the IRS were to be successful in such an assertion, holders of Reorganized RII Preferred Stock would be required to include accrued dividends on the Reorganized RII Preferred Stock in income currently, regardless of whether such dividends were paid currently.

C.    *Risks Relating to the Company*

1.    *Leverage and Debt Service*

We are highly leveraged and will remain so even if the Plan is confirmed and the transactions contemplated thereunder are consummated.  Our high levels of indebtedness could have important consequences, including:

(a)    requiring us to dedicate a substantial portion of our cash flow from operations to payments on indebtedness thereby reducing the availability of cash flow to fund working capital, capital expenditures, research and development efforts and other general corporate purposes;

(b)    increasing our vulnerability to adverse general economic or industry conditions;

(c)    limiting our flexibility in planning for, or reacting to, changes in our business or the industry in which we operate;

(d)    impairing our ability to obtain additional financing in the future for working capital, capital expenditures, debt service requirements, acquisitions, general corporate purposes or other purposes;

(e)    placing us at a competitive disadvantage to our competitors who are not as highly leveraged; or

(f)    triggering an event of default under the Exit Facility or the New Third-Lien Notes Indenture if we fail to comply with the financial and other restrictive covenants contained therein.

In order to adequately service our indebtedness, we will require a significant amount of cash.  Our future cash flow may not be sufficient to meet our obligations and commitments.  If we are unable to generate sufficient cash flow from operations in the future to service our indebtedness and to meet our other commitments, we will be required to adopt one or more alternatives, such as a further refinancing or restructuring of our indebtedness, selling material assets or operations or seeking to raise additional debt or equity capital.  These actions may not be implemented on a timely basis or on satisfactory terms or at all, and may not enable us to continue to satisfy our capital requirements.  Restrictive covenants in our indebtedness may prohibit us from adopting any of these alternatives (with the failure to comply with these covenants resulting in an event of default which, if not cured or waived, could result in the acceleration of all of our indebtedness).  We cannot assure you that our assets or cash flow would be sufficient to fully repay borrowings under our outstanding debt instruments, if accelerated upon an event of default, or that we would be able to repay, refinance or restructure the payments of those debt instruments.  To the extent that interest on the New Third-Lien Notes is paid-in-kind rather than in cash, our leverage will continue to increase, which could further exacerbate the risks described above.

2. *Floating Rate Indebtedness*

Our new Exit Facility and the New Third-Lien Notes will bear interest at floating rates, which may adversely affect our cash flow and liquidity. If there is a rise in interest rates, our debt service obligations on the borrowings under the Exit Facility and the amounts owed in connection with the New Third-Lien Notes would increase even though the principal amount of our indebtedness remained the same. We cannot assure you that we will be able to limit our exposure to such rate fluctuations by entering into an interest rate hedging agreement on favorable terms, or at all, in the future.

3. *Prepetition Credit Agreement, Receivables Financing and Liquidity*

To address certain defaults under the Prepetition Credit Agreement, including the cross-default resulting from the non-payment of required interest under the Senior Notes and the Subordinated Notes, we have entered into the Limited Waivers, including, most recently, the July 31 Waiver, with the Prepetition Revolving Lenders. We also have entered into the June 20 Waiver with the Prepetition Revolving Lenders to address certain defaults in connection with the consummation of the sale of certain assets of Remy Reman, L.L.C. relating to our starter and alternator remanufacturing business and our use of the proceeds arising therefrom and from the post-closing adjustments for the sale of certain assets of Western Reman Industrial, Inc. (f/k/a Franklin Power Products, Inc.) and International Fuel Systems, Inc. Pursuant to the terms of the Limited Waivers, the Prepetition Revolving Lenders have agreed to permit us to continue to access funds otherwise available under the Prepetition Revolver. These waivers provide continued access to the Prepetition Revolver only until September 17, 2007 (or such time as a previously unwaived default occurs). There can be no assurance that the Prepetition Revolving Lenders will extend this date.

Our liquidity generally depends on cash provided by operating activities and the Prepetition Revolver. Our ability to continue as a going concern during the Solicitation Period depends, among other things, on (i) our ability to maintain adequate cash on hand; (ii) our ability to generate cash from operations; and (iii) the duration and outcome of the Solicitation. In conjunction with our advisors, we are working to design and implement strategies to provide adequate liquidity. There can be no assurance, however, as to the success of such efforts.

We have in place certain factoring arrangements with: (i) SunTrust Bank and (ii) BB&T. Under these arrangements, SunTrust and BB&T may purchase (but are under no obligation to do so) certain receivables owed to us, and we are not obligated to sell any such receivables. SunTrust and BB&T could cease at any time and there can therefore be no assurance with respect to our ability to raise capital through such arrangements.

4. *Enforcement of Defaults by Entities Not Party to the Plan Support Agreement*

The Plan Support Agreement can be terminated prior to the commencement of the Chapter 11 Cases if, among other things, (i) Holders of the Prepetition Notes accelerate indebtedness in excess of $10 million as a result of a default under the Prepetition Indentures governing such notes or (ii) Holders of more than 25% of the face amount of any issuance of

Prepetition Notes initiate any action or proceeding to collect or recover any amount that is or may become due and payable with respect to such notes. Although Holders of a substantial proportion of the outstanding principal amount of Impaired Notes are party to the Plan Support Agreement, it is possible that these termination events could be triggered by actions of Holders who have not agreed to the Plan Support Agreement, in particular, the Holders of the Floating Rate Secured Notes.

5. *Treatment of Trade Vendors and Other Unsecured Claims in the Chapter 11 Cases and Risk of Failure to Obtain Authority to Pay Their Claims in the Ordinary Course of Business*

In response to concerns of a prospective insolvency proceeding, certain of our vendors recently have contracted their trade terms with us (*i.e.*, shortened payment terms). When taken as a whole, the contraction of trade support has thus far been manageable and at a level that continues to allow us to operate our businesses. We believe that our ability to continue to receive significant levels of trade support following the Petition Date will require that we obtain a "first day order" from the Bankruptcy Court authorizing us to continue to pay trade vendors and other unsecured creditors in the ordinary course of business, including obligations which arise prior to the filing of the Chapter 11 Cases. Although we believe that ample precedent exists for obtaining such an order in chapter 11 cases such as ours, there can be no assurance that the Bankruptcy Court will grant the order or that trade support will not further erode.

Irrespective of whether we are able to obtain such an order, the Plan provides that Holders of General Unsecured Claims will be Unimpaired. Thus even if such an order is not obtained, General Unsecured Claims will be paid on the later of (x) the Effective Date, (y) the date on which the claim becomes Allowed, and (z) such later date as may be mutually agreed by the Holder of the claim, the Steering Committee and us. As a result, no General Unsecured Claims will be restructured or otherwise reduced in connection with the Plan (although certain Claims arising on account of the rejection of real property leases will be "statutorily impaired" pursuant to section 502(b)(6) of the Bankruptcy Code).

There will be no Claims bar date established in connection with the Plan, however, and in the absence of a bar date, there will be uncertainty with respect to the overall liabilities of the Reorganized Debtors because there will be no requirement for Holders of General Unsecured Claims to identify the nature and amount of their Claims by timely Filing a proof of claim. If we had elected to pursue an alternative plan of reorganization in which General Unsecured Claims were Impaired, the amount of indebtedness with respect to such Claims could have been reduced, and the total liabilities of the Reorganized Debtors would be more clear. We believe, however, that the Plan is a superior alternative to any alternative plan of reorganization which would Impair the Holders of General Unsecured Claims because: (i) a large number of the Holders of General Unsecured Claims are key suppliers of products and services used by the Company and any Impairment of these Claims could be detrimental to our ability to obtain essential trade credit and could substantially impair our ability to do business with trade creditors whose goods and services are essential and (ii) we believe the Plan can be consummated on a more expeditious and significantly less contentious and costly basis if General Unsecured Claims are Unimpaired than if such Claims were to be Impaired.

### 6. *Competition*

The markets in which we operate are highly competitive. Competition in the automotive parts market is based primarily on customer relationships and product performance characteristics, such as quality, reliability and price. Our ability to be an effective competitor will depend on our competitiveness on the basis of these characteristics. We also will depend on our success in developing new and enhanced products for our customers. Although we have broad product lines and are continually developing new and enhanced products, our current customers may not continue to purchase our products, and we may not be successful in preventing customers from seeking alternative suppliers.

Furthermore, we cannot be sure that we will be able to compete successfully in the markets in which we operate. Some of our competitors in the OEM market are divisions or subsidiaries of companies that are larger and have substantially greater resources. Certain of these competitors are located in geographic areas that we are targeting for growth, and thus present a formidable challenge. In addition, the trend towards consolidation among automotive parts suppliers is resulting in fewer, larger suppliers who benefit from purchasing and distribution economies of scale. If we cannot achieve cost savings and operational improvements sufficient to allow us to compete favorably in the future with these larger companies, our financial condition and results of operations could be adversely affected.

### 7. *Disruption of Operations and Retention of Key Customers and Employees*

The commencement and pendency of the Chapter 11 Cases could adversely affect our relationships with our customers and suppliers, as well as our ability to retain or attract high-quality employees. In such event, weakened operating results may occur that could give rise to variances from the stated Projections.

Certain customers have expressed concerns with respect to our ability to ensure continuity of supply. Although we believe we have addressed these concerns, there can be no assurance that certain customers, or end users, will not seek alternative sources of supply.

Our ability to operate our businesses and implement our strategies effectively depends, in part, on the efforts of our executive officers and other key employees. In this way, our future success will depend on, among other factors, our ability to attract and retain other qualified personnel in key areas, including engineering, sales and marketing, operations, information technology, and finance. Because of the traditional stigma associated with any bankruptcy, regardless of whether it may improve our financial condition, the commencement of the Chapter 11 Cases may adversely affect our ability to attract and retain the requisite highly-skilled personnel and key employees. Although we intend to seek authority from the Bankruptcy Court to pay, among other things, all prepetition wages, salaries, commissions and employee benefits, we cannot assure you that the Bankruptcy Court will grant such an order, or that, even with such an order, our highly-skilled personnel and key employees will commence or continue their employment with us, and their failure to do so could have a material adverse effect on our business.

### 8. *Rise in Costs of Raw Materials and Component Parts*

We are heavily dependent on certain commodities and other inputs such as aluminum castings, rare-earth magnets, gray and ductile iron castings, armatures, solenoids, copper wire, injectors, electronics, steel shafts, forgings, bearings, commutators, pumps and carbon brushes. The costs of such materials have escalated sharply in recent years, a development that has affected our economic performance. The escalation in raw material costs could be exacerbated by new laws or regulations, suppliers' allocations to other purchasers, interruptions in production by suppliers, changes in exchange rates and worldwide price levels. If the costs of these raw materials and component parts continue to rise, we may not be able to absorb the cost increases or pass along a substantial portion of the increases to our customers, further negatively impacting our financial condition.

### 9. *Reductions in Profit Margins*

In the past, we experienced declining profit margins due to the necessity of making substantial pricing concessions to retain the business of certain major customers. Although we have sought to address low profit margins by exiting unprofitable market segments and negotiating improved terms with customers, including with our largest OEM customer, there can be no guarantee that further decline in the domestic automotive market will not lead OEMs and other significant customers to demand additional concessions in the future. Profitability may be negatively affected by the need to address such requests through price concessions or by exiting additional market segments for our products.

Although we anticipate that our proposed shift in product mix will increase our profit margins, it may be accompanied by reduced revenue as we deemphasize lower margin sales. We cannot provide any assurances that such a shift in product mix will prove successful in increasing our overall profit margin or that as we deemphasize sales of lower profit margin products that we will be able to increase sales of higher profit margin products to the level we anticipate.

### 10. *Product Development and Technology*

Some of our current products are subject to changing technology. In addition, we are developing certain new products, some of which recently have been introduced commercially into the market, others of which are in various stages of development. For example, hybrid vehicles use more advanced technology than found in traditional starters and alternators. Although we regularly seek to remain a leader in technological advances, including in hybrid vehicle technology, we cannot be certain that we will be able to achieve the technological advances that may be necessary to remain competitive within our markets. We may require significant ongoing and recurring additional capital expenditures and investment in research and development, manufacturing and other areas to remain competitive. In addition, there can be no assurance that new products will be successfully commercialized, and if commercialized, that competing products will not be introduced into the marketplace. Further, we cannot be certain that any technology we develop can be adequately protected from access by our competitors such that we can maintain a sustainable competitive advantage.

11.    *Cyclical Business Model*

In recent years, a substantial portion of our sales were derived from the OEM market in North America.  The demand for our original equipment products is dependent on the production of automobiles, light trucks and heavy duty vehicles in North America.  The automotive industry is highly cyclical, as new vehicle demand is dependent on consumer spending and is tied closely to the overall strength of the North American economy.  In addition, automotive production can be affected by inventory levels, interest rates, labor relations issues, strikes, regulatory requirements, trade agreements and other factors.  The volume of automotive production in North America has fluctuated, sometimes significantly, from year to year, and such fluctuations give rise to fluctuations in the demand for our products.  Any decline in the demand for new automobiles, particularly in the United States, could have a material adverse impact on our cash flow, financial condition and results of operations.  Seasonality experienced by the automobile industry also impacts our operations, and historically we have reported lower levels of sales for July and December due to model changeovers and plant idling by the automobile and light truck OEMs.

Historically, the heavy duty truck industry has been more cyclical than the automotive industry.  New demand in the heavy duty truck industry is largely dependent upon the overall strength of the North American economy.  In addition, heavy duty truck production can be affected by interest rates, government regulations, labor relations, strikes, new product introductions and other factors.  There can be no assurance that the heavy duty truck industry we supply will not experience downturns in the future.  A significant decrease in overall demand for heavy duty trucks could have a material adverse effect on us.

12.    *Longer Product Life*

In recent years, supplying the aftermarket has been a significant source of our sales.  The average useful life of OE parts has been steadily increasing due to improved quality and innovations in products and technologies.  The longer product lives allow vehicle owners to replace parts of their vehicles less often.  Additional increases in the average useful life of automotive parts are likely to adversely affect the demand for our aftermarket products.

13.    *Industry Volatility*

The revenues of our OE operations are closely tied to global OE automobile sales and production levels.  The OE market is characterized by short-term volatility, with overall expected long-term growth in global vehicle sales and production.  Automotive production in the local markets we serve can be affected by macroeconomic factors such as interest rates, fuel prices, consumer confidence, employment trends, regulatory requirements and trade agreements.  A variation in the level of automobile production would affect not only sales to OE customers, but, depending on the reasons for the change, could impact demand from aftermarket customers.  If we fail to respond in a timely and appropriate manner to changes in the demand for our products, our operational results, cash flow and financial condition could be adversely affected.

14. *GM Agreements*

Historically, we have depended heavily on GM's business, and GM and its affiliates continue to account for a substantial percentage of our aggregate net sales. In 2006, GM accounted for approximately 25% of our net sales. The loss of GM as a customer for our OEM or aftermarket products, a substantial decrease in demand for GM's automobile models containing our products or our failure to obtain new supply orders for products in new GM automobile models could have a material adverse effect on our business, cash flow, financial condition and operational results. In addition, any potential disruption of GM's supply chain by strikes and work stoppages could postpone GM's need for our products, which may have a material adverse effect on our business, cash flow, financial condition and results of operations.

The GM Agreements attempt to address our concerns associated with our historical GM arrangement by, among other things, extending the term of certain purchase orders and increasing the price for associated products supplied to GM. Despite the GM Agreements providing us with what we believe are significant economic benefits, the agreements also increase GM's rights in the event that we default under our obligations to GM, including by allowing GM, under certain circumstances, rights to operate our GM production lines in Mexico and to purchase certain tooling and utilize certain intellectual property owned by us so GM can resource our business with another automotive supplier. See Article VII.A. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of GM Agreements."

15. *Predetermined Product Pricing*

Our supply agreements with certain customers require us to provide our products at predetermined prices. In some cases, these prices decline over the course of the contract. The costs that we incur in fulfilling these contracts may vary substantially from our initial estimates. Unanticipated cost increases may occur as a result of several factors, including increases in the costs of labor, components or materials. Although in some cases we are permitted to pass on to our customers the cost increases associated with specific materials, cost increases that we cannot pass on to our customers would adversely affect our cash flow, financial condition and results of operations.

16. *Customer Issues*

- Customer Erosion

The majority of our historical sales are to automotive and heavy-duty OEMs, OEM dealer networks, leading automotive parts retail chains and warehouse distributors. There can be no assurance that any of our most significant customers will continue to require all of the products or services we currently provide to them, or that any of those customers will not develop alternative sources, including their own in-house operations, for the products or services they currently purchase from us. In addition, certain customers are facing structural issues, potential disruption of their supply chain due to bankruptcy and labor issues and negative industry trends resulting in deteriorating financial conditions. Some of these customers are addressing these problems through restructurings, which may include significant capacity reductions or

reorganization under bankruptcy laws. The loss of any of our major customers, reduction in their demand for our products or the substantial restructuring activities by our major customers, could reduce our net sales, cash flow and profitability.

- Customer Commitments

The Projections are based, in part, on commitments made by our customers. These commitments generally renew yearly during a program life cycle. If actual production orders from our customers do not approximate such commitments, it could have a material adverse effect on our growth and financial performance.

- Customer Consolidation

In both the original equipment market and aftermarket, our customer base is consolidating. Our aftermarket sales already are concentrated among a relatively small set of customers. As a result, we are competing for business from fewer customers. Certain of our existing customer programs and practices, including promotional allowances and core return policies, are designed to promote customer loyalty and to provide customers with incentives not to switch suppliers. Even if we are successful in continuing to attract business from customers who have consolidated with other customers, we would become more reliant on major customers. Due to the cost and capital focus of these major customers, we have been, and expect to continue to be, required to reduce prices (as discussed above). If we are not able to generate cost savings and operational improvements in the future that would be sufficient to offset price reductions required by existing customers or as otherwise necessary to attract new business, these price reductions could affect adversely our cash flow, operational results and financial condition.

- Customer Labor Concerns

Difficult conditions in the automotive industry and actions taken by our customers and other suppliers to address negative industry conditions may affect our business. If any of our customers experience a significant work stoppage, that customer may halt or limit the purchase of our products. Similarly, a work stoppage at another supplier could interrupt production to our customers, which would have the same effect. These circumstances could cause us to shut down production facilities relating to those products, which could have a material adverse effect on our business, cash flow, operational results and financial condition.

- Customer Requirements for Vendor Owned Inventory

Certain aftermarket customers, including both large retail customers and smaller warehouse distributors, require the vendor of record to provide financial assistance to offset the customer investment in inventory held for sale. Such assistance may be in the form of extended payment terms, vendor owned inventory or supply of inventory without a core deposit. Participation in such initiatives requires us to invest our financial resources in accounts receivable, or products residing on the customer shelf prior to its sale to the end user. As such demands increase in number and dollar volume, our financial condition, liquidity and cash flow may be impacted adversely.

17. *Core Liabilities*

We record a liability for core returns based on cores expected to be returned.[9]  The liability represents the difference between the core deposit value to be credited to the customer and the core inventory value for the core being returned.  Core inventory values decline over the expected remaining life of the core family.  Core inventory values decline on the basis of several economic factors, including market availability, seasonality and demand.  If estimated returns and/or core market value differ from our estimates, revisions to the estimated core liability may be required and may have an adverse impact on our financial results.

18. *Global Supply Chain*

Weather, strikes and seasonal fluctuations are all potential obstacles to obtaining the supply of components and products that we require.  Although some supply items are dual sourced (from more than one geographic area), any disruption in the supply chain from weather, strikes or government port intervention or excessive demand would cause us to incur premium alternative freight costs or cause temporary shortages to customers, thereby negatively impacting our business, cash flow and financial results.

In addition, the adverse industry environment or concerns about our ongoing financial stability may require us to pay suppliers in advance or on short credit terms.  This may negatively impact our liquidity and lead to interruptions in production.

19. *Lean Manufacturing and Other Cost Saving Plans*

Our operational strategy includes goals such as improvement of inventory sourcing practices, warranty programs management, customer delivery, plant and distribution facility consolidation and the further integration of back office functions across our businesses.  Although we believe that the successful implementation of these and other cost saving plans could result in reducing our expenses, there can be no assurance that these results can be achieved.  If we are unable to realize these anticipated synergies, our operating results and financial condition may be adversely affected.  Moreover, the implementation of cost saving plans and facilities integration may disrupt our operations and financial performance, and one-time implementation costs might be greater than estimated by management.

20. *Litigation*

From time to time, we are subject to claims or litigation incidental to our business.  As of the date of this Solicitation and Disclosure Statement, we are not currently involved in any legal proceedings that, individually or in the aggregate, are expected to have a material effect on our business, financial condition, results of operations or cash flows.  Our major pending litigation consists of the matters described in Article IV.G.  "THE BUSINESS—Environmental, Health and Safety Matters" and Article IV.K.  "THE BUSINESS—Legal Proceedings."

---

[9]     See Article III.A. "BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION—Background" for a description of "cores."

21. *Product Liability, Warranty and Recall Claims*

We may be exposed to product liability claims in the event that our products actually or allegedly fail to perform as expected or the use of our products actually or allegedly results in bodily injury and/or property damage. Accordingly, in the future we could incur significant costs to defend product liability claims, and, in certain instances, we could experience material product liability losses.

Depending on the terms under which we supply a product, we may be held responsible for some or all of the repair or replacement costs of such product when the product supplied does not perform, or is alleged to have not performed, as represented. In addition, if any of our products are, or are alleged to be, defective, we may be required to participate in a recall of that product or other warranty costs. Our costs associated with providing product warranties could be material. Product liability, warranty and recall costs may have a material adverse effect on our financial condition.

22. *Intellectual Property*

Our businesses could be affected by our ability to exploit and protect against infringement of our intellectual property, including trademarks, trade names, copyrights, patents, and trade secrets. We also are subject to the risk of challenges by third parties claiming infringement of their proprietary rights. Regardless of their validity, such claims may result in substantial costs and diversion of resources which could have an adverse effect on our operations.

23. *Goodwill and Other Identifiable Intangible Assets*

We have recorded a significant amount of goodwill and other identifiable intangible assets, including customer relationships, core return rights, trademarks and developed technologies. Goodwill and other identifiable intangible assets accounted for as much as 20% of our total assets in recent years.

Impairment of goodwill and other identifiable intangible assets may result from, among other things, deterioration in our performance, adverse market conditions, adverse changes in applicable laws or regulations, including changes that restrict the activities of or affect the products we sell, and a variety of other factors. The amount of any quantified impairment must be expensed immediately as a charge that is included our operating income.

24. *Acquisitions, Sales and Other Major Transactions*

In the past, we have completed many acquisitions and entered into numerous joint ventures and may consider additional acquisitions, business combinations and joint ventures in the future. Acquisitions and joint ventures involve a number of special risks and challenges, including those relating to conforming the standards, processes, procedures and controls of the acquired business with those of our existing operations, coordinating new product and process development, the assumption of unknown liabilities, integrating product technologies, increases in indebtedness and increasing the scope, geographic diversity and complexity of our operations.

Our failure to integrate acquired businesses successfully into our existing businesses could result in our incurring unanticipated expenses and losses.

We also may consider, on a case by case basis, certain asset sales or other divestitures of noncore assets in the future, although no such sale or divestiture is contemplated by the Plan. There can be no assurances that material liabilities will not arise in connection with such future sales and divestitures or of the consideration that we would receive in connection with any such sale or other disposition.

25.  *International Operations*

A substantial portion of our net sales are derived from net sales in markets outside of the United States.  We expect sales from international markets to represent an increasing portion of total sales in future periods.  Risks inherent in international operations include the following:

(a)  agreements may be difficult to enforce and receivables difficult to collect through a foreign country's legal system;

(b)  foreign customers may have longer payment cycles;

(c)  foreign countries may impose additional withholding taxes or otherwise tax our foreign income, impose tariffs or adopt other restrictions on foreign trade or investment, including exchange controls;

(d)  U.S. export licenses may be difficult to obtain;

(e)  intellectual property rights may be more difficult to enforce in foreign countries;

(f)  general economic conditions in the countries in which we operate could have an adverse effect on our earnings from operations in those countries;

(g)  unexpected adverse changes in foreign laws or regulatory requirements may occur;

(h)  compliance with a variety of foreign laws and regulations may be difficult; and

(i)  overlap of different tax structures may subject us to additional taxes.

We cannot be sure that any of these factors will not have a material adverse effect on our business, financial condition and results of operations.

26. *Domestic and Foreign Currency Fluctuation*

Our international sales generally are denominated in foreign currencies, and this revenue could be materially affected by currency fluctuations. Changes in currency exchange rates could adversely affect our revenues and could require us to reduce our prices to remain competitive in foreign markets, which could also have a material adverse effect on our results of operations. Our ability to pay interest and principal on our indebtedness when due is dependent on the then current exchange rates between the U.S. dollar, on the one hand, and the Euro and other European as well as Asian currencies, on the other hand, which rates are and will be subject to fluctuation.

Furthermore, we source many of our parts, components and finished products from Mexico, Europe and Asia. The cost of these products could fluctuate depending on foreign currency fluctuations.

Finally, a substantial portion of our net sales in recent years was derived from net sales in foreign markets. Fluctuations in exchange rates may affect product demand and may adversely affect the profitability in U.S. dollars of products and services provided by us in foreign markets where payment for our products and services is made in the local currency.

27. *Environmental and Health and Safety Liabilities and Requirements*

We are subject to various U.S. and foreign laws and regulations relating to environmental protection and worker health and safety, including those governing:

(a) discharges of pollutants into the air and water;

(b) the management and disposal of hazardous substances; and

(c) the cleanup of contaminated properties.

The nature of our operations exposes us to the risk of liabilities and claims with respect to environmental matters, including on-site and off-site disposal of hazardous waste. For example, we have been subject to investigation and remediation activities in connection with several of our properties. We also have in the past been named a defendant in connection with certain asbestos-related litigation. See Article IV.G. "THE BUSINESS—Environmental, Health and Safety Matters."

In addition, future events could require us to make additional expenditures to modify or curtail our operations, install pollution control equipment or investigate and cleanup contaminated sites, such as:

(a) the discovery of new information concerning past releases of hazardous substances;

(b) the discovery or occurrence of compliance problems relating to our operations;

(c)     changes in existing environmental laws or their interpretation; and

(d)     more rigorous enforcement by regulatory authorities.

Expenditures resulting from these events could have a material adverse effect on our businesses, financial condition and results of operation.

## III.    BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION

### A.    *Background*

We are a leading global supplier of automobile, truck and heavy machinery starters, alternators, hybrid transmissions and steering components.  Currently, we operate within four main business segments, as:  (i) a "tier one" supplier (*i.e.*, a direct supplier to an OEM) of light duty (*i.e.*, passenger vehicles) starters and alternators; (ii) a "tier one" supplier of heavy duty (*i.e.*, trucks and heavy machinery) starters and alternators; (iii) a "tier one" supplier of hybrid systems; and (iv) an aftermarket supplier of replacement starters and alternators.  We also operate as a supplier of used parts and steering components to OEMs and to retailers and distributors in the aftermarket channels, and as a supplier of remanufactured locomotive diesel engine components.  In addition to newly manufactured products, we produce "remanufactured" products, which are products created to exacting standards by utilizing components from previously manufactured products (including the shell of the product, which is known as the "core"), and new components and wiring.

As of the date hereof, we believe that, by market share, we are the largest supplier of light duty starters, heavy duty starters, and heavy duty alternators to OEMs in the North American market, and the third largest supplier of light duty alternators to OEMs in the North American market.  In the aftermarket segment, we believe that, by market share, we are the largest supplier to the "do-it-yourself" channel in North America through our sales to retail channel customers, and the third largest supplier to the North American "do-it-for-me" channel through sales to warehouse distributors or providers of repair services.  For a more detailed description of the Company's businesses, see Article IV.  "THE BUSINESS."

### B.    *Events Leading to Financial Distress*

Commencing in 1995, we embarked on an aggressive growth strategy that was designed to achieve four principal goals:  (i) diversification of our customer base; (ii) diversification of our business portfolio beyond starters and alternators; (iii) establishment of a low cost position through a realignment of manufacturing facilities to lower cost locations; and (iv) global expansion to support growth outside of the North American market.  As part of our growth strategy, from 1995 to 2006, we made over $475 million of acquisitions and investments in joint ventures, including acquisitions of:  (a) a powertrain business, which remanufactured diesel engines and components, diesel locomotive aftermarket products, transmissions and gas engines; (b) an electrical aftermarket business; (c) a traction control business; and (d) a light duty alternator business.  In addition, we invested significant capital to acquire and develop manufacturing capabilities in Mexico, Korea, Hungary, Poland, Brazil, Tunisia and China for both our OEM and aftermarket businesses.  Our total capital expenditures from 1995 to 2006 amounted to approximately $300 million.  Net proceeds from sales of businesses and assets from 1995 to June 30, 2007 were approximately $300 million.

Although our growth strategy had several important successes, those successes came at a heavy price in the form of the increased leverage that currently is weighing on our capital

structure – including the approximately $716 million of funded indebtedness as of June 30, 2007, including indebtedness under (i) Prepetition Credit Agreement, (ii) Floating Rate Secured Notes, (iii) Senior Notes and (iv) Subordinated Notes. The effects of the increased debt load have been exacerbated by, among other things, pricing pressures from our customers at a time when material costs were increasing dramatically; the decline of the U.S. dollar relative to the currencies of many of the markets to which production was shifted; increased warranty costs; and the failure of global markets to develop for the products we manufacture at the pace previously expected.

In an effort to rationalize our businesses and reduce debt, between 2003 and 2006, we divested or discontinued several of the business lines (for net proceeds of $146 million) that we had acquired in prior years, including our gas engine business, transmission business and traction control business. In addition, in 2007, we consummated the sale of our diesel engine remanufacturing business to Caterpillar for approximately $158 million[10] and entered into the Caterpillar Outsourcing Agreements.[11]

In a further attempt to address our financial condition, over the past year, we implemented a number of cost-cutting and restructuring initiatives, including: (i) freezing of future benefits under our U.S. defined benefit plan for certain salaried employees and former hourly, union employees; (ii) curtailing the post-retirement health care benefits for certain salaried U.S. employees; (iii) aggressively managing our supply chain management to reduce the purchase costs of component parts; (iv) restructuring of our European operations; and (v) closing certain electrical aftermarket remanufacturing facilities and transferring related production to low cost facilities in Mexico. Such efforts, however, were not sufficient to allow us to stem the loss of value to our business caused by our outstanding debt and reduced profitability.

C.    *Events Leading to the Proposed Financial Restructuring*

Due to the short-term maturity of certain of our indebtedness, including the Senior Notes, and the significant interest payments associated with our funded indebtedness, we determined that it was in the best interests of the Company and its stakeholders' to restructure our indebtedness. Accordingly, we retained Rothschild as our financial advisor, and Shearman & Sterling as our legal counsel, in order to assist us with the development of a comprehensive

---

[10]    Of the $158 million, $50 million was deposited in an account that is subject to an account control agreement for the benefit of the collateral agent under the Prepetition Credit Agreement. See Article III.D.2. "BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION—Equity Ownership and Debt Structure—Debt Structure" for a discussion of our intended use of such escrowed funds.

[11]    The Caterpillar Outsourcing Agreements provide for staged transfers of assets relating to the remanufacturing of heavy duty starters and alternators - the initial closing occurred on June 25, 2007, and additional assets will continue to be transferred periodically, with the final transfer anticipated to occur on or about October 2007. Pursuant to the Caterpillar Outsourcing Agreements, Caterpillar will become our exclusive supplier of remanufactured heavy duty starters and alternators, and in conjunction therewith, will acquire certain machinery and equipment that we currently utilize for that production.

financial restructuring plan, and AlixPartners to assist us in connection with operational, supplier and customer related issues.

In March of 2007, we met with representatives of FNSO, a Plan Support Party, and with the financial and legal advisors to the Plan Support Parties, to begin discussing the possibility of implementing a financial restructuring. FNSO executed a confidentiality agreement with RII on March 19, 2007, after which we began providing FNSO and the Plan Support Parties' legal and financial advisors with certain material non-public information.

On April 2, 2007, we filed with the SEC a Form 15 certification and notice of our suspension of our duty to file reports under sections 13 and 15(d) of the Exchange Act, and issued a press release announcing that, as a result, we would not file the 2006 10-K with the SEC. Our failure to file the 2006 10-K with the SEC resulted in a default under the Prepetition Indentures.

We have ceased making interest payments on our Senior Notes and Subordinated Notes. On April 15, 2007, we did not make the interest payment on account of the 9⅜% Subordinated Notes, on May 1, 2007 we did not make the interest payment due on the 11% Subordinated Notes and on June 15, 2007 we did not make the interest payment due on the Senior Notes. These non-payments of interest resulted in us being in default under the Prepetition Indentures for the Senior Notes and the Subordinated Notes and the Prepetition Credit Agreement. After the expiration of the applicable cure periods in the Prepetition Indentures, the non-payments of interest gave rise to events of default under the Prepetition Credit Agreement.

To address the defaults in the Prepetition Indentures caused by our failure to file the 2006 10-K and our decision to cease making interest payments on our Senior Notes and Subordinated Notes, we sought an agreement from certain holders of the Senior Notes and the Subordinated Notes to forbear from exercising their rights under the applicable indentures as a result of (i) our anticipated failure to pay interest on certain Prepetition Notes and (ii) our failure to file a 2006 10-K. Following negotiations with the Plan Support Parties' advisors, we entered into the Forbearance Agreement on April 15, 2007, with Impaired Noteholders holding approximately 84% of the outstanding principal amount of the Senior Notes and over 90% of the outstanding principal amount of the Subordinated Notes.

In order to allow us to continue to access the Prepetition Revolver notwithstanding the defaults and events of default, we sought a waiver of the condition to the making of advances under the Prepetition Revolver that there exist no default or event of default under the Prepetition Credit Agreement. Following this request, we obtained the Limited Waivers from the Prepetition Revolving Lenders. The Limited Waivers allow us to continue to borrow under the Prepetition Revolver but do not waive the applicable defaults or events of default. Consequently, defaults that currently exist under the Prepetition Credit Agreement entitle the Prepetition Revolving Lenders and the Prepetition Term Lenders to exercise all their rights and remedies under the Prepetition Credit Agreement.

On June 20, 2007, we obtained an additional waiver of the condition to borrow under the Prepetition Revolver from the Prepetition Revolving Lenders in connection with certain asset sales relating to the Caterpillar Outsourcing Agreements, including the consummation of the sale

of certain assets of Remy Reman, L.L.C. and to our use of the proceeds arising therefrom and from the post-closing adjustments relating to the sale of certain assets of Western Reman Industrial, Inc. (f/k/a Franklin Power Products) and International Fuel Systems, Inc..

Following execution of the Forbearance Agreement, we continued to negotiate the terms of a financial restructuring with FNSO and the Informal Committee's legal and financial advisors. Concurrently with the negotiations with the Plan Support Parties, we were engaged in negotiations with GM regarding a restructuring of our customer-supplier relationship.

On May 25, 2007, the Limited Restricted Holders entered into confidentiality agreements pursuant to which we provided to the Limited Restricted Holders certain material non-public information necessary to discuss the terms of a potential financial restructuring. FNSO also executed a new confidentiality agreement on May 25, 2007.

On June 15, 2007, we announced that RWHI, RII and Impaired Noteholders holding more than approximately 83% of the outstanding principal amount of the Senior Notes and approximately 80% of the outstanding principal amount of the Subordinated Notes had entered into the Plan Support Agreement. Subject to the terms and conditions thereof, the Plan Support Agreement requires the Plan Support Parties to vote in favor of the Plan. On July 15, 2007, the Requisite Plan Support Parties agreed to extend the date by which the Solicitation must be commenced to July 23, 2007. On July 23, 2007, the Requisite Plan Support Parties agreed to further extend the date by which the Solicitation must be commenced to July 30, 2007. Pursuant to a number of subsequent extensions, the most recent of which was the Fifth Plan Support Amendment, the Plan Support Parties agreed to extend the date by which the Solicitation must be commenced to September 14, 2007. In addition, the Fifth Plan Support Amendment reflects the renegotiation of certain aspects of our financial restructuring and the agreement of the Company to pay to holders of Senior Notes (i) a $10 million consent fee (upon the occurrence of the Effective Date and the receipt of $85 million in gross aggregate proceeds upon the consummation of the Rights Offering) in connection with the execution of the Fifth Plan Support Amendment and (ii) post-petition interest, up to a cap of $2 million, payable in Reorganized RII Series A Preferred Stock on account of the Senior Notes. Had the Plan Support Parties not agreed to enter into the Fifth Plan Support Amendment, the Plan Support Agreement would have terminated.

As of June 15, 2007, we, Court Square and the CVC Noteholder Parties entered into the CVC Settlement Agreement pursuant to which Court Square agreed, among other things, to (i) certain limitations on its ability to effectuate stock transfers and take a worthless stock deduction in respect of the shares of RWHI Equity Interests held by it, (ii) compromise amounts owed to it under the Advisory Agreement and (iii) grant certain releases in favor of the Prospective Debtors and the CVC Noteholder Parties. In exchange for Court Square's agreement, the Prospective Debtors and the CVC Noteholder Parties agreed, among other things, to grant certain releases in favor of Court Square, and the Company agreed, among other things, to pay to Court Square $4 million on the Effective Date and to seek to assume the CVC Settlement Agreement promptly following the commencement of the Chapter 11 Cases. In addition, the CVC Noteholder Parties agreed to grant certain releases in favor of Court Square and, so long as the Plan was not withdrawn, to (a) acknowledge that the Plan would provide for the CVC Payment and the appropriate treatment therefore and (b) refrain from opposing the

Debtors' motion to assume the CVC Settlement Agreement. A copy of the CVC Settlement Agreement is attached hereto as Exhibit K. See Article VII.H. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of CVC Settlement Agreement."

On July 30, 2007, the Company and GM entered into the GM Agreements, pursuant to which GM and the Company agreed to an extension of their current supply arrangements and certain pricing concessions. See Article VII.A. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of GM Agreements."

On August 27, 2007, the Board of Directors (or the equivalent authorized body) of each of the Prospective Debtors determined that consummation of the transactions contemplated by the Plan was in the best interests of the Prospective Debtors and their stakeholders and authorized the commencement of this Solicitation.

RWHI and certain of its subsidiaries entered into the Backstop Commitment Agreement with the Committed Purchasers, as of August 29, 2007, a copy of which is attached hereto as Exhibit C. See Article VI.F. "RIGHTS OFFERING—Backstop Commitment Agreement."

D.    *Equity Ownership and Debt Structure*

1.    *Equity Ownership Structure*

Each Prospective Debtor (other than RWHI) is either a direct or indirect wholly-owned subsidiary of RWHI. The authorized capital stock of RWHI consists of 12,001,000 shares of common stock and 3,500,000 shares of preferred stock. As of March 31, 2007, there were 2,503,024.48 shares of RWHI common stock and 2,237,257.23 shares of RWHI preferred stock outstanding.

2.    *Debt Structure*

(a)    *Prepetition Credit Agreement*

RII and certain of its subsidiaries are parties to the Prepetition Credit Agreement. The Prepetition Credit Agreement is comprised of the Prepetition Term Loan and the Prepetition Revolver. The Prepetition Term Loan bears interest at the rate of LIBOR plus 6%. A substantial portion of the outstanding borrowings under the Prepetition Revolver bear interest at the rate of LIBOR plus 2.00 to 2.75%. In the event of a specified default under the Prepetition Credit Agreement these interest rates may increase by an additional 2%, and we have been paying this default rate of interest with respect to the Prepetition Term Loan since May 15, 2007. Prepayment of the Prepetition Term Loan is subject to a prepayment penalty of 3% with respect to prepayments occurring between April 15, 2007 to April 15, 2008 and 2% with respect to any period thereafter.

As of the date hereof, the outstanding principal amount due under (i) the Prepetition Term Loan is $80 million, and (ii) the Prepetition Revolver, is approximately $77.4 million, plus approximately $8.5 million of issued and outstanding letters of credit. The obligations under the

Prepetition Credit Agreement are secured by a first priority lien on substantially all assets of certain of the Prospective Debtors. We intend to request that the Bankruptcy Court authorize us to repay, in full, all outstanding amounts owed under the Prepetition Credit Agreement promptly following the commencement of the Chapter 11 Cases (including all accrued and unpaid interest thereon at the default rate, to the extent applicable, and any prepayment penalties, make-whole payments or other similar amounts that may be due and owing). We also expect to request the authority to make such repayment with: (i) a portion of the proceeds available under the DIP Credit Agreement and (ii) the funds that were escrowed in connection with the sale of our diesel engine business to Caterpillar (as described above). There can be no assurance, however, that the Bankruptcy Court will allow us to repay Secured Credit Agreement Claims prior to the confirmation of the Plan and in such an event we intend to repay all Secured Credit Agreement Claims on or after the Effective Date pursuant to the terms of the Plan, as described below in Article V "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION."

(b)      *Floating Rate Secured Notes*

As of the date hereof, the outstanding amount due in respect of the Floating Rate Secured Notes is $125 million, plus accrued and unpaid interest thereon. RII is the issuer of the Floating Rate Secured Notes. The Floating Rate Secured Notes bear interest at LIBOR plus 4.00%, and such interest is payable quarterly. Interest payable on overdue installments of principal or interest is payable at this rate plus 1% *per annum*. The Floating Rate Secured Notes are redeemable at our election for 100.5% of the total face value of such notes if such redemption occurs after April 15, 2007 and for 100% of the total face value of such notes if such redemption occurs after April 15, 2008. The Floating Rate Secured Notes are secured by a second priority lien on substantially all assets of certain of the Prospective Debtors.

(c)      *Senior Notes*

As of the date hereof, the outstanding amount due in respect of the Senior Notes is $145 million, plus accrued and unpaid interest thereon. The Senior Notes bear interest at a fixed rate of 8⅝% *per annum* and interest payable on overdue installments of principal or interest is payable at this rate plus 1% *per annum*. RII is the issuer of the Senior Notes. The Senior Notes are guaranteed on a joint and several basis by certain of the Prospective Debtors. The Senior Notes are unsecured.

(d)      *11% Subordinated Notes*

As of the date hereof, the outstanding amount due in respect of the 11% Subordinated Notes is $165 million, plus accrued and unpaid interest thereon. The 11% Subordinated Notes bear interest at a fixed rate of 11% *per annum* and interest payable on overdue installments of principal or interest is payable at this rate plus 1% *per annum*. RII is the issuer of the 11% Subordinated Notes. The 11% Subordinated Notes are guaranteed on a joint and several basis by certain of the Prospective Debtors. The 11% Subordinated Notes are unsecured and subordinate in right of payment to the Senior Notes.

(e)        *9⅜% Subordinated Notes*

As of the date hereof, the outstanding amount due in respect of the 9⅜% Subordinated Notes is $150 million, plus accrued and unpaid interest thereon.  The 9⅜% Subordinated Notes bear interest at a fixed rate of 9⅜% *per annum* and interest payable on overdue installments of principal or interest is payable at this rate plus 1% *per annum*.  RII is the issuer of the 9⅜% Subordinated Notes.  The 9⅜% Subordinated Notes are guaranteed on a joint and several basis by certain of the Prospective Debtors.  The 9⅜% Subordinated Notes are unsecured and subordinate in right of payment to the Senior Notes.

## IV.    THE BUSINESS

### A.    *General*

As a result of the realignment of our manufacturing to facilities in lower cost foreign locations, only a small portion of our sales is derived from products manufactured in the United States.  With the exception of a small facility in Anderson, Indiana that manufactures products for our hybrid business, nearly all of the products we distribute to OEMs are manufactured outside of the United States by our foreign subsidiaries.[12]  Our foreign subsidiaries are organized under the laws of the jurisdictions in which they operate and will not be debtors in the Chapter 11 Cases.  We are highly dependent upon the supply of products purchased from our Non-Debtor Foreign Affiliates – principally those located in Korea and Mexico – to satisfy our delivery requirements to customers.

Other manufacturing facilities located in the United States produce components for our aftermarket and locomotive businesses.

### B.    *Corporate History*

Our corporate predecessor – Remy Electric – entered the automotive electrical components business in the early 1900s.  In 1918, the business was acquired by, and operated as a division of GM, until GM sold it to a group of private investors in 1994.  After the sale, the business was known as Delco Remy International, Inc. and remained private until it consummated an initial public offering of its common stock on December 22, 1997.  After operating as a public company for a little over three years, on February 7, 2001, Delco Remy International, Inc. once again became a privately held company as a result of a going-private transaction with its largest stockholder.  On August 1, 2004, Delco Remy International, Inc. changed its name to Remy International, Inc.  On September 30, 2004, RWHI was formed to act as a holding company of all of the outstanding capital stock of RII.

### C.    *Products*

Below is a description of our material business products:

*Automotive OEM / Automotive Starters and Alternators* – Products within the automotive OEM category include light duty manufactured starters and alternators, which consist mainly of high output and efficiency alternators, as well as basic starters used in passenger vehicles.  We believe we are the largest supplier, by unit volume, of light duty starters in the North American market, the third largest supplier of light duty starters in the Asian Pacific market and the second largest supplier of light duty starters in the South American market.  With respect to light-duty alternators, we believe we are the third largest supplier, by unit volume, in the North American Market, and we have a small but growing presence in the Asia Pacific region, with especially notable advances being made in China.

---

[12]    Although we currently maintain remanufacturing facilities in Mississippi, these facilities are expected to close by the end of 2007 upon the consummation of the Caterpillar Outsourcing Agreements.

*Heavy Duty OEM* – Products within the heavy duty OEM categories include manufactured starters and alternators for heavy duty trucks, industrial, construction and agricultural applications and other heavy duty applications. We believe we are the largest supplier, by unit volume, of heavy duty starters and heavy duty alternators in the North American market, and a leading supplier in both the European and South American markets.

*Electrical Aftermarket* – Products within the electrical aftermarket consist of a broad line of Remy brand and private-labeled remanufactured starters and alternators. We provide high quality products with competitive pricing to both wholesale distributors and large retail customers. We believe we are the largest supplier to the "do it yourself" channel (*i.e.*, retail channel) and the third largest supplier to the "do it for me" channel (*i.e.*, commercial channel) in North America. With respect to North American heavy duty aftermarket market share, we believe we are the largest supplier of both new service and remanufactured products.

D.      *Industry Overview*

Our business is influenced by the underlying trends in the automobile, light truck, heavy-duty truck, construction and industrial markets. We seek to balance the cyclical nature of our businesses with the diversity of original equipment manufacturing markets, including between the automotive, heavy duty truck and industrial markets, as well as by focusing on our remanufacturing capabilities and aftermarket business.

*Aftermarket*

The automotive parts aftermarket involves production and sale of new and remanufactured parts used in the maintenance and repair of automobiles, trucks and other vehicles. Aftermarket parts are supplied principally through three distribution channels:

- automobile and truck dealers that obtain parts through their OEM parts organizations or directly from an OEM-authorized remanufacturer;

- retail automotive parts chains and mass merchandisers; and

- independent warehouse distributors and jobbers who supply independent service stations, installers, specialty and general repair shops, farm equipment dealers, car dealers and small retailers.

The aftermarket and our opportunity in the aftermarket have been, and likely will continue to be, impacted by the following trends:

- increasing number and average age of vehicles in use and the number of miles driven annually;

- increasing demands of customers that their aftermarket suppliers meet high quality and service standards;

- increasing use of remanufactured parts for OEM warranty and extended service programs;

- growth and consolidation of large retail automotive parts chains and warehouse distributors requiring larger, nationally capable suppliers;

- increasing engine output and durability demands;

- increasing high-technology content of replacement components, which requires more factory manufacturing, compared with in-vehicle repair;

- increasing service lives of automotive parts in both the OEM market and aftermarket;

- increasing demands of customers to have the supplier offer vendor managed inventory and related financing and increasing demand for suppliers to own cores; and

- increasing competition from Asia.

Recently, several large retail automotive parts chains offering a broad range of new and remanufactured products have experienced growth at the expense of small, independent retail and wholesale stores as they implement strategies to take advantage of their economies of scale in addressing the needs of the traditional/commercial market. Increasingly, it appears that retail chains generally prefer to deal with large, national suppliers capable of meeting their cost, quality, volume and service requirements.

*OEM Markets*

The OEM market consists of the production and sale of new component parts for use in the manufacture of new vehicles and engines. The OEM market includes two major classes of customers:

- automobile and light truck manufacturers, hybrid propulsion system, marine and industrial manufacturers; and

- heavy-duty truck and engine manufacturers and other heavy-duty manufacturers.

The OEM market has been impacted by fundamental changes in the sourcing strategies of OEMs. OEMs are consolidating their supplier base, demanding that their suppliers provide technologically advanced product lines, greater systems engineering support and management capabilities, just-in-time sequenced delivery and lower system and component costs. OEMs are requiring that their preferred suppliers establish global production capabilities to meet their needs as they expand internationally and increase platform standardization across multiple markets. As OEM global alliances increase, global pricing for automotive components has been the norm. China and India sourcing is anticipated to continue to have an effect on the global OEM market and the related components industry in both regional and global markets. OEMs continue to

outsource component manufacturing in response to competitive pressures on OEMs to improve quality and reduce capital outlays, production costs, overhead and inventory levels.

*Competition*

The automotive component parts market is highly competitive.  Competition is based primarily on quality of products, service, delivery, technical support and price.  Most OEMs and aftermarket distributors source component parts from one or two suppliers, and we compete with a number of companies who supply automobile manufacturers throughout the world.  In the automotive market, our principal competitors include BBB, Bosch, Denso, Hitachi, Mitsubishi, Motorcar Parts of America, Rayloc, Valeo and Visteon.  In the heavy-duty truck market, our competitors include Bosch, Denso, Mitsubishi and Prestolite.

Although the business segments in which we operate tend to be asset intensive businesses that have a high cost of entry, it cannot be assumed that the markets into which we sell our products will not attract additional competitors that could have significantly greater financial, technological, manufacturing and marketing resources than ourselves.

E.    *Recent and Future Strategy*

In 2006, we installed a new management team focused on (i) tailoring growth to match well performing sectors of the market and (ii) improving operating results.  The new management team has focused on:

- achieving improved short-term operational execution and discipline;

- achieving long-term operating efficiency and reinvesting for strategic growth;

- improving profitability in the global OE market;

- enhancing market share in the commercial segment of the electrical aftermarket;

- capitalizing on growth in the heavy duty truck market; and

- developing and capitalizing on technologically advanced products.

Our reinvigorated strategic focus on operational results produced clear progress in 2006, including:

- free cash flow (a reconciliation of free cash flow to U.S. GAAP measures is posted on our website www.remyinc.com) improvements of $98 million through focus on strong working capital control and strict discipline over capital investment;

- increased adjusted EBITDA[13] (a reconciliation of adjusted EBITDA to U.S. GAAP measures is posted on our website www.remyinc.com) of 15% to $70

---

[13]    Although EBITDA is not a measure of performance calculated in accordance with generally accepted accounting principles, management believes that it is useful in evaluating the Company because it is widely used as a measure to evaluate a company's operating cash flow before debt expense.  EBITDA does not purport to represent cash generated by operating activities and should not be considered in isolation or as a

million, before unusual charges of $28 million yielding a reported $42 million (including from the results of our discontinued diesel operations);

- implementation of a disciplined process to capture material cost reduction, resulting in $10 million of year-over-year savings and a projected $20 million in additional savings in 2007;

- revenue increase of 13% while total worldwide headcount was reduced by almost 14%;

- our13% revenue increase reflects significant increase in volume in light duty alternator and heavy duty businesses, the effect of the Unit Parts Company acquisition in March 2005, and the pass through of higher commodity prices. Alternator sales volume increased approximately 50%, broadening the OE business;

- transitioning of the "high efficiency-high temperature" technology from light duty to heavy duty alternators, giving us a leading edge in the heavy duty market;

- relocating engineering centers from the U.S. to Korea and Eastern Europe allowed us to provide better support to our global markets and maintain our position as a technology leader while reducing total engineering costs by $12 million;

- securing long-term contracts with key retail customers that significantly strengthened our profitable position in the North American automotive aftermarket; we also abdicated a position at a significant customer due to unacceptable profitability; and

- significant strengthening of our infrastructure and mitigation of risks by reducing our reliance on an antiquated and unsupportable IT system. Such upgrades will further standardize processes and systems that will help drive additional productivity gains.

In January 2007, we sold our diesel remanufacturing business to Caterpillar for approximately $158 million. As part of this transaction, we also agreed to transfer certain assets in connection with the outsourcing of our heavy duty starter and alternator remanufacturing business to Caterpillar, which will result in additional cash proceeds of approximately $14 million in 2007. We are evaluating sales of other noncore assets and outsourcing opportunities on a case by case basis.

We also are in the process of implementing several important strategies for improved performance going forward. For example, we are in the process of shifting our product mix by focusing on higher value products on which we anticipate generating higher profit margins and moving away from lower margin products. As a result, we will focus on growing our hybrid and heavy duty products lines, as well as increasing our participation in the commercial channel of the automotive aftermarket business. We also are implementing a program of site

---

substitute for measures of performance in accordance with generally accepted accounting principles. In addition, because EBITDA is not calculated identically by all companies, the presentation here may not be comparable to other similarly titled measures of other companies.

consolidations, with approximately 16 existing sites targeted for consolidation.  In addition, we have initiated a comprehensive material resourcing and warranty improvement program designed to achieve substantial cost savings through resourcing to low cost countries, product redesigns, manufacturing changes and warranty cost improvements.  Over the next 36 months, we expect to move approximately $65 million of purchased materials in the U.S., Europe and Korea to lower cost regions, particularly China.  These moves are projected to reduce our costs in 2008 by $15-$20 million.  We also will be launching several new, lower cost, higher reliability products over the next 18 months, particularly in our heavy duty alternator and starter portfolios.  These changes are expected to give us a much more competitive portfolio for the light duty market as well as a broader portfolio of high reliability products for the heavy duty market.  Expansion into the commercial channel of the automobile aftermarket, which we believe has better growth potential and cash requirements than the retail segment of the market, is also a priority.  See Article IX.A. "FINANCIAL PROJECTIONS AND VALUATION ANALYSIS—Financial Projections."

F.      *Government Regulation*

Due to the nature of our business, our operations are subject to a variety of federal, state and local laws, regulations and licensing requirements.  We believe that our operations are in substantial compliance with those laws, regulations and requirements.  Compliance with federal, state and local requirements has not had, and is not expected to have, a material effect on capital expenditures, financial condition, results of operations or competitive position.

We are the North American leader in the heavy duty market (*i.e.*, heavy equipment & class 8 trucks) for both original equipment and aftermarket products.  This market is experiencing a significant, but expected, downturn in 2007 which we believe is because of the introduction of new Environmental Protection Agency regulations.  We anticipate that the market will increase in 2008 as demand recovers from the buildup of equipment in advance of the new regulations, but cannot provide any assurances of such recovery.  See Article IX.A. "FINANCIAL PROJECTIONS AND VALUATION ANALYSIS—Financial Projections."

G.      *Environmental, Health and Safety Matters*

We are subject to stringent environmental, health and safety requirements, including laws and regulations relating to air emissions, wastewater management, the handling and disposal of waste, and the cleanup of properties affected by hazardous substances.  We believe that our current operations are in substantial compliance with environmental, health and safety requirements.  There are ongoing investigations and remediation activities in connection with several of our properties, however, we currently believe that any existing and future involvement in matters arising under various environmental or health and safety laws will not have a material adverse effect on our operations, liquidity or financial condition.

In the past, we have been named as a defendant in various asbestos-related complaints.  All such litigation relates to our businesses prior to the 1994 separation from GM.  Pursuant to the contractual arrangements through which that separation was effected, GM is required to indemnify us from any liability arising in connection with such claims (to the extent that such

liability arises from pre-separation acts and liabilities). To date, we have not been held liable in connection with any such asbestos-related litigation.

H.  *Executive Officers*

The Company's executive officers are as follows:

| Name | Age | Position(s) held |
|------|-----|------------------|
| John H. Weber | 51 | Chief Executive Officer, President & Director |
| Kerry A. Shiba | 52 | Senior Vice President & Chief Financial Officer |
| Jerry Mills | 55 | Senior Vice President & Chief Human Resources Officer |
| David R. Muir | 49 | Senior Vice President & Chief Procurement Officer |

Set forth below is a brief description of the business experience of the executive officers listed above.

*John H. Weber, Chief Executive Officer, President and Director.* Mr. Weber was elected as our Chief Executive Officer, President and Director in January 2006. Prior to joining us, Mr. Weber served as President, Chief Executive Officer and Director of Eagle Picher, Inc. since July 2001. Prior to that, Mr. Weber served as President of the Industrial Controls and Friction Materials Group for Honeywell International since July 2000.

*Kerry A. Shiba, Senior Vice President and Chief Financial Officer.* Mr. Shiba was appointed as our Senior Vice President and Chief Financial Officer in May 2006. Before joining us, Mr. Shiba was with Kaiser Aluminum Corporation since 1998 in financial roles of increasing responsibility, most recently as Vice President and Chief Financial Officer. Prior to that, Mr. Shiba was with The BFGoodrich Company since 1981 where he served as the Vice President and Controller of the Specialty Chemicals Segment from 1994 to 1997.

*Jerry Mills, Senior Vice President and Chief Human Resources Officer.* Mr. Mills was appointed as our Senior Vice President and Chief Human Resources Officer in May 2006. Prior to joining us, Mr. Mills served as Vice President of Human Resources for NVR Inc. and served as Senior Vice President of Human Resources for Eagle-Picher Industries from 2002 to 2005. Mr. Mills spent 28 years with Owens-Corning in several human resource leadership positions prior to joining Eagle-Picher Industries.

*David R. Muir, Senior Vice President & Chief Procurement Officer.* Mr. Muir was appointed as our Senior Vice President & Chief Procurement Officer in May 2006. Prior to joining us, Mr. Muir served as the Senior Vice President and Chief Procurement Officer of R.R. Donnelley. Prior to that, Mr. Muir served as Vice President of Materials and Supply Chain Management for American Plumbing and Mechanical Inc. from 2001 through 2003.

The following table sets forth, for the year ending December 31, 2006, the information regarding the cash compensation paid by us, as well as other compensation paid or accrued for that period, to each of our current executive and principal officers named below, in all capacities in which they served.

| Name and Principal Position | Year | Compensation[14] | Other[15] | Total Compensation |
|---|---|---|---|---|
| John H. Weber[16] President and Chief Executive Officer | 2006 | $1,368,655 | $275,364 | $1,644,019 |
| Kerry A. Shiba[17] Senior Vice President and Chief Financial Officer | 2006 | $412,792 | $82,274 | $495,066 |
| David R. Muir[18] Senior Vice President and Chief Procurement Officer | 2006 | $331,370 | $154,990 | $486,360 |
| Jerry Mills[19] Senior Vice President and Chief Human Resources Officer | 2006 | $319,844 | $48,499 | $368,343 |

I.    *Employees*

As of December 31, 2006, the Company employed approximately 7,500 full-time employees in continuing operations, of which approximately 1,700 were employed by the Prospective Debtors and based in the United States.  Approximately 285 hourly workers in Oklahoma are affiliated with the United Food and Commercial Workers Union, Local 1000, Dallas, Texas.  Agreements with this union expire on March 1, 2009.  As of the date hereof, all employee relations are considered to be satisfactory.  We have very limited exposure to the legacy costs (including collective bargaining agreements and large, underfunded legacy liabilities) typical of many other key industry participants.  We sponsor a pension plan on behalf of certain salaried U.S. employees and a separate plan for certain former hourly, union U.S. employees.  As of the date hereof, we are current on our minimum funding requirements for these pension plans.  We provide benefit-eligible salaried retirees and their dependents with the opportunity to enroll for various medical, dental, vision and life insurance coverage benefits.

---

[14]    Includes base compensation and annual bonus earned.  Total compensation does not reflect amounts for matching contributions under our 401(k) plan.  In addition, Mr. Weber participates in a Supplemental Executive Retirement Plan, the amounts of which are not included in the total compensation above.

[15]    Other expense includes normal relocation costs, signing bonus and tax payments, if applicable.

[16]    Mr. Weber was hired on January 23, 2006.

[17]    Mr. Shiba was hired on May 9, 2006.

[18]    Mr. Muir was hired on May 8, 2006.

[19]    Mr. Mills was hired on May 31, 2006.

Salaried retirees enrolled in these benefits programs are required to make certain co-payments and pay a portion of the costs we incur in providing the program. In addition, we provide 68 benefit-eligible former United Auto Workers union members and their eligible dependents with certain benefits pursuant to the terms of a 1997 agreement with the United Auto Workers union. The benefits to the union retirees are provided at no cost to such retirees, although a percentage of the expenses incurred are paid by GM.

J. *Properties*

Our world headquarters are located at 2902 Enterprise Drive, Anderson, Indiana 46013, which is a leased property. As of December 31, 2006, continuing operations had approximately 71 manufacturing and other facilities in approximately 12 countries. The majority of these properties are leased. We believe that our facilities are suitable for their intended purposes and adequate for our level of operations.

K. *Legal Proceedings*

We are subject to a number of legal proceedings with respect to claims that arose in the ordinary course of our business, including a number of product liability claims, which have not been settled or fully adjudicated. We carry comprehensive product liability insurance for the purpose of mitigating our exposure to such claims.

We have been named a defendant in a proceeding relating to a tugboat fire in Louisiana. Our product liability insurance carrier has been notified of the claim, and the carrier has retained counsel in New Orleans in connection with this matter. Expert witnesses have been procured with respect to this matter and such experts have indicated they believe the fire was caused by a malfunction attributable to faulty maintenance and it is believed this fact provides a defense to the claim. There have been no substantial settlement discussions to date.

We also are party to a proceeding for patent infringement that was initiated by GE Licensing (d.b.a CIF Licensing LLC) in the Eastern District of Texas. We have obtained an invalidity opinion with respect to the patent in question in this matter and have been engaged in settlement discussions with the plaintiff. We also have filed a request for reexamination of the patent with the U.S. Patent & Trademark Office in an effort to invalidate the GE patent, and although we believe the patent to be invalid, we have contacted and initiated proceedings with respect to certain of our suppliers based upon their obligation to indemnify us pursuant to the terms of relevant purchase orders in the event that we are found liable for infringement of the patent.

We actively review our import/export processes in North America, Europe and Asia to verify that we apply the appropriate import duty classifications, values and duty rates (including import value added taxes). As part of this review process, a potential exposure related to customs duties in the U.S. has been identified. We have paid approximately $1 million and accrued approximately $8 million as of December 31, 2006 with respect to this issue.

No currently pending or anticipated litigation, including those matters described above, when ultimately concluded, will, in the opinion of management, have a material adverse effect upon our financial position or results.

L.    *Currency Hedging*

Due to the existing mix of our manufacturing and vendor base, we have been negatively impacted in the past by the weakening of the U.S. dollar, primarily against the Korean Won.  The impact was mitigated by the implementation of the "point-of-use" sourcing strategy but not to the extent necessary to keep pace with the degree of change during 2005.

## V. THE PLAN – CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION

### A. *Overview of Chapter 11*

Chapter 11 is the business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its financial affairs for the benefit of itself and its creditors and equity holders. The principal goals of chapter 11 are to permit the rehabilitation of the debtor and provide for equality of treatment of similarly situated creditors.

The Plan provides, among other things, for a restructuring of our financial indebtedness. The goal of the Plan is to delever our balance sheet in order to provide us with a capital structure that will best enable us to compete effectively in our markets.

The following summary is a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Solicitation and Disclosure Statement.

### B. *Administrative Claims, Priority Tax Claims and Other Unclassified Claims*

#### 1. *Administrative Claims*

Each Holder of an Allowed Administrative Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the amount of such Allowed Administrative Claim (except to the extent that such Holder agrees to less favorable treatment thereof) on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Administrative Claim becomes Allowed, (c) the date on which such Administrative Claim becomes due and payable and (d) such other date as mutually may be agreed to by such Holder, the Steering Committee and the Debtors. Notwithstanding the foregoing, any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto.

#### 2. *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable and (d) such other date as mutually may be agreed to by and among such Holder, the Steering Committee and the Debtors; provided, however, that the Debtors shall be authorized, at their option, and in lieu of payment in full of an Allowed Priority Tax Claim, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.

### 3. *Professional Fees*

Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Confirmation Date must File an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases on or before the sixtieth day following the Effective Date. Without limiting the foregoing, any Debtor or Reorganized Debtor, as the case may be, may pay the charges incurred by the Debtors on and after the Confirmation Date for any Professional's fees disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

Notwithstanding the above, all reasonable fees and expenses of the Committee Professionals that are incurred in connection with the Chapter 11 Cases (whether incurred before or after the Petition Date, but no later than the Effective Date) will be deemed to be Allowed Administrative Claims for purposes of the Plan.

### 4. *Prepetition Indenture Trustee Fees and Expenses*

The Prepetition Indenture Trustees have provided and will continue to provide necessary services under the Prepetition Indentures prior to and after the Petition Date. On or as soon as practicable after the Effective Date, the Debtors are required to pay all reasonable fees, costs and expenses incurred by the Prepetition Indenture Trustees in the performance of their duties and as provided under the Prepetition Indentures (including, but not limited to, the reasonable fees, costs and expenses incurred by the Prepetition Indenture Trustees' professionals) prior to the Effective Date, provided (a) such fees, costs and expenses are reimbursable under the terms of the applicable Prepetition Indentures and (b) any dispute in connection with such fees, costs and expenses has been resolved by Final Order. The Reorganized Debtors shall pay all reasonable fees, costs and expenses incurred by any Prepetition Indenture Trustee after the Effective Date in connection with the distributions required pursuant to section 6.2 of the Plan or the implementation of any provisions of the Plan (including, but not limited to, the reasonable fees, costs and expenses incurred by the Prepetition Indenture Trustees' professionals). Any dispute regarding the obligations of the Debtors or the Reorganized Debtors with respect to the payment of the reasonable fees, costs and expenses of the Prepetition Indenture Trustees shall be resolved by the Bankruptcy Court. Distributions received by the Holders of Allowed Floating Rate Secured Note Claims, Allowed Senior Note Claims and Allowed Subordinated Note Claims, pursuant to the Plan, will not be reduced on account of the payment of the Prepetition Indenture Trustees' fees, costs and expenses pursuant to the Plan.

### 5. *Claims Under DIP Credit Agreement*

All amounts outstanding under the DIP Credit Agreement will be paid in full in Cash on the Effective Date, or as otherwise provided in the DIP Credit Agreement, the Confirmation Order, or the Exit Facility Documents.

C.    *Classification of Claims and Interests*

Section 1123(a)(1) of the Bankruptcy Code requires a plan of reorganization to designate classes of claims and classes of interests.  The Plan segregates the various Claims against the Debtors into various classes.

The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class.  We believe that all Claims and Equity Interests have been appropriately classified in the Plan.

In the event that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, we would seek (with the consent of any required parties) to (i) modify the Plan to provide for whatever reasonable classification might be required for confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this Solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which the Holder of such Claim was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan adversely affects the treatment of a Holder of Claims in a manner that requires resolicitation, we likely will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this Solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class to which such Holder is ultimately deemed to be a member.  See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases."

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the Holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest.  We believe we have complied with the requirement of equal treatment for each Claim or Equity Interest of a particular Class.

Only Classes that are "impaired" (pursuant to section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan, unless the Class is deemed to have rejected the Plan.  As a general matter, a class of claims or equity interests is considered to be "unimpaired" under a plan of reorganization if the plan does not alter the legal, equitable and contractual rights of the holders of such claims or equity interests.  Under the Bankruptcy Code, holders of unimpaired claims are conclusively presumed to have accepted a proposed plan of reorganization.  Holders of Equity Interests which do not receive or retain anything under a proposed plan of reorganization are deemed to have rejected such plan.

The categories of Claims and Equity Interests outlined in the Plan and listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  Pursuant to section 3.1 of the Plan, a Claim or Equity Interest will be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest will fall within a particular Class only to the extent that such Claim or Equity Interest has not been paid or otherwise settled prior to the Effective Date.  Intercompany Claims are not classified in the Plan, and will be reinstated pursuant to section 1124 of the Bankruptcy Code such that such Claims are rendered Unimpaired.  RII Equity Interests and Surviving Equity Interests also are not classified in the Plan.  Section 3.1 of the Plan provides that all RII Equity Interests shall be cancelled, extinguished and discharged on the Effective Date, and all Surviving Equity Interests will remain outstanding on and after the Effective Date, subject to the terms of the Plan.

**The Plan classifies General Unsecured Claims as a separate Class because this Class is largely composed of trade creditors.  We intend to seek authority from the Bankruptcy Court to make payments on account of obligations to general unsecured creditors in the ordinary course of business, including any such obligations arising prior to the commencement of the Chapter 11 Cases.  The Plan also provides for nonimpairment by ensuring that Allowed General Unsecured Claims either will be paid in full in Cash or be reinstated pursuant to section 1124 of the Bankruptcy Code.**

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

Claims Against and Equity Interests in the Debtors

Class 1—Secured Credit Agreement Claims

Class 2—Floating Rate Secured Note Claims

Class 3—Other Secured Claims

Class 4—Other Priority Claims

Class 5—General Unsecured Claims

Class 6—Senior Note Claims

Class 7—Subordinated Note Claims

Class 8—Subordinated Securities Claims

Class 9—RWHI Equity Interests

In the event that no Secured Credit Agreement Claim exists as of the date of commencement of the Confirmation Hearing (as a result of the repayment of all such claims

from the proceeds of the DIP Facility), Class 1 will be deemed to have been deleted from the Plan for all purposes, including for purposes of (a) determining whether such Class has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code and (b) distributions to be made under the Plan.

D.    *Treatment of Claims and Interests*

The treatment of Claims and Equity Interests pursuant to Article III of the Plan is as follows:

1.    *Treatment of Claims and Equity Interests*

(a)    Class 1—Secured Credit Agreement Claims

(i)    *Treatment:* On, or as soon as practicable after, the Effective Date, each Holder of an Allowed Secured Credit Agreement Claim shall receive Cash in an amount equal to the principal, interest and any other amounts that may be owed in respect of such Claim, so as to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder.

(ii)    *Voting*: Class 1 is Unimpaired. Holders of Secured Credit Agreement Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(b)    Class 2—Floating Rate Secured Note Claims

(i)    *Treatment:* On, or as soon as practicable after, the Effective Date, each Holder of an Allowed Floating Rate Secured Note Claim shall receive Cash in an amount equal to the principal, interest and any other amounts that may be owed in respect of such Claim, so as to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder.

(ii)    *Voting*: Class 2 is Unimpaired. Holders of Floating Rate Secured Note Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(c)    Class 3—Other Secured Claims

(i)    *Treatment*: Each Holder of an Allowed Other Secured Claim shall have such Claim reinstated pursuant to

section 1124(2) of the Bankruptcy Code such that the Claim is rendered Unimpaired, except to the extent that the Holder agrees to less favorable treatment thereof. The failure of the Debtors or any other party in interest (including the Steering Committee) to File an objection, prior to the Effective Date, with respect to any Other Secured Claim that is reinstated under the Plan shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest (including the Steering Committee) to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes Allowed, or (z) such other date as mutually may be agreed to by and among such Holder, the Steering Committee and the Debtors.

(ii) *Voting*: Class 3 is Unimpaired. Holders of Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(d) Class 4—Other Priority Claims

(i) *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive Cash in an amount sufficient to leave unaltered the legal, equitable and contractual rights to which the Claim entitles such Holder, on or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such Other Priority Claim becomes Allowed, (y) the date on which such Other Priority Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such Holder, the Steering Committee and the Debtors.

(ii) *Voting*: Class 4 is Unimpaired. Holders of Other Priority Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code,

and, therefore, are not entitled to vote to accept or reject the Plan.

(e) Class 5—General Unsecured Claims

    (i) *Treatment*: Each Holder of an Allowed General Unsecured Claim will have such Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code such that the Claim is rendered Unimpaired, except to the extent that such Holder agrees to less favorable treatment thereof. The failure of the Debtors or any other party in interest (including the Steering Committee) to File an objection, prior to the Effective Date, with respect to any General Unsecured Claim that is reinstated under the Plan will be without prejudice to the rights of the Reorganized Debtors or any other party in interest (including the Steering Committee) to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated General Unsecured Claim will be paid on, or as soon as practicable after, the latest of (x) the Effective Date, (y) the date on which such General Unsecured Claim becomes Allowed, or (z) such other date as mutually may be agreed to by and among such Holder, the Steering Committee and the Debtors.

    (ii) *Voting*: Class 5 is Unimpaired. Holders of General Unsecured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(f) Class 6—Senior Note Claims

    (i) *Treatment*: Each Holder of an Allowed Senior Note Claim shall receive, in full satisfaction and discharge thereof: (A) on the Subscription Commencement Date, its Pro-Rata Share of Senior Note Rights (to acquire up to 25,000 shares of Reorganized RII Series A Preferred Stock); and (B) on, or as soon as practicable after, the Effective Date, its Pro-Rata Share of (x) the New Third-Lien Notes (*i.e.*, $100 million in original principal amount), (y) the Senior Note Cash (*i.e.*, approximately $65 million assuming an October 1, 2007 Petition Date) and (z) the Senior Note Preferred Shares (*i.e.*, up to 2,000 shares of Reorganized RII Series A Preferred Stock).

(ii) *Allowance*: The Senior Note Claims shall be deemed Allowed in the aggregate sum of (A) the Senior Note Principal Amount (*i.e.*, $145 million) (and the accrued and unpaid non-default rate interest thereon through the Effective Date) *plus* (B) the amount of the Consent Fee (*i.e.*, $10 million).

(iii) *Voting*: Class 6 is Impaired. Holders of Allowed Senior Note Claims are entitled to vote to accept or reject the Plan.

(g) Class 7—Subordinated Note Claims

(i) *Treatment*: Each Holder of an Allowed Subordinated Note Claim shall receive, in full satisfaction and discharge thereof: (A) on the Subscription Commencement Date, its Pro-Rata Share of Subordinated Note Rights (to acquire up to 60,000 shares of Reorganized RII Series B Preferred Stock); and (B) on, or as soon as practicable after, the Effective Date, its Pro-Rata Share of Available Reorganized RII Common Stock (*i.e.*, 100% of the Reorganized RII Common Stock, subject to dilution with respect to the approximately 5% of such stock to be issued under the New Management Incentive Plan).

(ii) *Allowance*: The Subordinated Note Claims shall be deemed Allowed in the aggregate principal amount of $315 million (and the accrued and unpaid non-default rate interest thereon through the Petition Date, *i.e.*, approximately $30 million assuming a Petition Date of October 1, 2007).

(iii) *Voting*: Class 7 is Impaired. Holders of Allowed Subordinated Note Claims are entitled to vote to accept or reject the Plan.

(h) Class 8—Subordinated Securities Claims

(i) *Treatment*: No Holder of a Subordinated Securities Claim will be entitled to, nor will it receive or retain, any property or interest in property on account of such Subordinated Securities Claim. On the Effective Date, all Subordinated Securities Claims will be cancelled, extinguished and discharged.

(ii) *Voting*: Class 8 is Impaired. Holders of Subordinated Securities Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(i) Class 9—RWHI Equity Interests

(i) *Treatment*: No Holder of RWHI Equity Interests will be entitled to, nor will it receive or retain, any property

or interest in property on account of such RWHI Equity Interests. On the Effective Date, all RWHI Equity Interests will be cancelled, extinguished and discharged.

(ii) *Voting*: Class 9 is Impaired. Holders of RWHI Equity Interests are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

2. *Confirmation Pursuant to 1129(b) of the Bankruptcy Code*

Section 3.3 of the Plan provides that if any Class of Claims or Equity Interests entitled to vote on the Plan does not vote to accept the Plan, the Debtors may, with the consent of the Requisite Senior Note Committed Purchasers, the Requisite Subordinated Note Committed Purchasers, the Requisite Committed Purchasers and the Steering Committee seek to confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code or to amend or modify the Plan in accordance with section 8.4 thereof. With respect to any Class of Claims or Equity Interests that is deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

E. *Means of Implementation of Plan*

1. *Compromise of Controversies*

The Plan is the product of extensive negotiations with the Plan Support Parties, as representatives of the Classes of Claims that are Impaired by the Plan. Section 4.1 of the Plan provides that in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

2. *Guarantees*

The Secured Credit Agreement, the Floating Rate Secured Notes, the Senior Notes and the Subordinated Notes all have been guaranteed by certain of the Prospective Debtors. Section 4.2 of the Plan contemplates that on the Effective Date, all guarantees by any Prospective Debtor of the payment, performance, or collection of another Debtor with respect to the Claims specified in Class 1, Class 2, Class 6 and Class 7 will be forever discharged, eliminated, cancelled and of no further force and effect.

3. *Vesting of Assets*

Pursuant to section 4.3 of the Plan, except as otherwise provided in the Plan or in any Plan Document, on the Effective Date, title to all Assets of any Debtor will vest in such Reorganized Debtor, free and clear of all Claims, liens, encumbrances and other interests.

4.      *Continued Corporate Existence and New Constituent Documents*

On and after the occurrence of the Effective Date, the Reorganized Debtors will be authorized to operate their respective businesses, and to use, acquire or dispose of Assets without supervision or approval by the Bankruptcy Court, and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.  With the exception of RWHI, each of the Prospective Debtors, as Reorganized Debtors, will continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law and pursuant to the applicable New Constituent Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law; provided, however, that such continued corporate existence will not apply to any entity whose existence has been terminated in connection with a restructuring transaction permitted pursuant to section 4.15 of the Plan.

Pursuant to section 1123(a)(6) of the Bankruptcy Code, with respect to each Debtor that is a corporation, a limited liability corporation or a limited liability partnership, the charter (or other similar constituent document) is required, after the Effective Date, to provide for (i) a prohibition on the issuance of non-voting equity securities and (ii) as to all of the classes of stock possessing voting power, an appropriate distribution of voting power among the classes, including, in the case of stock that is preferred for dividend purposes, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of dividends.  The Plan provides that the New Constituent Documents for each of the Prospective Debtors other than Remy Powertrain, L.P. (which is a Delaware limited partnership) will be amended consistent with section 1123(a)(6) of the Bankruptcy Code.  Section 8.2 of the Plan provides that it is a condition precedent to the effectiveness of the Plan that the Reorganized RII Certificate of Incorporation and the Reorganized RII Certificates of Designation must be duly filed with the Delaware Secretary of State, unless such condition is waived pursuant to the terms of the Plan.  In addition, on, or as soon as practicable after, the Effective Date, the Reorganized Debtors will, in consultation with the Steering Committee, (a) make any and all filings as may be required in connection with the New Constituent Documents with the appropriate governmental offices and/or agencies and (b) take any and all other actions as may be required to render the New Constituent Documents effective.

5.      *Cancellation of Notes, Instruments, Debentures, Equity Interests and Liens*

Section 4.5 of the Plan provides that so long as the treatments provided for in, and the distributions contemplated by, Article III of the Plan are made as provided therein, each of (a) the Floating Rate Secured Notes, (b) the Senior Notes, (c) the Subordinated Notes, (d) the Prepetition Indentures, (e) the RWHI Equity Interests, (f) the RII Equity Interests, and (g) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any Claims or Equity Interests that are Impaired under the Plan, will be cancelled and deemed terminated, and shall represent only the right to receive the distributions, if any, to which the Holders thereof are entitled under the Plan; provided, however, that solely in the event and to the extent that the Prepetition Indenture Trustees do not receive payments of their fees, costs and expenses payable pursuant to section 2.4 of the Plan, the provisions of the Prepetition Indentures granting the Prepetition Indenture Trustees charging liens or other rights against distributions

payable to holders of the Prepetition Notes shall survive the cancellation of the Prepetition Indentures and remain in full force and effect, until such payments are made in accordance with section 2.4 of the Plan (but in no event shall such rights decrease the distributions to be made to the noteholders under the Plan). Except with respect to their obligations concerning the distributions to be made by the Disbursing Agent under the Plan (as described in section 6.2 of the Plan), as of the Effective Date, the Prepetition Indenture Trustees shall have no further obligations under their respective Prepetition Indentures.

Under section 4.6 of the Plan, upon the Effective Date, any Lien (other than a Lien with respect to a Class 3 Claim that is reinstated pursuant to the treatment provided by section 3.2(c) of the Plan) securing any Secured Claim will be deemed released, and the Holder of such Secured Claim will be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

6. *Directors and Officers of the Reorganized Debtors*

Pursuant to section 1129(a)(5) of the Bankruptcy Code, which requires, among other things, that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director or officer of the debtor, the identity and affiliations of each proposed member of the initial Reorganized RII Board of Directors (and, to the extent such Person is an insider, the nature of any compensation for such Person) will be disclosed in the Plan Supplement. The initial Reorganized RII Board of Directors will consist of seven directors, (i) two of whom will be designated by the members of the Steering Committee who are Holders of Subordinated Note Claims (based upon the holdings of such Holders), (ii) one of whom will be designated by the Senior Note Committed Purchasers, (iii) three of whom will be designated by the Requisite Subordinated Note Committed Purchasers, and (iv) one of whom will be the initial chief executive officer of Reorganized RII. Each member of the initial Reorganized RII Board of Directors (other than the initial chief executive officer of Reorganized RII) will assume such position on the day immediately following the Effective Date. Any subsequent Reorganized RII Board of Directors will be elected, classified, and composed in a manner consistent with the Reorganized RII New Constituent Documents, and applicable non-bankruptcy law. The identity and affiliations of each of the New Employment Agreement Officers and proposed members of each other Reorganized Subsidiary Debtors' Board of Directors also will be disclosed in the Plan Supplement.

The Plan contemplates that on, or as soon as practicable after, the Effective Date, the Reorganized Debtors will enter into the New Employment Agreements with the New Employment Agreement Officers (*i.e.* John H. Weber, Jerry Mills, Kerry A. Shiba, David Muir, Jay Pittas and RII's chief financial officer).[20] The New Employment Agreements will supersede

---

[20] Although not a New Employment Agreement Officer, we will be entering into a modified employment agreement with Philippe James. Certain of the figures disclosed herein in connection with the compensation payable to the New Employment Agreement Officers includes compensation that will be payable to Mr. James.

any and all other employment agreements by and between us and the New Employment Agreement Officers who are parties to such agreements.

The Plan also contemplates the adoption of the New Management Incentive Plan, which will include: (i) the amendment and restatement of our Annual Incentive Bonus Plan (resulting in the Amended and Restated Annual Incentive Bonus Plan); (ii) entry into the 2010 Long-Term Incentive Cash Bonus Plan and (iii) granting of shares of restricted stock pursuant to the Reorganized RII Restricted Stock Agreements. The material terms of the New Employment Agreements, the Reorganized RII Restricted Stock Agreements, the Amended and Restated Annual Bonus Plan and the 2010 Long-Term Incentive Cash Bonus Plan are attached hereto in Exhibit F and are described more fully in Article VII.G. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of New Management Incentive Plan and the New Employment Agreements."

7.      *Corporate Action*

Section 4.10 of the Plan provides that all actions contemplated by the Plan will be deemed authorized and approved in all respects, including (a) the adoption of the New Constituent Documents and the New Management Incentive Plan, (b) the selection of the directors and officers for the Reorganized Debtors, (c) the execution of and entry into the New Employment Agreements and the Exit Facility Documents, (d) the issuance of the New Third-Lien Notes, (e) the issuance of the Reorganized RII Common Stock, (f) the issuance of the Reorganized RII Preferred Stock, (g) the execution of and entry into the Registration Rights Agreement and (h) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by us or the Reorganized Debtors in connection with the Plan, will be deemed to have occurred and will be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors. Upon the Effective Date, the appropriate officers of the Reorganized Debtors and members of the boards of directors of the Reorganized Debtors will be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary and desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including (i) the Exit Facility Documents, (ii) the New Third-Lien Note Indenture, (iii) the Registration Rights Agreement and (iv) any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated in section 4.10 of the Plan will be effective notwithstanding any requirements under any applicable non-bankruptcy law. The Plan further provides that the issuance of shares of Reorganized RII Common Stock and Reorganized RII Preferred Stock will be exempt from the requirements of section 16(b) of the Exchange Act (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director by deputization for purposes thereof) as of the Effective Date.

8. *Sources of Cash for Plan Distribution*

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made under the Plan will be obtained from the Debtors' and the Reorganized Debtors' operations and Cash balances, the Exit Facility and the Rights Offering.

9. *Restructuring Transactions*

Pursuant to section 4.15 of the Plan, from the Confirmation Date through the Effective Date, and subject to the reasonable consent of the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee we will be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of our businesses, to otherwise simplify our overall corporate structure or to reincorporate certain of the Debtors under the laws of jurisdictions other than the laws of which they currently are incorporated. In effecting the Restructuring Transactions, the Debtors will be permitted to (a) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree, (b) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree, (c) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable state law and (d) take all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by us, the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Debtors vesting in one or more surviving, resulting or acquiring corporations. In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Debtor, such surviving, resulting or acquiring corporation will perform the obligations of such Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Debtor will perform such obligations.

10. *Registration Rights*

On, or as soon as practicable after, the Effective Date, Reorganized RII will enter into the Registration Rights Agreement with each Plan Support Party and any recipient of shares of Available Reorganized RII Common Stock that, prior to the Effective Date, notifies the Debtors and counsel to the Informal Committee, in writing, that such Person desires to be a party thereto. See Article VII.F. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Registration Rights Agreement."

11.     *Rights Offering*

On the Subscription Commencement Date we will commence the Rights Offering. Pursuant to the Rights Offering (i) Holders of Senior Note Rights will be entitled to subscribe for up to 25,000 shares of Reorganized RII Series A Preferred Stock (representing $25 million) and (ii) Holders of Subordinated Note Rights will be entitled to subscribe for up to 60,000 shares of Reorganized RII Series B Preferred Stock (representing $60 million). RWHI and RII (together with certain of their subsidiaries), the Senior Note Committed Purchasers and the Subordinated Note Committed Purchasers have entered into the Backstop Commitment Agreement. The Backstop Commitment Agreement provides that, subject to the satisfaction of certain conditions precedent, not less than (i) 25,000 shares of Reorganized RII Series A Preferred Stock (representing $25 million) and (ii) 60,000 shares of Reorganized RII Series B Preferred Stock (representing $60 million) will be purchased prior to the Effective Date and that the gross proceeds of the Rights Offering of $85 million will be available to the Debtors and the Reorganized Debtors for working capital and other purposes. See Article VI. "RIGHTS OFFERING."

12.     *CVC Settlement Agreement*

Pursuant to section 4.12 of the Plan, the transactions contemplated by the CVC Settlement Agreement will be implemented on the Effective Date, subject to the terms and conditions thereof and in the Plan.

13.     *Dissolution of RWHI*

Pursuant to section 4.14 of the Plan, any and all assets and liabilities of RWHI will be transferred to (or assumed by, as applicable) RII on the Effective Date, and immediately thereafter, RWHI will be dissolved, and the Plan further allows and requires the Reorganized Debtors to make any filings required to effect the dissolution of RWHI and to take any and all other actions that may be required to render such dissolution effective.

## VI.    RIGHTS OFFERING

### A.    *Section 1145 Exemption*

Section 1145 of the Bankruptcy Code exempts from registration under the Securities Act securities issued under a chapter 11 plan either entirely in exchange for a claim against or interest in a debtor or issued principally in such exchange and partly for cash or property.  We believe that the offering and issuance of the Subscription Rights and the shares of Reorganized RII Preferred Stock issuable upon the exercise thereof satisfy the requirements of section 1145.  The aggregate value of the New Third-Lien Notes, Senior Note Cash and Senior Note Preferred Shares to be issued under the Plan to holders of Senior Note Claims exceeds the aggregate amount of cash payable to the Debtors upon the exercise of Senior Note Rights.  Similarly, the aggregate value of the Reorganized RII Common Stock to be issued under the Plan to holders of Subordinated Note Claims exceeds the aggregate amount of cash payable to the Debtors upon the exercise of Subordinated Note Rights.  Therefore, the Subscription Rights and the shares of Reorganized RII Preferred Stock issuable upon the exercise thereof will be exempt from registration under the Securities Act pursuant to section 1145 of the Bankruptcy Code.

### B.    *Motion to Approve Rights Offering*

Prior to the Subscription Commencement Date, for the purpose of ensuring that the Rights Offering is successfully concluded prior to the Confirmation Hearing, we intend to file a motion seeking (i) authority to implement the Rights Offering and approving the related procedures described below and (ii) confirmation that the offering and issuance of the Subscription Rights and the shares of Reorganized RII Preferred Stock qualify for the registration exemption provided under section 1145 of the Bankruptcy Code.  We intend to request that the procedures described below be utilized in connection with the issuance and exercise of the Subscription Rights, but no assurances can be made that such procedures will be authorized by the Bankruptcy Court.

### C.    *Issuance of Subscription Rights*

The Rights Offering will commence on the Subscription Commencement Date, and a Subscription Form will be mailed to each Offeree on, or as soon as practicable after, such date. The Rights Offering will conclude on the Subscription Expiration Date, such date to be set forth in the Subscription Approval Order.

*The Senior Note Rights.*  Each Holder of an Allowed Senior Note Claim as of the Subscription Record Date will have the opportunity, but not the obligation, to participate in the Rights Offering entitling such Holder to subscribe for all or a portion of its Pro-Rata Share (determined as of the Subscription Record Date) of the Reorganized RII Series A Preferred Stock.  Any Holder of an Allowed Senior Note Claim who fully subscribes for its Pro-Rata Share of Reorganized RII Series A Preferred Stock also may oversubscribe (on a pro-rata basis) to exercise any Senior Note Rights not subscribed for by other Holders of Allowed Senior Note Claims.  To the extent that any Senior Note Rights remain unexercised after the Subscription

Expiration Date, such Senior Note Rights will be null and void and have no further value. Pursuant to the Backstop Commitment Agreement, the Senior Note Committed Purchasers have committed to purchase, in the aggregate, up to 25,000 shares of Reorganized RII Series A Preferred Stock that are not otherwise subscribed for in the Rights Offering, on the terms and conditions set forth in the Backstop Commitment Agreement. We will collaborate with the Steering Committee to devise a mechanism whereby any Holder of Allowed Senior Note Claims that elects to participate in the Rights Offering will be able to apply all or any portion of the Senior Note Cash that such Holder is entitled to receive under the Plan toward the payment required in connection with the exercise of such Holder's Senior Note Rights. In addition, any Senior Note Committed Purchaser that is required to purchase any shares of Reorganized RII Series A Preferred Stock pursuant to the Backstop Commitment Agreement will be permitted to apply all or any portion of its Pro-Rata Share of the Senior Note Backstop Fee towards the payment required in connection with such purchase.

*The Subordinated Note Rights*. Each Holder of an Allowed Subordinated Note Claim as of the Subscription Record Date will have the opportunity, but not the obligation, to participate in the Rights Offering entitling such Holder to subscribe for all or a portion of its Pro-Rata Share (determined as of the Subscription Record Date) of the Reorganized RII Series B Preferred Stock. Any Holder of an Allowed Subordinated Note Claim who fully subscribes for its Pro-Rata Share of Reorganized RII Series B Preferred Stock also may oversubscribe (on a pro-rata basis) to exercise any Subordinated Note Rights not otherwise subscribed for by other Holders of Allowed Subordinated Note Claims. To the extent that any Subordinated Note Rights remain unexercised after the Subscription Expiration Date, such Subordinated Note Rights will be null and void and have no further value. Pursuant to the Backstop Commitment Agreement, the Subordinated Note Committed Purchasers have committed to purchase, in the aggregate, up to 60,000 shares of Reorganized RII Series B Preferred Stock not subscribed for in the Rights Offering, on the terms and conditions set forth in the Backstop Commitment Agreement. Any Subordinated Note Committed Purchaser that is required to purchase any such shares of Reorganized RII Series B Preferred Stock pursuant to the Backstop Commitment Agreement will be permitted to apply all or any portion of its Pro-Rata Share of the Subordinated Note Backstop Fee toward the payment required in connection with such purchase.

D.      *Exercise of Subscription Rights*

Each Offeree may exercise all or any portion of such Offeree's Subscription Rights pursuant to the procedures outlined below. We may adopt, with the consent of the Steering Committee, such additional detailed procedures consistent with the provisions of the Plan and the Subscription Approval Order to more efficiently administer the exercise of the Subscription Rights. The exercise of any Subscription Right will be irrevocable.

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined by us (with the consent of the Steering Committee), and our good faith determination in that regard shall be final and binding. We may, in our discretion reasonably exercised in good faith and with the consent of the Steering Committee, waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as we may determine, or reject any purported exercise of any Subscription Right. We will use commercially reasonable efforts to give notice to any Offeree regarding any defect or irregularity

in connection with any purported exercise of Subscription Rights by such Offeree and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that none of the Debtors, the Reorganized Debtors nor the Subscription Agent will incur any liability for failure to give such notification.

In order to exercise the Subscription Rights, each Offeree must: (i) return a duly completed Subscription Form to the Subscription Agent so that such form is actually received by the Subscription Agent on or before the Subscription Expiration Date, or, in the case of securities held through a bank or brokerage firm, arrange for such firm to effect such Offeree's subscription through DTC, so that such form or DTC instruction is actually received by the Subscription Agent on or before the Subscription Expiration Date; and (ii) pay or arrange for payment to the Subscription Agent on or before the Subscription Expiration Date, or by DTC to the Subscription Agent, such Offeree's Subscription Purchase Price in accordance with the wire instructions set forth on the Subscription Form or by certified bank or cashier's check delivered to the Subscription Agent along with the Subscription Form.

If the Subscription Agent for any reason does not receive from an Offeree (or DTC) both: (i) a duly completed Subscription Form or equivalent instructions from DTC on or prior to the Subscription Expiration Date and (ii) immediately available funds in an amount equal to such holder's Subscription Purchase Price on or prior to the Subscription Expiration Date, or payment by DTC with respect to such Offeree's Subscription Rights, such Offeree shall be deemed to have relinquished and waived its right to participate in the Rights Offering. Each Offeree intending to participate in the Rights Offering must affirmatively elect to exercise its Subscription Right(s) on or prior to the Subscription Expiration Date.

We will not issue fractional Subscription Rights or Cash in lieu of fractional Subscription Rights. Fractional Subscription Rights will be rounded down to the nearest whole number.

The payments made in connection with the Rights Offering shall be deposited and held by the Subscription Agent in a trust account, or similarly segregated account or accounts which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any Lien or any cash collateral arrangements and which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date, or such other later date, at our option (and with the consent of the Requisite Committed Purchasers and the Steering Committee), but not later than 20 days after the Effective Date. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any Lien.

On the Subscription Commencement Date, we will cause the Subscription Form to be mailed to each Offeree, together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for the payment (to the extent required) of the applicable Subscription Purchase Price for such portion of the Subscription Rights sought to be exercised by such Offeree. Brokerage firms or banks holding Senior Notes and/or Subordinated Notes on behalf of beneficial owners will be provided with sufficient quantities of Subscription Forms and subscription materials to forward to beneficial owners of those securities, and shall effect any exercise of Subscription Rights on behalf of such

beneficial owners through DTC's ASOP system. Brokerage firms or banks may use the Subscription Forms provided or such other form as they may customarily use for the purpose of obtaining instructions with respect to a subscription on account of the beneficial owner's Subscription Rights.

E.  *Transfer and Revocation of Subscription Rights*

The Subscription Rights are not Transferable. Any Transfer or attempted Transfer of any Subscription Rights will be null and void, and we will not treat any purported transferee as the holder of any Subscription Rights. Once an Offeree has properly exercised any Subscription Rights, such exercise cannot be revoked.

F.  *Backstop Commitment Agreement*

In connection with the Rights Offering, we entered into the Backstop Commitment Agreement with the Committed Purchasers. Subject to the terms of the Backstop Commitment Agreement, each Committed Purchaser has agreed to purchase a specified percentage of Reorganized RII Preferred Stock (the Senior Note Committed Purchasers have agreed to purchase up to 25,000 shares of Reorganized RII Series A Preferred Stock and the Subordinated Note Committed Purchasers have agreed to purchase up to 60,000 shares of Reorganized RII Series B Preferred Stock, which, in the aggregate, is the full 85,000 shares that are subject to the Rights Offering).

The respective obligations of the Committed Purchasers under the Backstop Commitment Agreement are subject to the satisfaction of certain conditions precedent, which may be waived, as set forth in the Backstop Commitment Agreement. Among other conditions precedent: (i) the Plan Support Agreement must be in effect; (ii) the Confirmation Order must be entered and be a final order; (iii) other definitive documentation necessary to consummate the transactions contemplated by the Plan must be in form and substance reasonably satisfactory to the parties to the Backstop Commitment Agreement; (iv) our representations and warranties in the Backstop Commitment Agreement must be true and correct; (v) the Reorganized RII Preferred Stock must be issued and distributed pursuant to an exemption from registration under the Securities Act; (vi) and there must not have occurred any unwaived termination events permitting the Committed Purchasers to terminate the Backstop Commitment Agreement. It is also a condition precedent that no Material Adverse Effect (as defined in the Backstop Commitment Agreement) has occurred from December 31, 2006 through the Effective Date.

The Backstop Commitment Agreement contains representations and warranties made by us and the Committed Purchasers. Our representations and warranties relate to, among other things: corporate organization and similar corporate matters; authorization, execution, delivery and enforceability of the Backstop Commitment Agreement, the Plan and this Solicitation and Disclosure Statement; authorization of the issuance of the Reorganized RII Preferred Stock pursuant to the Rights Offering; the nonoccurrence of any Material Adverse Effect (as defined in the Backstop Commitment Agreement) since the date of certain referenced financial statements; and that we have not made a general solicitation or general advertisement regarding the Subscription Rights or the Rights Offering. The representations and warranties of the Committed Purchasers relate to, among other things: corporate organization and similar

corporate matters; authorization, execution, delivery and enforceability of the Backstop Commitment Agreement; and investment intent and compliance with federal and state securities laws.

Under the Backstop Commitment Agreement, we also have agreed with the Committed Purchasers to use reasonable best efforts to fulfill our obligations under the Plan and consummate the transactions contemplated by the Plan and the Backstop Commitment Agreement.  In addition, we have agreed to reimburse the Committed Purchasers for fees for their legal counsel and financial advisors, subject to certain limitations set forth in the Backstop Commitment Agreement.

The Backstop Commitment Agreement also requires us to provide the Committed Purchasers with three Business Days to review the Plan and all other documents to be filed with the Bankruptcy Court.  We are required to provide the Committed Purchasers such information as they may reasonably request.

The Committed Purchasers may terminate the Backstop Commitment Agreement under certain circumstances, which include any of the following:  (i) our material breach of the Backstop Commitment Agreement; (ii) the failure to satisfy the material terms and conditions set forth in the Backstop Commitment Agreement (including the occurrence of a Material Adverse Effect as defined therein); (iii) our inability to satisfy the conditions precedent to obligations of the Committed Purchasers; (iv) the making of a public announcement, entry into an agreement or filing of a document evidencing our intention to take or support any action that is materially inconsistent with the transactions contemplated by the Plan or the Backstop Commitment Agreement; and (v) the termination of the Plan Support Agreement in accordance with its terms.

The obligations, representations and warranties of the Senior Note Committed Purchasers and the Subordinated Note Committed Purchasers are several and not joint.  In consideration for the Backstop Commitment Agreement, upon the Effective Date, the Subordinated Note Committed Purchasers will be paid a fee, on a ratable basis, of $1.2 million, and the Senior Committed Purchasers will be paid a fee, on a ratable basis, of $500,000.

G.      *Use of Proceeds of the Rights Offering*

The proceeds of the Rights Offering will be used (i) to fund Cash payments required to be made under the Plan and the Plan Support Agreement and (ii) for general corporate purposes of the Reorganized Debtors.

**VII. DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN**

A.     *Description of GM Agreements*

In connection with a financial review of our OEM business, we undertook an analysis of sales and profitability data by major customer and product.  We have negotiated pricing and other concessions from a number of our customers, the most significant of which are from our largest customer, GM.

In 2006, our sales to GM represented approximately 25% of our total sales.  Sales to GM were made in North America, Brazil, Europe, China and Korea, and we supply GM with more than 85% of the starters and 45% of the alternators for GM's passenger cars produced in North America.  Although GM is our largest customer in terms of sales, in recent years the profitability of parts sold to GM fell to levels that were not economical for us, due, in large part, to contractual price reductions (or long-term adjustments) and unrecoverable increases in raw material prices that reduced sales prices to levels below cost.

Discussions with GM commenced during the early months of 2007 and were centered on modifications to our existing purchase orders with GM.  Our central objective in those discussions was to improve the profitability of the products we sell to GM.  We understand that GM's main objective was to ensure a reliable source of supply for the parts we manufacture over the life of each current vehicle platform.

In July 2007, we reached agreement with GM with respect to modifications to existing purchase orders, as documented in the GM Agreements.  The most significant terms and provisions of the GM Agreements include:

- the conversion of all existing purchase orders to long-term contracts – under the resulting GM Supply Contracts, we will supply 100% of GM's requirements for parts that it currently produces for existing vehicle programs, and many of the contract termination dates have been extended to coincide with GM's time period for the related vehicle programs;

- pricing modifications under a majority of the contracts through various mechanisms; and

- clarification of GM's rights in connection with a default by the Company under the GM Supply Contracts – in certain respects these rights have been expanded. To help ensure continuous flow of parts from our manufacturing facilities to GM and upon an event of default, GM would, among other things, have the right to:

  i.     access and manage our GM product lines, which are the subject of the disruption;

ii.     resource our products to other vendors; and

iii.    purchase tooling and utilize royalty-free intellectual property licenses in connection with the resourcing of our products.

Under the GM Agreements, defaults include:

- certain supply defaults in shipping product to GM (which defaults exclude the occurrence of any "force majeure" as defined in the GM Agreements);

- material uncured breaches of the terms of the GM Agreements;

- certain uncured defaults under the Company's credit and loan agreements entered into after the Effective Date which result in: (i) requests for additional accommodations from GM or (ii) our inability to provide assurances of our continued access to adequate financing and liquidity;

- the commencement of certain foreclosure or other enforcement actions by the agents under our credit or loan agreements entered into after the Effective Date; or

- certain uncured monetary defaults under any other real estate or equipment leases for the two plants in Mexico which are subject to GM's access rights.

The GM Agreements provide that we must assume both the underlying agreements and certain related purchase orders and that such assumptions will be a condition precedent to the Effective Date. We anticipate that such assumption will occur in connection with the confirmation of the Plan pursuant to section 5.1 thereof. Under certain conditions, however, including: (i) our failure to receive or retain the votes necessary for confirmation of the Plan, (ii) a determination by the Bankruptcy Court that we have not complied with certain Bankruptcy Code requirements for the solicitation of such votes or (iii) the existence of an unresolved confirmation objection, GM may be entitled to require us to seek the assumption of the GM Agreements pursuant to a motion.

The GM Agreements are conditioned upon receipt of certain third-party consents with respect to GM's rights after an event of default and, assuming the conditions precedent have been satisfied, will become effective upon the Effective Date. In the event that the Effective Date has not occurred on or before December 31, 2007, the GM Agreements will terminate. Upon such termination, however, any existing purchase orders will remain in effect, and certain provisions of the GM Agreements concerning extensions of purchase orders and metals price indexing will survive.

B.    *Description of Exit Financing*

On July 30, 2007, we entered into the original DIP/Exit Commitment Letter and on August 29, 2007 we amended the commitment. A copy of the DIP/Exit Commitment Letter is attached hereto as Exhibit I. The Exit Facility Arranger agreed to provide us with up to $330

million in the form of senior secured credit facilities following consummation of the Plan.  The proceeds from the Exit Facility will be used to refinance the DIP Facility and certain other existing senior secured indebtedness of RII, including the Floating Rate Secured Notes, and to make certain other distributions pursuant to the terms of the Plan, fund certain transaction fees and expenses associated with the consummation of the Plan and for other general corporate purposes following the Effective Date.  If confirmation of the Plan does not occur by December 14, 2007, the DIP/Exit Commitment Letter will terminate, unless extended by the Exit Facility Agent.

The principal terms of the Exit Facility are summarized below.  Capitalized terms used in this Article VII.B. "Description of Exit Financing" but not otherwise defined in Annex II shall have the meanings assigned such terms in the DIP/Exit Commitment Letter.  The DIP/Exit Fee Letter includes customary "market flex" provisions which permit Barclays Capital, subject to certain limitations, to adjust the terms and conditions, pricing and/or structure of the Exit Facility if Barclays Capital reasonably determines that such changes are necessary to facilitate the successful syndication of the Exit Facility.  If Barclays Capital exercises its rights pursuant to this provision, the final terms and conditions, pricing and structure of the Exit Facility (including the terms and conditions of the Intercreditor Agreement) may differ from those indicated below.

| | |
|---|---|
| **Borrower:** | Reorganized RII and certain subsidiaries to be determined. |
| **Guarantors:** | Each existing and subsequently acquired or organized domestic and material foreign subsidiary of RII (to the extent that there are no material adverse tax consequences with respect to any foreign subsidiary's inclusion as a Guarantor). |
| **Lenders:** | Barclays and other financial institutions selected by Barclays in consultation with RII. |
| **Lead Arranger:** | Barclays Capital. |
| **Exit Facility Agent:** | Barclays. |
| **Exit Facilities:** | Exit Revolving Credit Facility:  A $125 million asset based revolver including the Exit L/C Facility (not in excess of $20 million). |
| | First-Lien Term Loan:  The First-Lien Term Loan Facility of $150 million. |
| | Second-Lien Term Loan:  The Second-Lien Term Loan Facility of $55 million. |

**Availability:**    Exit Revolving Credit Facility:  Amounts available will be limited to the lesser of (a) $125 million and (b) the Borrowing Base.  At the Borrower's option, up to $20 million of such amounts may be made available for the issuance of Letters of Credit by Barclays.

First-Lien Term Loan:  One drawing of up to $150 million under the First-Lien Term Loan Facility shall be available to the Borrower on the Closing Date.

Second-Lien Term Loan:  One drawing of up to $55 million under the Second-Lien Term Loan Facility shall be available on the Closing Date.

**Term:**    The Exit Facility shall terminate on the earliest of (i) the date that is (a) 5 years from the Closing Date in the case of the Exit Revolving Credit Facility, (b) 6 years from the Closing Date in the case of the First-Lien Term Loan Facility and (c) 6½ years from the Closing Date in the case of the Second-Lien Term Loan Facility, or (ii) the date of termination of the commitments and/or acceleration of any outstanding extensions of credit.

**Interest Rate:**  At the Borrower's option, either the LIBOR Rate or the Alternate Base Rate, <u>plus</u> the applicable margins set forth below:

<u>Exit Revolving Credit Facility</u>:

Applicable LIBOR Margin of 2.00% and Applicable ABR Margin of 1.00%.  Upon the earlier of (i) ninety days after the Closing Date of the DIP Facility or (ii) the Closing Date of the Exit Facility, the applicable margin for the Exit Revolving Credit Facility will be determined by a grid based on average excess availability for the most recent prior month as follows:

| Excess Availability | Applicable LIBOR Margin | Applicable Facility ABR Margin |
|---|---|---|
| > $85 million | 1.75% | 0.75% |
| < $85 million  but > $40 million | 2.00% | 1.00% |
| < $40 million | 2.25% | 1.25% |

<u>First-Lien Term Loan</u>:  Applicable LIBOR Margin of 4.00% and Applicable Facility ABR Margin of 3.00%.

<u>Second-Lien Term Loan</u>:  Applicable LIBOR Margin of 7.00% and Applicable Facility ABR Margin of 6.00%.

Upon an event of default, default interest and letter of credit fees at 2.00% above the rate otherwise applicable thereto.

| | |
|---|---|
| **Facility Fees:** | Exit Revolving Credit Facility Commitment Fee:  0.375% *per annum* payable on the unused portion of the Exit Revolving Credit Facility; |
| | Term Loan Facility Commitment Fee:  1% *per annum* on the committed but undrawn portion of the Term Loan Facilities from the DIP Facility Closing Date to the Exit Facility Closing Date.  The undrawn portion of the Term Loan Facilities means $50 million of the First-Lien Term Loan and the entire $55 million of the Second-Lien Term Loan. |
| | Letter of Credit Fees:  (i) The Applicable LIBOR Margin then in effect for the Exit Revolving Credit Facility, *multiplied by* (ii) the average daily maximum aggregate amount available to be drawn under all Letters of Credit.  In addition, a fronting fee will be payable to the Issuing Bank as well as certain customary fees assessed thereby. |
| **Interest Rate Protection:** | No later than 90 days following the Closing Date and at all time thereafter until the third anniversary of the Closing Date, Borrower shall obtain and cause to be maintained protection against fluctuations in interest rates pursuant to one or more Interest Rate Agreements in form and substance reasonably satisfactory to the Administrative Agent, in order to ensure that no less than 50% of the aggregate principal amount of the total funded Exit Facility (excluding the portion of the Revolving Credit Facility or other debt for which interest is not paid in cash) of the Borrower and its subsidiaries then outstanding is either (i) subject to such Interest Rate Agreements or (ii) indebtedness that bears interest at a fixed rate. |
| **Funding Protection:** | Customary for transactions of this type, including breakage costs, gross-up for tax withholding, compensation for increased costs and compliance with capital adequacy and other regulatory restrictions. |

| | |
|---|---|
| **Mandatory Prepayments:** | Borrower shall make the following mandatory prepayments (subject to certain basket amounts to be agreed): |

<u>Indebtedness/Equity/Extraordinary Receipts</u>:  (a) 100% of the net cash proceeds received from the incurrence of indebtedness, (b) 50% of the net cash proceeds received from the issuance of additional equity (but specifically excluding any net cash proceeds received in connection with the Rights Offering) and (c) 100% of the net cash proceeds from the receipt of any extraordinary receipts by Borrower or its subsidiaries including capacity for reinvestment on terms to be agreed.

<u>Dispositions</u>:  100% of the net cash proceeds from the sale or other disposition of any property or assets of Borrower or its subsidiaries (including as a result of casualty or condemnation) with certain specified exceptions.

<u>Excess Cash Flow</u>:  Beginning with the fiscal year ended December 31, 2008 prepayments in an amount equal to 50% of the annual excess cash flow of Borrower.

**Call Premium:**  In the event all or any portion of the Second-Lien Term Loan Facility is repaid for any reason prior to the second anniversary of the Closing Date, such repayments will be made at (i) 102.0% of the amount repaid if such repayment occurs on or prior to the first anniversary of the Closing Date, (ii) 101.0% of the amount repaid if such repayment occurs after the first anniversary of the Closing Date, but on or prior to the second anniversary of the Closing Date and (iii) at par thereafter.

**Security/Priority:**  <u>Exit Revolving Credit Facility</u>:  The Exit Revolving Credit Facility will be secured by a first priority security interest on all cash and working capital assets of the Borrower and the Guarantors.  The Exit Revolving Credit Facility will have a third priority security interest and mortgage on the Exit Term Loan Collateral.

<u>First-Lien Term Loan</u>:  The First-Lien Term Loan Facility will be secured by a first priority security interest and mortgage (where applicable) in all assets of the Borrower and the Guarantors (excluding the Revolver Collateral) including machinery, equipment, real estate and other fixed assets, intangibles, intellectual property, contracts, license agreements and a stock pledge of the Borrower and each subsidiary of the Borrower (limited to 65% of the capital stock of each foreign subsidiary) and Guarantors.  The First-Lien Term Loan Facility will have a second priority security interest on the Exit

Revolver Collateral.

Second-Lien Term Loan:  The Second-Lien Term Loan Facility will be secured by a second priority security interest and mortgage (where applicable) in the Exit Term Loan Collateral and will have a third priority security interest in the Exit Revolver Collateral.

Additionally, the Facilities shall be secured by the unencumbered foreign assets of the Borrower and the Guarantors (to the extent there are no material adverse tax consequences with respect to any security on such foreign assets), including but not limited to the following:  (i) up to 65% of the capital stock of the Borrower's first-tier foreign subsidiaries, (ii) liens on the Borrower's and Guarantors' assets located in Mexico as may be determined by the Arranger in its sole discretion; (iii) a negative pledge covenant as to the foreign subsidiaries' assets exclusive of any existing liens encumbering such assets; and (iv) additional foreign assets as may be determined by the Arranger in its sole discretion to the extent permitted by applicable law.

The priority of the security interests and related creditor rights between the Exit Revolving Credit Facility, the First-Lien Term Loan Facility and the Second-Lien Term Loan Facility will be set forth in an intercreditor agreement on terms and conditions reasonably satisfactory to the Arranger.

|                       |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     |
|-----------------------|---|
| **Closing Conditions:** | The Exit Facilities are subject to conditions precedent including conditions relating to: completion by the Arranger of satisfactory confirmatory due diligence; minimum liquidity; maximum leverage ratio; EBITDA at close; corporate structure and organizational documents; confirmation of the plan; provision of financial statements; provision of financial projections; payment of costs and expenses; absence of material litigation; rating of the Exit Facility; funding of Rights Offering; customary closing documents; definitive documentation evidencing the Exit Facility; intercreditor agreement with respect to the New Third-Lien Notes; provision of lien search results; perfection of collateral; review and establishment of cash management systems; insurance; no material adverse change since December 31, 2006; receipt of necessary waivers and consents; no default or event of default and correct representations and warranties. |

| | |
|---|---|
| **Affirmative Covenants:** | The Loan Documents will include such affirmative covenants by each of the Borrowers and the Guarantors as are usual and customary for comparable financings including, without limitation, delivery of financial statements, reports, accountants' letters, projections, officers' certificates, notices of default, litigation and other material events and other information requested by the Lenders or Administrative Agent; payment of taxes and other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; compliance with environmental laws; further assurances (including, without limitation, with respect to security interests in after-acquired property). |
| **Negative Covenants:** | The Loan Documents will include such negative covenants by each of the Borrowers and the Guarantors as are usual and customary for comparable financings including, without limitation, limitations with respect to other indebtedness (including negative pledge and guarantee obligations); liens; mergers, consolidations, liquidations and dissolution; sales and other dispositions of assets (with certain specified permitted sales); dividends and other payments in respect of capital stock; capital expenditures; investments, loans and advances; payments and modifications of subordinated and other debt instruments; transactions with affiliates; changes in fiscal year; negative pledge clauses restricting subsidiary distributions; prepayment of other debt; and changes in lines of business; in each case, with exceptions and baskets to be agreed and, provided that the New Third-Lien Notes will be Permitted Indebtedness. |
| **Financial Covenants:** | The Loan Documents will include financial covenants as are usual and customary for comparable financings including, without limitation, maximum leverage, maximum capital expenditures, minimum EBITDA and minimum interest coverage (exclusive of non-cash pay PIK interest with respect to the New Third-Lien Notes) in amounts to be determined, each to be tested on a quarterly basis (with monthly financial reporting). |

| | |
|---|---|
| **Events of Default:** | The Loan Documents will include such events of default as are usual and customary for comparable financings including, without limitation, failure to make payments of principal, interest or fees when due; failure to pay other amounts; material inaccuracy of representations and warranties; violations of covenants; cross-default to material indebtedness to be agreed; certain "ERISA events"; material monetary and non-monetary judgments; actual or asserted impairment of any guarantee or security document or security interests; and change of control. |
| **Indemnity:** | The Revolving Credit Facility, the First-Lien Term Loan Facility and the Second-Lien Term Loan Facility will each provide customary and appropriate provisions relating to indemnity and related matters in a form reasonably satisfactory to the Arranger, the Administrative Agent and the Lenders. |

C.      *Description of the New Third-Lien Notes*

The New Third-Lien Notes will be issued by Reorganized RII in an aggregate principal amount of $100 million.  The terms and conditions of the New Third-Lien Notes will be substantially similar to the terms and conditions described in the Description of Notes attached hereto as Exhibit G.  A summary of certain of the principal terms of the New Third-Lien Notes is set forth below.  Capitalized terms used in this Article VII.C. "Description of New Third-Lien Notes" but not otherwise defined in Annex II shall have the meanings assigned such terms in Exhibit G.

| | |
|---|---|
| **Term:** | The New Third-Lien Notes will have a seven-year term (commencing on the Effective Date). |
| **Interest:** | Interest will accrue at a rate, reset semi-annually, of LIBOR + 9.5% *per annum* in the event that interest payments are paid in cash, and at a rate of LIBOR + 12% *per annum* in the event that interest payments are paid in kind (meaning that such interest is paid in additional Third-Lien Notes).  Whether interest is paid in cash or in kind depends upon the Free Cash Flow Coverage Ratio which measures the ratio between the Reorganized Debtors' cash availability and their interest and certain related expenses.  If the Free Cash Flow Coverage Ratio is equal or greater than 1.5:1, then interest will be paid in cash.  If the Free Cash Flow Coverage Ratio is less than 1.5:1, the interest will be paid in kind or, at the election of Reorganized RII, in cash. |
| **Guarantees:** | The New Third-Lien Notes will be guaranteed by certain Reorganized RII subsidiaries. |
| **Security:** | The New Third-Lien Notes and the Guarantees will be secured by third-priority security interests in all assets of Reorganized RII and the Guarantor subsidiaries (third in priority to the first-priority and second- |

priority liens securing the First-Lien Term Loan Facility and Second-Lien Term Loan Facility, respectively), in each case, subject to certain permitted liens. The Agent and Lenders under the First-Lien Term Loan Facility (and, under certain circumstances, the Second-Lien Term Loan Facility) have rights and remedies with respect to the Collateral that, if exercised, could adversely affect the value of the Collateral or the ability of the Holders of New Third-Lien Notes to realize or foreclose on the Collateral. See Article VII.D. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN— Description of Intercreditor Agreement."

**Covenants:** The indenture for the New Third-Lien Notes will contain a number of customary covenants, including with respect to the following: (i) financial covenants; (ii) limitations on indebtedness; (iii) limitations on payments to subsidiaries; (iv) limitations on liens; (v) limitations on sale/leaseback transactions; (vi) liens on after-acquired property; (vii) limitations on restrictions on distributions from subsidiaries; (viii) limitations on sales of assets and subsidiary stock; (ix) limitation on affiliate transactions; (x) limitation on the sale or issuance of capital stock of subsidiaries; (xi) mergers and consolidations; (xii) future guarantors; (xiii) reporting/information; and (ix) rating of notes.

**Optional Redemption:** Reorganized RII will be entitled at its option to redeem all or a portion of the New Third-Lien Notes upon not less than 30 nor more than 60 days' notice at the redemption prices (expressed as percentages of principal as of the redemption date), plus accrued interest to the redemption date, for any of the periods listed below:

| Period | Redemption Price |
| --- | --- |
| 2009 | 112% |
| 2010 | 109% |
| 2011 | 106% |
| 2012 | 103% |
| 2013 and thereafter | 100% |

**Transfer of Notes:** See Article XI.B "CERTAIN OTHER LEGAL CONSIDERATIONS— Section 1145 of the Bankruptcy Code" for a discussion of certain potential restrictions on the transfer of the New Third-Lien Notes.

| | Upon a Change of Control (as defined in the New Third-Lien Note Indenture), each holder shall have the right to require Reorganized RII to repurchase their New Third-Lien Notes at the purchase price in cash (expressed in percentages of principal amount on the date of purchase) if purchased during the twelve month period commencing on the day such notes are issued with respect to each of the following years: |
|---|---|

**Change of Control:**

| Period | Redemption Price |
|---|---|
| 2007 | 100% plus Applicable Premium |
| 2008 | 100% plus Applicable Premium |
| 2009 | 112% |
| 2010 | 109% |
| 2011 | 106% |
| 2012 | 103% |
| 2013 and thereafter | 101% |

D.    *Description of Intercreditor Agreement*

The relative rights and priorities of the holders of New Third-Lien Notes vis-à-vis the holders and agents with respect to the First-Lien Term Loan Facility and the Second-Lien Term Loan Facility will be governed by the terms of the Intercreditor Agreement, which we anticipate will be in substantially the form attached hereto in Exhibit H.  The Plan, however, provides that it is a condition to the effectiveness thereof that, if and to the extent that the terms of the Intercreditor Agreement differ in any material respect from the form of such agreement attached hereto as Exhibit H, the reasonable consent of the Requisite Senior Note Plan Support Parties with respect to such differing terms must be obtained.  A description of the Intercreditor Agreement is contained in the description of the New Third-Lien Notes attached hereto in Exhibit H.

E.    *Description of Reorganized RII Stock and Certificate of Incorporation*

1.    *Description of Reorganized RII Preferred Stock*

Pursuant to the Reorganized RII Constituent Documents, up to 87,000 shares of Reorganized RII Preferred Stock, par value $0.0001 per share, with an initial liquidation preference of $1,000 per share, will be authorized.  Of the 87,000 authorized shares of Reorganized RII Preferred Stock up to 27,000 shares will be Reorganized RII Series A Preferred Stock and the remaining 60,000 shares will be Reorganized RII Series B Preferred Stock.  The

Reorganized RII Series A Preferred Stock and the Reorganized RII Series B Preferred Stock will be *pari passu* and rank equally in right of payment and with respect to any consent rights or other rights vis-à-vis Reorganized RII.  All shares of the Reorganized RII Preferred Stock, when issued pursuant to the Rights Offering, will be fully paid and nonassessable.  The aggregate liquidation preference of Reorganized RII Preferred Stock to be issued on the Effective Date will not exceed $87 million.[21]

Dividends in respect of the Reorganized RII Preferred Stock accrue on a daily basis at an annual rate of LIBOR plus 20 percentage points on the initial liquidation preference amount and any accrued but unpaid dividends.  If not declared and paid quarterly, such dividends are added to the liquidation preference and accrue and compound at such dividend rate.  Upon the liquidation, dissolution or winding-up of Reorganized RII, the holders of Reorganized RII Preferred Stock will be entitled, after payment of all prior claims, to receive ratably the liquidation preference – including both the initial liquidation preference and all accrued and unpaid dividends.  The Reorganized RII Preferred Stock does not give the holders thereof any conversion rights, and there will be no mandatory redemption provisions other than upon the occurrence of a Change of Control or a qualified initial public offering.

The Reorganized RII Preferred Stock will have no voting rights other than rights to vote upon matters with respect to which Delaware General Corporation Law requires the affirmative vote or consent of the holders of Reorganized RII Preferred Stock and the protective provisions described below.  With respect to all such matters, the holders of Reorganized RII Preferred Stock will vote as separate classes by majority vote of the then outstanding shares in each series. Each of the Reorganized RII Certificates of Designation will contain certain protective provisions that provide that Reorganized RII only will be entitled to take certain actions if a majority of the holders of the then outstanding shares of Reorganized RII Preferred Stock voting as separate classes, consent thereto.  The types of events subject to such protective provisions include, among other things:

- any change to the rights of the Reorganized RII Preferred Stock or increase in the authorized number of shares of Reorganized RII Preferred Stock;

- any change to the rights of any capital stock of Reorganized RII that affects adversely the Reorganized RII Preferred Stock;

- other than any preferred stock dividend payable in kind with respect to the Reorganized RII Preferred Stock, the authorization, designation or issuance of any class or series of equity securities of Reorganized RII that ranks senior to the Reorganized RII Preferred Stock or on parity with the Reorganized RII Preferred Stock;

---

[21]    The number of shares of Reorganized RII Series A Preferred Stock issued on the Effective Date will depend on the calculation of the Senior Note Preferred Shares, which is contingent upon the amount of interest that accrues with respect to Senior Note Claims during the Chapter 11 Cases.  In no event will the number of shares of Reorganized RII Series A Preferred Stock constituting Senior Note Preferred Shares exceed 2,000 shares.

- the issuance of any shares of Reorganized RII Preferred Stock (other than any preferred stock dividend payable in kind) other than on the Effective Date;

- the declaration or payment of any dividend or distribution on, or redemption, repurchase or other acquisition of any of any shares of Common Stock or other equity securities of Reorganized RII; or

- the entry into any contract, agreement or undertaking that would violate or be in conflict with the rights of the Reorganized RII Preferred Stock.

The Reorganized RII Preferred Stock also will provide certain remedies against Reorganized RII in the event of violations of the terms and conditions of their respective certificates of designation.

2.     *Description of Reorganized RII Common Stock*

Pursuant to the Reorganized RII Certificate of Incorporation (attached hereto as Exhibit D), 20 million shares of common stock, par value $0.0001 per share, will be authorized.  All shares of the Reorganized RII Common Stock, when issued pursuant to the Plan, will be fully paid and nonassessable.

3.     *Description of Reorganized RII Certificate of Incorporation*

Section 8.2 of the Plan provides, among other things, that it is a condition precedent to the effectiveness of the Plan that the Reorganized RII Certificate of Incorporation be duly filed with the Delaware Secretary of State, unless such condition is waived pursuant to the terms of the Plan.  In addition to such other provisions as may be required pursuant to the terms of the Plan, the Reorganized RII Certificate of Incorporation will incorporate provisions governing, among other things, the election of Reorganized RII directors, restrictions on transfer of the Reorganized RII Common Stock, preemptive rights to purchase or subscribe for securities in Reorganized RII, information rights and other terms and provisions as more fully described in the Term Sheet For Certain Provisions of the Certificate of Incorporation attached hereto as Exhibit D.

Certain principal terms of the Term Sheet For Certain Provisions of the Certificate of Incorporation are summarized below.  Capitalized terms used in this Article VII.E.3 "Description of Reorganized RII Certificate of Incorporation" but not otherwise defined in Annex II shall have the meanings assigned such terms in the Term Sheet For Certain Provisions of the Certificate of Incorporation attached as Exhibit D hereto.

| | |
|---|---|
| **Information Rights:** | The Company will make available to each Shareholder (including the holders of Reorganized RII Preferred Stock) through a restricted website (*e.g.*, Intralinks), and commencing as of the first quarter of 2008 through a public website, certain financial and confidential information (including information sufficient to enable quotes in the "pink sheets" and Rule 144 trading of Reorganized RII Common Stock), subject to certain conditions and restrictions, until Reorganized |

RII becomes a public reporting company under the Exchange Act.

**Board of Directors:** The board of directors shall consist of seven directors (including the chief executive officer) and the Shareholders shall vote all voting securities of the Company to ensure that the Reorganized RII Certificate of Incorporation continues to include such provision. The Reorganized RII Certificate of Incorporation shall provide, among other things, that (i) the chief executive officer shall be a member of the Reorganized RII Board of Directors, (ii) the initial members of the Reorganized RII Board of Directors immediately following the effective date of the Plan may not be removed except for cause prior to the first annual shareholders meeting thereafter, and (iii) the Major Holders (*i.e.*, holders of at least a majority of the Shares then held by FNSO and its designated transferees) shall be entitled to designate up to three members of the Reorganized RII Board of Directors, depending upon the amount of their holdings.

**Shareholder Voting and Approval Rights:** Super-Majority Approval. Notwithstanding anything to the contrary permitted under applicable law or regulation or in the Reorganized RII Certificate of Incorporation or Bylaws, Reorganized RII shall not, without first obtaining the approval of Shareholders holding 66-2/3% or more of the then outstanding Reorganized RII Common Stock: (i) reduce or increase the number of members entitled to serve on the Reorganized RII Board of Directors to a number other than seven; (ii) repeal, amend, or otherwise modify, rescind or waive any provisions of the Reorganized RII Certificate of Incorporation or Bylaws; (iii) take part in certain affiliate or related party transactions; or (iv) issue Reorganized RII Common Stock (or options or other securities convertible into Reorganized RII Common Stock) not subject to the shareholder rights described in the Reorganized RII Certificate of Incorporation.

Major Holder Approval. As long as the Major Holders hold at least 34% of the outstanding Reorganized RII Common Stock, the approval of the Major Holders is required for certain actions, including: (i) the approval of the annual operating budget and capital expenditure budget of Reorganized RII and its subsidiaries; (ii) any authorization, reservation for issuance or issuance of capital stock of Reorganized RII or its subsidiaries; (iii) any amendments to the certificate of incorporation or bylaws of Reorganized RII or its subsidiaries in a manner which adversely affect the rights of Major Holders or which adversely affect the indemnification or exculpation of any director of Reorganized RII; (iv) the election, removal, delegation or amendment of power or authority, and compensation of certain officers of Reorganized RII and its subsidiaries; (v) certain mergers or acquisitions; (vi) certain asset or securities sales; (vii) the incurrence of certain indebtedness or liens; (viii) certain redemption or securities transactions; (ix) payment of

dividends on any capital stock of Reorganized RII (other than Reorganized RII Preferred Stock); and (x) any change in the number of directors of the Board. The Major Holders will have substantial rights with respect to approvals of key corporate actions in the future and no assurance can be made that such rights will be exercised for the benefit of other holders of New Securities. See Article II.B.6. "RISK FACTORS—Factors Affecting the Value of the Securities to be Issued Under the Plan of Reorganization—Ownership of Voting Stock."

**Tag Along Rights:** Other than with respect to certain affiliate or public transfers, if a Transferring Shareholder proposes to transfer a number of shares of Reorganized RII Common Stock representing 40% or more of the Reorganized RII Common Stock then outstanding, then the Transferring Shareholder shall give written notice to the Company and the other Shareholders at least 20 Business Days prior to the closing of such transfer and the other Shareholders shall have the right (but not the obligation) to include in such sale up to all of the Reorganized RII Common Stock held by such Shareholder.

**Drag Along Rights:** If a Selling Shareholder (or Shareholders) propose to sell Reorganized RII Common Stock representing an amount equal to more than 50% of the outstanding Reorganized RII Common Stock to any purchaser, other than to certain affiliates, the other Shareholders may be required by the Selling Shareholder to include the pro-rata portion of their Reorganized RII Common Stock in such sale and on the same terms and conditions applicable to the Selling Shareholder, and to take all necessary and desirable actions in connection with such sale.

**Preemptive Rights:** Until Reorganized RII's initial public offering of common stock occurs, if Reorganized RII offers any equity securities, except for Excluded Issuances, each holder of at least 3% of the Reorganized RII Common Stock shall have a right of first refusal to purchase that number of such equity securities on the same terms and conditions as would allow them to maintain their fully-diluted equity percentage ownership in Reorganized RII.

**Termination of Agreement:** The Reorganized RII Certificate of Incorporation provisions setting forth the special rights and obligations described in the Reorganized RII Certificate of Incorporation term sheet shall terminate and be of no force or effect upon the earliest to occur of (i) the date such termination has received a Supermajority Approval, (ii) the listing of Reorganized RII's common stock on a national securities exchange upon completion of a public offering of common stock or (iii) the effectiveness of a registration statement covering common stock filed pursuant to a demand registration under the Registration Rights Agreement.

F.       *Description of Registration Rights Agreement*

On, or as soon as practicable after, the Effective Date, Reorganized RII will enter into the Registration Rights Agreement with each Plan Support Party and any recipient of shares of Available Reorganized RII Common Stock (solely to the extent that such shares represent at least 2.5% of the Available Reorganized RII Common Stock) that, prior to the Effective Date, notifies us and counsel to the Informal Committee, in writing, that such Person desires to be a party to the Registration Rights Agreement. The Registration Rights Agreement will incorporate the terms identified in Exhibit E.

Certain principal terms of the Registration Rights Agreement are summarized below. Capitalized terms used in this Article VII.F. "Description of Registration Rights Agreement" but not otherwise defined in Annex II shall have the meanings assigned such terms in the Registration Rights Agreement term sheet attached hereto as Exhibit E.

| | |
|---|---|
| **Parties:** | Reorganized RII and the holders of Registrable Securities who receive at least 2.5% thereof under the Plan and who execute the Registration Rights Agreement. |
| **Request for Registration:** | Subject to the limitations in the Registration Rights Agreement, at any time or from time to time, the Holders will have the right to make a written request that Reorganized RII effect a registration under the Securities Act of all or part of the Registrable Securities of the Holders making such request. |
| **Demand Prior to Initial Public Offering:** | Each Holder of a number of shares of Reorganized RII Common Stock equal to at least 20% of the number of shares of outstanding Reorganized RII Common Stock as of the date of the Registration Rights Agreement (provided such Holder continues to hold such number of shares of Reorganized RII Common Stock at the time it makes a demand), and Holders of at least a majority in the aggregate of the Registrable Securities, each will have the right at any time to require Reorganized RII to register shares of Reorganized RII Common Stock held by them for resale under the Securities Act. |
| **Demand Following Initial Public Offering:** | In addition to the demand registration rights available prior to an initial public offering of Reorganized RII Common Stock described above, at any time following the initial public offering of Reorganized RII Common Stock under the Securities Act, each Holder will have the right to require Reorganized RII to register the shares of Reorganized RII Common Stock held by such Holder for resale under the Securities Act, subject to certain limitations as set forth in the Registration Rights Agreement. |

| | |
|---|---|
| **Limitations on Registration:** | Reorganized RII will not be required to effect more than five Demand Registrations (and there shall be no limitation on the number of Form S-3 registrations required). In addition, Reorganized RII will not be required to effect any registration during the period starting on the date 30 days prior to Reorganized RII's estimated date of filing of, and ending on the date 180 days immediately following the effective date of, any registration statement (other than on Form S-4 or S-8) pertaining to the securities of Reorganized RII, provided that Reorganized RII is employing in good faith all commercially reasonable efforts to cause such registration statement to become effective. |
| **Piggyback Rights:** | Unlimited "piggyback" rights will be provided to (i) all holders of Registrable Securities who otherwise would be considered underwriters pursuant to section 1145 of the Bankruptcy Code and (ii) each holder of shares of preferred stock issued by Reorganized RII on the Effective Date, solely to the extent that such holder did not receive such Preferred Stock pursuant to section 1145 of the Bankruptcy Code. |
| **Indemnification:** | In the event of any registration of any of the Registrable Securities under the Securities Act pursuant to the Registration Rights Agreement, Reorganized RII and each seller of securities shall provide each other with mutual customary indemnifications with respect to the registration and sale of securities. |
| **Assignment:** | Assignment of any right under the Registration Rights Agreement will be prohibited, except that a pro-rata portion of such rights may be assigned in connection with a permitted sale or transfer of Registrable Securities. |

G.      *Description of New Management Incentive Plan and the New Employment Agreements*

Pursuant to the Plan, we intend to adopt the New Management Incentive Plan and to enter into the New Employment Agreements. The New Employment Agreements and the New Management Incentive Plan, more fully described in Exhibit F, will provide each New Employment Agreement Officer with (i) their current base salary; (ii) a bonus upon emergence from bankruptcy (for all New Employment Agreement Officers, an aggregate of approximately $2.9 million); (iii) an increased annual target bonus under the Amended and Restated Annual Incentive Bonus Plan (for all New Employment Agreement Officers, an aggregate of approximately $6 million *per annum*); (iv) a deferred cash bonus under the 2010 Long-Term Incentive Cash Bonus Plan (for all New Employment Agreement Officers, an aggregate of approximately $10 million); and (v) the Restricted Stock pursuant to the Reorganized RII Restricted Stock Agreements (for all New Employment Agreement Officers, an aggregate of approximately 5% of the Reorganized RII Common Stock calculated on a fully diluted basis as of the Effective Date).

The New Employment Agreements provide for, among other things, severance in the event of an involuntary termination of the New Employment Agreement Officer equal to one (two for Mr. Weber) times such New Employment Agreement Officer's base salary in effect for the year of termination plus such New Employment Agreement Officer's minimum target bonus. For the purpose of calculating severance, the increased annual target bonus will not be given any effect. Severance will be paid in a lump sum within 30 days following termination, subject to the requirements of section 409A of the Tax Code. The New Employment Agreements also provide for the continuation of medical and dental benefits for 12 months (24 months for Mr. Weber) following an involuntary termination.

Under the New Employment Agreements, the Company will reimburse the New Employment Agreement Officers for any excise taxes due under section 280G of the Tax Code in the event of a change in control (other than a change resulting from consummation of the Plan). The aggregate amount of any excise tax reimbursements for the New Employment Agreement Officers will be limited to $2 million. In addition, certain New Employment Agreement Officers may be eligible for relocation expenses.

The Restricted Stock, which is described more fully under Exhibit F, represents approximately 5% of the Reorganized RII Common Stock, calculated on a fully diluted basis as of the Effective Date. The Restricted Stock will vest as to each New Employment Agreement Officer, subject to their continued employment, 12% per year for the first three years following issuance and 32% each year for years four and five. The Restricted Stock will fully vest upon a change in control of Reorganized RII and management also will have certain registration rights.

Under the 2010 Long-Term Incentive Cash Bonus Plan, each New Employment Agreement Officer will be eligible to receive a cash bonus, based on Reorganized RII's financial performance during fiscal years 2008, 2009 and 2010 (*i.e.*, during the Long-Term Incentive Period). The bonuses will be paid 50% in fiscal year 2011 and 50% in 2012. During the Long-Term Incentive Period, in the event of either: (i) an involuntary termination, Without Cause, of a New Employment Agreement Officer, or (ii) a resignation of a New Employment Agreement Officer for Good Reason (as such terms are defined in the New Employment Agreements), such New Employment Agreement Officer will receive a prorated bonus under the 2010 Long-Term Incentive Cash Bonus Plan. In the event of a change in control of Reorganized RII, each New Employment Agreement Officer will receive a pro-rated bonus under the plan.

H.      *Description of CVC Settlement Agreement*

We entered into the CVC Settlement Agreement in order to, among other things, protect against the possible loss of tax benefits related to our NOLs. A copy of the CVC Settlement Agreement is attached hereto as Exhibit K. The principal terms of the CVC Settlement Agreement are summarized below.

Section 4 of the CVC Settlement Agreement provides that Court Square will, among other things, (i) forbear from entering into an Exchange Transaction with respect to any RWHI Interests on or prior to the Plan Effective Date, (ii) not treat any RWHI Interests (or any portion thereof) owned by any Court Square Owner, or any Equity Interest (as defined in the CVC Settlement Agreement) in any Person owning a direct or indirect interest in a RWHI Interest (or

any portion thereof) as becoming worthless, within the meaning of section 382(g)(4)(D) of the Tax Code (by taking a loss pursuant to section 165(g) of the Tax Code or otherwise), if the result of such treatment would be to cause an "ownership change" within the meaning of section 382(g) of the Tax Code and any regulations thereunder on a date that is on or prior to the Plan Effective Date, and (iii) subject to the occurrence of the Plan Effective Date, waive any claims relating to the Advisory Agreement (or the rejection thereof).

Section 2 of the CVC Settlement Agreement provides, among other things, that the Prospective Debtors will, within two business days of the commencement of a chapter 11 proceeding, file the Assumption Motion with the Bankruptcy Court seeking to (x) assume the CVC Settlement Agreement, and (y) schedule a hearing thereon, such that the Bankruptcy Court will consider the Assumption Motion not more than 30 days following the filing thereof and not later than ten days prior to the original hearing date requested for the hearing to consider confirmation of a plan of reorganization.

In exchange for Court Square's agreements, section 5 of the CVC Settlement Agreement provides, among other things, that the Prospective Debtors will pay the CVC Settlement Amount to Court Square on the Plan Effective Date; provided that (x) Court Square is not in breach of its obligations under the CVC Settlement Agreement, (y) no Owner Shift has occurred, and (z) on the Plan Effective Date, Court Square shall have delivered to the Prospective Debtors the Confirmation Certificate, executed by a responsible officer of Court Square certifying that, as of the Plan Effective Date, (A) the representation made by Court Square in section 9(b) of the CVC Settlement Agreement is true and correct in all respects, and (B) Court Square has complied with section 4 of the CVC Settlement Agreement as of the Plan Effective Date. If Court Square does not receive the CVC Settlement Amount by June 15, 2008, the CVC Settlement Amount will begin to accrue interest as of such date at a rate of 20% *per annum* until paid in full, unless it is not otherwise due and payable. In addition to the payment of the CVC Settlement Amount, the CVC Releasors (only in the context of a Prepackaged Plan) and the Prospective Debtors (in the context of either the Prepackaged Plan or an Alternate Plan) have agreed to grant the releases contained in section 9(c) of the Plan and Court Square agreed to grant the releases contained in section 9(d) of the Plan.

Section 7 of the CVC Settlement Agreement provides that the agreement is terminable upon written notice to the Prospective Debtors and the CVC Noteholder Parties by Court Square, if, among other things: (i) the Prospective Debtors do not commence a case under chapter 11 of the Bankruptcy Code by June 15, 2008; (ii) the terms of the Plan or an Alternate Plan are inconsistent with the terms of the CVC Settlement Agreement; (iii) (x) any provision contained in the Non-Severable Obligations is severed or deemed unenforceable, or (y) so long as the Plan Support Agreement is effective, the CVC Noteholder Parties oppose the Plan; (iv) the Prospective Debtors (or the CVC Noteholder Parties in a Prepackaged Bankruptcy Case) seek an extension of the scheduling of the hearing on the Assumption Motion, without Court Square's prior written consent; (v) the Bankruptcy Court does not approve the Assumption Motion within the later of (x) ten days prior to the hearing date requested for the original hearing to consider confirmation of a plan of reorganization or (y) 45 days of the date of commencement of the bankruptcy case in which such motion is filed; provided that Court Square shall not be entitled to terminate the CVC Settlement Agreement if the Prospective Debtors use commercially reasonable efforts to satisfy the scheduling requirements set forth in the CVC

Settlement Agreement and the CVC Noteholder Parties have not breached the terms of the CVC Settlement Agreement; (vi) the Prospective Debtors or the CVC Noteholder Parties seek to modify the Plan or an Alternate Plan in a manner that is inconsistent with the transactions contemplated by the CVC Settlement Agreement, without the written consent of Court Square; or (vii) the Prospective Debtors or the CVC Noteholder Parties materially breach any of their other respective obligations hereunder, and such breach is not cured within five business days after the giving of notice by Court Square.

In addition, the CVC Settlement Agreement may be terminated upon written notice to Court Square by us or the CVC Noteholder Parties, if Court Square materially breaches the agreement, and such breach is not cured within five business days after the giving of notice.

Upon the termination of the CVC Settlement Agreement, no non-breaching party will have any continuing liability to any other party thereunder; provided, however, that no such termination shall relieve any party (i) from liability for its breach or non-performance of its obligations prior to the date of such termination or (ii) any obligation any party may have under any other agreements executed between such parties; provided, further, so long as (x) Court Square is not in breach of its obligations and representations, (y) has delivered the Confirmation Certificate to the Prospective Debtors and (z) no Owner Shift has occurred, the Prospective Debtors must pay the CVC Settlement Amount to Court Square.

On the Effective Date, the Advisory Agreement will be deemed terminated pursuant to section 5.5(a) of the Plan, and no amount (accrued or otherwise) owed in respect thereof shall be due or payable to Court Square, or otherwise qualify for treatment as an Allowed Claim under the Plan.

I.       *Description of Certain Retention Agreements with Financial Advisors*

On November 9, 2006, we entered into the Rothschild Retention Agreement pursuant to which we engaged Rothschild as our financial advisor and investment banker in connection with the restructuring of our existing liabilities and indebtedness. In connection with the Solicitation and the Plan, the Rothschild Retention Agreement provides for both a $5 million completion fee and a "new capital" fee of $4.95 million (such fees being subject to certain downward adjustments on account of certain previously paid monthly fees and certain other amounts). Consistent with the requirements of section 3(a)(9) of the Securities Act these fees will be deemed to be earned in full upon the occurrence of the Voting Deadline, regardless of whether the consents or acceptances received in connection with the Solicitation are sufficient for the Plan to be confirmed pursuant to the Bankruptcy Code. These fees will be payable upon the earlier of: (i) 180 days after the Voting Deadline and (ii) the confirmation of the Plan.

On July 1, 2007, we entered into the Houlihan Retention Agreement pursuant to which we agreed to pay certain fees in connection with Houlihan's retention as the financial advisor to the Ad Hoc Committee (as defined in the Houlihan Retention Agreement). Pursuant to such agreement, we agreed to the payment of certain fees, including a "deferred fee" in the amount of $5.7 million in connection with a solicitation pursuant to section 3(a)(9) of the Securities Act. Consistent with the requirements of section 3(a)(9) of the Securities Act this deferred fee will be deemed to have been earned in full upon the expiration of the Voting Deadline, regardless of

whether the consents or acceptances received in connection with the Solicitation are sufficient for the Plan to be confirmed pursuant to the Bankruptcy Code.  The deferred fee will be payable upon the earlier of (i) 180 days after the Voting Deadline and (ii) the Effective Date.

## VIII.   POST-REORGANIZATION CAPITAL STRUCTURE

The following table sets forth the consolidated debt and capitalization of Reorganized RII and its consolidated subsidiaries at October 31, 2007, and as adjusted to give effect to the Plan as though it became effective on October 31, 2007 and applying the midpoint of the estimated valuation range (as determined in Article IX below).

## Remy International, Inc. and Subsidiaries
## Condensed Consolidated Balance Sheet

| IN MILLIONS, as of October 31, 2007 | Before debt restructuring and fresh start | | Debt Restructuring | | Fresh Start | | After debt restructuring and fresh start | |
|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | |
| Current assets: | | | | | | | | |
| Cash and cash equivalents | $ | 15.0 | | | | | $ | 15.0 |
| Trade and other receivables, net | | 195.6 | | | | | | 195.6 |
| Inventories | | 189.2 | | | | | | 189.2 |
| Other current assets | | 6.9 | | | | | | 6.9 |
| Total current assets | | 406.7 | | - | | - | | 406.7 |
| | | | | | | | | |
| Property, plant and equipment, net | | 139.2 | | | | | | 139.2 |
| Reorganization value in excess of recorded amounts | | 113.4 | | | | 257.0 | | 370.4 |
| Other assets | | 51.7 | | | | | | 51.7 |
| | | | | | | | | |
| Total assets | $ | 711.0 | $ | - | $ | 257.0 | $ | 967.9 |
| | | | | | | | | |
| **Liabilities and Stockholders' (Deficit) Equity:** | | | | | | | | |
| Current liabilities: | | | | | | | | |
| Accounts payable | $ | 152.7 | | | | | $ | 152.7 |
| Other liabilities and accrued expenses | | 173.3 | | (47.1) | | | | 126.2 |
| Current maturities of long term debt | | 186.1 | | (145.0) | | | | 41.1 |
| Total current liabilities | | 512.1 | | (192.1) | | - | | 320.0 |
| | | | | | | | | |
| Long term debt, net of current portion | | 601.6 | | (235.8) | | | | 365.8 |
| Other non-current liabilities | | 65.6 | | | | | | 65.6 |
| Minority interest | | 5.3 | | | | | | 5.3 |
| | | | | | | | | |
| Redeemable preferred stock | | - | | 85.3 | | | | 85.3 |
| | | | | | | | | |
| Total stockholders' (deficit) equity | | (473.7) | | 342.6 | | 257.0 | | 125.9 |
| Total liabilities and stockholders' (deficit) equity | $ | 711.0 | $ | - | $ | 257.0 | $ | 967.9 |

## IX.   FINANCIAL PROJECTIONS AND VALUATION ANALYSIS

### A.   *Financial Projections*

The Bankruptcy Code requires as one of the conditions to confirmation of a plan of reorganization that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  This requirement is commonly referred to as the "feasibility standard."  For the purposes of determining whether the Plan meets the feasibility standard, and to assist the Impaired Noteholders' evaluation of whether to vote to accept or reject the Plan and exchange their Claims against the Prospective Debtors for the distributions described herein, management has analyzed our ability to meet our obligations under the Plan and retain sufficient liquidity and capital resources to conduct our business following emergence from the Chapter 11 Cases.  Management also has prepared certain estimates and projections of operating profit, EBITDA and certain other items for the Projection Period.

The Projections should be read in conjunction with the assumptions and qualifications set forth herein.  The Projections were prepared in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  OUR INDEPENDENT ACCOUNTANTS, ERNST & YOUNG LLP, HAVE NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAVE NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

WE DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF OUR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS.  ACCORDINGLY, WE DO NOT INTEND, AND DISCLAIM ANY OBLIGATION, TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS WHICH WE MAY FILE WITH THE SEC OR INCLUDE ON OUR WEBSITE, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.  THE PROJECTIONS PROVIDED IN THIS SOLICITATION AND DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE COMPANY'S MANAGEMENT.  THESE PROJECTIONS, ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, NECESSARILY ARE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND OUR CONTROL.  WE CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO OUR ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME

ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  SEE ARTICLE II. "RISK FACTORS."

THE FOLLOWING ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS.

The estimated and projected consolidated financial statements of the Company set forth below have been prepared based on the assumption that the Effective Date would occur on or about October 31, 2007.  Although we would seek to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when the Effective Date actually would occur.

Additional information relating to the principal assumptions used in preparing the Projections is set forth below:

(a)     *Fresh Start Accounting*

The Projections assume an Effective Date of October 31, 2007, and as required, the concepts of Fresh Start Accounting have been applied for periods after the Effective Date.  These principles are contained in the American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code."  Adoption of Fresh Start Accounting requires the determination of the reorganization value of the entity that emerges from bankruptcy.  Reorganization value generally approximates fair value of the entity before considering liabilities.

An enterprise valuation analysis was completed by Rothschild which estimated a reorganization value range between $570 million and $670 million with a midpoint of $620 million.  The resulting reorganization value in excess of assets as recorded has not been allocated among the individual categories of assets in these Projections.  The allocation when made will be made based on asset appraisals by independent valuation experts.  Accordingly, the asset valuation will have an effect on future depreciation, amortization and tax expenses which have not been reflected in these Projections.  The inventory valuation has not been adjusted in accordance with Fresh Start Accounting, thus the resulting effect on cost of sales has not been reflected in these Projections.  We estimate the increases in inventory valuation and resulting cost of sales will be approximately $4-$9 million (noncash costs).  Based on the assumed Effective Date, the cost of sales impact will be spread over the last two months of 2007 and the first half of 2008.  The Fresh Start Accounting adjustments included in the following projections are preliminary estimates.

(b)     *Revenues*

Our Projections for revenues through 2011 are relatively flat at approximately $1.2-$1.3 billion as we attempt to move away from commodity type products and focus growth on higher value products.  See Article IV.E. "THE BUSINESS—Recent and Future Strategy."

In the OE business, we are focusing on product mix improvement rather than revenue growth. We expect significant growth in our higher margin hybrid and heavy duty product lines, offset by revenue reductions in several lower margin light-duty products.

Hybrids – We are an early entrant to the emerging market for hybrid motor technology. The market is growing at triple digit rates and we are well positioned with proprietary stator technology and production experience with both BAS (belt-driven alternator starter) and full hybrid technology. We have been awarded business on two major OEM platforms which will launch in 2008 and 2009 (disclosure of specific customer names and programs is not permitted under confidentiality agreements). We also have several programs in development and an increasing pipeline of opportunities. Hybrid sales are anticipated to increase by approximately $35-$40 million in 2008 and by a similar amount from 2009-2011 based on large application launches (awarded programs) and several smaller programs.

Heavy Duty – We are the North American leader in the Heavy Duty market (Heavy equipment & Class 8 trucks) for both the OE and aftermarket products. The market is experiencing a significant downturn in 2007 following the most recent deadline for emissions reductions imposed by tightened EPA regulations. We anticipate an approximate $25 million revenue rebound in 2008, followed by another increase in 2009 as the market prepares for the next round of regulatory requirements. We are launching several new market share initiatives, including a new line of planetary gear starters with lower cost design and higher reliability. We are also expanding our high performance alternator line and positioning for global expansion, particularly in the Asian market where key customers are expanding. We expect sales of high output alternators to increase by approximately $20 million by 2011 We also will be launching several new, lower cost, higher reliability products over the next 18 months in our heavy duty alternator, starting motor and hybrid product lines. These changes are expected to give us a much more competitive portfolio for the light-duty market as well as a broader portfolio of high reliability, added feature products for the heavy-duty market.

In the automotive aftermarket, we expect relatively flat sales over the projection period. The do-it-yourself (i.e., retail) segment will continue to decline as the market shifts to the do-it-for-me (i.e., commercial) channel where we are focusing our efforts. This segment has better growth potential and lower cash requirements than the retail segment of the market. In the retail segment, we have established long-term contracts with most of our major customers which makes significant market share shifts unlikely. Furthermore, we are now expanding into the commercial segment with "Remy" branded products and a unique package of high value services such as our "Category Management" program which optimizes customer sales and inventory stocking levels. This segment has higher margins, faster growth, and lower entry barriers. Supply is highly fragmented. We expect to add approximately $40-$45 million of revenues from this segment by 2011.

We expect our gross profits over the next 5 years to improve to approximately $240 million as a result of our new strategy focusing on higher value products and several other key initiatives:

GM Agreements – The GM Agreements contain a number of favorable improvements for us, including pricing modifications under a majority of the contracts covered by the agreements, through various mechanisms. The Projections assume an improvement in our gross profit as a result of the impact of the GM Agreements, with the majority of such improvements beginning in calendar year 2008 (although some of the improvements are expected to begin in 2007). The Projections assume that volumes covered by our 4 year agreement will begin to decline as programs expire in 2011. The Company is well-positioned to bid on new replacement GM volume.

Multiple site consolidations – The Projections also include the anticipated financial impact for certain site consolidations we are considering. Approximately 16 sites have been targeted for consolidation. The Projections assume an annualized improvement of approximately $17 million of gross profit as a result of these consolidations, of which approximately $4-$5 million is anticipated in 2008. The total cost of consolidation is assumed to be approximately $27 million which will be offset partially by asset sales. The Projections assume that most of the restructuring would be complete in 2008.

Master savings plan – We have initiated a comprehensive material re-sourcing program that is expected to reduce material costs. These savings are included in the Projections. The primary sources of these improvements are resourcing material procurement to low cost countries, product redesigns, and manufacturing changes. Related cost improvements will contribute year-over-year savings of $21 million in 2007 and $28 million in 2008. Material costs typically represent approximately two-thirds of the Company's total cost of goods sold and almost three-fourths of the Company's total cost of goods sold in the OE business. The following initiatives are being implemented to achieve the above net savings (all savings amounts are before assumed contingencies and other offsets):

Resourcing – Resourcing will occur over the next 36 months as we move approximately $65 million of purchased materials from high cost regions in Europe and North America to low costs regions, particularly in China. The Company has largely identified the supply base required to implement the resourcing program. These moves will improve our 2008 cost position by $15-$20 million.

Re-Design – We are also re-designing multiple OE product lines to improve our cost position in both the light duty and heavy duty segments. We will be launching several new, lower cost, higher reliability products over the next 18 months, particularly in our planetary gear starter portfolio. These changes will give us a much more competitive portfolio for the light duty market as well as a broader portfolio of

high reliability products for the heavy-duty market. These changes will reduce product costs by $10-$15 million by 2008.

Manufacturing - In the automotive aftermarket business, we have implemented new "Smart Salvage" techniques to reduce the cost of our remanufactured products by a cumulative $7-$10 million by 2008.

Warranty – We have fixed product design issues that led to almost 80% of special warranty accrual increases in 2006, but significant cash cost related to legacy product reliability issues will continue in 2007. However, this is an area in which we are adding staff and resources to ensure that we can better anticipate and prevent future problems. These investments will start to show results in 2008 when our annual warranty costs drop by $4-$5 million. We are investing in new personnel and new processes to reduce our excessive annual cash warranty costs of approximately $50 million and the projections include a reduction of approximately $10-$15 million by 2011.

Product Mix – By 2011, we anticipate a revenue decline of approximately $100 million with respect to low or zero margin products and businesses as we add over $135 million of revenue in higher value, higher margin products (Hybrid, Heavy Duty and After-market businesses). This gain includes approximately $75 million of hybrid business. The EBITDA improvements from these changes are forecast at approximately $15 million.

New customer agreements - The Projections assume that various new customer agreements will produce in excess of $18 million of additional EBITDA per year to the Company.

Long term risk factors such as metals price escalation, currency exchange rates, market changes, and other risks associated with long term projections have been factored into our plan. We have included an approximately $5-$10 million reduction in our EBITDA projections to offset these risks.

(d) *Operating Expenses*

Key provisions of the New Management Incentive Plan and the New Employment Agreements, are described in Article VII.G. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN – Description of New Management Incentive Plan and the New Employment Agreements" and in Exhibit F hereto. Attrition rates have been applied to the deferred compensation plans based on historical experience. Expenses related to restricted stock grants are not included in the accompany projections. Other salaried, engineering and administrative expenses are projected to remain flat in aggregate for the projection period. Planned site consolidations and reduction in our global footprint will allow us to reduce headcount in order to offset salary inflation and provide resources for the key initiatives described above. The New Management Incentive Plan includes a deferred cash plan of $10 million that is accrued for

evenly in each of 2008, 2009 and 2010 in the Projections and is paid in two installments of $5 million each, with the first of these installments assumed to be paid in 2011.

Sales, Engineering, and Administrative costs – Overhead costs are projected to remain flat in aggregate from 2009-2011 before costs associated with the New Management Incentive Plan. Salary and benefit inflation will be offset by reductions in staff which will result in part from our global site consolidations.

(e)    <i>Interest Expense</i>

Interest expense in the accompanying projections has been calculated using face value of debt at stated interest rates plus amortization of deferred financing costs.

(f)    <i>Taxes</i>

Tax liabilities were calculated by taking into account current income and withholding tax rates. Net operating losses were used to the extent allowable after considering Tax Code limitations imposed following an ownership change. The calculation assumes that all available after-tax excess funds are distributed from foreign subsidiaries, and foreign tax credits were used, to the extent allowable, to reduce the tax liability.

(g)    <i>Capital Expenditures</i>

Capital expenditures for each year in the projection period are projected to be greater than they were in 2006 by approximately $6 million. Hybrid and other new product technology investments comprise the majority of the approximately $20-$25 million per year of projected capital expenditures. The balance is allocated to maintenance, testing equipment and tooling expenditures related to cost reduction and resourcing initiatives.

(h)    <i>Working Capital</i>

Trade receivables, inventory and accounts payable levels are projected to be maintained at relatively consistent levels during the 2009-2011 projection period. Inventory levels will be impacted during the 2007 and 2008 periods as restructuring activities are executed. Trade payables are expected to increase after emergence from chapter 11 as the Company's vendors modify their currently restrictive credit terms but only a modest increase has been included in the projections. Customer obligation payments over the projection period are $22 million in 2007 (full year), $16 million in 2008, $14 million in 2009, $12 million in 2010 and $11 million in 2011, based on existing customer agreements.

Costs associated with certain operational restructuring initiatives are included in the Projections in the amount of approximately $27 million over the 2007-2009 period, with the vast majority of these costs occurring in 2008.

The Company has identified certain potential initiatives designed to improve liquidity in late 2007 and 2008, including: (i) effectuating certain asset sales and sales of non-core businesses, though as of the date of this Solicitation and Disclosure Statement, no final determination has been made by the Company to complete these potential sales; and

(ii) delaying certain discretionary operational restructuring initiatives that require upfront working capital investment to implement. Although the Company is pursuing some of those initiatives, and may seek to implement them during the Chapter 11 Cases, the Projections do not include any liquidity benefit from these potential initiatives.

# Remy International, Inc. and Subsidiaries
## Condensed Consolidated Projected Statements of Operations

| | (Unaudited) | | | | |
|---|---|---|---|---|---|
| *IN MILLIONS, For the periods ended December 31,* | **Two months ended 2007** | **Year ended 2008** | **Year ended 2009** | **Year ended 2010** | **Year ended 2011** |
| **Net sales** | $ 196.0 | $ 1,289.7 | $ 1,295.4 | $ 1,298.1 | $ 1,305.6 |
| Cost of goods sold | 173.4 | 1,078.9 | 1,059.8 | 1,056.1 | 1,061.5 |
| Gross profit | 22.7 | 210.9 | 235.7 | 242.1 | 244.1 |
| Selling, general and administrative expenses | 20.1 | 138.5 | 138.9 | 140.3 | 134.5 |
| Restructuring charges | 2.5 | 9.4 | 2.3 | 3.2 | - |
| **Operating income** | 0.1 | 63.0 | 94.5 | 98.5 | 109.6 |
| Interest expense | 8.1 | 48.0 | 45.0 | 44.0 | 41.9 |
| Income (loss) from operations before income taxes and minority interest | (8.0) | 15.0 | 49.5 | 54.5 | 67.7 |
| Income tax expense | 1.2 | 9.9 | 17.3 | 19.0 | 27.4 |
| Minority interest | 0.1 | 0.6 | 0.6 | 0.6 | 0.6 |
| **Net (loss) income** | (9.3) | 4.5 | 31.6 | 34.9 | 39.7 |
| Accretion of preferred stock | 3.7 | 24.4 | 31.3 | 40.1 | 51.3 |
| Net loss attributable to common stockholders | $ (13.0) | $ (19.9) | $ 0.3 | $ (5.2) | $ (11.6) |
| **Adjusted EBITDAR Reconciliation:** | | | | | |
| Adjusted earnings before interest and taxes | $ 0.1 | $ 63.0 | $ 94.5 | $ 98.5 | $ 109.6 |
| Restructuring and non-recurring charges | 2.5 | 9.4 | 2.3 | 3.2 | - |
| Depreciation and amortization | 5.9 | 29.8 | 25.0 | 25.1 | 24.8 |
| Adjusted EBITDAR | $ 8.4 | $ 102.2 | $ 121.8 | $ 126.8 | $ 134.5 |

# Remy International, Inc. and Subsidiaries
## Condensed Consolidated Projected Balance Sheets

| | (Unaudited) | | | | |
| IN MILLIONS, At December 31, | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 15.0 | $ 15.0 | $ 26.2 | $ 35.0 | $ 35.0 |
| Trade and other receivables, net | 186.9 | 183.0 | 187.0 | 187.7 | 187.9 |
| Inventories | 181.8 | 164.0 | 164.6 | 163.4 | 162.1 |
| Other current assets | 6.3 | 12.4 | 12.4 | 12.4 | 12.4 |
| Total current assets | 390.0 | 374.4 | 390.2 | 398.6 | 397.4 |
| | | | | | |
| Property, plant and equipment, net | 136.7 | 129.7 | 128.6 | 129.1 | 128.8 |
| Reorganization value in excess of recorded amounts | 370.4 | 370.4 | 370.4 | 370.4 | 370.4 |
| Other assets | 52.5 | 50.2 | 49.1 | 48.0 | 46.9 |
| | | | | | |
| Total assets | $ 949.6 | $ 924.7 | $ 938.3 | $ 946.0 | $ 943.5 |
| | | | | | |
| **Liabilities and Stockholders' Equity:** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 149.9 | $ 160.3 | $ 163.0 | $ 163.8 | $ 165.8 |
| Other liabilities and accrued expenses | 124.0 | 118.9 | 116.6 | 117.2 | 109.3 |
| Current maturities of long term debt | 40.6 | 30.0 | 25.0 | 25.0 | 128.1 |
| Total current liabilities | 314.4 | 309.2 | 304.7 | 305.9 | 403.2 |
| | | | | | |
| Long term debt, net of current portion | 365.1 | 343.7 | 335.6 | 315.2 | 181.1 |
| Other non-current liabilities | 62.7 | 59.5 | 53.5 | 44.8 | 38.8 |
| Minority interest | 5.4 | 6.0 | 6.6 | 7.2 | 7.8 |
| | | | | | |
| Redeemable preferred stock | 89.0 | 113.4 | 144.7 | 184.8 | 236.1 |
| | | | | | |
| Total stockholders' equity | 112.9 | 93.0 | 93.3 | 88.0 | 76.4 |
| | | | | | |
| Total liabilities and stockholders' equity | $ 949.6 | $ 924.7 | $ 938.3 | $ 946.0 | $ 943.5 |

# Remy International, Inc. and Subsidiaries
## Condensed Consolidated Projected Statements of Cash Flows

| | | | | | (Unaudited) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *IN MILLIONS, For the periods ended December 31,* | | Two months ended 2007 | | Year ended 2008 | | Year ended 2009 | Year ended 2010 | Year ended 2011 |
| **Cash Flows from Operating Activities:** | | | | | | | | | |
| Net loss attributable to common stockholders | $ | (13.0) | $ | (19.9) | $ | 0.3 | $ (5.2) | $ (11.6) |
| Adjustments to reconcile net loss to cash used in operating activities: | | | | | | | | | |
| Accretion of preferred stock | | 3.7 | | 24.4 | | 31.3 | 40.1 | 51.3 |
| Accrued interest on third-lien paid-in-kind notes | | 2.9 | | 18.3 | | - | - | - |
| Depreciation and amortization | | 5.9 | | 29.8 | | 25.0 | 25.1 | 24.8 |
| Amortization of deferred financing costs | | 0.1 | | 0.7 | | 0.7 | 0.7 | 0.7 |
| Changes in operating assets and liabilities: | | | | | | | | | |
| Accounts receivable | | 9.2 | | (8.1) | | (4.0) | (0.7) | (0.2) |
| Inventories | | 7.4 | | 17.8 | | (0.6) | 1.2 | 1.3 |
| Accounts payable | | (2.9) | | 10.4 | | 2.7 | 0.8 | 2.0 |
| Other assets and liabilities, net | | (6.1) | | (2.2) | | (7.7) | (7.7) | (13.4) |
| Net cash provided by operating activities | | 7.3 | | 71.1 | | 47.7 | 54.2 | 54.9 |
| | | | | | | | | | |
| **Cash Flows from Investing Activities:** | | | | | | | | | |
| Purchases of property, plant and equipment | | (3.2) | | (20.8) | | (23.4) | (25.0) | (23.9) |
| Net cash used in investing activities | | (3.2) | | (20.8) | | (23.4) | (25.0) | (23.9) |
| | | | | | | | | | |
| **Cash Flows from Financing Activities:** | | | | | | | | | |
| Net repayments under revolving line of credit and other | | (4.1) | | (50.3) | | (13.1) | (20.4) | (31.0) |
| Net cash used in financing activities | | (4.1) | | (50.3) | | (13.1) | (20.4) | (31.0) |
| | | | | | | | | | |
| Net increase in cash and cash equivalents | | - | | - | | 11.2 | 8.8 | - |
| Cash and cash equivalents at beginning of period | | 15.0 | | 15.0 | | 15.0 | 26.2 | 35.0 |
| Cash and cash equivalents at end of period | $ | 15.0 | $ | 15.0 | $ | 26.2 | $ 35.0 | $ 35.0 |

# Remy International, Inc. and Subsidiaries
## Projections Summary

| IN MILLIONS | Actual 2006 | 2007 | 2008 | Projected 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|
| Sales | $1,255.5 | $1,215.7 | $1,289.7 | $1,295.4 | $1,298.1 | $1,305.6 |
| Reported EBITDAR | $16.2 | | | | | |
| Significant Adjustments | 27.6 | | | | | |
| Adjusted EBITDAR | $43.8 | $55.0 | $102.2 | $121.8 | $126.8 | $134.5 |
| Free Cash Flow before Interest, Taxes and Restructuring Costs | $60.4 | ($35.8) | $89.4 | $84.1 | $91.2 | $98.1 |

**Note: the effects of Fresh Start Accounting, restructuring costs, stock compensation and bankruptcy expenses are excluded.**

## B. *Valuation*

In conjunction with formulating the Plan, we have estimated the post-confirmation going-concern enterprise value of the Reorganized Debtors. At our request, Rothschild performed an analysis of the estimated reorganization value of Reorganized RII (and its subsidiaries) on a going-concern basis.

### 1. *Valuation Overview*

The valuation estimates set forth herein represent an estimated reorganization enterprise value that was developed solely for the purpose of the Plan. Rothschild's estimated valuation assumes that the Reorganized Debtors will continue as a going concern and operate in a manner consistent with the Projections. The estimate reflects the computations of the estimated enterprise value of the Reorganized Debtors through the application of various generally accepted valuation techniques and do not constitute appraisals of the Reorganized Debtors' assets or the actual market value of the New Securities.

In preparing its analysis, Rothschild has, among other things: (i) reviewed certain recent publicly available financial results of the Company; (ii) reviewed certain internal financial and operating data of the Company; (iii) discussed with certain senior executives the current operations and prospects of the Company; (iv) reviewed certain operating and financial forecasts prepared by the Company, including the Projections; (v) discussed with certain senior executives of the Company key assumptions related to the Projections; (vi) prepared discounted cash flow analyses based on the Projections, utilizing various discount rates, and separately valued and accounted for the Company's NOLs following the Effective Date, including the limitations thereon under the Tax Code; (vii) considered the market value of certain publicly-traded companies in businesses reasonably comparable to the operating business of the Company; (viii) considered the value assigned to certain precedent merger and acquisition transactions for businesses similar to the Company, as well as certain economic and industry information relevant to the operating business of the Company and (ix) conducted such other analyses as Rothschild deemed necessary under the circumstances. Rothschild also has considered a range of potential risk factors, including the Reorganized Debtors': (a) ability to execute and realize savings from planned operational initiatives; (b) capital structure; and (c) ability to meet projected growth targets in all of their business units.

Rothschild assumed, without independent verification, the accuracy, completeness, and fairness of all of the financial and other information available to it from public sources or as provided to Rothschild by the Prospective Debtors or their representatives. Rothschild also assumed that the Projections have been reasonably prepared on a basis reflecting the Prospective Debtors' best estimates and judgment as to future operating and financial performance. Rothschild did not make any independent evaluation of the Prospective Debtors' assets, nor did Rothschild verify any of the information it reviewed. To the extent the estimated valuation is dependent upon the Reorganized Debtors' achievement of the results upon which the Projections are based, the estimated valuation must be considered speculative. Rothschild does not make any representation or warranty as to the fairness of the terms of the Plan.

In addition to the foregoing, Rothschild relied upon the following assumptions in arriving at its estimated valuation of the Reorganized Debtors:

- The Effective Date occurs on or about October 31, 2007;

- The Prospective Debtors are able to recapitalize with adequate liquidity as of the Effective Date;

- The Prospective Debtors are able to implement the Plan in the manner described herein;

- The pro forma net debt levels of the Reorganized Debtors would be approximately $407 million immediately following the Effective Date;

- A significant portion of the Prospective Debtors' NOLs will be available to the Reorganized Debtors, subject to certain limitations under the Tax Code;

- The GM Agreements becoming effective on the Effective Date; and

- General financial and market conditions as of the Effective Date will not differ materially from the conditions prevailing as of the date of this Solicitation and Disclosure Statement.

       2.    *Methodology*

Rothschild has employed generally accepted valuation techniques in estimating the reorganization value of the Reorganized Debtors. The three methodologies upon which Rothschild primarily relied are (i) comparable public company analysis, (ii) comparable acquisition analysis and (iii) DCF analysis. These valuation methodologies reflect both the market's current view of the Prospective Debtors' business plan and operations, as well as longer term focus on the intrinsic value of the cash flow projections in the Prospective Debtors' business plan.

       (a)    *Comparable Public Company Analysis*

In a comparable public company analysis, a subject company is valued by comparing it with publicly held companies in reasonably similar lines of business. The comparable public companies are chosen based on, among other attributes, their similarity to the subject company's size, profitability and market presence. The price that an investor is willing to pay in the public markets for each company's publicly traded securities represents that company's current and future prospects as well as the rate of return required on the investment.

In selecting comparable public companies, Rothschild considered factors such as the focus of the comparable companies' businesses as well as such companies' current and projected operating performance relative to the Prospective Debtors. Numerous financial multiples and ratios were developed to measure each company's valuation and relative performance. Some of the specific analyses entailed comparing the enterprise value (defined as market value of equity plus market value of debt, book value of preferred stock and minority interest minus excess cash) for each of the comparable public companies to their projected revenue and EBITDA. These multiples were calculated on or around the date of this Solicitation and Disclosure Statement and

were then applied to the Prospective Debtors' financial projections to determine the range of enterprise value and equity value using this methodology.

(b)     *Comparable Acquisition Analysis*

The comparable acquisition analysis was the second valuation methodology used to determine the reorganization value for the Reorganized Debtors. This approach entails calculating multiples of revenues and EBITDA based upon prices paid (including any debt assumed and equity purchased) in mergers and acquisitions of companies similar to the Prospective Debtors. These multiples were then applied to the Prospective Debtors' financial projections to determine the implied range of enterprise values using this methodology.

(c)     *DCF Analysis*

The third valuation methodology that was used to determine the reorganization value of the Reorganized Debtors was the discounted cash flow method. The discounted cash flow of an enterprise represents the present value of unleveraged, after-tax cash flows available to all providers of capital using an appropriate set of discount rates. The DCF approach takes into account the projected operating cash flows of the subject company by using company projections as the basis for the financial model. The underlying concept of the DCF approach is that debt-free, after-tax cash flows are estimated for a projection period and a terminal value is estimated to determine the going concern value of the subject company from the end of the projection period forward. These cash flows are then discounted at an appropriate weighted average cost of capital, which is determined by referring to, among other things, the average cost of debt and equity for the other participants throughout the industry.

3.     *Valuation of Reorganized Company*

Rothschild has advised us that for purposes of the valuation described above, Rothschild assumed that (i) the proposed capitalization of the Reorganized Debtors will be as set forth in the Plan; (ii) market, business and general economic conditions will be similar to conditions observed as of the date hereof; (iii) the financial and other information furnished to Rothschild by the Company and its professionals and the publicly available information with respect to the Company was accurate and complete; and (iv) the Plan will be confirmed without material changes from those detailed herein. Based upon the analyses detailed above, the assumptions made, matters considered and limits of review also set forth above, Rothschild estimated the total reorganization value range of the Reorganized Debtors to be between $570 million to $670 million with a midpoint of approximately $620 million. The range of reorganization common equity value (excluding the Reorganized RII Preferred Stock), which takes into account the total reorganization value range less estimated debt (and the Liquidation Preference of the Reorganization RII Preferred Stock) outstanding as of October 31, 2007, was estimated by Rothschild to be between $76 million and $176 million, with a midpoint of approximately $126 million as of August 31, 2007. The foregoing reorganization equity value reflects, among other factors described herein, current financial market conditions as of the date of this Solicitation and Disclosure Statement and the inherent uncertainty as to the achievement of the results described in the Projections.

The implied reorganized equity value ascribed in this analysis does not purport to be an estimate of the post-reorganization market trading value of the New Securities issued pursuant to the Plan. Such trading value may be materially different from the implied reorganized equity value ranges associated with Rothschild's valuation analysis. Rothschild's estimate is based on economic, market, financial and other conditions as they exist on, and on the information made available as of, the date of this Solicitation and Disclosure Statement. It should be understood that, although subsequent developments may affect Rothschild's conclusions, before or after the Confirmation Hearing, Rothschild does not have any obligation to update, revise or reaffirm the estimate set forth herein.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS WHICH ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE COMPANY AND ROTHSCHILD. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE ESTIMATED VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. ADDITIONALLY, THE POST-REORGANIZATION VALUE ESTIMATED BY ROTHSCHILD DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL BE ATTAINED IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE DESCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH ROTHSCHILD'S VALUATION ANALYSIS. INDEED, THERE CAN BE NO ASSURANCE THAT A TRADING MARKET WILL DEVELOP FOR THE NEW SECURITIES.

# X. LIQUIDATION ANALYSIS

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Impaired Equity Interest that has not voted to accept the Plan must receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code (sometimes called the "Best Interests Test," which is described in greater detail in Article XV.E. hereof). If all members of an impaired class of claims or interests have accepted the Plan, the "best interests test" does not apply with respect to that class.

A determination of the value that Holders will receive or retain if we were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code begins with an estimation of the gross proceeds that would be generated from the hypothetical liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case, including the cash and cash equivalents held by Debtors at the time of the commencement of the hypothetical chapter 7 case. The gross liquidation proceeds then are reduced by the costs and expenses of the liquidation – including such additional administrative expenses and priority claims that may result from the termination of Debtors' business and the use of chapter 7 for the purposes of a hypothetical liquidation – to determine the net liquidation proceeds available for distribution to creditors. Such net liquidation proceeds (*i.e.*, cash available for distribution) are then applied on a hypothetical basis to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code.

We believe that all individual Holders of Claims and Equity Interests will receive not less than what they would receive under a chapter 7 liquidation. Our belief is based on the Liquidation Analysis we prepared, which is set forth below, that considers the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including:

- the increased cost and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee;

- the erosion in value of assets in a chapter 7 case in the context of the liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; and

- substantial increase in claims treated as priority and general unsecured claims than we anticipate in a chapter 11 case.

Moreover, we believe that the value of any distributions from the liquidation proceeds to each class of allowed claims and interests in a chapter 7 case would be less than the value of distributions under the Plan because such distributions in chapter 7 may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a substantial time after the completion of such liquidation to resolve all objections to claims and prepare for distributions.

We prepared the Liquidation Analysis with the assistance of our advisors. The Liquidation Analysis estimates the values that may be obtained by Claim and Equity Interest

Holders upon disposition of assets, pursuant to a liquidation in a bankruptcy case under chapter 7 of the Bankruptcy Code, as an alternative to continued operations of our businesses under the Plan. The Liquidation Analysis assumes we file for bankruptcy protection without a prepackaged plan and is based on the other assumptions discussed below. **Because of the numerous risks, uncertainties and contingencies beyond our control, there can be no assurances whatsoever that the recoveries set forth below could be realized in actual liquidation.** Moreover, because the Liquidation Analysis was prepared for purposes of evaluating the Plan in respect of section 1129(a)(7) of the Bankruptcy Code and reflects our estimates of potential recoveries that could be realized in a liquidation, the amounts disclosed are not likely to be meaningful for us as a going concern or indicative of actual returns that may eventually be realized in a non-liquidation context.

Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies beyond control of ourselves or a chapter 7 trustee. Additionally, various liquidation decisions upon which certain assumptions are based are subject to change. The actual amount of claims could vary significantly from our estimate, depending on the claims asserted during the chapter 7 case. No value was assigned to additional proceeds that might result from the sale of certain items with intangible value. Accordingly, the actual liquidation value of the Prospective Debtors could vary materially from the estimates provided herein.

Additional information concerning the assumptions underlying the Liquidation Analysis is as follows:

A.    *General*

The Liquidation Analysis is based on the Prospective Debtors' estimated balance sheet as of March 31, 2007. This Liquidation Analysis reflects the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Prospective Debtors' assets on September 15, 2007. Any difference in asset values between the values used herein and actual values on the date a liquidation process would begin, would result in a variance to the estimated recovery amounts. The Liquidation Analysis assumes a liquidation period of 24 months.

This analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the AICPA.

B.    *Cash*

The cash balance reflects actual cash held in the Prospective Debtors' bank accounts as of August 8, 2007.

C.    *Trade Accounts Receivable*

Estimated proceeds realized from accounts receivable are based on management's estimate of collection. The methodology for determining recovery excludes certain accounts receivable based upon their aging versus due date and/or invoice date. Eligible accounts receivables are further discounted by 20% to 40%.

D. *Inventories*

Estimated proceeds from the sale of inventories on hand as of the liquidation date are based on management's estimate of liquidating such inventories. The methodology for determining recovery excludes classes of inventory that have minimal value in liquidation, are considered to be potentially obsolete or are excess inventory based on age.

E. *Other Assets*

Prepaid and other current assets consist primarily of settlements, amounts due from asset sales, deposits and advances and other miscellaneous current assets.

F. *Goodwill*

Goodwill is considered to have no recovery value in liquidation as it relates to the intangible value of a going concern business.

G. *Investment in Subsidiaries*

The value attributed to investment in subsidiaries relates to foreign subsidiaries. The assets of the domestic subsidiaries are excluded because domestic assets are included in their respective line items (*e.g.*, accounts receivable, inventory etc.). There is no value attributed to discontinued operations. The valuations of the foreign subsidiaries were primarily based on a liquidation value at the foreign subsidiary level.

H. *Property, Plant and Equipment*

PP&E is comprised of buildings and improvements, automobiles and trucks, various equipment, furniture and fixtures and leasehold improvements. The largest line items by book value are equipment, construction-in-process and buildings.

Assumed recoveries from the sale of these items were based upon management's best estimate from prior dispositions. PP&E includes assets such as buildings, tooling and machines.

I. *Other Noncurrent Assets*

The "other noncurrent assets" line is comprised of core return rights (cores being a key component in our production), capitalized customer contracts, noncurrent deposits and other noncurrent items that are considered to have little or no liquidation recovery value.

J. *Winddown Costs*

It is assumed that the liquidation process would occur over a 24-month period. Winddown costs include nearly full operating expenses, overhead and other corporate costs during the first three months, with declining amounts of costs required in the following months.

K.      *Other Professional Fees*

During the liquidation period, it will be necessary for the Debtors' estates to engage the services of various professionals to assist in the estates' liquidation including, but not necessarily limited to, counsel, accountants, financial advisors, investment bankers and brokers.

L.      *Chapter 7 Trustee Fees*

Compensation for the chapter 7 trustee will be limited to fee guidelines in section 326 of the Bankruptcy Code.  For purposes of this analysis, trustee fees in an amount of $5.5 million to $9 million are based upon a reasonable assumption of a percentage of net proceeds as is customary in comparable cases.

M.      *Secured Creditors*

Estimated amounts to be distributed to secured creditors reflect balances due, including accrued interest on account of the Prepetition Credit Agreement, the Floating Rate Secured Notes and certain other secured indebtedness as of the hypothetical liquidation date.

N.      *Unsecured Creditors*

Unsecured creditors primarily include trade creditors and Holders of Impaired Notes. Based upon the estimated recoveries under this hypothetical liquidation scenario, no proceeds would be available to satisfy allowed general unsecured claims.

*I. CALCULATION OF NET ESTIMATED PROCEEDS AVAILABLE FOR ALLOCATION*

| | | Balances @ 3/31/2007 | Estimated Recovery Rate Range | | Estimated Recovery on Collateral | | See Note |
|---|---|---|---|---|---|---|---|
| | | | Low | High | Low | High | |
| A. | ASSETS | | | | | | |
| | Cash and Equivalents | $ 1,500 | 100% | 100% | $ 1,500 | $ 1,500 | |
| | Restricted Cash (a) | 50,000 | 0% | 0% | - | - | |
| | Accounts Receivable | 119,166 | 47% | 62% | 55,479 | 73,972 | 1 |
| | Inventories | 141,179 | 56% | 71% | 79,671 | 100,459 | 2 |
| | Other Current Assets | 27,701 | 32% | 43% | 8,795 | 12,013 | 3 |
| | Goodwill | 108,204 | 0% | 0% | - | - | 4 |
| | Investment In Subs | 552,876 | 2% | 6% | 12,000 | 32,400 | 5 |
| | Net PP&E | 92,584 | 26% | 69% | 23,847 | 64,003 | 6 |
| | Other NonCurrent Assets | 42,411 | 0% | 8% | - | 3,522 | 7 |
| | Total Assets | 1,135,622 | 16% | 25% | 181,292 | 287,870 | |
| | | | | | | | |
| B. | RECOVERIES FROM EXERCISE OF AVOIDING POWERS | | | | 0 | 16,000 | 8 |
| C. | GROSS PROCEEDS | | | | 181,292 | 303,870 | |
| | | | | | | | |
| D. | CREDITOR RECOVERY EXPENSES (POST-PETITION) | | | | | | |
| | Corporate Expenses | | | | (4,920) | (4,100) | 9 |
| | Employee Payroll Services (b) | | | | (16,800) | (14,000) | 9 |
| | Chapter 7 Trustee Fees (3% of Gross Proceeds) | | | | (5,439) | (9,116) | |
| | Other Professional Fees (Two-Year Period) | | | | (18,000) | (18,000) | 10 |
| | | | | | (45,159) | (45,216) | |
| | | | | | | | |
| **Net Estimated Proceeds Available for Allocation** | | | | | $ 136,134 | $ 258,654 | |

(a)    Restricted cash is assumed to be used to pay down the revolver under the Secured Credit Agreement.

(b)    Employee obligations required for winddown process.

**II.**     *ALLOCATION OF NET ESTIMATED PROCEEDS TO SECURED CLAIMS*

| | Principal and Accrued Interest | | Estimated Recovery on Secured Claims | | Estimated Recovery Range | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Estimated Proceeds Available For Allocation To Secured Claims** | | | $ 136,134 | $ 258,654 | | |
| **Secured Claims: (a)** | | | | | | |
| Pre-Petition Secured Debt (Revolver - 1st Lien) (b) | 6,540 | 6,540 | 6,540 | 6,540 | 100% | 100% |
| Pre-Petition Secured Debt (Term Loan) | 85,910 | 85,910 | 85,910 | 85,910 | 100% | 100% |
| Pre-Petition Letters of Credit (c) | 9,038 | 9,038 | 9,038 | 9,038 | 100% | 100% |
| Pre-Petition Secured Debt (Sr Floating Rate Notes - 2nd Lien) | 126,028 | 135,804 | 34,646 | 135,804 | 27% | 100% |
| **Total Secured Claims** | 227,515 | 237,292 | 136,134 | 237,292 | | |
| **Net Estimated Proceeds After Secured Claims** | | | $     - | $ 21,362 | | |

(a)  Post-petition interest is calculated on the following distribution schedule: 50% after first six months, 35% after the next six months and 15% in the next six months.  For purposes of this Liquidation Analysis, post-petition interest is calculated using the nondefault contract rate.  It is possible that default rate interest would apply.

(b)  Restricted cash of $50 million is designated to pay down the revolver under the Secured Credit Agreement.  Principal and Accrued Interest of the revolver under the Secured Credit Agreement is $56.5 million, but is reduced to $6.5 million after the pay down.

(c)  Wachovia Capital Finance is the agent for the letters of credit, which are a component of the Secured Credit Agreement.  The current letters of credit of $8.5 million are assumed to be drawn on the filing date and accrue $538,000 of interest in the post petition period.

### III.   ALLOCATION OF NET ESTIMATED PROCEEDS TO ADMINISTRATIVE AND PRIORITY CLAIMS

| | Estimated Allowable Claims | | Estimated Recovery on Administrative and Priority Claims | | Estimated Recovery Range | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Estimated Proceeds After Secured Claims** | | | $    - | $   21,362 | | |
| **Chapter 7 Administrative Claims:** | | | | | | |
| Administrative Claims (a) | 10,500 | 15,100 | - | 11,009 | 0% | 73% |
| Reclamation Claims (b) | 7,100 | 14,200 | - | 10,353 | 0% | 73% |
| Total administrative Claims | | | | | | |
| **Net Estimated Proceeds After Secured and Administrative Claims** | | | $    - | $    - | | |
| **Less Priority Claims:** | | | | | | |
| Employee Priority Claims | 1,806 | 3,612 | - | - | 0% | 0% |
| Priority & Property Tax Claims | 415 | 800 | - | - | 0% | 0% |
| Total Priority Claims | | | | | | |
| **Net Estimated Proceeds After Secured and Administrative and Priority Claims** | | | $    - | $    - | | |

a)   Amount represents the open trade accounts payable that was invoiced in the 20 days prior to February 28, 2007.

b)   We believe that there would not be any valid reclamation claims and such claims would be treated as general unsecured claims.  For the purposes of this analysis, however, which depicts a conservative scenario with respect to the Prospective Debtors' claims, we have depicted the possible reclamation claimants as having valid reclamation claims even though we do not believe they are or should be treated as such.  This depiction is without prejudice to our rights to continue to assert that such reclamation claims are not entitled to any priority treatment under the Plan, or otherwise.  If we are correct in our position regarding the value of the reclamation claims, the reclamation claims likely would receive the same treatment as general unsecured claims, and the related recovery reflected herein will be available to pay other claims.  Likewise, if we reach a consensual resolution with the reclamation claimants, some portion of the related recovery reflected herein likely will be available to pay other claims.

*IV.* ***ALLOCATION OF NET ESTIMATED PROCEEDS TO UNSECURED CLAIMS***

| | Estimated Allowable Claims | | Estimated Recovery on Unsecured Claims | | Estimated Recovery Range | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Estimated Proceeds After Secured, Administrative and Priority Claims** | | | $ | $ - | $ | - |
| Notes - After Subordinated Notes Refunding: | | | | | | |
| Senior Notes 8 5/8% issued 12/22/97 | 152,298 | 152,298 | - | - | 0% | 0% |
| Senior Sub Notes 9 3/8% | 158,206 | 158,206 | - | - | 0% | 0% |
| Senior Sub Notes 11% | 174,994 | 174,994 | - | - | 0% | 0% |
| | 485,499 | 485,499 | - | - | | |
| General Unsecured Claims: | | | | | | |
| Pre-Petition Accounts Payable | 105,709 | 105,709 | - | - | 0% | 0% |
| Other General Unsecured Claims (a) | 21,821 | 44,821 | - | - | 0% | 0% |
| Warranty and Customer Obligations (b) | 49,000 | 49,000 | - | - | 0% | 0% |
| Preference Addback | 0 | 16,000 | - | - | 0% | 0% |
| Rejection Claims (c) | 2,000 | 5,000 | - | - | 0% | 0% |
| Contingency Claims (Litigation, other lease obligations, etc.) | 1,000 | 16,348 | - | - | 0% | 0% |
| | 179,530 | 236,878 | - | - | | |
| Total | $ 665,029 | $ 722,377 | $ - | $ - | | |

a) Other General Unsecured Claims represent various accruals but excludes warranty and other customer obligations.

b) Warranty and Customer Obligations represent amounts not used to offset Accounts Receivable balances.

c) Rejection Claims represent calculated exposure relating to real property leases as modified by section 502(b)(6) of the Bankruptcy Code.

**Note 1 — Accounts Receivable**

Accounts Receivable recovery percentages are based upon management estimates, which considered, among other things, percentages used as part of revolver advance rates.

Accrued Warranty is carried on the books at $37.6 million and Customer Obligations is carried at $55 million between current and long term. These amounts were netted against the applicable entity's receivables up to the amount of the accounts receivable balance. This resulted in a Warranty set off of $29.6 million and Customer Obligations set off of $16 million. The remaining $10 million of warranty and $39 million of customer obligations are treated as unsecured claims.

| Business Unit | Balance @ 3/31/2007 | Warranty | Customer Obligation Setoff | Core Rights Reserve | Net Balance | Recovery Rate Range | | Estimated Proceeds Range | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Low | High | Low | High |
| Remy Inc | $ 68,671 | $ (17,998) | | | $50,673 | 60% | 80% | $ 30,404 | $ 40,538 |
| Componentes | 6,999 | | | | 6,999 | 60% | 80% | 4,199 | 5,599 |
| WWA | 13,373 | (5,436) | $ (8,024) | $ 4,756 | 4,668 | 60% | 80% | 2,801 | 3,735 |
| UPC | 16,531 | (6,150) | (8,024) | 14,174 | 16,531 | 60% | 80% | 9,918 | 13,225 |
| WRI | 2,017 | | | | 2,017 | 60% | 80% | 1,210 | 1,614 |
| Knopf | 11,576 | | | | 11,576 | 60% | 80% | 6,946 | 9,261 |
| | $ 119,166 | $ (29,584) | $ (16,048) | $ 18,930 | $92,465 | | | $ 55,479 | $ 73,972 |

**RWHI**
**Liquidation Analysis For Domestic Entities**
($ in 000s)

**Note 2 — Inventories**

The return for Finished Goods and POS Inventory (*i.e.*, "point of sale" inventory) is close to full value because such goods can either be shipped for sale, or in the case of the POS Inventory, are already on the shelves and ready to be sold. Raw Materials, Work-in-Process and Other are expected to have a lesser value and in some cases only an expected salvage value due to limited usability.

"Other" includes consigned cores, cores in transit and nonproductive cores. POS Inventory represents inventory held at customer locations. In certain instances, POS Inventory may be subject to setoff by a customer, however this setoff amount is deemed negligible as most major customers have net receivables to the Prospective Debtors.

| Inventory Commodity Type | Balance @ 3/31/2007 | Recovery Rate Range | | Estimated Proceeds Range | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Finished Goods | $ 64,245 | 75% | 90% | $ 48,183 | $ 57,820 |
| Work-In-Process | 4,437 | 5% | 15% | 222 | 666 |
| Raw Materials | 41,180 | 25% | 40% | 10,295 | 16,471 |
| POS Inventory | 27,961 | 75% | 90% | 20,971 | 25,165 |
| Other | 3,356 | 0% | 10% | - | 336 |
| Total Inventory | $ 141,179 | 56% | 71% | $ 79,671 | $ 100,459 |

132

**Note 3 — Other Current Assets**

Other receivables primarily relate to amounts due from Hennessy, Caterpillar and a core bank reserve.  These receivables are assumed to have a high recovery based on prior rulings and/or expected settlements.  Other prepaids, such as orders and advances, are expected to have little recovery value.  Deferred Financing and Deferred Income Tax are deemed to have no recoverable value due to the fact that they will not be utilized in a liquidation.

| Other Current Assets | Balance @ 3/31/2007 | Recovery Rate Range | | Estimated Proceeds Range | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Other Receivables | $ 12,702 | 60% | 80% | $ 7,621 | $ 10,161 |
| Deferred Income Tax - Current Assets | 542 | 0% | 0% | - | - |
| Prepaid Insurance Premiums | 644 | 5% | 20% | 32 | 129 |
| Prepaid Orders | 144 | 50% | 75% | 72 | 108 |
| Other Misc. Prepaid | 2,102 | 50% | 75% | 1,051 | 1,576 |
| Advances | 77 | 25% | 50% | 19 | 39 |
| Deferred Financing | 9,744 | 0% | 0% | - | - |
| Deferred Income Taxes | 1,746 | 0% | 0% | - | - |
| Total | $ 27,701 | 32% | 43% | $ 8,795 | $ 12,013 |

**Note 4 — Goodwill and Other Intangibles**[*]

Goodwill is considered to have no recovery value in liquidation.

| Other Current Assets | Balance @ 3/31/2007 | Recovery Rate Range | | Estimated Proceeds Range | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Goodwill | $ 108,204 | 0% | 0% | $ - | $ - |

\* Although no formal valuation has been performed with respect to our patents and trademarks, a hypothetical sale of such patents and trademarks is not expected to yield amounts that would materially impact this recovery analysis, therefore, the value of our patents and trademarks is estimated at $0.

**Note 5 — Investment In Subsidiaries**

The value attributed to "Investment in Subsidiaries" relates to foreign subsidiaries. The assets of the domestic subsidiaries are excluded from below because domestic assets are included in their respective line items (*e.g.*, accounts receivable, inventory etc.). Discontinued Operations includes intercompany balances from dissolved or sold business units. There is no value attributed to discontinued operations. The valuations of the foreign subsidiaries primarily were based on a liquidation value at the foreign sublevel.

| Other Current Assets | Balance @ 3/31/2007 | Estimated Proceeds Range | | |
|---|---|---|---|---|
| | | Low | High | |
| Domestic Subsidiaries | $ 251,858 | $ - | $ - | (a) |
| Discontinued Operations | 183,423 | - | - | (b) |
| Foreign Subsidiaries | | | | |
| Remy Korea Ltd | 39,720 | 3,000 | 9,000 | (c) |
| Remy Mexico | 18,510 | 4,000 | 13,400 | (d) |
| Europe | 49,616 | 5,000 | 10,000 | (e) |
| Other | 9,750 | - | - | (f) |
| | $ 552,876 | $ 12,000 | $ 32,400 | |

a) The assets and liabilities for the domestic subsidiaries are included elsewhere in this analysis at the line-item level. To avoid duplication, their values are excluded from this schedule.

b) The balance for the Discontinued Operations is deemed to have no recovery value.

c) Remy Korea is assumed to have limited viability as a going concern if the domestic subsidiaries are liquidated. The value attributed to Remy Korea is based on a liquidation of its assets in a fashion similar to the domestic subsidiaries.

d) Remy Mexico is assumed to have limited viability as a going concern if the domestic subsidiaries are liquidated. The value attributed to Remy Mexico is based on a liquidation of its assets in a fashion similar to the domestic subsidiaries.

e) The European subsidiaries are assumed to be able to remain as a going concern if the domestic entities liquidate. However, due to negative EBITDA amounts, the primary value is attributed to real estate in Poland.

f) The Other subsidiaries include Remy Automotive Brazil, Remy Electrical China Co. and Remy Electricals Hubei Co. These entities have limited operations and are expected to have no recovery value due to amount of liabilities at each location.

**Note 6 — Net PP&E - Owned and Leased**

Net PP&E is comprised of buildings and improvements, automobiles and trucks, various equipment, furniture and fixtures and leasehold improvements. The largest line items by book value are equipment, construction in process and buildings.

PP&E such as buildings, tooling and machines were given the highest assumed recovery, while computer software and leasehold improvements are expected to have negligible or no liquidation value.

Assumed recoveries from the sale of these items were based upon management's best estimate from prior dispositions.

| PP&E | Balance @ 3/31/2007 | Recovery Rate Range | | Estimated Proceeds Range | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Automotive | $ 46 | 50% | 75% | $ 23 | $ 34 |
| Building | 15,750 | 62% | 93% | 9,700 | 14,700 (a) |
| Computer Hardware | 886 | 5% | 25% | 44 | 221 |
| Computer Software | 3,138 | 0% | 10% | - | 314 |
| Furniture and Fixtures | 423 | 20% | 70% | 85 | 296 |
| Leasehold Improvements | 2,363 | 0% | 0% | - | - |
| Machinery and Equipment | 53,525 | 20% | 70% | 10,705 | 37,467 |
| Tooling Equipment | 4,617 | 20% | 70% | 923 | 3,232 |
| CIP | 9,100 | 20% | 70% | 1,820 | 6,370 |
| Other | 2,737 | 20% | 50% | 547 | 1,368 |
| Total | $ 92,584 | | | $ 23,847 | $ 64,003 |

a)  Building includes net book value of capital leases of $2.7 million and net book value of property in Oklahoma of $13 million. The property in Oklahoma was appraised in 2004 at a value of $14.3 million, however, the expected sale value is estimated to be $9.7 million. For the purposes of this report these appraised values were used to estimate the High / Low scenarios.

**Note 7 — Other NonCurrent Assets**

Other Non Current Assets are composed of "core return rights", capitalized customer contracts, noncurrent deposits and other noncurrent items that are considered to have little to no liquidation recovery value.

| Other Noncurrent Assets | Balance @ 3/31/2007 | Less: Utilized Core Return Rights (a) | Net Non Current Assets | Recovery Rate Range | | Estimated Proceeds Range | |
|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High |
| Other Noncurrent Assets | $ 42,411 | $ 18,930 | $ 23,481 | 0% | 15% | $ | $ 3,522 |

(a)   Core Return Rights are used as setoffs to customer obligations.  Any value that was removed and used as an offset to reductions in Accounts Receivable is excluded as a recoverable asset.

**Note 8 — Recoveries from Avoidance Actions**

It is likely in a chapter 7 liquidation that the trustee would seek to recover certain payments made in the 90 days prior to filing.  The pre-petition payments in the total below excludes vendor debit balances, which are assumed to reside in Accounts Receivable.  The amount listed is the cash recovered by the Prospective Debtors.  For purposes of this analysis, management has estimated the recoveries net of all potential setoffs, recoupment and other defenses and claims that are likely to be asserted by the preference defendants as being between 0% and 10% of the estimated payments.

| Component | Estimated Payments Within 90 Days | Estimated Recovery Range | | Estimated Recovery Range | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Total Estimated Preference Period Payments | $      160,000 | 0% | 10% | $          0 | $      16,000 |

**Note 9 — Corporate Expenses and Employee Payroll Services**

It is assumed that the creditor recovery process spans a two-year period. For purposes of the analysis, corporate expenses include both headquarters and distribution centers related expense. A nearly full complement of corporate expenses is assumed to be required during the first three months, with reducing amounts of corporate expenses required in the following months. It is assumed that there will be a period during which employees will need to be retained during the liquidation.

**Corporate Expense**

| | Monthly Run Rate | Reduction Rate | Monthly Expense | Total |
|---|---|---|---|---|
| **Phase I Months 1-3** | | | | |
| Corporate Rent & Occupancy | $ 392 | 100% | $ 392 | $ 1,175 |
| Corporate SG&A | 200 | 60% | 120 | 360 |
| | 592 | 87% | 513 | 1,535 |
| **Phase II Months 4-12** | | | | |
| Corporate Rent & Occupancy | 392 | 40% | 157 | 1,410 |
| Corporate SG&A | 200 | 25% | 50 | 450 |
| | 592 | 35% | 207 | 1,860 |
| **Phase II Months 13-24** | | | | |
| Corporate Rent & Occupancy | 392 | 10% | 39 | 470 |
| Corporate SG&A | 200 | 10% | 20 | 240 |
| | 592 | 10% | 59 | 710 |

| | | |
|---|---|---|
| **Calculated Total Corporate Expenses** | | $ 4,105 |
| **Estimated Corporate Expense Range** | | |
| | High | $ 4,920 |
| | Low | $ 4,100 |

**Employee Payroll Services**

| | Monthly Run Rate | Reduction Rate | Monthly Expense | Total |
|---|---|---|---|---|
| **Phase I Months 1-3** | | | | |
| Corporate Employment Expense | $ 2,872 | 60% | $ 1,723 | $ 5,170 |
| Non Corporate Employment Expenses | 4,352 | 25% | 1,088 | 3,264 |
| | 7,224 | 39% | 2,812 | 8,434 |
| **Phase II Months 4-12** | | | | |
| Corporate Employment Expense | 2,872 | 15% | 431 | 3,877 |
| Non Corporate Employment Expenses | 4,352 | 0% | - | - |
| | 7,224 | 6% | 431 | 3,877 |
| **Phase II Months 13-24** | | | | |
| Corporate Employment Expense | 2,872 | 5% | 144 | 1,723 |
| Non Corporate Employment Expenses | 4,352 | 0% | - | - |
| | 7,224 | 2% | 144 | 1,723 |

| | | |
|---|---|---|
| **Calculated Total Corporate Expenses** | | $14,034 |
| **Estimated Corporate Expense Range** | | |
| | High | $ 4,920 |
| | Low | $ 4,100 |

**Note 10 - Professional Fees**

It is assumed that the creditor recovery process occurs over a twenty-four month period. For purposes of the analysis, professional fees are expected to be at full rates for the first year and then are scaled back over the second year.

| | Remy International Inc. | |
|---|---|---|
| | Monthly Run Rate | Total Expense |
| **Year 1** | $ 1,000 | $ 12,000 |
| **Year 2** | $ 500 | 6,000 |
| **Total** | | $ 18,000 |

## XI.    CERTAIN OTHER LEGAL CONSIDERATIONS

A.    *Solicitation of Votes Prior to Commencement of Chapter 11 Cases and Section 3(a)(9) of the Securities Act*

We are relying on section 3(a)(9) of the Securities Act to exempt from the registration requirements of the Securities Act the offer to Impaired Noteholders of the New Third-Lien Notes and the Reorganized RII Common Stock that may be deemed to be made pursuant to the solicitation of votes on the Plan.  Section 3(a)(9) of the Securities Act provides an exemption from the registration requirements of the Securities Act for any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange.

Neither RII nor any of its direct or indirect subsidiaries has any contract, arrangement or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent or any other person for soliciting votes to accept or reject the Plan or for soliciting any exchanges of Impaired Notes.  In addition, none of our financial advisors nor those to the Plan Support Parties, and no broker, dealer, salesperson, agent or any other person, has been engaged or authorized to express any statement, opinion, recommendation or judgment with respect to the relative merits and risks of the solicitation or the Plan (and the transactions contemplated thereby).

B.    *Section 1145 of the Bankruptcy Code*

1.    *Initial Offer and Sale of Securities*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied:  (i) the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold a claim against, or an interest in, the debtor or such affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claims against or interests in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.  In addition, section 1145(a)(2) exempts from the registration under section 5 of the Securities Act and state securities laws, the offer of a security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in section 1145(a)(1). We believe that the distribution of the Subscription Rights (and the subscription for shares of Reorganized RII Preferred Stock pursuant to the exercise thereof) and the other New Securities under the Plan satisfy the requirements of sections 1145(a)(1) and 1145(a)(2) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

2.    *Subsequent Transfers of Securities*

To the extent not otherwise prohibited, and subject to the terms of the Reorganized RII Constituent Documents and the New Third-Lien Note Indenture, as applicable, all New

Securities issued under the Plan and covered by sections 1145(a)(1) and 1145(a)(2) of the Bankruptcy Code may be resold by the holders thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (i) purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (ii) offers to sell securities offered under a plan for the holders of such securities; (iii) offers to buy such securities from the holders of such securities, if the offer to buy is: (A) with a view to distributing such securities; and (B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is used in section 2(a)(11) of the Securities Act. Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. Such a person is an "affiliate" of the issuer. "Control" (as such item is defined in rule 405 promulgated under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting of securities, by contract or otherwise.

To the extent that Persons who receive New Securities pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including as an "affiliate" of the issuer, resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Consequently, an "underwriter" or "affiliate" may not resell New Securities except in compliance with the registration requirements of the Securities Act or an exemption therefrom, including Rule 144. In addition, any person who is an "underwriter" but not an "issuer," including an "affiliate," with respect to an offer and sale of securities is entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Securities to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, we express no view as to whether any particular Person receiving New Securities under the Plan would be an "underwriter" with respect to such Subscription Rights or New Securities.

**Given the complex and subjective nature of the question of whether a particular holder may be an "underwriter," we make no representation concerning the right of any Person to trade in the New Securities. We recommend that potential recipients of the New Securities consult their own counsel concerning whether they may freely trade the New Securities without taking additional action to ensure compliance with the Securities Act, the Exchange Act or similar state and federal laws.**

3.      *Subsequent Transfers Under State Law*

State securities laws generally provide registration exemptions for subsequent transfers by a *bona fide* owner for the owner's own account and subsequent transfers to institutional or

accredited investors.  Such exemptions generally are expected to be available for subsequent transfers of the New Securities.

**We are not making any representation to any offeree of the securities issued under the Plan regarding the legality of any investment therein by such offeree under appropriate legal investment or similar laws or regulations.**

## XII.    THE PLAN – OTHER PROVISIONS

### A.    *Treatment of Executory Contracts and Unexpired Leases*

#### 1.    *Assumption and Cure of Executory Contracts and Unexpired Leases*

Section 365 of the Bankruptcy Code permits debtors to assume or reject executory contracts and unexpired leases with the authorization of the Bankruptcy Court.  Section 365 of the Bankruptcy Code further provides that an executory contract or unexpired lease can be assumed only if (i) certain defaults with respect to such contract or lease are cured (or adequate assurance of a prompt cure is provided), (ii) compensation for any pecuniary losses arising from such default are provided and (iii) "adequate assurance" of future performance is provided.  Section 1123(b)(2) of the Bankruptcy Code allows for the assumption of unrejected contracts and leases pursuant to the terms of a plan of reorganization.  Pursuant to Section 5.1 of the Plan, all executory contracts and unexpired leases of the Debtors (including the GM Agreements, the CVC Settlement Agreement and the engagement letters relating to the Committee Professionals) that are not (i) rejected by the Debtors prior to the Effective Date, (ii) subject to a motion seeking such rejection as of the Effective Date, or (iii) identified in the Plan Supplement as executory contracts or unexpired leases for which the Debtors expressly reserve the right to seek rejection, will be deemed to have been assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code without further notice or order of the Bankruptcy Court.  Each executory contract and unexpired lease assumed pursuant to Article V of the Plan will revest in, and be fully enforceable by, the Reorganized Debtors in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.  Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default will be satisfied by payment of such amount in Cash, on the Effective Date, or upon such other terms as the parties to such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (i) the amount of any cure payments required under section 365(b)(1) of the Bankruptcy Code, (ii) the ability of any Reorganized Debtor or any assignee thereof to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption under section 365 of the Bankruptcy Code, the cure payments required under section 365(b)(1) of the Bankruptcy Code, if any, will be made following the entry of a Final Order resolving such dispute.

#### 2.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Section 5.2 of the Plan provides that all proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be Filed within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection. Any Claim arising from the rejection of an executory contract or unexpired lease for which proof of such Claim is not Filed within such time period will be barred forever from assertion against the Debtors or the Reorganized Debtors, the Estates and their property, unless otherwise ordered by the Bankruptcy Court. The Allowed amount of a Claim shall be subject to the limitations of Section 502(b).  Section 502(b) of the Bankruptcy Code provides, among other things, for certain statutory limitations or "caps" on the size of allowed claims of certain types of creditors.  Among the types of claims that may be capped under section 502(b) of the Bankruptcy Code are

(i) certain claims of lessors of real property and (ii) certain claims arising from the termination of employment contracts.

### 3. *Indemnification of Directors, Officers and Employees*

Pursuant to section 5.3 of the Plan, any obligations or rights of the Debtors or Reorganized Debtors to defend, indemnify, reimburse, or limit the liability of Covered Persons pursuant to any applicable certificates of incorporation, by-laws, policy of providing employee indemnification, state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtors prior to the Effective Date, will be treated as if they were executory contracts that are assumed under the Plan and will survive the Effective Date and remain unaffected thereby, and will not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability is owed in connection with an occurrence before or after the Petition Date.

### 4. *Compensation and Benefit Programs*

Section 5.4 of the Plan provides that other than with respect to the New Employment Agreement Officers (see Article VII.G. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN— Description of New Management Incentive Plan and the New Employment Agreements"), all duly-authorized employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, retirees and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, and life, accidental death and dismemberment insurance plans (but excluding any supplemental executive retirement plan), will be deemed to be, and treated, as executory contracts and, on the Effective Date, will be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

### 5. *Termination of Advisory Agreement and Prepetition Equity Agreements*

On the Effective Date, the Advisory Agreement will be deemed terminated pursuant to section 5.5(a) of the Plan, and no amount (accrued or otherwise) owed in respect thereof shall be payable to Court Square, or otherwise qualify for treatment as an Allowed Claim under the Plan. Section 5.5(b) of the Plan also provides that upon the Effective Date, each Prepetition Equity Agreement will be deemed terminated and of no further force and effect, and any Claim in respect thereof will be treated as a Subordinated Securities Claim under the Plan.

### B. *Provisions Governing Distributions*

### 1. *Date of Distributions*

Pursuant to section 6.1 of the Plan, and except as otherwise provided therein with respect to distributions in connection with the Rights Offering or any undeliverable or unclaimed distributions, any distribution to be made or done under the Plan will be made on the Effective Date, or as soon as practicable thereafter. Any payment or act required to be made under the Plan on a day that is not a Business Day will be made on the next succeeding Business Day.

2. *Disbursing Agent*

Section 6.2 of the Plan provides that except as otherwise ordered by the Bankruptcy Court, all distributions under the Plan will be made by the Reorganized Debtors, acting as Disbursing Agent thereunder. The Disbursing Agent will be authorized to make any Cash payment required to be made under the Plan by check or wire transfer, at its discretion. No distributions of fractional shares or fractions of dollars (whether in the form of Cash or notes) will be made under the Plan on account of Claims in Classes 6 and 7, and for purposes of distribution under the Plan on account of such Claims, fractional shares and fractions of dollars (whether in the form of Cash or notes) shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down). The Reorganized Debtors will be permitted, without further order of the Bankruptcy Court, to employ or contract with any Entities to assist in or make the distributions required under the Plan. The Plan also provides that the Prepetition Agent and the Prepetition Indenture Trustees (or such other recipients as these entities shall instruct) are to receive, in the first instance, all distributions on account of Allowed Secured Credit Agreement Claims, Allowed Floating Rate Secured Note Claims, Allowed Senior Note Claims and Allowed Subordinated Note Claims. The Prepetition Agent and the Prepetition Indenture Trustees (or such other recipients as these entities have instructed) will be authorized and required to deliver such distributions to the applicable Holders as of the Mandatory Exchange Date pursuant to section 6.2 of the Plan, except for distributions made to any Committed Purchaser or Plan Support Party who may, if certain requirements have been satisfied, receive their distributions directly from the Disbursing Agent, pursuant to section 6.2(d) of the Plan.[22] Holders of Allowed Claims will receive such distributions only after they have surrendered their Prepetition Notes and/or any other instrument or documentation relating to such Claims to the Reorganized Debtors pursuant to any notice received in connection with section 6.6 of the Plan (or at such time as a waiver of such requirement has been received). **The Holder of any Allowed Claim that fails to surrender such securities in the manner required within two years of the Effective Date, will have such Claim discharged, and will forever be barred from asserting such Claim against any of the Reorganized Debtors or their respective property.**

3. *Mandatory Exchange Date*

Pursuant to section 6.3 of the Plan, as of the Mandatory Exchange Date relating to any Prepetition Indenture, the transfer register for such Prepetition Indenture will be closed and the transfer of the Prepetition Notes issued thereunder, or any interest therein, will be prohibited. Neither the Disbursing Agent nor the Prepetition Indenture Trustee under such Prepetition Indenture will have any obligation to recognize the transfer or sale of, or any participation in, any Allowed Claims relating to such Prepetition Indenture that occurs after such Mandatory

---

[22]   In order for a Committed Purchaser or Plan Support Party to receive their distributions directly from the Disbursing Agent, such entity must: (i) comply with the provisions governing the surrender of securities contained in section 6.6 of the Plan, (ii) comply with any and all procedures as may be required by the applicable Prepetition Indenture Trustee (or trustees) to permit such distribution to be made directly to such Committed Purchaser or Plan Support Party, and (iii) provide, prior to the Effective Date, written evidence to us that such Committed Purchaser or Plan Support Party has complied with the procedures set forth in (ii) above (which evidence must be in form and substance satisfactory to us).

Exchange Date, and will be entitled for all purposes related to the Plan to recognize and make distributions only to Holders of such Claims as of the Mandatory Exchange Date.

4.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

Pursuant to section 6.4 of the Plan, any distribution to be made under the Plan to a Holder of an Allowed Claim will be made to the address of such Holder as set forth in the books and records of the Debtors or their agents, or in a letter of transmittal, unless the Debtors have been notified in writing of a change of address, including by the Filing of a proof of claim by such Holder that contains an address for such Holder that is different from the address reflected on such books and records or letter of transmittal. In the event that any distribution or notice provided in connection with the Chapter 11 Cases to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or otherwise is unclaimed, the Disbursing Agent will make no further distribution to such Holder unless and until such Disbursing Agent is notified in writing of such Holder's then current address. On, or as soon as practicable after, the date on which a previously undeliverable or unclaimed distribution becomes deliverable and claimed, the Disbursing Agent will make such distribution without interest thereon. Any Holder of an Allowed Claim that fails to assert a Claim under the Plan for an undeliverable or unclaimed distribution within one year after the Effective Date will be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and will forever be barred and enjoined from asserting such Claim against any of the Debtors, the Estates, or the Reorganized Debtors or their property. Any Cash amounts in respect of undeliverable or unclaimed distributions for which a Claim is not made within the one-year period will be forfeited to the Reorganized Debtors. Any securities issued by the Debtors in respect of undeliverable or unclaimed distributions for which a Claim is not made within the one-year period will be cancelled and extinguished. Nothing contained in the Plan will require, or be construed to require, the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5.    *Setoff and Recoupment*

Pursuant to section 6.5 of the Plan, the Reorganized Debtors will be permitted, but not required, to set off against any Claim (other than the Secured Credit Agreement Claims, the Floating Rate Secured Note Claims and the Impaired Note Claims, which Claims will not be subject to setoff, recoupment or reduction of any kind), or the distributions to be made under the Plan on account of such Claim, any claims of any nature whatsoever the Debtors have against the Holder of such Claim. The Plan also provides that neither the failure to exercise any such setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Reorganized Debtors of any such claim the Reorganized Debtors may have against such Holder.

6.    *Surrender of Cancelled Instruments or Securities*

Under section 6.6 of the Plan, any Holder of a Claim evidenced by the instruments, securities or other documentation cancelled under section 4.5 of the Plan (including the Prepetition Agent and the Prepetition Indenture Trustees) is required to surrender such applicable instruments, securities or other documentation to the Reorganized Debtors, in accordance with written instructions to be provided to such Holder by the Reorganized Debtors, unless such requirement is waived in writing by the Debtors or the Reorganized Debtors. With respect to

any global note relating to any Prepetition Indenture that is held in the name of DTC, DTC will surrender the applicable instrument to the applicable Prepetition Indenture Trustee, and such Prepetition Indenture Trustee shall surrender such global note to the Reorganized Debtors. Any distribution required to be made under the Plan on account of any such Claim will be treated as an undeliverable distribution under section 6.4(b) of the Plan pending the satisfaction of the terms of section 6.6(a) of the Plan.

Subject to section 6.7 of the Plan, any Holder of any Claim evidenced by the instruments, securities or other documentation cancelled under section 4.5 of the Plan that fails to surrender such applicable instruments, securities or other documentation in accordance with section 6.6(a) of the Plan within two years after the Effective Date will have such Claim, and the distribution on account of such Claim, discharged, and will forever be barred from asserting such Claim against any of the Reorganized Debtors or their respective property.

7. *Lost, Stolen, Mutilated or Destroyed Debt or Equity Securities*

In the event that any instruments, securities or other documentation cancelled under section 4.5 of the Plan have been lost, stolen, mutilated or destroyed, the Holder of a Claim or Interest based upon such instruments, securities or documentation, in addition to any requirements under any applicable agreement, are required as a condition to receiving distributions under the Plan, and in lieu of surrendering such instruments, securities or other documentation, to deliver to the Reorganized Debtors (a) evidence reasonably satisfactory to the Reorganized Debtors and the Steering Committee of such loss, theft, mutilation or destruction and (b) such security or indemnity as may be required by the Reorganized Debtors to hold the Reorganized Debtors harmless from any damages, liabilities or costs incurred in treating such Entity as the Holder of such Allowed Claim. Such Holder will, upon compliance with Article VI of the Plan, be deemed to have surrendered such instruments, securities or other documentation for all purposes under the Plan.

8. *No Proofs of Claim Required*

Except with respect to professional fee applications governed by section 2.3 of the Plan and with respect to proofs of claim relating to the rejection of executory contracts and unexpired leases, section 6.10 of the Plan provides that Holders of Claims against the Debtors will not be required to file proofs of claim.

C. *Procedures for Resolving Disputed Claims*

With respect to Holders of Claims in Classes that are not impaired, their legal, equitable and contractual rights will be unaltered by the Plan (except to the extent that any such claims are "statutorily impaired" by virtue of the application of section 502(b) of the Bankruptcy Code or otherwise). As such, all General Unsecured Claims, including claims asserted in litigation against the Debtors, will be unimpaired by the Chapter 11 Cases and will remain subject to all legal and equitable defenses of the Debtors. Nothing under the Plan will affect the Debtors' rights, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against such Claims, except as expressly provided in the Plan. Because holders of Claims in Classes 1 through 5 are not impaired, and because the Debtors believe they

are aware of the amount of all outstanding claims in Classes 6 through 9, the Prospective Debtors do not intend to set a bar date by which holders of Claims and Equity Interests must file proofs of claim and proofs of equity interest. The Prospective Debtors anticipate that their Chapter 11 Cases will have little or no impact on the business relationship with unimpaired creditors.

1. *Prosecution of Objections to Claims and Payments and Distributions on Disputed Claims*

Article VII of the Plan provides that on and after the Confirmation Date, the Debtors (or the Reorganized Debtors, as the case may be) will have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims, and will be permitted to settle or compromise any Disputed Claim without approval of the Bankruptcy Court, provided that prior to the Effective Date, the Debtors shall in each case obtain the reasonable consent of the Steering Committee. Notwithstanding any other provision to the contrary in the Plan, no payments or distributions will be made under the Plan with respect to all or any portion of any Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, or determined by Final Order, and such Disputed Claim has become an Allowed Claim.

2. *Estimation of Claims*

Pursuant to section 7.2 of the Plan, the Debtors (or the Reorganized Debtors, as the case may be) and the Steering Committee will be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors (or the Reorganized Debtors, as the case may be) or the Steering Committee previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection, and the Plan provides that the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors (or the Reorganized Debtors, as the case may be) or, prior to the Effective Date, the Steering Committee may elect to pursue any supplemental proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

D. *Conditions Precedent to Confirmation and Effective Date of the Plan*

1. *Conditions Precedent to Confirmation*

Section 8.1 of the Plan provides that the Confirmation Order will not be entered unless and until such Confirmation Order is in form and substance reasonably satisfactory to the Debtors, the Requisite Plan Support Parties, the Requisite Committed Purchasers and the Steering Committee.

2.    *Conditions Precedent to the Effective Date and Waiver of Conditions*

Section 8.2 of the Plan provides that the Effective Date will not occur unless and until each of the following conditions has occurred or has been waived:

(a)    the Confirmation Order will have become a Final Order;

(b)    the execution and delivery of (i) the Exit Financing Documents, (ii) the New Third-Lien Note Indenture, (iii) the GM Agreements, (iv) the CVC Settlement Agreement, (v) the Intercreditor Agreement and (vi) all other documents and agreements necessary to implement the terms of the Plan;

(c)    the proceeds of the Exit Facility have been made available to the Reorganized Debtors to fund the distributions under the Plan;

(d)    RII shall have received aggregate Cash proceeds of $85 million from the Rights Offering and/or pursuant to the terms of the Backstop Commitment Agreement, in either case, less any fees payable under the Backstop Commitment Agreement and after taking into account any application of the Senior Note Cash toward the exercise of Senior Note Rights;

(e)    to the extent due and payable, the CVC Settlement Amount shall have been paid in accordance with the terms of the CVC Settlement Agreement;

(f)    the Reorganized RII Certificate of Incorporation and Reorganized RII Certificates of Designation shall have been duly filed with the Delaware Secretary of State;

(g)    all authorizations, consents and approvals determined by the Debtors, the Committed Purchasers or the Steering Committee to be necessary to implement the terms of the Plan will have been obtained;

(h)    the Outside Date will not have passed, unless waived or extended by the Requisite Plan Support Parties in accordance with the Plan Support Agreement;

(i)    each of the Senior Note Backstop Fee and the Subordinated Note Backstop Fee shall have been paid in accordance with the terms of the Backstop Commitment Agreement, unless applied toward the exercise of Subscription Rights in accordance with the terms of the Backstop Commitment Agreement;

(j)      the fees and expenses payable under sections 2.3(b) and 2.4 of the Plan, and applications for which have been submitted to the Debtors, will have been paid in full;

(k)      to the extent that the terms of the Intercreditor Agreement differ in any material respect from the form of intercreditor and subordination agreement attached as Exhibit H to this Solicitation and Disclosure Statement, the reasonable consent of the Requisite Senior Note Plan Support Parties with respect to such differing terms shall have been obtained; and

(l)      all other actions necessary to implement the terms of the Plan will have been taken.

The conditions set forth above (other than the condition that the Confirmation Order shall have become a Final Order and the condition identified in subparagraph (k) above) may be waived, pursuant to section 8.3 of the Plan, in whole or in part, at any time by the Debtors, with the reasonable consent of the Steering Committee, the Requisite Plan Support Parties and the Requisite Committed Purchasers, without notice or leave or order of the Bankruptcy Court; provided, however, that the condition set forth in section 8.2(e) of the Plan may be waived only with the prior written consent of Court Square.

### 3.    *Modification of Plan*

Section 1127 of the Bankruptcy Code provides for the modification of a plan of reorganization, subject to certain statutory requirements. A modification of the Plan prior to confirmation of the Plan would require compliance with the Bankruptcy Code provisions governing the filing and content, solicitation and disclosure, and confirmation of a plan of reorganization. Section 1127 of the Bankruptcy Code also provides for modification of a plan of reorganization after confirmation (but prior to substantial consummation) of such plan if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified under section 1129 of the Bankruptcy Code. Section 8.4 of the Plan provides that the Debtors, with the consent of the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee, will be permitted to amend, supplement or modify the Plan at any time, subject to the restrictions and requirements under section 1127 of the Bankruptcy Code, provided, however that such amendment, supplement or modification may not (a) affect a party's right of consent under the Plan unless such consent has been obtained or (b) have the effect of altering, amending or modifying the terms of the CVC Settlement Agreement unless the prior written consent of Court Square to such amendment, supplement or modification has been obtained.

### 4.    *Effect of Withdrawal or Revocation and Reservation of Rights*

The Debtors (with the reasonable consent of the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee) reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. Section 8.5 of the Plan provides that if the Plan is so revoked or withdrawn, or if the Effective Date fails to occur, then the Plan

will be deemed null and void in its entirety, and of no force or effect. In such event, nothing contained in the Plan will be deemed to constitute a waiver or release of (i) any Claims or rights of the Informal Committee, the Steering Committee, any Committed Purchaser or any Plan Support Party or (ii) any Claim against or Equity Interest in any Debtor or any other Entity, or to prejudice in any manner, in any further proceedings involving any Debtor, the rights of (a) any Debtor or any other Entity or (b) the Informal Committee, the Steering Committee, any Committed Purchaser or any Plan Support Party.

Except as otherwise provided in section 3.2 of the Plan (which provides for the distribution of Subscription Rights prior to entry of the Confirmation Order), the Plan will have no force or effect unless and until the Confirmation Order is entered. Section 8.6 of the Plan clarifies that prior to the Effective Date, none of the Filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan will be, or will be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

5. *Substantial Consummation of Plan*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) will be deemed to occur on the Effective Date.

E. *Effect of Plan Confirmation*

1. *Binding Effect*

Upon the Effective Date, the Plan will be binding upon and inure to the benefit of the Debtors, all current and former Holders of Claims and Equity Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors.

2. *Discharge of Claims*

Section 1141(d)(1)(A) of the Bankruptcy Code provides debtors with a discharge of debts that arose before the date of the confirmation of a plan of reorganization. Except as otherwise provided in Article III of the Plan, which, as described in Article V.C. below, provides for the reinstatement of certain Claims (including all Allowed General Unsecured Claims of trade creditors and other Holders of Class 5 Claims), Section 9.2 of the Plan provides that upon the Effective Date, all existing Claims and Equity Interests will be, and will be deemed to be, discharged and terminated.

3. *Releases*

The Plan provides for certain releases, including releases against certain non-debtor third-parties. Although we believe that these provisions in the Plan are permissible under the Bankruptcy Code, arguments exist that certain case law would permit a contrary conclusion which, if accepted by the Bankruptcy Court, may result in the Plan not being confirmed. See Article II.A.7. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Certain Risks of Nonconfirmation or Delay of Confirmation."

(a)     *Releases By the Debtors*

Section 9.3(a) of the Plan provides that upon the Effective Date, the Debtors and the Reorganized Debtors, in their individual capacities and as debtors in possession, will be deemed forever to release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Plan or this Solicitation and Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, the Estates or the Reorganized Debtors against any of the Releasees.  There will, however, be no such release, waiver or discharge on account of claims or obligations in respect of (i) any loan, advance or similar payment made by the Debtors or their affiliates to or for the benefit of any Releasee or (ii) any continuing contractual obligation owed by such Releasee to or for the benefit of the Debtors.

(b)     *Releases By Holders of Claims*

Section 9.3(b) of the Plan provides that upon the Effective Date, each Releasor, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash and other contracts, instruments, releases, agreements or documents to be delivered in connection with the Plan, will be deemed forever to release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights to enforce the obligations of the Debtors and the Reorganized Debtors under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Plan or this Solicitation and Disclosure Statement against any of the Releasees.

(c)     *Release By the Debtors and the CVC Releasors of the CVC Releasees*

Section 9.3(c) of the Plan provides that if the CVC Settlement Amount is paid on the Effective Date and Court Square has duly provided the Confirmation Certificate (and has otherwise complied with the terms of the CVC Settlement Agreement), upon the Effective Date: (i) each Debtor and its successors and assigns and each CVC Releasor and its successors and assigns forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising on or prior to the date hereof, against the CVC Releasees in connection with the acts of the CVC Releasees related to the Debtors, including any claims arising from or related to their ownership,

purchase or sale of securities of the Debtors, claims under fraudulent conveyance, avoidance, preference, and other similar claims, claims arising from or related to violations of federal securities laws, claims based upon any act or omission related to past service with, for or on behalf of the Debtors, claims related to breaches of fiduciary obligations, and claims under or related to the Advisory Agreement or the Prepetition Equity Agreements; and (ii) to the extent that any Debtor or its successors or assigns or any CVC Releasor its successors or assigns receive any consideration on account of any claim released under the Plan from any of the CVC Releasees, whether asserted by any Debtor or its successors or assigns, by any CVC Releasor or its successors and assigns, or by any other party, the recipients of such consideration hereby assign all of their right, title, and interest in and to such recovery to the CVC Releasees against whom such consideration is recovered, and the CVC Releasees will be entitled to enforce the provisions of section 9.3(c) of the Plan against any Debtor or Reorganized Debtor or its successors or assigns as third-party beneficiaries; provided, however, that in no event will any CVC Releasee be released under section 9.3 of the Plan from (A) any claim related to or arising from any breach by Court Square of any of its obligations under or representations made in connection with the CVC Settlement Agreement or (B) any claim that has resulted from a criminal act, fraud, gross negligence, or willful misconduct by or of such CVC Releasee. Nothing in section 9.3(c) of the Plan will be deemed to assert or imply any admission of liability on the part of any CVC Releasee.

(d)     *Release By Court Square of the CVC Released Parties*

Section 9.3(d) of the Plan provides that if the CVC Settlement Amount is paid on the Effective Date, and the CVC Released Parties have otherwise complied with the terms of the CVC Settlement Agreement, upon the Effective Date: (i) Court Square and its successors and assigns forever releases, waives and discharges all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising on or prior to the date of the Plan, against the CVC Released Parties, including any claims related to or arising from their ownership, sale or purchase of securities of the Debtors, claims with respect to fraudulent conveyance, avoidance, preference and other similar claims, any claims arising from or related to violations of federal securities laws, claims based upon any act or omission related to past service with, for or on behalf of the Debtors, claims related to breaches of fiduciary obligations, and claims under or related to the Advisory Agreement and the Prepetition Equity Agreements; and (ii) to the extent that Court Square or its successors or assigns receives any consideration on account of any claim released under section 9.3(d) of the Plan from any of the CVC Released Parties, whether asserted by Court Square or its successors or assigns or by any other party, the recipients of such consideration assign all of their right, title, and interest in and to such recovery to the CVC Released Parties, as appropriate, against whom such consideration is recovered, and the CVC Released Parties shall be entitled to enforce the provisions of section 9.3(d) of the Plan against Court Square or its successors or assigns as third-party beneficiaries; provided, however, that in no event shall any CVC Released Party be released under paragraph 9.3(d) of the Plan from any claim that has resulted from a criminal act, fraud, gross negligence, or willful misconduct by or of such CVC Released Party. Nothing in section 9.3(d) of the Plan will be deemed to assert or imply any admission of liability on the part of any of the CVC Released Parties.

4. *Exculpation and Limitation of Liability*

Section 9.4 of the Plan provides that none of the Debtors, the Reorganized Debtors or the CVC Releasees will have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or Equity Interest, or any other party in interest in the Chapter 11 Cases, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence, willful misconduct, fraud or criminal conduct as determined by a final order entered by a court of competent jurisdiction. Without limiting the foregoing, the Plan provides that the Debtors, the Reorganized Debtors and the Releasees will, in all respects, be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and related thereto.

5. *Injunction*

(a) *General*

Section 9.5 of the Plan provides that all Entities that hold or have held Claims or Equity Interests (other than the Claims that are reinstated under section 3.2 of the Plan) and all other parties in interest in the Chapter 11 Cases, along with their respective current and former employees, agents, officers, directors, principals and affiliates, permanently are enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors, (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtors or Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, on account of such Claims or Equity Interests. This injunction will not, however, preclude such Entities from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements and documents delivered under and in connection with the Plan.

(b) *Injunction Against Interference With Plan*

Section 9.5 of the Plan further provides that upon entry of the Confirmation Order, all Holders of Claims and Equity Interests and their respective current and former employees, agents, officers, directors, principals and affiliates will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have consented to the injunction set forth in section 9.5 of the Plan.

6. *Term of Bankruptcy Injunction or Stays*

Section 362 of the Bankruptcy Code provides for an "automatic stay" that enjoins a large number of creditor enforcement actions against a debtor's estate. A debtor also may seek additional injunctive relief from the Bankruptcy Court pursuant to the court's equitable powers under section 105 of the Bankruptcy Code. Section 9.6 of the Plan provides that any such injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence as of the Confirmation Date, will remain in full force and effect until the Effective Date.

7. *Termination of Subordination Rights and Settlement of Related Claims*

The classification and manner of satisfying all Claims and Equity Interests under the Plan takes into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise. Section 9.7 of the Plan, therefore, provides that all subordination rights that a Holder of a Claim or Equity Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently. Accordingly, distributions under the Plan to Holders of Allowed Claims will not be subject to payment of a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

8. *Preservation of Rights of Action*

Under section 1123(b) of the Bankruptcy Code a plan may provide for the retention by the debtors of any claims, including rights and causes of action against other entities. In accordance with section 9.8 of the Plan, the Reorganized Debtors will retain and have the exclusive right to enforce, after the Effective Date, any claims, rights and Causes of Action that the Debtors or the Estates may hold against any Entity, including, but not limited to, Causes of Action against former employees, officers and directors (unless otherwise provided in the Plan), all claims relating to transactions under section 549 of the Bankruptcy Code, all transfers recoverable under section 550 of the Bankruptcy Code, all Causes of Action against any Entity on account of indebtedness and any other Causes of Action in favor of the Reorganized Debtors or their Estates. The Reorganized Debtors will be permitted to pursue such retained claims, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

F. *Retention of Jurisdiction*

Article X of the Plan provides that pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order and the Chapter 11 Cases to the fullest extent permitted by law, including jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest,

including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(b)     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

(c)     Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which any Debtor or Reorganized Debtor may be liable, and hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(d)     Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(f)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Rights Offering or the Confirmation Order;

(g)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such other documents;

(h)     Modify the Plan before or after the Effective Date under section 1127 of the Bankruptcy Code or modify the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Rights Offering or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, this Solicitation and Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Rights Offering or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, in each case subject to the reasonable consent and approval of the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee;

(i)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331,

503(b), 1103 and 1129(c)(9) of the Bankruptcy Code; provided, however, that from and after the Confirmation Date, the payment of fees and expenses of the Reorganized Debtors, including fees and expenses of counsel, will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

(j)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation or enforcement of the Plan or the Confirmation Order;

(k)    Hear and determine any rights, claims or Causes of Action held by, or reserved by, or accruing to, the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code, the Confirmation Order or, in the case of the Debtors any other applicable law;

(l)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(m)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(n)    Determine any other matters that may arise in connection with or relate to the Plan, this Solicitation and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Rights Offering, or the Confirmation Order;

(o)    Enter an order of final decree closing the Chapter 11 Cases;

(p)    Hear and resolve all matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(q)    Hear and resolve all matters involving the nature, existence or scope of the Debtors' discharge;

(r)    Hear and resolve all matters related to the property of the Estates from and after the Confirmation Date;

(s)    Hear and resolve all matters and disputes related to the CVC Settlement Agreement; and

(t)    Hear and resolve such other matters as may be provided in the Confirmation Order or as may be authorized by the Bankruptcy Code.

G.     *Miscellaneous Provisions*

1.     *Payment of Statutory Fees*

Section 1930 of title 28 of the United States Code requires the payment of certain filing and quarterly fees by debtors, and any such fees, as determined by the Bankruptcy Court at the confirmation hearing to be held pursuant to section 1128 of the Bankruptcy Code, will be paid on or before the Effective Date pursuant to section 11.1 of the Plan.

2.     *Section 1145 Exemption*

Section 11.2 of the Plan provides that pursuant to section 1145(a) of the Bankruptcy Code, the Subscription Rights, shares of Reorganized RII Common Stock, shares of Reorganized RII Preferred Stock issuable upon exercise and payment under the Subscription Rights and the New Third-Lien Notes issued under the Plan will be exempt from registration under section 5 of the Securities Act and may be resold by holders thereof without registration, unless the holder is an "underwriter" (as defined in section 1145(b)(1) of the Bankruptcy Code) with respect to such securities, in each case, subject to the terms thereof, applicable securities laws, the Reorganized RII Constituent Documents and the Registration Rights Agreement, as applicable.  See Article XI.B.  "CERTAIN OTHER LEGAL CONSIDERATIONS—section 1145 of the Bankruptcy Code" for a discussion of section 1145.

3.     *Governing Law*

Section 11.3 of the Plan provides that except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law, rule or regulation is applicable, or to the extent that an exhibit or supplement to the Plan provides otherwise, the Plan will be governed by and construed in accordance with the laws of the State of New York, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.

4.     *Severability*

Section 11.4 of the Plan provides that if, prior to entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the reasonable consent of the Requisite Committed Purchasers, the Requisite Plan Support Parties and the Steering Committee and, with respect to any term or provision relating to the CVC Settlement Agreement, with the prior written consent of Court Square), will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

5.    *Inconsistency*

In the event of any inconsistency among the Plan, this Solicitation and Disclosure Statement, the Plan Documents, any exhibit or schedule to the Plan, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan will govern pursuant to section 11.5 of the Plan.

6.    *Section 1125(e) of the Bankruptcy Code*

Section 11.8 of the Plan provides that as of the Confirmation Date, (i) the Debtors will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (ii) the Debtors, the Committed Purchasers, the Plan Support Parties, the Informal Committee, the Steering Committee and each of their respective affiliates, agents, directors, officers, employees, advisors and attorneys will be deemed to have participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

7.    *Exemption from Certain Transfer Taxes*

Section 1146(a) of the Bankruptcy Code prohibits the imposition of a stamp or similar tax on the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under a chapter 11 plan.  Section 11.9 of the Plan provides that pursuant to section 1146(a) of the Bankruptcy Code, no stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax or other similar tax will result from, or be levied on account of, (i) the issuance, transfer or exchange of notes or equity securities, (ii) the creation of any mortgage, deed of trust, lien, pledge or other security interest, (iii) the making or assignment of any lease or sublease, or (iv) the making or delivery of any deed or other instrument of transfer, under, in furtherance of or in connection with, the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property.  Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date will be deemed to have been in furtherance of, or in connection with, the Plan.

8.    *Tax Reporting and Compliance*

Section 502(b)(2) of the Bankruptcy Code empowers debtors to obtain expedited determinations of tax liability with respect to postpetition tax periods and proscribes certain time limits within which governmental units must respond to tax returns for such periods.  Pursuant to section 11.10 of the Plan, the Reorganized Debtors will be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on

behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

9. *Schedules and Exhibits*

Other than for purposes of section 11.5 of the Plan, all exhibits and schedules to the Plan, including the Plan Supplement, will be deemed incorporated into and a part of the Plan as if fully set forth in the Plan.

10. *No Prejudice*

Section 11.12 of the Plan provides that if the Confirmation Order is vacated or the Effective Date has not occurred within one year of the last day of the Confirmation Hearing, then (a) the Confirmation Order will be vacated, (b) the Plan will be null and void in all respects, (c) no distributions under the Plan will be made, (d) the Debtors and all Holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date and (e) nothing contained in the Plan or this Solicitation and Disclosure Statement will: (i) be deemed to constitute a waiver or release of (x) any Claims by the Informal Committee, the Steering Committee, the Committed Purchasers or the Plan Support Parties or (y) any Claims against, or Equity Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors, the Informal Committee, the Steering Committee, the Committed Purchasers or the Plan Support Parties; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors, the Informal Committee, the Steering Committee, the Committed Purchasers or the Plan Support Parties, in any respect.

11. *Allocation of Payments*

To the extent that any Allowed Claim entitled to distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, for all income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest, pursuant to section 11.12 of the Plan.

## XIII.   CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

*CIRCULAR 230 DISCLOSURE:* HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DOCUMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following is a discussion of certain significant federal income tax considerations of the Plan under the Tax Code.  This discussion is limited to certain tax considerations for Holders of Senior Notes and Holders of Subordinated Notes who are United States persons (as defined in the Tax Code) and who hold such interests as "capital assets" and Senior Noteholders who will hold the New Third-Lien Notes, the Reorganized RII Common Stock or the Reorganized RII Preferred Stock as capital assets (generally property held for investment) within the meaning of section 1221 of the Tax Code.  This discussion does not apply to Holders of Claims or interests other than those held by Senior Noteholders and Subordinated Noteholders.  This general description does not discuss all aspects of U.S. federal income taxation that may be relevant to a Senior Noteholder or Subordinated Noteholder in light of such Person's personal investment circumstances, or to certain types of Senior Noteholders or Subordinated Noteholders subject to special treatment under the federal income tax laws (for example, (i) banks, regulated investment companies, real estate investment trusts, insurance companies, employee stock ownership plans, brokers, dealers in securities or currencies, subchapter S corporations, entities treated as partnerships for U.S. federal income tax purposes, and tax exempt organizations, (ii) Persons who hold Claims or interests or who will hold the Reorganized RII Common Stock, the New Third-Lien Notes or the Reorganized RII Preferred Stock as part of a straddle, hedge, conversion transaction or other integrated investment, (iii) Persons whose functional currency is not the U.S. dollar (iv) Persons that use a mark to market method of accounting and (v) Persons that are not U.S. persons under the Tax Code).  In addition, this discussion does not address state, local or non-U.S. taxes.  Furthermore, estate and gift tax issues are not addressed herein.  This discussion is based upon laws, regulations, rulings and decisions now in effect and upon proposed regulations all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision.  No opinion of counsel has been sought or obtained with respect to any federal income tax consequences of the Plan and no tax opinion is given by this Solicitation and Disclosure Statement.  No rulings or determination letters from the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other taxing authorities.  With respect to some of the federal income tax consequences discussed herein, the tax law is unclear.  Accordingly, it is possible that the IRS will disagree with the description below of the tax consequences, and there can be no certainty that the IRS would not prevail in any challenge it may decide to make in that regard.

FOR THE FOREGOING REASONS, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX

CONSEQUENCES (FOREIGN, FEDERAL, STATE, AND LOCAL) OF THE PLAN TO THEM.  WE ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY SPECIFIC HOLDER OF A CLAIM AGAINST US, NOR ARE WE RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

### A.     *Tax Consequences to the Company*

We expect to report an NOL carryover for federal income tax purposes of approximately $340 million as of December 31, 2006.  Because of the significant taxable gain on the sale of our diesel business in connection with the Caterpillar Outsourcing Agreements and a contemplated distribution from our foreign subsidiaries, we expect to derive taxable income in 2007 and thus we expect that our NOL carryover will be reduced by our taxable income during 2007.  The amount of such NOL carryovers and other losses remain subject to adjustment by the IRS.  Moreover, as discussed below, such NOL carryovers and certain other tax attributes of the Company may be reduced and/or subjected to limitation upon the implementation of the Plan.

### 1.     *Cancellation of Debt Income*

As a result of the anticipated exchange of the Senior Notes and Subordinated Notes for Reorganized RII Common Stock, New Third-Lien Notes, Senior Note Rights, Subordinated Note Rights and cash pursuant to the Plan, the amount of our aggregate outstanding indebtedness will be reduced.  In general, for federal income tax purposes, a debtor will realize COD income when a creditor accepts less than full payment in satisfaction of its debt.  Under section 108 of the Tax Code, if a debtor corporation transfers stock to a creditor in satisfaction of its indebtedness, such corporation shall be treated as having satisfied the indebtedness with an amount of money equal to the fair market value of the stock.  Furthermore, when a corporation uses one debt instrument to retire another, it is treated as having satisfied its prior indebtedness for an amount equal to the "issue price" of the new debt instrument as determined under the OID rules (see below).  Absent an exception, the amount of COD income realized must be included in taxable income. Section 108 of the Tax Code provides in part that gross income does not include COD income if the discharge occurs in a case under the Bankruptcy Code.  Instead, the taxpayer applies the COD income that would otherwise be included in gross income to reduce the following tax attributes in the following order:  net operating losses or net operating loss carryovers, carryovers of the general business credit, carryovers of the minimum tax credit, net capital losses or capital loss carryovers, basis of the taxpayer's depreciable and non-depreciable property, passive activity loss and credit carryovers and carryovers of foreign tax credit.  The taxpayer may elect to first reduce the basis of depreciable property.

We expect that we will realize significant COD income pursuant to the transactions in the Plan.  Based on the midpoint of the estimated reorganization value range of the Company, the amount of COD income is estimated to be approximately $189 million (and, in addition, we expect not to deduct the interest accruing in 2007 on the indebtedness that will be cancelled in the bankruptcy).  Because the realization of COD income will occur in a title 11 case, the Company will not recognize such COD income, but instead will reduce tax attributes after the end of the tax year in which the COD income is recognized.  We have not decided yet whether

we will reduce our NOLs or elect to first reduce the basis of some or all of our depreciable property.

> 2. *Applicable High Yield Discount Obligations – Limitation on Interest Deductions*

Under section 163 of the Tax Code, a corporation that issues an "applicable high yield discount obligation" will be limited in its ability to take a deduction for interest attributable to OID. An "applicable high yield discount obligation" is a debt instrument which has a term of more than five years and a yield five percentage points or more in excess of the AFR in effect when the debt instrument was issued, and has "significant original issue discount." A debt instrument has "significant original issue discount" if for periods before the close of any accrual period ending after the date five years after the date of issue, the aggregate interest and OID accrued on the debt instrument exceeds the aggregate amount of interest and OID required to be paid on the debt instrument by more than the product of the issue price and the yield to maturity of the debt instrument. If the yield on the debt instrument does not exceed the AFR by more than six percentage points the issuer will be denied a deduction for the original issue discount on the debt instrument until the interest is paid. If the yield on the debt instrument does exceed the AFR by more than six percentage points, a portion of the total return on the debt instrument, measured by reference to such excess, is not deductible at all by the issuer and is treated when accrued as a distribution with respect to the issuer's common stock which may be treated as a dividend eligible for the "dividends received" deduction for corporate holders of the debt instrument but is not eligible for "qualified dividend income" treatment for non-corporate holders.

We will be subject to the rules governing applicable high yield discount obligations, because the New Third-Lien Notes will have a term of greater than five years, will have a yield of greater than six percentage points over the AFR and will have significant original issue discount as a result of the payment-in-kind feature (whether the Company pays interest currently or in kind).

> 3. *Section 382 Limitation*

Under section 382 of the Tax Code, if a loss corporation undergoes an "ownership change," the amount of its pre-change losses that may be utilized to offset future taxable income generally will be subject to an annual limitation. Such limitation may also apply to subsequently recognized "built-in" losses, *i.e.*, losses economically accrued but unrecognized as of the date of the ownership change. In general, pursuant to section 382(l)(6) of the Tax Code, the annual limitation for a corporation that undergoes an ownership change pursuant to a plan of reorganization in a title 11 case would be equal to the product of (i) the value of the loss corporation's outstanding stock immediately after the ownership change (with certain adjustments) and (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (which is, for example, 4.50% for August 2007). Any unused portion of the annual limitation would be available in subsequent years. However, if the loss corporation does not continue its historic business or use a significant portion of its business assets in a new business for two years after the ownership change, the annual limitation would be zero.

In general, an ownership change occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect 5% shareholders (as specially defined for purposes of section 382 of the Tax Code) has increased by more than 50 percentage points over the lowest percentage of that value owned by such 5% shareholders at any time during a three-year testing period. It is anticipated that the issuance of Reorganized RII Common Stock pursuant to the Plan will constitute an ownership change of the Company.

As stated above, section 382 also can operate to limit built-in losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and all items of "built-in" income and deductions), then any built-in losses recognized (including by way of depreciation deductions) during the following five years (up to the amount of the original net built-in loss) generally will be treated as a pre-change loss and similarly will be subject to the annual limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Based on the estimated reorganization value of the Company, we currently anticipate that we will be in a net unrealized built-in loss position on the Effective Date.

An exception to the foregoing annual limitation (and built-in gain and loss rules) generally applies pursuant to section 382(l)(5) of the Tax Code where shareholders and qualified creditors of the debtor receive at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed title 11 plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis but are reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the reorganization and during the part of the taxable year prior to and including the reorganization, in respect of the debt converted into stock in the reorganization. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

A qualified creditor is a creditor who either (i) has held its debt continuously beginning at least 18 months prior to the filing of the title 11 case, or (ii) has at all times owned a claim that qualifies as an "ordinary course" claim (*e.g.*, a trade creditor). In addition, any stock received by a creditor who does not become a direct or indirect 5% shareholder of the reorganized debtor generally will be treated as received by a qualified creditor, other than in the case of any creditor whose participation in the plan makes evident to the debtor that the creditor has not owned the debt for the requisite period. We have not yet determined whether we will be eligible for, and will choose to be governed by, the section 382(l)(5) exception or whether we will elect not to apply the section 382(l)(5) exception and will instead be subject to the section 382(l)(6) annual limitation and built-in gain and loss rules described above.

4. *Worthless Stock Deduction*

Section 382 of the Tax Code provides that if a 50 % shareholder of a loss corporation takes a worthless stock deduction with respect to such stock pursuant to section 165 of the Tax Code, this in effect results in an ownership change with respect to the loss corporation as of the first day of the following tax year. If a worthless stock deduction were taken by such a 50% shareholder of our stock for any tax year ending prior to the tax year that includes the Effective Date, then section 382 of the Tax Code would require that a limitation be placed on our NOL carryovers based on our equity value as of the first day of the following tax year, which would precede the Effective Date. The equity value at such time presumably would be zero, we would be unable to use the favorable valuation rule of Section 382(l)(6) of the Tax Code, and therefore our ability to use our NOL carryovers to offset our future taxable income would effectively be eliminated.

CVCEP LP holds more than 50% of both RII's common stock and its Series A Preferred. The CVC Settlement Agreement provides that Court Square Owners will, among other things, forbear from taking a worthless stock deduction with respect to their interests in the Company. However, see Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases— Termination Rights Under Material Restructuring Agreements." for a discussion of the fact that, under certain circumstances, Court Square has the ability to terminate the CVC Settlement Agreement, in which event CVCEP LP could sell such stock or claim a worthless stock deduction and thereby effectively eliminate our ability to use our NOL carryovers to offset future taxable income of Reorganized RII.

5. *Alternative Minimum Tax*

In general, an AMT is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as recomputed for AMT purposes).

In addition, if a corporation undergoes an ownership change within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

B.   *Tax Consequences to the Exchanging Senior Noteholders and Subordinated Noteholders*

1.   *Exchange of the Senior Notes for New Third-Lien Notes, Cash and Subscription Rights and Subordinated Notes for Reorganized RII Common Stock and Subscription Rights*

For (i) Senior Noteholders that exchange their Senior Notes for New Third-Lien Notes, Senior Note Cash and Senior Note Rights (the "Senior Exchange") and (ii) Subordinated Noteholders that exchange their Senior Subordinated Notes for Reorganized RII Common Stock and Subordinated Note Rights, (the "Subordinated Exchange"), each pursuant to the Plan, the federal income tax consequences will depend on whether or not each such exchange qualifies as a "recapitalization" under the Tax Code. In general, the Tax Code requirements for recapitalization treatment for the Senior Exchange will be met if the Senior Notes are considered securities for federal income tax purposes. In general, the Tax Code requirements for recapitalization treatment for the Subordinated Exchange will be met so long as the Subordinated Notes are considered securities for federal income tax purposes. Furthermore, the receipt of the New Third-Lien Notes will constitute "boot" to the Senior Noteholders in the recapitalization (potentially resulting in recognition of gain but not loss by the Senior Noteholders) if the New Third-Lien Notes are not considered securities for federal income tax purposes.

In this regard, the term "securities" is not clearly defined under current federal income tax law; instead, the status of a debt instrument as a security typically is determined based upon an overall evaluation of the nature of the debt instrument, the term to maturity of the debt instrument, the extent of the investor's proprietary interest in the issuer of the debt instrument and certain other factors. Although the matter is not free from doubt, we believe that the Senior Notes, the Subordinated Notes and the New Third-Lien Notes should all be considered "securities" for federal income tax purposes, and that, accordingly, (i) the Senior Exchange and the Subordinated Exchange should each qualify as a recapitalization under the Tax Code and (ii) the New Third-Lien Notes should not constitute "boot" to the Senior Noteholders in the recapitalization. Assuming that the Senior Notes, Subordinated Notes and New Third-Lien Notes are securities (which will be assumed for the balance of this discussion), Senior Noteholders and Subordinated Noteholders, respectively, will not generally recognize gain or loss on the Senior Exchange or the Subordinated Exchange except as further discussed. Senior Noteholders and Subordinated Noteholders will recognize gain, if any, to the extent of any "boot" received in the recapitalization and will not recognize a loss in the exchange. The Senior Note Cash will constitute "boot" in the Senior Exchange.

The law is unclear with respect to the federal income tax treatment of the Consent Fee. The receipt of the Consent Fee by a Senior Noteholder may be treated for federal income tax purposes either as (a) additional consideration in exchange for the Senior Notes, in which case the amount of the Consent Fee would be treated as "boot" in the Senior Exchange and would be taken into account in determining the amount of gain on the exchange and the amount of COD income realized by the Company or (b) separate consideration for consenting to the terms of the Fifth Plan Support Amendment, in which case the amount of the Consent Fee would constitute ordinary income to the Senior Noteholders. In the absence of further guidance from the IRS, the

Company intends to take the position that the Consent Fee is additional consideration in exchange for the Senior Notes. No assurance can be provided, however, that the IRS will not take a contrary position. If the Consent Fee were treated as separate consideration for consenting to the terms of the Fifth Plan Support Amendment, such payment would constitute ordinary income to the Senior Noteholders. Senior Noteholders should consult their tax advisors regarding the federal income tax treatment of the Consent Fee.

Senior Noteholders will be treated as receiving an interest payment to the extent that a portion of the New Third-Lien Notes, Senior Note Rights and Senior Note Cash received is allocable to accrued interest that accrued during the Senior Noteholders' holding period for the notes exchanged therefor. Subordinated Noteholders will be treated as receiving an interest payment to the extent that a portion of the Reorganized RII Common Stock and Subordinated Note Rights received is allocable to accrued interest that accrued during the Subordinated Noteholders' holding period for the notes exchanged therefor. Accordingly, Senior Noteholders and Subordinated Noteholders who previously had not included such accrued interest in income will recognize ordinary taxable income with respect to such interest payment, and Senior Noteholders and Subordinated Noteholders who previously had included such accrued interest in income will recognize ordinary income or loss equal to the difference between the Senior Noteholders' and Subordinated Noteholders' basis in such interest (*i.e.*, the amount of such accrued interest recognized as income by such Senior Noteholders and Subordinated Noteholders) and the amount of the payment. We intend to allocate the distributions of the New Third-Lien Notes, Reorganized RII Common Stock, Senior Note Rights, Subordinated Note Rights and Senior Note Cash to the Senior Noteholders and Subordinated Noteholders first to the principal portion of the Senior Notes and Subordinated Notes to the extent thereof and thereafter to any accrued interest on the Senior Notes or the Subordinated Notes. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. Each Impaired Noteholder is urged to consult its tax advisor regarding the allocation of consideration.

Senior Noteholders will be treated as receiving an interest payment equal to the fair market value of the Senior Note Preferred Shares. The tax basis of the Senior Note Preferred Shares received by the Senior Noteholders will be equal to such fair market value.

The tax basis of the New Third-Lien Notes and Senior Note Rights received by the Senior Noteholders in the Senior Exchange will be equal to the adjusted tax basis of the Senior Notes surrendered in the exchange, increased by any gain recognized on the receipt of "boot", and increased, for a cash method Senior Noteholder, by the amount of income recognized with respect to accrued interest and decreased by the amount of the "boot" and decreased by any deduction or loss claimed in respect of any previously accrued interest. A Senior Noteholder's tax basis, determined as provided in the previous sentence, will be apportioned between such Noteholder's New Third-Lien Notes and Senior Note Rights based on their relative fair market values.

The tax basis of the Reorganized RII Common Stock and Subordinated Note Rights received by the Subordinated Noteholders in the Subordinated Exchange will be equal to the adjusted tax basis of the Subordinated Notes surrendered in the exchange, increased, for a cash method Subordinated Noteholder, by the amount of income recognized with respect to accrued

interest and decreased by any deduction or loss claimed in respect of any previously accrued interest.  A Subordinated Noteholder's tax basis, determined as provided in the previous sentence, will be apportioned between such Noteholder's Reorganized RII Common Stock and its Subordinated Note Rights.  It is unclear how the amounts treated as interest payments and how such income, deduction or loss would be allocated, in the case of the Senior Noteholders, as between the New Third-Lien Notes, the Senior Note Rights and Senior Note Cash and, in the case of the Subordinated Noteholders, as between the Reorganized RII Common Stock and the Subordinated Note Rights, and each Senior Noteholder and Subordinated Noteholder is urged to consult its tax advisor regarding such allocation.

To the extent that a Senior Noteholder exercises its Senior Note Rights or a Subordinated Noteholder exercises its Subordinated Note Rights, such Noteholder will add its tax basis in such Subscription Rights to its tax basis in the Reorganized RII Preferred Stock received pursuant to such exercise.

The holding period of the New Third-Lien Notes received in the Senior Exchange will include the holding period of the Senior Notes surrendered in the exchange (provided such Senior Notes were held as a capital asset at the time of the exchange), except that the portion of New Third-Lien Notes treated as interest payments will have a new holding period beginning the day after the exchange.  The holding period of the Reorganized RII Common Stock received in the Subordinated Exchange will include the holding period of the Subordinated Notes surrendered in the exchange (provided such Subordinated Notes were held as a capital asset at the time of the exchange), except that the portion of Reorganized RII Common Stock treated as interest payments will have a new holding period beginning the day after the exchange.  The holding period of the Reorganized RII Preferred Stock received in the Senior Exchange will have a new holding period beginning the day after the exchange.

2.      *Reorganized RII Series A Preferred Stock*

We intend to take the position that the accrual of an undeclared dividend on the Reorganized RII Preferred Stock does not result in a constructive distribution under section 305(c) of the Tax Code and that, as a result, dividends on the Reorganized RII Preferred Stock would not be includible in the gross income of a holder until declared and paid.  This position is not binding on the IRS and the IRS could assert that the accrual of an undeclared dividend on the Reorganized RII Preferred Stock results in a constructive distribution (or series of constructive distributions) under section 305(c) of the Tax Code.  If the IRS were to be successful in such an assertion, holders of Reorganized RII Preferred Stock would be required to include accrued dividends on the Reorganized RII Preferred Stock in income currently, regardless of whether such dividends were paid currently.  We urge Senior Noteholders receiving Reorganized RII Preferred Stock under the Plan, or Senior Noteholders or Subordinated Noteholders contemplating the exercise of the Senior Rights or the Subordinated Rights, respectively, to consult their tax advisors regarding the federal income tax treatment of holding the Reorganized RII Preferred Stock.  The following discussion assumes that the accrual of an undeclared dividend on the Reorganized RII Preferred Stock does not result in a constructive distribution under section 305(c) of the Tax Code.

Distributions with respect to the Reorganized RII Preferred Stock (whether such stock was received in connection with the Senior Exchange or through the exercise of the Senior Note Rights or Subordinate Note Rights) generally will be characterized as dividend income when paid to the extent of our current or accumulated earnings and profits, as determined for federal income tax purposes. To the extent that the amount of a distribution with respect to the Reorganized RII Preferred Stock exceeds our current and accumulated earnings and profits, such distribution will be treated first as a tax-free return of capital to the extent of the holder's adjusted tax basis in such the Reorganized RII Preferred Stock (as discussed above) which reduces such basis dollar-for-dollar, and thereafter as capital gain. Such gain will be long-term capital gain provided that the holder has held such Reorganized RI Preferred Stock for more than one year at the time of the distribution.

Distributions constituting dividend income received before January 1, 2011 by a non-corporate holder in respect of Reorganized RII Preferred Stock generally will be subject to taxation at a maximum rate of 15%. Distributions on the Reorganized RII Preferred Stock constituting dividend income paid to holders that are corporations generally will qualify for the dividends received deduction, subject to applicable limitations. Each holder should consult its tax advisor regarding the availability of the reduced dividend tax rate and the dividends received deduction in the light of its particular circumstances.

Holders of the Reorganized RII Preferred Stock that are U.S. corporations should be aware that under certain circumstances, a corporation that receives an "extraordinary dividend" (as defined in section 1059 of the Tax Code) is required to (i) reduce its stock basis (but not below zero) by the portion of such dividend that is not taxed because of the dividends received deduction and (ii) treat the non-taxed portion of such dividends as gain from the sale or exchange of the Reorganized RII Preferred Stock for the taxable year in which such dividend is received (to the extent that the non-taxed portion of such dividend exceeds such holder's basis). Non-corporate holders who receive an "extraordinary dividend" on the Reorganized RII Preferred Stock would be required to treat any losses on the sale of the stock as long-term capital losses to the extent such dividends received by them qualify for the reduced 15% tax rate. Investors should consult their tax advisor with respect to the potential application of the extraordinary dividend rules to an investment in our preferred stock or common stock.

A holder generally will recognize capital gain or loss on a sale, exchange or redemption of the Reorganized RII Preferred Stock equal to the difference between the amount realized upon the sale, exchange or redemption (not including any proceeds attributable to any declared accrued but unpaid dividends, which will be taxable as described above to holders of record who have not previously included such dividends in income) and the holder's adjusted tax basis in the shares sold, exchanged or redeemed. Such capital gain or loss generally will be long-term capital gain or loss if the holder's holding period for the shares sold or exchanged is more than one year. Long-term capital gains of noncorporate taxpayers generally are taxed at a maximum tax rate of 15%. The deductibility of net capital losses is subject to limitations.

3. *Applicable High Yield Discount Obligations*

As described above, the New Third-Lien Notes will be "applicable high yield discount obligations." As such, because their yield will exceed the AFR by more than six percentage points, a portion of the total return on the debt instrument, measured by reference to such excess, will not be deductible by the Company and might be treated, when accrued, as a distribution eligible for the dividends received deduction for Senior Noteholders that are corporations but will not be eligible for "qualified dividend income" treatment for non-corporate Senior Noteholders. Senior Noteholders are urged to consult their tax advisors regarding the application of these rules.

4. *Original Issue Discount (OID)*

Because the New Third-Lien Notes do not unconditionally require us to pay interest in cash at least annually, none of the interest payments on the New Third-Lien Notes will be qualified stated interest even if we pay interest currently in cash. As a result, inclusions on the New Third-Lien Notes will be determined pursuant to the OID rules, and a holder will be required to include OID in gross income as it accrues, possibly in advance of the receipt of cash, regardless of whether such holder uses the accrual method of accounting.

We intend to take the position that the New Third-Lien Notes will qualify as "variable rate debt instruments." This position is not binding on the IRS, and the IRS could assert that the New Third-Lien Notes should be characterized as "contingent payment debt instruments." If the IRS were successful in such an assertion, a holder may be required, among other things, to accrue interest income, regardless of the holder's method of accounting for federal income tax purposes, at a rate higher than the stated interest rate on the notes, and to treat as ordinary income, rather than as capital gain, any gain recognized on a sale, exchange or redemption of a New Third-Lien Note. Our position that the New Third-Lien Notes are not contingent payment debt instruments is binding on holders unless they disclose their contrary positions to the IRS in the manner that is required by applicable U.S. Treasury regulations. The following discussion assumes that the New Third-Lien Notes will be respected as variable rate debt instruments.

Applying the OID rules to the New Third-Lien Notes, a holder generally will be required to include OID at the applicable stated rate of interest on the New Third-Lien Notes. A payment of interest in the form of additional New Third-Lien Notes will not be treated as a separate payment of interest, but the applicable stated interest on such additional New Third-Lien Notes would be includible OID. If we in fact pay cash interest on the New Third-Lien Notes, a holder will not adjust its OID inclusions. Each payment of cash under the New Third-Lien Notes will be treated first as a payment of any accrued OID that has not been allocated to prior payments and second as a payment of principal (which is not includable in income). A holder generally will not be required to include separately in income cash payments received on the New Third-Lien Notes to the extent such payments constitute payments of previously accrued OID.

Further, if the issue price of the New Third-Lien Notes is less than the principal amount of such notes, holders may be required to include additional OID. The issue price of the New Third-Lien Notes depends on whether a substantial amount of such notes is considered to be "traded on an established market" within the meaning of the applicable U.S. Treasury

regulations.  If a substantial amount of the New Third-Lien Notes is considered to be traded on an established market, the issue price of such notes will be their trading price on the issue date. If it is not the case that a substantial amount of the New Third-Lien Notes is considered to be traded on an established market, but a substantial amount of the Senior Notes is considered to be so traded, the fair market value of the Senior Notes on the date of the exchange will be the issue price of the New Third-Lien Notes.  If neither the New Third-Lien Notes nor the Senior Notes are considered to be traded on an established market, the issue price of the New Third-Lien Notes will be equal to their stated principal amount.  The method for accruing such additional OID, if any, will be based on the "constant yield method" by constructing a fixed rate debt instrument, based on LIBOR plus a margin as of the issue date.

If a holder's adjusted tax basis in its New Third-Lien Notes immediately after the exchange is less than the issue price of such New Third-Lien Notes, the amount of the difference will be treated as "market discount," unless such difference is less than a specified *de minimis* amount.  Under the market discount rules, a holder will be required to treat any gain realized on the sale, exchange or retirement of a New Third-Lien Note as ordinary income to the extent of the market discount which has not previously been included in income and is treated as having accrued on such note at the time of such disposition.  Market discount is considered to accrue ratably during the period from the date of acquisition to the maturity date of the New Third-Lien Notes, unless the holder elects to accrue market discount under the rules applicable to OID.  A holder may elect to include market discount in income (generally as ordinary income) as it accrues, in which case the rule described above regarding the ordinary income treatment upon disposition will not apply.  Such election will apply to all debt instruments acquired by the holder on or after the first day of the first taxable year to which such election applies and may be revoked only with the consent of the IRS.

In addition, if a holder's adjusted tax basis in its New Third-Lien Notes immediately after the exchange (i) is less than or equal to the principal amount of the New Third-Lien Notes, but (ii) exceeds the issue price of such New Third-Lien Note, such excess will be considered "acquisition premium."  In such case, while the application of the acquisition premium rules is not entirely clear, a holder generally should be entitled to reduce its OID inclusions with respect to the New Third-Lien Notes (as described in the second previous paragraph) by an amount equal to the amount of OID such holder would otherwise include in its gross income multiplied by a fraction, the numerator of which is the amount of acquisition premium and the denominator of which is the excess of (i) the principal amount of the New Third-Lien Notes over (ii) the issue price of the New Third-Lien Notes.

If a holder's adjusted tax basis in its New Third-Lien Notes immediately after the exchange exceeds the principal amount of such notes, such excess also will be considered "acquisition premium."  In such case, while the application of the acquisition premium rules is not entirely clear, a Holder generally should be entitled to recover such acquisition premium under a "constant yield method" by constructing a fixed rate debt instrument, based on LIBOR plus a margin as of the issue date.

Finally, a holder is permitted to elect to include in gross income its entire return on its New Third-Lien Notes (*i.e.,* the excess of all remaining payments to be received on its New Third-Lien Notes over its adjusted tax basis on its New Third-Lien Notes) based on

compounding of interest at a constant rate.  For this purpose, a holder should calculate the constant rate by constructing a fixed rate debt instrument, based on LIBOR plus a margin as of the issue date.

**The manner in which one calculates OID on the New Third-Lien Notes is extremely complex, and therefore, we urge you to consult your own tax advisor**.

     5.    *Subsequent Sale of Reorganized RII Common Stock or New Third-Lien Notes*

     (a)    Sale of Reorganized RII Common Stock

Upon the sale, exchange, redemption or other taxable disposition of Reorganized RII Common Stock (collectively, a "disposition"), a Subordinated Noteholder generally will recognize capital gain or loss equal to the difference between (1) the amount of such cash and the fair market value of any property received with respect to such disposition and (2) the noteholder's adjusted tax basis in the Reorganized RII Common Stock.  Such capital gain or loss will be long term capital gain or loss if the Subordinated Noteholder's holding period for such Reorganized RII Common Stock exceeds one year on the date of disposition (subject to the discussion of accrued market discount below).

     (b)    Sale, Exchange, Redemption or other Taxable Disposition of the New Third-Lien Notes

Upon the sale, exchange, retirement or other taxable disposition of a New Third-Lien Note (collectively, a "disposition''), a Senior Noteholder generally will recognize capital gain or loss equal to the difference between (1) the amount of cash and the fair market value of any property received with respect to such disposition, and (2) such noteholder's adjusted tax basis in the New Third-Lien Note.  A Senior Noteholder's adjusted tax basis in a note generally will equal its initial tax basis for the New Third-Lien Note (as previously described), increased by the amount of OID previously included in income and decreased by the amount of any cash payment received with respect to the New Third-Lien Note.  Such capital gain or loss will be long-term capital gain or loss if the noteholder's holding period for such New Third-Lien Note exceeds one year on the date of disposition (subject to the discussion of accrued market discount below).

     (c)    Accrued Market Discount

Any accrued "market discount" not treated as ordinary income upon a tax-free exchange of market discount bonds carries over to nonrecognition property received in the exchange. Senior Noteholders that have accrued market discount in the Senior Notes would carry over the portion of accrued market discount allocable to the New Third-Lien Notes received pursuant to the Plan such that any gain recognized by the Senior Noteholders upon a subsequent disposition of such New Third-Lien Notes would be treated as ordinary income to the extent of any accrued market discount not previously included in income (unless the amount of such market discount were less than a specified *de minimis* amount, in which case market discount would be disregarded).  Subordinated Noteholders that have accrued market discount in the Subordinated Notes would carry over the portion of accrued market discount allocable to the Reorganized RII Common Stock received pursuant to the Plan such that any gain recognized by the Subordinated

Noteholders upon a subsequent disposition of such Reorganized RII Common Stock would be treated as ordinary income to the extent of any accrued market discount not previously included in income (unless the amount of such market discount were less than a specified *de minimis* amount, in which case market discount would be disregarded). In general, Senior Notes and Subordinated Notes will have accrued "market discount" if such Senior Notes and Subordinated Notes were acquired after their original issuance at a discount to their adjusted issue price.

C.    *Backup Withholding*

Under certain circumstances a noteholder may be subject to backup withholding at the rate of 28% with respect to "reportable payments." We will be required to deduct and withhold the prescribed amount if (a) the noteholder fails to furnish a taxpayer identification number to us in the manner required, (b) the IRS notifies us that the taxpayer identification number furnished by the noteholder is incorrect, (c) there has been a failure of the Noteholder to certify under penalty of perjury that the noteholder is not subject to withholding or (d) the Noteholder is notified by the IRS that he or she failed to report properly payments of interest and dividends and the IRS has notified us that he or she is subject to backup withholding.

Backup withholding is not an additional tax. Any amount withheld from a payment to a noteholder under the backup withholding rules is allowable as a credit against such holder's U.S. federal income tax liability (and may entitle such noteholder to a refund), provided that the required information is furnished to the IRS on a timely basis. Certain persons are exempt from backup withholding, including corporations and financial institutions. Noteholders should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for obtaining such exemption.

## XIV. THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS

### A. *Proposed Debtor in Possession Financing*

On July 30, 2007 we entered into the DIP/Exit Commitment Letter, which was subsequently amended on August 29, 2007. Pursuant to the DIP/Exit Commitment Letter, the DIP Agent agreed to provide up to $225 million under the DIP Credit Agreement to the Prospective Debtors pursuant to and in accordance with the DIP/Exit Commitment Letter. The proceeds from the DIP Facility will be used (i) to repay our indebtedness under the Prepetition Credit Agreement, (ii) for post-petition operating expenses of the Prospective Debtors incurred in the ordinary course of business, (iii) to pay transaction fees and expenses and (iv) for certain other costs and expenses of administration of the Bankruptcy Cases. If the closing with respect to the DIP Facility does not occur by October 17, 2007, the DIP/Exit Commitment Letter will terminate, unless extended by the Exit Facility Agent.

The principal terms of the DIP Facility are summarized below. Capitalized terms used in this Article XIV.A. "Proposed Debtor in Possession Financing" but not otherwise defined in Annex II shall have the meanings assigned such terms in the DIP/Exit Commitment Letter. The DIP/Exit Fee Letter includes customary "market flex" provisions which permit Barclays Capital, subject to certain limitations, to adjust the terms and conditions, pricing and/or structure of the DIP Facility if Barclays Capital reasonably determines that such changes are necessary to facilitate the successful syndication of the DIP Facility. If Barclays Capital exercises its rights pursuant to this provision, the final terms and conditions, pricing and structure of the DIP Facility may differ from those indicated below.

| | |
|---|---|
| **Borrower:** | The Prospective Debtors. |
| **Guarantors:** | Each existing and subsequently acquired or organized domestic and material foreign subsidiary of RII (to the extent that there are no material adverse tax consequences with respect to any foreign subsidiary's inclusion as a Guarantor). |
| **Lenders:** | Barclays and other financial institutions selected by Barclays in consultation with Borrower. |
| **Lead Arranger:** | Barclays Capital. |
| **DIP Agent:** | Barclays. |

| **DIP Facilities:** | **DIP Revolving Credit Facility**: A $125 million asset based revolving credit facility including, at Borrower's option, up to $20 million in Letters of Credit pursuant to the DIP L/C Facility. |
|---|---|

DIP Term Loan Facility: The DIP Term Loan Facility of $100 million.

**Availability:**  DIP Revolving Credit Facility: Amounts available will be limited to the lesser of (a) $125 million and (b) the Borrowing Base.

First-Lien Term Loan: One drawing of up to $100 million under the DIP Term Loan Facility shall be available to the Borrower on the Closing Date.

**Term:**  The DIP Facility shall terminate on the earliest of (i) 6 months after the Closing Date, (ii) the effective date of a plan of reorganization in any chapter 11 case or (iii) the DIP Maturity Date. The DIP Facility may be extended by up to 6 months upon the satisfaction of certain conditions to be mutually agreed.

**Interest Rate:**  At the Borrower's option, either the LIBOR Rate or the Alternate Base Rate plus, the applicable margins set forth below:

DIP Revolving Credit Facility: Applicable LIBOR Margin of 2.00% and Applicable ABR Margin of 1.00%. Three months after the Closing Date, the applicable margin for the DIP Revolving Credit Facility will be determined by a grid based on average excess availability for the most recent prior month as follows:

| Excess Availability | Applicable LIBOR Margin | Applicable Facility ABR Margin |
|---|---|---|
| > $85 million | 1.75% | 0.75% |
| < $85 million but > $40 million | 2.00% | 1.00% |
| < $40 million | 2.25% | 1.25% |

DIP Term Loan Facility: Applicable LIBOR Margin of 4.00% and Applicable ABR Margin of 3.00%.

| | |
|---|---|
| **Default Interest:** | Upon an event of default, default interest and letter of credit fees at 2.00% above the rate otherwise applicable thereto. |
| **Facility Fees:** | <u>DIP Revolving Credit Facility Commitment Fee</u>:  0.375% *per annum* payable on the unused portion of the DIP Revolving Credit Facility. |
| | <u>DIP Term Loan Facility Commitment Fee</u>:  1% *per annum* on the committed but undrawn portion of the Term Loan Facilities from the DIP Facility Closing Date to the Exit Facility Closing Date.  The undrawn portion of the Term Loan Facilities means $50 million of the First-Lien Term Loan and the entire amount of the Second-Lien Term Loan. |
| | <u>Letter of Credit Fees</u>:  (i) The Applicable LIBOR Margin then in effect for the DIP Revolving Credit Facility, multiplied by (ii) the average daily maximum aggregate amount available to be drawn under all Letters of Credit.  In addition, a fronting fee will be payable to the Issuing Bank as well as certain customary fees assessed thereby. |
| **Funding Protection:** | Customary for transactions of this type, including breakage costs, gross-up for tax withholding, compensation for increased costs and compliance with capital adequacy and other regulatory restrictions. |
| **Mandatory Prepayments:** | Borrower shall make the following mandatory prepayments (subject to certain basket amounts to be agreed): |
| | <u>Indebtedness/Equity/Extraordinary Receipts</u>:  (a) 100% of the net cash proceeds received from the incurrence of indebtedness, (b) 50% of the net cash proceeds received from the issuance of additional equity (but specifically excluding any net cash proceeds received in connection with the Rights Offering) and (c) 100% of the net cash proceeds from the receipt of any extraordinary receipts by Borrower or its subsidiaries including capacity for reinvestment on terms to be agreed. |
| | <u>Dispositions</u>:  100% of the net cash proceeds from the sale or other disposition of any property or assets of Borrower or its subsidiaries (including as a result of casualty or condemnation) with certain specified exceptions. |
| **Security/Priority:** | <u>DIP Revolving Credit Facility</u>:  The DIP Revolving Credit Facility will be secured by a first priority security interest on all cash and working capital assets of the Borrower and the Guarantors pursuant to sections 364(c)(2) and (d) of the Bankruptcy Code, subject only to certain agreed upon permitted |

liens (which permitted liens shall include liens securing the Borrower's existing Floating Rate Secured Notes), provided such Floating Rate Secured Notes are subject and subordinate to the DIP Facility. The DIP Facility shall prime such Floating Rate Secured Notes and such Floating Rate Secured Notes shall not obtain super-priority status pursuant to sections 364(c) and (d) of the Bankruptcy Code. The Floating Rate Secured Notes shall not be paid until the close of the Exit Facility. The DIP Revolving Credit Facility will have a second priority security interest and mortgage on the DIP Term Loan Collateral.

DIP Term Loan Facility: The DIP Term Loan Facility will be secured by a first priority security interest and mortgage (where applicable) in all assets of the Borrower and the Guarantors (excluding the DIP Revolver Collateral) including machinery, equipment, real estate and other fixed assets, intangibles, intellectual property, contracts, license agreements and a stock pledge of the Borrower and each subsidiary of the Borrower (limited to 65% of the capital stock of each foreign subsidiary) and Guarantors pursuant to sections 364(c)(2) and (d) of the Bankruptcy Code, subject only to certain agreed upon permitted liens (which permitted liens shall include liens securing the Floating Rate Secured Notes). The DIP Term Loan Facility will have a second priority security interest on the DIP Revolver Collateral.

The DIP Revolving Credit Facility and DIP Term Loan Facility will also be secured by a junior lien on all other assets of the Borrower that are subject to valid and perfected liens in existence at the time of commencement of the Bankruptcy Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code pursuant to section 364(c)(3) of the Bankruptcy Code.

Additionally, the Facilities shall be secured by the unencumbered foreign assets of the Borrower and the Guarantors (to the extent there are no material adverse tax consequences with respect to any security on such foreign assets), including but not limited to the following: (i) up to 65% of the capital stock of the Borrower's first-tier foreign subsidiaries, (ii) liens on the Borrower's and Guarantors' assets located in Mexico as may be determined by the Arranger in its sole discretion; (iii) a negative pledge covenant as to the foreign subsidiaries' assets exclusive of any existing liens encumbering such assets; and (iv) additional foreign assets as may be

determined by the Arranger in its sole discretion to the extent permitted by applicable law.

**Closing Conditions:** The DIP Facilities are subject to conditions precedent including conditions relating to: completion by the Arranger of satisfactory environmental, legal and collateral due diligence; maximum leverage ratio; EBITDA at close; entry into an acceptable contract with GM; corporate structure and organizational documents; interim and final orders; first day motions; minimum liquidity; provision of financial statements; provision of financial projections; payment of costs and expenses; absence of material litigation; customary closing documents; definitive documentation evidencing the DIP Facilities; provision of lien search results; perfection of collateral; review and establishment of cash management systems; insurance; no material adverse change since December 31, 2006; receipt of necessary waivers and consents; no default or event of default and correct representations and warranties.

**Affirmative Covenants:** The Loan Documents will include such affirmative covenants by each of the Borrowers and the Guarantors as are usual and customary for comparable financings including, without limitation, delivery of financial statements, reports, accountants' letters, projections, officers' certificates, notices of default, litigation and other material events and other information requested by the Lenders or Administrative Agent; payment of taxes and other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; compliance with environmental laws; further assurances (including, without limitation, with respect to security interests in after-acquired property).

**Negative Covenants:** The Loan Documents will include such negative covenants by each of the Borrowers and the Guarantors as are usual and customary for comparable financings including, without limitation, limitations with respect to other indebtedness (including negative pledge, guarantee obligations); liens; mergers, consolidations, liquidations and dissolution; sales and other dispositions of assets (with certain permitted asset sales); dividends and other payments in respect of capital stock; capital expenditures; investments, loans and advances; payments and modifications of subordinated and other debt instruments; transactions with affiliates; changes in fiscal year; negative pledge clauses restricting subsidiary distributions; prepayment

of other debt; and changes in lines of business, in each case, with exceptions and baskets to be agreed.

**Financial Covenants:** The Loan Documents will include financial covenants as are usual and customary for comparable financings including, without limitation, maximum leverage, maximum capital expenditures and minimum EBITDA in amounts to be determined, each to be tested on a monthly basis.

**Events of Default:** The Loan Documents will include such events of default as are usual and customary for comparable financings including, without limitation, failure to make payments of principal, interest or fees when due; failure to pay other amounts; material inaccuracy of representations and warranties; violations of covenants; cross-default to material indebtedness to be agreed; termination of the exclusive period for the Borrower to file a plan of reorganization in the Bankruptcy Cases; dismissal of the Bankruptcy Cases or conversion to a chapter 7 case; appointment of a chapter 11 trustee or a responsible officer or examiner with enlarged powers relating to the operation of the business of any Borrower or Guarantor; a final order in form and substance satisfactory to Agent and its counsel approving the DIP Facility shall not have been entered by the Bankruptcy Court on or before the date which is 40 days after the filing of the Bankruptcy Cases; certain "ERISA events"; material monetary and non-monetary judgments; actual or asserted impairment of any guarantee or security document or security interests; and change of control.

B.   *First Day Orders*

On the first day of the Chapter 11 Cases or as soon as practicable thereafter, we intend to seek relief in the form of various "first day orders" from the Bankruptcy Court as to various matters, certain of which are described below. We believe each of the requests, if granted, would facilitate the Chapter 11 Cases. There can be no assurance, however, that the Bankruptcy Court will grant any such relief. The following "first day orders" are not exhaustive and we reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent that we determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or to not seek portions of the relief described below.

1.   *Rights Offering Approval Motion*

In order to commence the Rights Offering as soon as practicable following the commencement of the Chapter 11 Cases, we intend to file a motion seeking (i) authorization of the Rights Offering and the related procedures described in Article VI herein and

(ii) confirmation that the Rights Offering qualifies for the registration exemption provided under section 1145 of the Bankruptcy Code.

### 2. *Provisions for Employees*

We believe we have a valuable asset in our workforce and that the efforts of our employees are critical to a successful reorganization. We intend to seek the approval of the Bankruptcy Court to honor payroll checks outstanding as of the Petition Date and to make payments under medical, severance, retirement and all other employee benefit programs. We also will seek to make certain payments to contract personnel providers.

### 3. *Trade Vendors and Other Unsecured Creditors*

We believe that good relationships with our vendors are necessary to the continued viability of our business during the Chapter 11 Cases. We intend to seek an order from the Bankruptcy Court, authorizing payments as they become due in the ordinary course of business to such vendors and to other unsecured creditors subject to the continuation of ordinary trade terms, including amounts related to Claims arising prior to the Petition Date.

### 4. *Cash Management*

We believe it would be disruptive to our operations if we were forced to implement significant changes to our cash management system upon the commencement of the Chapter 11 Cases. We intend to seek relief from the Bankruptcy Court authorizing us to maintain our cash management system and existing investment practices.

### 5. *DIP Financing Motion*

We intend to seek an order authorizing us (i) to enter into the DIP Facility, (ii) to utilize a portion of the proceeds thereof to repay the indebtedness under the Prepetition Credit Agreement and (iii) to utilize cash collateral.

### 6. *Customer Programs*

We intend to seek authority to honor any prepetition customer programs that we determine to be essential to the operation of our business. We believe that continuing these services is essential to maintaining customer loyalty.

### 7. *Taxes*

We intend to seek authority to pay prepetition tax claims owed to various taxing authorities.

### 8. *Utility Service*

We intend to seek an order restraining utilities from discontinuing, altering or refusing service and establishing procedures for the provision of adequate assurance to such providers.

9. *Scheduling Order*

We intend to file a motion seeking, *inter alia*, entry of an order (i) scheduling hearings to confirm the Plan, to find that this Solicitation and Disclosure Statement complies with sections 1126(b)(1) and 1126(b)(2) of the Bankruptcy Code and to approve the prepetition solicitation procedures and (ii) establishing deadlines and procedures for filing objections to confirmation of the Plan, the Solicitation and Disclosure Statement and the solicitation procedures.

C.     Second Day Orders

On the first day of the Chapter 11 Cases or as soon as practicable thereafter, we also intend to seek relief, after notice and, if necessary, a hearing in the form of various "second day orders" from the Bankruptcy Court as to various matters, certain of which are described below. There can be no assurance that the Bankruptcy Court will grant any such relief. The following "second day orders" are not exhaustive and we reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent that we determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or to not seek portions of the relief described below.

1.     *Assumption of the CVC Settlement Agreement*

We intend to seek authority to assume the CVC Settlement Agreement pursuant to section 365 of the Bankruptcy Code.

2.     *Rejection of Real Property Leases*

We intend to seek authority to reject certain of our real property leases in order to realize certain cost savings associated with the capped damages that would be payable in connection with such the rejection of such leases.

3.     *Retention of Professionals*

We intend to seek authority to employ Ernst & Young LLP, as our accountants, AP Services, LLC, as our crisis managers and Shearman & Sterling and Young, Conaway, Stargatt & Taylor, LLP, as our legal advisors.

## XV.   CONFIRMATION

### A.   *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing to consider confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.

If we commence the Chapter 11 Cases and seek confirmation of the Plan, the Bankruptcy Court will schedule a Confirmation Hearing to consider whether the Plan satisfies the various requirements of the Bankruptcy Code.  At that time, the Debtors will submit a report to the Bankruptcy Court concerning the vote for acceptance or rejection of the Plan by the parties entitled to vote thereon.  We intend to seek a "first day order" scheduling the Confirmation Hearing, at which the Debtors will seek approval of this Solicitation and Disclosure Statement and confirmation of the Plan pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code. The Confirmation Hearing Notice will be provided to all Holders of Claims and Equity Interests or their representatives as required by Bankruptcy Rule 2002.  Objections to confirmation must be filed with the Bankruptcy Court by the date designated in the Confirmation Hearing Notice and are governed by Bankruptcy Rules 3020(b) and 9014, and local rules of the Bankruptcy Court.  UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THE CONFIRMATION HEARING NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.   *Requirements for Confirmation*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the provisions of section 1129 of the Bankruptcy Code have been satisfied by the Plan.  If all of the provisions of section 1129 of the Bankruptcy Code are met, the Bankruptcy Court may enter an order confirming the Plan.  We believe that all of the requirements of section 1129 of the Bankruptcy Code will be satisfied.

### C.   *Class Acceptance of the Plan*

As a condition to confirmation, the Bankruptcy Code requires that each impaired class of claims or interests accept a plan, subject to the exceptions described in the section entitled "cram down" below.  At least one impaired class of claims must accept a plan in order for the plan to be confirmed.

For a class of claims to accept a plan, section 1126 of the Bankruptcy Code requires acceptance by creditors that hold at least two-thirds in dollar amount and a majority in number of allowed claims of such class, in both cases counting only those claims actually voting to accept or reject the plan.  The holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

For a class of interests to accept a plan, section 1126 of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests actually voting to accept or reject the plan. The holders of interests who fail to vote are not counted as either accepting or rejecting a plan.

If the Plan is confirmed, the Plan will be binding with respect to all Holders of Claims and Equity Interests of each Class, including Classes and members of such Classes that did not vote or that voted to reject the Plan.

We believe that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, that we have complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and made in good faith.

D. *Cram Down*

A court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cram down" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that the court find that a plan is "fair and equitable" and does not "discriminate unfairly" with respect to any nonaccepting impaired class of claims or interests. With respect to a dissenting class of claims, the "fair and equitable" standard requires, among other things, that the plan contains one of two elements: (i) that each holder of a claim in such class receive or retain property having a value, as of the effective date of a plan, equal to the allowed amount of its claim, or (ii) that no holder of allowed claims or interests in any junior class receive or retain any property on account of such claims or interests. With respect to a dissenting class of interests, the "fair and equitable" standard requires that the plan contain one of two elements. It must provide either (i) that each holder of an interest in the class receive or retain property having a value, as of the effective date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests or (ii) that no holder of an interest in any junior class receive or retain any property on account of such interests. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive a distribution is known as the "absolute priority rule."

In the event that any impaired Class shall fail to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, we reserve the right, subject to any necessary consents to, (i) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or (ii) modify the Plan in accordance with the terms thereof. See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases."

E. *Plan Meets Requirements for Confirmation*

1. *Best Interests of Creditors—Liquidation Analysis*

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code, that is, that the Plan is in the best interests of each Holder of a Claim or Equity Interest in an Impaired Class that has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the "best interests" test requires that the

Bankruptcy Court find that the Plan provides to each non-consenting Holder in such Impaired class a recovery on account of such Holder's Claim or Equity Interest that has a value at least equal to the value of the distribution that each such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

We believe that confirmation of the Plan is in the best interests of the Holders of Claims and Equity Interests because it provides distributions to such Holders having a present value, as of the Effective Date, of not less than the value such Holders likely would receive if the Prospective Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Article IX. "FINANCIAL PROJECTIONS AND VALUATION ANALYSIS" and Article X. "LIQUIDATION ANALYSIS."

To estimate what members of each Impaired Class of Claims or Equity Interests would receive if the Prospective Debtors were liquidated pursuant to chapter 7 of the Bankruptcy Code, we must first determine the aggregate dollar amount that would be available to such member for distribution if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the Prospective Debtors' assets were liquidated by a chapter 7 trustee. The resulting Liquidation Value of the Debtors would consist of the net proceeds from the disposition of assets of the Prospective Debtors, augmented by any cash held by the Prospective Debtors.

We believe that chapter 7 liquidation would result in a diminution in the value to be realized by Holders of Claims and Equity Interests due to, among other factors, (i) the failure to realize the maximum going-concern value of the Prospective Debtors' assets, (ii) the incurrence of additional tax liabilities in the event of a liquidation, (iii) additional costs and expenses involved in the appointment of a chapter 7 trustee and attorneys, accountants and other professionals to assist such trustee in the chapter 7 case, (iv) additional expenses and Claims, some of which would be entitled to priority in payment, which would arise by reason of the liquidation, including Claims resulting from the rejection of unexpired real estate leases and other leases and executory contracts in connection with a cessation of the Prospective Debtors' operations, and (v) the substantial time that would elapse before creditors would receive any distribution in respect of their Claims. Consequently, we believe that the Plan, which provides for the continuation of our business, will provide a greater ultimate return to Holders of Claims and Equity Interests than would a chapter 7 liquidation.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the non-consenting Holders of Claims (if any) in Impaired Classes will receive distributions under the Plan that are at least as great as the distributions that such Holders would receive upon a liquidation of the Prospective Debtors pursuant to chapter 7 of the Bankruptcy Code.

2.     *Feasibility of the Plan*

We believe that confirmation of the Plan is not likely to be followed by a liquidation of the Reorganized Debtors or a need for a further financial reorganization of the Reorganized Debtors. Upon consummation of the Exit Facility and the Rights Offering, the Reorganized Debtors will have sufficient cash to fund distributions under the Plan and to support and meet their ongoing financial needs. The Projections indicate that the Plan as proposed is feasible and that the Reorganized Debtors will be financially viable after confirmation of the Plan.

F.      *Alternatives to Confirmation and Consummation of the Plan*

If we commence the Chapter 11 Cases and the Plan is not subsequently confirmed by the Bankruptcy Court and consummated, the alternatives available to the Debtor would include (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (ii) an out-of-court restructuring involving a dismissal of the proceedings or (iii) liquidation under chapter 7 or chapter 11 of the Bankruptcy Code.  If the Plan is not confirmed, we will decide which alternative to pursue by weighing each of the available options and choosing the alternative or alternatives that are in the best interests of the Prospective Debtors, their stakeholders and other parties in interest.

1.      *Alternative Plans of Reorganization*

If the chapter 11 petitions are filed and Plan is not confirmed, the Debtors (or, if the exclusive period in which to file a plan of reorganization has expired or is terminated by the Bankruptcy Court, any other party in interest) could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization or continuation of our business or an orderly liquidation of our assets.

We believe that the Plan is a significantly more attractive alternative than those alternatives, because it could, among other things, minimize disputes during the reorganization of the Prospective Debtors, significantly shorten the time required to accomplish the reorganization, reduce the expenses of cases under chapter 11 of the Bankruptcy Code, minimize the disruption of our business that would result from a protracted and contested bankruptcy case and ultimately result in a larger distribution to creditors than would other types of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 or chapter 11 of the Bankruptcy Code.

2.      *Dismissal of the Debtors' Chapter 11 Cases*

Dismissal of our Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*.  Upon dismissal of our Chapter 11 Cases, we would lose the protections afforded by the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with our creditors, and possibly resulting in costly and protracted litigation in various jurisdictions.  Most significantly, dismissal of our Chapter 11 Cases would permit secured prepetition lenders that have not been paid in full to foreclose upon the assets that are subject to their liens.  Moreover, the Prepetition Notes would be in default and subject to enforcement in accordance with their respective indentures.  Dismissal also will permit unpaid unsecured creditors to obtain and enforce judgments against us.  We believe that these actions would seriously undermine our ability to obtain financing and could lead ultimately to the liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Therefore, we believe that dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

3. *Liquidation Under Chapter 7 or Chapter 11*

If chapter 11 petitions are filed and no plan of reorganization is confirmed (and in certain other circumstances), the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Prospective Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. A discussion of the potential effects that a chapter 7 liquidation would have on the recovery of Holders of Claims and Equity Interests is set forth under Article X. "LIQUIDATION ANALYSIS." In a liquidation, the assets of the Prospective Debtors would be sold in exchange for cash, securities or other property, which would then be distributed to creditors. In contrast to the Plan (or an alternative reorganization under chapter 11 of the Bankruptcy Code), in which certain creditors would receive debt or equity securities of the Reorganized Debtors and would be subject to the risks associated with holding such securities, in a liquidation creditors might receive cash or other assets which are not subject to those risks. See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases." We believe, however, that liquidation under chapter 7 would result in smaller distributions to Holders of Claims in certain Classes (and, as to certain Classes, no distributions) as compared to those provided for in the Plan because of, among other things, (i) failure to realize the greater going-concern value of the Prospective Debtors' assets and the erosion in value of assets in a chapter 7 case due to the expeditious liquidation required and the "forced sale" atmosphere that would prevail, (ii) administrative expenses involved in the appointment of a trustee and professional advisors to such trustee and (iii) expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations of the Prospective Debtors. In addition, a chapter 7 liquidation is likely to result in substantial litigation and delays in ultimate distributions to creditors. In the event of a chapter 7 liquidation, we believe that there would not be sufficient assets to make any distribution to unsecured creditors, and depending on the value realized in such a liquidation, certain priority claimants, and even secured creditors, also would not be paid in full.

In a liquidation under chapter 11, the Prospective Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, potentially resulting in somewhat greater (but indeterminate) recoveries. Although preferable to a chapter 7 liquidation, we believe that a liquidation under chapter 11 still would not realize the full going-concern value of the Prospective Debtors' assets or the value of any accumulated net operating losses. First, the going-concern value is predicated upon the Debtors continuing in operation. In contrast, liquidation value assumes that the Prospective Debtors would be unable to continue functioning as a going concern and their assets would be sold separately. Second, due to certain provisions of the Tax Code, it is unlikely that the Debtors could take advantage of the Debtors' accumulated NOLs following a liquidation or a sale of the Debtors' assets to an unaffiliated third party. Consequently, the Prospective Debtors believe that a liquidation under chapter 11 is a less attractive alternative to creditors than the Plan because of the likelihood of a greater recovery provided for by the Plan. See Article V. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION" and Article X. "LIQUIDATION ANALYSIS.

## RECOMMENDATION AND CONCLUSION

We believe that confirmation of the Plan is in the best interests of creditors and that the Plan should be confirmed.  We recommend that all Holders of Claims that are entitled to vote on the Plan vote to accept the Plan.

Dated: August 31, 2007

Respectfully Submitted,
REMY WORLDWIDE HOLDINGS, INC.

/s/  John H. Weber
John H. Weber
President

Remy Worldwide Holdings, Inc.
Ballantrae Corporation
Western Reman Industrial, Inc.
HSG I, Inc.
HSG II, Inc.
International Fuel Systems, Inc.
iPower Technologies, Inc.
M. & M. Knopf Auto Parts, L.L.C.
Marine Corporation of America
NABCO, Inc.
Power Investments Marine, Inc.
Power Investments, Inc.
Powrbilt Products, Inc.
Publitech, Inc.
Reman Holdings, L.L.C.
Remy Alternators, Inc.
Remy India Holdings, Inc.
Remy International, Inc.
Remy International Holdings, Inc.
Remy Korea Holdings, L.L.C.
Remy Logistics, L.L.C.
Remy Powertrain, L.P.
Remy Reman, L.L.C.
Remy Sales, Inc.
Remy Inc.
Unit Parts Company
Western Reman Industrial, LLC
World Wide Automotive, L.L.C.
World Wide Automotive Distributors, Inc.

REMY WORLDWIDE HOLDINGS, INC.,
as agent and attorney-in-fact for each of the
foregoing entities

/s/  John H. Weber
John H. Weber
President

[THIS PAGE INTENTIONALLY LEFT BLANK]

## ANNEX I

## List of Prospective Debtors

Remy Worldwide Holdings, Inc.

Remy International, Inc.

Ballantrae Corporation

Western Reman Industrial, Inc.

HSG I, Inc.

HSG II, Inc.

International Fuel Systems, Inc.

iPower Technologies, Inc.

M. & M. Knopf Auto Parts, L.L.C.

Marine Corporation of America

NABCO, Inc.

Power Investments Marine, Inc.

Power Investments, Inc.

Powrbilt Products, Inc.

Publitech, Inc.

Reman Holdings, L.L.C.

Remy Alternators, Inc.

Remy India Holdings, Inc.

Remy International Holdings, Inc.

Remy Korea Holdings, L.L.C.

Remy Logistics, L.L.C.

Remy Powertrain, L.P.

Remy Reman, L.L.C.

Remy Sales, Inc.

Remy Inc.

Unit Parts Company

Western Reman Industrial, LLC

World Wide Automotive, L.L.C.

World Wide Automotive Distributors, Inc.

**Terms**

"9⅜% Subordinated Note Indenture" shall have the meaning ascribed in the Plan.

"9⅜% Subordinated Notes" shall have the meaning ascribed in the Plan.

"11% Subordinated Note Indenture" shall have the meaning ascribed in the Plan.

"11% Subordinated Notes" shall have the meaning ascribed in the Plan.

"2006 10-K" means a Form 10-K, relating to the Company, for the fiscal year ended December 31, 2006.

"2010 Long-Term Incentive Cash Bonus Plan" means that certain 3-year deferred cash bonus plan entered into in connection with the New Management Incentive Plan for the benefit of the New Employment Agreement Officers. A form of the 2010 Long-Term Incentive Cash Bonus Plan, is attached hereto as Exhibit F.

"Administrative Claims" shall have the meaning ascribed in the Plan.

"Adjusted EBITDAR" means net income (loss) from continuing operations before interest expense, income taxes, minority interest and income from unconsolidated subsidiaries, cumulative effect of change in accounting principles, depreciation, amortization, restructuring and special charges in 2003 (and includes an adjustment for impairment).

"Advisory Agreement" shall have the meaning ascribed in the Plan.

"AFR" means the applicable federal rate.

"AICPA" means the American Institute of Certified Public Accountants.

"Allowed" shall have the meaning ascribed in the Plan.

"Alternate Plan" shall have the meaning ascribed in the CVC Settlement Agreement.

"Amended and Restated Annual Incentive Bonus Plan" means the Annual Incentive Bonus Plan, as such plan is amended in connection with the adoption of the New Management Incentive Plan. A form of the Amended and Restated Annual Incentive Bonus Plan is attached hereto as Exhibit F.

"AMT" means alternative minimum tax.

"ASOP" means DTC's automated subscription offer program.

"Assets" shall have the meaning ascribed in the Plan.

"Assumption Motion" shall have the meaning ascribed in the CVC Settlement Agreement.

"Available Reorganized RII Common Stock" shall have the meaning ascribed in the Plan.

"Backstop Commitment Agreement" shall have the meaning ascribed in the Plan. A copy of the Backstop Commitment Agreement, as of the date hereof, is attached hereto as Exhibit C.

"Ballot" shall have the meaning ascribed in the Plan.

"Bankruptcy Code" shall have the meaning ascribed in the Plan.

"Bankruptcy Court" shall have the meaning ascribed in the Plan.

"Bankruptcy Rules" shall have the meaning ascribed in the Plan.

"Barclays" means Barclays Bank PLC.

"BB&T" means Branch Banking and Trust Company.

"Business Day" shall have the meaning ascribed in the Plan.

"Cash" shall have the meaning ascribed in the Plan.

"Caterpillar" means Caterpillar, Inc.

"Caterpillar Outsourcing Agreements" means those certain agreements by and between RII and certain of its affiliates and Caterpillar and certain of its affiliates that govern the sale and transfer of RII's starter and alternator remanufacturing business and the prospective exclusive remanufacturing relationship related thereto, including that certain Amended and Restated Asset Purchase Agreement, dated June 25, 2007, and the Amended and Restated Remanufacturing Supply Agreement, dated June 25, 2007, each as amended, modified or supplemented from time to time, together with all other agreements entered into and documents delivered in connection therewith.

"Causes of Action" shall have the meaning ascribed in the Plan.

"Chapter 11 Cases" shall have the meaning ascribed in the Plan.

"Change of Control" shall have the meaning ascribed in the Reorganized RII Certificates of Designation.

"Claim" shall have the meaning ascribed in the Plan.

"Class" shall have the meaning ascribed in the Plan.

"COD" means cancellation of indebtedness.

"Committed Purchasers" shall have the meaning ascribed in the Plan.

"Committee Professionals" shall have the meaning ascribed in the Plan.

"Confirmation Certificate" shall have the meaning ascribed in the Plan.

"Confirmation Date" shall have the meaning ascribed in the Plan.

"Confirmation Hearing" shall have the meaning ascribed in the Plan.

"Confirmation Hearing Notice" means a notice of the Confirmation Hearing.

"Confirmation Order" shall have the meaning ascribed in the Plan.

"Consent Fee" shall have the meaning ascribed in the Plan.

"Court Square" shall have the meaning ascribed in the Plan.

"Court Square Owner" shall have the meaning ascribed in the CVC Settlement Agreement.

"Covered Persons" shall have the meaning ascribed in the Plan.

"CSA LLC" means Court Square Advisor, LLC.

"CVC Noteholder Parties" or "CVC Noteholder Party" shall have the meanings ascribed in the Plan.

"CVC Payment" means $4 million in cash owed under the terms and conditions of the CVC Settlement Agreement.

"CVC Released Debtor Parties" shall have the meaning ascribed in the Plan.

"CVC Released Noteholder Parties" shall have the meaning ascribed in the Plan.

"CVC Released Parties" shall have the meaning ascribed in the Plan.

"CVC Releasors" shall have the meaning ascribed in the Plan.

"CVC Settlement Agreement" shall have the meaning ascribed in the Plan.  A copy of the CVC Settlement Agreement, as of the date hereof, is attached hereto as Exhibit K.

"CVC Settlement Amount" shall have the meaning ascribed in the Plan.

"CVCEP LP" means Citicorp Venture Capital Equity Partners, L.P.

"Daily Liquidation Preference Amount" shall have the meaning ascribed in the Reorganized RII Certificates of Designation.

"DCF" means discounted cash flow.

"Debtor" shall have the meaning ascribed in the Plan.

"Delaware General Corporation Law" means the General Corporation Law of the State of Delaware, as it may be amended or modified from time to time.

"DIP Agent" shall have the meaning ascribed in the Plan.

"DIP Collateral" means the DIP Term Loan Collateral and the DIP Revolver Collateral.

"DIP Credit Agreement" shall have the meaning ascribed in the Plan.

"DIP/Exit Commitment Letter" shall have the meaning ascribed in the Plan. A copy of the DIP/Exit Commitment Letter, as of the date hereof, is attached hereto as Exhibit I.

"DIP/Exit Fee Letter" means that certain fee letter between us and Barclays Capital entered into in connection with the DIP/Exit Commitment Letter, as amended, modified or supplemented from time to time.

"DIP Facility" means the debtor-in-possession financing provided under the DIP Credit Agreement.

"DIP L/C Facility" means the letter of credit sub-facility to be provided under the DIP Credit Agreement.

"DIP Maturity Date" means the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding extensions of credit under the DIP Facility.

"DIP Revolver Collateral" means the collateral securing the DIP Revolving Credit Facility.

"DIP Revolving Credit Facility" means the $125 million asset based revolving credit facility to be provided under the DIP Credit Agreement.

"DIP Term Loan Collateral" means the collateral securing the DIP Term Loan Facility.

"DIP Term Loan Facility" means the $100 million first-lien term loan B to be provided under the DIP Credit Agreement.

"Disbursing Agent" shall have the meaning ascribed in the Plan.

"Disputed" shall have the meaning ascribed in the Plan.

"DTC" means The Depository Trust Company.

"EBITDA" means earnings before interest, taxes, depreciation and amortization.

"Effective Date" shall have the meaning ascribed in the Plan.

"Entity" shall have the meaning ascribed in the Plan.

"Equity Interests" shall have the meaning ascribed in the Plan.

"Estates" shall have the meaning ascribed in the Plan.

"Exchange Act" shall have the meaning ascribed in the Plan.

"Exchange Transaction" shall have the meaning ascribed in the CVC Settlement Agreement.

"Exit Collateral" means the Exit Term Loan Collateral and the Exit Revolver Collateral.

"Exit Facility" shall have the meaning ascribed in the Plan.

"Exit Facility Agent" shall have the meaning ascribed in the Plan.

"Exit Facility Documents" shall have the meaning ascribed in the Plan.

"Exit L/C Facility" means the letter of credit sub-facility to be provided under the Exit Facility Documents.

"Exit Revolver Collateral" means the collateral securing the Exit Revolving Credit Facility.

"Exit Revolving Credit Facility" means the $125 million asset based revolver to be provided under the Exit Facility Documents.

"Exit Term Loan Collateral" means the collateral securing the First-Lien Term Loan Facility.

"Facilities" means the DIP Facility and the Exit Facility.

"FBG" means Financial Balloting Group, LLC.

"Fifth Plan Support Amendment" means that certain Fifth Amendment to Plan Support Agreement, dated as of August 1, 2007, by and among certain of the Plan Support Parties, RWHI, RII and certain of the affiliates of RWHI and RII.

"File," "Filed" or "Filing" shall have the meaning ascribed in the Plan.

"Final Allocation" means, with respect to any Offeree that has elected to participate in the Rights Offering, the Subscription Rights exercised by such Offeree in accordance with the terms of this Solicitation and Disclosure Statement.

"Final Order" shall have the meaning ascribed in the Plan.

"First-Lien Term Loan Facility" means the $150 million first-lien term loan B to be provided under the Exit Facility Documents.

"Floating Rate Secured Note Claims" shall have the meaning ascribed in the Plan.

"Floating Rate Secured Notes" shall have the meaning ascribed in the Plan.

"FNSO" means Fidelity National Special Opportunities, Inc.

"Forbearance Agreement" means that certain Forbearance Agreement, dated as of April 15, 2007, by and between RII and certain Impaired Noteholders party thereto.

"Fresh Start Accounting" means accounting treatment consistent with the principles contained in the American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code."

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time

"General Unsecured Claims" shall have the meaning ascribed in the Plan.

"GM" means General Motors Corporation.

"GM Agreements" shall have the meaning ascribed in the Plan.

"GM Supply Contracts" means those existing purchase orders that convert to long-term contracts pursuant to the terms of the GM Agreements.

"Holder" means the beneficial holder of any Claim, Equity Interest or Prepetition Note.

"Houlihan Retention Agreement" means that certain letter agreement dated, July 1, 2007, by and between Houlihan, RII and Akin Gump Strauss Hauer & Feld LLP (as counsel to the ad hoc committee), as amended, modified or supplemented from time to time, together with all other agreements entered into and documents delivered in connection therewith.

"IC Acknowledgement" shall have the meaning ascribed in the Plan Support Agreement.

"Impaired" shall have the meaning ascribed in the Plan.

"Impaired Noteholders" means, collectively, Holders of the Impaired Notes.

"Impaired Notes" means, collectively, the Senior Notes and the Subordinated Notes.

"Informal Committee" shall have the meaning ascribed in the Plan.

"Intercompany Claims" shall have the meaning ascribed in the Plan.

"Intercreditor Agreement" shall have the meaning ascribed to the term "Intercreditor and Subordination Agreement" in the Plan. A form of Intercreditor Agreement is attached hereto as Exhibit H.

"IRS" means the Internal Revenue Service.

"July 31 Waiver" means that certain Fifth Limited Waiver to the Third Amended and Restated Loan and Security Agreement, dated as of July 31, 2007, granted by certain lenders under the Prepetition Credit Agreement for the benefit of the borrowers thereunder.

"June 20 Waiver" means that certain Fourth Limited Waiver to the Third Amended and Restated Loan and Security Agreement, dated as of June 20, 2007, granted by certain lenders under the Prepetition Credit Agreement for the benefit of the borrowers thereunder.

"LIBOR" means the applicable London Interbank Offered Rate.

"Lien" shall have the meaning ascribed in the Plan.

"Limited Restricted Holders" means H Partners LP, Corriente Master Fund, LP, Hoak & Co., Group G Capital Partners, LLC, Ore Hill Hub Fund Ltd., Third Point LLC and Joshua Tree Capital Partners, LP.

"Limited Waivers" means those certain waivers, dated as of April 16, 2006, May 15, 2006, June 20, 2006 and July 31, 2007, each granted by the lenders under the Prepetition Credit Agreement in favor of the borrowers thereunder.

"Liquidation Analysis" means the liquidation analysis prepared by the Company and described in Article X hereof.

"Liquidation Preference" shall have the meaning ascribed in the Reorganized RII Certificates of Designation.

"Liquidation Value" means the aggregate dollar amount that would be available for distribution if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the Debtors' assets were liquidated by a chapter 7 trustee.

"Long-Term Incentive Period" means the period covering Reorganized RII's fiscal years 2008 through 2010.

"Mandatory Exchange Date" shall have the meaning ascribed in the Plan.

"Master Ballot" means the form of master ballot distributed in connection with this Solicitation and Disclosure Statement.

"May 15 Waiver" means that certain Third Limited Waiver to the Third Amended and Restated Loan and Security Agreement, dated as of May 15, 2006, granted by certain lenders under the Prepetition Credit Agreement for the benefit of the borrowers thereunder.

"New Constituent Documents" shall have the meaning ascribed in the Plan.

"New Employment Agreement" means agreements consistent with the term sheets therefor, attached hereto as Exhibited F.

"New Employment Agreement Officers" shall have the meaning ascribed in the Plan.

"New Management Incentive Plan" shall have the meaning ascribed in the Plan. The forms and term sheet attached hereto as Exhibit F reflect the proposed terms of the New Management Incentive Plan.

"New Securities" means, collectively, the New Third-Lien Notes, the Reorganized RII Preferred Stock and the Reorganized RII Common Stock.

"New Third-Lien Note Indenture" shall have the meaning ascribed in the Plan.

"New Third-Lien Notes" shall have the meaning ascribed in the Plan.

"NOLs" means net operating losses, for federal income tax purposes, determined pursuant to the provisions of the Tax Code.

"Nominee" means, with respect to any beneficial owner of Impaired Notes, such Impaired Noteholder's broker, bank or other nominee, or such person's proxy holder or agent.

"Non-Debtor Foreign Affiliates" means the foreign affiliates of the Prospective Debtors.

"Non-Severable Obligations" shall have the meaning ascribed in the CVC Settlement Agreement.

"OE" means original equipment.

"OEM" means original equipment manufacturer.

"Offerees" means all Holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims as of the Subscription Record Date.

"OID" means original issue discount.

"Other Priority Claims" shall have the meaning ascribed in the Plan.

"Other Secured Claims" shall have the meaning ascribed in the Plan.

"Outside Date" shall have the meaning ascribed in the Plan.

"Owner Shift" shall have the meaning ascribed in the CVC Settlement Agreement.

"Person" shall have the meaning ascribed in the Plan.

"Petition Date" shall have the meaning ascribed in the Plan.

"PIK" means payment in kind.

"Plan" shall have the meaning ascribed in the Plan. A copy of the Plan, as of the date hereof, is attached hereto as Exhibit A.

"Plan Documents" shall have the meaning ascribed in the Plan.

"Plan Effective Date" shall have the meaning ascribed in the CVC Settlement Agreement.

"Plan Supplement" shall have the meaning ascribed in the Plan.

"Plan Support Agreement" shall have the meaning ascribed in the Plan. A redacted copy of the Plan Support Agreement, as of the date hereof, is attached hereto as Exhibit B.

"Plan Support Party" shall have the meaning ascribed in the Plan.

"PP&E" means property, plant and equipment.

"Prepackaged Bankruptcy Case" shall have the meaning ascribed in the CVC Settlement Agreement.

"Prepackaged Plan" shall have the meaning ascribed in the CVC Settlement Agreement.

"Prepetition Agent" shall have the meaning ascribed in the Plan.

"Prepetition Credit Agreement" means the Third Amended and Restated Loan and Security Agreement, dated as of December 27, 2005, by and among RII and certain of its subsidiaries, as borrowers, Wachovia Capital Finance Corporation (Central) and the other parties thereto, as amended, modified or supplemented from time to time, together with all other agreements entered into and documents delivered in connection therewith.

"Prepetition Equity Agreements" shall have the meaning ascribed in the Plan.

"Prepetition Indenture Trustees" shall have the meaning ascribed in the Plan.

"Prepetition Indentures" shall have the meaning ascribed in the Plan.

"Prepetition Noteholders" means Holders of the Prepetition Notes.

"Prepetition Notes" shall have the meaning ascribed in the Plan.

"Prepetition Revolver" means the revolving credit facility provided under the Prepetition Credit Agreement.

"Prepetition Revolving Lenders" means the lenders under the Prepetition Revolver.

"Prepetition Term Lenders" means the lenders under the Prepetition Term Loan.

"Prepetition Term Loan" means the term loan provided under the Prepetition Credit Agreement.

"Priority Tax Claims" shall have the meaning ascribed in the Plan.

"Professionals" shall have the meaning ascribed in the Plan.

"Projection Period" means fiscal years 2007 through 2011.

"Projections" means the financial projections prepared by the Company and described in Article IX hereof.

"Pro-Rata Share" shall have the meaning ascribed in the Plan.

"Prospective Debtors" means the prospective Debtors as defined in Annex II.

"PSLRA" means the Private Securities Litigation Reform Act of 1995, as may be amended or modified from time to time.

"Registration Rights Agreement" shall have the meaning ascribed in the Plan. A term sheet reflecting then proposed terms of the Registration Rights Agreement, is attached hereto as Exhibit E.

"Releasees" shall have the meaning ascribed in the Plan.

"Released Noteholder Parties" shall have the meaning ascribed in the Plan.

"Releasors" shall have the meaning ascribed in the Plan.

"Reorganized Debtor" shall have the meaning ascribed in the Plan.

"Reorganized RII" shall have the meaning ascribed in the Plan.

"Reorganized RII Board of Directors" shall have the meaning ascribed in the Plan.

"Reorganized RII Certificate of Incorporation" shall have the meaning ascribed in the Plan. A copy of the Reorganized RII Certificate of Incorporation is attached hereto as Exhibit D.

"Reorganized RII Certificates of Designation" shall have the meaning ascribed in the Plan. Copies of the Reorganized RII Certificates of Designation are attached hereto as Exhibit L.

"Reorganized RII Common Stock" shall have the meaning ascribed in the Plan.

"Reorganized RII Constituent Documents" shall have the meaning ascribed in the Plan.

"Reorganized RII Preferred Stock" shall have the meaning ascribed in the Plan.

"Reorganized RII Restricted Stock Agreements" means agreements consistent with the term sheets therefor attached hereto as Exhibit F.

"Reorganized RII Series A Preferred Stock" shall have the meaning ascribed in the Plan.

"Reorganized RII Series B Preferred Stock" shall have the meaning ascribed in the Plan.

"Reorganized RII Stock" means, collectively, the Reorganized RII Preferred Stock and the Reorganized RII Common Stock.

"Reorganized Subsidiary Debtors' Boards of Directors" shall have the meaning ascribed in the Plan.

"Requisite Committed Purchasers" shall have the meaning ascribed in the Plan.

"Requisite Plan Support Parties" shall have the meaning ascribed in the Plan.

"Requisite Senior Note Committed Purchasers" shall have the meaning ascribed in the Plan.

"Requisite Subordinated Note Committed Purchasers" shall have the meaning ascribed in the Plan.

"Restricted Stock" means the shares of Reorganized RII Common Stock to be granted pursuant to the Reorganized RII Restricted Stock Agreements.

"Restructuring Transactions" shall have the meaning ascribed in the Plan.

"Retention Agreements' means the Rothschild Retention Agreement and the Houlihan Retention Agreement.

"Rights Offering" shall have the meaning ascribed in the Plan.

"RII" shall have the meaning ascribed in the Plan.

"RII Equity Interests" shall have the meaning ascribed in the Plan.

"Rothschild" means Rothschild, Inc.

"Rothschild Retention Agreement" means that certain letter agreements dated as of November 9, 2006, by and between Rothschild, RII and the direct and indirect subsidiaries of RII, as amended, modified or supplemented from time to time, together with all other agreements entered into and documents delivered in connection therewith.

"RWHI" shall have the meaning ascribed in the Plan.

"RWHI Equity Interests" shall have the meaning ascribed in the Plan.

"RWHI Interest" means an Equity Interest (as defined in the CVC Settlement Agreement) in RWHI.

"SEC" means the Securities and Exchange Commission.

"Second-Lien Term Loan Facility" means the second-lien term loan facility of $55 million to be provided under the Exit Facility Documents.

"Secured Credit Agreement" shall have the meaning ascribed in the Plan.

"Secured Credit Agreement Claims" shall have the meaning ascribed in the Plan.

"Securities Act" shall have the meaning ascribed in the Plan.

"Senior Exchange" means the exchange by Holders of Senior Notes of such notes for New Third-Lien Notes, Cash and Senior Note Rights.

"Senior Note Backstop Commitment" shall have the meaning ascribed in the Plan.

"Senior Note Backstop Fee" shall have the meaning ascribed in the Plan.

"Senior Note Cash" shall have the meaning ascribed in the Plan.

"Senior Note Claims" shall have the meaning ascribed in the Plan.

"Senior Note Committed Purchaser" shall have the meaning ascribed in the Plan.

"Senior Note Indenture" shall have the meaning ascribed in the Plan.

"Senior Note Interest Amount" shall have the meaning ascribed in the Plan.

"Senior Note Preferred Shares" shall have the meaning ascribed in the Plan.

"Senior Note Principal Amount" shall have the meaning ascribed in the Plan.

"Senior Note Rights" shall have the meaning ascribed in the Plan.

"Senior Noteholders" means Holders of Senior Notes.

"Senior Notes" shall have the meaning ascribed in the Plan.

"Shearman & Sterling" means Shearman & Sterling LLP.

"Solicitation" means the solicitation of votes to accept or reject the Plan pursuant to this Solicitation and Disclosure Statement.

"Solicitation and Disclosure Statement" means this Solicitation and Disclosure Statement.

"Steering Committee" shall have the meaning ascribed in the Plan.

"STRH Agreement" shall have the meaning ascribed in the Plan.

"Subordinated Exchange" means the exchange by the Holders of Subordinated Notes of such notes for Available Reorganized RII Common Stock and Subordinated Note Rights.

"Subordinated Note Backstop Commitment" shall have the meaning ascribed in the Plan.

"Subordinated Note Backstop Fee" shall have the meaning ascribed in the Plan.

"Subordinated Note Claims" shall have the meaning ascribed in the Plan.

"Subordinated Note Committed Purchasers" shall have the meaning ascribed in the Plan.

"Subordinated Note Guaranty" shall have the meaning ascribed in the Plan.

"Subordinated Note Rights" shall have the meaning ascribed in the Plan.

"Subordinated Noteholders" means Holders of Subordinated Notes.

"Subordinated Notes" shall have the meaning ascribed in the Plan.

"Subordinated Securities Claims" shall have the meaning ascribed in the Plan.

"Subscription Agent" means FBG.

"Subscription Approval Order" shall have the meaning ascribed in the Plan.

"Subscription Commencement Date" shall have the meaning ascribed in the Plan.

"Subscription Expiration Date" shall have the meaning ascribed in the Plan.

"Subscription Form" means the form to be used by an Offeree to exercise its Subscription Rights.

"Subscription Purchase Price" means, for each Holder of Subscription Rights, such Holder's Final Allocation multiplied by $1,000.

"Subscription Record Date" shall have the meaning ascribed in the Plan.

"Subscription Rights" shall have the meaning ascribed in the Plan.

"Surviving Equity Interests" shall have the meaning ascribed in the Plan.

"Tax Code" means the Internal Revenue Code of 1986, as may be amended or modified from time to time.

"Term Loan Facilities" means the First-Lien Term Loan Facility and the Second-Lien Term Loan Facility.

"Term Sheet" means that certain term sheet attached to the Plan Support Agreement, as amended from time to time.

"Transfer" or "Transferable" means, with respect to any security or the right to receive a security or to participate in any offering of any security including the Rights Offering (each a "Security"), the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in, or other disposition of such Security or the Beneficial Ownership (as defined below) thereof, the offer to make such a sale, transfer, constructive sale, or other disposition, and each option, agreement, arrangement, or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing. The term "constructive sale" for purposes of this definition means a short sale with respect to such Security, entering into or acquiring an offsetting derivative contract with respect to such Security, entering into or acquiring a futures or forward contract to deliver such security, or entering into any transaction that has substantially the same effect as any of the foregoing. The term "Beneficially Owned" or "Beneficial Ownership" as used in this definition shall include, with respect to any Security, the beneficial ownership of such Security by a person and by any direct or indirect subsidiary of such person.

"Unimpaired" shall have the meaning ascribed in the Plan.

"Voting Deadline" means 5:00 p.m. Prevailing Eastern Time, on October 1, 2007, unless extended.

"Voting Instructions" means the voting instructions described in Article I hereof, together with the instructions contained in the Ballot and Master Ballot.

"Voting Record Date" means the close of business on August 29, 2007, unless extended.

[THIS PAGE INTENTIONALLY LEFT BLANK]