**EXHIBIT C**
**to**
**Disclosure Statement:**
**Backstop Commitment Agreement**

[THIS PAGE INTENTIONALLY LEFT BLANK]

Fidelity National Special Opportunities, Inc.
Ore Hill Hub Fund Ltd.
Third Point LLC
Group G Capital Partners, LLC
H Partners LP
Hoak & Co.
Corriente Master Fund, LP
Joshua Tree Capital Management, LLC


August 24, 2007



Remy International, Inc.
2902 Enterprise Drive
Anderson, Indiana 46013
Attention: John Weber

Re:     Commitment to Purchase New Preferred Stock

Gentlemen:

Remy Worldwide Holdings, Inc. ("RWHI"), Remy International, Inc. ("RII") and the subsidiaries of RWHI and RII (together, the "Remy Subsidiaries") that are signatories hereto (collectively, "Remy" or the "Remy Parties" and each, individually, a "Remy Party"), intend to engage in a reorganization (the "Reorganization") by soliciting votes for a joint pre-packaged plan of reorganization pursuant to Section 3(a)(9) of the Securities Act of 1933, as amended (the "Securities Act"), and Sections 1125 and 1145 of chapter 11 of title 11, of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). Reference is made to the Plan Support Agreement (as amended, modified, supplemented or extended from time to time, the "Plan Support Agreement") dated as of June 15, 2007, among the Remy Parties and the Plan Support Parties signatory thereto, the term sheet (as amended, modified, supplemented or extended from time to time, the "Term Sheet") attached as Exhibit A thereto and the joint pre-packaged plan of reorganization (as amended, modified and supplemented from time to time in accordance with and subject to the terms thereof, the "Plan"), a copy of which is attached as Exhibit [__] to Remy's Solicitation and Disclosure Statement dated [__], 2007. Terms used in this Backstop Commitment Agreement (this "Agreement") with initial capital letters that are not otherwise defined shall have the meanings ascribed to such terms in the Plan.

Remy anticipates commencing the 3(a)(9) solicitation and then filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on behalf of each of the Remy Parties in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

The Plan provides, among other things, that each holder of an Allowed Subordinated Note Claim, as of the record date set therefor, shall be granted rights (the

"Subscription Rights") entitling such holder to subscribe for up to its pro rata share of 60,000 shares of Reorganized RII Series B Preferred Stock having an initial aggregate liquidation preference as of the Effective Date of $60 million pursuant to the Rights Offering (defined below). All such holders shall be required to pay cash in an amount up to an aggregate of $60 million to exercise their Subscription Rights (i.e., $1,000.00 per share of Reorganized RII Series B Preferred Stock). Pursuant to the Plan, each holder of an Allowed Senior Note Claim, as of the record date set therefor, shall be granted Subscription Rights entitling such holder to subscribe for up to its pro rata share of 25,000 shares of Reorganized RII Series A Preferred Stock having an initial aggregate liquidation preference as of the Effective Date of $25 million pursuant to the Rights Offering.

To exercise their Subscription Rights, holders of Allowed Senior Note Claims, first, in lieu of paying cash therefor, shall forego a portion of the cash distributions contemplated to be made to such holders under the Plan, on a dollar-for-dollar basis, and, second, in addition and only if necessary, they also shall pay cash (or set-off fees payable to them pursuant to Section 3 hereof, if applicable) in an amount such that Reorganized RII receives an aggregate of $25 million in total value from holders of Allowed Senior Note Claims in the Rights Offering (i.e., $1,000.00 per share of Reorganized RII Series A Preferred Stock). All Holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims shall have the right, but not the obligation, to participate in the Rights Offering as provided in the Plan and the Subscription Approval Order.

1. The Commitments.

Subject to the terms and conditions hereof, (a) Fidelity National Special Opportunities, Inc., Joshua Tree Capital Management, LLC, H Partners LP, Hoak & Co., Corriente Master Fund, LP or, in each case, one or more of their respective affiliates (the "Subordinated Note Committed Purchasers"), agree to purchase, pursuant to the rights offering being made pursuant to the Plan and the Subscription Approval Order to Holders of Allowed Subordinated Note Claims (the "Subordinated Noteholder Rights Offering") (i) on a ratable basis in accordance with the allocation attached as Exhibit A hereto, severally and not jointly, up to the first 50,000 shares of Reorganized RII Series B Preferred Stock having an initial aggregate liquidation preference as of the Effective Date of $50 million and (ii) on a ratable basis in accordance with the allocation attached as Exhibit B hereto, severally and not jointly, up to the next 10,000 shares of Reorganized RII Series B Preferred Stock having an initial aggregate liquidation preference as of the Effective Date of $10 million, in each case offered pursuant to the rights offering being made pursuant to the Plan and the Subscription Approval Order to Holders of Allowed Subordinated Note Claims and (b) Ore Hill Hub Fund Ltd., Third Point LLC, Group G Capital Partners, LLC or, in each case, one or more of their affiliates (collectively, the "Senior Note Committed Purchasers") agree to purchase, on a ratable basis in accordance with the allocation attached as Exhibit A hereto, severally and not jointly, up to 25,000 shares of Reorganized RII Series A Preferred Stock having an initial aggregate liquidation preference as of the Effective Date of $25 million offered pursuant to the rights offering being made pursuant to the Plan and the Subscription Approval Order to Holders of Allowed Senior Note Claims (the "Senior Noteholder Rights Offering" and, together with the

Subordinated Noteholder Rights Offering, the "Rights Offering"), in both cases at the same price per share as provided in the Plan, it being understood that such commitments shall cover only those shares of Reorganized RII Preferred Stock that are not purchased in the Subordinated Noteholder Rights Offering or the Senior Noteholder Rights Offering, as the case may be (the agreements described in clauses (a) and (b) of this Section 1 shall be referred to herein collectively as the "Backstop Commitments"). The Subordinated Note Committed Purchasers shall fulfill their Backstop Commitment hereunder, on the terms and conditions described herein, by paying in cash for the shares of Reorganized RII Series B Preferred Stock that are not purchased in the Subordinated Noteholder Rights Offering. The Senior Note Committed Purchasers shall fulfill their Backstop Commitment hereunder, on the terms and conditions described herein, in payment for the shares of Reorganized RII Series A Preferred Stock not purchased in the Senior Noteholder Rights Offering, first by forgoing, on a dollar-for-dollar basis, a portion of the cash distributions to be paid to such holders by Remy under the Plan in partial satisfaction of their Allowed Senior Note Claims and, second, in addition and only if necessary, by paying an amount of cash (or set-off of fees pursuant to Section 3 hereof, if applicable) such that the total value received by Reorganized RII in the Senior Noteholder Rights Offering shall be $25 million. The Senior Note Committed Purchasers together with the Subordinated Note Committed Purchasers are referred to in this Agreement collectively as the "Committed Purchasers" and each individually as a "Committed Purchaser".

2. The Closing.

(a) The delivery of and payment for the Reorganized RII Preferred Stock purchased hereunder and the consummation of the Rights Offering shall take place at the offices of Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022 on the Effective Date (the "Closing").

(b) Upon Closing:

(i) the Committed Purchasers, in satisfaction of each of their Backstop Commitments, shall pay by wire transfer or, with respect to the Senior Note Committed Purchasers only, by offset against cash distributions to be made to them under the Plan and, if necessary, by wire transfer, the purchase price payable in consideration of any shares of Reorganized RII Series Preferred Stock purchased by each of them pursuant to Section 1(a) or (b), which shall be equal to $1,000.00 per share of Reorganized RII Preferred Stock;

(ii) Remy shall deliver to each of the Committed Purchasers (or their designees) shares of Reorganized RII Preferred Stock or, if the shares of Reorganized RII Preferred Stock are in global form, The Depositary Trust Company ("DTC") shall credit the account of the participating organizations in DTC's system designated by such Committed Purchaser with shares or portions of the global certificate representing the Reorganized RII Preferred Stock (which global certificate shall be issued to DTC or its nominee) purchased by such Committed Purchaser pursuant to its Backstop Commitment, as previously allocated by written notice of such Committed Purchaser to Remy;

(iii)    Remy shall deliver all certificates, instruments and other documents required to satisfy their conditions set forth in this Agreement;

(iv)    Remy shall pay the reasonable out-of-pocket fees, costs and expenses incurred in connection with this Agreement and the Rights Offering by each of the Committed Purchasers, including, without limitation, if not paid previously, reasonable fees and expenses of one law firm acting on behalf of the Committed Purchasers as a group, which shall be Akin Gump Strauss Hauer & Feld LLP (in its capacity as counsel to the ad hoc committee of holders of the Notes, which has authorized such firm to assist the Committed Purchasers hereunder) (all of the fees, costs and expenses set forth in this Section 2(b)(iv), collectively "Expenses"); and

(v)    Remy shall pay the Senior Notes Backstop Fee (defined below) and the Subordinated Notes Backstop Fee (defined below) to each of the Senior Note Committed Purchasers and the Subordinated Note Committed Purchasers, respectively, in accordance with Section 3.

3.    Consideration for the Backstop Commitments.

In consideration for the Backstop Commitments, upon the Effective Date (a) the Subordinated Note Committed Purchasers shall be paid an aggregate fee equal to (i) on a ratable basis in accordance with Exhibit A, in cash by wire transfer, $1,000,000 (One Million Dollars) (i.e., 2% (two percent) of $50 million) plus (ii) on a ratable basis in accordance with Exhibit B, in cash by wire transfer, $200,000 (Two Hundred Thousand Dollars) (i.e., 2% (two percent) of $10,000,000) (together, the "Subordinated Notes Backstop Fee") and (b) the Senior Note Committed Purchasers shall be paid a fee equal to, on a ratable basis in accordance with Exhibit A, in cash by wire transfer, $500,000 (Five Hundred Thousand Dollars) (i.e., 2% (two percent) of $25 million) (the "Senior Notes Backstop Fee", together with the Subordinated Notes Backstop Fee, the "Backstop Fee"). Each of the Committed Purchasers may, by written notice to the Remy Parties in advance of the Effective Date, credit their portion of the Backstop Fee against any cash payments such Committed Purchaser is required to make pursuant to this Agreement.

4.    Representations and Warranties.

(a)    Each of the Remy Parties hereby jointly and severally represents and warrants as of the date of this Agreement, and, other than those representations and warranties that speak only as of a specified date, as of the Closing, to each of the Committed Purchasers that:

(i)    Such Remy Party is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, except where the failure to be in good standing would not reasonably be expected to have a Material Adverse Effect (as defined herein), and has all requisite corporate or other power and authority to own, lease and operate its properties and assets and to conduct its business as now being conducted, subject to the restrictions that may result solely from its status as a debtor-in-possession under the Bankruptcy Code. Such Remy Party is duly qualified to transact business in

each jurisdiction in which the nature of property owned or leased by it or the conduct of its business requires it to be so qualified, except where the failure to be duly qualified to transact business, would not reasonably or be expected to have a Material Adverse Effect;

(ii)     Each of such Remy Party's subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, except where the failure to be in good standing would not reasonably be expected to have a Material Adverse Effect. All of the outstanding shares of capital stock of each of RII's subsidiaries are duly authorized, validly issued, fully paid and nonassessable and, with respect to the direct and indirect wholly owned domestic subsidiaries of any Remy Party, all such shares are owned by RII or another wholly owned subsidiary of RII free and clear of all liens, preemptive rights, rights of first refusal, subscription and similar rights that would not be cancelled and extinguished under the Plan on the Effective Date;

(iii)     Such Remy Party has, or shall have on the filing date thereof, the requisite corporate or other power and authority to execute and deliver this Agreement, the Plan, the Solicitation and Disclosure Statement and, subject to the approval of the Bankruptcy Court, the definitive documents necessary or appropriate to consummate the transactions contemplated hereby and thereby, and, as applicable, to file such documents with the Bankruptcy Court and, subject to the approval of the Bankruptcy Court, consummate the transactions contemplated hereby and thereby. The formulation, preparation and, as applicable, filing of this Agreement, the Plan, the Solicitation and Disclosure Statement and such definitive documents have been, or shall have been on the filing date thereof, (A) duly and validly authorized by all necessary corporate or other action on the part of such Remy Party and (B) duly and validly executed and delivered by such Remy Party. Upon the entry of the Confirmation Order, the Plan shall constitute a valid and binding obligation of such Remy Party enforceable against it in accordance with its terms;

(iv)     Subject to entry of the Confirmation Order, and except for the applicable requirements of the Securities Act and any applicable state and foreign securities laws, the Bankruptcy Code, the Confirmation Order and the Plan (collectively, the "Applicable Requirements"), (A) the execution and delivery of this Agreement, the Plan and each of the definitive documents necessary to effect the Reorganization by such Remy Party, as applicable, do not and shall not (1) violate any provision of the articles of incorporation or by-laws or other organizational documents of such Remy Party or (2) conflict with, violate, constitute a breach of or result in the creation of a lien or any other encumbrance against, such Remy Party or its properties pursuant to any material contract, agreement or instrument by which such Remy Party or any of its subsidiaries is bound or any judgment, order, decree, law, statute, rule, regulation or other judicial or governmental restriction to which such Remy Party or any of its subsidiaries is subject, other than such violations, conflicts or breaches that have not had nor would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and (B) the performance of this Agreement, the Plan and each of the definitive documents necessary to effect the Reorganization by such Remy Party, as applicable, and the consummation by such Remy Party of the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof shall not (1) violate any provision of the articles of incorporation or by-laws or other organizational documents of such Remy Party as such

documents are proposed to be amended pursuant to the Plan or (2) conflict with, violate, constitute a breach of or result in the creation of a lien or any other encumbrance against, such Remy Party or its properties pursuant to any material contract, agreement or instrument by which such Remy Party or any of its subsidiaries shall be bound or any judgment, order, decree, law, statute, rule, regulation or other judicial or governmental restriction to which such Remy Party or any of its subsidiaries shall be subject in each case immediately after the Effective Date, other than such violations, conflicts or breaches that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(v)     Subject to the filing of the Reorganized RII Certificate of Incorporation and the Reorganized RII Certificates of Designation, the shares of Reorganized RII Preferred Stock issuable upon exercise of the Subscription Rights or in accordance with Section 1 have been, or as of the Effective Date shall be, duly authorized and reserved for issuance, and when issued against payment therefor upon exercise of the Subscription Rights, or pursuant to the provisions of Section 1, shall be validly issued, fully paid, non-assessable and free of all liens, preemptive rights, rights of first refusal, subscription and similar rights except as created pursuant to the Plan and documents contemplated therein or thereby;

(vi)     Since the Balance Sheet Date (defined below), there has not occurred with respect to Remy a Material Adverse Effect;

(vii)     Each Remy Party has good and marketable title to all of its material real and personal properties, which on the Effective Date shall be free and clear of all liens, except (x) as shall be permitted under the Plan or as shall be described in the Solicitation and Disclosure Statement (including liens granted under the debtor-in-possession and exit financing obtained by Remy) or (y) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(viii)     There is no litigation, proceeding or governmental investigation (collectively, "Litigation") to which such Remy Party is a party which is pending, or to the knowledge of such Remy Party, threatened, against such Remy Party or any properties or rights of such Remy Party which would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Such Remy Party is not in violation of any term of any judgment, writ, decree, injunction or order entered by any court or governmental authority and outstanding against it or any of its properties or rights, except for such violations which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, subject to the restrictions that may result solely from its status as a debtor-in-possession under the Bankruptcy Code;

(ix)     As of the Effective Date, no Remy Party shall be in conflict with, or in default or violation of, any law, order, or agreement applicable to it or by which any property or asset of such Remy Party is bound or affected, except for such conflicts, defaults, or violations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(x)     Assuming the representations of each Committed Purchaser set forth in Section 4(b)(v) through (viii) are true and correct, the offering and issuance of the Subscription Rights and the shares of Reorganized RII Preferred Stock to the Committed Purchasers hereunder and in the Rights Offering shall be exempt from registration under the Securities Act pursuant to Section 4(2) thereof.

The representation and warranty set forth in Section 4(x) (the "Surviving Representation") shall survive as if made on, and shall be deemed assumed by, Reorganized RII and the Surviving Entities for a period of twelve (12) months following the date of the Closing.

(b)     Each Committed Purchaser, severally and not jointly, hereby represents and warrants to Remy:

(i)     It is a limited liability company, limited partnership, corporation or other entity, as the case may be, duly organized, validly existing and in good standing under the laws of its state of organization and has all requisite power and authority to execute, deliver and perform its obligations hereunder and to consummate the transactions contemplated hereby;

(ii)     The execution, delivery and performance of this Agreement by such Committed Purchaser and the consummation by such Committed Purchaser of the transactions contemplated hereby have been duly and validly authorized by all necessary action on the part of such Committed Purchaser;

(iii)     This Agreement has been duly executed and delivered by such Committed Purchaser and constitutes the legal, valid and binding obligation of such Committed Purchaser, enforceable against such Committed Purchaser in accordance with its terms;

(iv)     the execution, delivery and performance of this Agreement and the consummation by such Committed Purchaser of the transactions contemplated hereby do not and shall not (A) violate any provision of the articles of incorporation or by-laws or other organizational documents of such Committed Purchaser or (B) conflict with, violate, constitute a breach of or result in the creation of a lien or any other encumbrance against, such Committed Purchaser or its properties pursuant to any material contract, agreement or instrument by which such Committed Purchaser is bound or any judgment, order, decree, law, statute, rule, regulation or other judicial or governmental restriction to which such Committed Purchaser is subject, other than such violations, conflicts or breaches that have not had nor would, individually or in the aggregate, reasonably be expected to have a material adverse effect with respect to such Committed Purchaser;

(v)     It is an "accredited investor" within the meaning of Regulation D of the Securities Act;

(vi)     It acknowledges that it has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment contemplated hereby and understands and is able to bear any economic risk associated with such investment;

(vii)    The shares of Reorganized RII Preferred Stock to be received by such Committed Purchaser hereunder will be acquired for such Committed Purchaser's own account, not as nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of the Securities Act, and such Committed Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same in violation of the Securities Act.  Notwithstanding anything in this Section 4(b)(vi) to the contrary, by making the representations herein, such Committed Purchaser does not agree to hold the shares of Reorganized RII Preferred Stock for any minimum or other specific term and reserves the right to dispose of such shares at any time in accordance with or pursuant to a registration statement or an exemption from the registration requirements under the Securities Act and any applicable state securities laws; and

(viii)    It has been afforded the opportunity to ask questions and receive answers concerning Remy and to obtain additional information.

5.  Certain Conditions.

(a)    The obligations of each of the Committed Purchasers to consummate the transactions contemplated herein shall be subject to the satisfaction (or waiver by the Requisite Senior Note Committed Purchasers and the Subordinated Note Committed Purchasers who collectively have committed to provide more than $25 million in connection with the Rights Offering pursuant to Section 1(a)(i) and Exhibit A hereto) of each of the following conditions:

(i)    the Plan Support Agreement shall not have been validly terminated in accordance with the terms thereof;

(ii)    (x) the order of the Bankruptcy Court confirming the Plan, in a form reasonably satisfactory to the Committed Purchasers, shall have been entered by the Bankruptcy Court, which order shall provide for, among other things, the approval of this Agreement (the "Confirmation Order"), (y) no order staying, reversing, modifying or amending the Confirmation Order shall be in effect, and (z) none of the Remy Parties shall have made a public announcement, entered into an agreement or filed any pleading, evidencing its intention to support or otherwise supports any transaction with respect to the reorganization or sale of any of the Remy Parties or otherwise shall have taken any action that is materially inconsistent with the transactions contemplated by the Plan or this Agreement;

(iii)    any plan of reorganization of Remy shall be consummated only on terms consistent with the Plan, and all of the conditions precedent to the confirmation and effectiveness of the Plan shall have been satisfied, in all material respects, in a manner reasonably satisfactory to each of the Committed Purchasers;

(iv)    the final documentation relating to the Plan and the transactions contemplated by the Plan, including, without limitation, each of the definitive documents necessary to effect the Reorganization, shall be in form and substance reasonably satisfactory to each of the Committed Purchasers and shall be consistent with the Plan and the exhibits attached thereto, and any and all amendments or modifications to the

Plan on or after the initial filing date thereof shall be in form and substance reasonably satisfactory to each of the Committed Purchasers;

(v)  (x) the representations and warranties of each of the Remy Parties contained in this Agreement that are qualified as to materiality, material adverse effect or Material Adverse Effect, and the representation and warranty contained in Section 4(a)(x), shall be true and correct in all respects, on and as of the date hereof and, with respect to the Remy Parties that are to continue in existence immediately following the Effective Date, or the successors of Remy or new entities created pursuant to the Plan (the "Surviving Entities"), as of the Effective Date, with the same force and effect as though made on and as of such date (except, in each case, to the extent that any representation or warranty is made as of a specified date, in which case, such representation or warranty shall be true and correct as of such specified date), and (y) the representations and warranties that are not so qualified, shall be true and correct in all material respects on and as of the date hereof and, with respect to the Surviving Entities, as of the Effective Date, with the same force and effect as though made on and as of such date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date, and (z) Remy shall have performed or complied with, in all material respects, its covenants required to be performed or complied with under this Agreement on or prior to the date hereof and the Effective Date, as applicable (and Remy shall have delivered to each of the Committed Purchasers a certificate of its Chief Executive Officer or Chief Financial Officer to the effect that each of the conditions specified in this Section 5(a)(v) is satisfied in all respects);

(vi)  (x) the appropriate Remy Parties and the Committed Purchasers that will individually acquire 10% or more of the Reorganized RII Common Stock under the Plan shall, on the Effective Date, enter into a registration rights agreement reasonably acceptable to each such party, in accordance with the term sheet for such registration rights agreement annexed as an exhibit to the Solicitation and Disclosure Statement; (y) the shares of Reorganized RII Preferred Stock to be purchased by each of the Committed Purchasers pursuant to its Backstop Commitment shall be issued and distributed in accordance with the Plan and this Agreement pursuant to an exemption from registration under the Securities Act, and (z) other than the Committed Purchasers and any entity that is an underwriter as defined in subsection (b) of Section 1145 of the Bankruptcy Code, subject to the approval of the Bankruptcy Court in the Confirmation Order, the issuance of the Subscription Rights under the Plan and the shares of Reorganized RII Preferred Stock in the Rights Offering on the Effective Date to Holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims shall qualify for the exemption from registration under Section 5 of the Securities Act and any state or local law requiring registration for the offer or sale of a security provided in Section 1145 of the Bankruptcy Code; and

(vii)  no provision of any applicable law or regulation and no judgment, injunction, decree or other legal restraint shall prohibit the consummation of the Plan, the Rights Offering or the transactions contemplated by this Agreement.

(b)     The obligations of each of the Remy Parties to consummate the transactions contemplated herein shall be subject to the satisfaction (or waiver by Remy) of each of the following conditions:

(i)     the Plan Support Agreement shall not have been validly terminated in accordance with the terms thereof either automatically or by the Requisite Plan Support Parties (as defined therein);

(ii)     (x) the Confirmation Order shall have been entered by the Bankruptcy Court, (y) such Confirmation Order shall have become a Final Order, and (z) the conditions precedent to the effectiveness of the Plan shall have been satisfied or waived in accordance with the Plan;

(iii)     (x) the representations and warranties of each of the Committed Purchasers contained in this Agreement that are qualified as to materiality, and the representations and warranties of the Committed Purchasers contained in Section 4(b)(v, vi and vii), shall be true and correct in all respects, on and as of the date hereof and the Effective Date, with the same force and effect as though made on and as of such date (except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct as of such specified date), and (y) the representations and warranties that are not so qualified shall be true and correct in all material respects on and as of the date hereof and the Effective Date, with the same force and effect as though made on and as of such date (except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date), and (z) each of the Committed Purchasers shall have performed or complied with, in all material respects, their covenants required to be performed or complied with under this Agreement on or prior to the date hereof and the Effective Date, as applicable (and each of the Committed Purchasers shall have delivered to Remy a certificate to the effect that each of the conditions specified in this Section 5(b)(iii) is satisfied in all respects); and

(iv)     no provision of any applicable law or regulation and no judgment, injunction, decree or other legal restraint shall prohibit the consummation of the Plan or the Rights Offering.

6.     Additional Condition.

This Agreement is subject to the further condition that there shall not have occurred between December 31, 2006 (the "Balance Sheet Date") and the Effective Date a Material Adverse Effect.  For purposes of this Agreement, a "Material Adverse Effect." shall mean any change, effect, event, occurrence, development, circumstance or state of facts which has or would reasonably be expected to have a materially adverse effect on the business, properties, operations, financial condition or results of operations of Remy (including its foreign subsidiaries and their respective businesses), taken as a whole, or which materially impair Remy's ability to perform its obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the transactions contemplated by

this Agreement; provided, that in no event shall any of the following, alone or in combination, be taken into account in determining whether there has been or would reasonably likely be, a Material Adverse Effect: (i) any effect directly resulting from the public announcement of and compliance with the terms and conditions of the Plan Support Agreement or the transactions contemplated thereby; (ii) any effect that results from events, circumstances or situations affecting the automotive supply industry and/or the United States economy generally, so long as such effect does not disproportionately affect Remy; or (iii) any effect that results from events, circumstances or situations affecting general worldwide economic or capital market conditions, including acts of war, acts of terrorism or natural disasters, so long as such effect does not disproportionately affect Remy.

7. Satisfaction of the Backstop Commitment.

Each Committed Purchaser may, in its sole discretion, satisfy its Backstop Commitment directly and/or indirectly through one or more of its affiliates, separate accounts within its control or investment funds under its or its affiliates' management.

8. Certain Covenants.

(a)     RII shall, and shall cause each of the other Remy Parties to, except in an emergency where it is not reasonably practicable, provide draft copies of all motions or applications and other documents Remy intends to file with the Bankruptcy Court to counsel for the Committed Purchasers within three Business Days prior to the date when Remy intends to file any such document and shall consult in good faith with counsel to the Committed Purchasers identified in Section 15 hereof regarding the form and substance of any such proposed filing with the Bankruptcy Court.

(b)     Remy shall use its reasonable best efforts to obtain all approvals, waivers, consents and other authorizations required by the Applicable Requirements, necessary in connection with the performance of the Plan and this Agreement by each of the Committed Purchasers and the consummation by each of the Committed Purchasers of the transactions contemplated hereby and under the Plan; provided, however that the parties shall cooperate with respect to obtaining such approvals, waivers, consents and authorizations, but no party hereto shall be obligated to take any action on behalf of the other party in order to obtain any such approval, waiver, consent or authorization.

(c)     [Intentionally Omitted]

(d)     Remy shall use its reasonable best efforts to promptly take, or cause to be taken, all actions and promptly do, or cause to be done, all things necessary, proper or advisable in order to (i) obtain a Confirmation Order with respect to the Plan, (ii) include in the Confirmation Order the approval of the payment of the Backstop Fees and Expenses and (iii) consummate the transactions contemplated by the Plan on terms consistent with the terms set forth in the Plan. Each of the Committed Purchasers and Remy shall cooperate fully with each other to the extent reasonable in connection with the foregoing, and none of the Committed Purchasers or Remy shall take any action for the purpose of delaying, impairing or impeding the receipt of any approval for any Applicable Requirement.

(e)     Remy shall pay in full all Expenses incurred by the Committed Purchasers in accordance with Section 2(b)(iv) or, if this Agreement is terminated prior to the Effective Date, at the time of any such termination.

(f)     Remy shall deliver to each of the Committed Purchasers, as soon as reasonably practicable but in any event at least two days prior to the Effective Date, a written notice which shall (a) specify the amount payable on the Effective Date by such Committed Purchaser in satisfaction of its Backstop Commitment, (b) specify the date on which it reasonably believes the Effective Date will occur and (c) designate the account to which each of the Committed Purchasers shall deliver the amounts so payable, as set forth in Section 2(b)(i).

9.     Other Committed Purchaser Commitments. No Committed Purchaser shall have any liability for the Backstop Commitment of the other Committed Purchasers.

10. Certain Notices; Certain Information.

(a)     Remy hereby covenants that it shall promptly deliver to each of the Committed Purchasers, and each of the Committed Purchasers hereby covenants that it shall promptly deliver to Remy, written notice of any matter, event or development that would (i) render any representation or warranty made by it herein inaccurate or incomplete in any material respect or (ii) constitute or result in a material breach by it of, or a failure by it to comply with, any material covenant herein.

(b)     Remy shall furnish each of the Committed Purchasers with such information regarding the Remy Parties as any Committed Purchaser may reasonably request, provided, that, such Committed Purchasers shall keep such information confidential in accordance with the confidentiality agreements signed by Remy and such Committed Purchasers. All such requests for information made to any of the Remy Parties by the Committed Purchasers shall be made to the Chief Executive Officer or to the Chief Financial Officer of RII or their designee.

11. Certain Consent Rights.  Each of the Remy Parties hereby covenants that, without the prior written consent of each of the Committed Purchasers, it shall not, prior to the Subscription Expiration Date, enter into any agreement with respect to its securities (it being understood that no such written consent shall be required for purposes of the issuance of the securities contemplated by the Plan), or amend any existing agreement with respect to such securities in any manner inconsistent with the rights of each of the Committed Purchasers pursuant to this Agreement.

12. Removal of Legends.  In the event that, following the transactions contemplated by the Plan and this Agreement, any certificates, notes or other forms of evidence of securities ("Securities") of Reorganized RII held by each of the Committed Purchasers bear a restrictive legend then:

(a)     if a Committed Purchaser delivers to Reorganized RII (i) a certificate, in a form reasonably satisfactory to Reorganized RII, certifying that such Securities have been transferred pursuant to a registration statement that is effective under the Securities Act or (ii) a certificate, in a form reasonably satisfactory to Reorganized RII, certifying that such Securities

have been transferred without registration in accordance with the requirements of Rule 144 under the Securities Act, Reorganized RII shall, or shall instruct its transfer agent to, subject to a stockholders' agreement, if any, issue, upon surrender of such Securities, one or more new Securities in respect of those so transferred evidenced by Securities so surrendered, which new Securities shall not bear any such legend; and

(b)     if a Committed Purchaser delivers to Reorganized RII an opinion of outside counsel to such Committed Purchaser, reasonably acceptable to Reorganized RII, that, in the opinion of such counsel, such legend is not, or is no longer, required to ensure compliance with the Securities Act, subject to a stockholders' agreement, if any, Reorganized RII shall, or shall instruct its transfer agent to, issue upon surrender of such Securities one or more new Securities, which new Securities shall not bear any such legend.

13. <u>Termination by Committed Purchaser; Survival</u>.  Each Committed Purchaser shall be entitled to terminate its obligations under this Agreement by giving written notice thereof to RII and the other Committed Purchasers (a) in the event any of the Remy Parties (i) materially breaches this Agreement (and fails to cure such breach within five (5) business days from the receipt of notice of such breach), (ii) fails to satisfy any of the material terms or conditions of this Agreement, in all material respects or the substantial satisfaction, in all material respects, of any such term or condition becomes impossible, (iii) cannot satisfy any of the conditions set forth in Section 5 by the Outside Date (as defined in the Plan Support Agreement) or (iv) shall have made a public announcement, entered into an agreement or filed any pleading evidencing its intention to support or otherwise supports any transaction with respect to the reorganization or sale of any of the Remy Parties or takes any other action that is otherwise materially inconsistent with the transactions contemplated by this Agreement, the Solicitation and Disclosure Statement and the Plan; or (b) upon the termination of the Plan Support Agreement in accordance with the terms thereof.  Upon any termination of, or non-occurrence of the Subscription Expiration Date pursuant to, this Agreement, the provisions of Sections 8(e), 15, 16, 17, 18 and 19 shall survive any such termination.

