# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

----------------------------------------------------------------x

In re:                                                :        **Chapter 11**

**REMY WORLDWIDE HOLDINGS, INC., et al.,**[1]       :        Case No. 07 – _1148/_ (___)

                    **Debtors.**                     :        **(Jointly Administered)**

----------------------------------------------------------------x

## AFFIDAVIT OF JOHN H. WEBER
## IN SUPPORT OF CHAPTER 11 PETITIONS AND
## FIRST DAY MOTIONS AND APPLICATION

| | | |
|---|---|---|
| STATE OF INDIANA | ) | |
| | ) | ss: |
| COUNTY OF MADISON | ) | |

John H. Weber, being duly sworn, deposes and states:

1.      I am the President of Remy Worldwide Holdings, Inc. ("Remy

Worldwide"), a corporation organized under the laws of the state of Delaware and one of

the above-referenced debtors and debtors in possession (collectively, the "Debtors") in

---

[1]     The Debtors in these proceedings are: Remy Worldwide Holdings, Inc. (Tax ID No. XX-XXX1720); Ballantrae Corporation (Tax ID No. XX-XXX3201); Western Reman Industrial, Inc. (Tax ID No. XX-XXX9762); HSG I, Inc. (Tax ID No. XX-XXX1750); HSG II, Inc. (Tax ID No. XX-XXX1751); International Fuel Systems, Inc. (Tax ID No. XX-XXX0654); iPower Technologies, Inc. (Tax ID No. XX-XXX9859); M. & M. Knopf Auto Parts, L.L.C. (Tax ID No. XX-XXX8102); Marine Corporation of America (Tax ID No. XX-XXX4826); NABCO, Inc. (Tax ID No. XX-XXX5668); Power Investments Marine, Inc. (Tax ID No. XX-XXX1862); Power Investments, Inc. (Tax ID No. XX-XXX7602); Powrbilt Products, Inc. (Tax ID No. XX-XXX8592); Publitech, Inc. (Tax ID No. XX-XXX8549); Reman Holdings, L.L.C. (Tax ID No. XX-XXX8057); Remy Alternators, Inc. (Tax ID No. XX-XXX1999); Remy India Holdings, Inc. (Tax ID No. XX-XXX0043); Remy International, Inc. (Tax ID No. XX-XXX9253); Remy International Holdings, Inc. (Tax ID No. XX-XXX4050); Remy Korea Holdings, L.L.C. (Tax ID No. XX-XXX4050); Remy Logistics, L.L.C. (Tax ID No. XX-XXX2157); Remy Powertrain, L.P. (Tax ID No. XX-XXX0548); Remy Reman, L.L.C. (Tax ID No. XX-XXX9101); Remy Sales, Inc. (Tax ID No. XX-XXX0653); Remy Inc. (Tax ID No. XX-XXX9405); Unit Parts Company (Tax ID No. XX-XXX4509); Western Reman Industrial, LLC (Tax ID No. XX-XXX9665); World Wide Automotive, L.L.C. (Tax ID No. XX-XXX1141); and World Wide Automotive Distributors, Inc. (Tax ID No. XX-XXX8559), each with a mailing address of 2902 Enterprise Drive, Anderson, IN 46013.

these proceedings. I am generally familiar with the Debtors' day-to-day operations, business affairs, books, and records.

2.      On October 8, 2007 (the "Petition Date"), each of the Debtors will file a voluntary petition with this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

3.      To minimize the adverse effects of filing for chapter 11 protection and to enhance their prospects of a successful reorganization, the Debtors will file a number of motions requesting various types of "first day" relief (collectively, the "First Day Motions"). I am familiar with the contents of each First Day Motion (including the exhibits and other attachments thereto), and believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) is critical to the Debtors' achievement of a successful reorganization; and (iii) best serves the Debtors' estates and creditors' interests.

4.      I submit this affidavit in support of the First Day Motions.[2] Except as otherwise indicated, all statements set forth in this affidavit are based upon: (i) my personal knowledge, (ii) information supplied to me by other members of the Debtors' management or their professionals, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this affidavit.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

066079.1001

5.    Part I of this affidavit describes the Debtors' businesses, their capital

structure, and the circumstances surrounding the commencement of these chapter 11

cases.  Part II sets forth the relevant facts in support of each First Day Motion.

## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

**A.    The Remy Enterprise**

6.    Remy Worldwide, through Remy International (as defined below) and its

other Debtor and non-Debtor subsidiaries (collectively, the "Remy Enterprise"), is a

leading global supplier of automobile, truck and heavy machinery starters, alternators,

hybrid motors and steering components, as well as a supplier of diesel locomotive parts

and services.  Currently, the Remy Enterprise operates within four main business

segments, as: (i) a "tier one" supplier (*i.e.*, a direct supplier to an original equipment

manufacturer ("OEM")) of light duty (*i.e.*, for passenger vehicles) starters and alternators;

(ii) a "tier one" supplier of heavy duty (*i.e.*, for trucks and heavy machinery) starters and

alternators; (iii) a "tier one" supplier of electric motors for hybrid systems; and (iv) an

aftermarket supplier of replacement starters and alternators.  The Remy Enterprise also

operates as a supplier of (a) aftermarket products used in diesel locomotives, (b) used

parts and (c) steering components both to OEMs and in the aftermarket channels.  In

addition to newly manufactured products, the Debtors also produce "remanufactured"

products, which are products created to exacting standards by utilizing components from

previously manufactured products (including the shell of the product, which is known as

the "core"), and new components and wiring.

7.    As of the Petition Date, the Debtors believe that, by market share, the

Remy Enterprise is the largest supplier of light duty starters, heavy duty starters, and

heavy duty alternators to OEMs in the North American market, and the third largest

supplier of light duty alternators to OEMs in the North American market. In the automotive aftermarket segment, the Debtors believe that, by market share, the Remy Enterprise is the largest supplier to the "do-it-yourself" channel in North America through its sales to retail channel customers, and the third largest supplier to the North American "do-it-for-me" channel through sales to warehouse distributors or providers of repair services.

8.      The Debtors trace their roots back to Remy Electric, which was formed in 1886 as a home wiring business and moved into the automotive electrical components business in the early 1900s. After an intervening sale, in 1918, the business was acquired by, and operated as a division of, General Motors Corporation ("GM"), until GM sold it to a group of private investors in 1994. After the sale, the business was known as Delco Remy International, Inc. ("Delco Remy"), and remained private until it consummated an initial public offering of its common stock on December 22, 1997. After operating as a public company for a little over three years, on February 7, 2001, Delco Remy once again became a privately held company as a result of a going-private transaction with its largest stockholder. On August 1, 2004, Delco Remy changed its name to Remy International, Inc. ("Remy International"). On September 30, 2004, Remy Worldwide was formed to act as a holding company of all of the outstanding capital stock of Remy International.

**B.      Events Leading to the Chapter 11 Cases**

9.      Commencing in 1996, the Debtors embarked on an aggressive growth strategy that was designed to achieve four principal goals: (i) diversification of their customer base beyond GM; (ii) diversification of their business portfolio beyond starters and alternators; (iii) establishment of a low cost position through a realignment of manufacturing facilities to lower cost locations; and (iv) global expansion to support

4

growth outside of the North American market. As part of its growth strategy, between 1996 and 2005, the Remy Enterprise made over $450 million of acquisitions and investments in new manufacturing facilities, including acquisitions of: (a) a powertrain business, which remanufactured diesel engines and components, diesel locomotive aftermarket products, transmissions and gas engines; (b) an electrical aftermarket business; (c) a traction control business; and (d) a light duty alternator business. In addition, the Remy Enterprise invested significant capital to acquire and develop manufacturing capabilities in Mexico, Korea, Hungary, Poland, Brazil, Tunisia and China for both its OEM and aftermarket businesses.

10. As a result of the Debtors' efforts to realign their manufacturing to facilities in lower cost locations and their focus on worldwide growth, only a small portion of the Remy Enterprise's sales are derived from products manufactured in the United States, and, only approximately 1,500 of over 7,000 Remy Enterprise employees worldwide were employed by the Debtors. Only approximately 270 of the Debtors' employees are Unionized Employees, represented by the United Food and Commercial Workers' Union Local 1000.

11. With the exception of a small facility in Anderson, Indiana that manufactures products for the Debtors' hybrid business, nearly all of the products distributed by the Debtors for OEMs – which together account for approximately 45% of the Remy Enterprise's sales – are manufactured outside of the United States by Non-Debtor Foreign Affiliates of Remy International that are organized under the laws of the

5

jurisdictions in which they operate.[3]  As a result, Remy Inc., the primary supplier to the

North American OEM market, is highly dependent upon purchases it makes from Non-

Debtor Foreign Affiliates – principally those located in Korea and Mexico[4] – to satisfy its

own delivery requirements to customers.  This interrelationship between the Debtors and

their non-U.S. (non-Debtor) affiliates stands in stark contrast to many of the other

traditional U.S. automobile suppliers that have commenced chapter 11 proceedings in

recent years, which have significant domestic manufacturing operations and associated

legacy costs (including collective bargaining agreements and large underfunded legacy

liabilities).  Accordingly, although the Debtors are not burdened by substantial legacy

liabilities associated with underfunded defined benefit plans (accruals of benefits under

the Debtors' two defined benefit plans either have been frozen or have otherwise ceased)

or complicated collective bargaining issues, the continued smooth operation of the Non-

Debtor Foreign Affiliates that supply them is critical to their reorganization efforts.

     12.    Although the growth strategy employed by the Remy Enterprise, which

essentially lasted until 2005, had several important successes, those successes came at a

heavy price in the form of a highly leveraged capital structure.  Specifically, the Debtors'

---

[3]    Although the Debtors currently maintain a remanufacturing facility in Mississippi, that facility is expected to close in 2007 upon the consummation of the Caterpillar Outsourcing Agreement (as defined below).

[4]    Products manufactured by Remy Inc.'s Korean affiliates are purchased by other affiliates, including Remy Inc., in much the same way as if the Korean affiliate were a third-party supplier.  The Remy Enterprise's Mexican manufacturing operations generally are structured as *maquiladoras* – an arrangement under which a U.S.-based entity ships (or arranges with suppliers for shipments of) components and materials to a Mexican affiliate that assembles the components and materials into a finished product, and either ships the finished product back to the U.S.-based entity or purchases the finished product in order to sell it to its own customers (including other affiliates).  Under the *maquiladora* structure, unless finished products are purchased by the Mexican affiliate, at all times title to the components, materials and finished products is held by the U.S.-based entity.

066079.1001

capital structure includes approximately $665 million of long term funded debt,

consisting of:

- $80 million of term loan outstanding under the
  Third Amended and Restated Loan and Security
  Agreement (the "Credit Agreement");[5]

- $125 million of secured Second Priority Senior
  Floating Rate Notes due April 15, 2009 (the
  "FRNs") issued by Remy International;[6]

- $145 million 8⅝% Senior Notes due December 15,
  2007 (the "Senior Notes") issued by Remy
  International;

- $165 million 11% Senior Subordinated Notes due
  May 1, 2009 (the "11% Subordinated Notes")
  issued by Remy International; and

- $150 million 9⅜% Senior Subordinated Notes due
  April 15, 2012 (the "9⅜% Subordinated Notes," and
  together with the 11% Subordinated Notes, the
  "Subordinated Notes"; the Subordinated Notes and
  the Senior Notes collectively referred to herein as,
  the "Impaired Notes") issued by Remy
  International.[7]

13.    The effects of the increased debt load were exacerbated by, among other

things, pricing pressures from the Remy Enterprise's largest customer, GM, at a time

when material costs were increasing dramatically;[8] the decline of the U.S. dollar relative

---

[5]    In addition to the $80 million term facility, the Credit Agreement provides for a revolving credit
facility (the "Revolver"). On the Petition Date the outstanding balance of the Revolver, including
issued but undrawn letters of credit, was approximately $78 million. The amounts owed under the
Credit Agreement purportedly are secured by a first priority security interest in substantially all of the
Debtors' domestic assets (the "Collateral").

