UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                              .     Chapter 11
                                    .
REMY WORLDWIDE HOLDINGS, INC., .         Case No. 07-11481(KJC)
*et al.*,                           .     (Jointly Administered)
                                    .
                                    .     October 10, 2007
                                    .     10:00 a.m.
              Debtors.              .     (Wilmington)
                                    .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Good morning all.

3          MS. MORGAN: Good morning, Your Honor.  Pauline

4    Morgan from Young, Conaway, Stargatt & Taylor on behalf of

5    the Debtors, Remy Worldwide Holdings, Inc. and its

6    affiliates.  First we'd like to thank the Court for making

7    time for us this morning.  We appreciate it.  If I may, Your

8    Honor, I'd like to begin with some brief introductions.

9    Sitting with me at counsel table, my co-counsel from Shearman

10   & Sterling, Douglas Bartner, Michael Torkin.  At the back

11   table, my colleague from Young Conaway, Ed Morton.  Randy

12   Martin from Shearman & Sterling, and Justin Hewitt from

13   Shearman & Sterling, and Jill Frizzley, didn't quite get a

14   seat, behind there, at Shearman & Sterling, and Ken Enos from

15   our offices.

16         THE COURT: Good morning.

17         MS. MORGAN: Your Honor, in the first row, I'd also

18   like to introduce, at the first seat there, Mr. Carey Sheeba

19   (phonetic), who is the CFO of the company.  John Weber, who's

20   the President and CEO.  And sitting next to him Jerry Mills,

21   who's the Senior VP of, and Chief Human Resources Officer.

22         THE COURT: Good morning.

23         MS. MORGAN: Your Honor, you should have our agenda

24   and our binder.

25         THE COURT: I do.

1          MS. MORGAN: I'm pleased to report that because we

2     had some lead time getting to this filing, we did work out

3     many, not all, I think most of our issues with the US

4     Trustee.  So I think there are very few changes to the orders

5     that are in your binder.

6          THE COURT: Very well.

7          MS. MORGAN: And where there are, we will certainly

8     point them out to you.  Your Honor, the first matter on the

9     agenda is the Debtors' motion for joint administration of

10    their cases.  There are 29 Debtors.  Each is an affiliate

11    within the meaning of §101, and we do believe that joint

12    administration is in the best interest of the estate, and

13    would ask that that motion be approved.

14         THE COURT: I'll ask, for the record, if anyone else

15    wishes to be heard on this motion.  I hear no response.  Do

16    you have a form of order?

17         MS. MORGAN: Yes, Your Honor.  May I approach?

18         THE COURT: Yes.  Thank you.  That order has been

19    signed.

20         MS. MORGAN: Thank you, Your Honor.  The next matter

21    on the agenda are five motions for admission *pro hac vice* of

22    our co-counsel from Shearman & Sterling.  Douglas Bartner,

23    Frederic Sosnick, who's not here today, Michael Torkin, and

24    Justin Hewitt, and Jill Frizzley.  As the motions indicate,

25    they are all admitted in good standing in New York, and in

1    other jurisdictions in some cases, and we ask that they be

2    admitted *pro hac vice*.

3              THE COURT: Very well.

4              MS. MORGAN: May I approach with all five, Your

5    Honor?

6              THE COURT: You may.  Normally, my J.A. would stamp

7    these, but since she's away, I'll sign them myself.  I

8    haven't done that in a while.  All right.  Those orders have

9    been signed.

10             MS. MORGAN: Thank you, Your Honor.  The next matter

11    on the agenda is the Debtors' motion to retain and employ

12    Kurtzman Carson Consultants as noticing agent.  Your Honor,

13    this is under 28USC 156.  We did have some discussions with

14    the US Trustee prior to the bankruptcy filing, and we did

15    make changes to the order that are already reflected in your

16    binder.  But just to point them out, paragraph 4 of the order

17    - - and these are, these basically effect revisions to the

18    Kurtzman Carson engagement letter.  In paragraph 4, basically

19    substitutes a shortened paragraph 3(e), merely providing that

20    the parties intend that KCC shall be employed pursuant to

21    28USC 156, if the company files.  It eliminates provisions in

22    the engagement letter which provided for their employment in

23    a Chapter 7 case, should that be, should that be necessary.

24    And paragraph 5, again, provides that the retention agreement

25    is modified to eliminate the limitation of liability

1  provisions and the provision for an evergreen retainer.  And

2  with that, Your Honor, I believe the US Trustee finds the

3  order acceptable, and we ask that it be approved.

4          THE COURT: All right.  The only question I have is

5  that the affidavit does not expressly state that KCC is

6  disinterested, and neither does it separately allege the a,

7  b, and c, of 101-14.  It says c, but not a or b.  So I can't,

8  I can't, through addition, through the definition get to

9  disinterestedness.  I'm, I'm certain that's just an

10  oversight.  I would be willing to sign the order upon

11  submission of a, a supplemental affidavit saying that

12  expressly.

13          MS. MORGAN: Your Honor, we will talk to KCC and ask

14  that that be submitted to the Court.

15          THE COURT: Okay.

16          MS. MORGAN: But we would like to take you up on

17  your offer to have that application approved today with that

18  understanding.

19          THE COURT: Well, okay.  Let's do it this way.  On

20  the assumption that it was just an oversight, and there is no

21  problem, I will sign the order today.  But if the supplement,

22  if the supplemental affidavit shows otherwise, we'll have to

23  reconsider the order, obviously.

24          MS. MORGAN: We understand that all of these orders

25  are subject to reconsideration under our local rules, Your

1    Honor.

2              THE COURT: Okay.

3              MS. MORGAN: I don't, no one is here from KCC today,

4    so I can't directly answer the question.  But we will talk to

5    them as soon as this hearing concludes.

6              THE COURT: All right.  Do you have a form of order?

7              MS. MORGAN: Yes, Your Honor.

8              THE COURT: Thank you.

9              MS. MORGAN: Thank you, Your Honor.  I'd like to

10   turn the podium over to Douglas Bartner, who's going to

11   handle several of the next items on the agenda, and also tell

12   the Court about some of the history and background of the

13   case.

14             THE COURT: Very well.

15             MS. MORGAN: Thank you.

16             MR. BARTNER: Good morning, Your Honor.  Douglas

17   Bartner, Shearman & Sterling, co-counsel to the Debtors.

18   Thank you, Your Honor, for seeing us this morning.  Making

19   time for our first day.  On Monday evening, Your Honor, Remy

20   and it's affiliated Debtors filed together with their Chapter

21   11 petitions, and the first day motions, a pre-packaged plan

22   of reorganization.  That plan had been voted on, and

23   overwhelmingly approved, by each of the classes of impaired

24   bondholders.  In fact, with respect to Class VI, the senior

25   note holders, the plan was approved by over 99.9% voting in

1    amount, and with respect to Class VII, the subordinated note

2    holders, it was approved by 100% of those voting.  The

3    numerosity was equally as overwhelming.  Out of 110 votes in

4    Class VI, only two small bondholders rejected the plan, and

5    44 bondholders in Class VII out of 44 voting, voted to

6    approve the plan.  Your Honor is undoubtedly aware of the

7    Chapter 11 landscape populated by companies in the auto

8    supply sector like Remy.  From Dura, Dana, Delphi, Tower, J.

9    L. French, Meridian, and so on, these cases have proved to be

10   multi-year, exceedingly expensive, often contentious and

11   litigious.  So we're especially pleased, Your Honor, to

12   present the Court today with what, to my knowledge, is the

13   first successful pre-pack of a company of any size in this

14   sector.  And I would like, with the Court's permission, to

15   give you a brief background of Remy and the pre-packaged

16   plan, to set the context for our first day relief.

17          THE COURT: You may proceed.

18          MR. BARTNER: Thank you, Your Honor.  Remy

19   International and its affiliated Debtors manufacture and

20   distribute starters and alternators for automobiles, trucks,

21   and heavy duty equipment.  Remy also is a leader in the

22   developing field of hybrid power technology.  Remy supplies

23   starters and alternators to original equipment manufacturers,

24   or OEM's, such as General Motors and Chrysler, as well as to

25   the, to the so-called consumer after market, through retail

1   chains such as Auto Zone.  The Debtors themselves employ

2   about 15 hundred workers.  By having realigned its

3   manufacturing function to lower cost, foreign locations,

4   Remy's non-debtor affiliates employ over 55 hundred people,

5   and a large portion of Remy's sales are derived from products

6   manufactured outside the US by it's non-debtor affiliates,

7   and by third party manufacturers.  For its fiscal year ended

8   12/31/06, Your Honor, Remy had consolidated revenue of about

9   $1.2 billion, and had EBITDA of about 42 million.  Remy had

10  fueled, in large part, its aggressive growth and acquisition

11  strategy over the last ten years or so with borrowed money.