14. <u>Indemnification</u>.

(a)     If following the Closing (i) Remy or any Surviving Entities breach the Surviving Representation or (ii) any action, suit or proceeding (related to or arising from this Agreement or the transactions contemplated hereby) shall be commenced against, or any claim or demand (related to or arising from this Agreement or the transactions contemplated hereby) shall be asserted against any of the Committed Purchasers by a third-party, then the Surviving Entities, on a joint and several basis, (each, an "Indemnifying Party") shall indemnify, defend and hold harmless each Committed Purchaser and each such Committed Purchaser's affiliates and each of their respective officers, directors, managers, partners, stockholders, employees, advisors, agents and other representatives and any affiliate of the foregoing, and each of its respective successors and permitted assigns (each, an "Indemnified Party") from and against, and shall promptly reimburse each Indemnified Party for, all losses, damages, liabilities, costs and expenses, including, without limitation, interest, court costs and reasonable attorneys' fees and expenses arising or resulting from or in connection with (i) any such breach of the Surviving Representation for which the Committed Purchasers have asserted a claim in accordance with this Section 14 on or prior to one year following the date of the Closing and (ii) any such action,

suit or proceeding by a third-party (collectively, "Indemnified Liabilities"); provided, however that Indemnified Liabilities shall exclude any portion of such losses, damages, liabilities, costs or expenses resulting from an Indemnified Party's gross negligence or willful misconduct.

(b) Each Indemnified Party entitled to indemnification hereunder shall (i) give prompt written notice to the Indemnifying Party of any claim with respect to which it seeks indemnification or contribution pursuant to this Agreement and (ii) permit such Indemnifying Party to assume the defense of such claim with counsel selected by the Indemnified Party and reasonably satisfactory to the Indemnifying Party; provided, however, that any Indemnified Party entitled to indemnification hereunder shall have the right to employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Indemnifying Party has agreed in writing to pay such fees and expenses, (y) the Indemnifying Party shall have failed to assume the defense of such claim within 20 days of delivery of the written notice of the Indemnified Party with respect to such claim or failed to employ counsel selected by such Indemnifying Party and reasonably satisfactory to such Indemnified Party or (z) in the reasonable judgment of such Indemnified Party, based upon advice of its counsel, a conflict of interest may exist between such Indemnified Party and the Indemnifying Party with respect to such claims (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such claim on behalf of such Indemnified Party). In connection with any settlement negotiated by an Indemnifying Party, no Indemnifying Party shall, and no Indemnified Party shall be required by an Indemnifying Party to, (i) enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a release from all liability in respect to such claim or litigation, (ii) enter into any settlement that attributes, by its terms, liability to the Indemnified Party, or (iii) consent to the entry of any judgment that does not include as a term thereof a full dismissal of the litigation or proceeding with prejudice. In addition, without the consent of the Indemnified Party (which consent shall not be unreasonably withheld), no Indemnifying Party shall be permitted to consent to entry of any judgment or enter into any settlement which provides for any action on the part of the Indemnified Party other than the payment of money damages which are to be paid in full by the Indemnifying Party. If an Indemnifying Party fails or elects not to assume the defense of a claim pursuant to clause (y) above, or is not entitled to assume or continue the defense of such claim pursuant to clause (z) above, the Indemnified Party shall have the right without prejudice to its right of indemnification hereunder to, in its discretion, exercise in good faith and upon advice of counsel its rights to contest, defend and litigate such claim and may settle such claim, either before or after the initiation of litigation, at such time and upon such terms as the Indemnified Party deems fair and reasonable; provided, however that at least 10 days prior to any settlement, written notice of its intention to settle is given to the Indemnifying Party. If requested by the Indemnifying Party, the Indemnified Party agrees (at no expense to the Indemnified Party) to cooperate with the Indemnifying Party and its counsel in contesting any claim that the Indemnifying Party elects to contest.

15. Notices. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers.

| If to any Committed Purchaser: | To the address set forth beneath such Committed Purchaser's signature to this Agreement |
|---|---|
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>590 Madison Avenue, 19th Floor<br>New York, NY 10022<br>Attn:  Fred S. Hodara, Esq.<br>　　　　Stephen B. Kuhn, Esq.<br>Facsimile:  (212) 872-1002 |

-- And --

| If to Remy: | Remy Worldwide Holdings Inc.<br>2902 Enterprise Drive<br>Anderson, IN 46013<br>Attn:  Mr. Kerry A. Shiba<br>Facsimile:  (765) 221-7365 |
|---|---|
| With a copy to: | Shearman & Sterling LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>Attn:  Douglas P. Bartner, Esq.<br>Facsimile:  (212) 848-7179 |

16. Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, and, except as contemplated by Section 7 hereof, (i) any Committed Purchaser may assign, delegate or otherwise transfer any of its rights or obligations hereunder without the consent of Remy or any of the Surviving Entities, provided, that any such assignment shall not relieve such Committed Purchaser from liability resulting from a default by any assignee of its obligations hereunder, and (ii) Remy or any of the Surviving Entities may not assign, delegate or otherwise transfer any of their rights or obligations hereunder without the consent of each of the Committed Purchasers. Nothing in this Agreement is intended to confer upon any person not a party hereto any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, including, without limitation, to confer third party beneficiary rights.

17. Amendments.  This Agreement represents the final agreement and the entire understanding among the parties hereto with respect to the subject matter hereof and may not be contradicted by evidence of prior or contemporaneous agreements and understandings of the parties.  There are no unwritten oral agreements or understandings between the parties relating to the subject matter hereof.  This Agreement may not be amended or modified except by a written instrument signed by each of the Committed Purchasers and Remy.

18. Counterparts. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

19. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement each of the parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, RWH, RII, the Remy Subsidiaries and the Committed Purchasers have executed this Agreement as of the date first written above.

REMY WORLDWIDE HOLDINGS, INC.

By: _____
Name: Kerry A. Shiba
Title: Chief Financial Officer

BALLANTRAE CORPORATION
FRANKLIN POWER PRODUCTS, INC.
HSG I, INC.
HSG II, INC.
INTERNATIONAL FUEL SYSTEMS, INC.
M&M KNOPF AUTO PARTS, L.L.C.
MARINE CORPORATION OF AMERICA
NABCO, INC.
POWER INVESTMENTS, INC.
POWER INVESTMENTS MARINE, INC.
POWRBILT PRODUCTS, INC.
REMAN HOLDINGS, L.L.C.
REMY INC.
REMY INTERNATIONAL HOLDINGS, INC.
REMY INTERNATIONAL, INC.
REMY KOREA HOLDINGS, L.L.C.
REMY LOGISTICS, L.L.C.
REMY REMAN, L.L.C.
REMY SALES, INC.
UNIT PARTS COMPANY
WESTERN REMAN INDUSTRIAL, LLC
WORLD WIDE AUTOMOTIVE, L.L.C.

By: _____
Kerry A. Shiba
Chief Financial Officer for each of the above entities

THIRD POINT LLC

By: _____
    Name:  _Neel Devani_
    Title:  _Partner_

Address:

    390 Park Avenue, Suite 1800
    New York, NY 10022
    Attn: Neel Devani
    Tel: 310.356.4657
    Fax: _21.356.4659_
    Email: ndevani@thirdpoint.com

[Signature Page to Backstop Commitment Agreement]
S-6

FIDELITY NATIONAL SPECIAL OPPORTUNITIES, INC.

By: _____

Title: Exec. V.P.


Address:

4050 Calle Real, Suite 1210
Santa Barbara, California 93110
Attn: Eric Scroggins
Tel: 805.696.7350
Fax: 805.696.7713
Email: eric.scroggins@fnf.com

[Signature Page to Backstop Commitment Agreement]

S-2

613137 v2

ORE HILL HUB FUND LTD.

By: _____
Name: John S. Irish
Title: Managing Director

Address:

c/o Ore Hill Partners LLC
650 Fifth Avenue, 9th Floor
New York, NY 10019
Attn: John Irish
Tel: 212.389.2333
Fax: 212.389.2332
Email: jirish@orehill.com

H PARTNERS LP

By: _____

Name:

Title: **Rehan Jaffer**
**Managing Member**

Address:

152 W. 57th Street, 52nd Floor
New York, NY 10019
Attn: Rehan Jaffer
Tel: 212.974.7175
Fax: 212.974.7181
Email: rjaffer@riverrunmanagement.com

HOAK & CO.

By: _____

Name:  J. HALE HOAK

Title:  President

Address:

500 Crescent Court, Suite 230
Dallas, Texas 75201
Attn: Chuck Warltier
Tel: 214.855.2284
Fax: 972.960.4895
Email: chuck@hoakco.com

[Signature Page to Backstop Commitment Agreement]

S-9

JOSHUA TREE CAPITAL MANAGEMENT, LP

By: _____

Name: VIKAS TANDON

Title: MANAGING MEMBER

Address:

One Maritime Plaza
Suite 750
San Francisco, California 94111
Attn: Vikas Tandon
Tel:  415.568.4260
Fax:  415.568.4268
Email: vtandon@jtcap.com

[Signature Page to Backstop Commitment Agreement]

6131378 v2

GROUP G CAPITAL PARTNERS, LLC

By: _____

Name: Arthur Weiss

Title: Portfolio Manager


Address:

115 Sansome Street, Suite 1401
San Francisco, California 94104
Attn: Arthur Weiss
Tel:   415.248.0018
Fax:   415.248.0068
Email:  arthur.weiss@groupgcapital.com

6131378 v2

CORRIENTE MASTER FUND, LP

Corriente Master Fund, L.P.
by Corriente Capital Management, L.P.
Its managing general partner
by Corriente Advisors, LLC
its general partner.

By: _____
Name: James Haddaway
Title: Member of GP

Address:

201 Main Street, Suite 1800
Fort Worth, Texas 76102
Attn: James Haddaway
Tel: 817.870.1560
Fax: 817.870.0400
Email: james@corrientecapital.com

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT A**
**to**
**Backstop Commitment Agreement**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# EXHIBIT A

Allocation

Senior Note Committed Purchasers

Ore Hill
Third Point
Group G

Subordinated Note Committed Purchasers

FNSO
Hoak
Corriente
H Partners
Joshua Tree

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT B**
**to**
**Backstop Commitment Agreement**

[THIS PAGE INTENTIONALLY LEFT BLANK]

## **EXHIBIT B**

Allocation

Corriente
FNSO
Joshua Tree
H Partners
Hoak

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT D**
**to**
**Disclosure Statement:**
**Reorganized RII Certificate of Incorporation – Term Sheet**

[THIS PAGE INTENTIONALLY LEFT BLANK]

**Remy International, Inc.
Term Sheet
For Certain Provisions of the
Certificate of Incorporation**


Reference is made to the Plan Support Agreement dated as of June 15, 2007, among Remy Worldwide Holdings, Inc., Remy International, Inc. and certain of their subsidiaries (collectively, the "Company") and the Plan Support Parties signatory thereto (the "Plan Support Agreement") and the term sheet (the "Term Sheet") attached as Exhibit A to the Plan Support Agreement for the joint pre-packaged plan of reorganization (the "Plan") of the Company. The following sets forth certain key terms of the Certificate of Incorporation of the Company (the "Charter") contemplated in the Term Sheet among the holders of the New Common Stock to go into effect on the Effective Date of the Plan. Capitalized terms used herein without definition shall have the meanings provided in the Plan Support Agreement and the Term Sheet.


**Information Rights:** The Company will make available to each Shareholder (including the holders of shares of preferred stock of the Company) through a restricted website (e.g., Intralinks) the following information, <u>provided</u>, <u>however</u>, that each Shareholder that accesses such website must agree to keep such information confidential until the Company becomes a public reporting company under the Securities Exchange Act of 1934, as amended (the "1934 Act"), (although it may be shared with prospective purchasers of New Common Stock (the "Shares") who agree to a comparable confidentiality restriction), and <u>provided</u>, <u>further</u>, that the Company may prohibit such information from being shared with customers, suppliers or other parties engaged in business with the Company with whom it would be damaging to the Company's business to share such information:

    (i)      As soon as available but in any event within (a) 45 days after the end of the third fiscal quarter of 2007 and (b) 60 days after the end of 2007, consolidated financial statements and financial information (including an income statement, balance sheet and statement of cash flows), which shall be unaudited in the case of the third quarter information, and a narrative discussion, prepared by the Company's management, comparing the operations for the current fiscal year to date and the same period for the previous fiscal year.

    Until such time as the Company becomes a 1934 Act reporting company, commencing as of the first quarter of 2008, the Company will make available to each Shareholder (including the holders of shares of preferred stock of the Company) through a public website (e.g., the Company's website) the following information:

    (ii)     As soon as available but in any event within 90 days after the end of the fiscal year, (A) audited consolidated financial statements and financial information of the type that satisfies the requirements of the 1934 Act (including an income statement, balance sheet and statement of cash flows), accompanied by (B) a narrative discussion, prepared by the Company's management, comparing the operations of the current fiscal year and the previous fiscal year.

(iii) As soon as available but in any event within 45 days after the end of each fiscal quarter, unaudited consolidated financial statements and financial information (including an income statement, balance sheet and statement of cash flows), and a narrative discussion, prepared by the Company's management, comparing the operations for the current fiscal year to date and the same period for the previous fiscal year.

(iv) Not less than quarterly, the senior management of the Company shall participate in a conference call for holders of Shares to discuss the Company's performance and answer questions.

(v) The Company shall make the other items of information called for by Rule 15c2-11 under the Exchange Act publicly available (so as to enable quotes in the pink sheets and Rule 144 trading).

Further, if any shareholder of the Company (each, a "Shareholder") shall be required to consolidate the results of the Company into its own financial statements pursuant to GAAP, the Company shall provide such additional information and assistance as shall be required in connection therewith.

**Board of Directors:** The board of directors of the Company (the "Board") shall consist of seven (7) directors (including the chief executive officer) and the Shareholders shall vote all voting securities of the Company to ensure that the Charter continues to include such provision. The Charter of the Company shall provide, among other things, that (i) the chief executive officer shall be a member of the Board, (ii) the initial members of the Board immediately following the effective date of the Prepackaged Plan may not be removed except for cause prior to the first annual shareholders meeting thereafter, (iii) until such time as they shall hold less than 34% of the outstanding Shares, the Major Holders (as herein defined) shall be entitled to designate three directors, (iv) until such time as they shall hold less than 25% of the outstanding Shares, the Major Holders shall be entitled to designate two directors, (v) until such time as they shall hold less than 15% of the outstanding Shares, the Major Holders shall be entitled to designate one director, (vi) each director shall be elected to serve a one-year term on the Board or until such time as a successor is duly elected by the Shareholders or designated by the Major Holders or the Board, as applicable, and (vii) upon the resignation, removal for cause, death or incapacity of a director, the remaining term of such director may be served by a successor designated by majority vote of the remaining members of the Board or by the Major Holders, as applicable. Any directors permitted to be designated by the Major Holders pursuant to clauses (iii), (iv) or (v) above shall not be in addition to, but shall include, any individuals then serving on the Board who were designated by FNSO under the bankruptcy plan (subject to FNSO's right to replace those individuals, to be set forth in the Charter). Election of directors by the Shareholders at a shareholders meeting shall be by plurality vote. The Major Holders shall have the right to call meetings of the Shareholders if needed to effectuate the designation rights described in this section. The Charter shall not prohibit the Shareholders from taking action by written consent in lieu of a shareholders meeting.

**Shareholder Voting Rights:**

Notwithstanding anything to the contrary permitted under applicable law or regulation or in the Company's Charter or Bylaws, the Company shall not, without first obtaining the approval of Shareholders holding 66-2/3% or more of the then outstanding Shares (a "Supermajority Approval"):

(i)    Reduce or increase the number of members entitled to serve on the Board to a number other than seven (7).

(ii)    Repeal, amend, or otherwise modify, rescind or waive any provisions of the Charter or Bylaws; provided, however, that nothing herein shall prohibit the Charter or Bylaws from providing additional requirements (including a greater percentage vote) to repeal, amend, or otherwise modify, rescind or waive any provision or provisions therein; provided further, that notwithstanding the foregoing, unless (x) Shareholder approval is expressly required by the Bylaw provision being repealed, amended or otherwise modified, rescinded or waived or (y) the proposed provision or the proposed repeal, amendment or other modification, rescission or waiver would be inconsistent with a provision expressly requiring Shareholder approval, Bylaws may be repealed, amended or otherwise modified, rescinded or waived with the written consent of the Board.

(iii)    Consummate, or permit any controlled subsidiary to consummate, any proposal that (A) the Company or any controlled subsidiary merge or consolidate with any Related Person (as defined below), or that (B) the Company or any controlled subsidiary sell or exchange all or a substantial part of its assets to or with such Related Person, or that (C) the Company or any controlled subsidiary issue or deliver any stock or other securities of its issue in exchange or payment for any services, properties or assets (other than cash) of such Related Person or securities issued by such Related Person, or in a merger of the Company or any Affiliate of the Company with or into such Related Person (provided, however, that the foregoing shall not apply to any such merger, consolidation, sale or exchange, or issuance or delivery of stock or other securities which was duly approved by resolution of the Board prior to the acquisition of the beneficial ownership of more than five percent (5%) of the outstanding Common Stock of the Company by such Related Person); or (D) involves any other transaction, agreement or arrangement with any Related Person other than a director or employee of the Company, but not including (i) any such item contemplated by the Plan, this Agreement, the Registration Rights Agreement or any related agreements, (ii) any transaction to which the pre-emptive rights apply, and (iii) any other transaction having a value of less than 10% of the Company's consolidated stockholders' equity as of the end of the most-recently ended quarter (any such transaction, agreement or other arrangement, an "Affiliate Transaction") (provided, however, that in no event will the Company be permitted to enter into an Affiliate Transaction unless such Affiliate Transaction is fair to the Company).

"Related Person" means (x) any Affiliate (as defined below) of the Company or (y) any other Person if such other Person or its Affiliates singly or in the aggregate directly or indirectly beneficially own, or otherwise control, more than 10% of the outstanding Shares.

"Affiliate" means any Person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified. For purposes of the definition of Affiliate, "control" means the possession, directly or indirectly, of the power to direct, or to cause the direction of, the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

For the purposes of this provision, a "substantial part" of the assets of the Company shall mean assets comprising more than 10% of the book value of the total assets of the Company and its subsidiaries taken as a whole.

(iv)    Issue Shares (or options or other securities convertible into Shares) not subject to the Charter provisions described herein.

In addition, the following actions by the Company or any of its subsidiaries shall, whether under the Charter or pursuant to an agreement entered into between FNSO and the Company, require the approval of the holders of at least a majority of the Shares then held by FNSO and its transferees after the date the plan becomes effective who are designated as Major Holders by FNSO or such transferees (together, the "Major Holders"), as long as the Major Holders hold at least 34% of the outstanding Shares:

(i)     the approval of the annual operating budget and capital expenditure budget of the Company and its subsidiaries and any interim modification or deviation in excess of 5% in any line item thereof;

(ii)    any authorization, reservation for issuance or issuance of capital stock of the Company or its subsidiaries, including any options, warrants or securities convertible into capital stock of the Company or its subsidiaries, except for the initial options to purchase shares under the management incentive plan;

(iii)   any amendments to the certificate of incorporation or bylaws of the Company or any of its subsidiaries in a manner which adversely affect the rights of Major Holders or which adversely affect the indemnification or exculpation of any director of the Company;

(iv)    the election, removal, delegation or amendment of power or authority, and compensation of the Chief Executive Officer, Chief Operating Officer or the Chief Financial Officer of the Company or any of its subsidiaries;

(v)     the acquisition, by merger or consolidation, or by purchase of, or investments in, all or substantially all of the assets or stock of, any business or any corporation, partnership, joint venture, limited liability

company, association or other business organization or division thereof, in excess of $10,000,000 per transaction or series of related transactions;

(vi) subject to the rights of Selling Shareholders under Drag Along Rights, any (A) disposition of any material assets of the Company, (B) sale of all or substantially all of the assets of, or liquidation, dissolution or recapitalization of, the Company or any of its material subsidiaries, or (C) change of control of the Company or a material subsidiary, whether through merger or sale of stock or otherwise, the result of which is Persons owning voting stock of the Company or such material subsidiary, as the case may be, prior to such transaction do not hold more than 50% of the voting stock of the Company or such material subsidiary after giving effect to such transaction;

(vii) the incurrence of any indebtedness for borrowed money by the Company or any of its subsidiaries in excess of $10,000,000 in the aggregate or the granting of any lien or encumbrance on the assets or pledge of the capital stock of the Company or its subsidiaries (other than (A) indebtedness incurred under, and liens imposed in connection with, debt incurred on the date the plan becomes effective, (B) liens or encumbrances granted in the ordinary course of business consistent with past practice, and (C) liens or encumbrances on assets having a value of not more than $5,000,000);

(viii) entering into or effecting any transaction or series of related transactions in connection with or involving the repurchase, redemption or other acquisition of capital stock of the Company (other than any required and up to $1,000,000 in annual optional repurchases of capital stock or options from employees pursuant to certain repurchase rights under the management incentive plan) or any subsidiary;

(ix) declaring or paying any cash or other dividend or making any other distribution on the capital stock of the Company or any of its subsidiaries other than dividends or other distributions by a direct or indirect wholly-owned subsidiary of the Company to its equity holder and PIK dividends on the Class A and Class B Preferred Stock in accordance with the terms thereof;

(x) subject to rights granted under the registration rights agreement, any public offering or any listing on any securities exchange (including any level of the NASDAQ Stock Market);

(xi) any change in the number of directors of the Board; or

(xii) committing to do any of the actions provided in (i) through (xi) above.

**Transfer of Shares:** <u>Restrictions on Transferability</u>. No Shares shall be Transferred, except upon the conditions set forth below, and the Company shall not register in its books the Transfer of any Shares unless such Transfer has been effected in accordance with the terms set forth below.

Endorsement; Certain Transfer. Notwithstanding any other provision of the Charter, Shares shall not be Transferred, and the Company shall not be required to register any transfer of Shares on its books, unless the Company shall be reasonably satisfied prior to such Transfer that registration under the 1933 Act and the applicable securities laws of any other jurisdiction is not required in connection with or as a result of the transaction resulting in such Transfer.

Limitation on Number of Shareholders. Notwithstanding anything set forth in the Charter, or the compliance with any of the terms hereof, prior to January 1, 2008, no Transfer of Shares shall be effective, and any such Transfer of Shares shall be deemed null and void, if, as a result of any such Transfer, the record number of holders of the Company's equity securities would exceed 450.

**Tag Along Rights:** Other than Permitted Transfers (as defined below), if a Shareholder or Shareholders (collectively referred to as the "Transferring Shareholder(s)") propose(s) to sell, transfer or otherwise dispose of (a "Transfer") a number of Shares representing 40% or more of the Shares then outstanding, then the Transferring Shareholder shall give written notice to the Company and the other Shareholders at least 20 Business Days prior to the closing of such Transfer and the other Shareholders shall have the right (but not the obligation) to include in such sale up to all of the Shares held by such Shareholder. If the proposed purchaser elects to purchase less than all of the Shares offered for sale as a result of the Shareholders' exercise of their respective tag along rights, the Transferring Shareholder(s) and each Shareholder exercising its tag along rights will have the right to include its pro rata portion of the Shares to be Transferred to the proposed purchaser on the same terms and conditions as the Transferring Shareholder(s) including without limitation in exchange for a pro rata share of all consideration received by the Transferring Shareholder(s). A "Permitted Transfer" shall be (x) a Transfer to any Person who is an Affiliate of the Shareholder Transferring such Shares or (y) any Transfer pursuant to a public offering; provided, however, that any such Transfer is in good faith and not for the primary purpose of circumventing the transfer restrictions set forth in this provision, through the Transfer to an Affiliate of the Transferring Shareholder in connection with a transaction or series of related transactions in which the control of such Affiliate will be transferred or is intended to be transferred to a party other than another Affiliate of the Transferring Shareholder.

**Drag Along Rights:** If a Shareholder or Shareholders (collectively, the "Selling Shareholder(s)") propose(s) to sell Shares representing an amount equal to more than 50% of the outstanding Shares to any purchaser, in each case other than to an Affiliate of any of the Selling Shareholder(s), the other Shareholders may be required by the Selling Shareholder(s) to include the pro rata portion of their Shares in such sale and on the same terms and conditions applicable to the Selling Shareholder, and to take all necessary and desirable actions in connection with such sale, including the surrender of stock certificates.

**Pre-emptive Rights:** Until the Company's initial public offering of common stock occurs, if the Company offers any equity securities, except for Excluded Issuances, each holder of at least 3% of the Shares shall have a right of first refusal to purchase that number of such equity securities on the same terms and conditions as would

allow them to maintain their fully-diluted equity percentage ownership in the Company. "Excluded Issuances" shall mean the issuance of Shares (i) representing not more than ___% of the fully-diluted equity of the Company granted pursuant to or issued upon the exercise of options granted under an equity incentive plan, including the management incentive plan, (ii) in consideration for a transaction approved by the Board which does not result in the issuance for cash of more than 5% of the outstanding Shares, (iii) pursuant to conversion or exchange rights included in securities previously issued or (iv) in connection with a stock split, stock division or stock dividend.

**Amendments:** The Charter may not be amended, terminated (except pursuant to the terms thereof) or otherwise modified or waived without a Supermajority Approval; provided, that any amendment or termination of the Charter provisions relating to the designation of directors by the Major Holders shall also require approval of a majority of the Major Holders.

**Termination of Agreement:** The Charter provisions setting forth the special rights and obligations described in this Term Sheet, including, without limitation, the tag along rights, the drag along rights and the pre-emptive rights, shall terminate and be of no force or effect upon the earliest to occur of (i) the date such termination has received a Supermajority Approval, (ii) the listing of the Company's common stock on a national securities exchange upon completion of a public offering of common stock or (iii) the effectiveness of a registration statement covering common stock filed pursuant to a demand registration under the Registration Rights Agreement.

**Legend:** Each certificate representing shares of capital stock of the Company will contain appropriate legends referring to the transfer restrictions, voting agreements and other rights and obligations described herein.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT E**
**to**
**Disclosure Statement:**
**Registration Rights Agreement – Term Sheet**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# REORGANIZED REMY
## REGISTRATION RIGHTS AGREEMENT TERM SHEET

**PARTIES**

- Reorganized Remy International, Inc. (the "Company") and the holders of Registrable Securities[1] who receive at least 2.5% thereof under the Plan[2] and who execute the Registration Rights Agreement (the "Agreement") are being granted registration rights under the Agreement pursuant to the Plan (collectively, the "Holders").[3]

**DATE**

- The Effective Date.

**DESCRIPTION**

- The parties will enter into the Registration Rights Agreement (the "Agreement") in connection with the receipt of Common Stock (the "Shares") under the Plan, par value $[.001] per share.

**DEMAND REGISTRATION RIGHTS**

---

[1] "Registrable Securities" means (a) the Shares of Common Stock to be received by noteholders pursuant to the Plan or subsequently acquired and (b) any capital stock or other securities of the Company issued or issuable with respect to the Shares (i) upon any conversion or exchange thereof, (ii) by way of stock dividend or other distribution, stock split or reverse stock split, or (iii) in connection with a combination of shares, recapitalization, merger, consolidation, exchange offer or other reorganization. As to any particular Registrable Securities, once issued such securities will cease to be Registrable Securities when (A) a registration statement with respect to the sale of such securities will have become effective under the Securities Act and such securities have been disposed of in accordance with such Registration Statement, (B) such securities are then able to be sold by the holder therof in reliance upon Rule 144 (or any successor provision) under the Securities Act, provided that at the time such securities are proposed to be disposed of, they may be sold under Rule 144 without any limitation on the amount of such securities which may be sold, (C) the Company has become a public reporting company under the Exchange Act and such securities are freely tradable under Section 1145 of the Bankruptcy Code, (D) they will have ceased to be outstanding or (E) such securities have been sold and may thereafter be sold without registration.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in that certain Plan Support Agreement dated as of June 15, 2007, as amended.

[3] The Plan should provide that all Holders described above will be entitled to execute and be subject to the Registration Rights Agreement. In addition, certain preferred stockholders will also be entitled to do so, as described under Piggyback Rights below.

| | |
|---|---|
| REQUEST FOR REGISTRATION | • Subject to the limitations described below, at any time or from time to time, the Holders will have the right to make a written request that the Company effect a registration under the Securities Act of 1933, as amended (the "Securities Act") of all or part of the Registrable Securities of the Holders making such request (the "Demand Registration"). In any Demand Registration, the Holder or Holders making the demand will also be entitled to request the registration of Registrable Preferred (as herein defined) held by such Holders. |
| DEMAND PRIOR TO INITIAL PUBLIC OFFERING | • Each Holder of a number of shares of Common Stock equal to at least 20% of the number of shares of outstanding Common Stock as of the date of the Agreement (provided such Holder continues to hold such number of shares of Common Stock at the time it makes a demand), and Holders of at least a majority in the aggregate of the Registrable Securities, each will have the right at any time to require the Company to register shares of Common Stock held by them for resale under the Securities Act. If requested by the Holders, any such request for registration will be a "shelf registration" pursuant to rule 415 under the Securities Act, if the Company is then eligible to use Form S-3. |
| DEMAND FOLLOWING INITIAL PUBLIC OFFERING | In addition to the demand registration rights available prior to an initial public offering of Common Stock described above, at any time following the initial public offering of Common Stock under the Securities Act, each Holder will have the right to require the Company to register the shares of Common Stock held by such Holder for resale under the Securities Act, subject to the following limitations: (i) the Company will not be required to effect any demand by a Holder if the Company provides an opinion of counsel, which is reasonably satisfactory to the Holder, to the effect that no registration is required under the Securities Act in respect of the shares proposed to be transferred by such Holder; and (ii) the greater of (x) at least 10% of the outstanding Registrable Securities at the time of the demand and (y) at least 5% of the outstanding Registrable Securities as of the Effective Date are requested to be included in such demand registration. |

| | |
|---|---|
| OBLIGATIONS TO EFFECT REGISTRATION | • Within ten days after receipt by the Company of any request for Demand Registration, the Company will give written notice of such requested registration to all Holders. Such Holders will have the right, by giving written notice to the Company within 30 days after the Company provides its notice, to elect to have included in such registration such of their Registrable Securities as such Holders may request in such notice of election. The Company (i) will file a registration statement regarding such Registrable Securities that have been requested to be registered as soon as practicable, but in no event later than 40 days following the conclusion of the foregoing 30-day notice period and (ii) will use its commercially reasonable best efforts to have such registration statement declared effective by the SEC as soon as practicable, but in no event later than 90 days following the date of the initial filing thereof with the SEC. |
| LIMITATIONS ON REGISTRATION | • The Company will not be required to effect more than five Demand Registrations (and there shall be no limitation on the number of Form S-3 registrations required). In addition, the Company will not be required to effect any registration during the period starting on the date 30 days prior to the Company's estimated date of filing of, and ending on the date 180 days immediately following the effective date of, any registration statement (other than on Form S-4 or S-8) pertaining to the securities of the Company, *provided* that the Company is employing in good faith all commercially reasonable efforts to cause such registration statement to become effective. |
| | • If and whenever the Company is required to use its commercially reasonable best efforts to effect the registration under the Securities Act of any Registrable Securities, and if such registration is not withdrawn or abandoned, the Company will not be obligated to file any Registration Statement with respect to any of its securities (including Registrable Securities) under the Securities Act, [with certain exceptions,] whether of its own accord or at the request or demand of any Holder or Holders of such securities, until a period of 180 days will have elapsed from the effective date of such previous registration. |
| SPECIFIC PERFORMANCE | • Any Holder will, in addition to such other remedies as may be available to it at law or in equity, have the right to enforce |

its rights hereunder by actions for injunctive relief and specific performance in any court of the United States or any state thereof having jurisdiction, to the extent permitted by law and the Company shall agree not to oppose any such demand for specific performance on the basis that monetary damages are available.