[6]    The amounts owed under the FRNs purportedly are secured by a second priority security interest in
certain of the Collateral.

[7]    Obligations under each of the Impaired Notes are guaranteed by each of the other Debtors (other than
Remy Worldwide).

[8]    GM has used its market power to obtain an estimated $92 million in pricing concessions from the
Debtors for the years 2004 through 2007. At the same time, the Debtors and their affiliates faced a

to the currencies of many of the markets to which production was shifted; increased

warranty costs; and the failure of global markets to develop for products manufactured by

Remy International's subsidiaries at the pace previously expected.

14.    In an effort to rationalize their businesses and reduce debt, between 2003

and 2006, the Remy Enterprise divested several of the business lines it had acquired

during its wave of expansion, including its gas engine business, transmission business

and traction control business.  In addition, in 2007, the Debtors consummated the sale of

their diesel engine remanufacturing business to Caterpillar, Inc. ("Caterpillar") and

entered into a separate outsourcing supply agreement (the "Caterpillar Outsourcing

Agreement") with Caterpillar.[9]  Pursuant to the Caterpillar Outsourcing Agreement,

Caterpillar will become the Debtors' exclusive supplier of remanufactured heavy duty

starters and alternators, and, in conjunction therewith, have acquired certain machinery,

equipment and inventory that the Debtors utilized for that production.[10]

15.    In a further attempt to address the Remy Enterprise's financial condition,

over the past year, management implemented a number of cost-cutting and restructuring

initiatives, including:  (i) freezing of future accruals of benefits under the Debtors' U.S.-

defined benefit plan for salaried employees; (ii) aggressive supply chain management to

---

dramatic increase in raw material costs, including an approximately 230% increase in copper pricing, 57% increase in aluminum pricing and 75% increase in steel pricing.  Although significant portions of the increased raw material costs could be passed on to customers, not all could be.  For example, in 2006, the Debtors and their affiliates were *not* able to pass on approximately 25% of their raw material cost increases ($7 million out of the $29 million increased raw material costs) to their customers.

[9]    Of the $150 million purchase price paid at the closing of the sale of the diesel engine business to Caterpillar, $50 million of such proceeds have been deposited in an account that is subject to a blocked account agreement for the benefit of the lenders under the Credit Agreement.

[10]    The Caterpillar Outsourcing Agreement provides for a two-phase closing – the first phase of which closed in the second quarter of 2007 and the second phase of which includes inventory purchases over the span of the third and fourth quarters of 2007.

reduce the purchase costs of component parts; (iii) restructuring of the Debtors' European

operations; and (iv) closing certain electrical aftermarket remanufacturing facilities and

transferring related production to low cost facilities in Mexico. Such efforts, however,

have not been sufficient to allow the Debtors to stem the loss of value to their business

caused by their overwhelming debt load and reduced profitability in their principal OEM

business.

16.    Consequently, beginning in March 2007, the Debtors determined to pursue

a balance sheet restructuring through a "prepackaged" chapter 11 case. On June 15, 2007,

the Debtors and then-holders of approximately 83% of the Senior Notes, 84% of the 9¾%

Subordinated Notes and 75% of the 11% Subordinated Notes (collectively, the "Plan

Support Parties") entered into a plan support agreement, which, subject to certain

conditions, required, among other things, the Debtors to effectuate, and the Plan Support

Parties to support, the Plan.[11] The Plan will substantially delever the Debtors' capital

structure and will provide a foundation for growth and sustained profitability.

17.    The Debtors believe that the Plan reflects an appropriate resolution of all

claims against and equity interests in the Debtors that is in the best interests of the

Debtors and their estates, taking into account both the valuation of the Debtors and the

differing nature and priorities of such claims and interests. Furthermore, because the

Plan will substantially delever the Debtors' capital structure, the Debtors believe it will

provide a foundation for growth and sustained profitability.

18.    The Plan provides that allowed general unsecured claims will be paid in

full. Only three classes of claims and one class of interests are impaired under the Plan:

---

[11]    A redacted copy of the Plan Support Agreement, together with each amendment thereto, is attached as
Exhibit B to the Solicitation and Disclosure Statement.

(i) Class 6 – Senior Note Claims, (ii) Class 7 – Subordinated Note Claims, (iii) Class 8 –
Subordinated Securities Claims (as defined in the Plan) and (iv) Class 9 – RWHI Equity
Interests (as defined in the Plan). The only classes of claims that were entitled to vote on
the Plan were Class 6 – Senior Note Claims and Class 7 – Subordinated Note Claims.
Holders of claims in Class 8 – Subordinated Securities Claims and interests in Class 9 –
RWHI Equity Interests are not receiving any distributions or retaining any interests under
the Plan and, therefore, are deemed to have rejected the Plan and were not entitled to vote
thereon.[12]

     19.    The Debtors engaged Financial Balloting Group LLC (the "Voting Agent")
to act as its voting and solicitation agent for purposes of distributing the Solicitation and
Disclosure Statement and Plan ballots and calculating and tabulating votes on the Plan.
On August 31, 2007, the Debtors caused the Voting Agent to commence the distribution
of copies of the Solicitation and Disclosure Statement, the Plan and ballots to each person
or entity (or to their nominee) that was a beneficial holder of a Senior Note Claim or
Subordinated Note Claim as of August 29, 2007, the voting record date.[13] The Debtors
established October 1, 2007 as the deadline by which completed ballots had to be
received by the Voting Agent.[14]

     20.    As discussed above, as of the voting deadline, a vast majority of both
classes of claims entitled to vote on the Plan voted to accept the Plan. On the Petition

---

[12]    The summary of the Plan contained in this Affidavit is qualified in its entirety by the terms thereof. In
the event of any conflict between this Motion and the terms of the Plan, the Plan shall control and
govern.

[13]    On September 18, 2007, the Debtors caused the Voting Agent to distribute Supplement No. 1 to the
Solicitation and Disclosure Statement to the same parties.

[14]    The solicitation period was at least 20 business days, in accordance with the Securities Exchange Act
of 1934, as amended, and the rules promulgated thereunder.

                              066079.1001

Date, the Debtors filed with this Court the Solicitation and Disclosure Statement and the

Plan, together with certified results of the pre-bankruptcy solicitation as set forth in the

voting affidavit submitted by the Voting Agent. By separate motion filed on the Petition

Date, the Debtors will request that this Court set a date for a hearing to approve the

Solicitation and Disclosure Statement and the prepetition solicitation procedures and to

confirm the Plan.

**PART I**

**FIRST DAY MOTIONS**

A.    **Administrative Matters**

    1.    **Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases**

    21.    The Debtors seek entry of an order directing the joint administration of the

Debtors' chapter 11 cases, and consolidating them for procedural purposes only.

    22.    Remy Worldwide is the direct or indirect parent of each of the other

Debtors.

    23.    I have been advised that many of the motions, applications, hearings and

orders that will arise in these chapter 11 cases will affect all Debtors jointly. I have also

been advised that the Debtors' interests, as well as the interests of their creditors and

other parties-in-interest, would be best served by the joint administration of these chapter

11 cases, for procedural purposes only.

    24.    I have been advised that the Debtors anticipate that the joint

administration of these chapter 11 cases will also  permit the Clerk of this Court to utilize

a single docket for all of the cases and to combine notices to creditors and other parties-

in-interest in the Debtors' respective cases. Additionally I have been advised that, as

11

there likely will be numerous motions, applications, and other pleadings filed in these

chapter 11 cases that will affect all, or at least most, of the 29 Debtors, joint

administration will significantly reduce the volume of paper that otherwise would be filed

with the Clerk of this Court, render the completion of various administrative tasks less

costly and minimize unnecessary delays. Moreover I have been advised that, joint

administration also will permit counsel for all parties-in-interest to include all of the

Debtors' chapter 11 cases in a single caption for the numerous documents that are likely

to be filed and served in these chapter 11 cases, and enable parties-in-interest (including

the U.S. Trustee) in each of the chapter 11 cases to stay apprised of all the various related

matters before this Court.

25.     I therefore believe that the relief requested is necessary and appropriate

and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

**2.     Application of the Debtors to Employ and Retain Kurtzman Carson
Consultants LLC as Noticing Agent to the Debtors**

26.     The Debtors seek entry of an order authorizing and approving the

retention of Kurtzman Carson Consultants LLC ("KCC") as the Noticing Agent to the

Debtors upon the terms and conditions set forth in the retention agreement between KCC

and the Debtors.

27.     The Debtors believe that the number of creditors in these chapter 11 cases

will greatly exceed 200. The Debtors further believe that it is necessary and in the best

interests of their creditors and estates to engage KCC to act as Noticing Agent in order to

assume full responsibility for, among other things, the distribution of notices in the

Debtors' chapter 11 cases.

12

28.     The Debtors anticipate that there will be thousands of entities that the

Debtors will be required to serve with certain of the notices, pleadings and other

documents filed in these chapter 11 cases.  The appointment of KCC will expedite the

distribution of notices and relieve the Clerk's office of the administrative burden of

processing such notices.  The Debtors' estates and creditors will benefit as a result of

KCC's experience and cost-effective methods.

29.     I understand that the actions and procedures KCC will undertake, as

Noticing Agent, will include, but not be limited to, the following:

> a.  notifying all potential creditors of the filing of these
>     chapter 11 cases and of the setting of the first meeting
>     of creditors, pursuant to section 341(a) of the
>     Bankruptcy Code, if any;
>
> b.  filing affidavits of service for all mailings, including a
>     copy of each notice, a list of persons to whom such
>     notice was mailed, and the date mailed;
>
> c.  maintaining an official copy of the Schedules (to the
>     extent filed), listing creditors and amounts owed; and
>
> d.  providing any other distribution services as are
>     necessary or required.

30.     If necessary, despite the fact that the Debtors do not anticipate establishing

a claims bar date in light of the "prepackaged" nature of these chapter 11 cases, KCC

may undertake certain claims-related duties such as:

> a.  docketing all claims filed and maintaining the official
>     claims register on behalf of the Clerk and providing to
>     the Clerk an exact duplicate thereof;
>
> b.  specifying in the claims register for each claim docket
>     (i) the claim number assigned, (ii) the date received, (iii)
>     the name and address of the claimant, (iv) the filed
>     amount of the claim, if liquidated, and (v) the allowed
>     amount of the claim;

      c.  recording all transfers of claims and providing notices
of such transfers as required pursuant to Bankruptcy
Rule 3001(e); and

      d.  maintaining the official mailing list for all entities who
have filed proofs of claim.

31.     KCC has considerable experience in providing similar services in large

chapter 11 cases, and the Debtors believe that KCC eminently is qualified to serve as

Noticing Agent in these chapter 11 cases and that the retention of KCC as the Noticing

Agent is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

**B.**    **Business Matters**

    **1.**    **Motion of the Debtors for an Order Authorizing the Payment of
Prepetition Sales, Use, Franchise and Other Taxes and Government
Charges**

32.     The Debtors seek entry of an order authorizing, but not directing, the

Debtors to pay prepetition Taxes as the Debtors, in their sole discretion, deem necessary

and authorizing the Debtors to reissue checks or wire transfers for payments approved

under this Motion where such method of payment has been dishonored postpetition.

33.     In the ordinary course of business, the Debtors collect and incur certain

Taxes (which include, but are not limited to, sales, use, franchise, income and property

taxes, other similar government impositions) necessary to operate their business. The

Debtors in turn remit such Taxes to the Taxing Authorities on monthly, quarterly and

annual bases.

34.     I affirm that the Debtors' records reflect that they are current on all of the

Taxes that were required to be paid as of the Petition Date; however, there may be Taxes

incurred or collected from sales and services provided prepetition that were not due until

shortly after the Petition Date, and, therefore, remain unpaid.