12  Remy is now burdened by over $665 million of funded debt.

13  And Remy's capital structure became impossible to maintain,

14  Your Honor, in the face of increasing pricing pressures from

15  customers, soaring raw material costs, a declining US dollar

16  against currencies, against currencies in countries in which

17  manufacturing facilities were moved, sharply increased

18  warranty costs, and a slower than expected demand in the

19  global market for Remy products.  And I'm sure Your Honor has

20  seen some of those factors in other cases in which Your Honor

21  is involved.  Remy recognized and addressed its over

22  leveraged issues by, among other things, divesting of

23  businesses, freezing benefits under defined benefit plans for

24  salaried, hourly, and union employees, curtailing post-

25  retirement healthcare benefits for salaried employees, and

1   restructuring its European operations and transferring

2   certain of its re-manufacturing facilities to lower cost

3   facilities in Mexico.  But it could not outrun the

4   debilitating effects of having to service almost $700 million

5   of debt and having to repay that debt in due course.  So in

6   March of this year, Your Honor, through about mid-June, Remy

7   and its professionals negotiated the terms of reorganization

8   plan with an informal committee of bondholders and its

9   professionals.  The result was a plan that would reduce long

10  term debt by about $360 million.  On June 15th, Remy and the

11  holders of over 80% in amount of each of the senior notes,

12  that was Class VI, and the subordinated notes, Class VII,

13  entered into a plan support agreement.  The plan support

14  agreement essentially locked the plan support parties into

15  supporting a plan of reorganization, the terms of which were

16  set forth in a restructuring term sheet.  And both the plan

17  support agreement, and the restructuring term sheet are

18  attached as exhibits to the solicitation and disclosure

19  statement.  The plan of reorganization that we filed on

20  Monday evening conforms in all respects to the requirements

21  of the plan support agreement and the restructuring term

22  sheet.  And specifically, Your Honor, the plan provides for a

23  refinancing of the existing secured revolver and term loan

24  debt with the proceeds of a DIP financing and existing cash

25  collateral.  And you'll hear more about that a little later

1   this morning.  It provides for the repayment of the

2   outstanding principle amount of the floating rate notes, in

3   the amount of $145 million, which are secured by a second

4   lien on the substantial portion of the Debtors' assets.

5   Together with the repayment of accrued interest through the

6   effective date, as well as the payment of an optional pre-

7   payment penalty in the amount of ½ of 1%.  And that will be

8   paid with the proceeds of an exit financing.  The plan

9   provides for the exchanging, exchanging the senior note

10   claims, again Class VI, of $145 million in principle and $10

11   million of a consent fee, together with accrued interest

12   through the effective date, for new third lien picknotes

13   (phonetic) in the principle amount of $100 million, about $65

14   million of cash, and $2 million of new preferred stock.  Your

15   Honor, I may have misspoken.  The amount of the floating rate

16   notes is in the principle amount of $125 million.  I might

17   have said 145.

18          THE COURT: You did.

19          MR. BARTNER: Class VII, the subordinated note

20   claims, would exchange their claims of about $315 million in

21   the aggregate, together with accrued interest through the

22   petition date, for 100% of the common stock of reorganized

23   Remy.  In addition, the holders of the senior note claims

24   will receive rights to acquire $25 million of new preferred

25   stock, and the holders of the subordinated note claims would

1    receive rights to acquire $60 million of new preferred stock.

2    The existing equity would not receive any distribution under

3    the plan.  All other creditors, secured and unsecured, are to

4    be paid in full, in cash on the effective date, or when their

5    claims become due and owing.  The plan obligations will be

6    funded principally through the 85 million, an $85 million

7    rights offering, and a $330 million exit financing.  Every

8    dollar of the necessary financing has been committed to.  In

9    respect of the rights offering, Your Honor, the Debtors have

10   received a back stop commitment from certain holders of the

11   senior notes, and subordinated notes, assuring the Debtors

12   that the $85 million from the rights offering will be

13   available, whether or not the other holders of senior notes

14   or subordinated notes participate.  The identities of the

15   back stop providers and the back stop commitment itself is

16   attached as Exhibit C to the disclosure, solicitation and

17   disclosure statement.  The Debtors have also obtained a

18   commitment for $330 million of exit financing from Barclays

19   Capital.  It's worth noting, Your Honor, that the commitment

20   was obtained after the severe credit market correction in

21   August.  So that the DIP and exit financing commitments have

22   been priced and syndicated under the current credit

23   environment, and Remy is not dragging along reluctant

24   creditors looking to get out of the deal, as is happening in

25   other situations both in and out of court.  Those commitments

1   are attached to the solicitation and disclosure statement as

2   Exhibit I.  Remy set a voting record date of August 29th and

3   commenced the solicitation of the holders of senior note

4   claims and subordinated note claims on August 31st.  We set

5   October 1st, or 20 business days after the commencement, as

6   the last day for votes to come in.  The Debtors didn't

7   register the solicitation and disclosure statement with the

8   SEC, but relied on an exemption from registration contained

9   in §3(a)(9) of the Securities Act.  Your Honor, we will

10  provide the Court with more detail of the precise pre-

11  petition solicitation procedures and their conformity with

12  applicable Bankruptcy Law and non-bankruptcy law in due

13  course, and of course no later than the disclosure statement

14  hearing.  Yesterday, on Monday evening, Your Honor, the

15  Debtors filed with the Court, together with their Chapter 11

16  petitions and first day motions, the solicitation and

17  disclosure statement itself, which included as I mentioned,

18  as exhibits, the plan support agreement, the back stop

19  commitment, and the financing commitments on the DIP and

20  exit.  The plan of reorganization that was voted on, as well

21  as the voting certificate of Jane Sullivan, the Executive

22  Director of Financial Balloting Group, attesting to the votes

23  on the plan of reorganization.  Unless Your Honor has any

24  questions on the background, I would propose we move into the

25  first day orders starting at tab 5 of your binder.

1       THE COURT: Go ahead.  I do not have any questions

2    presently.

3       MR. BARTNER: Thank you, Your Honor.  At tab 5, and

4    no. 5 on the agenda, is the Debtors' motion for an order

5    authorizing the payment of pre-petition sales, use,

6    franchise, and other taxes.  Your Honor, this would authorize

7    the Debtor, in the ordinary course, to pay taxes that have

8    been collected in respect of sales, and that are due and

9    owing during the course of this case.  As of the petition

10   date, Your Honor, we believe that there are approximately

11   $3.2 million of taxes that have not yet come due.  The

12   Debtors' records reflect that they are current on all taxes

13   that are due.  We expect that during the course of this case,

14   Your Honor, approximately a million dollars would become due

15   and owing in respect of sales and use taxes.  Your Honor, I'm

16   sure, is familiar with the arguments that justify the entry

17   of this order.  Those taxes are trust fund taxes, and

18   therefore are not property of the estate under §541(d) of the

19   Code.  To the extent that those taxes aren't paid, it does

20   subject officers and directors to potential liability or

21   criminal prosecution in some jurisdictions.  Those taxes, to

22   the extent they're not trust fund taxes, would be priority

23   taxes under §507(a)(8) of the Bankruptcy Code, and thus we're

24   affecting only the timing of payment, and not the ultimate

25   amount paid to the taxing authorities.  Your Honor, again, we

1    have a pre-packaged plan, so unsecured creditors will be

2    receiving 100¢, and again we're just accelerating the payment

3    of a relatively diminimous amount.  §363(b), Your Honor, also

4    provides support.  And finally, of course, if Your Honor

5    isn't persuaded by all of that, we have §105.

6         THE COURT: Does anyone else - -

7         MR. BARTNER: Unless Your Honor - -

8         THE COURT:  - - care to be heard in connection with

9    this motion?  I hear no response.  I've reviewed the motion,

10   and don't have any questions.  I'm prepared to grant the

11   relief that's been requested.

12        MR. BARTNER: Thank you, Your Honor.  Would you like

13   me to bring up the orders one at a time?

14        THE COURT: Why don't we hold them until the end?

15        MR. BARTNER: Very good.  Your Honor, next at tab 6,

16   no. 6 on the agenda, is our utilities motion.  This follows

17   the post-BABCA protocol generally adopted in large Chapter 11

18   cases, and approved in this and other districts.  We ask,

19   first, Your Honor, for a bridge order that would bridge the,

20   to a final hearing on this, which would presumably be the

21   second day hearing, where Your Honor would essentially enjoin

22   utilities from altering or cutting off service until such

23   time as we had that hearing.  The final order that is being

24   requested would deem the utility companies, that are set

25   forth on Exhibit A to our motion, there are some 60 utilities

1   that provide services to the, to the Debtors, would deem them

2   to be adequately assured of payment under §366 on the basis

3   of the establishment of a utility deposit account, which I'll

4   describe in a moment, and also establishes procedures for

5   resolving requests for additional security.  Your Honor, this

6   motion, as well as all the first days, are supported by the

7   affidavit of John Weber, who you have met, the CEO President

8   of the Debtors.  Your Honor, here the Debtors pay

9   approximately $5.3 million annually in respect of its utility

10  charges.  The average monthly cost is approximately $440

11  thousand.  What the Debtors would propose to do is to deposit

12  50% of the monthly utility charge, or $220 thousand, into an

13  escrow account as adequate assurance.  The Debtors would also

14  increase the amount of deposits in that account to the extent

15  utilities are added during the course of the case.  Your

16  Honor, the procedures that we propose be adopted in

17  connection with the final hearing on this would be that the

18  Debtors would serve notice on the utilities within five

19  business days after the entry of the bridge order.  Serve

20  notice both of the bridge order, of course, as well as the

21  request for a final order.  Utility companies would have 30

22  days from the petition date to request additional adequate

23  assurance.  The Debtors would be authorized to comply with

24  those requests by increasing the deposit amounts or

25  otherwise.  If the Debtors believe the request to be

1    unreasonable, the Debtors would seek, at the earliest

2    practical time, a hearing so that matters can be resolved

3    before the Court.  To the extent that a utility company fails

4    to send an additional notice request within the time period,

5    they would be deemed to have accepted the deposit as adequate

6    assurance under 366.