**REGISTRATION EXPENSES**

- The Company will pay the Registration Expenses (to be defined in the Agreement) other than underwriting commissions and discounts of all registrations under the Agreement.

**UNDERWRITTEN OFFERING**

- The Agreement will not establish additional registration rights with regard to underwritten offerings, but instead set forth procedures applicable to any registration that is also an underwritten offering.

**UNDERWRITTEN OFFERINGS EXCLUSIVE**

- Whenever a request for Demand Registration is for an underwritten offering, only securities that are to be distributed by the underwriters may be included in the Registration.

**UNDERWRITING AGREEMENT**

- If requested by the underwriters for any underwritten offering by Holders pursuant to a request for Demand Registration, the Company will enter into an underwriting agreement with such underwriters for such offering, such agreement to be reasonably satisfactory in substance and form to the Holders of a majority of the Registrable Securities to be covered by such registration and to the underwriters and to contain such representations and warranties by the Company and such other terms and provisions as are customarily contained in agreements of this type, including, but not limited to, indemnities to the effect and to the extent provided in the Agreement or as are otherwise then customary (if more extensive), provisions for the delivery of officers' certificates, opinions of counsel and accountants' "cold comfort" letters, and hold-back arrangements.

| | |
|---|---|
| **HOLD-BACK AGREEMENTS** | • If and whenever the Company proposes to register any of its equity securities under the Securities Act, whether or not for its own account, or is required to use its commercially reasonable best efforts to effect the registration of any Registrable Securities under the Securities Act pursuant to a Demand Registration, each Holder, if required by the managing underwriter in an underwritten offering, agrees by acquisition of such Registrable Securities not to effect (other than pursuant to such registration) any public sale or distribution, including, without limitation, any sale pursuant to Rule 144, of any Registrable Securities, any other equity securities of the Company or any securities convertible into or exchangeable or exercisable for any equity securities of the Company during the 10 days prior to, and for up to 180 days after, the effective date of such registration or the date of the prospectus for such offering (if later), to the extent such Holder is timely notified in writing by the Company or the managing underwriter, and the Company agrees to cause each director and executive officer of the Company to enter into a similar agreement with the Company.  The Company further will agree not to effect (other than pursuant to such registration or pursuant to registrations on Form S-4 or S-8) any public sale or distribution, or to file any Registration Statement covering any, of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities, during the 10 days prior to, and up to 180 days after, the effective date of such registration (or the date of the prospectus for such offering, if later) if required by the managing underwriter (or for such longer period as so required). |
| **PIGGYBACK RIGHTS** | • Unlimited "piggyback" rights will be provided to (i) all Holders of Registrable Securities who otherwise would be considered underwriters pursuant to section 1145 of the Bankruptcy Code and (ii) each holder of shares of preferred stock issued by the Company on the Effective Date (the "Preferred Stock"), solely to the extent that such holder did not receive such Preferred Stock pursuant to section 1145 of the Bankruptcy Code or if such holder would be considered an underwriter with respect to such Preferred Stock pursuant to section 1145 of the Bankruptcy Code, in each case unless any of the conditions described in clauses (A) through (E) of the last sentence of footnote 1 of this term sheet would apply to such Preferred Stock (any such Preferred Stock to which none of such conditions would apply, "Registrable |

Preferred").

- If the Company at any time proposes to register any of its securities of the same class as the Registrable Securities under the Securities Act (other than pursuant to a Demand Registration or on Form S-4 or S-8), whether or not for sale for its own account (a "Company Registration"), it will, prior to each such filing, give prompt written notice to all Holders of Registrable Securities and holders of Registrable Preferred (collectively, "Piggyback Holders") of its intention to do so and, upon the written request of any Piggyback Holder given to the Company within 30 days after the Company has provided such notice (which request will state the intended method of disposition of such Registrable Securities or Registrable Preferred), the Company will use commercially reasonable best efforts to cause all Registrable Securities or Registrable Preferred that the Company has been requested by the Piggyback Holders thereof to register to be so registered under the Securities Act to the extent necessary to permit their disposition in accordance with the intended methods of distribution specified in the request of such Piggyback Holder or Holders; *provided*, that if at any time after giving written notice of its intention to register any securities and prior to the effective date of the Registration Statement filed in connection with such registration, the Company determines for any reason not to register such securities, the Company may, at its election, give written notice of such determination to each Piggyback Holder that previously was notified of such registration, and, thereupon, will not register any Registrable Securities or Registrable Preferred in connection with such registration, without prejudice, however, to the rights of any Holders to request that a registration be effected under a Demand Registration and *provided further*, that no registration effected under this provision will relieve the Company from its obligations to effect Registration upon a Demand Registration, subject to "Limitation on Registration," and "Demand Following Initial Public Offering".

ALLOCATION

- If any Company Registration involves an underwritten offering and the managing underwriter of such offering advises the Company that, in its good faith view, the number of securities requested to be included in such registration exceeds the largest number that can reasonably be sold in an orderly manner without having a significant and adverse effect on such offering, the Company will include in such

registration:

    i.    first, all securities that the Company proposes to register for its own account (the "Company Securities"); and

    ii.   second, to the extent that the number of Company Securities is less than the largest number that can be sold in an orderly manner in such offering within a price range acceptable to the Company, the remaining securities to be included in such registration will be allocated on a *pro rata* basis among (i) all Piggyback Holders requesting that Registrable Securities or Registrable Preferred be included in such Registration, and (ii) all other holders ("Other Holders") of the Company's securities who have been granted "piggy-back" registration rights with respect to such securities (the "Other Securities") and have requested that such Other Securities be included in such registration, based on the number of Registrable Securities or Registrable Preferred and Other Securities that each such Piggyback Holder and Other Holder requesting such registration bears to the aggregate number of Registrable Securities or Registrable Preferred and Other Securities then owned by all such Piggyback Holders and Other Holders requesting such registration; *provided further*, *however*, that if such underwriter advises the Company that the inclusion of Registrable Preferred in the offering will have a significant and adverse effect on the offering, some or all of the Registrable Preferred may be excluded even if none of the other securities are.

**INDEMNIFICATION**

INDEMNIFICATION BY THE COMPANY

- In the event of any registration of any of the Registrable Securities (or Registrable Preferred) under the Securities Act pursuant to the Agreement, the Company will indemnify and hold harmless the seller of such securities, its directors, officers, and employees, each other person who participates as an underwriter, broker or dealer in the offering or sale of

such securities, and each other person, if any, who controls such seller, underwriter, broker, dealer or any such participating Person within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages, or liabilities, joint or several, to which such seller or any such director, officer, employee, underwriter, broker, dealer, participating person, or controlling person may become subject under the Securities Act, the Exchange Act, state securities or blue sky laws, or otherwise, insofar as such losses, claims, damages, or liabilities (or actions or proceedings in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any Registration Statement under which such Registrable Securities (or Registrable Preferred) were registered under the Securities Act, any preliminary prospectus, free writing prospectus or prospectus contained in the registration statement, or any amendment or supplement to such registration statement, or arise out of or are based upon the omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading; and the Company will reimburse such seller and each such director, officer, employee, underwriter, broker, dealer, participating person, and controlling person in connection with investigating or defending any such loss, claim, damage, liability, action or proceeding as such expenses are incurred; *provided*, *however*, that the Company will not be liable in any such case to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon any untrue statement or omission made in such registration statement, preliminary prospectus, or prospectus, or any such amendment or supplement, in reliance upon and in conformity with information furnished to the Company, in writing, by or on behalf of such seller, underwriter, participating person or controlling person specifically for use in the preparation thereof.

INDEMNIFICATION BY HOLDERS OF SECURITIES

- In the event of any registration of any of the Registrable Securities (or Registrable Preferred) under the Securities Act pursuant to the Agreement, each seller of such securities, severally and not jointly, will indemnify and hold harmless the Company, each of its directors and officers and each underwriter (if any) and each person, if any, who controls the Company or any such underwriter within the meaning of the Securities Act or the Exchange Act, against any losses,

8

claims, damages, or liabilities, joint or several, to which the Company, such directors and officers, underwriters, or controlling persons may become subject under the Securities Act, Exchange Act, state securities or blue sky laws, or otherwise, insofar as such losses, claims, damages, or liabilities (or actions or proceedings in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in any registration statement under which such securities were registered under the Securities Act, any preliminary prospectus, free writing prospectus or prospectus contained in the registration statement, or any amendment or supplement to the registration statement, or arise out of or are based upon any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, if the statement or omission was made in reliance upon and in conformity with information relating to such seller furnished in writing to the Company by or on behalf of such seller expressly for use in connection with the preparation of such registration statement, preliminary prospectus, prospectus, amendment, or supplement; *provided, however*, that the liability of each such seller hereunder will be in proportion to and limited to the net amount received by such seller (after deducting any underwriting discount and expenses) from the sale of Registrable Securities (or Registrable Preferred) sold in connection with such registration.

| | |
|---|---|
| **ASSIGNMENT** | • Assignment of any right under this Agreement is prohibited, except that a pro rata portion of the rights under this Agreement may be assigned in connection with a permitted sale or transfer of Registrable Securities (or Registrable Preferred). |
| **AMENDMENT & WAIVER** | • This Agreement may not be amended, amended and restated, or otherwise modified without the prior written consent of Holders of a majority of the Registrable Securities, including each holder of a number of shares equal to 20% or more of the outstanding Common Stock as of the date of the Agreement provided that such holder continues to hold such number of shares of Common Stock on the date of any such amendment; *provided, however*, that the piggyback rights described herein granted to the holders of Registrable Preferred may not be amended, amended and restated or |

otherwise modified with respect to any holder of Registrable Preferred without the written consent of such holder

**GOVERNING LAW**

- Delaware.

**EXHIBIT F**
**to**
**Disclosure Statement:**
**New Employment Agreements and New Management Incentive Plan – Forms and Term Sheets**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# New Employment Agreement Term Sheet

# Remy International, Inc.
## Term Sheet for Key Personnel Employment Agreements

| | |
|---|---|
| Covered Employees | John Weber, Kerry Shiba, CFO (TBD), John Pittas, David Muir and Jerry Mills (each, an "Employee").  Phillipe James, as he is a party to a European split-payroll employment agreement, will not be party to a new employment agreement, but his Base Salary, Target Bonus and other bonus amounts will be adjusted as indicated herein. |
| Term | Two-year term, ending December 31, 2009, with an automatic renewal for successive one-year terms unless either party provides notice 120 days prior to the scheduled expiration date. |
| Base Salary | Each Employee will receive a "Base Salary", which may be increased, but not decreased by the Board.  The Employees' Base Salaries are as follows: |

| | |
|---|---|
| John Weber | $875,000 |
| Kerry Shiba | $469,000 |
| CFO (TBD) | [$450,000] (estimated) |
| John Pittas | $378,000 |
| David Muir | $375,000 |
| Jerry Mills | $375,000 |
| Phillipe James | €262,500 |

| | |
|---|---|
| Prior Awards | All awards that have accrued prior to January 1, 2008, including, without limitation, the Financial Performance Bonus Plan for 2007, the Annual Incentive Bonus for 2007 and, in the case of John Weber, the SERP, will be paid in accordance with their terms, ***provided, however***, that in no event will the restructuring be deemed a change in control for purposes of such awards; and ***provided, further,*** each Employee will acknowledge and agree that the restructuring will not be deemed as such. |
| Minimum Target Bonus | The Agreement will specify a "Minimum Target Bonus", which will be used for calculating severance.  The Minimum Target Bonus is the lowest target bonus the Company is permitted to set for the Employee under the annual bonus plan. |
| Target Bonus | Each employee will also have a specified "Target Bonus" for 2008, 2009 and 2010 under the Amended Annual Performance Bonus Plan. |

| Employee | Minimum Target Bonus | Target Bonus |
|---|---|---|
| John Weber | $1,225,000 | $2,400,000 |
| Kerry Shiba | $469,000 | $1,006,740 |

| | | |
|---|---|---|
| CFO (TBD) | [$338,000 | $763,040] (estimated) |
| John Pittas | $189,000 | $507,780 |
| David Muir | $187,500 | $400,020 |
| Jerry Mills | $187,500 | $400,020 |
| Phillipe James | €78,750 | €172,220 |

Emergence Bonus

Each employee will receive a bonus (the "Emergence Bonus"), paid in cash within 30 days of emergence from restructuring. The Emergence Bonus will be an amount equal to 1.5 times Base Salary for Weber and 0.75 times Base Salary for all other Employees.

| Employee | Emergence Bonus |
|---|---|
| John Weber | $1,312,500 |
| Kerry Shiba | $351,750 |
| John Pittas | $283,500 |
| David Muir | $281,250 |
| Jerry Mills | $281,250 |
| Phillipe James | €196,500 |

Deferred Cash Bonus Plan

Each Employee will receive an award under the 2010 Long-Term Incentive Cash Bonus Plan, which will be based on performance over a three-year period. The long-term bonus will vest at the end of the three-year term and will be paid 50% in year 4 and 50% in year 5, subject to the terms and conditions of the plan.

| Employee | Deferred Cash Bonus |
|---|---|
| John Weber | $4,000,000 |
| Kerry Shiba | $1,670,000 |
| CFO (TBD) | [$1,320,000] (estimated) |
| John Pittas | $990,000 |
| David Muir | $660,000 |
| Jerry Mills | $660,000 |
| Phillipe James | €251,090 |

Restricted Stock Awards

Following emergence from the restructuring, each Employee will receive an award of restricted stock. The Agreements will provide for a number of shares equal to approximately 5% of the total equity of the Company upon emergence from restructuring for each Employee and a form of Restricted Stock Agreement, as described below.

| Employee | Restricted Stock |
|---|---|
| John Weber | 2.000% |

|                |           |
|----------------|-----------|
| Kerry Shiba    | 0.835%    |
| CFO (TBD)      | 0.660%    |
| John Pittas    | 0.495%    |
| David Muir     | 0.330%    |
| Jerry Mills    | 0.330%    |
| Phillipe James | 0.165%    |

| | |
|---|---|
| **Expenses, Other Benefits & Medical Coverage** | Employee will participate in all health and welfare plans and be reimbursed for all ordinary and reasonable expenses per Company policy. |
| **Relocation Expenses** | If applicable, the Company will pay for relocation expenses, including without limitation real estate broker commissions, closing costs and moving of household goods. Eligible Employees will have the option to relocate at any time during the 18 months following execution of the employment agreement, and expenses will be paid by the Company promptly following relocation (the "Relocation Date"). If, prior to the 18-month anniversary of the Relocation Date, the Employee's employment is terminated for Cause or the Employee resigns without Good Reason, the Employee must repay any commissions paid on his behalf. (Only the new CFO, Muir and Mills are eligible for relocation benefits.) |

**Termination for Death or Disability**

Employee will receive:

- Accrued but unpaid Base Salary; and

- A pro rata Target Bonus for the year of termination, to be based on actual performance, determined as of the end of such year,

(collectively, the "Accrued Amounts").

**Termination Without Cause or for Good Reason**

The Employee will receive:

- The Accrued Amounts;

- Continuation of medical and dental benefits for 12 months following termination (24 for Weber); and

- 1.0 times the sum of Base Salary and Minimum Target Bonus, paid in lump sum in cash within 30 days of termination, subject to Section 409A[1] (2.0 times for Weber).

**Termination for Cause or Without Good Reason**

In the event the Employee is terminated for Cause or terminates his employment without Good Reason, the Employee will only receive accrued but unpaid Base Salary.

---

[1] For specified employees, this will mean the first $450,000 will be paid within 30 days and the remaining amount will be paid in a lump sum immediately after the 6-month waiting period.

| | |
|---|---|
| Cause | Cause will be defined as: |

- Gross misconduct or gross negligence;
- Embezzlement;
- Conviction or plea of no contest to a felony or a misdemeanor involving moral turpitude;
- Any breach of the Restrictive Covenants;
- Willful and material failure to follow the lawful and reasonable instructions of the CEO or the Board of Directors; or
- The Employee becoming barred or prohibited by the United State Securities and Exchange Commission or other regulatory body from holding his or her position with the Company or any of its subsidiaries.

| | |
|---|---|
| Good Reason | Good Reason will be defined as: |

- A material diminution in the Employee's duties, responsibilities or effective authority or any adverse change to title or position;
- A reduction of Base Salary or Minimum Target Bonus; or
- Failure by the Company to pay any compensation when earned; or
- Any material breach of the agreement, including without limitation, Assignment to the Employee of any duties, responsibilities or tasks that would violate federal, state or local law, or GAAP.

The Employee must provide written notification of his intention to resign within 90 days after the Employee knows or has reason to know of the occurrence of any such event, (ii) such event or condition is not corrected, in all material respects, by the Company within 30 days of its receipt of such notice and (iii) the Employee actually resigns his employment with the Company not more than 30 days following the expiration of such 30-day period.

| | |
|---|---|
| Restrictive Covenants | The following restrictive covenants (the "<u>Restrictive Covenants</u>") will apply during the Employment Period and for 12 months following a termination with or without Cause or with or without Good Reason: |

- The Employee will not solicit or hire any employee of the Company;
- The Employee will not be employed by or acquire an interest in any company that engages in a line of business engaged in, or producing products made by, the Company in North America with respect to all Employees other than Phillipe James, for

whom the covenant will apply with respect to such business and products of the Company in Europe; and

- The Company and the Employee will agree not to disparage each other.

| | |
|---|---|
| 280G Gross Up | In the event that any amount or benefit paid, distributed or otherwise provided to the Employee by the Company, whether pursuant to the employment agreement or otherwise would constitute a "parachute payment" within the meaning of Section 280G, then the Employee shall be entitled to receive from the Company an additional payment in an amount that shall fund the payment by the Employee of any excise tax on the covered payments up to a maximum aggregate gross-up payment of $2 million for all Employees; ***provided, however***, that such additional payment shall be subject to shareholder approval, if applicable, in accordance with meaning of Section 280G(b)(5) of the Internal Revenue Code (the "Code"); ***provided, further,*** that if the total amount of covered payments is within 110% of 3.0 times the Employee's base amount under Section 280G, such payments will be cutback to avoid any tax liability under Section 4999 of the Code rather than being grossed up; and ***provided, further,*** the Company and Employee agree to cooperate to cause all payments payable under the employment agreements and any other compensation arrangement be characterized, consistent with applicable law, as payments not subject to Section 280G or Section 4999. |

**Form of Amended and Restated Annual Incentive Bonus Plan**

**Remy International, Inc.**
**Amended and Restated**
**Annual Incentive Bonus Plan**

This Annual Incentive Bonus Plan (the "*Plan*"), dated as of _____, 2007 has been adopted by the Board of Directors of Remy International, Inc., a Delaware corporation, having its principal offices at 2902 Enterprise Drive, Anderson, Indiana 46013 (the "*Company*").

## 1.    PURPOSE

The purpose of the Remy International, Inc. Amended and Restated Annual Incentive Bonus Plan (the "*Plan*") is to motivate, retain and reward employees of the Company and its business units for their continued service during each Fiscal Year, as defined below.

## 2.    DEFINITIONS

"*Aggregate Award*" means, with respect to any Applicable Year, the sum of all Awards for all Participants, without giving effect to the discretionary authority in Section 4.

"*Annual Incentive Bonus*" means, with respect to each Participant, an amount equal to the sum of such Participant's Remy Bonus, if any, plus such Participant's Business Unit Bonus, if any, which amount with respect to any Participant who commences employment with the Company after the first day of any Applicable Year shall be prorated by multiplying such sum by a fraction (i) the numerator of which is the number of days that have transpired from the first day of such Participant's employment up to and including the earliest to occur of the last day of such Applicable Year or the effective date of a Change of Control or termination of such Participant's employment (other than by the Company for Cause or by the Participant without Good Reason) and (ii) the denominator of which is 365; provided, however, that in the event a Prorated Annual Incentive Bonus is paid to any Participant in lieu of an Annual Incentive Bonus for any Applicable Year, such Participant's Annual Incentive Bonus shall be zero.

"*Applicable Year*" means the Fiscal Year in respect of which the Annual Incentive Bonus, if any, has been earned.

"*Award*" means, with respect to any Participant in any Applicable Year, such Participant's Annual Incentive Bonus or Prorated Annual Incentive Bonus, as the case may be, for such Applicable Year.

"*Board*" means the Board of Directors of the Company.

"*Business Unit*" means, with respect to each Participant, the business unit of the Company to which such Participant is assigned, as provided in Annex B, including any business operation or entity purchased or acquired by the Company after the Effective Date.

"*Business Unit Actual EBITDAR*" means, with respect to each Participant in any Applicable Year, the EBITDAR of such Participant's Business Unit as of the Measuring Date, as determined by reference to the Company's audited financial statements for such Applicable Year; provided, however, that in the event a Change in Control occurs prior to the end of any Applicable Year, the EBITDAR of such Participant's Business Unit shall be determined with reference to the Company's unaudited quarterly financial statements as of the Measuring Date; provided further, that in the event a Change in Control occurs during the first fiscal quarter of any Applicable Year, such Participant's Business Unit Actual EBITDAR will be deemed to be the Business Unit EBITDAR Target for the Applicable Year.

"*Business Unit Bonus*" means, with respect to each Participant, an amount equal to the product of (i) such Participant's Business Unit EBITDAR Ratio and (ii) such Participant's Target Bonus.

"*Business Unit EBITDAR Maximum*" means, with respect to each Business Unit on each Measuring Date during any Applicable Year, the amount provided in Annex A, as such Annex may be amended from time-to-time by the Board; provided, however, that the Board may not amend Annex A with respect to any current or prior Applicable Year for which such amounts have been previously determined. If Business Unit Actual EBITDAR is between the Business Unit EBITDAR Target and the Business Unit EBITDAR Maximum, Participants will receive between 100% and 150% of their Business Unit Target Bonus. If Business Unit Actual EBITDAR exceeds the Business Unit EBITDAR Maximum, Participants will receive 150% of their Business Unit Target Bonus.

"*Business Unit EBITDAR Ratio*" means:

(a) if the Business Unit Actual EBITDAR is less than the Business Unit EBITDAR Threshold, then zero;

(b) if the Business Unit Actual EBITDAR is greater than or equal to the Business Unit EBITDAR Threshold but less than or equal to the Business Unit EBITDAR Target, then (i) 0.50 plus (ii) 0.50 multiplied by (x) the Business Unit Actual EBITDAR minus the Business Unit EBITDAR Threshold and then divided by (y) the Business Unit EBITDAR Target minus the Business Unit EBITDAR Threshold;

(c) if the Business Unit Actual EBITDAR is greater than the Business Unit EBITDAR Target, but less than the Business Unit EBITDAR Maximum, then (i) 1.00 plus (ii) 0.50 multiplied by (x) the Business Unit Actual EBITDAR minus the Business Unit EBITDAR Target and then divided by (y) the Business Unit EBITDAR Maximum minus the Business Unit EBITDAR Target;

(d) if the Business Unit Actual EBITDAR is greater than the Business Unit EBITDAR Maximum, then 1.50.

*"Business Unit EBITDAR Target"* means, with respect to each Business Unit on each Measuring Date during any Applicable Year, the amount provided in Annex A, as such Annex may be amended from time-to-time by the Board; provided, however, that the Board may not amend Annex A with respect to any current or prior Applicable Year for which such amounts have been previously determined.

*"Business Unit EBITDAR Threshold"* means, with respect to each Business Unit on each Measuring Date during any Applicable Year, the amount provided in Annex A, as such Annex may be amended from time-to-time by the Board; provided, however, that the Board may not amend Annex A with respect to any current or prior Applicable Year for which such amounts have been previously determined. This represents the lowest Business Unit EBITDAR for which the Participants will receive the Business Unit portion of their Annual Incentive Bonus. If Business Unit Actual EBITDAR is between the Business Unit EBITDAR Threshold and the Business Unit EBITDAR Target, Participants will receive between 50% and 100% of their Business Unit Target Bonus.

*"Business Unit Target Bonus"* means, with respect to each Participant, the amount listed next to such Participant's name on Annex B under "Business Unit Target Bonus."

*"Cause"* means, with respect to a Participant, (a) the Participant engages in gross misconduct or gross negligence in the performance of such Participant's duties for the Company or any of its subsidiaries, (b) the Participant embezzles assets of the Company or any of its subsidiaries, (c) the Participant is convicted (including a plea of guilty or *nolo contendere*) of a felony involving moral turpitude, (d) the Participant's breach of any restrictive covenant in such Participant's employment agreement, if any, and any other written agreement between the Participant and the Company, or (e) the Participant's willful and material failure to follow the lawful and reasonable instructions of the Board, the Company or any officer thereof to whom the Participant reports, as the case may be, which, in each such case (except with regard to (c)), is not cured within a reasonable period of time after receipt of notice.

*"Change in Control"* means the occurrence of any of the following events:

(a)  the Company shall sell, convey or dispose of, by means of any transaction or series of transactions, all or substantially all of the assets of the Company (on a consolidated basis, it being agreed that for purposes of this definition, "substantially all the assets of the Company" shall include, without limitation, assets accounting for 51% or more of the sales of the Company and its subsidiaries taken as a whole during the immediately preceding twelve month period);

(b)  the merger or consolidation of the Company with or into another Person (as defined below) or the merger of another Person with or into the Company, by means of any transaction or series of transactions, other than a merger or consolidation transaction immediately following which (A) securities issued in such transaction and in all other merger or consolidation transactions

after the date the Company's Series A Preferred Stock is issued ("*Merger Issuance Voting Stock*") represented in the aggregate less than a majority of the total voting power of the Voting Stock (as defined below) of the surviving Person in such merger or consolidation transaction immediately following such transaction and (B) the holders of securities representing the total voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction (other than Merger Issuance Voting Stock) hold such securities (other than Merger Issuance Voting Stock) immediately after such transaction and in the same proportion as before such transaction;

(c) any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*")), other than (A) a person consisting of one or more Permitted Holders (as defined below) (or a person in which Permitted Holders hold a majority of the aggregate number of shares held by such person), (B) an underwriter of equity securities in a public offering or (C) a person pursuing a drag-along sale pursuant to the terms of the certificate of incorporation of the Company, is or becomes "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that for purposes of this clause (c) such person shall be deemed to have "beneficial ownership" of all shares that any such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of a majority of the total voting power of the Voting Stock of the Company; provided, however, that for purposes of this clause (c) such other person shall be deemed to beneficially own any Voting Stock of a specified person held by a parent entity, if such other person is the beneficial owner (as defined in this clause (c)), directly or indirectly, of more than a majority of the voting power of the Voting Stock of such parent entity;

(d) at any time (A) that the Company or any successor by merger or consolidation is a public reporting company under the Exchange Act with its common stock listed on a national securities exchange or (B) after a registration statement covering shares of common stock filed pursuant to a demand registration under the registration rights agreement entered into in connection with the Plan has become effective, individuals who on the Plan Effective Date constituted the Board of Directors (together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of the Company was made pursuant to special nomination rights provided under the Company's or such successor's certificate of incorporation or a stockholders agreement between the Company or such successor and such stockholder or stockholders or was approved by a vote of a majority of the directors of the Company or such successor then still in office who were either directors on the Plan Effective Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office.

Notwithstanding the foregoing, no Change in Control shall occur due solely to the restructuring of the Company's debt obligations.  For purposes of this Change in Control definition, "*Person*" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity; "*Plan Effective Date*" shall mean the date of effectiveness of that certain joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code dated [  ], 2007, as confirmed by the United States Bankruptcy Court for the District of Delaware on [    ], 2007, and in accordance with Section 303 of the Delaware General Corporation Law; "*Permitted Holders*" shall mean each noteholder party to that certain Plan Support Agreement, dated as of June 15, 2007, as the same may have been amended, modified and supplemented, and any affiliates of such noteholders; and "*Voting Stock*" means the capital stock of any Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Change in Control Payment Date*" means a date within 30 calendar days of the effective date of a Change in Control.  (In the event the Participant's Annual Incentive Bonus becomes payable under Section 4 hereof other than because of a Change in Control, the phrase "date of termination" shall be substituted for "date of a Change in Control" hereunder.)

"*Code*" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"*EBITDAR*" means earnings before interest, taxes, depreciation, amortization and restructuring costs, without giving effect to payment of extraordinary expenses, including, without limitation, any restructuring costs, and prior to any consideration for the impact of Fresh Start Accounting, all as adjusted in accordance with Section 6.

"*Effective Date*" means the later to occur of (i) the date that the requisite shareholder approval necessary to satisfy Section 280G(b)(5) of the Code is obtained with respect to the Plan or (ii) January 1, 2008.

"*Fiscal Year*" means a fiscal year of the Company, which shall begin on [January] 1 and end on [December 31] of each year.

"*Good Reason*" means and will be deemed to exist if, without the Participant's consent, (a) the Participant suffers a material diminution in the Participant's duties, responsibilities or effective authority or any adverse changes in the Participant's titles or positions, (b) the Participant suffers a reduction of "*Base Salary*" or target bonus opportunity as defined in his or her employment agreement, if any; or (c) the Company fails to pay any earned compensation or to provide for the Participant's vested benefits when due and payable and which, in each such case, is not cured within a reasonable period of time after receipt of notice.  For the avoidance of doubt, the setting by the Board of any performance goals for this Plan shall not be deemed Good Reason, regardless of the magnitude of such performance goals.  Moreover, the failure by a

Participant to renew such Participant's employment agreement, if any, shall not be deemed to be Good Reason.

*"Measuring Date"* means, with respect to any Applicable Year, the last day of such Applicable Year; <u>provided</u>, <u>however</u>, that if a Change in Control occurs during any Applicable Year, the Measuring Date shall be the last day of the fiscal quarter that immediately precedes the fiscal quarter in which such Change in Control occurs. For the avoidance of doubt, absent a Change in Control, the Measuring Date with respect to a Participant's Prorated Annual Incentive Bonus in the event of termination other than for Cause or without Good Reason shall be the last day of the Applicable Year.

*"Participant"* means any employee of the Company who is chosen by the Board to become a participant in the Plan in accordance with the provisions of Section 3.