14

35.    I estimate that the total amount of prepetition Taxes payable to the Taxing Authorities as of September 30, 2007 is approximately $3.2 million and that during the pendency of the chapter 11 cases the amount of such taxes to be paid in the ordinary course will not exceed approximately $1 million (excluding any additional tax liabilities that may come due as the result of an audit).

36.    Further, I represent that any amounts that actually are due, but have not yet been paid to the Taxing Authorities due to the filing of these chapter 11 cases, will represent a small fraction of the total assets held by the Debtors. Moreover, many of the Taxes that the Debtors seek to pay hereunder are so-called "trust fund" taxes that the Debtors have collected from their customers for the benefit of, and eventual payment to, the Taxing Authorities, and, therefore, do not constitute property of the Debtors' estates.

37.    The Debtors' failure to pay the prepetition Taxes could have a material adverse effect on the Debtors' ability to operate in the ordinary course of business. I am advised that some, if not all, of the Taxing Authorities may initiate audits of the Debtors if the Taxes are not paid immediately, which would divert the Debtors' attention from the reorganization process. In addition, if the Debtors do not pay the prepetition Taxes in a timely manner, the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that would be harmful to the Debtors' estates.

38.    I have been advised that, to the extent that, the Debtors incurred sales and use taxes prior to the Petition Date that remain unpaid, the Taxing Authorities could subject the Debtors' directors, officers, and other employees to lawsuits or criminal prosecution during the pendency of the Debtors' chapter 11 cases. The threat of a lawsuit

15

or a criminal prosecution, and any ensuing liability, would distract these personnel from the Debtors' restructuring, to the detriment of all parties-in-interest. The dedicated and active participation of the Debtors' directors, officers, and other employees is integral to continued, uninterrupted operations and essential to the orderly administration of these chapter 11 cases.

39.     I can attest that the Debtors have determined, in the exercise of their business judgment, that paying the prepetition Taxes is in the best interests of their estates, their creditors and all parties-in-interest and that failure to pay the prepetition Taxes could have a material adverse effect on the Debtors' operations as Taxing Authorities may take actions against the Debtors, resulting in significant administrative problems for the estates which would consume management's time and resources. Prompt and regular payment of the prepetition Taxes would avoid those unnecessary and distracting governmental actions and also would avoid actions against directors and officers, who might otherwise be held personally liable for the non-payment of sales and use taxes.

40.     I therefore believe that the relief requested is necessary and appropriate and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

**2.      Motion of the Debtors For Bridge and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II) Deeming Utility Companies to Have Adequate Assurance of Payment and (III) Establishing Procedures for Resolving Requests for Additional Assurance**

41.     By this First Day Motion, the Debtors seek entry of an order:  (i) prohibiting the Utility Companies from discontinuing, altering or refusing service to the Debtors except as permitted therein; (ii) deeming the Utility Companies to be adequately

16

assured of payment on the basis of the establishment of the Utility Deposit Account; and

(iii) establishing procedures for resolving requests for additional assurance of payment.

42.    In the operation of their manufacturing, distribution and office facilities,

the Debtors incur utility expenses in the ordinary course of business for, among other

things, water, electricity, gas, waste management, including sewage, cable and telephone

services. The Debtors' utility services are provided by approximately 60 Utility

Companies through approximately 200 different accounts. Prior to the Petition Date, the

Debtors spent approximately $5.3 million annually for various utility services, with an

average monthly cost of approximately $440,000. The Debtors anticipate that the

average postpetition monthly cost for utility services will be approximately $440,000.

43.    Uninterrupted utility services are essential to the Debtors' ongoing

operations and, therefore, to the success of their reorganization efforts. If one or more of

the Utility Companies refuse or discontinue service even for a brief period, the Debtors'

operations would be disrupted severely. Such an interruption would damage the Debtors'

business, to the detriment of their estates, creditors and employees. It therefore is critical

that utility services provided to the Debtors continue without interruption.

44.    The Debtors intend to pay all postpetition obligations owed to the Utility

Companies in the ordinary course of business. Further, the Debtors expect that

unencumbered cash and their authorized use of cash collateral will be more than

sufficient to pay all postpetition utility obligations.

45.    If the Utility Companies are permitted to terminate utility services, a

substantial disruption to the Debtors' operations will occur, and the Debtors' business

will be harmed, possibly irreparably. If faced with imminent termination of utility

17

066079.1001

services, the Debtors, to avoid the cessation of essential utility services, would be forced

to pay whatever amounts the Utility Companies demanded.

46.     The Debtors could face a severe cash drain if the Utility Companies were

to condition the provision of postpetition services to the Debtors upon the payment of

exorbitantly burdensome or unreasonable deposits or other forms of adequate assurance

of payment.

47.     I therefore believe that the relief requested is necessary and appropriate

and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

### 3.     Motion of the Debtors for an Order Authorizing the Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business

48.     By this First Day Motion, the Debtors request the entry of an order

authorizing, but not directing, the Debtors, in their good faith business judgment, to: (i)

perform certain of their prepetition obligations related to the Customer Programs as they

deem advisable; and (ii) continue, renew, replace, implement, modify and/or terminate

those Customer Programs as they deem appropriate, in the ordinary course of their

business.

49.     Prior to the Petition Date, in the ordinary course of their business, the

Debtors engaged in certain practices to develop and sustain positive relationships with

their customers and in the marketplace for their products.  Such practices include, among

others, warranty programs, customer adjustments, customer rebates, credits and

marketing allowances.  The common goal of the Customer Programs is to meet

competitive pressures, ensure customer satisfaction and generate goodwill for the Debtors,

18

thereby retaining current customers, attracting new ones and ultimately enhancing

revenue, margins and profitability.

50.      The Debtors' prepetition warranty programs generally can be classified

into two categories: (i) warranties providing that the starters and alternators supplied to

the Debtors' Original Equipment Manufacturer customers and integrated into such

customers' products (including heavy-duty as well as light-duty passenger vehicles), and

the service parts supplied to the Debtors' OEM customers, will be, among other things,

free from defects in material and workmanship (the "OEM Warranties," and the Debtors'

obligations with respect thereto, the "OEM Warranty Obligations"); and (ii) standard

consumer warranties provided to the ultimate purchasers of Remy-branded and Remy-

manufactured private-branded automotive aftermarket starters and alternators (the

"Consumer Warranties," and the Debtors' obligations with respect thereto, the

"Consumer Warranty Obligations"; the OEM Warranty Obligations and the Consumer

Warranty Obligations, together, referred to as the "Warranty Obligations").

51.      The OEM Warranty period generally runs from 12 to 18 months for base

products, for 36 months for premium products, and for 60 months for certain other

products. The Debtors typically incur OEM Warranty Obligations when an end-user (*i.e.*,

the ultimate customer of one of the Debtors' OEM customers) brings a defective product

to the OEM customer's dealer and has it replaced (after the dealer confirms that the

product is defective) by the dealer at no cost to the end-user. The dealer then invoices the

cost to the OEM, and such cost in turn is credited against the amounts owing by the OEM

to the Debtors.

19

52.     The Consumer Warranty period generally runs for 12 months for value-line products and for products sold through warehouse distributors, and, for the Debtors' premium and top-end products, for the lifetime of the product. The Debtors typically incur Consumer Warranty Obligations when an end-user returns a defective product to the retailer or warehouse distributor from which the end-user bought it in exchange for a replacement product. The retailer or warehouse distributor then returns the defective product to the Debtors, at which point the Debtors satisfy their Consumer Warranty Obligations by providing a like-for-like replacement unit to the retailer or warehouse distributor.

53.     From an accounting perspective, the Debtors recognize expected warranty costs for products sold at the time of sale. The Debtors' warranty accrual is based on management's estimate of the dollar amount that eventually will be required to settle the Warranty Obligations. That estimate is based upon consideration of many factors, including production and design changes, expected reliability and historical failure rates. As of the Petition Date, the Debtors' accrued balance for estimated OEM Warranty Obligations and for Consumer Warranty Obligations aggregated approximately $19 million and $15 million, respectively.[15]

54.     The Debtors are one of the leading global suppliers of OEM and aftermarket starters and alternators. I believe that one of the many reasons that the Debtors' customers select the Debtors' goods to incorporate into their products and

---

[15]    Those amounts reflect an estimate of the Debtors' likely exposure under warranties for products sold on or prior to the Petition Date. They do not reflect the Debtors' maximum potential liability under such warranties, which could be significantly larger. In addition, because most of the Warranty Obligations are satisfied in the form of a credit applied to a particular customer's account, the Debtors believe that their actual cash liabilities to customers with respect to the Warranty Obligations will be significantly lower than the accrued balance.

20

vehicles is the consistently high quality of the Debtors' products. Nevertheless, and despite the Debtors' continuous focus on and dedication to quality, it is inevitable in the production of complex heavy-duty and light-duty products that certain unexpected situations arise in which the goods supplied to the Debtors' customers do not conform to the products' stated specifications (the "Nonconforming Goods"). Similarly, despite the Debtors' intricate inventory and supply chain management systems, it is inescapable that goods occasionally are, among other things, misdelivered, delivered in an inaccurate quantity or damaged in transit (such goods, together with the Nonconforming Goods, the "Adjusted Goods").

55.     Issues also may arise with respect to the invoicing and payment system used by the Debtors and their customers. The Debtors and their customers generally rely upon a sophisticated electronic data interchange system for invoicing, pricing and payment. Nevertheless, errors do occur. Such errors include duplicate invoicing (when two invoices are created for the same shipment), improper invoicing (when the invoice created does not properly reflect the goods shipped or is otherwise incorrect), duplicate payment (when a customer makes two payments on account of the same shipment), mispricing (when a customer is charged or pays an incorrect price for the Debtors' products) and various other billing and payment errors (the "Invoicing or Payment Errors").

56.     In the event of the delivery of Adjusted Goods or an Invoicing or Payment Error, the Debtors and the affected customer typically agree to adjust the amount owed by such customer in connection with the affected shipment. The adjustment generally is

21

in such amount as is allocable to the Adjusted Goods or sufficient to correct the Invoicing or Payment Error, as appropriate.

57. The Debtors also may incur, directly or indirectly, additional shipping charges when expediting delivery in order to ensure timely delivery of goods. Alternatively, the Debtors may incur charges directly or indirectly in connection with the sorting, rework or repair of the Adjusted Goods.

58. The Debtors' aftermarket products consist of Remy-branded and private-branded remanufactured starters and alternators (the "Aftermarket Products"), which the Debtors build from base components known as "cores." The Debtors sell the Aftermarket Products to OEMs, warehouse distributors and various retail outlets across North America. The Debtors generally provide their aftermarket customers with certain rebates, incentives, credits, allowances and reimbursements (collectively, the "Customer Rebates, Credits and Allowances") to: (i) support the development, promotion and marketing of the Remy brand and the Aftermarket Products; and (ii) induce the return of cores (once the Aftermarket Products have reached the end of their useful lives) so that the Debtors can rebuild them into Aftermarket Products for resale. The Debtors accrue expense reserves for Customer Rebates, Credits and Allowances based upon the terms of their agreements with the relevant customers. As of September 30, 2007, the accrued expense reserve for Customer Rebates, Credits and Allowances was approximately $59 million.[16] The Debtors estimate that during the anticipated duration of these cases, less

---

[16] Inasmuch as many of the Customer Rebates, Credits and Allowances are granted in the form of a credit applied to a particular customer's account, the Debtors believe that their actual cash liabilities to customers with respect to the Customer Rebates, Credits and Allowances will be significantly lower than the accrued expense reserve.

than approximately $4 million of such reserved amounts will be paid in cash or credited against amounts that otherwise would be payable by the Debtors' customers.

59.     The precise form of Customer Rebates, Credits and Allowances differs by customer. The general types of Customer Rebates, Credits and Allowances are "Point of Sale" Marketing System and core deposits.