7         THE COURT: Does anyone else care to be heard in

8    connection with this motion?  I hear no response.  I have

9    reviewed the motion, and do not have any questions.  I'm

10   prepared to grant the relief that's been requested.

11        MR. BARTNER: Thank you, Your Honor.  At tab 7 and

12   no. 7 on the agenda is our customer programs motion.  Here,

13   Your Honor, the Debtors are seeking authority to perform

14   certain of their pre-petition obligations related to their

15   customer programs, and to continue those programs in effect.

16   We also, here and in each of the other motions, I should

17   mention, Your Honor, ask the Court to authorize and direct

18   banks to honor checks and to honor electronic payment

19   requests in connection with the payment of any pre-petition

20   claim.  Your Honor, here there are several programs.  I don't

21   think any of them are terribly unusual and I can, I'll go

22   through them very briefly.  And if Your Honor wants more

23   detail, I'm happy to do that.  The motion does provide a

24   considerable amount of detail on them.  We have two warranty

25   programs.  One is for original equipment manufacturers, the

1    other is for the consumer after market.  As of the petition

2    date, there were approximately $19 million of reserves for

3    warranties that could be claimed in the future in respect of

4    the OEM's, and about $15 million that has been reserved for

5    possible consumer warranty claims.  The warranties generally

6    cover defective products.  Again, nothing unusual at all.

7    Also have a program regarding customer adjustments.  Customer

8    adjustments may be necessary from time to time to deal with

9    mis-delivered goods, inaccurate quantities, double billing,

10   and all of those sorts of things.  So the Debtors seek

11   authority to adjust those matters to the extent they come to

12   the Debtors' attention post-petition in respect of pre-

13   petition dealings with customers.  Customer rebates and

14   allowances, that refers to the program mostly in the consumer

15   after market, where the Debtors generally provide after

16   market customers with certain rebates, incentives, credits,

17   allowances, and reimbursements for marketing the Debtors'

18   products, and the like.  As of the petition date, there was

19   approximately $59 million reserved for the payment over time

20   of those allowances, but only approximately $4 million we

21   expect to come due within the course of these cases.  Your

22   Honor, again, there, there, those are the principle programs

23   that the Debtor has and wishes to continue.  Unless there's

24   any questions.

25              THE COURT: Does anyone else care to be heard in

1  connection with this motion?  I hear no response.  I have

2  reviewed it, do not have any questions, and I'm prepared to

3  grant the relief that's been requested.

4        MR. BARTNER: Thank you, Your Honor.  Next on the

5  agenda, Your Honor, and at no. 8 in your book is the Debtors'

6  cash management motion.  This motion has four elements.

7  First the Debtors seek authority to continue maintenance of

8  the Debtors' existing bank accounts.  Second, the Debtors'

9  seek authority to continue to use their existing cash

10  management system.  Third, seek to continue to use their

11  business forms.  And finally, seek an interim waiver on the

12  investment and deposit requirements of §345(b) of the

13  Bankruptcy Code.  Your Honor, here we have attached as an

14  exhibit to this motion a pictorial of the cash management

15  system the Debtors use.  It looks complex, but I think I can

16  very quickly give Your Honor an overview, as it works pretty

17  much like it works in most other companies.  Here all of the

18  Debtors, plus one non-debtor affiliate, have accounts that

19  receive receivables that come into the company for the sale

20  of product, and then are swept up into a master account, or a

21  cash concentration account at Wachovia.  Most of the

22  accounts, by the way, are kept at Wachovia, and we've listed

23  all of the accounts in Exhibit A to the motion.  Once they're

24  in the master account they do one of three things,

25  essentially.  The funds will either go to pay down, on a

1   daily basis, any revolving debt that's outstanding on that

2   day.  They will either be disbursed into the disbursement

3   accounts, general disbursement accounts and payroll accounts

4   of some or all of the Debtors, depending on what payments are

5   coming due.  Or third, they will be swept into an investment

6   account, which is invested in overnight funds and receives

7   the highest yield available, generally.  So it's a very

8   efficient system, and the Debtors keep meticulous records of

9   each legal entity's contribution, if you will, to this, to

10  this program.  The one non-debtor affiliate that's included

11  in the cash management system is a Mexican affiliate called

12  Remy Componentes.  And that's, that's necessary for that

13  company to keep dollar denominated accounts as it receives

14  dollar denominated receivables, and may in fact need to tap

15  into the cash management system.  That is, it may need

16  disbursements during the course of these cases of

17  approximately $6 million.  Your Honor, the net receivable

18  that Componentes has against the Debtors is in excess of $6

19  million.  So we don't think that the distribution, or the

20  transfer to disbursement accounts of the non-debtor affiliate

21  is going to work any prejudice at all to the Debtors, because

22  of the net receivable Componentes has.  Your Honor, it would

23  be, obviously, extremely disruptive, very expensive, and

24  administratively burdensome to dismantle the cash management

25  system, and we'd ask that the cash management system be,

1    continue to work in effect, and in fact it is part of the

2    underpinning for also the financings that the Debtor has

3    proposed.  Your Honor, with respect to the existing bank

4    accounts, that's very much related to the cash management

5    system.  It would not be efficient to close the Debtors' bank

6    accounts, and to open new post-petition bank accounts, as

7    would be required by the US Trustee requirements.  And we

8    have had occasion to talk to the US Trustee about this, and I

9    think the US Trustee is fine with a waiver of the requirement

10   of closing the existing bank accounts.  Third, Your Honor, is

11   the continued use of business forms.  We would propose that

12   until our existing stock run out we not be required to mark

13   the checks, business forms, and other materials with DIP or

14   Debtor-in-Possession.  Widely publicized case.  Would be

15   inefficient and expensive to do that.  And finally, Your

16   Honor, with respect to the requirements under 345(b), we have

17   requested, I think consistent with Local Rule 2015(2)(b),

18   that we get an interim waiver of the requirements of

19   complying with 345(b).  2015(2)(b) provides that if we have

20   made the motion on the first day of the case, which we did,

21   if the case has more than 200 creditors, which it certainly

22   does, that the Court may grant an interim waiver.  What we're

23   requesting would be 60 days, and if the Court confirms a plan

24   before then, we would have, of course, a permanent waiver of

25   the 345(b) requirements.  Otherwise, we'll be back to discuss

1    it in 60 days.

2        THE COURT: Does anyone else care to be heard in

3    connection with this motion?  I hear no response.  I've

4    reviewed it, and have no questions.  I'm prepared to grant

5    the relief that's been requested.

6        MR. BARTNER: Thank you, Your Honor.  No. 9 on the

7    agenda, tab 9, is the employee benefits motion.  Your Honor,

8    here seeking to minimize personal hardships and to maintain

9    high employee moral, Debtors seek to pay all pre-petition

10   wages and salaries that have accrued through the petition

11   date, to reimburse all pre-petition expenses that employees

12   have incurred, make all payments for which pre-petition

13   payroll deductions or withholdings or matching employer

14   contributions were made, make all contributions to pre-

15   petition employee and retiree benefit programs, honor

16   worker's compensation program obligations, and again, to

17   authorize and direct banks to honor checks and electronic

18   payment transfers related to the foregoing.  Your Honor, as I

19   had mentioned, the Debtors currently employ about 15 hundred

20   employees, and about 330 independent contractors.  We have a

21   monthly payroll of approximately $6.1 million, and as of the

22   petition date, there was approximately a million and a half

23   dollars of wages and salaries that had not been paid.  To the

24   best of our knowledge, Your Honor, no employee is owed more

25   than $10,950 for unpaid wages, and the intention here would

1   not be to pay any employee over the cap.

2          THE COURT: Well, except that it's represented in

3   either that motion or the one that follows that to the extent

4   wages owed to an employee would exceed the cap, it's your

5   intention to seek authority to pay them under the general

6   order authorizing the payment of pre-petition claims.  Or did

7   I misread that?

8          MR. BARTNER: You may have misread it.  I'm happy to

9   state on the record that we do not believe that there are any

10  payments that are owed beyond the caps in 503(a)(4) or

11  (a)(5).  We've agreed with the US Trustee that before making

12  any payment, if in fact we're wrong, we will notify the US

13  Trustee and we will notify the Informal Committee's counsel.

14  We don't seek to, by the back door, and either, if Your Honor

15  misread it, we're happy to correct it, if we've mis-drafted

16  it, we're happy to correct it on the record.  We don't

17  intend, through the back door pre-petition claims motion to

18  pay any employee beyond the $10,950 cap.