*"Payment Date"* means, with respect to each Applicable Year, a date within 75 days of the last day of the such Applicable Year , but in no event later than March 15 of the calendar year following the calendar year in which such Applicable Year ends.

*"Prorated Annual Incentive Bonus"* means, in the event a Change in Control occurs prior to the end of any Applicable Year or a Participant is terminated other than for Cause or without Good Reason, the Annual Incentive Bonus that would have otherwise been paid multiplied by a fraction, the numerator of which is the number of days that have transpired in such Applicable Year up to and including the effective date of the Change in Control or termination, as applicable, and the denominator of which is 365. The Prorated Annual Incentive Bonus, if any, shall be paid in lieu of the Annual Incentive Bonus for such Applicable Year.

*"Remy Actual EBITDAR"* means, subject to the provisions of Section 6 below, with respect to any Applicable Year, the Company's EBITDAR as of the Measuring Date, as determined by reference to the Company's audited financial statements for such Applicable Year; <u>provided</u>, <u>however</u>, that in the event a Change in Control occurs prior to the end of any Applicable Year, Remy EBITDAR shall be determined with reference to the Company's unaudited quarterly financial statements as of the Measuring Date; <u>provided</u> <u>further</u>, that in the event a Change in Control occurs during the first fiscal quarter of any Applicable Year, Remy Actual EBITDAR will be deemed to be the Remy EBITDAR Target for the Applicable Year.

*"Remy Bonus"* means, with respect to each Participant, an amount equal to the product of (i) the Remy EBITDAR Ratio and (ii) such Participant's Target Bonus.

*"Remy EBITDAR Maximum"* means, subject to the provisions of Section 6 below, with respect to each Measuring Date during any Applicable Year, the amount provided in Annex A, as such Annex may be amended from time-to-time by the Board; <u>provided</u>, <u>however</u>, that the Board may not amend Annex A with respect to any current or prior Applicable Year for which such amounts have been previously determined. If Remy Actual EBITDAR is between the Remy EBITDAR Target and the Remy EBITDAR Maximum, Participants will receive between 100% and 150% of their Remy Target

Bonus. If Remy Actual EBITDAR exceeds the Remy EBITDAR Maximum, Participants will receive 150% their Remy Target Bonus.

*"Remy EBITDAR Ratio"* means:

(a) if the Remy Actual EBITDAR is less than the Remy EBITDAR Threshold, then zero;

(b) if the Remy Actual EBITDAR is greater than or equal to the Remy EBITDAR Threshold but less than or equal to the Remy EBITDAR Target, then (i) 0.50 plus (ii) 0.50 multiplied by (x) the Remy Actual EBITDAR minus the Remy EBITDAR Threshold and then divided by (y) the Remy EBITDAR Target minus the Remy EBITDAR Threshold;

(c) if the Remy Actual EBITDAR is greater than the Remy EBITDAR Target, but less than the Remy EBITDAR Maximum, then (i) 1.00 plus (ii) 0.50 multiplied by (x) the Remy Actual EBITDAR minus the Remy EBITDAR Target and then divided by (y) the Remy EBITDAR Maximum minus the Remy EBITDAR Target;

(d) if the Remy Actual EBITDAR is greater than the Remy EBITDAR Maximum, then 1.50.

*"Remy EBITDAR Target"* means, subject to the provisions of Section 6 below, with respect to each Measuring Date during any Applicable Year, the amount provided in Annex A, as such Annex may be amended from time-to-time by the Board; provided, however, that the Board may not amend Annex A with respect to any current or prior Applicable Year for which such amounts have been previously determined.

*"Remy EBITDAR Threshold"* means, subject to the provisions of Section 6 below, with respect to each Measuring Date during any Applicable Year, the amount provided in Annex A, as such Annex may be amended from time-to-time by the Board; provided, however, that the Board may not amend Annex A with respect to any current or prior Applicable Year for which such amounts have been previously determined. This represents the lowest Remy EBITDAR for which the Participants will receive the Remy portion of their Annual Incentive Bonus. If Remy Actual EBITDAR is between the Remy EBITDAR Threshold and the Remy EBITDAR Target, Participants will receive between 50% and 100% of their Remy Target Bonus.

*"Remy Target Bonus"* means, with respect to each Participant, the amount listed next to such Participant's name on Annex B under "Remy Target Bonus."

*"Section 409A"* means Section 409A of the Code and any related guidance issued by the Internal Revenue Service or the U.S. Treasury Department.

## 3. ELIGIBILITY AND PARTICIPATION

The Board, in its sole discretion, shall determine which employees of the Company shall become Participants. Each Participant will be notified in writing of his or her participation in the Plan. The Board may, from time to time, amend Annex B; provided, however, that the Board may not make any amendment that would adversely affect any Participant without such Participant's consent.

## 4. ANNUAL INCENTIVE BONUS

Subject to the provisions of Section 5 below, each Participant shall be paid his or her Annual Incentive Bonus, if any, in a lump sum cash payment on the Payment Date; provided, however, that in the event of a Change in Control, a Prorated Annual Incentive Bonus, if any, for the Applicable Year in which the Change in Control occurs shall be paid in full on the Change in Control Payment Date. Notwithstanding anything in this Plan to the contrary, the Board shall have discretion to increase or decrease the Award of any Participant, including any Participant who reports directly (a "*Reporting Officer*") to the chief executive officer of the Company (the "*CEO*"), by an amount that is not more than 10% of the amount of such Award, provided such Participant is neither a "covered employee" within the meaning of 162(m) of the Code nor one of certain executives who entered into employment agreements with the Company as of [August] __, 2007); further, the CEO shall have a similar discretion to so increase or decrease the Award of any other Participant who is not a Reporting Officer, a "covered employee" or one of the executives with such agreements; provided, however, that the Aggregate Award for any Applicable Year shall not increase as the result of the exercise of such discretion.

## 5. TERMINATION OF EMPLOYMENT/FORFEITURES

If, prior to the end of any Applicable Year, a Participant resigns from employment with the Company without Good Reason or the Company terminates such Participant's employment for Cause, the Participant shall forfeit his or her Annual Incentive Bonus for such Applicable Year. If a Participant's employment terminates for any other reason, other than the sale or disposition of such Participant's Business Unit, the Participant, or such Participant's beneficiary, as the case may be, shall be entitled to receive, upon the earlier to occur of the Payment Date for such Applicable Year or the Change in Control Payment Date, if any, a Prorated Annual Incentive Bonus, if any, for the Applicable Year in which such termination occurs.

## 6. EBITDAR ADJUSTMENTS IN THE EVENT OF BUSINESS UNIT SALE OR ACQUISITION

(a) In the event of a sale or disposition of one or more Business Units during any Applicable Year of the Term, Remy EBITDAR Threshold, Remy EBITDAR Target, Remy EBITDAR Maximum and Remy Actual EBITDAR for such Applicable Year shall each be equitably adjusted (up or down as appropriate in the circumstance), in accordance with the reasonable determination of the Board after good faith consultation with the CEO, for any fiscal quarter ending after the date of such sale or disposition for such Applicable Year by the relevant Business Unit EBITDAR Threshold, Business Unit EBITDAR Target, Business Unit EBITDAR

Maximum and Business Unit Actual EBITDAR, respectively, for any fiscal quarter ending after the date of such sale or disposition in any Applicable Year ending after such sale or disposition.

(b)     In the event of a purchase or acquisition of one or more Business Units during any Applicable Year of the Term, Remy EBITDAR Threshold, Remy EBITDAR Target, Remy EBITDAR Maximum and Remy Actual EBITDAR for such Applicable Year shall each shall be equitably adjusted (up or down as appropriate in the circumstance), in accordance with the reasonable determination of the Board after good faith consultation with the CEO, for any fiscal quarter ending after the date of such purchase or acquisition for such Applicable Year by the relevant Business Unit EBITDAR Threshold, Business Unit EBITDAR Target, Business Unit EBITDAR Maximum and Business Unit Actual EBITDAR, respectively, for any fiscal quarter ending after the date of such purchase or acquisition in any Applicable Year ending after such purchase or acquisition.

(c)     Each such equitable adjustment described in clause (a) and (b) above shall be made based upon the "base case" valuation analysis underlying the Board's approval of such transaction referred to in clause (a) or (b), and the resetting of applicable EBITDAR amounts in accordance with this Section 6 in respect of each such transaction shall be agreed to by the Board at the time the Board approves such transaction and become effective upon the closing of such transaction.

## 7.     ADMINISTRATION

The Plan shall be administered by the Board, which shall have full authority to interpret the Plan, to establish rules and regulations relating to the Plan, and to make all other determinations and take all other actions necessary or appropriate for the proper administration of the Plan.  The Board's interpretation of the Plan, and all actions taken within the scope of its authority, shall be final and binding on the Company, its stockholders, Participants and beneficiaries.

## 8.     DESIGNATION OF BENEFICIARY

A Participant may designate a beneficiary or beneficiaries who, in the event of the Participant's death prior to the payment of the Annual Incentive Bonus hereunder, shall receive payment of the Annual Incentive Bonus, if any, and the Prorated Annual Incentive Bonus if any.  Such designation shall be made by the Participant on a form prescribed by the Board.  The Participant may, at any time, change or revoke such designation.  A beneficiary designation, or revocation of a prior beneficiary designation, will be effective only if it is made in writing on a form provided by the Company, signed by the Participant and received by the Company's Vice President for Compensation and Benefits.  If the Participant does not designate a beneficiary or the beneficiary dies prior to receiving the Annual Incentive Bonus or Prorated Annual Incentive Bonus payable under the Plan, such amount shall be paid to the Participant's estate.

## 9.     AMENDMENT AND TERMINATION

The Board may not amend, modify or terminate this Plan, in whole or in part, until after the end of Fiscal Year 2010.  Notwithstanding the foregoing, if any provision of the

Plan contravenes Section 409A, the Company may reform the Plan or any provision hereof to maintain to the maximum extent practicable the original intent of the provision without violating the provisions of Section 409A.

## 10. MISCELLANEOUS PROVISIONS

(a)     This Plan is completely voluntary on the part of the Company.  No employee or other person shall have any claim or right to participate in this Plan other than as provided hereunder.  Neither the establishment of this Plan, nor any action taken hereunder, shall be construed as giving any Participant any right to be retained in the employ of the Company or shall affect the terms and conditions of any Participant's employment with the Company.

(b)     A Participant's right and interest under the Plan may not be assigned or transferred, except as provided in Section 8 hereof, and any attempted assignment or transfer shall be null and void.

(c)     The Plan shall be unfunded and any payments made hereunder shall be paid from the general assets of the Company.  The Company shall not be required to establish any special or separate fund, or to make any other segregation of assets, to assure payment of the Annual Incentive Bonus.

(d)     The Company shall have the right to deduct from all amounts paid under the Plan any applicable taxes or other amounts required by law to be withheld.

(e)     The Plan shall be binding upon and inure to the benefit of any successor or successors of the Company and the heirs and beneficiaries of each Participant.  In addition, the Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) to all or substantially all of the business or assets of the Company expressly to assume and to agree to perform its obligations under the Plan in the same manner and to the same extent that the Company would be required to perform such obligations if no such succession had taken place.  Any reference to the Company hereunder shall include any successor(s) to the Company.

(f)     The Plan shall be construed, interpreted and governed in accordance with the laws of the State of Delaware without reference to rules relating to conflicts of law.

**Thresholds, Targets and Maximums for Applicable Years**

**2008, 2009 and 2010**

| Measuring Date | REMY EBITDAR | | |
|---|---|---|---|
| | Threshold | Target | Maximum |
| March 30, 2008 | $[ ] | $[ ] | $[ ] |
| June 30, 2008 | $[ ] | $[ ] | $[ ] |
| September 30, 2008 | $[ ] | $[ ] | $[ ] |
| December 31, 2008 | $86,955,000 | $102,300,000 | $117,645,000 |
| December 31, 2009 | $103,870,000 | $122,200,000 | $140,530,000 |
| December 31, 2010 | $107,780,000 | $126,800,000 | $145,820,000 |

The Business Unit Threshold, Target and Maximum for
**[NAME OF BUSINESS UNIT]** for 2008 are provided below.

The Thresholds, Targets and Maximums for all other Business Units
are on file with the Company.

**[TO BE FILLED IN FOR EACH BUSINESS UNIT PRIOR TO DISTRIBUTION]**

| Measuring Date | BUSINESS UNIT EBITDAR | | |
|---|---|---|---|
| | Threshold | Target | Maximum |
| March 30 | | | |
| June 30 | | | |
| September 30 | | | |
| December 31 | | | |

**[NOTE: THE MASTER FILE SHOULD INCLUDE DATA FOR ALL BUSINESS UNITS]**

**2009 and All Future Applicable Years**

To be determined by the Board in its discretion.

## Participants and Their Target Bonus

**Form of 2010 Long-Term Incentive Cash Bonus Plan**

# Remy International, Inc.
## 2010 Long-Term Incentive Cash Bonus Plan

This 2010 Long-Term Incentive Cash Bonus Plan (the "*Plan*"), dated as of [_____], 2007 has been adopted by the Board of Directors of Remy International, Inc., a Delaware corporation, having its principal offices at 2902 Enterprise Drive, Anderson, Indiana 46013 (the "*Company*").

## 1.    PURPOSE

The purpose of the Remy International, Inc. Long-Term Incentive Cash Bonus Plan (the "*Plan*") is to motivate, retain and reward employees of the Company for their continued service through the Term, as defined below.

## 2.    DEFINITIONS

*"Actual EBITDAR"* means the Company's EBITDAR as of the Measuring Date, as determined by reference to the Company's audited financial statements for the Term; provided, however, that in the event a Change in Control occurs prior to the end of the Term, the Company's EBITDAR shall be determined with reference to the Company's unaudited quarterly financial statements as of the Measuring Date; provided further, that in the event a Change in Control occurs (i) during the first fiscal quarter of any Fiscal Year (other than the first Fiscal Year) of the Term, Actual EBITDAR will be deemed to be the Actual EBITDAR for the previous Fiscal Year or (ii) during the first fiscal quarter of the Fiscal Year of the Term, Actual EBITDAR will be deemed to be the EBITDAR Target for the Term.

"*Annual Bonus Plan*" means the Remy International Inc. Amended and Restated Annual Incentive Bonus Plan, as amended from time to time.

"*Board*" means the Board of Directors of the Company.

"*Cause*" means, with respect to a Participant, (a) the Participant engages in gross misconduct or gross negligence in the performance of such Participant's duties for the Company or any of its subsidiaries, (b) the Participant embezzles assets of the Company or any of its subsidiaries, (c) the Participant is convicted (including a plea of guilty or *nolo contendere*) of a felony involving moral turpitude, (d) the Participant's breach of any restrictive covenant in such Participant's employment agreement, if any, and any other written agreement between the Participant and the Company, or (e) the Participant's willful and material failure to follow the lawful and reasonable instructions of the Board, which, in each such case (except with regard to (c)), is not cured within a reasonable period of time after receipt of notice.

*"Change in Control"* means the occurrence of any of the following events:

(a)  the Company shall sell, convey or dispose of, by means of any transaction or series of transactions, all or substantially all of the assets of the Company (on a consolidated basis, it being agreed that for purposes of this

definition, "substantially all the assets of the Company" shall include, without limitation, assets accounting for 51% or more of the sales of the Company and its subsidiaries taken as a whole during the immediately preceding twelve month period);

(b)  the merger or consolidation of the Company with or into another Person (as defined below) or the merger of another Person with or into the Company, by means of any transaction or series of transactions, other than a merger or consolidation transaction immediately following which (A) securities issued in such transaction and in all other merger or consolidation transactions after the date the Company's Series A Preferred Stock is issued ("*Merger Issuance Voting Stock*") represented in the aggregate less than a majority of the total voting power of the Voting Stock (as defined below) of the surviving Person in such merger or consolidation transaction immediately following such transaction and (B) the holders of securities representing the total voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction (other than Merger Issuance Voting Stock) hold such securities (other than Merger Issuance Voting Stock) immediately after such transaction and in the same proportion as before such transaction;

(c)  any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*")), other than (A) a person consisting of one or more Permitted Holders (as defined below) (or a person in which Permitted Holders hold a majority of the aggregate number of shares held by such person), (B) an underwriter of equity securities in a public offering or (C) a person pursuing a drag-along sale pursuant to the terms of the certificate of incorporation of the Company, is or becomes "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that for purposes of this clause (c) such person shall be deemed to have "beneficial ownership" of all shares that any such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of a majority of the total voting power of the Voting Stock of the Company; provided, however, that for purposes of this clause (c) such other person shall be deemed to beneficially own any Voting Stock of a specified person held by a parent entity, if such other person is the beneficial owner (as defined in this clause (c)), directly or indirectly, of more than a majority of the voting power of the Voting Stock of such parent entity;

(d)  at any time (A) that the Company or any successor by merger or consolidation is a public reporting company under the Exchange Act with its common stock listed on a national securities exchange or (B) after a registration statement covering shares of common stock filed pursuant to a demand registration under the registration rights agreement entered into in connection with the Plan has become effective, individuals who on the Plan Effective Date constituted the Board of Directors (together with any new directors whose election by such Board of Directors or whose nomination for election by the

stockholders of the Company was made pursuant to special nomination rights provided under the Company's or such successor's certificate of incorporation or a stockholders agreement between the Company or such successor and such stockholder or stockholders or was approved by a vote of a majority of the directors of the Company or such successor then still in office who were either directors on the Plan Effective Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office.

Notwithstanding the foregoing, no Change in Control shall occur due solely to the restructuring of the Company's debt obligations. For purposes of this Change in Control definition, "*Person*" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity; "*Plan Effective Date*" shall mean the date of effectiveness of that certain joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code dated [ ], 2007, as confirmed by the United States Bankruptcy Court for the District of Delaware on [ ], 2007, and in accordance with Section 303 of the Delaware General Corporation Law; "*Permitted Holders*" shall mean each noteholder party to that certain Plan Support Agreement, dated as of June 15, 2007, as the same may have been amended, modified and supplemented, and any affiliates of such noteholders; and "*Voting Stock*" means the capital stock of any Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Change in Control Payment Date*" means a date within 30 calendar days of the effective date of a Change in Control. (In the event the Participant's Long-Term Incentive Cash Bonus becomes payable under Section 4 hereof other than because of a Change in Control, the phrase "date of termination" shall be substituted for "date of a Change in Control" hereunder.)

"*Code*" means the Internal Revenue Code of 1986, as amended and the rules and regulations promulgated thereunder.

"*EBITDAR*" means earnings before interest, taxes, depreciation, amortization and restructuring costs, without giving effect to payment of extraordinary expenses, including, without limitation, any restructuring costs, and prior to any consideration for the impact of Fresh Start Accounting, all as adjusted in accordance with Section 6.

"*EBITDAR Bonus*" means, with respect to each Participant, an amount equal to the product of (i) the EBITDAR Ratio and (ii) such Participant's Target Bonus.

"*EBITDAR Maximum*" means, with respect to each Measuring date during the Term, the amount provided in Annex A. If Actual EBITDAR is between the EBITDAR Target and the EBITDAR Maximum, Participants will receive between 100% and 150% of their Target Bonus. If Actual EBITDAR exceeds the EBITDAR Maximum, Participants will receive 150% of their Target Bonus.

"*EBITDAR Ratio*" means:

      (a) if the Actual EBITDAR is less than the EBITDAR Threshold, then zero;

      (b) if the Actual EBITDAR is greater than or equal to the EBITDAR Threshold but less than or equal to the EBITDAR Target, then (i) 0.50 plus (ii) 0.50 multiplied by (x) the Actual EBITDAR minus the EBITDAR Threshold and then divided by (y) the EBITDAR Target minus the EBITDAR Threshold;

      (c) if the Actual EBITDAR is greater than the EBITDAR Target, but less than the EBITDAR Maximum, then (i) 1.00 plus (ii) 0.50 multiplied by (x) the Actual EBITDAR minus the EBITDAR Target and then divided by (y) the EBITDAR Maximum minus the EBITDAR Target;

      (d) if the Actual EBITDAR is greater than the EBITDAR Maximum, then 1.50.

"*EBITDAR Target*" means, with respect to each Measuring date during the Term, the amount provided in Annex A.

"*EBITDAR Threshold*" means, with respect to each Measuring date during the Term, the amount provided in Annex A. This represents the lowest EBITDAR for which the Participants will receive a Long-Term Incentive Cash Bonus. If Actual EBITDAR is between the EBITDAR Threshold and the EBITDAR Target, Participants will receive between 50% and 100% of their Target Bonus.

"*Effective Date*" means the date that the requisite shareholder approval necessary to satisfy Section 280G(b)(5) of the Code is obtained.

"*Final Payment Date*" means a day no later than 5 business days following the first anniversary of the Initial Payment Date.

"*Fiscal Year*" means a fiscal year of the Company, which shall begin on [January] 1 and end on [December 31] of each year.

"*Good Reason*" means and will be deemed to exist if, without the Participant's consent, (a) the Participant suffers a material diminution in the Participant's duties, responsibilities or effective authority or any adverse changes in the Participant's titles or positions, (b) the Participant suffers a reduction of "Base Salary" or target bonus opportunity as defined in his or her employment agreement, if any; or (c) the Company fails to pay any earned compensation or to provide for the Participant's vested benefits when due and payable and which, in each such case, is not cured within a reasonable period of time after receipt of notice. For the avoidance of doubt, the setting by the Board of any performance goals for this Plan shall not be deemed Good Reason, regardless of the magnitude of such performance goals. Moreover, the failure by a

Participant to renew such Participant's employment agreement, if any, shall not be deemed to be Good Reason.

"*Initial Payment Date*" means a date within 75 days of the last day of the last Fiscal Year of the Term, but in no event later than March 15 of the calendar year following the calendar year in which the Term ends.

"*Long-Term Incentive Cash Bonus*" means, with respect to each Participant, an amount equal to such Participant's EBITDAR Bonus, if any, which amount with respect to any Participant who commences employment with the Company after the first day of the first Fiscal Year of the Term shall be prorated by multiplying such amount by a fraction (i) numerator of which is the number of days that have transpired from the first day of such Participant's employment up to and including the earliest to occur of the last day of the last Fiscal Year of the Term or the effective date of a Change of Control or termination of employment (other than by the Company for Cause or by the Participant without Good Reason) and (ii) denominator of which is 1096; provided, however, that in the event a Prorated Long-Term Incentive Cash Bonus is paid to any Participant in lieu of a Long-Term Incentive Cash Bonus for the Term, such Participant's Long-Term Incentive Cash Bonus shall be zero.

"*Measuring Date*" means, the last day of the last Fiscal Year of the Term; provided, however, that if a Change in Control occurs during the Term, the Measuring Date shall be the last day of the fiscal quarter that immediately precedes the fiscal quarter in which such Change in Control occurs. For the avoidance of doubt, absent a Change in Control, the Measuring Date with respect to a Participant's Prorated Long-Term Incentive Cash Bonus in the event of termination other than for Cause or without Good Reason shall be the last day of the last Fiscal Year of the Term.

"*Participant*" means any employee of the Company who is chosen by the Board to become a participant in the Plan in accordance with the provisions of Section 3.

"*Prorated Long-Term Incentive Cash Bonus*" means, in the event a Change in Control occurs prior to the end of the Term, or a Participant is terminated other than for Cause or resigns without Good Reason, the Long-Term Incentive Cash Bonus that would have otherwise been paid multiplied by a fraction, the numerator of which is the number of days that have transpired in the Term, up to and including the effective date of the Change in Control or termination, as applicable, and the denominator of which is 1096. The Prorated Long-Term Incentive Cash Bonus, if any, shall be paid in lieu of the Long-Term Incentive Cash Bonus for the Term.

"*Section 409A*" means Section 409A of the Code and any related guidance issued by the Internal Revenue Service or the U.S. Treasury Department.

"*Target Bonus*" means, with respect to a Participant, the target bonus listed next to such participant's name of Annex B.

"*Term*" means the period beginning [January 1], 2008 and ending on [December 31], 2010.

## 3.     ELIGIBILITY AND PARTICIPATION

The Board, in its sole discretion, shall determine which employees of the Company shall become Participants. Each Participant will be notified in writing of his or her participation in the Plan. The Board may, from time to time, amend Annex B; provided, however, that the Board may not make any amendment that would adversely affect any Participant without such Participant's consent.

## 4.     LONG-TERM INCENTIVE CASH BONUS

Subject to the provisions of Section 5 below, each Participant shall be paid his or her Long-Term Incentive Cash Bonus, if any, in two substantially equal, lump sum cash installments on each of the Initial Payment Date and the Final Payment Date; provided, however, that in the event of a Change in Control, amounts payable under the Plan, including, without limitation, any remaining installment payments or any Prorated Long-Term Incentive Cash Bonus, shall be paid in full on the Change in Control Payment Date.

## 5.     VESTING & TERMINATION OF EMPLOYMENT

Each Participant's Long-Term Incentive Cash Bonus, if any, will vest if they are employed by the Company on the last day of the last Fiscal Year of the Term. If, prior to that date, a Participant resigns from employment with the Company without Good Reason or the Company terminates such Participant's employment for Cause, the Participant shall forfeit his or her Long-Term Incentive Cash Bonus. If a Participant's employment terminates prior to the last day of the last Fiscal Year of the Term for any other reason, the Participant, or such Participant's beneficiary, as the case may be, shall be entitled to receive, upon the earlier to occur of the Initial Payment Date or a Change in Control Payment Date, if any, a Prorated Long-Term Incentive Cash Bonus, if any. Notwithstanding any provision of this Plan to the contrary, in the event the Participant is determined to be a "specified employee" within the meaning of Section 409A of the Code as of the time of a separation from service (other than by reason of death or disability) as defined in such Section 409A, any payments due hereunder to the Participant upon such separation from service, to the extent they are subject to such Section 409A, shall be deferred until the date that is six months following such separation.

## 6.     EBITDAR ADJUSTMENTS IN THE EVENT OF BUSINESS UNIT SALE OR ACQUISITION

(a)     In the event of a sale or disposition of one or more Business Units during any Fiscal Year of the Term, Remy EBITDAR Threshold, Remy EBITDAR Target, Remy EBITDAR Maximum and Remy Actual EBITDAR for such Fiscal Year shall each be equitably adjusted (up or down as appropriate in the circumstance), in accordance with the reasonable determination of the Board after good faith consultation with the CEO, for any fiscal quarter ending after the date of such sale or disposition for such Fiscal Year by the relevant Business Unit EBITDAR Threshold, Business Unit EBITDAR Target, Business Unit EBITDAR Maximum and Business Unit Actual EBITDAR, respectively, for any fiscal quarter ending after the date of such sale or disposition in any Fiscal Year ending after such sale or disposition. For purposes of this paragraph, the terms Business Unit EBITDAR Threshold, Business Unit

EBITDAR Target, Business Unit EBITDAR Maximum and Business Unit Actual EBITDAR have the meaning given to such terms under the Annual Bonus Plan for the Fiscal Year in which such sale or disposition occurs.

(b)     In the event of a purchase or acquisition of one or more Business Units during any Fiscal Year of the Term, Remy EBITDAR Threshold, Remy EBITDAR Target, Remy EBITDAR Maximum and Remy Actual EBITDAR for such Fiscal Year shall each shall be equitably adjusted (up or down as appropriate in the circumstance), in accordance with the reasonable determination of the Board after good faith consultation with the CEO, for any fiscal quarter ending after the date of such purchase or acquisition for such Fiscal Year by the relevant Business Unit EBITDAR Threshold, Business Unit EBITDAR Target, Business Unit EBITDAR Maximum and Business Unit Actual EBITDAR, respectively, for any fiscal quarter ending after the date of such purchase or acquisition in any Fiscal Year ending after such purchase or acquisition.

(c)     Each such equitable adjustment described in clause (a) and (b) above shall be made based upon the "base case" valuation analysis underlying the Board's approval of such transaction referred to in clause (a) or (b), and the resetting of applicable EBITDAR amounts in accordance with this Section 6 in respect of each such transaction shall be agreed to by the Board at the time the Board approves such transaction and become effective upon the closing of such transaction.

## 7.     ADMINISTRATION

The Plan shall be administered by the Board, which shall have full authority to interpret the Plan, to establish rules and regulations relating to the Plan, and to make all other determinations and take all other actions necessary or appropriate for the proper administration of the Plan.  The Board's interpretation of the Plan, and all actions taken within the scope of its authority, shall be final and binding on the Company, its stockholders, Participants and beneficiaries.

## 8.     DESIGNATION OF BENEFICIARY

A Participant may designate a beneficiary or beneficiaries who, in the event of the Participant's death prior to the payment of the Long-Term Incentive Cash Bonus hereunder, shall receive payment of the Long-Term Incentive Cash Bonus, if any, and the Prorated Long-Term Incentive Cash Bonus if any.  Such designation shall be made by the Participant on a form prescribed by the Board.  The Participant may, at any time, change or revoke such designation.  A beneficiary designation, or revocation of a prior beneficiary designation, will be effective only if it is made in writing on a form provided by the Company, signed by the Participant and received by the Company's Vice President for Compensation and Benefits.  If the Participant does not designate a beneficiary or the beneficiary dies prior to receiving the Long-Term Incentive Cash Bonus or Prorated Long-Term Incentive Cash Bonus payable under the Plan, such amount shall be paid to the Participant's estate.

## 9.     AMENDMENT AND TERMINATION

The Board may not amend, modify or terminate this Plan in whole or in part prior to the end of the Term. Notwithstanding the foregoing, if any provision of the Plan contravenes Section 409A, the Company may reform the Plan or any provision hereof to maintain to the maximum extent practicable the original intent of the provision without violating the provisions of Section 409A.

## 10.     MISCELLANEOUS PROVISIONS

(a)     This Plan is completely voluntary on the part of the Company.  No employee or other person shall have any claim or right to participate in this Plan other than as provided hereunder.  Neither the establishment of this Plan, nor any action taken hereunder, shall be construed as giving any Participant any right to be retained in the employ of the Company or shall affect the terms and conditions of any Participant's employment with the Company.

(b)     A Participant's right and interest under the Plan may not be assigned or transferred, except as provided in Section 7 hereof, and any attempted assignment or transfer shall be null and void.

(c)     The Plan shall be unfunded and any payments made hereunder shall be paid from the general assets of the Company.  The Company shall not be required to establish any special or separate fund, or to make any other segregation of assets, to assure payment of the Long-Term Incentive Cash Bonus.

(d)     The Company shall have the right to deduct from all amounts paid under the Plan any applicable taxes or other amounts required by law to be withheld.

(e)     The Plan shall be binding upon and inure to the benefit of any successor or successors of the Company and the heirs and beneficiaries of each Participant.  In addition, the Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) to all or substantially all of the business or assets of the Company expressly to assume and to agree to perform its obligations under the Plan in the same manner and to the same extent that the Company would be required to perform such obligations if no such succession had taken place.  Any reference to the Company hereunder shall include any successor(s) to the Company.

(f)     The Plan shall be construed, interpreted and governed in accordance with the laws of the State of Delaware without reference to rules relating to conflicts of law.