60.     Point of Sale Marketing System is, in effect, is a consignment system, whereby the Debtors retain legal title to the Aftermarket Products as the customer holds them in store inventory and markets them to retail end-users. Legal title does not pass to the customer until the moment before the customer consummates the sale to the end-user. The Debtors ultimately reimburse the customer for various expenses related to holding such goods, including marketing costs and certain inventory tax accruals.

61.     With respect to OEMs and certain retail outlets, the Debtors incentivize the return of cores through a system of deposits and refunds. For that purpose, the Debtors build a "core deposit" into the price of every Aftermarket Product sold to such customers. The Debtors retain the core deposit until such time as the customer returns the core, at which point the Debtors refund the core deposit in full. (In contrast, for certain other retailers, the Debtors utilize a "core return policy," whereby the Debtors do not charge for the price of the Aftermarket Product cores because the Debtors are entitled to the return of such cores once such products have reached the end of their useful lives. If not returned, the cores give rise to a claim by the Debtors for the value of the unreturned cores against the customer.)

62.     For certain retailers under the "core return policy", the Debtors have a contractual obligation to reimburse the customer with regularly scheduled payments or

23

credits issued for the price of cores previously purchased by the customer or for core deposits previously paid by the customer to the Debtors under various agreements. The Debtors remain entitled to the physical return of such cores once the related products reach the end of their functional life. If not physically returned, the cores give rise to a claim by the Debtors against the customer for the value of the unreturned cores.

63.    The Debtors' Customer Rebates, Credits and Allowances also comprise, among other things, scheduled credits on account of certain customer accommodations, discounts to fund the aftermarket customers' purchase and use of promotional flyers and materials, allowances for television and radio advertising, other promotional allowances, group advertising rebates, assistance with the opening of new retail stores and funding for testing equipment to minimize returns under warranty. Those Customer Rebates, Credits and Allowances help to recruit the efforts of the Debtors' aftermarket customers in the Debtors' efforts to increase sales of Aftermarket Products to end-users.

64.    The Customer Programs have been successful in the past and are directly responsible for generating goodwill and increased revenue, margins and profitability for the Debtors. In some cases they also represent an effective means to help secure the Debtor's market share. I believe that maintaining those benefits throughout these chapter 11 cases is essential to the continued viability of their business and, ultimately, to their prospects for a successful reorganization.

65.    The Debtors' goodwill and ongoing business relationships are likely to suffer if their customers perceive that the Debtors are unable or unwilling to fulfill the prepetition promises that they have made through the Customer Programs – particularly those relating to refunds, returns and warranties. The same would be true if customers

24

believe that the Debtors no longer will be offering the full package of benefits or quality

of products that customers demand.

66.     I believe that the Customer Programs benefit customer development and

retention, solidify customer relationships and bolster sales of new and existing products.

Potential purchasers of the Debtors' products have numerous options in the marketplace

and will be less likely to purchase the Debtors' products if there is an interruption in any

of the Customer Programs. Without the continued support of their customers, the

Debtors' business could suffer significant harm.

67.     Maintaining the Debtors' revenue streams will be crucial to the Debtors'

ability to confirm the Plan, which, in turn, will provide a basis for the long term success

and profitability of the Debtors, to the benefit of all their constituencies. In addition, as

described above, the damage to the Debtors' prospects for rehabilitation if the Debtors

were put in a position where they no longer could honor the Customer Programs is

disproportionate to the relatively small cost of maintaining the Customer Programs.

68.     I therefore believe that the relief requested is necessary and appropriate

and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

4.     **Motion of the Debtors for an Order (I) Authorizing Continued
       Maintenance of Existing Bank Accounts, (II) Authorizing Continued
       Use of Existing Cash Management System, (III) Authorizing
       Continued Use of Existing Business Forms and (IV) Waiving the
       Requirements of 11 U.S.C. § 345(b) on an Interim Basis**

69.     By this First Day Motion the Debtors seek entry of an order authorizing

the continued maintenance of the Bank Accounts; (ii) authorizing the Debtors' continued

use of the Cash Management System; (iii) authorizing the Debtors' continued use of their

existing business forms; (iv) and waiving, on an interim basis, investment and deposit

25

requirements through the date of a hearing to consider confirmation of the Debtors' plan of reorganization.

70.    In the ordinary course of their business, the Debtors use their centralized Cash Management System to: (i) collect funds from and for their U.S. operations and the operations of Remy Componentes S. de R.L. de C.V. ("Componentes"), their Mexican non-Debtor affiliate; and (ii) pay the expenses incurred by their U.S. operations and the operations of Componentes.

71.    The Cash Management System comprises approximately 40 Bank Accounts, a list of which is attached to the Cash Management Motion as Exhibit A. The majority of the Bank Accounts are maintained at Wachovia Bank, NA, with the remainder maintained at Bank of America, Citizens National Bank, JP Morgan Chase Bank, N.A., Suntrust Bank, Magnolia State Bank, Trustmark National Bank and Evergreen Investments (such financial institutions, collectively, the "Banks").

72.    Componentes maintains two U.S.-based bank accounts in the Cash Management System for dollar-denominated transactions and two local Mexican bank accounts (not in the Cash Management System) for peso-denominated transactions. The ability of Componentes to access the dollar-denominated General Disbursement Accounts is critical to Componentes' operational viability. The Debtors believe that during the duration of these chapter 11 cases Componentes may be required to make disbursements in the aggregate amount of between $6 million from the General Disbursement Accounts. Componentes and its affiliates maintain detailed records of their intercompany transactions and Componentes presently holds substantial accounts receivable *vis-a-vis* a number of the U.S. based Debtors (*i.e.*, in excess of $27 million).

26

066079.1001

Componentes also owes the U.S. based Debtors approximately $21 million on account of intercompany payables. Thus Componentes, even on a net basis, is owed an amount equivalent to or in excess of their anticipated U.S. dollar cash needs during the anticipated duration of these chapter 11 cases.

73. Other than Componentes, the Debtors' non-U.S. affiliates do not participate in the Cash Management System, but instead, maintain their own bank accounts and, in some instances, utilize stand-alone cash management systems.

74. The principal components of the Cash Management System and the flow of funds among the Bank Accounts, as illustrated in overview form in the chart attached as Exhibit B to the Cash Management Motion, are as follows:

a. The Master Account: Remy International maintains a primary corporate concentration account at Wachovia (Account No. 2000014786994). All funds ultimately flow through the Master Account. Depending on the cash needs of the Debtors and Componentes, funds in the Master Account either are used to pay outstanding balances under the Revolver, moved into the Investment Account (as defined below) to accrue overnight interest or used to fund the Debtors' disbursement and payroll accounts, and to fund the disbursement account of Componentes. In the event that there are insufficient funds in the Master Account to fund disbursements on any given day, prior to the Petition Date, funds were added by draw-downs from the Revolver.

b. Disbursements for Payment Obligations:

- General Disbursement Accounts: Each of the following Debtors and Componentes maintains its own disbursement account at Wachovia: Remy International, World Wide Automotive, LLC ("World Wide"), Western Reman, Inc. ("Western Reman"), Remy Inc., M&M Knopf Auto Parts, L.L.C. ("Knopf"), Nabco, Inc. ("Nabco"), Remy Reman, L.L.C. ("Remy Reman"), and Unit Parts Company ("Unit Parts"). The General Disbursement Accounts are used to pay, among other things, suppliers, taxes, general and administrative expenses, utilities, rent, information technology services, royalty fees and professional, audit and legal fees. The General Disbursement Accounts are

ZBAs[17] in that they are funded directly from the Master Account, daily, at midnight, for checks, wires and automated clearing house transfers that have been presented against such accounts.

- <u>Payroll Accounts</u>:  Each of the following Debtors maintains one or more payroll accounts at Wachovia: World Wide, Western Reman, Remy Inc., Knopf, Nabco, Remy Reman, and Unit Parts.  The Payroll Accounts are ZBAs that are used to pay the Debtors' hourly and salaried employees, with hourly employees typically paid weekly and salaried employees typically paid semi monthly.  The Master Account directly funds all Payroll Accounts, daily, at midnight, for checks that have been presented against such accounts.

- <u>Local Disbursement Accounts</u>:  Due to the local and retail nature of Knopf's business (Knopf buys and sells used auto parts), Knopf maintains five non-Wachovia-based disbursement accounts in Indiana, Georgia, South Carolina, Pennsylvania and New York State (the "Knopf Local Accounts").  Those accounts are funded weekly, in advance, upon request, from Knopf's General Disbursement Account, and are used to pay Knopf's suppliers, typically small-scale parts dealers and scrap yards, who prefer to transact with local bank accounts.  In addition, Mississippi based Remy Reman maintains four petty cash and three employee fund accounts, which, for the convenience of Remy Reman's employees, are kept at banks with Mississippi branches (the "Mississippi Accounts").  The Mississippi Accounts are funded on an as-needed basis from Remy Reman's General Disbursement Account. Funds in the Knopf Local Accounts and in the Mississippi Accounts are maintained below maximum FDIC insurable amounts and are not swept into the Master Account.

c.    <u>Accounts Receivable</u>:  Each of the following Debtors and Componentes maintains its own Wachovia based lockbox account (the "Lockbox Accounts"): Remy International, World Wide, Western Reman, Remy Inc., Knopf, Nabco, Remy Reman, and Unit Parts.  The Lockbox Accounts are used to collect accounts

---

[17]    Certain of the ZBAs, including Componentes' General Disbursement Account and a number of the Payroll Accounts (defined above) have been funded in anticipation of these cases, so as to avoid the dishonoring of any checks issued against such accounts pending entry of the relief requested herein. For a limited period of time such accounts will not operate as ZBAs as they may contain limited funds and such funds will not be swept to the Master Account.

receivable checks and wire transfers for, among other things, proceeds from sales of material, inventory, components and finished goods, scrap sales and asset sales. The Lockbox Accounts (other than the Componetes' account) are ZBAs, in that all Lockbox Account balances are swept daily, at midnight, directly into the Master Account.

d.    Investment Account: Remy International maintains an Evergreen Institutional Prime Cash Money Market Account at Evergreen Investments (Account No. 400006575-00), which holds commercial paper, corporate notes and bonds. Cash left over in the Master Account after paying down the Revolver and funding of the operations of the Debtors and Componetes is transferred daily to the Investment Account where it earns interest overnight before transferring back to the Master Account. Interest is posted to the Investment Account and transferred to the Master Account on a monthly basis.

75.    The Bank Accounts are central to an established Cash Management System that the Debtors need to maintain to ensure smooth collections and disbursements in the ordinary course of business.

76.    Considering the complexity of the Debtors' operations, it is necessary for the Debtors to conduct transactions by debit, wire transfer, electronic transfer or by ACH payments and other similar methods, as discussed above. To deny the Debtors the opportunity to conduct transactions by debit, wire transfer, electronic transfer or ACH payments and other similar methods would unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors and their non-Debtor affiliates.

77.    The cash management procedures employed by the Debtors constitute ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises. The Cash Management System provides significant benefits to all of the Debtors, including the ability to: (i) control corporate funds centrally; (ii) invest idle cash; and (iii) ensure availability of funds when necessary.

066079.1001

78.     Maintenance of the Cash Management System, including the Debtors'

continued ability to transfer funds among themselves and to and from Componentes, not

only is essential, but is in the best interests of all creditors and other parties-in-interest.

79.     The ability of Componentes to pay its U.S. creditors through the General

Disbursement Accounts is crucial to the ongoing operational viability of both

Componentes and its Debtor affiliates.  Moreover, any amounts that Componentes draws

from the General Disbursement Accounts will be properly recorded as an intercompany

transaction and will be credited against the existing accounts payable owed by the

Debtors to Componentes.

80.     Changing correspondence and business forms would be expensive and

burdensome to the Debtors' estates and disruptive to the Debtors' business operations.