19         THE COURT: Okay.  I remember seeing discussion of

20  it, and perhaps the representation was actually to the

21  contrary.  I just don't recall.  But in light of the

22  statement on the record today, it's unimportant.  The motion

23  goes into great detail in describing the various benefits

24  available to employees.  And it's extensive.  And I don't

25  know whether you intended to run through that at the moment.

1    I don't think it's necessary unless there's another party

2    here who wishes to inquire further.  But my, my sole question

3    with respect to the many different types of benefits and

4    plans that are described is do any of the payments for which

5    the Debtor is seeking authorization implicate any of the

6    503(c) subsections?

7            MR. BARTNER: No they do not, Your Honor.  There is,

8    and perhaps related to this, the US Trustee has raised a

9    question regarding seven engineers who are employed in our

10   hybrid program who have the benefit of a retention bonus to

11   be paid in the aggregate amount of $170 thousand.  These

12   engineers are not insiders.  So we do not believe that they

13   fall within the prohibited language of 503(c).  In any event,

14   we've agreed with the US Trustee, and I don't know that the

15   US Trustee takes an opposite position, but he wished for that

16   aspect of this motion, and Your Honor's order, to be reserved

17   for the second day hearing.  So we'll put it out on notice,

18   and it, it is carved out of the order that we'll hand up.

19   The only change to the order.

20           THE COURT: Okay.

21           MR. BARTNER: Your Honor, Mr. Morton points out as

22   well, that in paragraph 11 of the proposed order we do say

23   that nothing in the motion or this order shall be deemed to

24   violate or permit a violation of 11USC 503(c).

25           THE COURT: All right.

1        MR. BARTNER: Again, we don't think it does.

2        THE COURT: All right.  Anything further in support

3   of the motion?

4        MR. BARTNER: No, Your Honor.

5        THE COURT: All right.  If not, I'll then ask if

6   anyone else cares to be heard in connection with this motion.

7   I - -

8        MR. HARRINGTON:  Your Honor, for the record,

9   William Harrington from the Office of the United States

10  Trustee.  Very briefly, Your Honor.  I had numerous

11  discussions with the Debtors in the week prior to the filing

12  regarding this motion and was also provided substantial

13  information with respect to the individual bonus programs,

14  the local plan, and the additional benefits, I think it's

15  defined as in the motion, and was provided a complete list of

16  all the parties receiving payments in connection with that.

17  And in light of that, other than asking for the hybrid

18  program to be moved to the second day hearing, we have no

19  concerns with respect to the bonus payments that are going to

20  be made.

21       THE COURT: Thank you.

22       MR. HARRINGTON: Thank you, Your Honor.

23       THE COURT: Does anyone else care to be heard in

24  connection with this motion?  All right.  I hear no further

25  response.  You've answered my questions, and I'm prepared to

1   grant the relief that's been requested.

2         MR. BARTNER: Thank you, Your Honor.  Next on the

3   agenda, at tab 10, is our motion to pay pre-petition claims.

4   Your Honor, one of, if not the greatest advantages of a pre-

5   packaged plan of reorganization is the Debtors' ability to

6   continue to operate all other aspects of its business in the

7   ordinary course.  To have as seamless a transition into the

8   pre-packaged Chapter 11 as possible.  This, of course, will

9   assure a steady stream of product supply and services.  It

10  will maintain existing relationships, that in some cases have

11  taken years to build up.  And of course, it will allow the

12  Debtors to use the ability to pay pre-petition claims to

13  obtain post-petition trade credit.  Under the threat of, of

14  course, of a recovery under §549 of the, of the Bankruptcy

15  Code.  Your Honor, the relief that we ask for here is

16  consistent with relief in other pre-packs in this and other

17  districts.  And again, the general unsecured claims in this

18  case will be paid in full, in cash, on the effective date of

19  a plan, or when it becomes due.  So we're not effecting, in

20  any way, the distributions under the proposed plan of

21  reorganization.  The amounts, Your Honor, that the Debtor

22  needs to pay during the course of these cases is estimated to

23  be approximately $87 million.  That is both to trade and

24  other ordinary course providers of goods and services. $34

25  million of that amount is estimated to be the amount of goods

1   that would have been delivered within 20 days of the

2   bankruptcy, entitled, therefore, to administrative priority

3   claim.  Approximately 20 million would be to foreign

4   suppliers that aren't affiliated with the Debtors.  So over

5   60% already, Your Honor, is arguably relief that might be

6   granted in a traditional case.  In addition, Your Honor,

7   above and beyond that, there's anywhere from 10 to 15%, which

8   can easily be shown to be in the critical vendor status.  So

9   we, we eat up a large portion of the 87 with buckets that

10  Your Honor is generally familiar with.  In addition to the

11  87, there's approximately, as of the petition date, $33

12  million of inter-company debt that the Debtors would need to

13  pay during the course of this case.  As I had indicated to

14  Your Honor, the Debtors have realigned over the years its

15  manufacturing footprint such that it has little in the way of

16  domestic manufacturing, and depends largely on foreign

17  manufacturers who are both affiliated and who are not

18  affiliated with the Debtors.  The 33 million represents

19  payments to non-debtor affiliates who are located in Korea,

20  Germany, Hungary, Mexico, and so on.  The payment to them is

21  necessary because they in turn need the working capital to

22  pay their suppliers.  Your Honor, the way that Remy has

23  established its business model is that it minimizes

24  production costs in several ways.  One is through a lien

25  inventory management system.  So it keeps on hand in

1    inventory only what is necessary to have in order to meet its

2    production requirements.  Thus, even a small blip in the

3    delivery of supply could halt production and create the

4    inability of the company to deliver product to customers on

5    time.  In addition, it relies largely on single source

6    suppliers.  Single source supply minimizes validation costs.

7    It also reduces the amount of capital investment that needs

8    to be put into what's called tooling that is often supplied

9    in respect of complex or technical componentry to the

10   supplier.  So Remy bills the tooling, if you will, supplies

11   it to the single source supplier, the single source supplier

12   then manufactures the component part.  It would be

13   inefficient to have second sourced or multiple sources for

14   the same highly technical products.  So again, here, the

15   single source supplier in many cases is highly dependent on

16   the regular flow of cash and payment of the products Remy

17   buys.  And any interruption could threaten the ability of

18   Remy, post-petition, to receive products as these

19   arrangements are typically on a purchase order basis, and not

20   on a long-term supply contract basis.  And Your Honor,

21   finally, I had mentioned the foreign manufacturers as another

22   important key to why we'd need the relief that we're

23   requesting in respect of the payment of pre-petition claims.

24   Your Honor, I do believe, and I'll yield the podium to the US

25   Trustee who, who I believe had an issue with our estimates,

1   which are estimates and not caps, but unless Your Honor had

2   any further questions on our motion.

3            THE COURT: No I do not.

4            MR. BARTNER: Thank you.

5            MR. HARRINGTON: Good morning, Your Honor.  For the

6   record, again, William Harrington from the Office of the

7   United States Trustee.  Your Honor, I think our general

8   concern with this motion is, while we certainly have had no

9   indication that this is not a true pre-pack, we have heard

10  nothing to the effect that the pre-petition solicitation was

11  not conducted in accordance with non-bankruptcy law, and that

12  the voting was not correct, we are concerned that we are in a

13  bankruptcy case, Your Honor, and we're being, you're being

14  asked to enter an order that effectively treats this as if we

15  were not in a bankruptcy case.

16           THE COURT: But this type of request on a pre-pack

17  is not unique, is it?

18           MR. HARRINGTON: It's not unique, Your Honor.  But I

19  do think in case, in certain cases it has been limited in

20  duration.  Either to the time of confirmation of the plan,

21  and also in amount.  And this order asks for open-ended

22  relief, and there is no amount that is being specified and

23  tied to sort of the doctrine of necessity for critical

24  vendors.  And even, on an interim basis, the relief is

25  uncapped in any way, or unchecked in any way.  And so it's an

1    open-ended request to provide payments in the ordinary course

2    of business to pre-petition creditors.  And Your Honor, I

3    think because it's a pre-pack case, it can cut both ways.

4    Creditors would only be waiting for 45 days for final

5    payment.  The only trade terms I was able to discern from the

6    motion itself were trade terms with respect to foreign

7    entities, which was trade terms were 45 to 120 days.  So in

8    essence I don't know if those would be paid in the ordinary

9    course of business if this is, if this case is confirmed in

10   the first 45 days.  So I do think while this is a pre-pack,

11   and that it's not unusual to request this type of relief, I

12   do think the motion itself should be capped, either

13   durationally and for a dollar amount as well.

14        THE COURT: Well, durationally it would be capped by

15   operation of law if the date of confirmation occurs, and it's

16   anticipated and hoped, it seems, that it will be soon.  So I

17   mean, it would, by operation of law stop when the plan is

18   confirmed.