**Thresholds, Targets and Maximums for the Term**

| Measuring Date[1] | EBITDAR | | |
|---|---|---|---|
| | Threshold (50% payout) | Target (100% payout) | Maximum (150% payout) |
| March 30, 2008 | $[ ] | $[ ] | $[ ] |
| June 30, 2008 | $[ ] | $[ ] | $[ ] |
| September 30, 2008 | $[ ] | $[ ] | $[ ] |
| December 31, 2008 | $86,955,000 | $102,300,000 | $117,645,000 |
| December 31, 2009 | $190,825,000 | $224,500,000 | $258,175,000 |
| December 31, 2010 | $298,605,000 | $351,300,000 | $403,995,000 |

---

[1] Measuring Dates to be adjusted if Fiscal Years vary from calendar years.

**[Participants and Their Target Bonus]**

**Reorganized RII Restricted Stock Agreement Term Sheet**

## Remy International, Inc.
## Form of Restricted Stock Agreement

| | |
|---|---|
| **Restricted Stock** | Each key employee who is party to an employment agreement will receive a grant of restricted common stock (the "Restricted Stock") of Remy International, Inc. (the "Company"). The number of shares will be determined following emergence from restructuring and will be represented in the Employee's employment agreement as a number of shares equal to a specified percentage which in the aggregate will not exceed 5% of the total equity upon emergence from restructuring. |
| **Vesting Schedule:** | Restricted Stock will vest: |
| | 12% on the first anniversary of grant; |
| | 12% on the second anniversary of grant; |
| | 12% on the third anniversary of grant; |
| | 32% on the fourth anniversary of grant; and |
| | 32% on the fifth anniversary of grant. |
| **Termination of Employment** | If the Employee's employment is terminated by the Company without Cause, or by the Employee for Good Reason or by reason of Death or Disability, the Employee will vest immediately in the percentage of Restricted Stock due to vest in respect of the year of such termination and the year immediately thereafter. If the Employee's employment is terminated for any other reason, any unvested Restricted Stock will be forfeited. |
| **Call Right** | Any time within [180] days of termination, the Company may, but is not required to, call the Restricted Stock at then-current fair market value, as determined by the Board of Directors in their discretion. |
| | Such call right will lapse to the extent such right lapses for all stockholders. |
| **Change in Control:** | All unvested Restricted Stock will vest immediately upon a Change in Control. |
| **Transfer Restrictions** | Restricted Stock may not be assigned or transferred except (i) by last will and testament, the laws of descent and distribution; (ii) pursuant to a domestic relations order; (iii) to a participant's family member; (iv) to one or more trusts established in whole or in part for the benefit of one or more of such family members; or (v) to one or more entities which are beneficially owned in whole or in part by one or more such family members. |
| | The restrictions on transferability set forth above will lapse to the extent such restrictions lapse for all stockholders. |
| **Rights as Stockholder:** | The recipient will have, with respect to Restricted Stock, all of the rights of a stockholder of Remy, including, if applicable, the right to vote the Restricted Stock and to receive any cash dividends, as well as any tag-along, drag-along, or any other |

right of any other stockholder.

**Registration/Tag-Along Rights:** The recipients will have the same registration/tag along rights as affiliated bond holders.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**EXHIBIT G**
**to**
**Disclosure Statement:**
**Description of New Third-Lien Notes**

[THIS PAGE INTENTIONALLY LEFT BLANK]

## DESCRIPTION OF NOTES

**General**

Certain terms used in this description are defined under the subheading "Certain Definitions." In this description, the terms "*we*," "*our*," "*us*" and "*the Issuer,*" "*the Company*" each refer to Remy International, Inc. (the "*Issuer*") and not to its consolidated Subsidiaries.

The Issuer will issue $100,000,000 aggregate principal amount of third priority floating rate senior secured notes due 2014 (including any PIK Notes (as defined below), the "*Notes*") under an indenture to be dated as of the Effective Date or such other date as is agreed to by the Issuer and the Holders (as such may be amended or supplemented from time to time, the "*Indenture*") among the Issuer, the Guarantors and The Bank of New York Trust Company, N.A., as trustee (the "*Trustee*"). Except as set forth herein, the terms of the Notes will include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act.

The following description is only a summary of the material provisions of the Indenture and related agreements, does not purport to be complete, and is qualified in its entirety by reference to the provisions of those agreements, including the definitions therein of certain terms used below.

**Brief Description of Notes**

The Notes:

- will be general obligations of the Issuer;

- will be secured on a third-priority basis, equally and ratably, with all existing and future obligations of the Issuer and the Guarantors under any future Junior Lien Obligations, by all of the assets of the Issuer and the Guarantors which secure the First Lien Obligations, subject to the Liens securing the First Lien Obligations and the Second Lien Obligations and other Permitted Liens;

- will be subordinated in right of payment to the First Lien Obligations and the Second Lien Obligations;

- may be subordinate to obligations secured by certain Permitted Liens, to the extent of the value of the assets of the Issuer and the Guarantors subject to those Permitted Liens;

- will be structurally subordinated to any existing and future indebtedness and liabilities of non-guarantor Subsidiaries, including any Unrestricted Subsidiaries;

- will rank equally in right of payment with all existing and future senior indebtedness of the Issuer and the Guarantors, other than the First Lien Obligations and the Second Lien Obligations, but, to the extent of the value of the Collateral (after taking into account the First Lien Obligations, the Second Lien Obligations and obligations secured by other Permitted Liens), will be effectively senior to all of the Issuer's and the Guarantors' unsecured senior indebtedness;

- will be senior in right of payment to any future Subordinated Indebtedness of the Issuer; and

- will be unconditionally guaranteed on a joint and several and senior basis by each Restricted Subsidiary that guarantees any First Lien Obligations or Second Lien Obligations.

**Guarantees**

The Guarantors, as primary obligors and not merely as sureties, will jointly and severally fully and unconditionally guarantee the performance and full and punctual payment when due, whether at maturity, by

acceleration or otherwise, of all obligations of the Issuer under the Indenture and the Notes, whether for payment of principal of, premium, if any, or interest in respect of the Notes, expenses, indemnification or otherwise, on the terms set forth in the Indenture.

The current and future Subsidiaries that guarantee the Issue Date Credit Facilities will guarantee the Notes. Each of the Guarantees of the Notes will be subordinated in right of payment to the First Lien Obligations and the Second Lien Obligations of each Guarantor and will be secured by a third-priority lien on all of the assets of each Guarantor that secure the Issue Date Credit Facilities or other First Lien Obligations or Second Lien Obligations. The Guarantees will rank equally in right of payment with all existing and future senior indebtedness of the Guarantor, other than the First Lien Obligations and the Second Lien Obligations, but, to the extent of the value of the Collateral (after taking into account the First Lien Obligations, the Second Lien Obligations and obligations secured by other Permitted Liens), will be effectively senior to all of the Guarantor's unsecured senior indebtedness. The Guarantees will be senior in right of payment to all existing and future Subordinated Indebtedness of each Guarantor.

Not all of the Issuer's Subsidiaries will Guarantee the Notes. In the event of a bankruptcy, liquidation or reorganization of any of these non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to the Issuer.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law.

Any Guarantor that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's *pro rata* portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

If a Guarantee were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the Guarantor, and, depending on the amount of such indebtedness, a Guarantor's liability on its Guarantee could be reduced to zero.

Each Guarantee by a Guarantor will provide by its terms that it will be automatically and unconditionally released and discharged upon:

(a) if no First Lien Obligations and Second Lien Obligations (and no commitments therefor) are then outstanding, any sale, exchange or transfer (by merger or otherwise) of the Capital Stock of such Guarantor, after which the applicable Guarantor is no longer a Restricted Subsidiary or all or substantially all the assets of such Guarantor, which sale, exchange or transfer is made in compliance with and subject to the applicable provisions of the Indenture;

(b) the release or discharge of the guarantee by such Guarantor of the First Lien Obligations and Second Lien Obligations or such other guarantee or Indebtedness that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c) if no First Lien Obligations and Second Lien Obligations (and no commitments therefor) are then outstanding, the designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with the applicable provisions of the Indenture; or

(d) the exercise by the Issuer of its legal defeasance option or covenant defeasance option as described under "Legal Defeasance and Covenant Defeasance" or the discharge of the Issuer's obligations under the Indenture in accordance with the terms of the Indenture.

**Security**

*General*

The Notes and the Guarantees will be secured by third-priority security interests in the Collateral (third in priority to the first-priority and second-priority Liens securing the First Lien Obligations and Second Lien Obligations, respectively), in each case, subject to Permitted Liens. First Lien Secured Parties (and, after the discharge of First Lien Obligations, the Second Lien Secured Parties) have rights and remedies with respect to the Collateral that, if exercised, could adversely affect the value of the Collateral or the ability of the respective agents under the Intercreditor Agreement to realize or foreclose on the Collateral on behalf of holders of the Notes.

The Issuer and the Guarantors are and will be able to incur additional Indebtedness in the future which could share in the Collateral, including additional First Lien Obligations, additional Second Lien Obligations, additional Junior Lien Obligations and Obligations secured by Permitted Liens. The amount of such additional indebtedness is and will be limited by the covenant described under "Certain Covenants—Limitation on Liens" and the covenant described under "Certain Covenants—Limitation on Indebtedness." Under certain circumstances, the amount of any such additional indebtedness could be significant.

*After-Acquired Collateral*

From and after the Issue Date and subject to certain limitations and exceptions, if the Issuer or any Guarantor creates any additional Lien upon any property or asset to secure any First Lien Obligations or Second Lien Obligations, it must concurrently grant a perfected Lien upon such property as security for the Notes.

*Liens with Respect to the Collateral*

*Security Documents and Intercreditor Agreements*

The Issuer, the Guarantors and the Junior Lien Collateral Agent will enter into one or more Security Documents with respect to the Collateral defining the terms of the Liens that secure the Notes and the Guarantees with respect to such Collateral. These Liens will secure the payment and performance when due of all of the Obligations of the Issuers and the Guarantors under the Notes, the Indenture, the Guarantees and the Security Documents, as provided in the Security Documents.

The Junior Lien Collateral Agent, Second Lien Collateral Agent and the First Lien Collateral Agent will enter into an Intercreditor and Subordination Agreement (as the same may be amended from time to time, the "*Intercreditor Agreement*") with respect to the Collateral. The First Lien Collateral Agent is initially the collateral agent under the First Lien Credit Facility. The Second Lien Collateral Agent is initially the collateral agent under the Second Lien Credit Facility, and the Junior Lien Collateral Agent is initially the Trustee. Pursuant to the terms of the Intercreditor Agreement, payment of the Junior Lien Obligations will be subordinate and subject to the prior payment in full of all Senior Lien Obligations. The Senior Lien Obligations will be capped at the sum of the First Lien Cap Amount and the Second Lien Cap Amount.

Without the express prior written consent of Senior Agent, no Holder may take, demand or receive from the Company and its Subsidiaries and the Company and its Subsidiaries may not make, give or permit, any prepayment (whether optional, voluntary, mandatory or otherwise) or other payment (except for regularly scheduled interest payments in accordance with the terms of the Notes <u>provided</u> no default has occurred and is continuing under any of the Senior Loan Obligations) (in each case, whether by redemption, defeasance or other payment or distribution), of any Junior Lien Obligation of any kind prior to the scheduled maturity date thereof or prior to the date on which such payment is required to be made under the terms of the Notes and the other Junior Lien Documents. Furthermore, the Junior Lien Collateral Agent will not be permitted to enforce the security interests even if any Event of Default under the Indenture has occurred and the Notes have been accelerated except in any insolvency or liquidation proceeding, solely as necessary to file a proof of claim or statement of interest with respect to the Junior Lien Obligations and vote on behalf of the Holders with respect to the Junior Lien Obligations in any such proceeding. The proceeds from the sale of the Collateral remaining after the satisfaction of all Senior Lien

Obligations may not be sufficient to satisfy the Junior Lien Obligations. By its nature some or all of the Collateral is and will be illiquid and may have no readily ascertainable market value. Accordingly, the Collateral may not be able to be sold in a short period of time, if salable.

In addition, without the express prior written consent of Senior Agent, while a Standstill Period is in effect, Junior Lien Collateral Agent may not (i) take, demand or receive from any Credit Party, and no Credit Party may make, give or permit, any Payment or Distribution (except under certain bankruptcy matters), or (ii) exercise remedies against any Credit Party or any of its assets or property; provided, however, that if no Standstill Period is then in effect, Credit Parties may make, and each Holder may receive, scheduled payments when due under the Notes, provided, that (i) no default under the Senior Loan Documents shall have occurred and be continuing or would result after giving effect to any such payment and (ii) after giving effect to any such payment, Excess Availability is no less than $40,000,000. Following an acceleration of the maturity of the Senior Lien Obligations and as long as such acceleration shall continue unrescinded, all Senior Lien Obligations will first be paid in full in cash before any payment or distribution is made on account of or applied on the Junior Lien Obligations (except to the extent payments are permitted as described in the first sentence of this paragraph and certain bankruptcy distributions discussed below). No acceleration (other than automatic acceleration upon the occurrence of certain bankruptcy or insolvency events with respect to the Company or a Significant Subsidiary) of the maturity of the Notes will be effective until five Business Days following notice by Holders to Senior Agent of such acceleration.

In addition, the Junior Lien Obligations will be subordinated to the Senior Lien Obligations irrespective of: (i) the time, order or method of attachment or perfection of the security interests created by any Senior Security Document or any Security Document; (ii) the time or order of filing or recording of financing statements or other documents filed or recorded to perfect security interests in any Collateral; (iii) anything contained in any filing or agreement to which the any Senior Lender or any Holder now or hereafter may be a party; and (iv) the rules for determining perfection or priority under the Uniform Commercial Code or any other law governing the relative priorities of secured creditors, any security interest in any Collateral pursuant to any Senior Security Document has and shall have priority, to the extent of any unpaid Senior Lien Obligations, over any security interest in such Collateral pursuant to any Security Documents. In exercising rights and remedies with respect to the Collateral, Senior Lenders may enforce the provisions of the Senior Security Documents and exercise remedies thereunder and under any other Senior Loan Documents, all in such order and in such manner as Senior Lenders may determine in the exercise of their sole business judgment. Such exercise and enforcement shall include, without limitation, the rights to sell or otherwise dispose of Collateral, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction. Subject to the Standstill Provisions described below, when all Senior Lien Obligations have been paid in full (whether in cash or otherwise satisfied, as determined by Senior Agent in its sole discretion), and the Senior Security Documents no longer are in effect, the Holders will have the right to enforce the provisions of the Security Documents and exercise remedies thereunder.

In addition, so long as the Senior Lien Obligations have not been paid in full and any Senior Security Document remains in effect, while a Standstill Period is in effect, neither Junior Lien Collateral Agent nor any Holder may (i) exercise or seek to exercise any rights or exercise any remedies with respect to any Collateral or (ii) institute any action or proceeding with respect to such rights or remedies, including without limitation, any action of foreclosure or any case or proceeding in relation to a bankruptcy or insolvency event, (iii) contest, protest or object to any foreclosure proceeding, postpetition financing, use of cash collateral or action brought by any Senior Lender or any other exercise by any Senior Lender of any rights and remedies under any Senior Loan Documents; and (iv) Senior Lenders will have the exclusive right to enforce rights and exercise remedies with respect to the Collateral and Senior Lenders will not be required to marshal any Collateral. Furthermore, the Junior Lien Collateral Agent may not exercise remedies with respect to the Collateral without first providing the Senior Agent at least fifteen (15) Business Days' written notice of an event of default under the Notes or the Indenture and advising the Senior Agent of its intention to exercise remedies against the Collateral as a result thereof, and if the Senior Agent does not deliver a Standstill Notice to the Junior Lien Collateral Agent by the end of such fifteen (15) Business Day period, then the Junior Lien Collateral Agent may proceed with the exercise of such remedies, and if Junior Lien Collateral Agent elects to exercise such remedies, neither the Senior Agent nor any of the Senior Lenders may exercise any of the remedies of the type described in the first sentence of this paragraph so long as the Junior Lien Collateral Agent has commenced and is diligently pursuing in good faith the enforcement of rights and the exercise of remedies with respect to the Collateral unless and until the Junior Lien Obligations have been paid in full. A Standstill Period may

not extend beyond Second Lien Standstill Period plus sixty (60) Days days from the date of receipt by the Junior Lien Collateral Agent from the Senior Agent of a Standstill Notice initiating such Standstill Period. A default under the Senior Lien Obligations that existed or was continuing on the date of the commencement of any Standstill Period and that was known to Senior Agent or any Senior Lender cannot be made the basis for the commencement of a second Standstill Period, whether or not within a period of 360 consecutive days, unless such default has been cured or waived for a period of not less than thirty (30) consecutive days.

In addition, any money, property or securities realized upon the sale, disposition or other realization by Senior Lenders upon all or any part of the Collateral, will be applied by Senior Lenders in the following order: (i) first, to the payment in full of all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) paid or incurred by Senior Lenders in connection with the such realization on the Collateral or the protection of their rights and interests therein; (ii) second, to the payment in full of all Senior Lien Obligations in such order as Senior Lenders may elect in their sole discretion; (iii) third, to the payment in full of all costs and expenses (including, without limitation, reasonable attorneys fees and disbursements) paid or incurred by Junior Lien Collateral Agent in connection with such realization on the Collateral or the protection of the rights and interests therein of the Junior Lien Collateral Agent on behalf of the Holders; (d) fourth, to the payment in full of all Junior Lien Obligations then due and which are secured by such Collateral, which shall be paid to Junior Lien Collateral Agent, as agent for the Holders; and (e) fifth, to pay to Borrowers, or their representative or as a court of competent jurisdiction may direct, any surplus then remaining. The Senior Lenders' rights with respect to the Collateral include the right to release any or all of the Collateral from the Lien of any Senior Security Document or Security Document in connection with the sale of such Collateral, notwithstanding that the net proceeds of any such sale may not be used to permanently prepay any Senior Lien Obligations or Junior Lien Obligations, provided however, that such proceeds be used in accordance with the Senior Loan Documents. If, at any time any of the Company, any of its Subsidiaries or Senior Agent delivers notice to the Junior Lien Collateral Agent that any Collateral is sold, transferred or disposed of (i) by the owner of such Collateral in a transaction permitted under the Senior Loan Documents and the Indenture or (ii) during the existence of any event of default under the Senior Loan Documents to the extent Senior Agent has consented to such sale, transfer or disposition, then the Liens in favor of the Junior Lien Collateral Agent upon such Collateral will automatically be released and discharged as and when and to the extent such Liens on such Collateral securing the Senior Lien Obligations are released and discharged. If Senior Lenders determine, in connection with any sale of Collateral, that the release of the Lien of any Security Document on such Collateral in connection with such sale is necessary, the Junior Lien Collateral Agent must execute such release documents and instruments and shall take such further actions as Senior Lenders reasonably request.

In addition, each Holder may not (i) challenge the enforceability of any Senior Lender's claim (ii) challenge the enforceability of any liens or security interests in assets securing the Senior Lien Obligations, (iii) assert any claims which any Borrower may hold with respect to any Senior Lender, or (iv) object to any sale or other disposition of the Company's or any Subsidiary's assets consented to by Senior Lenders in any bankruptcy or other proceeding or any borrowing or grant of any lien by the Company's or any Subsidiary consented to by Senior Lenders in any such proceeding. To the extent that Senior Lenders receive payments on, or proceeds of Collateral for, the Senior Lien Obligations which are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to any credit party, a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law, or equitable cause, then to the extent of such payment or proceeds received, the Senior Lien Obligations, or part thereof, intended to be satisfied will be revived and continue in full force and effect as if such payments or proceeds had not been received by Senior Lenders. If a bankruptcy or other insolvency event occurs, the Junior Lien Collateral Agent shall retain the right to file a proof of claim or debt or other document or amendment thereof in the form required in such event and vote on behalf of Holders with respect to the Junior Lien Obligations in any such proceeding. If any Borrower or any other Credit Party is subject to a bankruptcy or other insolvency event and the Senior Agent desires to permit the use of cash collateral or to provide any such Person financing (or to permit any such Person to obtain financing) (collectively, "DIP Financing") under Section 363 or Section 364 of the Bankruptcy Code (or any similar provision under the law applicable to any insolvency event) to be secured by all or any portion of the Collateral, then the Junior Lien Collateral Agent, on behalf of itself and the Holders, will not raise an objection to such DIP Financing so long as (i) the aggregate principal amount of indebtedness incurred pursuant to such DIP Financing together with the aggregate principal amount of all outstanding Senior Lien Obligations does not exceed the sum of the First Lien Cap Amount plus the Second Lien Cap Amount, (ii) the interest rate, fees and other terms of such DIP Financing are consistent with general market

terms at that time for debtor-in-possession financing of a similar amount and, such DIP Financing does not require the immediate sale of all or a substantial portion of the Company's and certain Subsidiaries' assets or the waiver of Company's and certain Subsidiaries' exclusive right to file and solicit acceptances of a plan of reorganization; (iii) the Junior Lien Collateral Agent retains the right to seek a Lien on the Collateral (including proceeds thereof arising after the commencement of such proceeding) in respect of the Junior Lien Obligations with the same priority with respect to the Senior Lien Obligations as existed prior to the commencement of the case under applicable law (an "Adequate Protection Lien"), provided, that the bankruptcy court's refusal to grant such a lien or refusal to grant permitted interest payments will not be a basis for objecting to such DIP Financing, and (iv) such use of cash collateral or DIP Financing is subject to the terms of this Agreement. The Liens securing the Junior Liens Obligations in the Collateral will be subordinated to such DIP Financing (and all obligations relating thereto) to the same extent and upon the same terms and conditions as they are subordinate to the Liens securing the Senior Lien Obligations. The Junior Lien Collateral Agent may not (i) seek relief from the automatic stay of Section 362 of the Bankruptcy Code in respect of any portion of the Collateral; (ii) seek or request any adequate protection, other than Adequate Protection Liens, permitted replacement Liens and permitted interest payments; (iii) object to any sale of all or any portion of the Collateral in accordance with Sections 363 or 365 of the Bankruptcy Code other than if Senior Agent or any Senior Lender objects to any such sale, to the same extent as such objection; (iv) seek, or support any request, to dismiss any Insolvency Event or to convert any chapter 11 case of any such party from chapter 11 to chapter 7 of the Bankruptcy Code; (v) seek, or support any request for, the appointment of a trustee pursuant to section 1104(a)(1) of the Bankruptcy Code; (vi) seek, or support any request for, the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending any DIP Financing order pursuant to which Senior Agent and/or the Senior Lenders have provided such financing; (vii) subject to certain exceptions, propose or vote in favor of any plan of reorganization, arrangement or liquidation unless it provides for the payment in full (in cash or otherwise) of the Senior Lien Obligations, as determined by Senior Agent in its sole discretion or the provision of value for the benefit of Senior Lenders in an amount equal to their secured claims under the Senior Loan Documents; or (viii) take any action to directly or indirectly challenge or contest (A) the validity or the enforceability of the Senior Loan Documents or the liens and security interests granted to Agent and Senior Lenders with respect to the Senior Loan Obligations, (B) the rights and duties of Agent and Senior Lenders established in the Senior Loan Document, or (C) the validity or enforceability of this Agreement.

Any payment, distribution or proceeds thereof received by Holder at a time when such receipt is not expressly permitted by the terms of the Intercreditor Agreement or prior to the discharge of Senior Lien Obligations must be segregated and held in trust for the benefit of and forthwith paid over to the Senior Agent for the benefit of the Senior Lien Obligations.

*Certain Limitations on the Collateral*

The Collateral securing the Notes will not include any of the following assets (the "*Excluded Assets*"):

        (1)        the property or assets owned by any Subsidiary of the Issuer that is not a Guarantor;

        (2)        any Voting Stock that is issued by any Foreign Subsidiary, if and to the extent that the inclusion of such Voting Stock in the Collateral would cause the Collateral pledged by the Issuer or the applicable Guarantor, as the case may be, to include in the aggregate more than 65% of the total combined voting power of all classes of Voting Stock of such Foreign Subsidiary; and the pledge of such Collateral the pledge of such Collateral would result in adverse tax consequences to the Issuer or any of its Subsidiaries as reasonably determined by the Issuer and identified in writing to the First Lien Collateral Agent, the Second Lien Collateral Agent and the Junior Lien Collateral Agent;

        (3)        any Capital Stock and other securities of a Subsidiary to the extent that the pledge of such Capital Stock and other securities results in the Company's being required to file separate financial statements of such Subsidiary with the SEC, but only to the extent necessary to not be subject to such requirement and only for so long as such requirement is in existence and only with respect to the relevant Notes affected; *provided* that neither the Issuer nor any Subsidiary shall take any action in the form of a reorganization, merger or other restructuring a principal purpose of which is to provide for the release of the Lien on any Capital Stock pursuant to this clause (3). In addition, in the event that Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to require (or is

replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Subsidiary of the Company due to the fact that such Subsidiary's Capital Stock secures the Notes affected thereby, then the Capital Stock of such Subsidiary will automatically be deemed not to be part of the Collateral securing the relevant Notes affected thereby but only to the extent necessary to not be subject to such requirement and only for so long as required to not be subject to such requirement.  In such event, the Security Documents may be amended or modified, without the consent of any holder of such Notes, to the extent necessary to release the security interests in favor of the applicable collateral agents on the shares of Capital Stock that are so deemed to no longer constitute part of the Collateral for the relevant Notes.

(4)     any Capital Stock or securities convertible into or exchangeable for Capital Stock (i) if, in the reasonable judgment of the Issuer, the cost or other consequences of pledging such Collateral shall be excessive in view of the benefits to be obtained by the Junior Lien Secured Parties therefrom or (ii) the pledge of such Collateral would result in adverse tax consequences to the Issuer or any of its Subsidiaries as reasonably determined by the Issuer and identified in writing to the Second Lien Collateral Agent and Junior Lien Collateral Agent;

(5)     any Collateral to the extent the grant of the security interest therein would violate any requirement of law; and

(6)     proceeds and products from any and all of the foregoing excluded collateral described in clauses (1) through (5), unless such proceeds or products would otherwise constitute Collateral securing the Notes.

*Sufficiency of Collateral*

The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the condition of the Issuer's industry, the ability to sell the Collateral in an orderly sale, general economic conditions, the availability of buyers and similar factors.  The amount to be received upon a sale of the Collateral would also be dependent on numerous factors, including, but not limited to, the actual fair market value of the Collateral at such time and the timing and the manner of the sale. By their nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value.  Accordingly, there can be no assurance that the Collateral can be sold in a short period of time or in an orderly manner. In addition, in the event of a bankruptcy, the ability of the holders to realize upon any of the Collateral may be subject to certain bankruptcy law limitations as described below.

## Paying Agent and Registrar for the Notes

The Issuer will maintain one or more paying agents for the Notes in the Borough of Manhattan, City of New York. The initial paying agent for the Notes will be the Trustee.

The Issuer may change the paying agents or the registrars without prior notice to the Holders. The Issuer or any of its Subsidiaries may act as a paying agent or registrar.

## Transfer and Exchange

A Holder may transfer or exchange Notes in accordance with the Indenture. The registrar and the Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes.  Holders will be required to pay all taxes due on transfer.  The Issuer will not be required to transfer or exchange any Note selected for redemption.  Also, the Issuer will not be required to transfer or exchange any Note for a period of 15 days before a selection of Notes to be redeemed.

**Principal, Maturity and Interest**

The Issuer will issue $100,000,000 in aggregate principal amount of Notes in this offering.  The Notes will mature on [Issue Date month and date], 2014.  Subject to compliance with the covenant described below under the caption "Certain Covenants—Limitation on Indebtedness", the Issuer may issue additional Notes, from time to time after this offering under the Indenture (any such Notes, "*Additional Notes*").  In addition, in connection with the payment of PIK Interest in respect of the Notes, the Issuer is entitled to, without the consent of the Holders, increase the outstanding principal amount of the Notes or issue additional Notes (the "*PIK Notes*") under the Indenture on the same terms and conditions as the Notes offered hereby (in each case, the "*PIK Payment*").  Except as described under "Amendment, Supplement and Waiver," the Notes offered by the Issuer, the PIK Notes and any Additional Notes subsequently issued under the Indenture will be treated as a single class for all purposes under the Indenture, including waivers, amendments, redemptions and offers to purchase.  Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of Notes" include any PIK Notes and Additional Notes that are actually issued, and references to "principal amount" of  the Notes includes any increase in the principal amount of the outstanding Notes as a result of a PIK Payment.

Interest on the Notes will be payable semi-annually in arrears on [        ] and [        ], commencing on [        ], to the Holders of Notes of record on the immediately preceding [        ] and [        ].  Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date.  Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

For any interest payment period the Issuer will pay interest on the Notes:

- in cash ("*Cash Interest*") if the Free Cash Flow Coverage Ratio on the date that is six months prior to the relevant interest payment date (each, an "*Interest Determination Date*")  is equal to or greater than 1.5:1.0; and

- if the Free Cash Flow Coverage Ratio on the relevant Interest Determination Date is less than 1.5:1.0, in PIK Notes or, at the election of the Issuer, in cash.

Cash Interest on the Notes will accrue at a rate, reset semi-annually, of LIBOR plus 9.5% per annum. PIK Interest on the Notes will accrue at a rate, reset semi-annually, of LIBOR plus 12.0% per annum ("*PIK Interest*"). Upon the occurrence and during the continuance of an Event of Default, the outstanding principal on the Notes and all accrued but unpaid interest on the Notes from day to day will accrue interest at a rate, reset semi-annually, of LIBOR plus 12.0% per annum and be payable in cash on demand.

LIBOR will be determined by the Calculation Agent, which shall initially be the Trustee.  PIK Interest shall be payable (x) with respect to Notes represented by one or more global notes registered in the name of, or held by, The Depository Trust Company ("*DTC*") or its nominee on the relevant record date, by increasing the principal amount of the outstanding global Note by an amount equal to the amount of PIK Interest for the applicable interest period (rounded up to the nearest $1,000) and (y) with respect to Notes represented by certificated notes, by issuing PIK Notes in certificated form in an aggregate principal amount equal to the amount of PIK Interest for the applicable period (rounded up to the nearest whole dollar), and the Trustee will, at the request of the Issuer, authenticate and deliver such PIK Notes in certificated form for original issuance to the Holders on the relevant record date, as shown by the records of the register of Holders.  Following an increase in the principal amount of the outstanding global Notes as a result of a PIK Payment, the global Notes will bear interest on such increased principal amount from and after the date of such PIK Payment.  Any P1K Notes issued in certificated form will be dated as of the applicable interest payment date and will bear interest from and after such date.  All Notes issued pursuant to a PIK Payment will be governed by, and subject to the terms, provisions and conditions of, the Indenture and shall have the same rights and benefits as the Notes issued on the Issue Date.  Any certificated PIK Notes will be issued with the description PIK on the face of such PIK Note.