81.     The Debtors have in excess of 200 creditors.

82.     I therefore believe that the relief requested is necessary and appropriate

and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

5.      **Motion of the Debtors for an Order Authorizing Debtors to:  (I) Pay
        Prepetition Employee Wages, Salaries and Other Compensation and
        Reimburse Contract Personnel Service Providers for Wages
        Attributable to Individuals Providing Services to the Debtors;
        (II) Reimburse Prepetition Employee Business Expenses; (III) Make
        Payments for which Prepetition Payroll Deductions were Made; (IV)
        Contribute to Prepetition Employee and Retiree Benefit Programs
        and Continue such Programs in the Ordinary Course of Business; (V)
        Pay Workers' Compensation Obligations; and (VI) Pay all Costs and
        Expenses Incident to the Foregoing Payments and Contributions**

83.     The Debtors seek entry of an order (i) authorizing, but not directing, the

Debtors to:  (a) pay all prepetition wages, salaries and other accrued compensation to

employees and reimburse contract personnel service providers for wages attributable to

individuals providing services to the Debtors; (b) reimburse all prepetition employee

business expenses; (c) make all payments for which prepetition payroll deductions, withholdings or matching employer contributions were made; (d) make all contributions to prepetition employee and retiree benefit programs and continue such programs in the ordinary course of business; (e) honor workers' compensation program obligations; and (f) pay all processing costs and administrative expenses relating to the foregoing payments and contributions, including any payments to third party administrators or other administrative service providers; and (ii) directing banks and other financial institutions to honor prepetition payroll and employee benefit checks and transfers made on or after the Petition Date, to process and honor all other checks issued for payments approved by this Motion, and authorizing the Debtors to reissue checks for payments approved by this Motion where the applicable check is dishonored postpetition.

84.    Of the Debtors' approximately 1,500 Employees, approximately 900 are hourly Employees and the balance are salaried Employees.[18]  In addition, the Debtors also retain the services of approximately 330 Contract Service Personnel that are arranged through Contract Personnel Suppliers.

85.    The Debtors' average aggregate monthly compensation to Employees for wages and salaries is approximately $6,191,000.  The Debtors' payroll is funded through a combination of direct deposit and payments made via check.  The Debtors' hourly Employees in the United States are paid on a weekly schedule, and are paid seven days in arrears (*i.e.*, seven days after completion of their period of work).  Salaried Employees in the United States are paid semi-monthly, with direct deposits or checks issued on the

---

[18]    As noted above, approximately 270 of the Debtors' hourly Employees are Union Employees.  Due to the terms of the Debtors' collective bargaining agreement, the requirements and details set forth herein with respect to the Union Employees and the benefit policies applicable to such Employees (*i.e.*, overtime, vacation and other applicable benefits) may vary from those of the Debtors' non-Union Employees.

066079.1001

fifteenth and the last day of each month, or on the first business day preceding such dates
in the event that such dates fall on a weekend or national holiday.

86.     Due to the filing of these chapter 11 cases, some of the Employees have
not received wages for the time worked prior to the Petition Date.  Moreover, some
payroll checks issued to Employees prior to the Petition Date may not have been
presented for payment or cleared the banking system prior to the Petition Date and,
accordingly, have not been honored and paid as of the Petition Date.[19]

87.     The Debtors estimate that the aggregate amount of accrued prepetition
wages, salaries, overtime pay, and other cash compensation that remain unpaid to the
Employees as of the Petition Date is approximately $1,500,000 (the "Unpaid Employee
Compensation").  To the best of the Debtors' knowledge, no Employee is owed more
than $10,950 for Unpaid Employee Compensation.[20]

88.     In the ordinary course of business, the Debtors reimburse Employees for
certain expenses that are incurred on behalf of the Debtors in the scope of their
employment (the "Reimbursable Expenses").  The Reimbursable Expenses generally are
reimbursed within one or two weeks of the submission of a proper expense report.
Reimbursable Expenses include expenses for travel (including for meals, tickets, lodging
and automobile mileage), business supplies, leased vehicles and other business-related
expenses.  The Debtors spend approximately $450,000 per month on Reimbursable

---

[19]    Additionally, some discrepancies may exist between the amounts actually paid and amounts
Employees believe they should have been paid, which, upon resolution, may reveal that additional
amounts are owed to such Employees.

[20]    The calculation of Unpaid Employee Compensation incorporates payments owing on account of wages,
salaries and vacation pay (to the extent it is payable in cash and the relevant Employee has sought
payment in cash).  The calculation does not attempt to allocate other benefits, including post-retirement
benefits or health and dental benefits, nor does it include expense reimbursement amounts.

066079.1001

Expenses, and estimate that, as of the Petition Date, less than $350,000 of Reimbursable Expenses were unpaid.[21]

89.     During each applicable pay period, the Debtors routinely take Deductions from paychecks, including, without limitation:  (i) union dues; (ii) garnishments for child support and similar deductions; (iii) voluntary charitable contributions; (iv) pre-tax contributions to health and dependent care spending accounts; and (v) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein and other miscellaneous deductions.  The Debtors deduct approximately $660,000 per month in Deductions from Employees' paychecks.

90.     The Debtors also are required by law to (i) withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes and social security and Medicare taxes (collectively, the "Withheld Amounts"), for remittance to the appropriate federal, state or local taxing authorities and (ii) make matching payments for social security and Medicare taxes, and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes").  The Debtors withhold approximately $1,367,000 in the aggregate on a monthly basis from Employees' paychecks on account of Payroll Taxes.

91.     The Contract Service Personnel work in various positions for the Debtors including, but not limited to, managerial and professional positions, engineering positions,

---

[21]     Although the monthly average Reimbursable Expense amount provides guidance as to the amount that may be outstanding as of the Petition Date, there is no practical way for the Debtors to determine the actual amount of prepetition Reimbursable Expenses.  A Reimbursable Expense is paid by the Debtors only after an Employee submits appropriate paperwork for reimbursement.  Although, as noted, the Debtors generally process requests within one to two weeks of submission, the Debtors do not require Employees to submit requests within a specific time period after the expenses are incurred.

066079.1001

sales and marketing roles and manufacturing positions.  The Debtors generally reimburse

the Contract Personnel Suppliers on a monthly basis.  The Debtors estimate that, as of the

Petition Date, no more than approximately $500,000 remains outstanding to the Contract

Personnel Suppliers (the "Unpaid Contract Personnel Compensation").  To the best of the

Debtors' knowledge, none of the Contract Service Personnel are individually owed more

than $10,950 on account of wages earned prior to the Petition Date.[22]

92.    In the ordinary course of business, the Debtors offer or provide Employees

(and their dependents) and Retirees (as defined below) with a variety of benefits

(collectively, the "Employee Benefits").  The Employee Benefits include, but are not

limited to:  (i) healthcare, dental and other related coverage provided or offered to

Employees; (ii) certain leave benefits to Employees; (iii) a 401(k) plan in which

Employees can participate and to which the Debtors make matching contributions; (iv)

medical, dental, vision and other insurance benefits to Retirees; and (v) other

miscellaneous benefits that are described in greater detail below.  The Debtors believe

that as of the Petition Date, the total amount owed or accrued in connection with the

Employee Benefits due to Employees (or Retirees, as applicable) is approximately $2.1

million, for an average of approximately $1,400 per Employee.[23]

93.    The Debtors offer comprehensive coverage to Employees (and their

dependents) for medical, health, dental, vision and certain other related benefits, and have

---

[22]    The amounts paid to the Contract Personnel Suppliers generally are based on contractually specified
hourly billing rates for identified categories of Contract Service Personnel. The Contract Personnel
Suppliers are responsible for making all payments of wages to the Contract Service Personnel and also
are responsible for providing the employee benefits received by the Contract Service Personnel, if any.

[23]    This estimate excludes any accrued but unused vacation time, sick days or personal days. Furthermore,
the per employee estimate is inclusive of some amounts owed to Retirees and so the average amount
owed to Employees would in fact somewhat lower than $1,400.

certain healthcare-related funding obligations relating to severed employees (collectively, the "Medical and Dental Benefits").[24] The Medical and Dental Benefits are provided on a self-insured, partially-insured or fully-insured basis, depending on the program in question.[25] The Debtors estimate that, as described in greater detail below, the aggregate amount due and owing on account of the Medical and Dental Benefits as of the Petition Date is approximately $1.37 million.

94.    For eligible non-Union Employees, the cost of medical and dental coverage is funded in part by the Debtors and in part through employee Deductions. Based on projections derived from historical costs, the Debtors make contributions that amount to approximately 65% of the annual anticipated cost of all payments made for covered claims under, and the administrative costs associated with, the plans. Employees' Deductions comprise the remaining 35% of such anticipated costs. The Debtors remain liable for all covered claims, regardless of whether they exceed the estimated amount used to determine Employee contributions. To mitigate that risk, in the case of the non-union medical plan (the "Remy Health Plan"),[26] the Debtors maintain "stop loss" coverage that limits their exposure to $150,000 for claims made by individual covered Employees Retirees (or dependents) (the "Stop Loss Coverage"). As of the

---

[24]    The benefits provided for severed employees are provided in accordance with the Debtors' statutory obligations pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the Health Insurance Portability and Accountability Act of 1996. Former employees are expected to make payments for the coverage provided pursuant to COBRA although these COBRA payments may be made on behalf of certain individuals pursuant to a severance agreement.

[25]    The Debtors also provide a fully-insured benefit options for employees such as a vision plan and certain other supplemental coverages that are funded entirely through Deductions from Employees.

[26]    The Remy Health Plan, which is provided by Anthem Blue Cross and Blue Shield ("Anthem"), covers approximately 1,070 eligible Employees. The Remy Health Plan provides two plan options with varying deductibles, maximum annual out of-pocket limits, co-pays, prescription drug coverage and certain other variations in coverage. The Stop Loss Coverage (as defined above) is provided by a separate policy with Anthem.

DB02:6283774.2                                                                                                          066079.1001

Petition Date, the Debtors estimate that the total amount owing in connection with the Remy Health Plan is approximately $1.21 million (inclusive of prepetition claim amounts and premium payments for Stop Loss Coverage).[27]

95.    Union employees ("Union Employees"), as well as their dependents, are provided medical coverage under a separate fully-insured plan (the "Unit Parts Health Plan"). The Debtors pay the premiums for the Unit Parts Health Plan on a monthly basis. The Debtors believe that as of the Petition Date, they will owe approximately $70,000 in premium payments for the month of October in connection with the Unit Parts Health Plan.

96.    Metropolitan Life Insurance Company ("Met Life") administers the Debtors' self-insured dental plan (the "Remy Dental Plan"), which provides coverage for various preventive and restorative dental care procedures on behalf of approximately 1,080 of the participating Employees. As of the Petition Date, the Debtors estimate that the amount owing in connection with the Remy Dental Plan is approximately $84,000 (inclusive of claim amounts and administrative amounts owed to Met Life).[28]

97.    The Debtors provide most Employees with various paid time-off benefits, depending upon the Employee's classification and length of employment. The Debtors provide some form of paid leave or enhanced compensation in connection with vacation time, sick days, holidays, personal leave, jury duty and bereavement leave (collectively

---

[27]    The estimate is based upon the average monthly cost for the Remy Health Plan (including claim amounts, premium payments for Stop Loss Coverage and certain administration costs), which is approximately $720,000.

[28]    As in the case of the Remy Health Plan, historical claims figures may not perfectly predict future costs and there is no practical way for the Debtors to determine the precise amount that will be owed on account of prepetition claims under the Remy Dental Plan.

066079.1001

the "Leave Policies").[29]  With the exception of vacation pay accruals for certain

Employees (who can receive a cash payment for such amounts upon termination of their

employment or pursuant to specified procedures), the remainder of the Leave Policies are

obligations that ultimately are satisfied in the ordinary course of business through salary

and payroll continuation.