19        MR. HARRINGTON: Certainly, Your Honor.  And that,

20   and again, we have no indication this is not a true pre-pack

21   and that we won't get to confirmation in 45 days.  But should

22   there be some calamity, and this case blew up during that 45

23   day period, this is an open-ended order, and not, you know,

24   tied to confirmation of a plan, and then - -

25        THE COURT: Well, let me ask you this.  Would entry

1   of the order that will be submitted preclude re-visitation of

2   the issue if confirmation does not occur within the time

3   frame that, that is offered here?

4           MR. HARRINGTON: I don't think there's, I don't

5   think there's anything in the order, or the request, one way

6   or the other, Your Honor.  And that, that's a concern of

7   ours.  That there's not some provision that provides that,

8   you know, should confirmation not occur in a certain period

9   of time that this order no longer has any effect.  And it

10  would continue throughout the case.  And again, Your Honor,

11  with respect to the dollar amount, certainly in a traditional

12  case we would be limited by the doctrine of necessity, and we

13  see no, no distinction here, and we should also be guided by

14  that doctrine here.

15          THE COURT: All right.

16          MR. HARRINGTON: Thank you, Your Honor.

17          THE COURT: Does anyone else care to be heard in

18  connection with this motion?  All right.  Mr. Bartner, let's

19  explore some alternatives here.  Is there any problem with

20  providing in the order that should confirmation not occur by

21  the date which presumably we'll set today the issue can be

22  revisited?

23          MR. BARTNER: None whatsoever, Your Honor.

24          THE COURT: Okay.

25          MR. BARTNER: It's self evident, frankly, to me.

1          THE COURT: All right.  Now with respect to the

2    estimates that, that you've given, normally when I hear such

3    estimates, the Debtor is generous to itself in terms of

4    giving outside numbers.  Is there some reason why we couldn't

5    cap it at the numbers that, without prejudice, at the numbers

6    that you've suggested today?

7          MR. BARTNER: Well, one I don't think we've been

8    generous to ourselves.  Number two, maybe rather than cap it,

9    which gives, you know, management some heartburn here, as

10   Your Honor knows, and as I said in the beginning we've been

11   at this since March.  And they have done a remarkable job in

12   keeping many of the trade relationships maintained and in

13   getting trade credit.

14         THE COURT: It's obvious from the submissions that a

15   tremendous amount of effort has gone into this - -

16         MR. BARTNER: Yes.

17         THE COURT:  - - project.

18         MR. BARTNER: Perhaps, Your Honor, as an alterative,

19   we can pledge to the Court that should we, at any point in

20   time, wish to make any payments that would exceed the

21   estimates in any material way, or at least non-diminimous

22   way, we will be back here, and we will notify the US Trustee,

23   the Informal Committee, and be back before Your Honor.

24         THE COURT: All right.  Would you be willing to

25   build that into an order?

1          MR. BARTNER: Well again, you know, building - - if

2    Your Honor makes me, yes.  Would prefer, prefer not to and

3    rely on the record, so - -

4          THE COURT: Well, I was hoping that maybe a little

5    gentle push would do that.  And you can, you can, without

6    making the order meaningless, you can be as fuzzy as you've

7    just described to me.  That's not a criticism, but - -

8          MR. BARTNER: Very well, Your Honor.

9          THE COURT:  - - build it accordingly, if you would.

10         MR. BARTNER: Okay.  We will do that.

11         THE COURT: Okay.

12         MR. BARTNER: With that, Your Honor, the order is

13   acceptable?

14         THE COURT: Well, as, as it will be revised to

15   provide that to the extent confirmation is not achieved by

16   the date that we pick the issue can be revisited by any party

17   in interest, and that secondly that you exceed the estimates

18   that you've described today, you'll need to come back to the

19   Court for further consideration.

20         MR. BARTNER: Very well.

21         THE COURT: All right.

22         MR. BARTNER: Thank you, Your Honor.

23         THE COURT: Now, I tell you that any revisions need

24   to get to me by 4 o'clock today.

25         MR. BARTNER: That's not a problem.

1          THE COURT: I have a commitment this evening that I,

2     that I can't break.

3          MR. BARTNER: Very well.

4          THE COURT: And I'll be gone tomorrow, as probably

5     many of you will be.

6          MR. BARTNER: Yes.  Your Honor, next on the agenda

7     is our DIP financing motion, and for that I would like to

8     turn the podium over to Justin Hewitt, my colleague.

9          THE COURT: Very well.

10         MR. BARTNER: Thank you, Your Honor.

11         MR. HEWITT: Your Honor, Justin Hewitt of Shearman &

12    Sterling, co-counsel for the Debtors.  Your Honor, the

13    submissions I will present relate to the Debtors' motion for

14    interim relief, authorizing the Debtors to obtain post-

15    petition financing pursuant to §364 of the Bankruptcy Code,

16    granting liens and super priority claims to the DIP lenders,

17    authorizing the immediate payoff of the pre-petition credit

18    facility, authorizing adequate protection to the floating

19    rate note parties that Mr. Bartner referred to, authorizing

20    the use of cash collateral pursuant to §364 of the Bankruptcy

21    Code, and also scheduling a final hearing.  Your Honor, in

22    order to support the record necessary to make the relief set

23    forth in the order, the Debtors would rely on the affidavit

24    of Mr. John Weber and the facts set forth in the motion.  And

25    if necessary, I have available a formal proffer of Carey

1    Sheeba, the Chief Financial Officer of the Debtors.  Your

2    Honor, Mr. Sheeba is present in court and would, if required,

3    testify as to the factual matters set forth in the motion.

4          THE COURT: I would like a proffer.

5          MR. HEWITT: Your Honor, if required to testify, Mr.

6    Sheeba would testify as to the planning that was involved in

7    the pre-packaged Chapter 11.  The Debtors and the Board of

8    Directors determined that the company required debtor-in-

9    possession financing in connection with the proposed

10   restructuring.  Mr. Sheeba would also testify that the

11   Debtors' Board authorized Rothschild, Inc., it's financial

12   advisor, to seek post-petition financing from lending

13   institutions including Barclays Bank, PLC, as agent for a

14   syndicate of pre-petition - - including Barclays Bank as

15   agent for a syndicate of post-petition lenders.  Mr. Sheeba

16   would also testify that the Debtors determined that it would

17   obtain the best available terms if it sought proposals for a

18   combined debtor-in-possession and exit facility.  Rothschild,

19   at the Debtors' instruction, initially contacted seven

20   lending institutions and received back five proposals for

21   financing.  Based on these five proposals, three candidates

22   were selected to engage in formal discussions which led to

23   term sheets being provided for the post-petition financing.

24   The Debtors engaged in good faith, arm's length negotiations

25   with Barclays and the other candidates.  As Mr. Bartner

1    mentioned, and as Mr. Sheeba would testify, the process and

2    outcome was made more difficult and more complex by the

3    general deterioration in the credit markets during the summer

4    of this year.  Rothschild, with the involvement of the

5    Debtors' management, reviewed and assessed each of the three

6    proposed financings, and after review and some negotiation

7    and deliberation the Debtors determined, in their business

8    judgment, that the proposal provided by Barclays Bank was the

9    best available proposal in the circumstances.  That process,

10   Your Honor, culminated in a binding commitment letter dated

11   July 30, 2007, which was subsequently amended on August 28,

12   2007.  And pursuant to that commitment letter, Barclays

13   Capital agreed to lead an effort to form a syndicate to

14   provide the post-petition financing, together with exit

15   financing on the terms and conditions set forth in the

16   commitment letter which forms an exhibit to the Debtors'

17   disclosure statement.  Mr. Sheeba would also testify, Your

18   Honor, that the Debtors were unable to obtain DIP financing

19   in the form of unsecured credit repayable as an

20   administrative expense, and that no third party lender was

21   willing to extend post-petition financing without receiving

22   senior and priming liens and security interests in

23   substantially all of the Debtors' pre-petition assets.  In

24   addition, Your Honor, Mr. Sheeba would testify that the, each

25   of the proposed financing proposals received provided for the

1   repayment in full of the senior secured pre-petition lenders,

2   as does the proposal provided by Barclays Bank.  In addition,

3   Your Honor, Mr. Sheeba would testify that the funds obtained

4   pursuant to the DIP financing will be used to refinance the

5   existing senior secured credit facility, and for post-

6   petition operating expenses of the borrowers, including the

7   payment of transaction fees and expenses, and for other costs

8   and expenses of administration of the bankruptcy cases.  In

9   addition, Your Honor, Mr. Sheeba would testify that the

10  Debtors have determined that without immediate access to this

11  financing, the Debtors will be unable to pay their suppliers,

12  and to satisfy the demands of their customers, or to fulfill

13  their payroll requirements, and meet their liquidity needs on

14  an ongoing basis.  This would have consequence, as Mr. Sheeba

15  would testify, that the Debtors could not meet their ongoing

16  obligations, which would most likely lead to an erosion of

17  market share, a defection of employees, and the deterioration

18  of the Debtors' going concern value, which would in turn

19  jeopardize the Debtors' ability to effectuate the pre-

20  packaged Chapter 11 that Your Honor has heard details of

21  today.  Your Honor, Mr. Sheeba would also testify that

22  approval of the DIP financing would benefit the Debtors by

23  providing suppliers, customers, and employees with increased

24  confidence to continue their existing relationships with the

25  Debtors during the course of the Chapter 11 cases, and

1   prevent irreparable harm that would result from the

2   deterioration of these critical relationships.  Mr. Sheeba

3   would testify, Your Honor, that for these reasons, the

4   approval of the DIP financing is integral to the preservation

5   of the Debtors' business, for the benefit of the Debtors,

6   their creditors, and all parties in interest.  And for the

7   Debtors' ability to successfully emerge from Chapter 11 in

8   accordance with the plan set forth in the disclosure

9   statement.  Your Honor, Mr. Sheeba would also testify that

10  the Debtors and Rothschild have concluded in their business

11  judgment, and after a vigorous and arm's length negotiation,

12  that the terms of the DIP financing provided by Barclays Bank

13  and the lenders party to the credit agreements, are fair and

14  reasonable, and are the most favorable available under the

15  circumstances, and that that financing appropriately

16  addresses the Debtors' working capital needs during the

17  course of these Chapter 11 cases.