"LIBOR," with respect to an Interest Period, will be the rate (expressed as a percentage per annum) for deposits in U.S. dollars for six-month periods beginning on the first day of such Interest Period that appears on

Telerate Page 3750 as of 11:00 a.m., London time, on the Determination Date. If Telerate Page 3750 does not include such a rate or is unavailable on a Determination Date, the Calculation Agent will request the principal London office of each of four major banks in the London interbank market, as selected by the Calculation Agent, to provide such bank's offered quotation (expressed as a percentage per annum), as of approximately 11:00 a.m., London time, on such Determination Date, to prime banks in the London interbank market for deposits in a Representative Amount in U.S. dollars for a six-month period beginning on the first day of such Interest Period. If at least two such offered quotations are so provided, LIBOR for the Interest Period will be the arithmetic mean of such quotations. If fewer than two such quotations are so provided, the Calculation Agent will request each of three major banks in New York City, as selected by the Calculation Agent, to provide such bank's rate (expressed as a percentage per annum), as of approximately 11:00 a.m., New York City time, on such Determination Date, for loans in a Representative Amount in U.S. dollars to leading European banks for a six-month period beginning on the first day of such Interest Period. If at least two such rates are so provided, LIBOR for the Interest Period will be the arithmetic mean of such rates. If fewer than two such rates are so provided, then LIBOR for the Interest Period will be LIBOR in effect with respect to the immediately preceding Interest Period.

"Determination Date," with respect to an Interest Period, will be the second London Banking Day preceding the first day of the Interest Period.

"Interest Period" means the period commencing on and including an interest payment date and ending on and including the day immediately preceding the next succeeding interest payment date, with the exception that the first Interest Period shall commence on and include the Issue Date and end on and include [     ], 2008.

"London Banking Day" is any day in which dealings in U.S. dollars are transacted or with respect to any future date, are expected to be transacted in the London interbank market.

"Representative Amount" means a principal amount of not less than U.S. $1,000,000 for a single transaction in the relevant market at the relevant time.

"Telerate Page 3750" means the display designated as "Page 3750" on the Moneyline Telerate service (or such other page as may replace Page 3750 on that service).

The amount of interest for each day that the Notes are outstanding (the "Daily Interest Amount") will be calculated by dividing the interest rate in effect for such day by 360 and multiplying the result by the principal amount of the Notes. The amount of interest to be paid on the Notes for each Interest Period will be calculated by adding the Daily Interest Amounts for each day in the Interest Period. All percentages resulting from any of the above calculations will be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point, with five one-millionths of a percentage point being rounded upwards (e.g., 9.876545% (or .09876545) being rounded to 9.87655% (or .0987655)) and all dollar amounts used in or resulting from such calculations will be rounded to the nearest cent (with one-half cent being rounded upwards).

The interest rate on the Notes will in no event be higher than the maximum rate permitted by New York law as the same may be modified by U.S. law of general application. The Calculation Agent will, upon the request of the Holder of any Note, provide the interest rate then in effect with respect to the Notes.

All calculations made by the Calculation Agent in the absence of manifest error will be conclusive for all purposes and binding on the Company and the holders of the Notes.

**Mandatory Redemption; Offers to Purchase; Open Market Purchases**

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase Notes as described under the captions "Change of Control" and "Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock." The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

## Optional Redemption

The Issuer will not be entitled to redeem the Notes at its option prior to the second anniversary of the Issue Date.

On and after the second anniversary of the Issue Date, the Issuer will be entitled at its option to redeem all or a portion of the Notes upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed in percentages of principal amount on the redemption date), plus accrued interest to the redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the 12-month period commencing on [Issue Date month & date] of the years set forth below:

| Period | Redemption Price |
|---|---|
| 2009 | 112.00% |
| 2010 | 109.00% |
| 2011 | 106.00% |
| 2012 | 103.00% |
| 2013 and thereafter | 100.00% |

Pursuant to the Intercreditor Agreement, without the express prior written consent of the Senior Agent, no Holder may take, demand or receive from the Issuer, and the Issuer will not make, give or permit, any prepayment or other payment (except, if no Standstill Period is then in effect, for regularly scheduled interest payments in accordance with the terms of the Junior Lien Documents provided, that (i) no Senior Loan Default shall have occurred and be continuing or would result after giving effect to any such payment and (ii) after giving effect to any such payment, Excess Availability shall be no less than $40,000,000) of any Junior Lien Obligation of any kind prior to the scheduled maturity date thereof or prior to the date on which such payment is required to be made under the terms of the Junior Lien Documents.

## Change of Control

Under the terms of the Indenture, upon the occurrence of any of the events listed in paragraphs (1) through (4) below (each a "*Change of Control*"), each Holder shall have the right to require that the Company repurchase such Holder's notes at a purchase price in cash (expressed in percentages of principal amount on the date of purchase) (the "*Purchase Price*") set forth below, if purchased during the 12-month period commencing on [Issue Date month & date] of the following years:

| Period | Purchase Price |
|---|---|
| 2007 | 100.00% plus Applicable Premium |
| 2008 | 100.00% plus Applicable Premium |
| 2009 | 112.00% |
| 2010 | 109.00% |
| 2011 | 106.00% |
| 2012 | 103.00% |
| 2013 and thereafter | 101.00% |

, in each case plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date):

(1) any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than (A) a person consisting of one or more Permitted Holders (or a person in which Permitted Holders hold a majority of the aggregate number of shares held by such person), (B) an underwriter of equity securities in a public offering or (C) a person pursuing a drag along sale pursuant to the terms of the certificate of incorporation of the Company, is or becomes "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that for purposes of this clause (1) such person shall be deemed to have "beneficial ownership" of all shares that any such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of a majority of the total voting power of the Voting Stock of the Company; provided, however, that for purposes of this clause (1), such other person shall be deemed to beneficially own any Voting Stock of a specified person held by a parent entity, if such other person is the

beneficial owner (as defined in this clause (1)), directly or indirectly, of more than a majority of the voting power of the Voting Stock of such parent entity;

(2) at any time (A) that the Company or any successor by merger or consolidation is a public reporting company under the Exchange Act with its common stock listed on a national securities exchange or (B) after a registration statement covering shares of common stock filed pursuant to a demand registration under the registration rights agreement entered into in connection with the Plan has become effective, individuals who on the Issue Date constituted the Board of Directors (together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of the Company was made pursuant to special nomination rights provided under the Company's or such successor's certificate of incorporation or a stockholders agreement between the Company or such successor and such stockholder or stockholders or approved by a vote of a majority of the directors of the Company or such successor then still in office who were either directors on the Issue Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office;

(3) the merger or consolidation of the Company with or into another Person or the merger of another Person with or into the Company, or the sale, conveyance or other disposition of all or substantially all the assets of the Company (determined on a consolidated basis; it being agreed that for purposes of this definition, "substantially all the assets of the Company" shall include, without limitation, assets accounting for 51% or more of the sales of the Company and its subsidiaries taken as a whole during the immediately preceding twelve month period) to another Person, by means of any transaction or series of transactions, other than a merger or consolidation transaction immediately following which (A) securities issued in such transaction and in all other merger or consolidation transactions after the Issue Date ("Merger Issuance Voting Stock") represented in the aggregate less than 20% of the voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction immediately following such transaction and (B) the holders of securities representing the total voting power of the Voting Stock of the surviving Person in such merger or consolidation transaction (other than Merger Issuance Voting Stock) hold such securities (other than Merger Issuance Voting Stock) in the same proportion as before such transaction; or

(4) the adoption of a plan relating to the liquidation or dissolution of the Company.

Within 30 days following any Change of Control (but subject to compliance with the immediately succeeding paragraph), we will mail a notice to each Holder with a copy to the Trustee (the "*Change of Control Offer*") stating:

(1) that a Change of Control has occurred and that such Holder has the right to require us to purchase such Holder's notes at a purchase price in cash equal to the applicable Purchase Price on the date of purchase, plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest on the relevant interest payment date);

(2) the circumstances and relevant facts regarding such Change of Control (including relevant financial information);

(3) the purchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

(4) the instructions, as determined by us, consistent with the covenant described hereunder, that a Holder must follow in order to have its notes purchased.

We will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indentures applicable to a Change of Control Offer made by us and purchases all notes validly tendered and not withdrawn under such Change of Control Offer.

We will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the covenant described hereunder, we will comply with the applicable securities laws and regulations and shall not be deemed to have breached our obligations under the covenant described hereunder by virtue of our compliance with such securities laws or regulations.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of the Company and, thus, the removal of incumbent management. We have no present intention to engage in a transaction involving a Change of Control, although it is possible that we could decide to do so in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indentures, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to Incur additional Indebtedness are contained in the covenants described under "Certain Covenants—Limitation on Indebtedness," "Certain Covenants—Limitation on Liens" and "Certain Covenants—Limitation on Sale/Leaseback Transactions." Such restrictions can only be waived with the consent of the Holders of a majority in principal amount of the Notes then outstanding. Except for the limitations contained in such covenants, however, the Indentures will not contain any covenants or provisions that may afford Holders of the notes protection in the event of a highly leveraged transaction.

The Issue Date Credit Facilities provide that the occurrence of certain change of control events with respect to the Company would constitute a default thereunder.

Future indebtedness that we may incur may contain prohibitions on the occurrence of certain events that would constitute a Change of Control or require the repurchase of such indebtedness upon a Change of Control. Moreover, the exercise by the Holders of their right to require us to repurchase their Notes could cause a default under such indebtedness, even if the Change of Control itself does not, due to the financial effect of such repurchase on us. Finally, our ability to pay cash to the Holders of Notes following the occurrence of a Change of Control may be limited by our then existing financial resources. There can be no assurance that sufficient funds will be available when necessary to make any required repurchases.

The definition of "Change of Control" includes a disposition of all or substantially all of the assets of the Company to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Company. As a result, it may be unclear as to whether a Change of Control has occurred and whether a Holder of Notes may require the Company to make an offer to repurchase the Notes as described above.

The provisions under the Indenture, relative to our obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the Holders of a majority in principal amount of the Notes.

## Certain Covenants

The Indenture contains covenants including, among others, those summarized below:

### Financial Covenants

The financial covenants will be substantially the same as the financial covenants in the Second Lien Loan Agreement but 25% less restrictive.

### Limitation on Indebtedness

(a) Except as permitted under paragraph (b) below, the Company will not, and will not permit any Restricted Subsidiary to, Incur, directly or indirectly, any Indebtedness.

(b) Notwithstanding the foregoing paragraph (a), the Company and the Restricted Subsidiaries will be entitled to Incur any or all of the following Indebtedness:

(1) Indebtedness Incurred by the Company and its Restricted Subsidiaries pursuant to any Credit Facility; *provided, however*, that, immediately after giving effect to any such Incurrence, (A) the aggregate principal amount of all Indebtedness Incurred under this clause (1) and then outstanding does not exceed $330.0 million less the sum of all principal payments with respect to such Indebtedness pursuant to paragraph (a)(3)(A) of the covenant described under "Certain Covenants—Limitation on Sales of Assets

and Subsidiary Stock", (B) the aggregate principal amount of all Indebtedness in the form of term loans Incurred under this clause (1) and then outstanding does not exceed $205.0 million less the sum of all principal payments with respect to such Indebtedness pursuant to paragraph (a)(3)(A) of the covenant described under "Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" (other than principal payments in connection with which there has been a corresponding permanent reduction in a related revolving loan commitment), and (C) the aggregate principal amount of all Indebtedness in the form of revolving loans Incurred under this clause (1) and then outstanding does not exceed $125.0 million less the sum of all principal payments with respect to such Indebtedness pursuant to paragraph (a)(3)(A) of the covenant described under "Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" pursuant to which there has been a corresponding permanent reduction in the related revolving loan commitment;

(2)     Indebtedness owed to and held by the Company or a Restricted Subsidiary; *provided, however*, that (A) any subsequent issuance or transfer of any Capital Stock which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of such Indebtedness (other than to the Company or a Restricted Subsidiary) shall be deemed, in each case, to constitute the Incurrence of such Indebtedness by the obligor thereon, (B) if the Company is the obligor on such Indebtedness, such Indebtedness is expressly subordinated to the prior payment in full in cash of all obligations with respect to the notes, and (C) if a Subsidiary Guarantor is the obligor on such Indebtedness, such Indebtedness is expressly subordinated to the prior payment in full in cash of all obligations of such obligor with respect to its Subsidiary Guarantee;

(3)     Indebtedness represented by the Notes;

(4)     Indebtedness outstanding on the Issue Date (other than Indebtedness described in clause (1), (2), (3), (11), (12) or (13) of this covenant);

(5)     Refinancing Indebtedness in respect of Indebtedness Incurred pursuant to clause (3) or (4) or this clause (5);

(6)     Hedging Obligations consisting of Interest Rate Agreements and Currency Agreements entered into in the ordinary course of business and not for the purpose of speculation; *provided, however*, that such Interest Rate Agreements and Currency Agreements do not increase the Indebtedness of the Company outstanding at any time other than as a result of fluctuations in foreign currency exchange rates or interest rates or by reason of fees, indemnities and compensation payable thereunder;

(7)     obligations in respect of performance, bid and surety bonds, completion guarantees and banker's acceptances provided by the Company or any Restricted Subsidiary in the ordinary course of business;

(8)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; *provided, however*, that such Indebtedness is extinguished within five Business Days of its Incurrence;

(9)     Indebtedness consisting of the Subsidiary Guarantee of a Subsidiary Guarantor and any Guarantee by a Subsidiary Guarantor of Indebtedness Incurred pursuant to clause (1), (2), (3), (4), (6), or (7) or pursuant to clause (5) to the extent the Refinancing Indebtedness Incurred thereunder directly or indirectly Refinances Indebtedness Incurred pursuant to clause (3) or (4);

(10)     Indebtedness of the Company and its Restricted Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, in any case Incurred in connection with the disposition of any assets of the Company or any Restricted Subsidiary (other than Guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such assets for the purpose of financing such acquisition), in a principal amount not to exceed the gross proceeds actually received by the Company or any Restricted Subsidiary in connection with such disposition;

(11)     Purchase Money Indebtedness and Capitalized Lease Obligations (other than Customer Obligations) Incurred to finance the acquisition of any lease or improvement of property (real or personal) equipment or other assets in the ordinary course of business (whether outstanding on the Issue Date or thereafter Incurred) and which, when added together with all Refinancing Indebtedness Incurred in respect

of Indebtedness previously outstanding or Incurred pursuant to this clause (11) and then outstanding, do not exceed $15.0 million in the aggregate at any time outstanding;

(12)     Non-Recourse Indebtedness of Non-Recourse Foreign Subsidiaries in the form of revolving loans or receivables financings in an aggregate principal amount outstanding at any time not to exceed $65.0 million; *provided*, *however*, (A) any Incurrence of or change in any Indebtedness which results in any such Foreign Subsidiary ceasing to be a Non-Recourse Foreign Subsidiary shall be deemed to constitute the Incurrence by such Foreign Subsidiary of all its Indebtedness then outstanding and (B) the aggregate outstanding purchase price of receivables sold by Foreign Subsidiaries pursuant to Permitted Receivables Sales shall, for purposes of this clause (12) only, be deemed to constitute Indebtedness;

(13)     (A) Customer Obligations outstanding on the Issue Date but excluding any refinancings or replacements thereof and (B) additional Customer Obligations up to an aggregate amount of such additional Customer Obligations at any time of $6.0 million; and

(14)     Indebtedness of the Company or of any Restricted Subsidiary in an aggregate principal amount which, when taken together with all other Indebtedness of the Company and the Restricted Subsidiaries outstanding on the date of such Incurrence (other than Indebtedness permitted by clauses (1) through (13) above) does not exceed $10.0 million.

(c) Notwithstanding the foregoing, neither the Company nor any Restricted Subsidiary will incur any Indebtedness pursuant to the foregoing paragraph (b) if the proceeds thereof are used, directly or indirectly, to Refinance any Subordinated Indebtedness of the Company or any Restricted Subsidiary unless such Indebtedness shall be subordinated to the Notes or the applicable Subsidiary Guarantee to at least the same extent as such Subordinated Indebtedness.

(d) For purposes of determining compliance with this covenant:

(1)     in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the types of Indebtedness described above in clause (b), the Company, in its sole discretion, will classify such item of Indebtedness (or any portion thereof) at the time of Incurrence and will only be required to include the amount and type of such Indebtedness in one of the above clauses;

(2)     the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described above; and

(3)     all Indebtedness Incurred on the Issue Date under the Issue Date Credit Facilities will be deemed Incurred under clause (b)(1) above.

(e) For purposes of determining compliance with any U.S. dollar denominated restriction on the Incurrence of Indebtedness where the Indebtedness Incurred is denominated in a currency other than U.S. dollars, the amount of such Indebtedness will be the U.S. Dollar Equivalent determined on the date of the Incurrence of such Indebtedness; *provided, however*, that if any such Indebtedness denominated in a currency other than U.S. dollars is subject to a Currency Agreement covering all principal, premium, if any, and interest payable on such Indebtedness, the amount of such Indebtedness expressed in U.S. dollars will be as provided in such Currency Agreement. The principal amount of any Refinancing Indebtedness Incurred in the same currency as the Indebtedness being Refinanced will be the U.S. Dollar Equivalent of the Indebtedness Refinanced, except to the extent that (1) such U.S. Dollar Equivalent was determined based on a Currency Agreement, in which case the Refinancing Indebtedness will be determined in accordance with the preceding sentence, and (2) the principal amount of the Refinancing Indebtedness exceeds the principal amount of the Indebtedness being Refinanced, in which case the U.S. Dollar Equivalent of such excess will be determined on the date such Refinancing Indebtedness is Incurred.

*Limitation on Restricted Payments*

(a)     Except to the extent permitted under paragraph  (b) below, the Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, make a Restricted Payment.

(b) The preceding paragraph will not prohibit:

(1)     any purchase, redemption or other acquisition or retirement of Capital Stock of the Company made out of the Net Cash Proceeds of the substantially concurrent sale of, or made by exchange for, Capital Stock of the Company (other than Disqualified Stock and other than Capital Stock issued or

sold to a Subsidiary of the Company or an employee stock ownership plan or to a trust established by the Company or any of its Subsidiaries for the benefit of their employees to the extent that the purchase by such plan or trust is financed by Indebtedness of such plan or trust to the Company or any Subsidiary or for which the Company or any Subsidiary is liable, directly or indirectly, as a guarantor or otherwise (including by the making of cash contributions to such plan or trust which are used to pay interest or principal on such Indebtedness)) or a substantially concurrent cash capital contribution received by the Company from its stockholders;

(2)     any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Indebtedness of the Company or a Subsidiary Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, Subordinated Indebtedness of such Person which is permitted to be Incurred pursuant to the covenant described under "Certain Covenants—Limitation on Indebtedness";

(3)     so long as no Default has occurred and is continuing, the repurchase or other acquisition of shares of Capital Stock of the Company or any of its Subsidiaries from employees, former employees, directors or former directors of the Company or any of its Subsidiaries (or permitted transferees of such employees, former employees, directors or former directors), pursuant to the terms of the agreements (including employment agreements) or plans (or amendments thereto) approved by the Board of Directors under which such individuals purchase or sell or are granted the option to purchase or sell, shares of such Capital Stock; *provided, however*, that the aggregate amount of such repurchases, dividends, distributions and other acquisitions (excluding amounts representing cancellation of Indebtedness) shall not exceed the sum of (A) $2.0 million in any calendar year and (B) the Net Cash Proceeds received by the Company after the Issue Date from the sale of such shares to, or the exercise of the option to purchase such shares by, employees or directors of the Company or any of its Subsidiaries;

(4)     repurchases of Capital Stock deemed to occur upon exercise of stock options if such Capital Stock represents a portion of the exercise price of such options;

(5)     cash payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of the Company; provided, however, that any such cash payment shall not be for the purpose of evading the limitation of the covenant described under this subheading (as determined in good faith by the Board of Directors);

(6)     in the event of a Change of Control, and if no Default shall have occurred and be continuing, the payment, purchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness of the Company or any Subsidiary Guarantor, in each case, at a purchase price not greater than 101% of the principal amount of such Subordinated Indebtedness, plus any accrued and unpaid interest thereon; *provided, however*, that prior to such payment, purchase, redemption, defeasance or other acquisition or retirement, the Company (or a third party to the extent permitted by the Indenture) has made a Change of Control Offer with respect to the Notes as a result of such Change of Control and has repurchased all Notes validly tendered and not withdrawn in connection with such Change of Control Offer;

(7)     payments of intercompany subordinated Indebtedness, the Incurrence of which was permitted under clause (2) of paragraph (b) of the covenant described under "Certain Covenants— Limitation on Indebtedness"; *provided, however*, that no Default has occurred and is continuing or would otherwise result therefrom; or

(8)     in the event of a Change of Control, and if no Default shall have occurred and be continuing, the payment, purchase, redemption, defeasance or other acquisition or retirement of the Issue Date Preferred Stock at a purchase price not greater than the purchase price calculated using the terms of such Issue Date Preferred Stock as in effect on the Issue Date; *provided, however*, that prior to such payment, purchase, redemption, defeasance or other acquisition or retirement, the Company (or a third party to the extent permitted by the Indenture) has made a Change of Control Offer with respect to the Notes as a result of such Change of Control and has repurchased all Notes validly tendered and not withdrawn in connection with such Change of Control Offer.

*Limitation on Liens*

The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, Incur or permit to exist any Lien (the "*Initial Lien*") of any nature whatsoever on any of its properties (including Capital Stock of a Restricted Subsidiary), whether owned at the Issue Date or thereafter acquired securing any Indebtedness (other than Permitted Liens).

Any Lien created for the benefit of the Holders of the Notes pursuant to the preceding sentence shall provide by its terms that such Lien shall be automatically and unconditionally released and discharged upon the release and discharge of the Initial Lien.

*Limitation on Sale/Leaseback Transactions*

The Company will not, and will not permit any Restricted Subsidiary to, enter into any Sale/Leaseback Transaction with respect to any property unless:

(1)    the Company or such Restricted Subsidiary would be entitled to (A) Incur Indebtedness in an amount equal to the Attributable Debt with respect to such Sale/Leaseback Transaction pursuant to the covenant described under "Certain Covenants—Limitation on Indebtedness" and (B) create a Lien on such property securing such Attributable Debt without equally and ratably securing the Notes pursuant to the covenant described under "Certain Covenants—Limitation on Liens";

(2)    the consideration received by the Company or any Restricted Subsidiary in connection with such Sale/Leaseback Transaction are at least equal to the Fair Market Value (as determined by the Board of Directors) of such property; and

(3)    the Company applies the proceeds of such transaction in compliance with the covenant described under "Certain Covenants—Limitation on Sale of Assets and Subsidiary Stock."

*Impairment of Security Interest*

The Company will not, and will not permit any of its Restricted Subsidiaries to, take or knowingly or negligently omit to take, any action which action or omission might or would have the result of materially impairing the security interest, or the priority thereof, with respect to the Collateral for the benefit of the Trustee and the Holders.

*Amendment to Security Documents*

The Company shall not amend, modify or supplement, or permit or consent to any amendment, modification or supplement of, the Security Documents in any way that would be adverse to the holders of the Notes in any material respect, except as described above under "Security for the Notes" or as permitted under "Amendments and Waivers."

*After-Acquired Property*

Upon the acquisition by the Company or any Subsidiary Guarantor of any Additional Assets, the Company or such Subsidiary Guarantor shall execute and deliver such mortgages, deeds of trust, security instruments, financing statements and certificates and opinions of counsel as shall be reasonably necessary to vest in the Junior Lien Collateral Trustee a perfected security interest or lien, subject only to Permitted Liens, in such Additional Assets and to have such Additional Assets added to the Collateral, and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such Additional Assets to the same extent and with the same force and effect.

*Limitation on Restrictions on Distributions from Restricted Subsidiaries*

The Company will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to (a) pay dividends or make any other distributions on its Capital Stock to the Company or a Restricted Subsidiary or pay any Indebtedness owed to the Company, (b) make any loans or advances to the Company or (c) transfer any of its property or assets to the Company, except:

(1)    with respect to clauses (a), (b) and (c),

(A)     any encumbrance or restriction pursuant to an agreement in effect at or entered into on the Issue Date;

(B)     any encumbrance or restriction contained in the terms of any Indebtedness Incurred pursuant to clause (b)(1) and (2) of the covenant described under "Certain Covenants—Limitation on Indebtedness" or any agreement pursuant to which such Indebtedness was issued if (i) either (x) the encumbrance or restriction applies only in the event of and during the continuance of a payment default or a default with respect to a financial covenant contained in such Indebtedness or agreement or (y) the Company determines at the time any such Indebtedness is Incurred (and at the time of any modification of the terms of any such encumbrance or restriction) that any such encumbrance or restriction will not materially affect the Company's ability to make principal or interest payments on the notes and any other Indebtedness that is an obligation of the Company and (ii) the encumbrance or restriction is not materially more disadvantageous to the Holders of the notes than is customary in comparable financings or agreements (as determined by the Company in good faith);

(C)     any encumbrance or restriction with respect to a Restricted Subsidiary pursuant to an agreement relating to any Indebtedness Incurred by such Restricted Subsidiary on or prior to the date on which such Restricted Subsidiary was acquired by the Company (other than Indebtedness Incurred as consideration in, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Restricted Subsidiary became a Restricted Subsidiary or was acquired by the Company) and outstanding on such date;

(D)     any encumbrance or restriction pursuant to an agreement effecting a Refinancing of Indebtedness Incurred pursuant to an agreement referred to in clause (A) or (B) of clause (1) of this covenant or this clause (D) or contained in any amendment to an agreement referred to in clause (A) or (B) of clause (1) of this covenant or this clause (D); *provided, however*, that the encumbrances and restrictions with respect to such Restricted Subsidiary contained in any such refinancing agreement or amendment are, in the good faith judgment of the Board of Directors, no less favorable to the Holders of the notes, taken as a whole, than encumbrances and restrictions with respect to such Restricted Subsidiary contained in such predecessor agreements;

(E)     any encumbrance or restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the Capital Stock or assets of such Restricted Subsidiary pending the closing of such sale or disposition;

(F)     any encumbrance or restriction with respect to the disposition or distribution of assets or property and contained in joint venture agreements and other similar agreements entered into in the ordinary course of business; and

(G)     any restriction contained in any agreement or instrument governing Capital Stock (other than Disqualified Stock) of any Restricted Subsidiary that is in effect on the date such Restricted Subsidiary is acquired by the Company or a Restricted Subsidiary; or

(2)     with respect to clause (c) only

(A)     any encumbrance or restriction consisting of customary nonassignment provisions in leases governing leasehold interests to the extent such provisions restrict the transfer of the lease or the property leased thereunder; and

(B)     any encumbrance or restriction contained in security agreements or mortgages securing Indebtedness of a Restricted Subsidiary to the extent such encumbrance or restriction restricts the transfer of the property subject to such security agreements or mortgages.

*Limitation on Sales of Assets and Subsidiary Stock*

(a)     The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, consummate any Asset Disposition unless:

(1)    the Company or such Restricted Subsidiary receives consideration at the time of such Asset Disposition at least equal to the Fair Market Value (including as to the value of all non-cash consideration), as determined in good faith by the Board of Directors, of the shares and assets subject to such Asset Disposition;

(2)    at least 75% of the consideration thereof received by the Company or such Restricted Subsidiary is in the form of cash or cash equivalents; and

(3)    an amount equal to 100% of the Net Available Cash from such Asset Disposition is applied by the Company (or such Restricted Subsidiary, as the case may be)

(A)    *first*, to the extent the Company elects (or is required by the terms of any Indebtedness), to prepay, repay, redeem or repurchase First Lien Obligations or Second Lien Obligations within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash;

(B)    *second*, to the extent of the balance of such Net Available Cash after application in accordance with clause (A), to the extent the Company elects, to acquire Additional Assets (provided that such Additional Assets (except to the extent constituting Excluded Assets) shall be pledged at the time of their acquisition to the Junior Lien Collateral Agent as Collateral subject to the Intercreditor Agreement) in each case within one year from the later of the date of such Asset Disposition or the receipt of such Net Available Cash (or enter into a binding commitment within such year to acquire additional assets, provided that such commitment shall be subject to only customary conditions (other than financing) and such acquisition shall be consummated within 365 days after the end of such one-year period); and

(C)    *third*, subject to the Intercreditor Agreement, to the extent of the balance of such Net Available Cash after application in accordance with clauses (A) and (B), to make an offer to the Holders to purchase Notes pursuant to and subject to the conditions contained in the Indenture;

*provided, however*, that in connection with any prepayment, repayment or purchase of Indebtedness pursuant to clause (A) or (C) above, the Company or such Restricted Subsidiary shall permanently retire such Indebtedness and shall cause the related loan commitment (if any) to be permanently reduced in an amount equal to the principal amount so prepaid, repaid or purchased.

In the event of an Asset Disposition that requires the purchase of Notes pursuant to clause (a)(3)(C) above, the Company will purchase Notes tendered pursuant to an offer by the Company for the Notes at a purchase price in cash (expressed in percentages of principal amount on the date of purchase) set forth below, if purchased during the 12-month period commencing on [Issue Date month & date] of the following years:

| Period | Purchase Price |
| --- | --- |
| 2007 | 100.00% plus Applicable Premium |
| 2008 | 100.00% plus Applicable Premium |
| 2009 | 112.00% |
| 2010 | 109.00% |
| 2011 | 106.00% |
| 2012 | 103.00% |
| 2013 and thereafter | 100.00% |

, in each case plus accrued and unpaid interest, if any, to the date of purchase (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date) in accordance with the procedures (including prorating in the event of oversubscription) set forth in the Indenture. In the event that in connection with such Asset Disposition, the Company is also required to purchase other Junior Lien Obligations of the Company, the Company will purchase such other Junior Lien Obligations at a purchase price of 100% of their principal amount (or, in the event such other Junior Lien Obligations of the Company were issued with significant original issue discount, 100% of the accreted value thereof) without premium, plus accrued but unpaid interest (or such lesser price, if any, as may be provided for by the terms of such Junior Lien Obligations) in accordance with the procedures (including prorating in the event of oversubscription) set forth in the Indenture.

If the aggregate purchase price of the securities tendered exceeds the Net Available Cash allotted to their purchase, the Company will select the securities to be purchased on a *pro rata* basis but in round denominations, which in the case of the Notes will be denominations of $1,000 principal amount of multiples thereof.

Notwithstanding the foregoing provisions of this covenant, the Company and the Restricted Subsidiaries will not be required to apply any Net Available Cash in accordance with this covenant except to the extent that the aggregate Net Available Cash from all Asset Dispositions which is not applied in accordance with this covenant exceeds $10.0 million and then only to such extent. Pending application of Net Available Cash pursuant to this covenant, such Net Available Cash shall be invested in Temporary Cash Investments or applied to temporarily reduce revolving credit indebtedness.

For the purposes of clause (a)(2) of this covenant and clause (G) of the definition of the term "Asset Disposition", the following are deemed to be cash or cash equivalents:

(1)    the assumption of First Lien Obligations, Second Lien Obligations or other Senior Indebtedness of the Company (other than obligations in respect of Disqualified Stock of the Company) or any Restricted Subsidiary (other than obligations in respect of Disqualified Stock or Preferred Stock of a Subsidiary Guarantor) secured by a Permitted Lien that is prior to the Junior Lien and the release of the Company or such Restricted Subsidiary from all liability on such Indebtedness in connection with such Asset Disposition; and

(2)    securities received by the Company or any Restricted Subsidiary from the transferee that are promptly converted by the Company or such Restricted Subsidiary into cash, to the extent of cash received in that conversion.