98.    The Debtors' 401(k) plan (the "401(k) Plan") is maintained for the benefit

of certain eligible hourly and salaried Employees.  The 401(k) Plan generally (i) allows

participants to make automatic pre-tax salary Deductions of eligible compensation up to

the limits set by the Internal Revenue Code and (ii) provides for the Debtors to make

matching contributions for participating Employees in the amount of 100% of the first

three percent of an Employee's pre-tax contributions, plus 50% of the next two percent of

such Employee's pre-tax contributions.[30]  As of the Petition Date, approximately 686

Employees participate in the 401(k) Plan and the Debtors estimate that the amount of

accrued but unpaid matching contributions owing for the benefit of Employees under the

401(k) Plan is approximately $32,000.

99.    The Debtors provide benefit-eligible salaried retirees and their eligible

dependents (collectively the "Salaried Retirees") with the opportunity to enroll for

various medical, dental, vision, and life insurance coverage benefits (the "Salaried

Retiree Benefits Program").  Salaried Retirees enrolled in the Salaried Retiree Benefits

---

[29]    Certain Employees are permitted to carry over accrued but unused vacation time to the following
calendar year and some Employees, including Union Employees, are permitted to receive pay in lieu of
earned vacation time (including carried-over time) pursuant to specified procedures and eligibility
requirements.  Most Employees also are entitled to a cash payout for accrued and unused vacation days
upon termination of employment with the Debtors.  Certain Employees also are permitted to "bank"
their sick time and personal time pursuant to established procedures permitting for the carry over of
such accrued benefits.

[30]    The Debtors' monthly matching contributions with respect to the 401(k) Plan are approximately
$140,000.

Program are required to make certain co-payments and pay a portion of the costs incurred by the Debtors in providing the Salaried Retiree Benefits Program. After the satisfaction of any applicable deductible, Salaried Retirees receive coverage with respect to a specified percentage of permitted health, dental and vision costs.

100.    The Debtors also provide 68 benefit-eligible former United Auto Workers Union (the "UAW") members and their eligible dependents (collectively, the "Union Retirees," and together with the Salaried Retirees, the "Retirees") with benefits, including medical, dental, vision, and life insurance coverage (the "Union Retiree Benefits Program," and together with the Salaried Retiree Benefits Program, the "Retiree Benefits Programs") pursuant to the terms of a 1997 agreement between the Debtors and the UAW. The benefits to the Union Retirees are provided at no cost to the Union Retirees and approximately 75% of such expenses incurred by the Debtors are paid by General Motors Corporation ("GM") pursuant to that certain asset purchase agreement entered into in 1994 between GM and Delco Remy International. The Debtors estimate that as of the Petition Date, the amount owed in connection with the Retiree Benefits Programs is approximately $274,000, and that all such amounts will be payable during the anticipated duration of these chapter 11 cases.

101.    The Debtors offer certain salaried Employees with a severance plan (the "Salaried Employee Severance Plan") that provides severance benefits to an Employee if, among other requirements:  (i) the Employee's employment is terminated by the Debtors without "cause" (as determined by the Debtors); (ii) the Employee has worked for the Debtors in a full-time capacity for at least one full, continuous year; and (iii) the Employee signs a company-provided severance agreement that generally includes, among

38

other provisions, a release of claims against the Debtors and non-compete and non-solicitation provisions. Under the Salaried Employee Severance Plan, eligible Employees are entitled to receive payment of their former base compensation for a specified period of time determined in accordance with a metric that takes account of both the Employee's former position and the number of years of service provided by the Employee (the "Base Severance"). Eligible Employees also receive continued medical, dental and vision benefits (for the period of the Base Severance) to the extent that they previously were covered as well as payments of earned but unused vacation time (together with the Base Severance, the "Severance Pay"). Severance Pay due under the Salaried Employee Severance Plan is payable on regular payroll cycles and is payable only until the Employee has found comparable employment or obtained comparable benefits coverage.

102.    The Debtors provide basic life insurance and accidental death and dismemberment coverage ("Life and AD&D Insurance Coverage") to all Employees. The premiums paid by the Debtors for the Life and AD&D Insurance Coverage are approximately $5,000 per week.

103.    Employees may supplement the Life and AD&D Insurance Coverage with additional personal life insurance and coverage of spouses and children ("Supplemental Life Insurance"). Participating Employees pay all premiums in connection with the Supplemental Life Insurance. Accordingly, the Debtors believe that they do not owe any prepetition amounts in connection with the Supplemental Life Insurance.

104.    The Debtors provide insurance with respect to medical treatment and evacuation needs for Employees traveling abroad (the "Overseas Medical Insurance"). The Debtors also provide personal umbrella liability insurance (the "Personal Umbrella

39

Liability Insurance") for 27 executive and other Employees that provides personal

liability protection of up to $2 million (per person).  The combined annual cost of the

Overseas Medical Insurance and the Personal Umbrella Liability Insurance is

approximately $47,200.  The Debtors also maintain premium-based directors' and

officers' liability insurance policies (together with the Overseas Medical Insurance and

the Personal Umbrella Liability Insurance, the "Additional Insurance Coverage") at an

annual cost in excess of approximately $300,000.  The Debtors have paid the premium

amounts with respect to the Additional Insurance Coverage and, as of the Petition Date,

the Debtors do not owe any amounts in connection with such policies.

     105.    The Debtors provide both short term and long term disability coverage

(collectively the "Disability Coverage") to all Employees.  Employees are provided with

short term disability coverage for a period of up to 26 weeks ("Short Term Coverage")

and long term disability coverage thereafter ("Long Term Coverage").  The percentage of

wages paid, the benefit maximums, the eligibility requirements that must be met, and

certain other terms vary depending on whether the covered Employee is an hourly or

salaried Employee.  Employees may supplement their Disability Coverage by electing to

have additional amounts withheld from their pay on an after-tax basis.  The Long term

Coverage is provided through a policy with Aetna Life Insurance Company, under which

the average monthly premium payment is $21,500.  Short Term Coverage is provided by

the Debtors on a self-insured basis.  As of the Petition Date, the Debtors estimate that

they owe approximately $8,000 in connection with the Disability Coverage on account of

unpaid claim amounts.

40

106.    The Debtors provide all Employees with access to an employee assistance plan through LifeWorks for Employees coping with depression, professional issues, financial, marital and other personal problems, or other similar issues that could affect job performance (the "Employee Assistance Program"). The Employee Assistance Program costs the Debtors approximately $3,300 per month.

107.    The Debtors also pay certain relocation expenses incurred by certain of the Employees in connection with their employment, including expenses relating to locating new accommodations, closing costs and commissions associated with the disposition of prior residences, temporary living costs, moving costs and taxes assessed on any of the aforementioned (the "Employee Relocation Program"). Some such expenses are reimbursed directly to the Employees that incur them with the remainder of the relocation services provided through a third-party service provider. An Employee may be required to return funds paid in connection with his/her relocation in the event that such Employee terminates his/her employment with the Debtors within a specified period of time. In 2006, the Debtors paid approximately $1 million in connection with the Employee Relocation Program. The Debtors anticipate that they may pay a comparable or higher amount in 2007, but the precise amount that will be payable is difficult to estimate because certain variable and contingent costs covered under the program cannot currently be determined. As of the Petition Date, the Debtors' best estimate is that they will owe approximately $600,000 in connection with the Employee Relocation Plan.

108.    The Debtors reimburse certain portions of the expenses incurred by Employees in connection with approved employment-related educational courses (the "Tuition Assistance Program"). To be eligible for full reimbursement, Employees must

41

complete approved courses and achieve specified grade results. Employees also are
required to enter into agreements to return funds reimbursed in accordance with the
Tuition Assistance Program in the event that the Employee leaves voluntarily or is
terminated by the Debtors under specified circumstances. In 2006, the Debtors paid
approximately $180,000 in connection with the Tuition Assistance Program and in the
first and second quarters of 2007, the Debtors paid approximately $71,000. Certain
Employees have enrolled in educational programs prior to the Petition Date and may be
eligible for reimbursement under the Tuition Assistance Program. The Debtors anticipate
that the amounts eligible for such reimbursement are unlikely to exceed amounts
reimbursed in the recent past.

109.     As described in greater detail below, the Debtors maintain certain
incentive plans that are designed to ensure the continued retention of two specific groups
of key non-senior management Employees (the "Retention Plans" and together with the
Salaried Employee Severance Plan, the Life and AD&D Insurance Coverage, the
Supplemental Life Insurance, the Additional Insurance Coverage, the Disability
Coverage, the Employee Assistance Program, the Employee Relocation Program and the
Tuition Assistance Program, the "Additional Employee Benefits"). The Retention Plans
cover: (i) eight Employees who currently are employed by the Debtors in connection
with their Mississippi remanufacturing operations, which will cease to be operated by the
Debtors after consummation of the Caterpillar Outsourcing Agreement (the "Mississippi
Program"); and (ii) seven highly skilled technical and engineering Employees who
provide key services in connection with the Debtors' hybrid business (the "Hybrid
Program").

42

110.    The Debtors believe that the Mississippi Program, under which the maximum amount that they will be required to pay is $155,000, is critical to the successful continuation of their remanufacturing operations pending the closing of the Caterpillar Outsourcing Agreement.  Under the Caterpillar Outsourcing Agreement, Caterpillar will become the Debtors' exclusive supplier of remanufactured heavy duty starters and alternators, and in conjunction therewith, will acquire certain machinery, equipment and inventory that the Debtors currently utilize for that production.[31]  The Debtors implemented the Hybrid Program, under which the maximum amount that they will be required to pay is $170,000, due to the highly-competitive environment around hybrid technology, and the need to retain the know-how of key engineers for that business.[32]

111.    The Debtors maintain annual bonus programs specific to certain of their operating locations (the "Local Plans") that provide Employees the opportunity to receive performance-based bonuses.  Awards under certain of these programs are paid on a quarterly basis and the Debtors estimate that approximately $200,000 of bonuses under the Local Plans accrued prior to the Petition Date and may be payable during the course of these chapter 11 cases.

112.    Under the laws of the approximately 47 states in which the Debtors operate or in which the Employees reside, the Debtors are required to maintain workers' compensation policies and programs to provide their Employees with compensation for

---

[31]    The Caterpillar Outsourcing Agreement provides for a two-phase closing – the first phase of which closed in the second quarter of 2007 and the second phase of which includes inventory purchases over the span of the third and fourth quarters of 2007.

[32]    I have been informed that none of the Employees subject to the Mississippi Program or the Hybrid Program are insiders and, as these are ordinary course retention plans for "rank and file" Employees, the Retention Plans do not violate (or, indeed, even implicate) section 503(c) of the Bankruptcy Code.

066079.1001

injuries arising from or related to their employment with the Debtors (the "Workers'

Compensation Program"). As of the Petition Date, there were approximately 49 workers'

compensation claims (the "Workers' Compensation Claims") pending against the

Debtors arising out of alleged injuries incurred by employees during the course of their

employment with the Debtors, which the Debtors expect to continue to resolve in the

ordinary course of business. The Debtors have reserved approximately $876,000 to

resolve the Workers' Compensation Claims. In 2006, the Debtors paid approximately

$830,000 in claims in connection with their Workers' Compensation Program and in

2005 they paid approximately $1,285,000. Although the Debtors partly are self-insured

in all states in which they operate, they maintain a "stop-loss" policy (the "Travelers

Policy") with Travelers Insurance Company ("Travelers"), which costs approximately

$478,000 per year. The Travelers Policy limits the Debtors' total exposure to any

individual Employee to $250,000 on account of Workers' Compensation Claims. As of

the Petition Date, the Debtors believe that they owe approximately $125,000 in

connection with the Travelers Policy, and approximately $876,000 on account of the

Workers' Compensation Claims for which the Debtors believe they have incurred unpaid

claims that will not be covered under the Travelers Policy.[33] In addition to amounts owed

in connection with the Workers' Compensation Claims, the Debtors maintain two letters

of credit in the aggregate amounts of $750,000 and 133,844 for the benefit of the

Oklahoma Workers' Compensation Court and the Royal Bank of Canada, respectively.