18          THE COURT: Would anyone care to examine the

19  Debtors' witness?  I hear no response.  Two questions.  One,

20  why is it necessary to pay the pre-petition debt now, rather

21  than at exit, which is proposed to follow so closely behind?

22  Is it because that the new financing provides additional

23  funds for necessary use prior to exit?

24          MR. HEWITT: The requirement to pay off the pre-

25  petition lenders was, as Mr. Sheeba proffered, a requirement

1    in each of the proposals received by the Debtors' four post-

2    petition financing.  It was a requirement provided by the

3    financing institutions who were offering debtor-in-possession

4    exit financing.  And one of the reasons for that, Your Honor,

5    was to obtain the release of liens that will be accompanied

6    by the repayment of the pre-petition, secured parties.

7            THE COURT: So in a sense it was a way of clearing

8    the decks.

9            MR. HEWITT: That is one of the reasons, Your Honor.

10   But there's also an additional business justification, which

11   is that the existing coupon or interest rate on the pre-

12   petition term loans is liable plus 8%, and the interest rate

13   on the post-petition term loans will be significantly lower

14   than that, so that there will be a cost saving to the Debtors

15   in the interest expense by paying off the pre-petition loans,

16   which are currently accruing default interest, and replacing

17   those outstanding loans with the post-petition loans.

18           THE COURT: Okay.  And can you recap, briefly for

19   me, the fees that are being charged and paid in connection

20   with this financing?

21           MR. HEWITT: Your Honor, the fee letter has been

22   filed under seal, and certain of those fees remain

23   confidential.  At least, the Debtor is under an obligation to

24   keep those letters confidential.  So I, my instructions are

25   not to recite those fees onto the record.

1          THE COURT: Has, does the proposed order - - well.

2    Is there a pending motion, including the DIP motion, that

3    requests that the information remain under seal, and does the

4    proposed order provide that the information remain under

5    seal?

6          MR. HEWITT:  Yes, Your Honor.

7          THE COURT: Okay.  Well, and what does, how long is

8    it anticipated such information would remain under seal?

9          MR. HEWITT: There's no termination date specified

10   in the papers filed, Your Honor.  So that obligation remains

11   on the Debtors without - -

12         THE COURT: All right.  Well I have - -

13         MR. HEWITT: - - a termination date.

14         THE COURT:  - - not reviewed that information.  I

15   will tell you I've read pretty thoroughly all of the

16   submissions, but that, that I did not review.  I will review

17   it between now and the second day hearings, and if I have

18   further questions, we'll explore them then.

19         MR. HEWITT: Thank you, Your Honor.

20         THE COURT: Okay.  Does anyone else wish to be heard

21   in connection with this motion?

22         MR. AUSTIN: I would like to, Your Honor.  For the

23   record, Your Honor, I'm Jess Austin with the firm of Paul,

24   Hastings, Janofsky, & Walker.  With me today is Kristine

25   Shryock from our firm, as well as Mark Collins from Richards,

1    Layton, & Finger, who is our local counsel.  And we are

2    representing Barclays as the agent and one of the lenders for

3    both the debtor-in-possession financing as well as the exit

4    financing.  To address a couple of the Court's questions,

5    first one of the reasons that there is the payoff of the pre-

6    petition, in addition to, as the Court described it, kind of

7    clearing the decks, is that indeed the DIP loan is providing

8    more liquidity to this Debtor.  At, for the interim basis.

9    The debtor-in-possession loan is made up of two components.

10   A revolver of $120 million and a first lien term loan of 105

11   million.  There will be a funding, upon the entry of the

12   order, of the full first lien term loan, of the 105, plus the

13   company will have access to up to $55 million of the revolver

14   until the final order.  The total amount that will be used to

15   pay off – - so there's additional liquidity there, as well as

16   the fact that the, in addition to the interest rate that

17   Debtors' counsel outlined on the existing pre-petition loan,

18   the pre-petition lenders are actually holding in, on deposit,

19   approximately $53 million.  So you actually have some

20   negative arbitrage going on, of which that $53 million will

21   be used to actually pay down the pre-petition facility so

22   you, the Court can see that there's actually not only the

23   benefit gained from the interest cut, and savings to the

24   company, but also the fact there is additional, significant

25   additional liquidity being granted to the Debtor.  With

1   respect to certain of the fees, the Debtors' counsel is

2   correct that the fee letter was provided, and is to be filed,

3   under seal.  The fees that were being charged on this credit

4   facility, as a general rule, have been shared with the United

5   States Trustee, as well as, I believe, with the Informal

6   Committee, so that at least the parties that are, have an

7   interest, if you will, have been generally appraised of where

8   the fees are.  That said, in the Debtors' motion itself,

9   there were certain of the fees identified.  There was a

10  revolving credit facility commitment fee, unused line fee, as

11  we would refer to it, of .375% payable.  There was a term

12  loan commitment fee of 1%.  And on the undrawn portion of

13  that revolver, plus some LC fees.  The additional fees are,

14  though, imbedded in the commitment letter itself - - excuse

15  me, the fee letter, and based on both the market and

16  proprietary reasons is why that has been requested to remain,

17  remain confidential.  With respect to this financing, though,

18  one of the things that I think that in this case is somewhat

19  unique is not only does this Debtor have the overwhelming

20  support on a pre-packaged basis from its existing creditor

21  constituents, this Debtor has not only the DIP financing, but

22  it also has the exit financing.  Not only lined up, not only

23  committed, but actually will be executed, not funding, but

24  pending the, obviously the conditions pressed, one of which

25  is actually have the confirmation order entered.  But this is

1   not a circumstance where we go from today to 45 days, and

2   there still is concern about who is going to step up and

3   actually provide the additional exit financing.  That is

4   being provided which at exit, the first lien term loan will

5   increase from the 105 to $160 million funded, as well as a

6   second lien term loan of approximately $50 million.  So we

7   have today the parties that will have signed that will

8   actually be committing to provide that additional roughly $55

9   million at the confirmation hearing.  And we'll have, as I

10  said, we'll have the stroke of the pen on the signature

11  lines.  Not having to chase them down in 45 days.  Thank you.

12          THE COURT: Thank you.  Does anyone else care to be

13  heard on connection with this motion?

14          MR. HARRINGTON: Good morning.  Again, for the

15  record, Your Honor, William Harrington from the Office of the

16  United States Trustee.  Your Honor, we had similar concerns,

17  I think, to the concerns you raised with respect to, to pay

18  off the entire pre-petition amount on the first day.  We were

19  somewhat comforted by, I think, the representations that

20  counsel for Barclays just made, that there is a significant,

21  and I think approximately $50 million in new money that will

22  be available for the Debtors.  We also had raised the fee

23  issue.  Again, we were provided a copy of the fee letter and

24  have reviewed that, Your Honor.  And generally, Your Honor,

25  we have worked out, in large part, all of our concerns with

1   respect to the proposed order itself, and they were built

2   into the order that was filed with the petition.  Your Honor,

3   we did have still one concern, and I don't know if you want

4   to hear concerns about the order itself at this point.  There

5   is one, one paragraph in the order that effectively there's

6   the clawback provision, and it's in paragraph 9(b) of the

7   order.  On my copy, it's page 22.

8          THE COURT: Yeah, I have the, a black line that was

9   submitted yesterday, which I have reviewed, but the pages are

10  not numbered.  But I am, I am at 9(b).

11         MR. HARRINGTON: I'm not sure if it's easier to work

12  up from the bottom of 9(b), but the provision we're concerned

13  about is the second to last sentence of 9(b), the

14  notwithstanding provision.

15         THE COURT: Hold on.  Let me get there.  Okay.

16         MR. HARRINGTON: In effect, we are concerned, Your

17  Honor, that above that there's the clawback provision should,

18  you know, any of the liens be deemed to be invalid, and there

19  was a need for disgorgement.  And this, I guess, is a

20  protective provision that was built in after the clawback

21  provision, with respect to the pre-petition lenders' liens.