(b)    The Company will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of notes pursuant to this covenant. To the extent that the provisions of any securities laws or regulations conflict with provisions of this covenant, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this covenant by virtue of its compliance with such securities laws or regulations.

*Limitation on Affiliate Transactions*

(a) The Company will not, and will not permit any Restricted Subsidiary to, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with any Affiliate of the Company (an "*Affiliate Transaction*") unless:

(1)    the terms of the Affiliate Transaction are no less favorable to the Company or such Restricted Subsidiary than those that could be obtained at the time of the Affiliate Transaction in arm's-length dealings with a Person who is not an Affiliate;

(2)    if such Affiliate Transaction involves an amount in excess of $5.0 million, the terms of the Affiliate Transaction are set forth in writing and a majority of the non-employee directors of the Company disinterested with respect to such Affiliate Transaction have determined in good faith that the criteria set forth in clause (1) are satisfied and have approved the relevant Affiliate Transaction as evidenced by a resolution of the Board of Directors; and

(3)    if such Affiliate Transaction involves an amount in excess of $10.0 million, the Board of Directors shall also have received a written opinion from an Independent Qualified Party to the effect that such Affiliate Transaction is fair, from a financial standpoint, to the Company and its Restricted Subsidiaries or is not less favorable to the Company and its Restricted Subsidiaries than could reasonably be expected to be obtained at the time in an arm's-length transaction with a Person who was not an Affiliate.

(b) The provisions of the preceding paragraph (a) will not prohibit:

(1)    any Investment (other than a Permitted Investment) or other Restricted Payment, in each case permitted to be made pursuant to (but only to the extent included in the calculation of the amount of Restricted Payments made pursuant to paragraph (a)(3) of) the covenant described under "Certain Covenants–Limitation on Restricted Payments";

(2)    any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Board of Directors;

(3)    loans or advances to employees in the ordinary course of business of the Company or its Restricted Subsidiaries, but in any event not to exceed $1.0 million in the aggregate outstanding at any one time;

(4)    the payment of fees, compensation or employee benefit arrangements to directors, officers or employees of the Company and its Restricted Subsidiaries in the ordinary course of business;

(5)    customary indemnity provided for the benefit of directors, officers or employees of the Company or any Restricted Subsidiary in the ordinary course of business;

(6)    any transaction with a Restricted Subsidiary; and

(7)    the issuance or sale of any Capital Stock (other than Disqualified Stock) of the Company.

*Limitation on the Sale or Issuance of Capital Stock of Restricted Subsidiaries*

The Company will not:

(1)    sell, pledge, hypothecate or otherwise dispose of any shares of Capital Stock of a Restricted Subsidiary (other than pledges of Capital Stock constituting First Priority Liens or Second Priority Liens); or

(2)    permit any Restricted Subsidiary, directly or indirectly, to issue or sell or otherwise dispose of any shares of its Capital Stock;

other than (A) to the Company or a Wholly Owned Subsidiary, (B) directors' qualifying shares, (C) if, immediately after giving effect to such issuance or sale, such Restricted Subsidiary would no longer constitute a Restricted Subsidiary or (D) with respect to the common stock of any Restricted Subsidiary, in a Public Equity Offering as a result of or after which a Public Market exists; *provided, however*, that, in the case of clauses (C) and (D), such issuance, sale or disposition or Public Equity Offering complies with the covenant described under "Certain Covenants–Limitation on Sales of Assets and Subsidiary Stock."

For purposes of this covenant, the creation of a Lien on any Capital Stock of a Restricted Subsidiary to secure Indebtedness of the Company or any of its Restricted Subsidiaries will not be deemed to be a violation of this covenant; *provided, however*, that any sale or other disposition by the secured party of such Capital Stock following foreclosure of its Lien will be subject to this covenant.

*Merger and Consolidation*

(a)    The Company will not consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, directly or indirectly, all or substantially all its assets to, any Person, unless:

(1)    the resulting, surviving or transferee Person (the "*Successor Company*") shall be a Person organized and existing under the laws of the United States of America, any State thereof or the District of Columbia and the Successor Company (if not the Company) shall expressly assume, by an indenture supplemental thereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, all the obligations of the Company under the notes and the Indentures;

(2)    immediately after giving *pro forma* effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Company or any Subsidiary as a result of such transaction as having been Incurred by such Successor Company or such Subsidiary at the time of such transaction), no Default shall have occurred and be continuing;

(3)    (A) immediately after giving *pro forma* effect to such transaction, the Successor Company would be required to pay Cash Interest on the Notes rather than PIK Interest or (B) the Free Cash Flow Coverage Ratio on the date of such transaction after giving pro forma effect thereto would be equal to or greater than the Free Cash Flow Coverage Ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(4)      the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures (if any) comply with the Indentures;

*provided, however*, that clause (3) will not be applicable to (A) a Restricted Subsidiary consolidating with, merging into or transferring all or part of its properties and assets to the Company or (B) the Company merging with an Affiliate of the Company solely for the purpose and with the sole effect of reincorporating the Company in another jurisdiction.

For purposes of this covenant, the sale, lease, conveyance, assignment, transfer or other disposition of all or substantially all of the properties and assets of one or more subsidiaries of the Company, which properties and assets, if held by the Company instead of such subsidiaries, would constitute all or substantially all of the properties and assets of the Company on a consolidated basis, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

The Successor Company will be the successor to the Company and shall succeed to, and be substituted for, and may exercise every right and power of, the Company under the Indentures, and the predecessor Company, except in the case of a lease, shall be released from the obligation to pay the principal of and interest on the notes.

(b) The Company will not permit any Subsidiary Guarantor to consolidate with or merge with or into, or convey, transfer or lease, in one transaction or a series of transactions, all or substantially all of its assets to any Person unless:

(1)      except in the case of a Subsidiary Guarantor (x) that has been disposed of in its entirety to another Person (other than to the Company or an Affiliate of the Company), whether through a merger, consolidation or sale of Capital Stock or assets or (y) that, as a result of the disposition of all or a portion of its Capital Stock, ceases to be a Subsidiary, in both cases, if in connection therewith the Company provides an Officers' Certificate to the Trustee to the effect that the Company will comply with its obligations under the covenant described under "Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" in respect of such disposition, the resulting, surviving or transferee Person (if not such Subsidiary) shall be a Person organized and existing under the laws of the jurisdiction under which such Subsidiary was organized or under the laws of the United States of America, or any State thereof or the District of Columbia, and such Person shall expressly assume, by a Guaranty Agreement, in a form satisfactory to the Trustee, all the obligations of such Subsidiary, if any, under its Subsidiary Guarantee;

(2)      immediately after giving effect to such transaction or transactions on a *pro forma* basis (and treating any Indebtedness which becomes an obligation of the resulting, surviving or transferee Person as a result of such transaction as having been issued by such Person at the time of such transaction), no Default shall have occurred and be continuing; and

(3)      the Company delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such Guaranty Agreement, if any, complies with the Indenture.

## Future Guarantors

The Indenture will provide that the Company will cause each Domestic Subsidiary that Incurs any Indebtedness (other than Indebtedness permitted to be Incurred pursuant to clauses (b)(2), (b)(7) and (b)(8) of the covenant described under "Certain Covenants–Limitation on Indebtedness"), and any other Subsidiary that guarantees any Indebtedness of the Company or any Domestic Subsidiary, to, in each case, at the same time, execute and deliver to the Trustee Guaranty Agreements pursuant to which such Subsidiary will Guarantee payment of the Notes on the same terms and conditions as those set forth in the Indenture.

## Reporting

The Company will provide the annual, quarterly and other financial statements, and other reports and notices to be agreed that are required to be provided pursuant to the Issue Date Credit Facilities at the times so required.

*Rating of Notes*

At any time after the first anniversary of the Issue Date, upon the request of the Holders of a majority in aggregate principal amount of the then outstanding Notes, the Company will obtain a current rating on the Notes by at least one nationally recognized statistical rating organization.

**Events of Default and Remedies**

The Indenture will provide that each of the following is an "*Event of Default*":

(1)     default in payment when due and payable, upon redemption, acceleration or otherwise, of principal of, or premium, if any, on the Notes;

(2)     default for 30 days or more in the payment when due of interest on or with respect to the Notes;

(3)     failure by the Issuer or any Guarantor for 30 days after receipt of written notice given by the Trustee or the Holders of not less 25% in principal amount of the Notes to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (1) and (2) above) contained in the Indenture, the Notes or the Security Documents, or any representation or warranty contained in any Security Document shall prove to have been untrue or incorrect in any material respect on or as of the date made or deemed made;

(4)     default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by the Issuer or any of its Restricted Subsidiaries or the payment of which is guaranteed by the Issuer or any of its Restricted Subsidiaries, other than Indebtedness owed to the Issuer or a Restricted Subsidiary, whether such Indebtedness or guarantee now exists or is created after the issuance of the Notes, if both:

(a)     such default either results from the failure to pay any principal of such Indebtedness at its stated final maturity (after giving effect to any applicable grace periods) or relates to an obligation other than the obligation to pay principal of any such Indebtedness at its stated final maturity and results in the holder or holders of such Indebtedness causing such Indebtedness to become due prior to its stated maturity; and

(b)     the principal amount of such Indebtedness, together with the principal amount of any other such Indebtedness in default for failure to pay principal at stated final maturity (after giving effect to any applicable grace periods), or the maturity of which has been so accelerated, aggregate $10.0 million or more at any one time outstanding;

(5)     failure by the Issuer or any Significant Subsidiary to pay final judgments aggregating in excess of $10.0 million, which final judgments remain unpaid, undischarged and unstayed for a period of more than 60 days after such judgment becomes final;

(6)     certain events of bankruptcy or insolvency with respect to the Issuer or any Significant Subsidiary;

(7)     the Guarantee of any Guarantor shall for any reason cease to be in full force and effect or be declared null and void or any responsible officer of any Guarantor denies that it has any further liability under its Guarantee or gives notice to such effect, other than by reason of the termination of the Indenture or the release of any such Guarantee in accordance with the Indenture; or

(8)     with respect to any Collateral having a fair market value in excess of $10.0 million, individually or in the aggregate, (a) the Lien under the Security Documents, at any time, ceases to be in full force and effect for any reason other than in accordance with the terms of the Indenture, the Security

Documents and the Intercreditor Agreement, (b) any Lien created thereunder or under the Indenture is declared invalid or unenforceable by a court of competent jurisdiction or (c) the Issuer or any Guarantor asserts, in any pleading in any court of competent jurisdiction, that any such Lien is invalid or unenforceable.

If any Event of Default (other than of a type specified in clause (6) above) occurs and is continuing under the Indenture, the Trustee or the Holders of at least 25% in principal amount of the then total outstanding Notes may declare the principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately.

Upon the effectiveness of such declaration, such principal and interest will be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising under clause (6) of the first paragraph of this section, all outstanding Notes will become due and payable without further action or notice. The Indenture will provide that the Trustee may withhold from the Holders notice of any continuing Default, except a Default relating to the payment of principal, premium, if any, or interest, if it determines that withholding notice is in their interest.

The Indenture provides that the Holders of a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default and its consequences under the Indenture except a continuing Default in the payment of interest on, premium, if any, or the principal of any Note held by a non-consenting Holder. In the event of any Event of Default specified in clause (4) above, such Event of Default and all consequences thereof (excluding any resulting payment default, other than as a result of acceleration of the Notes) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the Holders, if within 30 days after such Event of Default arose:

    (1)    the Indebtedness or guarantee that is the basis for such Event of Default has been discharged; or

    (2)    holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or

    (3)    the default that is the basis for such Event of Default has been cured.

Subject to the provisions of the Indenture relating to the duties of the Trustee thereunder, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the Holders of the Notes unless the Holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium, if any, or interest when due, no Holder of a Note may pursue any remedy with respect to the Indenture or the Notes unless:

    (1)    such Holder has previously given the Trustee notice that an Event of Default is continuing;

    (2)    Holders of at least 25% in principal amount of the total outstanding Notes have requested the Trustee to pursue the remedy;

    (3)    Holders of the Notes have offered the Trustee reasonable security or indemnity against any loss, liability or expense;

    (4)    the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

    (5)    Holders of a majority in principal amount of the total outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

Subject to certain restrictions, under the Indenture the Holders of a majority in principal amount of the total outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder of a Note or that would involve the Trustee in personal liability.

The Indenture will provide that the Issuer is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and the Issuer is required, within five Business Days, upon becoming aware of any Default, to deliver to the Trustee a statement specifying such Default.

## No Personal Liability of Directors, Officers, Employees and Stockholders

No director, officer, employee, incorporator or stockholder of the Issuer or any Guarantor or any of their parent companies (other than the Issuer and the Guarantors) shall have any liability for any obligations of the Issuer or the Guarantors under the Notes, the Guarantees or the Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder by accepting the Notes waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver may not be effective to waive liabilities under the federal securities laws, and it is the view of the SEC that such a waiver is against public policy.

## Legal Defeasance and Covenant Defeasance

The obligations of the Issuer and the Guarantors under the Indenture will terminate (other than certain obligations) and will be released upon payment in full of all of the Notes. The Issuer may, at its option and at any time, elect to have substantially all of its obligations discharged with respect to the Notes and to have each Guarantor's obligation discharged with respect to its Guarantee ("*Legal Defeasance*"), except for the rights of Holders of Notes to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due solely out of the trust created pursuant to the Indenture. In such case, payment of the Notes may not be accelerated because of the occurrence of an Event of Default.

In addition, the Issuer may, at its option and at any time, elect to have its obligations and those of each Guarantor released with respect to certain covenants that are described in the Indenture ("*Covenant Defeasance*") and thereafter any omission to comply with such obligations shall not constitute a Default with respect to the Notes. In the event Covenant Defeasance occurs, certain events (not including bankruptcy, receivership, rehabilitation and insolvency events pertaining to the Issuer) described under "Events of Default and Remedies" will no longer constitute an Event of Default with respect to the Notes.

In order to exercise either Legal Defeasance or Covenant Defeasance with respect to the Notes:

(1) the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, premium, if any, and interest due on the Notes on the stated maturity date or on the redemption date, as the case may be, of such principal, premium, if any, or interest on such Notes, and the Issuer must specify whether such Notes are being defeased to maturity or to a particular redemption date;

(2) in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions,

(a) the Issuer has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

(b)    since the issuance of the Notes, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)    in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions, the Holders of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to such tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)    no Default (other than that resulting from borrowing funds to be applied to make such deposit and the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit, 123 days pass after such deposit is made, and during such period no Default shall have occurred;

(5)    such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under the First Lien Obligations, the Second Lien Obligations or any other material agreement or instrument (other than the Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound;

(6)    the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that, as of the date of such opinion and subject to customary assumptions and exclusions following the deposit, the trust funds will not be subject to the effect of Section 547 of Title 11 of the United States Code and that such trust does not constitute an investment company under the Investment Company Act of 1940;

(7)    the Issuer shall have delivered to the Trustee an Officer's Certificate stating that the deposit was not made by the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of the Issuer or any Guarantor or others; and

(8)    the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

**Satisfaction and Discharge**

The Indenture will be discharged and will cease to be of further effect as to all Notes, when either:

(1)    all Notes theretofore authenticated and delivered, except lost, stolen or destroyed Notes which have been replaced or paid, have been delivered to the Trustee for cancellation; or

(2)    (a) all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, will become due and payable within one year or may be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest to pay and discharge the entire indebtedness on the Notes not theretofore delivered

to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(b) no Default (other than that resulting from borrowing funds to be applied to make such deposit and the granting of Liens in connection therewith) with respect to the Indenture or the Notes shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit, and such deposit will not result in a breach or violation of, or constitute a default under, the First Lien Obligations, the Second Lien Obligations or any other material agreement or instrument (other than the Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound;

(c) the Issuer has paid or caused to be paid all sums payable by it under the Indenture; and

(d) the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

In addition, the Issuer must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

**Amendment, Supplement and Waiver**

Except as provided in the next two succeeding paragraphs, the Indenture, any Guarantee, any Security Document and the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the Notes then outstanding, including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes, and any existing Default or compliance with any provision of the Indenture, the Notes issued thereunder, any Guarantee or the Security Documents may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes, other than Notes beneficially owned by the Issuer or its Affiliates (including consents obtained in connection with a purchase of or tender offer or exchange offer for the Notes).

The Indenture will provide that, without the consent of each affected Holder of Notes, an amendment or waiver may not, with respect to any Notes held by a non-consenting Holder:

(1) reduce the principal amount of such Notes whose Holders must consent to an amendment, supplement or waiver;

(2) reduce the principal of or change the Stated Maturity of any such Note or alter or waive the provisions with respect to the redemption of such Notes (other than provisions relating to the covenants described above under the caption "Repurchase at the Option of Holders") to the extent that such amendment or waiver takes effect at a time when no such repurchase obligation has been triggered;

(3) reduce the rate of or change the time for payment of interest on any Note;

(4) waive a Default in the payment of principal of or premium, if any, or interest on the Notes, except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment default that resulted from such acceleration, or in respect of a covenant or provision contained in the Indenture or any Guarantee which cannot be amended or modified without the consent of all Holders;

(5) make any Note payable in money other than that stated therein;

(6) make any change in the provisions of the Indenture relating to waivers of past Defaults or the rights of Holders to receive payments of principal of or premium, if any, interest on the Notes;

(7) make any change in these amendment and waiver provisions;

(8)     impair the right of any Holder to receive payment of principal of, or interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(9)     make any change to or modify the ranking of the Notes or the subordination of the Liens with respect to the Notes that would adversely affect the Holders; or

(10)     except as expressly permitted by the Indenture, modify any Guarantee in any manner adverse to the Holders of the Notes.

In addition, without the consent of at least 75% in aggregate principal amount of Notes then outstanding, an amendment, supplement or waiver may not:

(11)     modify any Security Document or the provisions of the Indenture dealing with the Security Documents or application of trust moneys, or otherwise release any Collateral, in any manner materially adverse to the Holders other than in accordance with the Indenture, the Security Documents and the Intercreditor Agreement; or

(12)     modify the Intercreditor Agreement in any manner materially adverse to the Holders other than in accordance with the Indenture, the Security Documents and the Intercreditor Agreement.

Notwithstanding the foregoing, the Issuer, any Guarantor and the Trustee may amend or supplement the Indenture, any Security Document and any Guarantee or Notes without the consent of any Holder:

(13)     to cure any ambiguity, omission, mistake, defect or inconsistency;

(14)     to provide for the assumption by a successor corporation of the obligations of the Company or any Subsidiary under the Indenture;

(15)      to provide for uncertificated Notes of such series in addition to or in place of certificated Notes;

(16)     to comply with the covenant relating to mergers, consolidations and sales of assets;

(17)     to provide for the assumption of the Issuer's or any Guarantor's obligations to the Holders;

(18)     to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights under the Indenture of any such Holder;

(19)     to add covenants for the benefit of the Holders or to surrender any right or power conferred upon the Issuer or any Guarantor;

(20)     to comply with requirements of the SEC in order to effect or maintain the qualification of the Indenture under the Trust Indenture Act;

(21)     to evidence and provide for the acceptance and appointment under the Indenture of a successor Trustee thereunder pursuant to the requirements thereof;

(22)     to add a Guarantor under the Indenture;

(23)      to conform the text of the Indenture, Security Documents, Guarantees or the Notes to any provision of this "Description of Notes" to the extent that such provision in this "Description of Notes" was intended to be a verbatim recitation of a provision of the Indenture, Security Documents, Guarantee or Notes;

(24)     to make any amendment to the provisions of the Indenture relating to the transfer and legending of Notes as permitted by the Indenture, including, without limitation to facilitate the issuance and administration of the Notes; provided, however, that (i) compliance with the Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law and (ii) such amendment does not materially and adversely affect the rights of Holders to transfer Notes;

(25)     to mortgage, pledge, hypothecate or grant any other Lien in favor of the Trustee for the benefit of the Holders of the Notes, as additional security for the payment and performance of all or any portion of the Obligations under the Indenture, in any property or assets, including any which are required to be mortgaged, pledged or hypothecated, or in which a Lien is required to be granted to or for the benefit of the Trustee or the Collateral Agent pursuant to the Indenture, any of the Security Documents or otherwise;

(26)     to release Collateral from the Lien of the Indenture and the Security Documents when permitted or required by the Security Documents or the Indenture; or

(27)     in the case of the Security Documents, to give effect to the provisions of the Intercreditor Agreement (or any replacement thereof) or to the release of Collateral permitted by the provisions of the Indenture.

The consent of the Holders is not necessary under the Indenture to approve the particular form of any proposed amendment.  It is sufficient if such consent approves the substance of the proposed amendment.

## Notices

Notices given by publication will be deemed given on the first date on which publication is made and notices given by first-class mail, postage prepaid, will be deemed given five calendar days after mailing.

## Concerning the Trustee

The Indenture will contain certain limitations on the rights of the Trustee thereunder, should it become a creditor of the Issuer, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise.  The Trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue or resign.

The Indenture will provide that the Holders of a majority in principal amount of the outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee, subject to certain exceptions.  The Indenture will provide that in case an Event of Default shall occur (which shall not be cured), the Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of his own affairs.  Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder of the Notes, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

## Governing Law

The Indenture, the Notes and any Guarantee will be governed by and construed in accordance with the laws of the State of New York.

## Certain Definitions

Set forth below are certain defined terms used in the Indenture.  For purposes of the Indenture, unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person on a

consolidated basis in accordance with GAAP, but excluding from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

"*Additional Assets*" means:

(1) all or substantially all of an operating unit of a business or product line or any property, plant or equipment or other long-term assets used or useful in a Related Business;

(2) the Capital Stock of a Person that becomes a Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Company or another Restricted Subsidiary; or

(3) Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary;

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, '"control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Applicable Premium*" means, with respect to a Note on any date of purchase, the greater of (1) 12.0% of the principal amount of such Note and (2) the excess of (a) the present value at such time of (i) the purchase price of such Note on [Issue Date month & date], 2009 (such purchase price being described under "Change of Control" or "Certain Covenants–Limitation on Sales of Assets and Subsidiary Stock" as appropriate) plus (ii) all required interest payments due on such Note through [Issue Date month & date], 2009 assuming that the interest rate during such period is the same as the interest rate that would be applicable to the Notes as of the date of purchase if the Company were to pay PIK Interest (but excluding accrued and unpaid interest to the purchase date), computed using a discount rate equal to the Treasury Rate plus 75 basis points, over (b) the then-outstanding principal amount of such Note.

"*Attributable Debt*" in respect of a Sale/Leaseback Transaction means, as at the time of determination, the present value (discounted at the interest rate borne by the Notes, compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale/Leaseback Transaction (including any period for which such lease has been extended); *provided, however*, that if such Sale/Leaseback Transaction results in a Capitalized Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capitalized Lease Obligation."

"*Asset Disposition*" means any sale, lease (other than operating leases entered into in the ordinary course of business), transfer or other disposition (or series of related sales, leases, transfers or dispositions) by the Company or any Restricted Subsidiary, including any disposition by means of a merger, consolidation or similar transaction (each referred to for the purposes of this definition as a "*disposition*"), of:

(1) any shares of Capital Stock of a Restricted Subsidiary (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Company or a Restricted Subsidiary);

(2) all or substantially all the assets of any division or line of business of the Company or any Restricted Subsidiary; or

(3) any other assets of the Company or any Restricted Subsidiary outside of the ordinary course of business of the Company or such Restricted Subsidiary;

other than, in the case of clauses (1), (2) and (3) above,

(A) a disposition by a Restricted Subsidiary to the Company or by the Company or a Restricted Subsidiary to a Guarantor;

(B) for purposes of the covenant described under "Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" only, (i) a disposition that constitutes a Restricted

Payment (or would constitute a Restricted Payment but for the exclusions from the definition thereof) and that is not prohibited by the covenant described under "Certain Covenants—Limitation on Restricted Payments," (ii) a disposition of all or substantially all the assets of the Company and its Restricted Subsidiaries in accordance with the covenant described under "Certain Covenants—Merger and Consolidation" and (iii) a disposition of accounts receivable (and related assets) in connection with a Permitted Receivables Financing;

      (C) a disposition of assets with a Fair Market Value of less than $500,000;

      (D) a disposition of cash or Temporary Cash Investments;

      (E) sales or other dispositions of obsolete, uneconomical, negligible, worn-out or surplus assets in the ordinary course of business (including equipment and intellectual property);

      (F) the creation of a Lien (but not the sale or other disposition of the property subject to such Lien);

      (G) if in the case of any such disposition (i) the consideration thereof received by the Company or such Restricted Subsidiary is equal to or greater than the Fair Market Value of the assets being disposed of and (ii) at least 75% of the consideration thereof received by the Company or such Restricted Subsidiary is in the form of cash or cash equivalents, (x) the sale of real estate in Poland that is owned by the Company or any Restricted Subsidiary on the Issue Date, (y) the sale of the Capital Stock and assets of Remy UK, and (z) the sale of assets of Remy Reman, L.L.C.; and

      (H) Permitted Receivables Sales.

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Law*" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"*Borrowers*" means the Company and certain of its subsidiaries party to the First Lien Credit Agreement.

"*Business Day*" means each day which is not a Legal Holiday.

"*Capital Stock*" means:

      (1)      in the case of a corporation, corporate stock;

      (2)      in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

      (3)      in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

      (4)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"*Cash Interest*" has the meaning set forth under "Principal, Maturity and Interest"

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor thereto.

"*Collateral*" means all assets, other than Excluded Assets, of the Company and its Restricted Subsidiaries.

"*Consolidated Interest Expense*" means, for any period, the total interest expense of the Company and its consolidated Restricted Subsidiaries, plus (a), to the extent not included in such total interest expense, and to the extent incurred by the Company or its Restricted Subsidiaries, without duplication:

> (1)      interest expense attributable to Capital Lease Obligations, in each case determined in accordance with GAAP;

> (2)      amortization of debt discount;

> (3)      capitalized interest;

> (4)      non-cash interest expense;

> (5)      commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing;

> (6)      net costs associated with Hedging Obligations (including amortization of fees);

> (7)      dividends accrued in respect of all Disqualified Stock of the Company and all Preferred Stock of any Restricted Subsidiary, in each case held by Persons other than the Company or a Wholly Owned Subsidiary (other than dividends payable solely in Capital Stock (other than Disqualified Stock) of the Company); *provided, however,* that such dividends will be multiplied by a fraction the numerator of which is one and the denominator of which is one minus the effective combined tax rate of the issuer of such Preferred Stock (expressed as a decimal) for such period (as estimated by the chief financial officer of the Company in good faith);

> (8)      interest incurred in connection with Investments in discontinued operations;

> (9)      interest accruing on any Indebtedness of any other Person to the extent such Indebtedness is Guaranteed by (or secured by the assets of) the Company or any Restricted Subsidiary; and

> (10)      the cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than the Company or any Wholly Owned Subsidiary) in connection with Indebtedness Incurred by such plan or trust;

minus (b) to the extent included in such total interest expense, amortization of deferred financing costs, fees and expenses.

"*Credit Facilities*" means, with respect to the Issuer or any of its Restricted Subsidiaries, one or more debt facilities, including the Issue Date Credit Facilities, or other financing arrangements (including, without limitation, commercial paper facilities or indentures) providing for revolving credit loans, term loans, letters of credit or other long-term indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (*provided* that such increase in borrowings or such alteration of maturity (any such alteration being treated as an incurrence of Indebtedness) is permitted under "Certain Covenants–Limitation on Indebtedness") or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders.

"*Credit Facility Obligations*" with respect to a Credit Facility means all obligations of the Issuer under such Credit Facility.

"*Credit Parties*" means Borrowers and their respective subsidiaries, and their respective successors and assigns.

"*Currency Agreement*" means any foreign exchange contract, currency swap agreement or other similar agreement with respect to currency values.

"*Customer Obligations*" means liabilities classified as customer obligations on the Company's balance sheet.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event:

(1)    matures or is mandatorily redeemable (other than redeemable only for Capital Stock of such Person which is not itself Disqualified Stock) pursuant to a sinking fund obligation or otherwise;

(2)    is convertible or exchangeable at the option of the holder for Indebtedness or Disqualified Stock; or

(3)    is mandatorily redeemable or must be purchased upon the occurrence of certain events or otherwise, in whole or in part;

in each case on or prior to the first anniversary of the Stated Maturity of the Notes; *provided, however*, that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the first anniversary of the Stated Maturity of the Notes shall not constitute Disqualified Stock if:

(1) the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the terms applicable to the Notes and described under "Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" and "Change of Control"; and

(2) any such requirement only becomes operative after compliance with such terms applicable to the Notes, including the purchase of any Notes tendered pursuant thereto.

The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Stock is to be determined pursuant to the applicable Indenture; provided, however, that if such Disqualified Stock could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent financial statements of such Person.

"*Domestic Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not a Foreign Subsidiary.

""*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"*Event of Default*" has the meaning set forth under "Events of Default and Remedies."

"*Excess Availability*" means the amount as of the date of determination (i.e., the date any cash interest payment would be made on account of the Notes) equal to (a) the lesser of the Borrowing Base (as defined in the First Lien Credit Facility) or the maximum revolver commitments of the First Lien Obligations less (i) amounts outstanding under the revolver under the First Lien Credit Facility, (ii) letters of credit issued and outstanding, and (iii) outstanding bank overdrafts, plus (b) unrestricted balance sheet cash of the Company's domestic US Affiliates and Subsidiaries, after having given effect for the semi-annual interest payment which may be due on the Notes.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Fair Market Value*" means, with respect to any asset or property, the price which could be negotiated in an arm's length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. Fair Market Value will be determined in good faith by the Board of Directors of the Company, whose determination will be conclusive and evidenced by a resolution of such Board of Directors.

"*First Lien Cap Amount*" means the result of (a) $285,000,000, minus (b) the sum of (i) the aggregate amount of all repayments and prepayments of the principal amount of the term loan obligations under the First Lien Credit Facility (other than repayments or prepayments of such term loan obligations to the extent of a refinancing thereof), and (ii) the amount of all repayments and prepayments of revolving loan obligations under the First Lien Credit Facility which result in a permanent reduction of the revolving credit commitment under the First Lien Credit Facility (other than repayments or prepayments of such revolving loan obligations to the extent of a refinancing thereof).

"*First Lien Collateral*" means all of the assets of the Issuer or any Guarantor, whether real, personal or mixed, with respect to which a Lien has been granted as security for any First Lien Obligations pursuant to a First Lien Document.

"*First Lien Collateral Agent*" shall mean Barclays Bank PLC, in its capacity as administrative agent and collateral agent for the lenders and other secured parties under the First Lien Credit Facility and the other First Lien Documents, together with its successors and permitted assigns under such Credit Facility exercising substantially the same rights and powers; and in each case provided that if such First Lien Collateral Agent is not Barclays Bank PLC, such First Lien Collateral Agent shall have become a party to the Intercreditor Agreements and the other applicable First Lien Security Documents.

"*First Lien Credit Facility*" means the Issue Date Credit Facility governing the First Lien Obligations.

"*First Lien Documents*" means the credit agreement, guarantee and security documents governing the First Lien Obligations, including, without limitation, the First Lien Credit Facility and the First Lien Security Documents.