The Debtors also have posted a letter of credit in the amount of approximately $6.1

---

[33]    In addition to amounts owed in connection with the Workers' Compensation Claims, the Debtors
maintain two letters of credit in the aggregate amounts of $750,000 and $133,844 for the benefit of the
Oklahoma Workers' Compensation Court and the Royal Bank of Canada, respectively. The Debtors
also have posted a letter of credit in the amount of approximately $6.1 million for the benefit of
Travelers in order to secure its deductible obligations with respect to the Travelers Policy.

066079.1001

million for the benefit of Travelers in order to secure its deductible obligations with respect to the Travelers Policy.

113.    As is customary in the case of most large companies, the Debtors utilize the services of numerous third-party administrators in the ordinary course of business to whom they outsource tasks associated with the payment of compensation and benefits to Employees and Retirees. Those administrative services include administering or assisting in the administration of the Debtors' payroll processes, benefit plans, pension plans, and workers' compensation obligations; facilitating the administration and maintenance of their books and records; assisting with legal compliance issues; and conducting special administrative and legal compliance projects in respect of Employee and Retiree benefit plans and programs (costs associated therewith, the "Third-Party Administrative Costs"). The ordinary course services provided by those third parties ensure that the Debtors' obligations with respect to Employees and Retirees continue to be administered in the most cost-efficient manner and comply with all applicable laws.

114.    It is essential that the Debtors be permitted to continue to honor their Employee Wages and Benefits obligations to ensure the continued operation of the Debtors' business and to maintain the morale of their Employees, many of whom otherwise may be unable to meet personal obligations.

115.    Should the Contract Personnel Suppliers not be paid for the services provided by the Contract Service Personnel, the Contract Service Personnel also will not be paid and thus will refuse to provide any future services for the Debtors. The services of the Contract Service Personnel are critical to the Debtors' reorganization efforts. Moreover, the Debtors heavily depend upon their Contract Personnel Suppliers to provide

066079.1001

the flexibility to rapidly adjust their workforce levels, on an as-needed basis, without accruing the long term costs of providing benefits and health care coverage to non-temporary employees. Any depletion of the Debtors' workforce would hinder the Debtors' ability to meet their customer obligations and diminish the Debtors' prospects for successful reorganization.

116.   I therefore believe that the relief requested is necessary and appropriate and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

**6.   Motion of the Debtors for an Order Authorizing the Debtors to Pay Prepetition Claims as They Become Due**

117.   The Debtors seek entry of an order:  (i) authorizing, but not directing, the Debtors to pay General Prepetition Claims as they become due and in the ordinary course of business; and (ii) authorizing the Debtors to reissue checks, wire transfers, ACH Payments, electronic transfers or other similar methods of payment for payments approved under this Fist Day Motion where such method of payment has been dishonored postpetition.

118.   Numerous suppliers, vendors, distributors, lessors and other parties holding General Prepetition Claims, in the United States and elsewhere, provide the Debtors with goods, including the manufactured automotive components and raw materials necessary to produce the Debtors' products, and with services such as insurance financing, operating logistics and support for corporate, administrative, sales, marketing, media and other functions. These goods and services are critical to the Debtors' businesses. In many instances, as a result of the Debtors' longstanding business relationships with such providers of goods and services and their history of timely

payments, the Debtors receive credit or other unique terms or benefits that are not available readily from other providers of similar goods and services.

119.    The Debtors have publicly announced to their creditors and other parties-in-interest in the Solicitation and Disclosure Statement that all General Prepetition Claims would be reinstated and/or paid in full in the ordinary course of business under the terms of the Plan.

120.    The Debtors' commitment to seek the relief requested hereunder was made clear to the Debtors' creditors and other parties-in-interest from the beginning of the Plan solicitation process.  Moreover, both prior to and during the solicitation process, a number of the Debtors' creditors have provided invaluable continuation of trade credit absent which the Debtors likely would not have had the ability to negotiate the Plan and successfully initiate these chapter 11 cases.  Many such creditors extended such credit based upon either an express or implied assurance that they would continue to be paid in full by the Debtors.

121.    The Debtors engage in a number of practices designed to minimize production costs.  One such practice is to limit working capital requirements at their manufacturing facilities by maintaining lean inventories of raw materials and component parts, relying instead on frequent shipments of required goods.  Maintenance of low inventory levels is a standard practice in the automotive industry followed by both the Debtors and their customers.

122.    The Debtors also rely heavily on single-source suppliers for their manufacturing, which reduces expenses associated with production start-up and other costs.  Because each of the component parts used by the Debtors in the manufacture of

47

their products must meet demanding specifications imposed by both the Debtors and their customers, numerous tests – sometimes taking place over the course of several months – must be run on such parts for quality-check purposes. Moreover, to manufacture components that can be used in the Debtors' products, suppliers often need to be provided with Tooling. By employing the single-source supply method, the Debtors are able to minimize the validation costs necessary to make component parts, as well as the capital investment costs related to Tooling. Many of the single-source suppliers utilized by the Debtors operate on a small scale, and because the Debtors are their primary customers, are dependent on continued payments from the Debtors to remain in business. Furthermore, the Debtors' suppliers typically operate on a purchase-order basis and have not entered into additional contractual arrangements with the Debtors for the supply of goods and services on a committed and ongoing basis. As a result, the Debtors cannot rely, in many cases, on such suppliers to continue to perform in a manner consistent with past practices after the filing of these chapter 11 cases.

123.    In addition, as described above, the Debtors, in recent years, have shifted the production and assembly of many component parts to foreign manufacturers. The Debtors thereby have been able to avoid the production and labor costs that have plagued many of the Debtors' competitors in the automotive industry.

124.    Although the production strategy employed by the Debtors have enabled them to lower costs, it also leaves the Debtors particularly vulnerable in the early stages of these chapter 11 cases. For example, due to the combination of lean inventory management and the single-source supply strategy, certain of the Debtors' suppliers are the only vendors from whom the Debtors can procure certain essential goods or services

within the timeframe that would permit the Debtors to avoid production shutdowns. As a

result, if such suppliers were to refuse to continue providing essential goods and services

to the Debtors due to the commencement of these chapter 11 cases, the Debtors would be

unable to produce and supply their products on a timely basis. Moreover, due to their

heavy reliance on overseas manufacturing, the Debtors are exposed to the risk that,

notwithstanding the automatic stay provisions of the Bankruptcy Code, Foreign Suppliers

will take actions against the Debtors in an effort to collect on their prepetition claims. I

am advised that such actions could be taken by Foreign Suppliers either inadvertently

because they are unaware of the fundamental protections afforded to debtors under the

Bankruptcy Code or purposefully due to their belief that this Court would not, as a

practical matter, be capable of enforcing judgments against them.

125.    In the ordinary course of the Debtors' business, the Debtors rely on certain

of their Non-Debtor Foreign Affiliates for essential supplies of goods and services

through the Intercompany Foreign Trade Transactions. The Intercompany Foreign Trade

Transactions primarily comprise, but are not limited to, the Debtors' purchase of cores,

processing services, sub-assembled components and finished goods from Non-Debtor

Foreign Affiliates located in Korea and Mexico and, to a lesser extent, from Non-Debtor

Foreign Affiliates located in Poland, Brazil and Hungary. The Intercompany Foreign

Trade Transactions typically have payment terms of between 45 and 120 days. Pending

payment, each entity records its Intercompany Foreign Trade Transactions as

intercompany payables and receivables. The Debtors estimate that, in 2006, they made

net cash payments of approximately $156.2 million on account of Intercompany Foreign

Trade Transactions, and that, as of the Petition Date, the Debtors owed approximately

49

$37 million to Non-Debtor Foreign Affiliates in respect of Intercompany Foreign Trade Transactions.

126.    The Debtors routinely finance certain of their insurance policies.  Under the terms of an existing insurance premium financing agreement (the "Existing PFA"), AFCO Premium Credit LLC ("AFCO") has been granted a security interest in any and all unearned insurance premiums and dividends (and loss payments that reduce the unearned premium), and also has been provided the right to terminate the Financed Policies in the event that a default arises under the Existing PFA.

127.    We have estimated that the total amount of General Prepetition Claims (other than amounts owed on account of Intercompany Foreign Trade Transactions) that will become payable during the anticipated duration of these chapter 11 cases is approximately $87 million.  Of this $87 million, we believe approximately $20 million will be payable to Foreign Suppliers.

128.    The delays associated with finding substitute suppliers of goods or services and retooling their operations to accommodate substitute goods and services could irreparably harm the Debtors' operations and threaten their successful reorganization, assuming any such alternative suppliers are even available.

129.    Further, the Debtors engage in business with certain types of creditors who, if not paid, could take actions that could have materially adverse effects upon the Debtors' estates, including:  (i) essential suppliers whose continued willingness and ability to supply the Debtors with goods is essential to the Debtors' ability to avoid operational shutdowns; (ii) foreign suppliers who might take the position that the automatic stay does not apply to them and who might therefore commence judicial

50

proceedings abroad; (iii) creditors who are in possession of the Debtors' Tooling; and (iv) providers of insurance financing.

130.    The Debtors are making every effort to avoid interruptions in their supply chain and the adverse effects that even a temporary break in their supply chain could have on their business. Any short term disruption could generate instability, and thus jeopardize the Debtors' ability to service their customers going forward.

131.    Many of the Debtors' suppliers operate on a purchase-order basis.

132.    Many of the goods and services required for the manufacture of the Debtors' products are supplied by Foreign Suppliers.

133.    Several of the Debtors' suppliers operate on a small scale, and, because the Debtors are their primary customers, are dependent on continued payments from the Debtors to remain in business. If such suppliers are not paid their prepetition claims, they will be unable to continue servicing the Debtors on a going-forward basis.

134.    Due to the limited inventory maintained by the Debtors and the predominantly single-source nature of their supply chain, the Debtors may be forced to shut down their operations in the event of a supply disruption. Moreover, due to the highly-integrated nature of the supply chain utilized by the Debtors and their customers, a shut down of the Debtors' operations could jeopardize lucrative contracts with key customers and produce a ripple effect throughout the automotive industry and trigger shutdowns of the manufacturing operations of the Debtors' customers. If that were to happen, the interests of all creditors and parties-in-interest in these chapter 11 cases could be impaired severely. Not only would the Debtors have squandered the goodwill developed with their customer base, any potential distribution to creditors could be

51

diluted by claims asserted by the Debtors' customers on account of the Debtors' failure to

supply materials within the terms of existing customer purchase orders.

135.    Virtually all of the Debtors' key manufacturing suppliers currently possess

Tooling that is vital to the Debtors' operations. It would prove extremely costly and

time-consuming for the Debtors to find specialized equipment to replace the Tooling that

may be withheld by such suppliers – even on a temporary basis.

136.    If AFCO were to terminate the Financed Policies due to a default under

the Existing PFA,[34] the Debtors would be left without the protections that such policies

currently provide. Although it is possible that over time the Debtors could replace the

Financed Policies, there is no assurance that they could do so, or that the replacement

policies would provide the same level and scope of coverage. Even if comparable

coverage could be obtained on an expedited basis and without significant gaps in the time

period covered, the Debtors believe the costs associated with obtaining such coverage

would be well in excess of the amounts that remain due under the Existing PFA (*i.e.*

approximately $340,000).

137.    The payment of amounts owed on account of Intercompany Foreign Trade

Transactions is of critical importance to the Debtors, as the Non-Debtor Foreign

Affiliates manufacture or supply virtually all of the products sold in the Debtor's OEM

business (which accounts for a very substantial portion of the Debtors' sales) and

substantial portions of remanufactured products sold in the automotive aftermarket.

Given that certain of the Non-Debtor Foreign Affiliates exist principally as suppliers to

---

[34]    Although I am advised that the Debtors could argue that AFCO's termination of the Financed Policies
violates the automatic stay provided by section 362 of the Bankruptcy Code, for the reasons described
herein, the risks to the Debtors' estates associated with losing coverage under the Financed Policies
weigh against the Debtors' reliance on such argument, particularly in light of the relatively small
amounts that are expected to be paid under the Existing PFA.