22  And my understanding is it was built in should there ever be,

23  on an interim basis, a disgorgement without a final order of

24  the Court, they would have protection of their liens.  My

25  concern, Your Honor, is I don't think this paragraph quite

1    says that.

2            THE COURT: Okay.  Then what would you suggest?

3            MR. HARRINGTON: Well, I guess sort of my initial

4    reaction is that - -

5            THE COURT: You'd like it removed.

6            MR. HARRINGTON:  - - it would be removed.  I don't

7    think they would disgorge any monies unless there was a final

8    order of the Court, Your Honor, indicating that.  So I think

9    it's effectively unnecessary.  And even if - - so I would

10   prefer that it was not in the order itself.

11           THE COURT: All right.  Anything further?

12           MR. HARRINGTON: No, Your Honor.

13           THE COURT: Thank you.  Does anyone else care to be

14   heard in connection with this motion?

15           MR. HARRIS: Yes, Your Honor.  Good morning.  Adam

16   Harris from Schulte, Roth, & Zabel on behalf of Credit

17   Suisse, excuse me, the agent for the pre-petition term loan

18   lenders.  Your Honor, the provision that the US Trustee is

19   pointing out was actually requested by, by us to basically

20   cover the situation in which the pre-petition lenders are

21   required to disgorge funds.  In a circumstance where there's

22   not a determination they're under secured, but for instance,

23   were someone to appeal the Court's order today, and a

24   District Court would require, reverse on the ability to pay

25   off the pre-petition lenders, and direct us to return it

1   pending confirmation of the plan.

2           THE COURT: Well, first of all, is an interim

3   financing order appealable?

4           MR. HARRIS: That's an interesting question, Your

5   Honor.  I don't know the answer to that, to be honest with

6   you.  Right off the top, right off the top of my head.  I do

7   know, however, that the DIP lenders, to the extent they move

8   forward, would be entitled to the protections from having

9   funded under, you know, the appropriate provisions of the

10  Bankruptcy Code.  The pre-petition lenders don't have any

11  such protections, Your Honor, in terms of the payoff.  All

12  this does, as far as we're concerned, Your Honor, is subject

13  to further order of the Court preserve the relative positions

14  that all the parties anticipated being in.  The DIP lenders

15  will have their collateral, the floating rate notes, which

16  are in effect a second secured position, will be in the exact

17  same position, and all this says is that the monies that we

18  disgorge, subject to further order of the Court, will be

19  subject to our lien.  If it turns out the disgorgement order

20  is based upon a finding of under, under-collateralization, or

21  invalid liens, then obviously there will be an order of the

22  Court that says we're not entitled to that.  If it's for some

23  other reason, Your Honor, that, you know, we can't

24  necessarily foresee right now, then all we'll do is

25  effectively reinstate the pre-petition lenders to the

1   positions they, they had originally bargained for, and the

2   ultimate disposition of that money will, will again be

3   subject to further order of the Court.  So really, from the

4   term loan lenders, and the pre-petition lenders perspective,

5   this simply keeps in line what everybody's expectations were

6   with respect to their collateral positions, and leaves

7   everybody in a position where it's subject to further order.

8          THE COURT: It's a, it's a placeholder - -

9          MR. HARRIS: Exactly.

10          THE COURT:  - - type of provision.

11          MR. HARRIS: Exactly, Your Honor.

12          THE COURT: Okay.  Thank you.  Does anyone else care

13   to be heard in connection with this motion?  I hear no

14   response.  With respect to the US Trustee's concern as the,

15   as has been explained to the Court, I see it as not

16   definitively determining, determining anything, and that

17   nothing definitive could be determined finally until some

18   further order of the Court.  So with that understanding, I

19   will not require that the sentence be removed from the

20   proposed order.  Anyone else care to be heard in connection

21   with the motion?  I hear no response.  My questions have been

22   answered, and I'm prepared to approve the financing.

23          MR. HEWITT: Thank you, Your Honor.  Just a couple

24   of housekeeping matters.  I just wanted to draw Your Honor's

25   attention to some changes that were made to the order that

1   was initially filed.  They should be reflected in the black

2   line that Your Honor received last night.  But just to be

3   clear, the interim facility that the Debtors seek is in the

4   amount of $160 million.  In addition, there's a provision

5   made for a potential lien in relation to a note in favor of

6   the Customs and Border Protection.  But that, if there any,

7   to be any priming of any potential length, it will not take

8   effect until the final hearing has occurred.

9          THE COURT: All right.  Thank you.

10         MR. HEWITT: The only other matter, Your Honor, is

11  that I have a revised budget which was attached to the motion

12  I'd like to hand up.

13         THE COURT: All right.  If you would.  Thank you.

14         MR. HEWITT: For the record, Your Honor, that budget

15  indicates the interest payment to the floating rate note

16  holders is $2.925 million.  That was a point that we were

17  asked to make for the record.

18         THE COURT: Very well.

19         MR. HEWITT: Thank - -

20         THE COURT: Thank you.

21         MR. HEWITT: Thank you, Your Honor.

22         MR. TORKIN: Good morning, Your Honor.  Michael

23  Torkin from Shearman & Sterling, co-counsel for the Debtor,

24  Remy Worldwide Holdings, Inc. and its affiliates.  I'm going

25  to present the final two motions, the first one of which is

1    scheduling.  I understand that Ed Morton from Young Conaway

2    has had some discussions with your chambers about available

3    dates.  I don't know if you want me to go back through the

4    procedure that Mr. Bartner outlined earlier with respect to

5    the pre-petition solicitation, or if you would like to just

6    begin looking at the calendar and going through some

7    particular dates.

8              THE COURT: No, let's, let's go to dates.

9              MR. TORKIN: Okay.

10             THE COURT: As I understand it, the Debtor has

11   requested the second day hearings to be held on November 5th.

12             MR. TORKIN: That's correct.

13             THE COURT: After reviewing my calendar, November 7th

14   looks more convenient for me.  Does that cause any issues for

15   the Debtor, or others?

16             MR. TORKIN: It's fine for us.

17             THE COURT: Okay.  Let's say November 7th, at 10

18   o'clock.  With respect to confirmation, the Debtors have

19   requested November 15th.  I will be someplace where I'll be

20   using lots of sun block during that week.

21             MR. TORKIN: Good for you, Your Honor.

22             THE COURT: So I look to the following week and ask

23   whether the 21st is suitable for the parties.

24             MR. TORKIN: Your Honor would the 20th be doable?  As

25   opposed to the day before Thanksgiving.  A lot of people are

1   giving - -

2          THE COURT: How much time will you need?

3          MR. TORKIN: I'm hoping less than two hours.

4          THE COURT: Well, the first open slot I have on the

5   20th is 3:30.  But I would slot you there if you like.

6          MR. TORKIN: That would be great.

7          THE COURT: Let me just check one other place.

8   Okay.

9          MR. TORKIN: And then with respect to the objection

10  deadline, perhaps we could set the 9th, November 9th?  And then

11  have responses to any objections on the 15th?

12         THE COURT: That's okay with me.  Let me ask whether

13  anyone else has a comment about that proposal.  I hear no

14  response.

15         MR. TORKIN: Thank you, Your Honor.  Just as a

16  matter of housekeeping, the other things the scheduling

17  motion provides is that we would provide newspaper

18  publication of all of the relevant dates and the items that,

19  that folks who wish to be heard and object to the plan must

20  satisfy would be filed by October 17th.  Published in USA

21  Today.  All of our materials, including the docket, would be

22  available on KCC's website.  And attached to the motion are

23  the proposed forms of mailing notice and publication notice.

24  The final thing that, that the scheduling motion does provide

25  is a waiver.  It's actually a request under the new 341(e)

1    that the Court direct the US Trustee not go convene a, a

2    meeting of creditors and equity holders in connection with a

3    pre-packaged plan at least until the first DIP hearing, and

4    then if everything is on track, extending that such that no

5    meeting of creditors or equity holders would be held if the

6    plan is confirmed within 90 days.

7            THE COURT: I saw that.  When is it the Debtors'

8    intention to file schedules?

9            MR. TORKIN: The Debtors will be filing a motion

10   later today or tomorrow requesting a, a interim and permanent

11   waiver of the, of the requirement to file schedules in this

12   case, given the pre-packaged nature, and the fact that the

13   plan of reorganization and the accompanying documents contain

14   a majority of the information that would otherwise be

15   required to be provided in the schedules.  With that relief,

16   obviously, to be heard on the November 7th date.

17           THE COURT: Okay.  I say okay meaning I acknowledge

18   that the Debtor intends to make such a request.

19           MR. TORKIN: Absolutely.

20           THE COURT: All right.  Anything further in support

21   of the scheduling motion?

22           MR. TORKIN: Nothing.

23           THE COURT: All right.  Does anyone else care to be

24   heard in connection with the scheduling motion?  I hear no

25   response.

1          MR. TORKIN: Oh, an objection date for the DIP.

2     Well, that, I assume that's just - - how many days notice?

3     We would request seven business days prior to the, to the

4     November 7th deadline for objections to the debtor-in-

5     possession financing.