"*First Lien Obligations*" shall mean (a) all Obligations of the Issuer and its Subsidiaries under the First Lien Credit Facility and (b) all other Obligations of the Issuer and its Subsidiaries under any refinancings of the First Lien Credit Facility (and in each case any Hedging Obligations related thereto or to Second Lien Obligations), but in each case only to the extent Incurred pursuant to clause (b)(1) (or clause (b)(6), in the case of Hedging Obligations) of the covenant described under "Certain Covenants–Limitation on Indebtedness."

"*First Lien Secured Parties*" means, at any relevant time, the holders of First Lien Obligations at such time, including, without limitation, the lenders and agents under the First Lien Credit Facility and the First Lien Collateral Agent.

"*First Lien Security Documents*" means the Security Documents (as defined in the First Lien Credit Facility) and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"*First Priority Liens*" means the first priority Liens securing the First Lien Obligations.

"*Foreign Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

"*Free Cash Flow*" means, for any period of determination, net cash provided by (used in) operating activities, plus cash interest expense, less purchases of property, plant and equipment (other than purchases financed

by Capitalized Lease Obligations) and mandatory debt repayments, as determined in accordance with GAAP, as appropriate.

"*Free Cash Flow Coverage Ratio*" as of any date of determination means the ratio of (a) the aggregate amount of Free Cash Flow for the period of the most recent four consecutive fiscal quarters ending at least 45 days (or, if less, the number of days after the end of such fiscal quarter as the consolidated financial statements of the Company shall be provided to the Holders pursuant to the Indenture) prior to the date of such determination to (b) Consolidated Interest Expense for such four fiscal quarters; *provided, however*, that:

        (1)     if the Company or any Restricted Subsidiary has Incurred any Indebtedness since the beginning of such period that remains outstanding or if the transaction giving rise to the need to calculate the Free Cash Flow Coverage Ratio is an Incurrence of Indebtedness, or both, Free Cash Flow and Consolidated Interest Expense for such period shall be calculated after giving effect on a *pro forma* basis to such Indebtedness as if such Indebtedness had been Incurred on the first day of such period and the discharge of any other Indebtedness repaid, repurchased, defeased or otherwise discharged with the proceeds of such new Indebtedness as if such discharge had occurred on the first day of such period (except that, in the case of Indebtedness used to finance working capital needs incurred under a revolving credit or similar arrangement, the amount thereof shall be deemed to be the average daily balance of such Indebtedness during such four-fiscal-quarter period);

        (2)     if the Company or any Restricted Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Free Cash Flow Coverage Ratio, Free Cash Flow and Consolidated Interest Expense for such period shall be calculated on a *pro forma* basis as if such discharge had occurred on the first day of such period and as if the Company or such Restricted Subsidiary had not earned the interest income actually earned during such period in respect of cash or Temporary Cash Investments used to repay, repurchase, defease or otherwise discharge such Indebtedness;

        (3)     if since the beginning of such period the Company or any Restricted Subsidiary shall have made any Asset Disposition, Free Cash Flow for such period shall be reduced by an amount equal to Free Cash Flow (if positive) directly attributable to the assets which are the subject of such Asset Disposition for such period, or increased by an amount equal to Free Cash Flow (if negative), directly attributable thereto for such period and Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Company or any Restricted Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Company and its continuing Restricted Subsidiaries in connection with such Asset Disposition for such period (or, if the Capital Stock of any Restricted Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary to the extent the Company and its continuing Restricted Subsidiaries are no longer liable for such Indebtedness after such sale);

        (4)     if since the beginning of such period the Company or any Restricted Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary (or any Person which becomes a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction requiring a calculation to be made hereunder, which constitutes all or substantially all of an operating unit of a business, Free Cash Flow and Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto (including the Incurrence of any Indebtedness) as if such Investment or acquisition occurred on the first day of such period; and

        (5)     if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period) shall have made any Asset Disposition, any Investment or acquisition of assets that would have required an adjustment pursuant to clause (3) or (4) above if made by the Company or a Restricted Subsidiary during such period, Free Cash Flow and Consolidated Interest Expense for such period shall be calculated after giving

*pro forma* effect thereto as if such Asset Disposition, Investment or acquisition occurred on the first day of such period.

For purposes of this definition, whenever *pro forma* effect is to be given to an acquisition of assets, the amount of income or earnings relating thereto and the amount of Consolidated Interest Expense associated with any Indebtedness Incurred in connection therewith, the *pro forma* calculations shall be determined in good faith by a responsible financial or accounting Officer of the Company. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness if such Interest Rate Agreement has a remaining term in excess of 12 months).

If any Indebtedness is incurred under a revolving credit facility and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated based on the average daily balance of such Indebtedness for the four fiscal quarters subject to the *pro forma* calculation to the extent that such Indebtedness was incurred solely for working capital purposes.

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Issue Date.

"*Government Securities*" means securities that are:

(1)     direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(2)     obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America, the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee*" means the guarantee by any Guarantor of the Issuer's Obligations under the Indenture.

"*Guarantor*" means each Restricted Subsidiary that Guarantees the Notes in accordance with the terms of the Indenture.

"*Hedging Obligations*" means, with respect to any Person, the obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, commodity swap agreement, commodity cap agreement, commodity collar agreement, foreign exchange contract, currency swap agreement or similar agreement providing for the transfer or mitigation of interest rate, currency risks or commodity pricing either generally or under specific contingencies.

"*Holder*" means the Person in whose name a Note is registered on the registrar's books.

"*Immaterial Subsidiaries*" shall mean any direct or indirect subsidiary that has less than (i) $15,000,000 in sales (externally and internally), or (ii) $2,500,000 of EBITDA as defined in the First Lien Documents.

"*Incur*" means issue, assume, Guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Restricted Subsidiary. The term "Incurrence" when used as a noun shall have a correlative meaning. Solely for purposes of determining compliance with "Limitation on Indebtedness":

(1) amortization of debt discount or the accretion of principal with respect to a non-interest bearing or other discount security;

(2) the payment of interest in the form of additional Indebtedness of the same instrument or the payment of dividends on Capital Stock in the form of additional Capital Stock of the same class and with the same terms, in each case to the extent such pay-in-kind securities were contemplated on the issue date of the underlying securities; and

(3) the obligation to pay a premium in respect of Indebtedness arising in connection with the issuance of a notice of redemption or making of a mandatory offer to purchase such Indebtedness will not be deemed to be the Incurrence of Indebtedness.

"*Indebtedness*" means, with respect to any Person, without duplication:

(3) any indebtedness (including principal and premium) of such Person, whether or not contingent;

(a) in respect of borrowed money;

(b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c) representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

(d) representing any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(1) to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise on, the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(2) to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person.

"*Independent Qualified Party*" means an investment banking firm, accounting firm or appraisal firm of national standing; *provided, however,* that such firm is not an Affiliate of the Company.

"*Insolvency Event*" means (i) any Borrower or any of its Subsidiaries (other than any Immaterial Subsidiaries) commencing any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or

other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or any Borrower or any of its Subsidiaries (other than any Immaterial Subsidiaries) making a general assignment for the benefit of its creditors; or (ii) there being commenced against any Borrower or any of its Subsidiaries (other than any Immaterial Subsidiaries) any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of thirty (30) days; or (iii) there being commenced against any Borrower or any of its Subsidiaries (other than any Immaterial Subsidiaries) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within thirty (30) days from the entry thereof; or (iv) any Borrower or any of its Subsidiaries (other than any Immaterial Subsidiaries) taking any corporate action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or (v) any Borrower or any of its Subsidiaries (other than any Immaterial Subsidiaries) generally not paying, or being unable to pay, or admitting in writing its inability to pay, its debts as they become due.

"*insolvency or liquidation proceeding*" means:

(1)     any case commenced by or against the Issuer or any Guarantor under any Bankruptcy Law for the relief of debtors, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Issuer or any Guarantor, any receivership or assignment for the benefit of creditors relating to the Issuer or any Guarantor or any similar case or proceeding relative to the Issuer or any Guarantor or its creditors, as such, in each case whether or not voluntary;

(2)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Issuer or any Guarantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)     any other proceeding of any type or nature in which substantially all claims of creditors of the Issuer or any Guarantor are determined and any payment or distribution is or may be made on account of such claims.

"*Interest Rate Agreement*" means any interest rate swap agreement, interest rate cap agreement or other financial agreement or arrangement designed to protect the Company or any Restricted Subsidiary against fluctuations in interest rates.

"*Intercreditor Agreement*" has the meaning set forth under "Security–Liens with Respect to the Collateral."

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commissions, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of the Issuer in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.

"*Issue Date*" means the date of initial issuance of the Notes under the Indenture.

"*Issue Date Credit Facilities*" means the first lien and second lien credit agreements (the "*First Lien Credit Facility*" and the "*Second Lien Credit Facility,*" respectively) to be entered into as of the Issue Date by and among the Issuer, the lenders party thereto in their capacities as lenders thereunder and Barclays Bank PLC, as administrative agent, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals and restatements thereof.

"*Issue Date Preferred Stock*" means the shares of Series A Preferred Stock of the Company issued on the Issue Date in accordance with the terms of the Plan Support Agreement.

"*Junior Lien Collateral Agent*" shall mean (i) so long as the Notes are outstanding, the Trustee, in its capacity as Trustee and collateral agent for the Holders and other secured parties under the Indenture and the Security Documents, and (ii) at any time thereafter, such agent or trustee as is designated "Junior Lien Collateral Agent" by Junior Lien Secured Parties holding a majority in principal amount of the Junior Lien Obligations then outstanding or pursuant to such other arrangements as agreed to among the holders of the Junior Lien Obligations, it being understood that as of the Issue Date, the Trustee shall be so designated Junior Lien Collateral Agent.

"*Junior Lien Documents*" means the credit and security documents governing the Junior Lien Obligations, including, without limitation, the Indenture, the related Security Documents and Intercreditor Agreement.

"*Junior Lien Obligations*" means the Notes and Obligations with respect to other Indebtedness permitted to be incurred under the Indenture and the General Credit Facility which is by its terms intended to be secured equally and ratably with the Notes; *provided* such Lien is permitted to be incurred under the Indenture and the Credit Facility; *provided, further*, that the holders of such Indebtedness or their Junior Lien Representative is a party to the Security Documents in accordance with the terms thereof and has appointed the Junior Lien Collateral Agent as collateral agent for such holders of Junior Lien Obligations with respect to all or a portion of the Collateral.

"*Junior Lien Representative*" means any duly authorized representative of any holders of Junior Lien Obligations, which representative is a party to the Security Documents.

"*Junior Lien Secured Parties*" means (i) Holders (including the Holders of any Additional Notes subsequently issued under and in compliance with the terms of the Indenture), (ii) the Junior Lien Collateral Agent and (iii) the holders from time to time of any other Junior Lien Obligations and each Junior Lien Representative.

"*Junior Liens*" means the Liens securing the Junior Lien Obligations.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the State of New York.

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction; *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Net Available Cash*" from an Asset Disposition means cash payments received therefrom (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to such properties or assets or received in any other non-cash form), in each case net of:

(1)     all legal, title and recording tax expenses, commissions and other fees and expenses incurred, and all Federal, state, provincial, foreign and local taxes required to be accrued as a liability under GAAP, as a consequence of such Asset Disposition;

(2)     all payments made on any Indebtedness which is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon or other security agreement of any kind with respect to such assets, or which must by its terms, or in order to obtain a necessary consent to such Asset Disposition, or by applicable law, be repaid out of the proceeds from such Asset Disposition;

(3)     all distributions and other payments required to be made to minority interest holders in Restricted Subsidiaries as a result of such Asset Disposition;

(4)     the deduction of appropriate amounts provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the property or other assets disposed in such Asset Disposition and retained by the Company or any Restricted Subsidiary after such Asset Disposition; and

(5)     any portion of the purchase price from an Asset Disposition placed in escrow, whether as a reserve for adjustment of the purchase price, for satisfaction of indemnities in respect of such Asset Disposition or otherwise in connection with that Asset Disposition; *provided, however*, that upon the termination of that escrow, Net Available Cash will be increased by any portion of funds in the escrow that are released to the Company or any Restricted Subsidiary.

"*Net Cash Proceeds*," with respect to any issuance or sale of Capital Stock or Indebtedness, means the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees actually incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

"*Non-Recourse Foreign Subsidiary*" means any Foreign Subsidiary so long as such Foreign Subsidiary does not have any Indebtedness outstanding other than Non-Recourse Indebtedness.

"*Non-Recourse Indebtedness*" with respect to any Person means Indebtedness:

(1)     as to which neither the Company nor any Restricted Subsidiary (other than a Non-Recourse Foreign Subsidiary) (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable (as a borrower, guarantor or otherwise) or (c) constitutes the lender;

(2)     as to which no default (including any rights that the holders thereof may have to take enforcement action against the Company or any Restricted Subsidiary (other than a Non-Recourse Foreign Subsidiary)), would permit (upon notice, lapse of time or both) any holder of any other Indebtedness of the Company or any Restricted Subsidiary (other than a Non-Recourse Foreign Subsidiary ) to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its Stated Maturity; and

(3)     as to which the lenders have been notified in writing they will not have recourse to the shares or assets of the Company or any Restricted Subsidiary (other than a Non-Recourse Foreign Subsidiary).

"*Obligations*" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities, and guarantees of payment of such principal, interest, premiums, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer.

"*Officers' Certificate*" means a certificate signed on behalf of the Issuer by two Officers of the Issuer, at least one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, that meets the requirements set forth in the Indenture.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the Trustee.  The counsel may be an employee of or counsel to the Issuer or the Trustee.

"*Permitted Holders*" means each Holder party to the Plan Support Agreement and such party's Affiliates.

"*Permitted Investment*" means an Investment by the Company or any Restricted Subsidiary in:

(1)     the Company, a Wholly Owned Subsidiary or a Person that will, upon the making of such Investment, become a Wholly Owned Subsidiary; *provided, however*, that the primary business of such Wholly Owned Subsidiary is a Related Business;

(2)     another Person if, as a result of such Investment, such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all its assets to, the Company or a Wholly Owned Subsidiary; *provided, however*, that such Person's primary business is a Related Business;

(3)     cash and Temporary Cash Investments;

(4)     receivables owing to the Company or any Restricted Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; *provided, however*, that such trade terms may include such concessionary trade terms as the Company or any such Restricted Subsidiary deems reasonable under the circumstances;

(5)     payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(6)     loans or advances to employees made in the ordinary course of business consistent with past practices of the Company or such Restricted Subsidiary;

(7)     stock, obligations or securities received in settlement of debts created in the ordinary course of business and owing to the Company or any Restricted Subsidiary or in satisfaction of judgments;

(8)     any Person to the extent such Investment represents the non-cash portion of the consideration received for (A) an Asset Disposition as permitted pursuant to the covenant described under "Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" or (B) a disposition of assets not constituting an Asset Disposition;

(9)     any Person where such Investment was acquired by the Company or any of its Restricted Subsidiaries (A) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable or (B) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(10)     any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary;

(11)     any Person to the extent such Investments consist of Hedging Obligations otherwise permitted under the covenant described under "Certain Covenants—Limitation on Indebtedness"; and

(12)     any Person to the extent such Investment existed on the Issue Date, and any extension, renewal or other modification (other than an increase) of such Investment.

"*Permitted Liens*" means, with respect to any Person:

(1)     pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business;

(2)     Liens imposed by law or ordinary course of business contracts, such as carriers', warehousemen's, landlords' and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3)     Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)     Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5)     minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)     Liens securing Indebtedness permitted to be incurred pursuant to clause (11), (12) or (14) of the second paragraph under "Certain Covenants–Limitation on Indebtedness"; *provided* that (a) Liens securing Indebtedness permitted to be incurred pursuant to clause (11) of the second paragraph under "Certain Covenants–Limitation on Indebtedness" extend only to the assets so financed, purchased, constructed or improved, and (b) Liens securing Indebtedness permitted to be incurred pursuant to clause (12) of such paragraph extend only to the assets of Foreign Subsidiaries;

(7)     Liens existing on the Issue Date (other than First Priority Liens, Second Priority Liens and Liens of the types described in clause (6) of this definition);

(8)     Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided*, *however*, such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided*, *further*, *however*, that such Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries other than additions and accessions thereto and proceeds thereof;

(9)     Liens on property at the time the Issuer or a Restricted Subsidiary acquired the property, including any acquisition by means of a merger or consolidation with or into the Issuer or any of its Restricted Subsidiaries; *provided*, however, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided*, further, however, that the Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries other than additions and accessions thereto and proceeds thereof;

(10)     Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary that is a Guarantor permitted to be incurred in accordance with the covenant described under "Certain Covenants–Limitation on Indebtedness";

(11)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(12)     leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries and do not secure any Indebtedness;

(13)     Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(14)     First Priority Liens;

(15)     Second Priority Liens;

(16)     Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided, however*, that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8) and (9) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(17)     deposits made in the ordinary course of business to secure liability to insurance carriers;

(18)     Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under the caption "Events of Default and Remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(19)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(20)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Issuer or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Issuer or any of its Restricted Subsidiaries in the ordinary course of business; and

(21)     Liens on transfers of accounts receivable and contracts and instruments relating thereto arising solely in connection with the sale of such accounts receivable pursuant to a Permitted Receivables Sale.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Permitted Receivables Sale*" means any sale pursuant to which the Company or any Restricted Subsidiary may sell to any other Person any accounts receivable (and related assets) of the Company or any Restricted Subsidiary; *provided, however*, that:

(1)     the covenants, events of default and other provisions applicable to such sale shall be customary for such transactions and shall be on the market terms (as determined in good faith by the Board of Directors) at the time such sale is entered into;

(2)     the price applicable to such sale shall be a market sales price (as determined in good faith by the Board of Directors) at the time such sale is entered into; and

(3)     such sale shall be non-recourse to the Company and its Subsidiaries except to a limited extent customary for such transactions.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*PIK Interest*" has the meaning set forth under "Principal, Maturity and Interest."

"*PIK Notes*" has the meaning set forth under "Principal, Maturity and Interest."

"*PIK Payment*" has the meaning set forth under "Principal, Maturity and Interest."

"*Plan Support Agreement*" means that certain Plan Support Agreement relating to the Company, dated as of June 15, 2007, and any amendments thereto.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution or winding up.

"*Public Equity Offering*" means an underwritten primary public offering of common stock of the Company (or, for purposes of the covenant described under "Limitation on the Sale of Assets and Subsidiary Stock" any Restricted Subsidiary) pursuant to an effective registration statement under the Securities Act.

"*Public Market*" means any time after (i) a Public Equity Offering has been consummated with respect to a Restricted Subsidiary and (ii) at least 10% of the total issued and outstanding common stock of such Restricted Subsidiary has been distributed by means of an effective registration statement under the Securities Act or sales pursuant to Rule 144 under the Securities Act.

"*Purchase Money Indebtedness*" mean Indebtedness:

(1) consisting of the deferred purchase price of property, conditional sale obligations, obligations under any title retention agreement, other purchase money obligations and obligations in respect of industrial revenue bonds or similar Indebtedness, in each case where the maturity of such Indebtedness does not exceed the anticipated useful life of the asset being financed; and

(2) incurred to finance the acquisition by the Company or a Restricted Subsidiary of such asset, including additions and improvements;

*provided, however*, that any Lien arising in connection with any such Indebtedness shall be limited to the specified asset being financed or, in the case of real property or fixtures, including additions and improvements, the real property on which such asset is attached; and *provided further, however*, that such Indebtedness is Incurred within 90 days after such acquisition of such asset by the Company or Restricted Subsidiary.

"*Receivables Subsidiary*" means a bankruptcy remote, special purpose Wholly Owned Subsidiary formed in connection with a Permitted Receivables Financing.

"*Refinance*" means, in respect of any Indebtedness, to refinance, extend, review, refund, repay, prepay, purchase, redeem, defease or retire, or to issue other Indebtedness in exchange of replacement for, such Indebtedness. "Refinanced" and "Refinancing" shall have correlative meanings.

"*Refinancing Indebtedness*" means Indebtedness that Refinances any Indebtedness of the Company or any Restricted Subsidiary existing on the Issue Date or Incurred in compliance with the Indenture, including Indebtedness that Refinances Refinancing Indebtedness; provided, however, that:

(1) such Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced;

(2) such Refinancing Indebtedness has an average life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the average Life of the Indebtedness being Refinanced;

(3) such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding (plus fees and expenses, including any premium and defeasance cost) under the Indebtedness being Refinanced;

(4)     if the Indebtedness being Refinanced is subordinated in right of payment to the Notes, such Refinancing Indebtedness is subordinated in right of payment to the Notes at least to the same extent as the Indebtedness being Refinanced; and

(5)     if the Indebtedness being Refinanced is payable in-kind, such Refinancing Indebtedness is payable in-kind at least to the same extent as the Indebtedness being Refinanced;

provided further, however, that Refinancing Indebtedness shall not include (A) Indebtedness of a Subsidiary that Refinances Indebtedness of the Company or (B) Indebtedness of the Company or a Restricted Subsidiary that Refinances Indebtedness of an Unrestricted Subsidiary.

"*Related Business*" means any business in which the Company or any of the Restricted Subsidiaries was engaged on the Issue Date and any business related, ancillary or complementary to such business (as determined in good faith by the Board of Directors).

"*Remy UK*" means Remy Automotive UK Limited, a company incorporated in the United Kingdom.

"*Restricted Payment*" with respect to any Person means:

(1)     the declaration or payment of any dividends or any other distributions of any sort in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving such Person) or similar payment to the direct or indirect holders of its Capital Stock (other than (A) dividends or distributions payable solely in its Capital Stock (other than Disqualified Stock), (B) dividends or distributions payable solely to the Company or a Restricted Subsidiary and (C) pro rata dividends or other distributions made by a Subsidiary that is not a Wholly Owned Subsidiary to minority stockholders (or owners of an equivalent interest in the case of a Subsidiary that is an entity other than a corporation));

(2)     the purchase, redemption or other acquisition or retirement for value of any Capital Stock of the Company held by any Person (other than by a Restricted Subsidiary) or of any Capital Stock of a Restricted Subsidiary held by any Affiliate of the Company (other than by a Restricted Subsidiary), including in connection with any merger or consolidation and including the exercise of any option to exchange any Capital Stock (other than into Capital Stock of the Company that is not Disqualified Stock);

(3)     the purchase, repurchase, redemption, defeasance or other acquisition or retirement for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment of any Subordinated Indebtedness of the Company or any Guarantor (other than (A) from the Company or a Restricted Subsidiary or (B) the purchase, repurchase, redemption, defeasance or other acquisition of Subordinated Indebtedness purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition); or

(4)     the making of any Investment (other than a Permitted Investment) in any Person.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of the Issuer (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided*, *however*, that upon an Unrestricted Subsidiary's ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*Sale/Leaseback Transaction*" means an arrangement relating to property owned by the Company or a Restricted Subsidiary on the Issue Date or thereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a Person and the Company or a Restricted Subsidiary leases it from such Person.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Second Lien Cap Amount*" means the result of (a) $55,000,000 minus (b) the aggregate amount of all repayments and prepayments of the principal amount of the term loan obligations under the Second Lien Credit Facility (other than repayments or prepayments of such term loan obligations to the extent of a refinancing thereof).

"*Second Lien Collateral Agent*" shall mean (i) so long as the Notes are outstanding, the Second Lien Notes Agent, in its capacity as collateral agent for the holders and other secured parties under the Second Lien Credit Facility and the Security Documents, and (ii) at any time thereafter, such agent or trustee as is designated "Second Lien Collateral Agent" by Second Lien Secured Parties holding a majority in principal amount of the Second Lien Obligations then outstanding or pursuant to such other arrangements as agreed to among the holders of the Second Lien Obligations, it being understood that as of the Issue Date, the Second Lien Notes Agent shall be so designated Second Lien Collateral Agent.

"*Second Lien Credit Facility*" means the Issue Date Credit Facility governing the Second Lien Notes.

"*Second Lien Documents*" means the credit and security documents governing the Second Lien Obligations, including, without limitation, the Second Lien Credit Facility and the related Security Documents.

"*Second Lien Notes*" means the notes evidencing the Second Lien Obligations.

"*Second Lien Notes Agent*" means the administrative agent with respect to the Second Lien Notes.

"*Second Lien Obligations*" means (a) all Obligations of the Issuer and its Subsidiaries under the Second Lien Credit Facility and (b) all other Obligations of the Issuer and its Subsidiaries under any refinancings of the Second Lien Credit Facility (and in each case any related Hedging Obligations), but in each case only to the extent Incurred pursuant to clause (b)(1) of the covenant described under "Certain Covenants–Limitation on Indebtedness."

"*Second Lien Representative*" means any duly authorized representative of any holders of Second Lien Obligations, which representative is a party to the Security Documents.

"*Second Lien Secured Parties*" means (i) holders of the Second Lien Notes, (ii) the Second Lien Collateral Agent and (iii) the holders from time to time of any other Second Lien Obligations and each Second Lien Representative.

"*Second Priority Liens*" means the Liens securing the Second Lien Obligations.

"*Secured Indebtedness*" means any Indebtedness of the Issuer or any of its Restricted Subsidiaries secured by a Lien.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means, collectively, the Intercreditor Agreement, the security agreements relating to the Collateral and the mortgages and instruments filed and recorded in appropriate jurisdictions to preserve and protect the Liens on the Collateral (including, without limitation, financing statements under the Uniform Commercial Code of the relevant states) applicable to the Collateral, each as in effect on the Issue Date and as amended, amended and restated, modified, renewed or replaced from time to time.

"*Senior Agent*" means (1) at any time any First Lien Obligations are outstanding, the First Lien Collateral Agent and (2) at any time after payment in full of all First Lien Obligations, the Second Lien Collateral Agent.

"*Senior Lenders*" means, individually and collectively, the lenders from time to time under any Senior Obligation and any refinancing thereof.

"*Senior Lien Obligations*" means the collective reference to the First Lien Obligations and the Second Lien Obligations.

"*Senior Loan Documents*" shall mean the First Lien Documents and the Second Lien Documents, and all agreements, documents and instruments at any time executed and/or delivered by any Credit Party or any other person to, with or in favor of any Senior Lender in connection therewith or related thereto, as all of the foregoing

now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Senior Obligations)

"*Senior Obligations*" means the collective reference to the First Lien Obligations and the Second Lien Obligations.

"*Senior Security Documents*" the collective reference to the First Lien Security Documents and the Second Lien Security Documents.

"*Significant Subsidiary*" means any Restricted Subsidiary that is not an Immaterial Subsidiary.

"*Standstill Notice*" shall mean a written notice from Senior Agent to Junior Lien Collateral Agent stating that a Senior Loan Default has occurred and is continuing and stating that it is a "Standstill Notice".

"*Standstill Period*" shall mean the period beginning on the date that a Standstill Notice is delivered to Junior Lien Collateral Agent through and including the first to occur of (a) the date on which all Senior Obligations have been paid in full, (b) the date on which Senior Agent shall have waived or acknowledged in writing the termination of the default that gave rise to the Standstill Period, or (c) the date that is Second Lien Standstill Period plus sixty (60) days, after delivery of such Standstill Notice by Junior Lien Collateral Agent.

"*Stated Maturity*" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the Holder thereof upon the happening of any contingency unless such contingency has occurred).

"*Subordinated Indebtedness*" means, with respect to the Notes,

> (1)     any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and

> (2)     any Indebtedness of any Guarantor which is by its terms subordinated in right of payment to the Guarantee of such entity of the Notes.

"*Subsidiary*" means, with respect to any Person:

> (1)     any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof or is consolidated under GAAP with such Person at such time; and

> (2)     any partnership, joint venture, limited liability company or similar entity of which

>> (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, or

>> (y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Temporary Cash Investments*" means any of the following:

(1)      any investment in direct obligations of the United States of America or any agency thereof or obligations guaranteed by the United States of America or any agency thereof;

(2)      investments in demand and time deposit accounts, certificates of deposit and money market deposits maturing within 180 days of the date of acquisition thereof issued by a bank or trust company which is organized under the laws of the United States of America, any State thereof or any foreign country recognized by the United States of America, and which bank or trust company has capital, surplus and undivided profits aggregating in excess of $50.0 million (or the foreign currency equivalent thereof) and has outstanding debt which is rated "A" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) or any money-market fund sponsored by a registered broker dealer or mutual fund distributor;

(3)      repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (1) above entered into with a bank meeting the qualifications described in clause (2) above;

(4)      investments in commercial paper, maturing not more than 90 days after the date of acquisition, issued by a corporation (other than an Affiliate of the Company) organized and in existence under the laws of the United States of America, any State thereof or the District of Columbia or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of "P-1" (or higher) according to Moody's or "A-1" (or higher) according to Standard and Poor's;

(5)      investments in securities with maturities of six months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "A" by Standard & Poor's or "A" by Moody's; and

(6)      investments in money market funds that invest substantially all their assets in securities of the types described in clauses (1) through (5) above.

"*Treasury Rate*" means the yield to maturity at the time of computation of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) which has become publicly available at least two Business Days prior to the purchase date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the purchase date to [Issue Date month & date], 2009;  *provided, however*, that if the period from the purchase date to [Issue Date month & date], 2009 is not equal to the constant maturity of a United States Treasury security for which a weekly average yield is given, the Treasury Rate shall be obtained by linear interpolation (calculated to the nearest one-twelfth of a year) from the weekly average yield of United States Treasury securities for which such yields are given, except that if the period from the purchase date to [Issue Date month & date], 2009 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year shall be used.

"*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C §§ 77aaa-777bbbb).

"*Unrestricted Subsidiary*" means:

(1)      any Subsidiary of the Issuer which at the time of determination is an Unrestricted Subsidiary (as designated by the Issuer, as provided below); and

(2)      any Subsidiary of an Unrestricted Subsidiary.

The Issuer may designate any Subsidiary of the Issuer (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, the Issuer or any Subsidiary of the Issuer (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that:

(3)      any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by the Issuer;

(4)      such designation complies with the covenants described under "Certain Covenants–Limitation on Restricted Payments"; and

(5)      each of:

(c)      the Subsidiary to be so designated; and

(d)      its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any Restricted Subsidiary.

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and the Issuer must be required to pay Cash Interest on the Notes rather than PIK Interest .

Any such designation by the Issuer shall be notified by the Issuer to the Trustee by promptly filing with the Trustee a copy of the resolution of the board of directors of the Issuer or any committee thereof giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

"*U.S. Dollar Equivalent*" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable foreign currency as published in *The Wall Street Journal* in the "Exchange Rates" column under the heading "Currency Trading" on the date two Business Days prior to such determination.

Except as described under "Certain Covenants—Limitation on Indebtedness," whenever it is necessary to determine whether the Company has complied with any covenant in the Indenture or a Default has occurred and an amount is expressed in a currency other than U.S. dollars, such amount will be treated as the U.S. Dollar Equivalent determined as of the date such amount is initially determined in such currency.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Wholly Owned Subsidiary*" means a Restricted Subsidiary all the Capital Stock of which (other than directors' qualifying shares) is owned by the Company or one or more other Wholly Owned Subsidiaries.