066079.1001

the Debtors, if the Debtors were to fail to satisfy their outstanding prepetition payables with respect to Intercompany Foreign Trade Transactions, the Non-Debtor Foreign Affiliates would suffer substantial harm, and in certain instances, could be forced to cease operations.

138.    Not only would a shutdown of the Non-Debtor Foreign Affiliates interrupt the Debtors' supply chain, as all of the Non-Debtor Foreign Affiliates are subsidiaries of the Debtors, loss of value in such entities would represent a loss of value to the Debtors' estates.  Thus, absent the continued smooth operation of the Non-Debtor Foreign Affiliates, the Debtors' supply chain, operations and business would be disrupted severely, and the value of their estates diminished.

139.    The continued availability of trade credit will be extremely valuable to the Debtors and allow them to preserve working capital while maintaining optimal production levels.  Conversely, a deterioration in postpetition trade credit available to the Debtors and a disruption or cancellation of deliveries of goods – most of which are not readily replaceable – would cripple the Debtors' business operations, increase the amount of funding needed by the Debtors postpetition and ultimately impede the Debtors' ability to supply their customers, thereby placing their customer base, as well as their successful reorganization, at risk.

140.    I have been advised the payment of general prepetition claims may help to avert the institution of countless reclamation claims, adversary proceedings and other motions filed by creditors requesting payments on account of claims.  Avoiding the time and expense of addressing such issues in the Bankruptcy Court will benefit the Debtors, their estates and their creditors.

141.    I am advised that many of the General Prepetition Claims that the Debtors seek to satisfy in the ordinary course of business would be treated as secured claims or priority claims and so would be paid in full even under a plan of reorganization that provided less than full recovery to general unsecured creditors.  I understand that as much as $34 million of the estimated $87 million in General Prepetition Claims which the Debtors believe will be payable during the course of these chapter 11 cases would be either secured claims or claims entitled to priority treatment under section 503(b)(9) of the Bankruptcy Code.

142.    I believe that the proposed debtor in possession financing, together with the cash generated in the ordinary course of the Debtors' businesses, will provide more than sufficient liquidity for payment of the General Prepetition Claims in the ordinary course of business.

143.    I therefore believe that the relief requested is necessary and appropriate and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

**C.    Financing**

    **1.    Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. § 364 of the Bankruptcy Code, (II) Granting Liens and Super-priority Claims, (III) Granting Adequate Protection to the Prepetition Agents and Prepetition Secured Lenders, (IV) Authorizing the Immediate Payoff of the Prepetition Credit Facility, (V) Authorizing Adequate Protection to the Senior Secured Noteholders, (VI) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 364 and (VII) Scheduling a Final Hearing On the Debtors' Motion to Incur Such Financing on a Permanent Basis**

144.    The Debtors seek entry of an order authorizing the Debtors to obtain postpetition financing in the form of the DIP Facility.

145.    In connection with the planning for a prepackaged chapter 11, the Debtors and its board of directors determined that the company would require debtor-in-possession and exit financing in connection with its proposed restructuring to meet its ongoing liquidity needs. The Debtors currently do not have any available sources of funds other than Cash Collateral and the proposed DIP Facility to carry on the operation of their businesses. The Debtors urgently require working capital to continue their operations. The Debtors' ability to maintain business relationships with their vendors and suppliers, to purchase new inventory and otherwise to finance their operations and confirm their Plan is dependent on their ability to use Cash Collateral and obtain the funds that would be made available under the DIP Facility.

146.    Any disruption of the Debtors' operations would be devastating at this critical juncture. The Debtors' inability to obtain sufficient liquidity and to make payments on certain obligations on a timely basis would result in a permanent and irreplaceable loss of business, causing a loss of value to the detriment of the Debtors and all parties-in-interest.

147.    The Debtors' board of directors authorized Rothschild, Inc., its financial advisor, to seek postpetition DIP and exit financing from lending institutions including the agent for its prepetition secured lenders.

148.    Rothschild subsequently contacted seven lending institutions. From those institutions, the Debtors received five initial proposals. Based on the initial proposals three institutions were invited to attend management presentations. Rothschild discussed each of the proposed financing proposals with the Debtors. After review and deliberation, the Debtors accepted the proposal from Barclays because they were the only institution

55

that provided a binding commitment letter and because the structure and pricing of the proposals were acceptable to the Debtors.

149.    The Debtors were unable to obtain DIP financing in the form of unsecured credit repayable as an administrative expense. No third party lender was willing to extend post-petition financing without receiving senior and priming liens on and security interests in substantially all of the Debtors' prepetition assets. Each of the proposed financing proposals received by the Debtors provided for the repayment in full of the Prepetition Indebtedness from the proceeds of the DIP financing.

150.    In light of the foregoing, the Debtors determined in their sound business judgment, in accordance with the advice of Rothschild, that the DIP Facility is critical to their ongoing operations in the ordinary course and that the terms of the DIP financing proposed by Barclays constituted the most cost-effective and advantageous proposal available in the circumstances. The proposal received from the Postpetition Agent is competitive and addresses the Debtors' working capital and liquidity needs.

151.    Prior to filing the voluntary petition, the Debtors engaged in extensive good faith, arm's-length negotiations with Barclays. These negotiations culminated in a binding commitment letter dated July 30, 2007 and an agreement that Barclays would form a syndicate to provide postpetition financing on the terms and conditions set forth in the DIP financing documents. The commitment letter was amended on August 28, 2007.

152.    The use of Deposited Funds to refinance the Prepetition Indebtedness will result in savings of interest for the Debtors. The Prepetition Lenders have consented to the Debtors' use of the Deposited Funds and other Cash Collateral.

066079.1001

153.    Cash Collateral (other than the Diesel Sale Proceeds) will be used by the Debtors to make such essential payments as employee salaries, payroll, taxes, the purchase of goods and materials and other general corporate and working capital purposes in the ordinary course of Debtors' businesses that become due and payable during the period commencing immediately after the Petition Date and through termination of the DIP Facility.

154.    I believe that a working capital facility of the type needed in these chapter 11 cases could not have been obtained on an unsecured basis. Potential sources of the proposed DIP facility for the Debtors, obtainable on an expedited basis and on reasonable terms, were extremely limited.

155.    The Debtors need immediate access to a working capital facility. Access to substantial credit is necessary to meet the day-to-day costs associated with maintaining business relationships with the Debtors' vendors and suppliers, purchasing new inventory and otherwise financing their operations. Access to sufficient cash is therefore critical to the Debtors. In the absence of immediate access to cash and credit, the Debtors' suppliers will refuse to sell critical supplies and services to the Debtors, and the Debtors will be unable to operate their businesses. The inability to meet payments to vendors and satisfy customers' desires for particular products would impair seriously the Debtors' prospects for reorganization.

156.    The Debtors require immediate use of Cash Collateral and the DIP Facility for, among other things, the repayment of the Prepetition Indebtedness, the Debtors' purchase of inventory, maintenance of their facilities and other working capital needs. It is essential that the Debtors immediately stabilize their operations and resume paying for

ordinary, post petition operating expenses, as well as the prepetition expenses approved

in the first-day orders, to minimize the damage occasioned by their cash flow problems.

Absent immediate use of Cash Collateral and the DIP Facility, the Debtors will be unable

to pay ongoing operational expenses.

157.   I therefore believe that the relief requested is necessary and appropriate

and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

**D.   Scheduling Matters**

    **1.   Motion of the Debtors for an Order (I) Scheduling a Combined
Hearing to Approve the Adequacy of the Solicitation and Disclosure
Statement and the Prepetition Solicitation Procedures and Confirm
the Plan of Reorganization, (II) Establishing Deadlines and
Procedures For Filing Objections to the Approval of the Solicitation
and Disclosure Statement, the Prepetition Solicitation Procedures
or Confirmation of Plan, (III) Directing the Office of the United States
Trustee to not Convene a Meeting of Creditors or Equity Security
Holders and (IV) Approving the Form and Manner and (IV)
Approving the Form and Manner of Notice of the Confirmation
Hearing**

158.   The Debtors seek entry of an order:  (i) scheduling a hearing to approve

the Solicitation and Disclosure Statement and the Prepetition Solicitation Procedures and

consider confirmation of the Plan; (ii) establishing deadlines and procedures for filing

objections to approval of the Solicitation and Disclosure Statement or the Prepetition

Solicitation Procedures or confirmation of the Plan; (iii) directing the U.S. Trustee to not

convene a meeting ("Committee Meeting") of creditors or equity security holders prior to

the final hearing with respect to the approval of the Debtors' debtor-in-possession

financing and following such hearing, unless otherwise ordered by this Court, to not

convene a Committee Meeting if the Plan is confirmed within 90 days after the Petition

Date; and (iv) approving the form and manner of notice of the commencement of these chapter 11 cases and the scheduling of the Confirmation Hearing.

159.    In connection with the Plan, the Debtors prepared the Solicitation and Disclosure Statement describing, among other things, the proposed reorganization of the Debtors and its effects on holders of claims against and interests in the Debtors.

160.    The Debtors caused the Voting Agent to distribute the Solicitation Materials, which included the Solicitation and Disclosure Statement, to the holders of the Impaired Notes as of the Voting Record Date and to their respective brokers, dealers, banks or other nominees, to solicit votes to accept or reject the Plan in advance of the Voting Deadline.

161.    I have been advised that the Debtors received the requisite acceptances of the Plan prior to the Petition Date.

162.    I also have been advised that a Solicitation and Disclosure Statement and Plan shall be provided to any parties-in-interest upon written request to the Debtors' counsel, and shall be available for download at http://www.kccllc.net/remy, at no charge.

163.    The most sensitive and complex tasks required to effectuate a successful reorganization have been accomplished in advance of the commencement of these chapter 11 cases, therefore, I believe the circumstances weigh heavily in favor of scheduling the Confirmation Hearing for the earliest date convenient to this Court after the expiration of the applicable notice periods and that the relief requested is necessary and appropriate and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

E.    **Rights Offering**

1.    **Motion of The Debtors For an Order (I) Authorizing the Commencement of a Rights Offering, (II) Approving the Subscription Forms Therefor and (III) Confirming the Applicability of 11 U.S.C § 1145 in Connection Therewith (the "Rights Offering Approval Motion")**

164.    The Debtors seek entry of an order authorizing the Debtors to commence the Rights Offering contemplated by the Plan, (ii) approving the Subscription Forms therefor, and (iii) confirming that the distribution of Subscription Rights and the issuance of shares of Reorganized RII Preferred Stock upon the exercise thereof qualify for the exemption from registration under applicable U.S. securities laws to the extent provided by section 1145 of the Bankruptcy Code.

165.    The Debtors have determined, in the exercise of their reasonable business judgment that conducting the Rights Offering as soon as reasonably practicable after commencing the chapter 11 cases is the most efficient means of seeking to implement the Plan. I understand that in order to meet the proposed timetable for confirmation and consummation of the Plan, it is imperative that the Rights Offering commence as soon as possible. Accordingly, if the Debtors are not permitted to expeditiously commence the Rights Offering, it is almost certain that they will not receive the contemplated funding from the Committed Purchasers in a timely manner, which may jeopardize the Debtors' ability to timely consummate the Plan.

166.    The Solicitation and Disclosure Statement was duly distributed to the holders of the Impaired Notes as of the Voting Record Date, and also was made available on the Securities and Exchange Commission's website at http://www.sec.gov/cgi-bin/srch-edgar?0001046859.

167.   I therefore believe that the relief requested is necessary and appropriate and is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

DB02:6283774.2

066079.1001

By: _____

John H. Weber
President
Remy Worldwide Holdings, Inc.

Sworn to before me on this
5th day of October 2007

By: _____

Sheila D. D. Cannon
Notary Public – State of Indiana
My Comm. Expires 7-29-2015