6          THE COURT: Anyone else have a comment on that?

7     That's fine with me.

8          MR. TORKIN: Thank you.  The last, the last motion

9     we have today, Your Honor, is a motion of the Debtors for

10    authorization to commence a rights offering approving the

11    forms with respect thereto, and confirming the applicability

12    of §1145 in connection with the rights offering.  As Mr.

13    Bartner alluded to earlier in his presentation, one of the

14    fundamental aspects of the plan of reorganization is the

15    consummation of an $85 million rights offering.  And as Mr.

16    Bartner also mentioned, the rights offering was backstopped

17    by certain holders of senior notes and subordinated notes,

18    and that backstop was dated August 24th.  A copy of the

19    backstop commitment is attached to the motion, as well as to

20    the disclosure statement.  And essentially the rights

21    offering is an $85 million offering bifurcated $25 million to

22    the senior note holders, and $60 million to the subordinated

23    note holders.  Each would receive, each of the rights is for

24    a right to, to purchase a fractional piece of a $1,000

25    preferred note, preferred stock, bifurcated A and B as well,

1   the purpose of which needs, has to do with the corporate

2   governance regime following the effective date, but otherwise

3   the rights and priorities of that preferred stock are

4   otherwise identical.  The fees associated with the backstop

5   aggregate approximately $1.7 million, and as the papers

6   indicate, we're not seeking authority to pay any fees at this

7   point.  That will all be subject to the effectiveness of the

8   plan, and confirmation of the plan at this point.  And those

9   fees are payable on the effective date, and subject depending

10  on whether or not we need to use the backstop offsetting the

11  proceeds from the backstop against the fees.  Specifically,

12  the plan of reorganization in §3.2(f) and (g) provides for a

13  pro rata distribution of the 25 and $60 million of preferred

14  stock, the rights to acquire the preferred stock to senior

15  and subordinated note holders.  The feature of the rights

16  offering, and as I have, as we have outlined in the motion,

17  is that the rights are non-transferrable, and non-detachable

18  from the claims.  Meaning once we commence the rights

19  offering, a note holder wouldn't be able to take a right and

20  sell its notes, which could have implicate, could have had

21  implications for 1145 principally in exchange for a claim and

22  partly for cash.  And by making the notes non-transferrable

23  and specifically non-detachable, we believe that the rights

24  would be a security that falls within 1145 as 1145

25  specifically contemplates the issuance of rights, including

1    payment upon exercise therefore.  The reason the Debtors are

2    requesting this relief is that the rights offering is going

3    to be commenced prior to the Court's approval of the adequacy

4    of the information contained in the disclosure statement.

5    And in most Chapter 11 cases, as Your Honor is well aware,

6    rights offerings are typically conducted either immediately

7    following approval of the disclosure statement, or following

8    confirmation of the plan.  And that process is consistent

9    with the policy objectives inherent in 1145 of the Bankruptcy

10   Code.  Namely that the SEC does not need to concern itself

11   with the offer and sale of a security on, on the premise that

12   the Bankruptcy Court, or some governing authority, will have

13   had an opportunity to review the adequacy of the information

14   in the disclosure statement, and ensure that the public is

15   protected.  Pre-petition, we relied on exemption from

16   registration under 3(a)(9) of the Securities Act, which was

17   sufficient for the solicitation of votes to accept or reject

18   the plan.  But would not have worked for the conduct of the

19   rights offering, otherwise we would have done that pre-

20   petition.  The issue there was 3(a)(9) works with respect to

21   exchanges of a security and the exercise of the rights

22   involves a payment of cash.  And we would not have found

23   ourselves within the 3(a)(9) exemption from registration.

24   And registering would have been far too time consuming and

25   costly for the Debtors to have incurred prior to commencing

1   the case.  In this case, we're asking for the Court to allow

2   us to conduct the rights offering prior to hearing, our

3   hearing on the adequacy of information contained in the

4   disclosure statement, but, but we believe that it's

5   consistent with the object, nevertheless consistent with the

6   objectives of 1145 and the Securities Act, because the rights

7   offering will not be consummated until Your Honor has

8   approved the adequacy of the information contained in the

9   disclosure statement.  If Your Honor, at that hearing,

10  determined, for whatever reason, the information was not

11  adequate, we would be required to re-conduct the, the rights

12  offering, and we may even have to reconsider whether or not a

13  re-solicitation of votes to accept or reject the plan would

14  be warranted.  The importance here is granting the relief

15  that we're requesting here will ensure that the rights

16  offering is concluded prior to the outside date on the exit

17  financing, and the outside date in the plan support

18  agreement, which is December 14th.  It will position the

19  Debtor to know that the rights offering is done, to inform

20  the backstop holders what their relative commitments are

21  going to be required to hit before the confirmation hearing,

22  and allow for a very orderly process during these Chapter 11

23  cases.  If Your Honor would like, I could go through the

24  intricacies of how we came up with the fractions and the

25  procedures, but if you don't have any other questions, we

1   would request that you enter the relief.

2           THE COURT: Yeah.  That's not necessary.  Does

3   anyone else care to be heard in connection with this motion?

4   I hear no response.  In light of the tightened time frame,

5   and the way the process has been set up not to give final

6   approval until what will be the combined disclosure and

7   confirmation hearings, I think the relief that's been

8   requested is appropriate, and I'm prepared to approve it.

9           MR. TORKIN: Thank you, Your Honor.  Just to go over

10  some specific dates.  We will have a record date that is 18

11  business days before the confirmation hearing.  Rights

12  offering to commence shortly after that and last for 15

13  business days.

14          THE COURT: Thank you.

15          MR. TORKIN: Thank you, Your Honor.  With that I

16  think we're done.  We can hand up the proposed orders.

17          THE COURT: All right.

18          MR. BARTNER: Your Honor, I will hand up the

19  proposed orders.  Ms. Morgan has filled in all the dates

20  regarding the second day hearings where they are necessary.

21  Your Honor, we did, during the time since I was last up here,

22  drafted some language as Your Honor has suggested.  We

23  reviewed it with the US Trustee and counsel for the Informal

24  Committee.  If it would be easiest, given Your Honor's

25  schedule today, perhaps I could read that into the record.

1    If it's acceptable, we can hand up the order with that

2    interlineated.

3            THE COURT: That's fine.

4            MR. BARTNER: Okay.  To recall, this is the order

5    authorizing the Debtors to pay general pre-petition claims as

6    they become due.  In the second paragraph, Your Honor, we

7    would add a sentence that would read, "To the extent that any

8    payment to be made by the Debtors, and authorized by this

9    order, would exceed in any material amount the estimates set

10   forth in the motion, the Debtors shall provide this Court,

11   the United States Trustee, and counsel to the Informal

12   Committee with notice prior to the making of such payment."

13   Then in a new last paragraph, Your Honor, numbered paragraph

14   14, we would say, "To the extent that the Debtors plan of

15   reorganization, filed on October 9, 2007, is not confirmed by

16   this Court on the date established by this Court for

17   confirmation, or such date as may be extended, or the hearing

18   is adjourned from time to time, the Debtors will schedule a

19   hearing, on notice, to all parties in interest to consider

20   any further disposition of this order."

21           THE COURT: Anyone have any comments on the proposed

22   additions to the order?  I hear no response.

23           MR. BARTNER: Thank you, Your Honor.  May I

24   approach?

25           THE COURT: You may.

1        MR. BARTNER: Thank you.

2        THE COURT: Thank you.  All right.  All of the

3    orders submitted have been signed.

4        UNIDENTIFIED SPEAKER: Thank you.

5        MR. BARTNER: Thank you.

6        THE COURT:  Let me ask this, no motion for an

7    administrative order was made today.  Tell me what the Debtor

8    and other parties anticipate with respect to submission to

9    the Court for approval of fees which may accrue during the

10   pendency of the Chapter 11.

11       MR. MORTON: Your Honor, I think given that the

12   standard administrative order would allow the first fee

13   application to be filed after confirmation is anticipated, I

14   think it's contemplated that everyone is just going to file a

15   final fee application in accordance with the deadlines in the

16   plan.

17       THE COURT: All right.  I expected as much, but just

18   wanted to be certain.

19       MR. MORTON: And Your Honor, I have been asked to

20   make what is truly the most standard request that anyone

21   makes in a first day hearing.  Obviously the DIP lenders have

22   a lot of money to move in a short period of time, so anything

23   that Your Honor can do to facilitate the appearance of that

24   order on the docket as soon as possible, would be greatly

25   appreciated.

1          THE COURT: Well, given the time of day, I'm sure

2    that will be no problem.

3          MR. MORTON: Thank you, Your Honor.

4          THE COURT: All right.  Anything further for today?

5          MR. MORTON: None, Your Honor.

6          THE COURT: Thank you all.  That concludes this

7    hearing.  Court will stand in recess.

8          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

9        (Whereupon at 11:32 a.m. the hearing in this matter was

10   concluded for this date.)

11

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber for

19   the United States Courts, certify that the foregoing is a

20   correct transcript from the electronic sound recording of the

21   proceedings in the above entitled matter.

22

23   _____          _____
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905